UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

v.                                    Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

Defendant.


UNITED STATES' BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT


MICHAEL J. SULLIVAN
United States Attorney

STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6546


Barbara Healy Smith
Assistant United States Attorney

TABLE OF CONTENTS

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

ISSUES PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-v

STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARGUMENT  . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONCLUSION . . . . . . . . . . . . . . . .  . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Associated Electric Cooperative, Inc. v. United States*, 226 F.3d 1322        12

*Bharmota v. Comm.,* T.C. Memo 1979-28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bingler v. Johnson*, 394 U.S. 741 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Commissioner v. Engle*, 464 U.S. 206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gonzalez v. McNary*, , 980 F.2d 1418 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Groves v. United States*, 533 F.2d 1376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hanson v. Comm.*, T.C. Memo 1979-108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Johnson City Medical Center v. U.S.*, 999 F.2d 973 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Knapp v. Commissioner*, 867 F.2d 749 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lane Processing Trust v. United States*, 25 F.3d 662        . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Malat v. Riddell*, 383 U.S. 569 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mayberry v. United States*, 151 F.3d 855 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Minnesota v. Apfel*, 151 F.3d 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Minnesota v. Chater*, No. 4-96-756, 1997 WL 33352908 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Parr v. United States*, 469 F.2d 1156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Proskey v. Comm.*, 51 T.C. 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Social Sec. Board v. Nierotko*, 327 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,12

*St. Luke's Hospital Assoc. v. U.S.*, 333 F.2d 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,15

*Storall Manufacturing Co. v. United States*, 755 F.2d 664 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

*Trotter v. Tennessee*, 290 U.S. 354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tupper v. United States*, 134 F.3d 444 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. v. Donruss Co., 393 U.S. 297* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Mayo Foundation*, 282 F. Supp. 2d 997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Menasche*, 348 U.S. 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Mount Sinai*, 353 F. Supp.2d 1217 . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Silk*, 331 U.S. 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Wells Fargo Bank*, 485 U.S. 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,19

*Zonkerman v. Commissioner*, 36 T.C.M. 6 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FEDERAL STATUTES**

IRC § 117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

IRC §501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IRC §1402(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IRC §1426(b)(11)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IRC § 3101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IRC § 3111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IRC §3121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**TREASURY REGULATIONS**

Treas. Reg. §1.117-4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Treas. Reg. § 1.170A-9(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Treas. Reg. §31.3121(b)(10)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Treas. Reg. §§31.3121(b)(10)-2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iv

## ISSUES PRESENTED

1.      The Internal Revenue Code (IRC) imposes a social security and Medicare tax on all wages. The Code defines wages as remuneration for employment.  Congress provided, in IRC §3121(a)(20), an exception to the definition of wages for any benefit provided to an employee if at the time such benefit is provided, it is reasonable to believe that the employee will be able to exclude that benefit from income under IRC §117.  IRC §117(a) provides that gross income does not include any amounts received as a qualified scholarship by someone who is a candidate for a degree at an educational institution described in IRC §170(b)(1)(A)(ii).  IRC §117(b)(1) defines a qualified scholarship as any amount received as a scholarship or fellowship that, under the terms of the grant, must be used to pay for qualified tuition and related expenses.  IRC §117(c) provides that the amount received shall not be excluded from gross income under IRC §117(a) if such amount represents payment for services that are required as a condition to receiving such amount.  Each resident in issue was required to sign a contract that required him or her to perform patient care services at the teaching hospital to which he or she was assigned as a condition to both admittance into the residency program and to receiving the  payments in question.  All residents received a Form W-2 for the payment they received for these services showing them to be wages .  Are the amounts received by the residents excepted from the definition of wages under IRC §3121(a)(20) because it was reasonable to believe those payments are excludable from gross income under IRC §117?

2.      The IRC imposes a social security and Medicare tax on all wages.  The Code defines wages as remuneration for employment and, in turn, it defines employment as any service performed by an employee for the person employing him.  In 1939, Congress amended the Social Security Act by providing an exception, in what is now Code §3121(b)(10), to the definition of employment "for

v

service performed in the employ of a school, college or university, or a related organization, if such service is performed by a student who is enrolled and regularly attending classes at such school, college or university."  In that same 1939 amendment, Congress separately excepted medical interns from the definition of employment.  In the legislative history of the intern exception, Congress stated that interns, as distinguished from resident doctors, were to be excepted from the definition of employment, as were self-employed physicians.  In the 1965 social security amendments, Congress expanded the social security coverage[1] of young doctors by repealing the exception for interns and self-employed physicians.   Does the legislative and statutory history of the Social Security Act and its amendments, together with the language of the statute, establish that medical residents and interns are covered by Social Security?

---

[1]Hereinafter, unless otherwise noted, any reference to coverage will be to coverage under the Social Security system.

STATEMENT

The United States' statement of facts is attached to its motion for summary judgment

pursuant to Local Rule 56.1.  It will not be repeated.

ARGUMENT

I

THE PAYMENTS TO THE RESIDENTS ARE NOT
EXCLUDABLE FROM GROSS INCOME UNDER IRC §117(a)

Defendant contends that its residents do not receive "wages" for the purposes of determining

whether the social security tax is applicable, because the salary stipends are "scholarships." It bases

this claim on IRC §117. It is true that *some* scholarship payments are exempt from the social security

tax.  IRC §§3121(a)(20) and 117, taken together, create a limited, carefully defined exemption from

the tax.  Although wages are broadly defined in the introductory clause of IRC § 3121(a) to mean

"all remuneration for employment," IRC § 3121(a)(20) nevertheless provides that the term "wages"

does not include:

> any benefit provided to or on behalf of an employee if at the time such benefit is
> provided it is reasonable to believe that the employee will be able to exclude such
> benefit from income under section 74(c), 117, or 132.

Defendant contends that IRC §117 is the applicable section. Section 117(a) provides that:

> [g]ross income does not include any amount received as a qualified scholarship by an
> individual who is a candidate for a degree at an educational organization described in
> section 170(b)(1)(A)(ii) of the Internal Revenue Code.

Defendant contends sections 117(a) and 3121(a)(20) exempt the residents' salary stipends from the

general definition of "wages."[2]

---

[2]Since this is an erroneous refund suit, the United States bears the burden to show (1) it issued a refund, (2) the amount of the refund, (3) the suit was timely filed, and (4) the refund was erroneous.  United States v. Mount Sinai, 353 F. Supp. 2d 1217, 1222 (SD Fla. 2005). Like the Mt. Sinai case, the first three elements are undisputed.  As to the fourth, we will show, as we did in Mt. Sinai, that the refunds were erroneous by showing that the only two contentions the defendant makes to support its claim, that the wages were qualified scholarships under IRC §117 and the student exception under IRC §3121(b)(10) applies, are without merit.

2

To come within the §117 exemption, a payment must (1) be a "qualified scholarship," (2) be made to a candidate for a degree,[3] and (3) be made to an individual attending an "educational organization" described in IRC § 170(b)(1)(A)(ii). IRC §117(a). IRC §117(c) provides that if, as a condition to receiving the payment, the individual is required to perform services, IRC §117(a) does not apply (i.e., such payment is not a qualified scholarship). This section codifies former Treas. Reg. §1.117-4(c) as interpreted by the Supreme Court in Bingler v. Johnson, 394 U.S. 741 (1969).

Section 117(b)(1), in defining a qualified scholarship, requires that the amount be "received . . . as a scholarship or fellowship grant" and that the funds must be "used for qualified tuition and related expenses" under the conditions of the grant. These "qualified" expenses must be either "tuition and fees required for the enrollment or attendance of a student at an educational organization described in section 170(b)(1)(A)(ii)" or "fees, books, supplies, and equipment required for courses of instruction at such an educational organization." IRC § 117(b)(2).

Section 117 was substantially amended in 1986. Before then, many residents had asserted that residents' salaries were not in fact compensation for services, contending instead that the salaries were scholarships. Prior to 1986, in cases that were largely fact-driven, the courts overwhelmingly determined that medical residents did not receive scholarships. See Parr v. United States, 469 F.2d 1156 (5th Cir. 1972), and cases discussed therein. With the 1986 amendments, the statute was changed to reduce these factual disputes and limit excludable scholarship grants to amounts that are "required to be used, and in fact [are] used, for tuition and ... course-related expenses" but does not include amounts that may be used for other expenses, such as "amounts for room, board, or incidental expenses." H.R. Conf. Rep. 99-841 at II-15 (Pl. ex. 9F, p. 93).

---

[3]This part of the §117 test will not be discussed further in this motion because of the possible factual nature of the test.

3

Congress specifically addressed the tax treatment of medical residents' salary stipends in enacting the 1986 amendments. The Joint Committee on Taxation report referred to the considerable number of cases filed by medical residents who sought to exclude their income under the former version of §117 (Staff of the Joint Comm. on Taxation, 100th Cong., *General Explanation of the Tax Reform Act of 1986* at 41 (Comm. Print 1987) (Pl. ex. 9F, p. 100):

> Under prior law, controversies arose between taxpayers and the Internal Revenue Service over whether a particular stipend made in an educational setting constituted a scholarship or compensation for services. In particular, numerous cases have involved resident physicians . . . who have sought – often notwithstanding substantial case authority to the contrary – to exclude from income payments received for caring for hospitalized patients. . . .[20] The limitation on the section 117 exclusion made by the Act . . . should lessen these problems of complexity, uncertainty of tax treatment, and controversy.

> _____
> [20] As the U.S. Tax Court stated in one case: "Interns and residents have been flooding the courts for years seeking to have their remuneration declared a 'fellowship grant' and hence partially excludable from income. They have advanced such illuminating arguments as they could have earned more elsewhere and they were enjoying a learning experience so therefore what they did receive must have been a grant. They have been almost universally unsuccessful and deservedly so. Why the amounts received by a young doctor just out of school should be treated differently from the amounts received by a young lawyer, engineer, or business school graduate has never been made clear." (*Zonkerman v. Commissioner*, 36 T.C.M. 6, 9 (1977), aff'd (4th Cir. 1978))

In the present case, it is plain that §117 does not apply to the residents' salary payments for several reasons. First, the appointment contract each resident is required to sign requires each resident, as a condition to receiving the salary payment, to perform certain tasks. Not surprisingly, the first responsibility mentioned in the contract (Pl. ex. 7, p.1) is that the resident must provide "patient care" services. The defendant also admits that the performance of patient care services by a resident is a condition to receiving the stipend. Pl. ex. 6, res. to req. 11. Finally, attached to the contract is a sample appointment letter which requires the resident, as a condition of his appointment, to perform patient care services. Thus, for this reason alone, the payments to the

4

residents are not, as a matter of law, qualified scholarships because each resident was contractually

required, as a condition to receiving such payments, to provide patient care services.  IRC §117(c).

Furthermore, the defendant admits (Pl. ex. 6, res. to req. 5) that the residents are not charged

tuition or fees of any sort,  and thus there can be no question that the salaries paid to the medical

residents are not used for "tuition and fees" or for "fees, books, supplies, and equipment required for

courses of instruction."  IRC §117(b).  Since there was no condition attached to the salary stipend

that it be used to pay tuition or "course-related expenses" (Pl. ex. 6, res. to req. 6), the payments to

the residents cannot rise to the status of a "qualified scholarship."

Section 117(a) excludes from income only those scholarships that are received by candidates

for a degree at an "educational organization described in section 170(b)(1)(A)(ii)."[4]  In

§170(b)(1)(A) Congress describes eight categories of organizations.  One of those organizations is an

"educational organization" – defined in §170(b)(1)(A)(ii) as one that "normally maintains a regular

faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance

at the place where its educational activities are regularly carried on."  Another category of

§170(b)(1)(A) organizations is one that provides "medical or hospital care or medical education or

medical research."  IRC §170(b)(1)(A)(iii).  Therefore, §170 recognizes a clear distinction between

educational organizations, on the one hand, and hospitals providing patient care and medical

education, on the other.[5]

---

[4]Under the admitted facts of this case, the only organizations that could possibly qualify under §170(b)(1)(A)(ii) are MGH and BWH.  The defendant, by its own admission, had as its primary purpose to "support affiliated exempt organizations" (Pl. ex. 3, p.2) and "to coordinate and to provide strategic planning opportunities for MGH and" BWH (Pl. ex. 2, attach. p.4).  It did not maintain a regular faculty and curriculum nor did it have a regularly enrolled body of pupils or students in attendance.  Thus defendant does not qualify as an educational organization.

[5]This distinction is also recognized by the defendant in its submission to the IRS in its Form 1023.  Pl. ex. 2.  There the defendant stated (pp. 2-3 of attachment) that both sponsoring organizations of the residency programs, MGH and BWH, were hospitals "described by IRC section . . . 170(b)(1)(A)(iii)", not educational organizations described in

5

The two organizations that sponsor the residency programs, MGH and BWH, are teaching hospitals and not educational organization for the purposes of § 170(b)(1)(A), and therefore they fail the "educational organization" test of § 117(a).  An educational organization described in § 170(b)(1)(A)(ii) "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities."  Treas. Reg. § 1.170A-9(b)(1)  (Pl. ex. 9B, p. 24).  For example, a "university which incidentally operates a museum . . . is an educational organization," but "the operation of a school by a museum does not necessarily qualify the museum as an educational organization."  *Id.*  In the present case, defendant concedes, as it must, that the patient care provided by its residents at MGH and BWH is not merely "incidental" to the education of its residents.  See Pl. ex. 6, res. to req. no. 13.  Indeed, BWH, one of the two founding members of the defendant and one of the two organizations who sponsor the residency programs in issue, in its first statement of values (Pl. ex. 10) makes it clear:  "**Quality patient Care**: Delivering quality patient care is the center of everything we do."  The same can be said for the other founding member, MGH. In addition, the myriad of cases that have examined the question of whether teaching hospitals, such as MGH and BWH, qualify as an educational organization or educational institution, have almost, without exception, found that teaching hospitals are not described in §170(b)(1)(A)(ii).  See, e.g., <u>Proskey v. Comm.</u>, 51 T.C. 918 (1969), <u>Bharmota v. Comm.</u>, T.C. Memo 1979-28 and <u>Hanson v. Comm.</u>, T.C. Memo 1979-108.[6]  Congress also noted, in the legislative history of the 1986 amendments, that it did not intend "educational organizations"

---

IRC §170(b)(1)(A)(ii).

[6]While the 1986 amendments did make some changes to IRC §117, other parts of the statute remained relatively unchanged.  For example, the "educational organization" described in the 1986 IRC §117(a) is effectively the same as the "educational institution" described in the prior statute.  Thus, these cases decided under the old statute regarding what constitutes an "educational institution" are equally applicable to the new statute.

6

to include on-the-job training facilities, which would include teaching hospitals with respect to their residency programs.  Pl. ex. 9F, p.93. See, e.g., Proskey at p. 925 (the resident training was merely incidental to the *raison d'etre* of the hospital, patient care.)

A further impediment to the residents' payments qualifying as a scholarship under §117 is that, under §3121(a)(20), the employer must reasonably believe, at the time of payment, that such payment is excludable from the resident's gross income under §117.  It is impossible for the residents' employer to reasonably believe these payments were excludable because (1) each resident got a Form W-2, Wage and Tax Statement, from their employer showing that the payments were compensation (Pl. ex. 6, res. to req. no. 20) and (2) the cases on this point, from the 1960s forward, have almost universally decided that such payments were not excludable from gross income and thus this exception was not applicable.  In fact, from 1939 to around 2000 there is no report of a resident or intern claiming an exemption from the FICA tax because the salary payments were excludable from gross income.

The plaintiff's claim that the wage payments to its residents are scholarship payments under §117 is without merit and must be denied.

II

THE RESIDENTS DO NOT QUALIFY FOR THE STUDENT EXCEPTION
TO COVERAGE UNDER THE SOCIAL SECURITY SYSTEM

This section of our argument discusses the question whether the wages paid for the services of the medical residents working at the hospitals can be exempt from social security taxes under the student exception (and therefore whether the residents can be denied coverage under the social security system).  In general, "wages" received by individuals "with respect to employment" are taxed at 6.2 percent for social security, IRC § 3101(a), and 1.45 percent for Medicare, IRC

7

§ 3101(b). Employers pay an identical excise tax on those same wages. IRC § 3111(a) and (b). At issue here is one component of the taxing statute: whether the residents' wages are received "with respect to employment" within the meaning of IRC §3121(b). They are received with respect to employment unless the residents qualify for the student exception under IRC §3121(b)(10). It is the United States' contention that, as a matter of law, based on the legislative and statutory history of the social security acts and amendments, that the residents can not qualify for the student exception and thus the residents earned wages with respect to *employment* within the meaning of IRC §3121(b). Therefore, their wages are subject to social security and Medicare taxes.[7]

The term "employment" is defined as "any service, of whatever nature, performed by an employee for the person employing him." IRC §3121(b)(A). The defendant contends that any money paid to the medical residents is not "with respect to employment" because of the "student exception" from social security, which is found in IRC § 3121(b)(10). Section 3121(b)(10) excludes from "employment" services rendered for a "school, college, or university" by "a student who is

---

[7]The Supreme Court has long held that where the language of the statute(s) in issue does not provide an answer to the question before the court, a detailed examination of its (their) legislative history is appropriate in determining the meaning Congress intended to give to the statute(s). U.S. v. Donruss Co., 393 U.S. 297, 303 (1969). So here, for example, the language of the statute in question (IRC §3121(b)(10)) does not provide the answer to the question: can medical residents and interns be students within the meaning of the 1939 amendment to the Social Security Act? While not specifically answering the question, Congress, in the 1939 amendments themselves, strongly indicated that it did not consider interns to be students when it specifically exempted interns from coverage separately from students. There would have been no need to write the intern exception into the 1939 amendment if an intern was meant to be included within the meaning of the student exception enacted at the same time as the intern exception. Thus, the broader context of the statute in question includes the 1939 Social Security amendments which include both the intern and student exception, especially since residents are discussed in the legislative history of the intern exception in the context of a decision not to exempt residents from social security coverage. In addition, it will be remembered that medical residents and interns, by definition, have already finished medical school. The most natural reading of the word "student" is that it would not apply to people with an MD degree who have entered a post-medical school residency program, but the statute does not absolutely preclude that possibility, therefore, resort to the legislative history of the social security statutes is appropriate. In fact, the court in Mount Sinai, in concluding that medical residents were not, as a matter of law, covered by the student exception found in IRC §3121(b)(10), relied heavily on such legislative history, which specifically stated that an intern "as distinguished from a resident doctor" was excluded from social security coverage,. In St. Luke's Hospital Assoc. v. U.S., 333 F.2d 157, 163 (6th Cir. 1964), the court also relied on the legislative history of the 1939 amendments in concluding that residents were not included within the then-applicable intern exception.

8

enrolled and regularly attending classes at such school, college, or university." The defendant

contends that it, MGH and/or BWH, is a school and that its medical residents are students enrolled in

that school, and thus they fall within the student exception. The defendant's position is without

merit. The student exception does not include medical residents. Instead, as a matter of law, like 98

percent of the American workforce, medical residents are covered under the social security system,

and they, and their employers, are subject to social security taxes.

The social security system was created during the Depression and initially covered a

relatively small percentage of the American workforce. Since that time, social security coverage has

continued to grow to the point where, now, it covers all but two percent of U. S. workers. The Social

Security Act was signed into law in 1935, and it "has grown to become an essential facet of modern

life." Pamphlet, *Social Security: A Brief History* (2005), available at

<http://www.ssa.gov/history/pdf/2005pamphlet.pdf> at p. 18. The 1935 Act was intended to prevent

old age dependency and to provide "decent support" for retired workers. *Social Sec. Bd. v. Nierotko*,

327 U.S. 358, 364 (1946). In particular, old age benefits were created "for retired workers who had

been employed in industry and commerce." *See* Pamphlet, *Historical Development*, Social Security

Programs in the United States, Social Security Administration, *available at*

<www.ssa.gov/history/pdf/histdev.pdf> at p. 3.

As originally enacted, social security taxes were imposed on "wages," which the 1935 Act

defined as "all remuneration for employment." 49 Stat. 639, § 811(a) (Pl. ex. 9A, p.9). The term

"employment" was defined as "any service, of whatever nature, performed within the United States

by an employee for his employer," but the statute contained eight broad exceptions, including

agricultural labor, domestic service, casual labor, and service for certain nonprofit and governmental

organizations. 49 Stat. 639, § 811(b) (Pl. Ex. 9A, p.9). Therefore, as originally enacted, there was

9

no exception for students, nor was there one for medical residents or interns.

After the 1935 Act was signed into law, and even before the first social security benefits were paid out, significant changes were adopted. Social Security Act Amendments of 1939, ch. 666, 53 Stat. 1360. The 1939 amendments created the student exception and a separate exception for medical interns. 53 Stat. 1385 (Pl. Ex. 9A, p.12). Self-employed physicians were also excepted.[8] The meaning of the term "employment" was still defined broadly to mean "any service, of whatever nature, performed after December 31, 1939, by an employee for the person employing him." *Id.* (Pl. Ex. 6A, p.7). The following three categories of employees, however, were excepted from social security coverage:

> (10)(A) Service performed in any calendar quarter in the employ of any organization exempt from income tax . . . if . . . (iii) such service is performed by a student who is enrolled and regularly attending classes at a school, college, or university. [53 Stat. 1385, § 1426(b)(10)(A) of the Internal Revenue Code of 1939 ] (Pl. Ex. 9A, pp. 11-12).

> (10)(E) Service performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax under section 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university, and the remuneration for such service does not exceed $45 (exclusive of room, board, and tuition) [*Id.* at § 1426(b)(10)(E)] (Pl. Ex. 9A, p.12).

> (13) . . . [S]ervice performed as an interne in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law. [*Id.* at § 1426(b)(13)] (Pl. Ex. 9A, p.12).

Thus, after 1939, each of these groups of employees was exempt from social security taxes under separate clauses of the tax code: students working for tax-exempt organizations; students working for non-tax-exempt schools and regularly attending classes there, as long as their wages did not

---

[8] Self-employed workers, in general, were not covered under social security until 1950 because of difficult problems of administration. (*See* Pl. Ex. 9A, p.22 and Pl. Ex. 9E, p.75). Self-employed doctors began being covered in 1965.

10

exceed $45 per quarter; and medical interns working for a hospital after having completed medical school.

Congress, in enacting the 1939 social security amendments, indicated that interns were not included in the definition of "student" by creating a specific exception for interns, at the same time it created the student exception. In the legislative history of the 1939 amendments, the House Report specifically stated, in reference to the intern exception, that only an interne, "as distinguished from a resident doctor", was excluded from coverage, thus further showing that Congress did not intend to include either residents or interns within the student exception. See H.R. Rep. No. 76-728 at 550-551 (Pl. Ex. 9D, pp.70,71). Since, in the 1939 amendments, Congress specifically excluded both interns and students from coverage in separate subparagraphs, it would be senseless to argue that interns were intended to be included within the definition of "student" as that term is used in what is now IRC §3121(b)(10). Congress did not intend to include interns within the meaning of "student." Interns are graduates of a medical school who are in their first year of residency.[9] In addition, as pointed out above, Congress intended, as reflected in the legislative history of the 1939 amendments, that residents should be covered when it carved residents out of the intern exception. The legislative history of the 1939 amendments, where the student exception was first introduced, also reflected Congress' intent to limit exceptions, such as the student exception, to those persons who earned nominal wages for part-time or intermittent work. See H.R. Rep. No. 728, 1939-2 C.B. at 543 (Pl. Ex. 9D, p.63), discussed infra. Residents, then and now, simply do not fit that description.

---

[9]From 1939 until sometime before 1964, most medical school graduates were not considered doctors since they only received their MD degree at the conclusion of their internship. St. Luke's at pp. 160-161. This fact buttresses our contention that Congress always intended to provide social security coverage for all doctors who were not self-employed or residents employed by a federal hospital from 1950 to 1965. Furthermore, in 1965, when it became obvious that most interns were doctors, i.e., had received their MD degree upon completion of four years of medical school, Congress removed the intern exception. It also removed the self-employed doctor and federal resident exception at this time.

11

The exclusions from social security coverage that were adopted in the 1939 amendments were very narrowly drafted and essentially applied only to people whose wages were expected to be de minimis. This de minimis approach is nowhere more evident than in the student exception amendment.  Any interpretation that included persons working full-time for large salaries, such as medical interns and residents, as coming within the student exception would make such exception much broader than Congress intended.  Congress explained the underlying rationale behind the additional exclusions as follows:

> In order to eliminate the nuisance of inconsequential tax payments the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax and certain other groups.  While the earnings  of a substantial number of persons are excluded by this recommendation, the total amount of earnings involved is undoubtedly very small. . .  . The intent of the amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of the tax is inconsequential and a nuisance.  The benefit rights that are built up are also inconsequential.  Many of those affected, such as students and the secretaries of lodges, will have other employment which will enable them to build up insurance benefits.  This amendment, therefore, should simplify the administration for the worker, the employer, and the government. [Emphasis supplied]

H.R. Rep. No. 728, 1939-2 C.B. at 543 (Pl. Ex. 9D, p.63); S. Rep. No. 76-734, 1939-2 C.B. at 570.

Prior to 1950, all students employed by a non-exempt school, college or university who earned $45 or less per quarter were exempt from coverage.  In 1950, the $45 quarterly minimum was eliminated, and the separate student exclusion provisions for employees of exempt and non-exempt entities were combined.  Social Security Amendments of 1950, Pub. L. No. 81-734, § 104(a), 64 Stat. 477, 497, 531 (1950).[10]  Section 1426(b)(11)(B) of the Code then in effect provided that the term "employment" does not include:

---

[10]In the 1950 amendments, Congress did maintain the exclusion for employees of tax-exempt organizations that received $50 or less in remuneration for services rendered in a calendar quarter. 1950 IRC §1426(b)(11)(A)(Pl. Ex. 9A, p.18).

12

Service performed in the employ of a school, college, or university if such service is
performed by a student who is enrolled and is regularly attending classes at such school,
college, or university.

(Pl. Ex. 9A, p.18). Identical language appears in today's IRC § 3121(b)(10). (*Compare* Pl. Ex. 9A,

p.7 and Pl. Ex. 9A, p. 18). The 1950 legislative history also continued to describe the student

exception as applicable only where nominal wages are paid. Pl. ex. 9E. p. 77.

Significant changes were made to the social security system in 1965, notably the creation of

Medicare and Medicaid. For our purposes, the 1965 amendments are particularly relevant for their

expansion of social security to include coverage of self-employed physicians. Although interns and

self-employed physicians had initially been excluded from social security coverage in the 1930s, the

1965 amendments expanded social security coverage to include interns (*i.e.*, doctors who had

graduated from medical school and were in their first year of medical residency), self-employed

physicians and residents-in-training at federal hospitals who had been specifically excluded from

social security coverage under the 1950 amendment.

There have been further expansions of coverage since 1965. Now all federal and state

employees not covered by certain state and federal retirement systems are covered by social security,

as are employees of nonprofit organizations. *Historical Development* at 4. Now, about 98 percent of

all workers hold jobs covered by social security. *Brief History* at p. 18.

Turning now to the rules of statutory construction, it is seen that the exceptions to social

security coverage, and social security taxes, are intended to be very limited. The Supreme Court has

directed that the terms "employment" and "wages," as defined in IRC § 3121, be broadly construed.

As the Supreme Court observed, "[t]he very words, 'any service . . . performed . . . for his employer,'

with the purpose of the Social Security Act in mind, import a breadth of coverage." Social Security

Bd. v. Nierotko, 327 U.S. at 365; *accord* Mayberry v. United States, 151 F.3d 855, 860 (8th Cir.

13

1998); *see also* Associated Electric Cooperative, Inc. v. United States, 226 F.3d 1322, 1327 (8th Cir.

2000); Lane Processing Trust v. United States, 25 F.3d 662, 665 (8th Cir. 1994).   Courts are to err

on the side of including employees in the system unless an exemption is beyond question.  As the

Supreme Court said in United States v. Silk, 331 U.S. 704 (1947):

> The very specificity of the exemptions . . . and the generality of the employment definitions
> indicates that the terms 'employment' and 'employee' are to be construed to accomplish the
> purposes of the [Social Security Act].  As the federal social security legislation is an attack on
> recognized evils in our national economy, a constricted interpretation of the phrasing by the
> courts would not comport with its purpose.  Such an interpretation would only make for a
> continuance, to a considerable degree, of the difficulties for which the remedy was devised
> and would invite adroit schemes by some employers and employees to avoid the immediate
> burdens at the expense of the benefits sought by the legislation.

331 U.S. at 711-712.   See also St. Luke's at p. 164 (coverage rather than exclusion is preferred).

It is well settled that taxpayers bear the burden of establishing a tax exemption.  Storall

Manufacturing Co. v. United States, 755 F.2d 664, 665 (8th Cir. 1985).  The burden to establish an

exemption is a heavy one, since tax exemptions must be unambiguously proved and cannot be

implied.  United States  v. Wells Fargo Bank, 485 U.S. 351, 354 (1988);  Groves v. United States,

533 F.2d 1376 (5th Cir. 1976); Knapp v. Commissioner, 867 F.2d 749 (2d Cir. 1989).  As the First

Circuit noted, "if 'doubts are nicely balanced' regarding the applicability of a tax exemption, the

exemption must be accorded its more limited interpretation."  Tupper v. United States, 134 F.3d

444, 446 (1st Cir. 1998) (citing Trotter v. Tennessee, 290 U.S. 354, 356 (1933)).

The defendant contends that the residents qualify for the "student exception" from FICA

coverage. But, narrowly construing the statutory exemption and broadly construing coverage under

the statute, as must be done, leads to only one conclusion: as a matter of law the student exception

does not include medical residents and interns. See Mount Sinai at p. 1224.

After 1939, nominal salaries or stipends received by students were exempt from FICA

14

taxation under §1426(b)(10)(A, E) of the 1939 IRC.  (Pl. Ex. 9A, p. 12, and Pl. ex. 9D, p.63).

Nominal salaries or stipends of medical interns were separately exempted under §1426(b)(13) (which

in 1954 became IRC § 3121(b)(13))  (Pl. Ex. 9A, p.12).  Self-employed physicians were also

generally exempt.  *See, e.g.*, §1402(c)(5) (Pl. Ex. 9A, p.6, 23).  Consequently, under the student and

intern exceptions, from 1939 until the Social Security Amendments of 1965, medical students

employed by their university and medical interns were excepted from social security, but medical

residents were not. Self-employed physicians in private practice were also excepted during this

time.[11] Thus, from the perspective of medical residents, they had been exempt from FICA taxation as

undergraduate students, exempt under the student exception as medical students, and, upon

graduation from medical school, exempt as interns, and they could expect to be exempt again when

they completed their residencies and began to practice medicine full time if they did so as self-

employed physicians.  During their residencies, however, they were covered by the social security

system and thus taxed.  For a typical physician's career path, this situation can be shown graphically

as follows where the shaded block represents the only step on that particular physician's career path

where he or she was subject to the social security tax:

| Medical school student ⇒ | Internship ⇒ | Residency ⇒ | Private Practice |
|---|---|---|---|

Some residents viewed this as an unjustified anomaly.  As the court in <u>Mount Sinai</u> noted (p.

1225), they "contended that it was unfair to pay social security taxes during the relatively brief time

that they would be covered under the Social Security Act and argued that they were covered by the

then-existing exception for medical interns.  They argued that, in substance, there was no difference

between a medical resident and a medical intern, and that therefore they qualified for the

---

[11]In 1950, Congress exempted from coverage a limited number of residents-in-training working at federal hospitals. See 1950 IRC §1426(b)(7)(C)(ix)(Pl. Ex. 9A, p.17 and Pl. Ex. 9E, p. 79).

15

§3121(b)(13) intern exception."

The residents' argument that they were exempt from the social security tax was rejected by

the Sixth Circuit Court of Appeals in <u>St. Luke's Hospital Assoc. v. United States</u>, 333 F.2d 157 (6th

Cir. 1964).[12]  In <u>St. Luke's</u> the trial court held that medical residents fell within the intern exception,

but the Sixth Circuit reversed.  "The Sixth Circuit held that a distinction did exist between residents

and interns in 1939, 333 F.2d at 160-162, and that, in creating the intern exception, Congress had

explicitly distinguished the intern from the medical resident and singled out only the intern for an

exemption from the social security tax." <u>Mount Sinai</u> at p. 1225.  In making this ruling, the Sixth

Circuit, after noting the expertise of the committees that draft federal legislation, quoted and relied

upon the legislative history of the 1939 amendments:

> Paragraph (13) excepts services performed as a student nurse in the employ of a hospital or a
> nurses' training school by an individual who is enrolled and is regularly attending classes in
> such a school chartered or approved pursuant to State law; and service performed as an intern
> *(as distinguished from a resident doctor)* in the employ of a hospital by an individual who
> has completed a 4 years' course in medical school chartered or approved pursuant to State
> law.

333 F.2d at 163, quoting H.R. Rep. No. 76-728 at 550-551 (emphasis added).   "The court [in <u>St.</u>

<u>Luke's</u>] recognized that the distinction between interns and residents might have blurred somewhat

since 1939, and it also recognized the anomaly that the medical residents had complained of in

subjecting them to social security taxes only during the few years that they were residents.  The

court, however, declined to allow medical residents to be excluded from social security. . . ." <u>Mount</u>

<u>Sinai</u> at p. 1225.  Rather the court in <u>St. Luke's</u>  held that only Congress could expand the exception

---

[12]The taxpayer only argued that residents were, in essence, interns and thus subject to the intern exception.   The
taxpayer in <u>St. Luke's</u> did not contend that residents were students and thus eligible for the student exception now
found in IRC §3121(b)(10), even though it presented evidence of the educational components of the internship and
residency programs.  See <u>Mount Sinai</u> at p. 1227.

16

to include medical residents.  333 F.2d at 164.

One year after <u>St. Luke's</u>, Congress did respond to the anomaly.  It did so, however, not by legislating an exception from coverage for medical residents, but by eliminating altogether the exemptions for medical interns and self-employed physicians. Thus, after 1965, social security coverage of physicians during their typical career path was this:

| Medical school student ⇒ | Internship ⇒ | Residency ⇒ | Private Practice |
| --- | --- | --- | --- |

Again, the shaded blocks represent the steps on the career path where the physician is subject to social security taxes.  Thus, after the 1965 amendments, there were no more anomalies in the coverage of physicians:  the typical physician was covered under social security during an internship, residency, and private practice. This coverage is consistent with both our contention that Congress has always intended to provide social security coverage for all doctors (except self-employed doctors until 1965 and residents at federal hospitals from 1950-1965), whether or not in training, and <u>St. Luke's</u> finding that by 1964 interns were doctors in that they had received an MD degree.

In the 1965 amendments, Congress discussed its intent to expand social security coverage to include medical interns, referring to medical interns as young doctors, not students:

> Coverage would also be extended to services performed by medical and dental interns.  The coverage of services as an intern would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at a time when they need the family survivor and disability protection it provides.  This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families.

H.R. Rep. No. 89-213, 89th Cong. 1st Sess. 95, 1965-2 C.B. 733, 735 (Pl. Ex. 9E, p.86).  Likewise, the Senate explained:

> Coverage would also be extended to services performed by medical and dental interns.  They would be covered on the same basis as other employees working for the same employers. . . .

17

S. Rep. No. 89-404, *reprinted in* 1965-2 C.B. 758, 759 (Pl. Ex. 9F, pp.89-90).

At the same time, Congress repealed the exception for self-employed doctors previously found in IRC §1402(c)(5).  Social Security Amendments of 1965, § 311(b)(1), 79 Stat. 381.  The House Report explained the repeal:

> Self-employed doctors of medicine are the only group of significant size whose self-employment income is excluded from coverage under social security.  Large numbers of doctors have requested coverage.  Your committee knows of no valid reason why this single professional group should continue to be excluded.  *It runs counter to the general view that coverage should be as universal as possible.*

H.R. Rep. No. 89-213, 1965-2 C.B. at 734-735 (Pl. Ex. 9E, pp. 85-86) (emphasis added)).

Lastly, Congress, in the 1965 amendments, repealed the exclusion for interns and residents-in-training working at federal hospitals that was first enacted in the 1950 amendment to the Social Security Act.  The House Report explained that "the effect of this amendment is to make the remuneration of such individuals for services performed by them as such interns or residents-in-training in the employ of hospitals of the Federal Government subject to . . .  FICA."  H.R. Rep. No. 89-213, 1965-2 C.B. at 747 (Pl. Ex. 9E, p.88).

In 1965, Congress, in an apparent response to the invitation in the <u>St. Luke's</u> decision to consider whether interns and residents should both be excluded from social security coverage, brought medical interns and self-employed medical practitioners, as well as interns and residents-in-training at federal hospitals, within the ambit of social security coverage.  In light of the then-recent decision of the Sixth Circuit in <u>St. Luke's</u>, it is impossible to conclude that, in expanding social security to include interns and private physicians within the scope of coverage, Congress *sub silentio* intended to exclude medical residents from social security coverage. Congress gave no indication

18

that it intended to do so.[13]

Indeed, interpreting the student exception to include medical residents conflicts with the intent of Congress to have "young doctors" covered by social security.[14] The legislative actions discussed above, taken together, reflect a broad plan by Congress to cover medical doctors under the social security system, regardless of whether they are still in training or not. Since after 1965 PGY-1 residents/interns are no longer exempt from coverage, it would be senseless to exclude all other residents from the benefits of a program intended to be "as universal as possible."

The defendant's reading of the statute violates every rule of statutory construction. In general, "the words of statutes – including revenue acts – should be interpreted where possible in their ordinary, everyday senses." Malat v. Riddell, 383 U.S. 569, 571 (1966). But "[t]he true meaning of

---

[13]In the legislative history of the 1965 repeal of the intern exception, Congress stated (Pl. ex. 9E, p.88) that interns were to be covered under FICA unless exempted under some provision other than IRC §3121(b)(13). In the next two sentences of that history, Congress elucidated on what it meant by its reference to "other provisions" when it wrote "Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the code. If the intern is employed by a hospital which is exempt from income tax and which has a waiver certificate in effect under section 3121(k) of the code, he is not excluded from coverage by section 3121(b)(8)(B) of the code. . ." Thus, this legislative history reveals that what Congress had in mind was that an intern may still be exempt after repeal of the intern exemption if, for instance, he is working for an organization listed in IRC §3121(b) and otherwise qualifies. Therefore, such services could be excluded under what was then IRC §3121(b)(8)(B) (repealed in 1983), which provided for an exclusion for work done at an exempt organization, even if he was an intern. Another possible exemption in 1965 is found in what was IRC §3121(b)(7), which exempted employees in state and local governments. There is nothing in the legislative history to suggest that the intern exception was intended to be mutually exclusive of those types of employer exemptions. That does not mean, however, that an exception, such as the student exception, which the legislative history does establish was mutually exclusive of the intern exception, suddenly became available to interns. This reading of the legislative history is consistent not only with the Supreme Court's requirement that the Social Security Act exemptions be read narrowly, but with every rule of statutory construction and admonition of Congress that coverage under the system is to be as universal as possible.

[14]It is undisputed here that medical residents at the hospitals were treated similarly to other employees in that they were provided numerous fringe benefits such as participation in the retirement system. As such, "Congress plainly intended that social security cover 'young doctors', like 'other employees working for the same' hospital." Mount Sinai at p. 1227. As the Court in Mount Sinai further noted (p. 1227, fn. 5)), "it appears somewhat disingenuous for Mount Sinai to argue that it allowed its residents to participate in Mount Sinai's own retirement system, but that the residents were students who were not covered by the Social Security system." So here, it is similarly disingenuous for the defendant to make the same argument.

19

a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part." Commissioner v. Engle, 464 U.S. 206, 223 (1984).  Moreover, legislation must not be read so as to render any part of it superfluous.  United States v. Menasche, 348 U.S. 528, 538-39 (1955); Gonzalez v. McNary, 980 F.2d 1418, 1420 (11th Cir. 1993).  The defendant has a  myopic view of the language of the student exception that violates the requirement in Engle that the statute can not be considered apart from related sections.  That view considers the student exception without consideration of other "related sections", such as the intern exception.  If that view were correct, that is, the student exception applies to medical residents and interns, there would have been no need for Congress to have also enacted a separate intern exception in 1939.

In the present case, the relevant statute excludes from the term "employment," services rendered for a "school, college, or university" by "a student who is enrolled and regularly attending classes at such school, college, or university."  IRC § 3121(b)(10).  With the 1939 amendments, Congress simultaneously enacted the intern and the student exception.  If Congress had considered interns as falling within the student exception, there would have been no need for a separate intern exception.   Thus today's student exception – which still exists in much the same form as originally enacted in 1939 – cannot encompass medical interns.  That would have the effect of rendering the original intern exception language superfluous.  *See United States v. Menasche*, *supra*.  In 1939 Congress expressed its intent that the intern exception *not* include "resident doctor[s]," lending further support to the notion that the student exception included neither medical interns nor medical residents.  *See* H.R. Rep. No. 76-728 at 550 (1939) (Pl. Ex. 9D, p.70) (excluding "service performed as an interne (as distinguished from a resident doctor)").

20

As previously discussed, statutes granting exemptions must be narrowly construed, and exemptions cannot be implied.  United States v. Wells Fargo Bank, 485 U.S. 351 (1988). Interpreting the student exception to include medical residents would violate two rules of statutory construction:  the rule that no statute should be read in such a way as to make any of its provisions superfluous and the rule that exemptions must be narrowly construed.

The present controversy finds its roots in the 1998 decision of the Eighth Circuit in Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998).  Prior to the Eighth Circuit's decision in that case (and after St. Luke's and the 1965 legislation described above), we are unaware of any refund claim by any taxpayer claiming that medical residents are excepted from social security coverage based on the student exception.  Indeed, the defendant (and, we believe, all similarly situated institutions) consistently treated the wages of medical residents as subject to the social security tax.  Pl. Ex. 6, res. to req. 19. Since the Eighth Circuit's decision, a large number of claims have been filed with the Internal Revenue Service.  More than 7,000 claims have been filed with the IRS seeking refunds of over $1.135 billion based on an argument that medical residents are excepted from social security coverage.  Mount Sinai at p. 1229. Without consideration of the merits of the claims, some refunds have been mistakenly made by the IRS,  such as the erroneous refunds here, where the taxpayer contended that the salary stipend is either eligible for the student exception and/or is a qualified scholarship. The IRS is attempting to recover all such refunds when they are discovered.

Given the reaction to the Apfel decision, a close review of that case is warranted.  The holding in Apfel that is relied upon is actually dictum. Mount Sinai at p. 1229.  Moreover, the court did not address the argument we raise in this motion for summary judgment– that the history of the Social Security Act, and, in particular, the Congressional action in 1965 requiring self-employed physicians, medical interns and residents and interns employed at Federal Hospitals, to join residents

21

as subject to social security coverage, provides a clear indication that medical residents had always been included in social security coverage and that their wages are, and always have been, subject to the social security tax since its inception.[15]

    The facts of Apfel, which was a contract interpretation case involving the deciphering of the intent of the parties to the contract, are unusual.  Historically, employees of the states were exempt from social security.  Apfel at pp. 743-44.  In 1950 Congress added 42 U.S.C. § 418, which allowed states to negotiate with the Social Security Administration to be included in the program.  The State of Minnesota did, in fact, execute a so-called §418 agreement in 1955, but argued that the state did not intend to cover  medical residents employed by the state.  Apfel at p. 744.  The state did not make social security contributions for medical residents employed at the University of Minnesota.  That situation continued until 1990, when the Social Security Administration determined that medical residents should be included.  The state contested that determination, and its primary argument was that its medical residents were not part of the 1955 §418 agreement and that they never were intended to be covered under that agreement.  The court of appeals rejected the government's argument that subsequent legislation made the parties' intent in 1955 irrelevant, and held that, as a matter of contract law, medical residents were not included in the 1955 §418 agreement.  Id. at 746-47.  The state had also argued that, if medical residents could be considered to be covered by the §418 agreement, then a student exception, which was added to the §418 agreement in 1958, took the medical residents out of coverage.  Again, the court of appeals agreed.  Id. at 747-48.  But the court, which was not construing the Internal Revenue Code social security provisions, but rather interpreting a contract between the State of Minnesota and the Social Security Administration, never

---

[15]The Apfel court also never addressed our contention that only those who earn nominal wages and who work part-time can qualify for the student exception.

22

considered the telling history of the social security tax provisions, did not construe the student

exception from the §418 agreement within the context of the taxing provisions, did not broadly

construe the statute to favor coverage, and did not refer to the decision in St. Luke's.  Indeed, given

that the Eight Circuit in Apfel held that the 1955 §418 agreement did not include medical residents,

its discussion of the 1958 student exception amendment to the contract was unnecessary to the

resolution of the case and is plainly dicta.  In accord, Mount Sinai at p. 1229.

Subsequently a district court within the Eighth Circuit rejected the government's statutory

construction argument in the context of the Internal Revenue Code.  United States v. Mayo

Foundation, 282 F. Supp.2d 997 (D. Minn. 2003).  The Mayo court relied heavily on the unreported

district court's Apfel decision, captioned Minnesota v. Chater, No. 4-96-756, 1997 WL 33352908

(D. Minn. May 21, 1997), which had rejected the argument on the following rationale (282 F.

Supp.2d at 1006 (citing Chater, 1997 WL 33352908 at *10)):

> [s]ince, in 1939, the term resident encompassed both residents-in-training (like the
> residents of today) and regular staff physicians, it is understandable that Congress
> would not want to exclude all "residents" as the term was then defined.  Instead, in
> light of the educational purpose of resident training programs, it was proper for
> Congress to allow the coverage status to depend on whether they qualified for the
> student exclusion.

With due respect to the Minnesota district courts, this thin analysis cannot withstand scrutiny and the

district court in Mount Sinai properly rejected the court's analysis in Mayo.

First, unlike the Mount Sinai court, the only court that has analyzed the legislative history of

the social security statutes in detail, the Mayo court utterly failed to examine any part of the

legislative history of the statutes to determine whether the student exception applies to medical

interns and residents.  Rather, it concluded, without any analysis, that medical residents and interns

were not specifically excluded from the student exception, but that a determination of the application

23

of that exception must be made on a case-by-case basis. As shown above, such legislative history

unmistakably shows that such exception does not apply to residents and interns.[16]   In addition, the

Mayo court's suggestion that Congress believed that "residents-in-training" could qualify for the

student exclusion is wholly unsupported. Nowhere in the legislative history can such a suggestion

---

[16]The conclusion in Mt. Sinai (pp. 1224,1227) that the student exception only applies to those students receiving
nominal salaries who work few hours is buttressed by the decision in  Johnson City Medical Center v. U.S., 999 F.
2d 973, 975 (6th Cir. 1993). There the court, both the majority as well as the dissent, relied on the legislative history
of the student nurse exception in concluding that the student nurse exception only applied to student nurses whose
total wages were nominal and whose work was substantially less than full-time.  The student nurse exception was
part of the 1939 amendments enacted at the same time as the student exception. The student nurse exception is
substantially similar to the student exception that is in issue here and their legislative histories are identical. In fact,
in the 1950 legislative history (Pl. ex. 9E, p. 77), Congress stated that only services performed for nominal amounts
by "student nurses and interns, and . . . students in the employ of colleges and universities" would be excluded.  It is
this language, and the similar language in the 1939 legislative history (Pl. ex. 9D, p. 63), that the Johnson City court
found persuasive in concluding (p. 975) that the student nurse exception, and, by logical extension, the student
exception, only applied to those who received nominal amounts for their services and worked part-time. The
defendant's contention that the Johnson City case is inapplicable because the nurse exception is not in IRC
§3121(b)(10) but rather §3121(b)(13) once again reflects the defendant's failure to consider all relevant statutes and
their legislative histories as required by the Supreme Court cases cited above in the text. Whatever may be said of the
medical residents and interns, one thing is certain: their earnings are not nominal and their work is not part-time.
Thus, it can be said that, as a matter of law, Congress intended to exclude residents and interns from qualifying for
the student exception.

The defendant contends that under Treas. Reg. §§31.3121(b)(10)-2(b)(Pl. ex. 9B, pp. 30-32), the amount of the
wages paid a resident is irrelevant in considering whether he or she qualifies for the student exception. That
regulation,  which immediately follows Treas. Reg. §31.3121(b)(10)-1 that deals with the $50 per calendar quarter
limitation, provides that, in determining the applicability of the student exception, the amount of wages paid during
the calendar quarter is immaterial. That regulation was promulgated in 1960.  It interprets 1954 IRC
§3121(b)(10)(B), the student exception, which was first enacted in 1939 and then amended in 1950 as 1939 IRC
§1426(b)(11)(B). Pl. Ex. 9A, p.18. As noted above in the text, Congress also enacted IRC §1426(b)(11)(A) in 1950
which became §3121(b)(10)(A) in the 1954 IRC. That section excluded from the definition of employment, services
performed by employees of organizations exempt from income tax under IRC §501(a) who received $50 or less for
services rendered in any calendar quarter. Reg. §31.3121(b)(10)-2(b)'s reference to the immateriality of the amount
of wages paid during a calendar quarter is simply to call attention to the fact that subparagraph (A), which is one of
two subparagraphs of IRC §3121(b)(10), has a $50 per calendar quarter limitation and the student exception found in
(B) has no such per calendar quarter limitation. Under this regulation, all other conditions set by Congress for
qualifying for the student exception, including the ones that the remuneration be nominal and the work be part-time
or intermittent, must still be met. Once those conditions, including that the wages be nominal, have been met, the
regulation provides that it is immaterial that the nominal amount paid is over $50 per calendar quarter. Thus,
consistent with the 1939 and 1950 legislative histories of the student exception discussed above, the Mt. Sinai court
was correct in concluding that the student exception only applies to students who receive nominal amounts. See also
Johnson City, supra. Any interpretation given to the regulation that the amount of wages paid does not have to be
nominal in determining whether the student exception applies is simply contrary to what Congress intended and what
every case that has considered the issue has said. No reading should be given to a regulation that makes it invalid if a
valid and reasonable reading is available, as here.

24

find support.  It will be remembered that in the legislative history to the 1939 amendments, Congress specifically stated that it intended to exempt medical interns, but not resident doctors, from social security coverage.  In these 1939 amendments, Congress enacted both the student and medical intern exception.  Congress also stated in the 1939 and 1950 legislative histories (Pl. ex. 9D, p. 63 and Pl. ex. 9E, p.77) that many of those affected by the exceptions, such as students, would be excluded only if they earned nominal amounts per quarter and worked part-time. Thus, when the legislative histories of the 1939 and 1950 amendments are considered with the actual statutory exceptions, Congress' intent is clear: It treated medical residents and interns as a distinct group outside the scope of the definition of the term "student."  Indeed, the possibility that Congress contemplated that medical residents might qualify for the student exception is contrary to the 1965 amendments adding interns (as well as self-employed physicians and residents-in-training at federal hospitals) to social security coverage.[17]  In fact, the House Report to the 1965 amendments noted that "[c]overage would also be extended to services performed by medical and dental interns," because coverage was "important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families."  H.R. Rep. No. 89-213, 1965-2 C.B. at 735 (Pl. Ex. 9E, p.86).  The district court's apparent belief in Mayo that Congress was not, in fact, expanding social security coverage finds no support whatsoever in the history and is at odds with the overwhelming

_____

[17]  There has never been any dispute that educational activities take place within medical residency programs.  But the idea, in 1965, that medical residents might qualify as students was a concept directly contrary to the then-recent decision in St. Luke's that had held that medical residents *were* subject to the social security tax.  Congress would surely have mentioned St. Luke's, and would likely have stated that it was being overruled, if it had intended to include residents and interns within the student exception.  Congress has never exempted from the social security system all employment in which educational activities take place.  Thus, recent graduates from university architectural and accounting programs, apprentice electricians, plumbers, bricklayers, and other workers who must gain work experience before being recognized in their field are covered in the social security system.

25

trend of the last 70 years to expand social security coverage.

Thus, from both a statutory history and a legislative history perspective, from the original enactment of the Social Security Act in 1935, to the amendments in 1939 excluding students and interns, but not residents, from the Act's coverage, to the 1950 amendments excluding medical residents-in-training employed at federal hospitals from coverage under the Act, to the 1965 amendments providing coverage for all medical interns (the 1939 intern exception was repealed), federally employed residents and self-employed physicians, one thing is undeniable: Congress has never once excluded residents (with the limited exception for federally-employed residents for 15 years) from coverage under the Act. Thus, as the <u>Mount Sinai</u> court concluded, the student exception does not apply, as a matter of law, to medical interns and residents.

<div align="center">CONCLUSION</div>

The United States' motion for summary judgment should be granted because the medical residents are not exempt from FICA taxation under either the §3121(a)(20) exception for qualified scholarships nor the student exception found in IRC §3121(b)(10).

MICHAEL J. SULLIVAN
United States Attorney

BARBARA HEALY SMITH
Assistant United States Attorney

        /s/ stephen t. lyons
STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6546
e-mail: stephen.t.lyons@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' BRIEF IN

SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT has this 19th day of January, 2006,

been electronically filed with the Clerk of the District Court using its CM/ECF system.


     /s/ stephen t. lyons
STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-6546

EXHIBIT LIST

EXHIBIT 1-   EXCERPTS FROM PARTNERS' WEB SITE REGARDING ITS HISTORY

EXHIBIT 2-   PARTNERS' IRS FORM 1023

EXHIBIT 3-   EXCERPTS FROM PARTNERS' 2002 IRS FORM 990

EXHIBIT 4-   PARTNERS' MISSION, VISION AND GOALS STATEMENT FROM ITS
             WEB SITE

EXHIBIT 5-   EXCERPTS FROM PARTNERS' WEB SITE DESCRIBING ITSELF

EXHIBIT 6-   PARTNERS' SUPPLEMENTAL RESPONSES TO UNITED STATES'
             FIRST SET OF REQUESTS FOR ADMISSION

EXHIBIT 7-   SAMPLE COPY OF A RESIDENT CONTRACT WITH ATTACHMENTS

EXHIBIT 8-   PGY PAY SCHEDULE FOR THE PERIOD JULY 1, 2000 TO JUNE 30, 2006

EXHIBITS 9A-9F-   SELECTED AUTHORITIES REFERENCED IN UNITED STATES'
                  BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

EXHIBIT 10-  MISSION, VISION AND VALUES STATEMENT OF BRIGHAM AND
             WOMEN'S HOSPITAL

EXHIBIT 1



**PARTNERS**
HEALTHCARE

| ABOUT PARTNERS | OUR HOSPITALS AND AFFILIATES | RESEARCH AND TEACHING | INFO FOR HEALTH CARE PROVIDERS | PATIENT CARE AND HEALTH INFO | FIND A PHYSICIAN | CAREERS |

ABOUT PARTNERS

- What Is Partners?
- Annual Report
- Giving
- Community Benefit Programs

**Search:**

Partners HealthCare [ Go ]

## What Is Partners?

About Partners



Making History: North Shore Medical Center's Salem Hospital broke ground on a new surgery unit, following its gaining authorization to perform sophisticated cardiac procedures.

‣ **Members**
**Mission, Vision, Goals**
‣ History

### HISTORY

### Creating a Continuum of High Quality Care

1994 | 1996 | 1997 | 1998 | 1999 | 2000 | 2002

#### 1994

Partners HealthCare was established in 1994 by Massachusetts General Hospital (MGH) and Brigham and Women's Hospital (BWH). Since then, it has become one of the nation's leading integrated health care delivery systems, based on a mission that combines patient care with medical education and research.

The original organization included, as components of the MGH, McLean Hospital and Spaulding Rehabilitation Hospital, and five community health centers that were associated with Massachusetts General Hospital or Brigham and Women's Hospital.

Partners Community HealthCare, Inc. (PCHI) was formed by Partners in 1994 to develop a network of affiliated community providers in Eastern Massachusetts. The network, today, includes about 1,000 primary care physicians and specialists.

⌃ Back to top

#### 1996

In 1996, North Shore Medical Center (Salem Hospital, North Shore Children's Hospital, and Shaughnessy-Kaplan Rehabilitation Hospital) became the first community-based system to become a full member of Partners

In 1996, Dana-Farber Cancer Institute formed a joint venture in adult oncology with Massachusetts General Hospital and Brigham and Women's Hospital, named Dana-Farber/Partners CancerCare.

⌃ Back to top

#### 1997

In 1997, AtlantiCare Medical Center in Lynn joined North Shore Medical Center, and thereby became part of Partners. (AtlantiCare changed its name to Union Hospital in 1999).

▴ Back to top

1998

In 1998, Faulkner Hospital joined with Brigham and Women's Hospital to form Brigham and Women's/Faulkner Hospitals and thereby became part of Partners.

▴ Back to top

1999

In 1999, Newton-Wellesley Hospital became a full member of Partners.

▴ Back to top

2000

In 2000, Spaulding Rehabilitation Hospital and Youville Hospital and Rehabilitation Center in Cambridge entered into a clinical affiliation to expand inpatient and outpatient services. * Since its formation, Partners has also developed relationships with community health centers, VNAs, and other community based providers.

▴ Back to top

2002

Partners Home Care (PHC) was formed by the merger of the Affiliated Community Visiting Nurse Association, MGH/Spaulding Home Health Agency, Newton-Wellesley Home Health Services, TLC Nursing, and The Visiting Nurse Association of Greater Salem.

▴ Back to top

© Copyright 2005 Partners HealthCare System, Inc.

HOME | SITEMAP | CONTACT US | PRIVACY & DISCLAIMER | SHUTTLE SCHEDULE |

EXHIBIT 2

Form **1023**
(Rev. July 1993)
Department of the Treasury
Internal Revenue Service

# Application for Recognition of Exemption
## Under Section 501(c)(3) of the Internal Revenue Code

Expires 5-31-96

If exempt status is approved, this application will be open for public inspection

Read the instructions for each Part carefully.
A User Fee must be attached to this application.
If the required information and appropriate documents are not submitted along with Form 8718 (with payment of the appropriate user fee), the application may be returned to you.
Complete the Procedural Checklist on page 7 of the instructions.

**Part I**    Identification of Applicant

| | |
|---|---|
| **1a** Full name of organization (as shown in organizing document)<br>Partners HealthCare System, Inc. | **2** Employer identification number (If none, see instructions.)<br>04 : 3230035 |
| **1b** c/o Name (if applicable)<br>H. Richard Nesson, M.D., Brigham & Women's Hospital | **3** Name and telephone number of person to be contacted if additional information is needed<br>Carolyn M. Osteen<br>( 617 ) 951-7000 |
| **1c** Address (number, street, and room or suite no.)<br>75 Francis Street | |
| **1d** City or town, state, and ZIP code<br>Boston, MA 02115 | **4** Month the annual accounting period ends<br>September |

| | | |
|---|---|---|
| **5** Date incorporated or formed<br>December 15, 1993 | **6** Activity codes (See instructions.)<br>179 \| 927 \| | **7** Check here if applying under section:<br>a ☐ 501(e)  b ☐ 501(f)  c ☐ 501(k) |

**8** Did the organization previously apply for recognition of exemption under this Code section or under any other section of the Code?  . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
If "Yes," attach an explanation.

**9** Is the organization required to file Form 990 (or Form 990-EZ)? . . . . . . . . . . . ☐ N/A ☒ Yes ☐ No
If "No," attach an explanation (see instructions).

**10** Has the organization filed Federal income tax returns or exempt organization information returns? . . ☐ Yes ☒ No
If "Yes," state the form numbers, years filed, and Internal Revenue office where filed.

**11** Check the box for the type of organization. BE SURE TO ATTACH A CONFORMED COPY OF THE CORRESPONDING DOCUMENTS TO THE APPLICATION BEFORE MAILING (See Specific Instructions, Part I, Line 11.) Get Pub. 557, Tax-Exempt Status for Your Organization, for examples of organizational documents.

  **a** ☒ Corporation—Attach a copy of the Articles of Incorporation (including amendments and restatements) showing approval by the appropriate state official; also include a copy of the bylaws.

  **b** ☐ Trust—Attach a copy of the Trust Indenture or Agreement, including all appropriate signatures and dates.

  **c** ☐ Association—Attach a copy of the Articles of Association, Constitution, or other creating document, with a declaration (see instructions) or other evidence the organization was formed by adoption of the document by more than one person; also include a copy of the bylaws.

If the organization is a corporation or an unincorporated association that has not yet adopted bylaws, check here ▶ ☐

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

Please
Sign
Here

*H. Richard Nesson*
Signature    Title or authority of signer    Date

For Paperwork Reduction Act Notice, see page 1 of the instructions.

1023.0    Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.

PHS 000196

Form 1023 (Rev. 7-93)

---

**Activities and Operational Information**

1   Provide a detailed narrative description of all the activities of the organization—past, present, and planned. Do not merely
    refer to or repeat the language in the organizational document. Describe each activity separately in the order of
    importance. Each description should include, as a minimum, the following: (a) a detailed description of the activity including
    its purpose; (b) when the activity was or will be initiated; and (c) where and by whom the activity will be conducted.

    See attached statement

---

2   What are or will be the organization's sources of financial support? List in order of size

    See attached statement

---

3   Describe the organization's fundraising program, both actual and planned, and explain to what extent it has been put into
    effect. Include details of fundraising activities such as selective mailings, formation of fundraising committees, use of
    volunteers or professional fundraisers, etc. Attach representative copies of solicitations for financial support.

    See attached statement

**PHS 000197**

---

Form 1023 (Rev. 7-93)

_____ Activities and Operational Information *(Continued)*

4  Give the following information about the organization's governing body:

a  Names, addresses, and titles of officers, directors, trustees, etc.

**b** Annual compensa...

See attached statement.

c  Do any of the above persons serve as members of the governing body by reason of being public officials or being appointed by public officials? . . . . . . . . . . . . . . .  ☐ Yes ☒ No
If "Yes," name those persons and explain the basis of their selection or appointment.

d  Are any members of the organization's governing body "disqualified persons" with respect to the organization (other than by reason of being a member of the governing body) or do any of the members have either a business or family relationship with "disqualified persons"? (See Specific Instructions, Part II, Line 4d.). . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes ☒ No
If "Yes," explain.

5  Does the organization control or is it controlled by any other organization? . . . . . . . . . .  ☐ Yes ☒
Is the organization the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors? . . . .  ☒ Yes ☐ No
If either of these questions is answered "Yes," explain.

See attached statement.

6  Does or will the organization directly or indirectly engage in any of the following transactions with any political organization or other exempt organization (other than a 501(c)(3) organization): (a) grants; (b) purchases or sales of assets; (c) rental of facilities or equipment; (d) loans or loan guarantees; (e) reimbursement arrangements; (f) performance of services, membership, or fundraising solicitations; or (g) sharing of facilities, equipment, mailing lists or other assets, or paid employees? . . . . . .  ☐ Yes ☒
If "Yes," explain fully and identify the other organizations involved.

7  Is the organization financially accountable to any other organization? . . . . . . . . . . . . .  ☒ Yes ☐
If "Yes," explain and identify the other organization. Include details concerning accountability or attach copies of reports if any have been submitted.

See attached statement.

PHS 000198

Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.

10/41

Form 1023 (Rev. 7-95)

**Part II**    Activities and Operational Information *(Continued)*

8  What assets does the organization have that are used in the performance of its exempt function? (Do not include property producing investment income.) If any assets are not fully operational, explain their status; what additional steps remain to be completed, and when such final steps will be taken. If "None," indicate "N/A."

      See attached statement.

9  Will the organization be the beneficiary of tax-exempt bond financing within the next 2 years? . . . ☐ Yes ☒

10a Will any of the organization's facilities or operations be managed by another organization or individual under a contractual agreement?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No

  b Is the organization a party to any leases? . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes ☐ No
    If either of these questions is answered "Yes," attach a copy of the contracts and explain the relationship between the applicant and the other parties.

11  Is the organization a membership organization? . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes ☐ No
    If "Yes," complete the following:
  a Describe the organization's membership requirements, and attach a schedule of membership fees and dues.

      See attached statement.

  b Describe the organization's present and proposed efforts to attract members, and attach a copy of any descriptive literature or promotional material used for this purpose.

      See attached statement.

  c What benefits do (or will) the members receive in exchange for their payment of dues?

      See attached statement.

12a If the organization provides benefits, services, or products, are the recipients required, or will they be required, to pay for them? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ N/A ☒ Yes ☐ N
    If "Yes," explain how the charges are determined, and attach a copy of the current fee schedule.

      See attached statement.

  b Does or will the organization limit its benefits, services, or products to specific individuals or classes of individuals? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ N/A ☒ Yes ☐ f
    If "Yes," explain how the recipients or beneficiaries are or will be selected.

      See attached statement.

13  Does or will the organization attempt to influence legislation? . . . . . . . . . . . . . . . ☐ Yes ☒
    If "Yes," explain. Also, give an estimate of the percentage of the organization's time and funds that it devotes or plans to devote to this activity.

      See attached statement.

14  Does or will the organization intervene in any way in political campaigns, including the publication or distribution of statements? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒
    If "Yes," explain fully.

      See attached statement.                                    **PHS 000199**

10/4/00    Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.

Form 1023 (Rev. 7-93)

**Part III** Technical Requirements

1 Are you filing Form 1023 within 15 months from the end of the month in which your organization was created or formed? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes ☐ No
If you answer "Yes," do not answer questions on lines 2 through 7.

2 If one of the exceptions to the 15-month filing requirement shown below applies, check the appropriate box and proceed to question 8.

Exceptions—You are not required to file an exemption application within 15 months if the organization:

☐ a Is a church, interchurch organization of local units of a church, a convention or association of churches, or an integrated auxiliary of a church (see instructions);

☐ b Is not a private foundation and normally has gross receipts of not more than $5,000 in each tax year; or

☐ c Is a subordinate organization covered by a group exemption letter, but only if the parent or supervisory organization timely submitted a notice covering the subordinate.

3 If the organization does not meet any of the exceptions on line 2, are you filing Form 1023 within 27 months from the end of the month in which the organization was created or formed?. . . . . . ☐ Yes ☐ No

If "Yes," your organization qualifies under section 4.01 of Rev. Proc. 92-85, 1992-42 I.R.B. 32, for an automatic 12-month extension of the 15-month filing requirement. Do not answer questions 4 through 7.

If "No," answer question 4.

4 If you answer "No" to question 3, has the organization been contacted by the IRS regarding its failure to file Form 1023 within 27 months from the end of the month in which the organization was created or formed?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

If "No," your organization qualifies for an extension of time to apply under the "reasonable action and good faith" requirements of section 5.01 of Rev. Proc. 92-85. Do not answer questions 5 through 7.

If "Yes," answer question 5.

5 If you answer "Yes" to question 4, does the organization wish to request relief from the 15-month filing requirement? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

If "Yes," give the reasons for not filing this application prior to being contacted by the IRS. See Specific Instructions, Part III, Line 5, before completing this item. Do not answer questions 6 and 7.

If "No," answer question 6.

6 If you answer "No" to question 5, your organization's qualification as a section 501(c)(3) organization can be recognized only from the date this application is filed with your key District Director. Therefore, do you want us to consider the application as a request for recognition of exemption as a section 501(c)(3) organization from the date the application is received and not retroactively to the date the organization was created or formed? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

7 If you answer "Yes" to the question on line 6 above and wish to request recognition of section 501(c)(4) status for the period beginning with the date the organization was formed and ending with the date the Form 1023 application was received (the effective date of the organization's section 501(c)(3) status), check here ► ☐ and attach a completed page 1 of Form 1024 to this application.

PHS 000200

Form 1023 (Rev. 7-93)                                                                          - Page

**Part III**    Technical Requirements *(Continued)*

8    Is the organization a private foundation?
☐ Yes  (Answer question on line 9.)
☒ No   (Answer question on line 10 and proceed as instructed.)

9    If you answer "Yes" to the question on line 8, does the organization claim to be a private operating foundation?
☐ Yes  (Complete Schedule E)
☐ No

After answering the question on this line, go to Part IV.

10    If you answer "No" to the question on line 8, indicate the public charity classification the organization is requesting by checking the box below that most appropriately applies:

**THE ORGANIZATION IS NOT A PRIVATE FOUNDATION BECAUSE IT QUALIFIES:**

| | | | |
|---|---|---|---|
| a | ☐ | As a church or a convention or association of churches (CHURCHES MUST COMPLETE SCHEDULE A.) | Sections 509(a)(1) and 170(b)(1)(A)(i) |
| b | ☐ | As a school (MUST COMPLETE SCHEDULE B.) | Sections 509(a)(1) and 170(b)(1)(A)(ii) |
| c | ☐ | As a hospital or a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital (MUST COMPLETE SCHEDULE C.) | Sections 509(a)(1) and 170(b)(1)(A)(iii) |
| d | ☐ | As a governmental unit described in section 170(c)(1). | Sections 509(a)(1) and 170(b)(1)(A)(v) |
| e | ☐ | As being operated solely for the benefit of, or in connection with, one or more of the organizations described in a through d, g, h, or i (MUST COMPLETE SCHEDULE D.) | Section 509(a)(3) |
| f | ☐ | As being organized and operated exclusively for testing for public safety. | Section 509(a)(4) |
| g | ☐ | As being operated for the benefit of a college or university that is owned or operated by a governmental unit. | Sections 509(a)(1) and 170(b)(1)(A)(iv) |
| h | ☒ | As receiving a substantial part of its support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. | Sections 509(a)(1) and 170(b)(1)(A)(vi) |
| i | ☐ | As normally receiving not more than one-third of its support from gross investment income and more than one-third of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). | Section 509(a)(2) |
| j | ☐ | The organization is a publicly supported organization but is not sure whether it meets the public support test of block h or block i. The organization would like the IRS to decide the proper classification. | Sections 509(a)(1) and 170(b)(1)(A)(vi) or Section 509(a)(2) |

If you checked one of the boxes a through f in question 10, go to question 15. If you checked box g in question 10, go to questions 12 and 13. If you checked box h, i, or j, go to question 11.

**PHS 000201**

Form 1023 (Rev. 7-93)　　　　　　　　　　　　　　　　　　　　　　　　　　　Page **7**

## Technical Requirements *(Continued)*

11 If you checked box h, i, or j on line 10, has the organization completed a tax year of at least 8 months?

☐ Yes—Indicate whether you are requesting:

☐ A definitive ruling (Answer questions on lines 12 through 15.)

An advance ruling (Answer questions on lines 12 and 15 and attach two Forms 872-C completed and signed.)

☒ No—You must request an advance ruling by completing and signing two Forms 872-C and attaching them to the application.

12 If the organization received any unusual grants during any of the tax years shown in Part IV-A, attach a list for each year showing the name of the contributor; the date and the amount of the grant; and a brief description of the nature of the grant.

N/A

13 If you are requesting a definitive ruling under section 170(b)(1)(A)(iv) or (vi), check here ▶ ☐ and:

a Enter 2% of line 8, column (e) of Part IV-A _____

b Attach a list showing the name and amount contributed by each person (other than a governmental unit or "publicly supported" organization) whose total gifts, grants, contributions, etc., were more than the amount entered on line 13a above.

14 If you are requesting a definitive ruling under section 509(a)(2), check here ▶ ☐ and:

a For each of the years included on lines 1, 2, and 9 of Part IV-A, attach a list showing the name of and amount received from each "disqualified person." (For a definition of "disqualified person," see Specific Instructions, Part II, Line 4d.)

b For each of the years included on line 9 of Part IV-A, attach a list showing the name of and amount received from each payer (other than a "disqualified person") whose payments to the organization were more than $5,000. For this purpose, "payer" includes, but is not limited to, any organization described in sections 170(b)(1)(A)(i) through (vi) and any governmental agency or bureau.

| Indicate if your organization is one of the following. If so, complete the required schedule. (Submit only those schedules that apply to your organization. Do not submit blank schedules.) | Yes | No | If "Yes," complete Schedule: |
|---|---|---|---|
| Is the organization a church? | | X | A |
| Is the organization, or any part of it, a school? | | X | B |
| Is the organization, or any part of it, a hospital or medical research organization? | | X | C |
| Is the organization a section 509(a)(3) supporting organization? | | X | D |
| Is the organization a private operating foundation? | | X | E |
| Is the organization, or any part of it, a home for the aged or handicapped? | | X | F |
| Is the organization, or any part of it, a child care organization? | | X | G |
| Does the organization provide or administer any scholarship benefits, student aid, etc.? | | X | H |
| Has the organization taken over, or will it take over, the facilities of a "for profit" institution? | | X | I |

Form 1023 (Rev. 7-93)

## Part IV  Financial Data

Complete the financial statements for the current year and for each of the 3 years immediately before it. If in existence less than 4 years, complete the statements for each year in existence. If in existence less than 1 year, also provide proposed budgets for the 2 years following the current year.

### A. Statement of Revenue and Expenses  (000's omitted)

| | | Current tax year | PROPOSED BUDGET FOR 2 YEARS | | | |
|---|---|---|---|---|---|---|
| | | (a) From 12/15/93 to 9/30/94 | (b) 19 10/1/94 9/30/95 | (c) 19 10/1/95 9/30/96 | (d) 19.......... | (e) TOTAL |
| Revenue | 1 Gifts, grants, and contributions received (not including unusual grants—see instructions) | $$6,000 | $ 500 | $1,000 | | $7,500 |
| | 2 Membership fees received | – | – | – | | |
| | 3 Gross investment income (see instructions for definition) | 150 | 400 | 600 | | 1,150 |
| | 4 Net income from organization's unrelated business activities not included on line 3 | | | | | |
| | 5 Tax revenues levied for and either paid to or spent on behalf of the organization | – | – | – | | |
| | 6 Value of services or facilities furnished by a governmental unit to the organization without charge (not including the value of services or facilities generally furnished the public without charge) | – | – | – | | |
| | 7 Other income (not including gain or loss from sale of capital assets) (attach schedule) | | | | | |
| | 8 Total (add lines 1 through 7) | | | | | |
| | 9 Gross receipts from admissions, sales of merchandise or services, or furnishing of facilities in any activity that is not an unrelated business within the meaning of section 513 | 3,000 | 4,800 | 6,000 | | 13,800 |
| | 10 Total (add lines 8 and 9) | | | | | |
| | 11 Gain or loss from sale of capital assets (attach schedule) | | | | | |
| | 12 Unusual grants | – | – | – | | |
| | 13 Total revenue (add lines 10 through 12) | $9,150 | $5,700 | $7,600 | | $22,450 |
| Expenses | 14 Fundraising expenses | | | | | |
| | 15 Contributions, gifts, grants, and similar amounts paid (attach schedule) | | | | | |
| | 16 Disbursements to or for benefit of members (attach schedule) | | | | | |
| | 17 Compensation of officers, directors, and trustees (attach schedule) | 320 | 817 | 1,005 | | |
| | 18 Other salaries and wages | 585 | 1,200 | 1,600 | | |
| | 19 Interest | | | | | |
| | 20 Occupancy (rent, utilities, etc.) | 50 | 275 | 290 | | |
| | 21 Depreciation and depletion | 20 | 150 | 150 | | |
| | 22 Other (attach schedule) | 2,025 | 2,558 | 2,955 | | |
| | 23 Total expenses (add lines 14 through 22) | 3,000 | 4,800 | 6,000 | | |
| | 24 Excess of revenue over expenses (line 13 minus line 23) | $6,150 | $ 900 | $1,600 | | |

PHS 000203

10/14/93

Published by Tax Management Inc., a Subsidiary of The Bureau of National Affairs, Inc.

102

Form 1023 (Rev 7-93)                                                                              Page 9

**Part IV**    Financial Data *(Continued)*          (000's omitted)

| B. Balance Sheet (at the end of the period shown) | | Current tax year Date 9/30/94 |
|---|---|---|
| **Assets** | | |
| 1 | Cash and Cash Equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | $66,150 |
| 2 | Accounts receivable, net . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Bonds and notes receivable (attach schedule) . . . . . . . . . . . . . . . | 4 | |
| 5 | Corporate stocks (attach schedule) . . . . . . . . . . . . . . . . . . . | 5 | |
| 6 | Mortgage loans (attach schedule) . . . . . . . . . . . . . . . . . . . | 6 | |
| 7 | Other investments (attach schedule) . . . . . . . . . . . . . . . . . . | 7 | |
| 8 | Depreciable and depletable assets (attach schedule) . . . . . . . . . . | 8 | |
| 9 | Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | |
| 10 | Other assets (attach schedule) . . . . . . . . . . . . . . . . . . . . | 10 | |
| 11 | Total assets (add lines 1 through 10) . . . . . . . . . . . . . . . . | 11 | 6,150 |
| **Liabilities** | | |
| 12 | Accounts payable . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | |
| 13 | Contributions, gifts, grants, etc., payable . . . . . . . . . . . . . . | 13 | |
| 14 | Mortgages and notes payable (attach schedule) . . . . . . . . . . . . | 14 | |
| 15 | Other liabilities (attach schedule) . . . . . . . . . . . . . . . . . . | 15 | |
| 16 | Total liabilities (add lines 12 through 15) . . . . . . . . . . . . . | 16 | |
| **Fund Balances or Net Assets** | | |
| 17 | Total fund balances or net assets . . . . . . . . . . . . . . . . . . | 17 | 6,150 |
| 18 | Total liabilities and fund balances or net assets (add line 16 and line 17) . . . . | 18 | $6,150 |

If there has been any substantial change in any aspect of the organization's financial activities since the end of the period shown above, check the box and attach a detailed explanation . . . . . . . . . . . . . . . . . . . . . . . . . . ▶

PARTNERS HEALTHCARE SYSTEM, INC.

## Attachment to Form 1023

## Part II - Activities and Operational Information.

1.   Partners HealthCare System, Inc. ("Partners") was
incorporated on December 15, 1993 as a Massachusetts non-profit
corporation named MGH/Brigham Health Care System, Inc. to
organize, operate and support the comprehensive health care
systems of The Massachusetts General Hospital ("MGH"), The
Brigham Medical Center, Inc. ("Brigham") and their affiliated
organizations.   On March 18, 1994, MGH/Brigham Health Care
System, Inc. filed articles of amendment to change the name of
the corporation to Partners HealthCare System, Inc.

Partners will conduct activities that promote the health and
welfare of the residents of the cities and towns served by MGH
and Brigham.

## The Massachusetts General Hospital & Affiliates

MGH is a Massachusetts non-profit corporation which was
incorporated by special act of the Massachusetts legislature in
1811.   MGH has been determined to be exempt from tax under
section 501(c)(3) of the Internal Revenue Code ("IRC") and is not
a private foundation because it is a publicly supported
organization described by IRC sections 509(a)(1) and
170(b)(1)(A)(vi).   MGH serves as the parent and sole member of
seven affiliated organizations, including Spaulding
Rehabilitation Hospital Corporation and The MGH Health Services
Corporation.   In its capacity as sole member, MGH elects the
officers and trustees, approves capital and operating budgets;
the acquisition and sale of property; capital fundraising
campaigns; and transactions resulting in new debt.

Until 1980, MGH conducted its operations through a single
corporation with two principal corporate divisions - the General
Hospital division, which operated an acute care teaching hospital
in Boston, Massachusetts, and the McLean Hospital division, which
operated a teaching hospital in Belmont, Massachusetts,
specializing in the treatment of mental illness.   In October
1980, MGH established The General Hospital Corporation (the
"General") and The McLean Hospital Corporation ("McLean").   MGH
transferred the operations and assets of the General Hospital
division to the General and the operations of the McLean Hospital
division to McLean.   Since that time, MGH's principal activities
have consisted of fundraising, the management of endowment funds

AJWATTAC.PH

and the distribution of funds to the General, McLean and other affiliates.

The General, a Massachusetts non-profit corporation which has been determined to be exempt from tax under IRC section 501(c)(3) and is not a private foundation because it is a hospital as described by IRC sections 509(a)(1) and 170(b)(1)(A)(iii), has long been recognized as one of the leading medical centers in the United States. With strong academic ties to Harvard University's School of Medicine (the "Medical School") and a large research community, the General has from its inception been at the forefront of advanced medical treatment, education, research and technology. The General provides a broad range of in-patient and out-patient services and is the largest hospital in the City of Boston. The General, a 1,044-licensed bed facility, serves as a tertiary care referral center for advanced specialty services and provides an extensive array of primary care to Boston area residents. In 1992, approximately 31 percent of the General's inpatients were from Boston, Revere, Chelsea, Somerville and Cambridge. The General also draws patients from more distant parts of the Commonwealth of Massachusetts and from other states and foreign countries.

The General is a major center for cardiac surgery. In 1992, the General averaged six cardiac related operations per weekday. In addition, the General is noted for its intensive care capabilities, provided through 114 beds in nine different units, including a 16-bed cardiac care unit, a 10-bed unit for respiratory patients, a 10-bed adult burn unit, an 8-bed pediatric unit, a 12-bed neonatal unit, a 3-bed unit for organ-transplant patients, an 8-bed neurology/neurosurgery unit, a 25-bed surgical unit and an 18-bed intensive care unit. For the past two years, it has been recognized as one of the top ten hospitals in the United States by national publications.

The General has also had a long tradition of educating physicians, scientists, nurses and other health care personnel. More than 90 percent of the General's medical staff hold faculty appointments at the Medical School. The General's medical staff provides substantial clinical training to Medical School students who serve clinical clerkships at MGH as well as other Harvard University teaching hospitals. Substantially all of the General's non-physician professional staff engaged in research hold faculty appointments at the Medical School.

McLean is a national leader in mental health care delivery, research and training. McLean conducts a wide array of research activities designed to advance the knowledge and treatment of mental illness. McLean operates a 328-bed facility, 13 community residence facilities and a specialty out-patient department. McLean also provides clinical training to medical students, interns and residents.

AJWATTAC.PH                          -2-

## The Brigham Medical Center, Inc. & Affiliates

Brigham was organized on February 13, 1986. It is a Massachusetts charitable corporation which has been determined to be exempt under IRC section 501(c)(3) and is not a private foundation on the basis that it is a publicly-supported organization as described by IRC sections 509(a)(1) and 170(b)(1)(A)(vi). Brigham is the parent and sole member of three non-profit affiliates including the Brigham and Women's Hospital, Inc. ("BWH") and the sole shareholder of a for-profit subsidiary. BWH is the result of a 1975 merger of three Boston hospitals: the Peter Bent Brigham Hospital (founded in 1913), the Robert Breck Brigham Hospital (founded in 1914), and the Boston Hospital for Women, a result of an earlier merger of the Boston Lying-in Hospital (founded in 1932) and the Free Hospital for Women (founded in 1875).

These three institutions with proud records of pioneering and discovery agreed to pool their resources in 1975 in the interest of even greater service to their community. Each in its own field was internationally recognized for its far-reaching contribution to patient care, teaching and research in the following areas: the pioneering of brain surgery, the discovery of a treatment for pernicious anemia and the first successful kidney transplant at the Peter Bent Brigham Hospital; the establishment of maternity, cardiac and prenatal diabetic clinics, and the development, in association with Children's Hospital of a procedure for exchange transfusions at the Boston Hospital for Women; and, at the Robert Breck Brigham Hospital, research to prevent deformities and rheumatic disorders, and the development of surgical procedures to reconstruct damaged joints.

Today, Brigham elects the officers and directors of its affiliated organizations thereby maintaining ultimate control of each organization. Brigham provides oversight, planning, and supervision to BWH in order to carry out its charitable missions of health care, scientific research and education, and coordinates activities of BWH with those if its other non-profit subsidiaries. Brigham engages in continuous activities to attract contributions to support the charitable missions of its subsidiaries. Brigham coordinates technology transfer from the laboratory to third parties experienced in perfecting the realization of research, and Brigham organizes the array of community outreach and benefit programs.

BWH, a Massachusetts non-profit corporation which has been determined to be exempt from tax under IRC section 501(c)(3) and is not a private foundation because it is a hospital as described in IRC sections 509(a)(1) and 170(b)(1)(A)(iii), has long been recognized one of the leading academic medical centers in the United States. Like the General, it is a teaching affiliate of

AJWATTAC.PH                           -3-

the Medical School.  BWH's strategic vision is to be an
acknowledged leader in patient care, research and education.  For
the past two years it has been recognized as one of the top ten
hospitals in the United States by national publications.

     BWH's 751-licensed bed facility serves the Boston
metropolitan area, eastern Massachusetts and patients throughout
the world.  A 1993 patient origin study indicated that 42% of the
hospital's inpatients were from Boston, Brookline, Cambridge,
Needham, and Newton.  BWH is the leading provider of obstetrical
services in Massachusetts, and has the highest percentage of
intensive care unit beds of the Boston area hospitals.  BWH is a
major center for cardiology, cardiac, and thoracic surgery, high
risk obstetrics, neonatology, trauma, the neurosciences,
arthritis and rheumatic disorders.  It is a center of excellence
in heart and lung transplantation.  For the past five years, it
has led all Massachusetts hospitals in inpatient admissions.

     Currently, BWH is world-renowned for its research.  Since
1986, it has been the leading recipient of National Institutes of
Health research awards among hospital-based research institutions
in the United States (with the exception of 1990 in which it
ranked second to the General).  Approximately 500 M.D.s and
Ph.D.s are involved in research activities in the physiology and
patho-physiology underlying disease in the areas of cardiology,
renal medicine, endocrinology, neurology, immunology and
rheumatology.

     BWH's strong academic ties to the Harvard Medical School and
its deep rooted specialty care and research in medicine, surgery,
arthritis and related diseases, and human reproduction and
reproduction biology, combine in 35 nationally recognized
accredited graduate medical education programs for 1,398
residents and fellows.

     Substantially all members of BWH's medical staff and its
non-physician professional staff hold Medical School
appointments.

### Partners' Role

     Partners has been established as a parent entity to allow
MGH, Brigham and their affiliated organizations to work together
and with the Medical School.  Its primary function will be to
coordinate and to provide strategic planning opportunities for
MGH and Brigham.  MGH and Brigham believe that by combining the
resources, facilities, expertise and experience of their long-
established medical care delivery systems, they may more
efficiently deliver of high-quality medical care to their
patients and meet their teaching and research goals.  Efforts are
currently underway to integrate or coordinate internship and
residency programs.

AJWATTAC.PH                    -4-

Studies conducted in 1993 by the Boston Consulting Group indicate that the number of hospital beds in Massachusetts significantly exceeds the public need. This excess results from advancements in care and technology which have resulted in a significant decrease in admissions and the amount of time patients spend in the hospital.

Partners is a responsible, cooperative response to the significant changes occurring in health care, including declining volume, increasing enrollment in managed care plans and the prospect of national health care reform. Partners will provide coordinated planning for the future development of health-related activities for MGH, the General, Brigham, BWH and their affiliated organizations and will provide overall management and planning with the intent of strengthening the patient care, education and research programs of each organization by programmatic integration. It is anticipated that the activities of Partners will facilitate the coordination of the development of new alternative health care delivery techniques that will benefit MGH, Brigham and their affiliated hospitals and the residents of the communities each serves.

2. Partners' primary source of support will be in the form of gifts, grants and contributions from the general public. Partners may also receive contributions and fees from MGH and Brigham for providing management, planning and development services.

3. Partners does not have any current plan to conduct fund raising activities. Partners may initiate a fund raising program at some future time. Partners has recently established a fellowship in health care improvement to honor David M. Donaldson, the lawyer who made a central and significant contribution to the creation of Partners and to its early development. The fellowship will attract contributions from the public, prominent friends and colleagues of David M. Donaldson.

4(a) and (b).

Officers

| Title | Name | Address |
|-------|------|---------|
| Chief Executive Officer | H. Richard Nesson, M.D. | President's Office Brigham & Women's Hospital 75 Francis Street Boston, MA 02115 |
| President | Samuel O. Thier, M.D. | President's Office The Massachusetts General Hospital Fruit Street Boston, MA 02114 |

AJWATTAC.PH

PHS 000189

| Vice President | Robert H. Scott | Partners Community HealthCare, Inc.<br>75 Francis Street<br>Boston, MA 02115 |
|---|---|---|
| Vice President | Ellen M. Zane | Partners Community HealthCare, Inc.<br>75 Francis Street<br>Boston, MA 02115 |
| Treasurer | Richard A. Spindler | 210 Schoolmaster Lane<br>Dedham, MA 02026 |
| Clerk | David M. Donaldson<br>(deceased 9/18/94) | 22 Weston Road<br>Lincoln Center, MA 01773 |

## Trustees

Name

W. Gerald Austen, M.D

Eugene Braunwald, M.D.

Samuel O. Thier, M.D.

Francis H. Burr

Ferdinand Colloredo-Mansfeld

John H. McArthur

H. Richard Nesson, M.D.

Address

163 Wellesley Street
Weston, MA  02193

75 Scotch Pine Road
Weston, MA  02193

President's Office
The Massachusetts General
  Hospital
Fruit Street
Boston, MA  02114

44 Prince Street
Beverly, MA  01915

The Massachusetts General
  Hospital
Fruit Street
Boston, MA  02114

Fowler Ten
Soldiers Field Road
Boston, MA  02134

President's Office
Brigham & Women's Hospital
75 Francis Street
Boston, MA  02115

AJWATTAC.PH

-6-

Richard A. Spindler

210 Schoolmaster Lane
Dedham, MA  02026

George Marshall Moriarty

Ropes & Gray
One International Place
Boston, MA  02110-2624

E. Lorraine Baugh

Central Pediatrics
Harvard Community Health Plan
10 Brookline Place
Room 308
Brookline, MA  02146

Micho Spring

Sawyer Miller Group
500 Boylston Street
Suite 1860
Boston, MA  02116

John A. Kaneb

90 Everett Avenue
P.O. Box 9151
Chelsea, MA  02150-2337

Non-employee officers and trustees are not compensated for
performance of their corporate responsibilities.  Drs. Thier and
Nesson, Mr. Scott and Ms. Zane receive compensation for their
administrative services.

5.  As identified in Item 1 above, Partners has a special
relationship with MGH, Brigham and their affiliated
organizations.  Partners is the parent organization of MGH and
Brigham.  Partners is organized for the sole purpose of enabling
MGH and Brigham to respond more effectively to health care reform
by consolidating energy and resources on cooperative ventures
that will improve quality, lower costs, and enhance each
organization's educational and research objectives.

7.  The Attorney General of the Commonwealth of
Massachusetts is entitled under Massachusetts law to protect
Partners' funds in the event they are misapplied or applied for
purposes other than those for which Partners was created.  Annual
filings must be made by Partners with the Attorney General's
Office and such filings will disclose the use to which Partners'
funds have been put.  These filings will be available to the
general public.

8.  Partners has leased office space to house its senior
executives and will acquire furnishings and fixtures for that
space.  It has no other assets for use in its exempt functions at
present.

AJWATTAC.PH

-7-

PHS 000191

9.  Partners has no immediate plans to conduct bond financings.

10.  Partners has leased office space for its senior executives.  The ten year lease of a portion of the 11th floor of The Prudential Tower, Boston, Massachusetts, commencing August 1, 1994, provides for payment of rent at a market rate beginning at $22 per square foot and increasing to $28 per square foot. Partners has a right to terminate after five years; and Partners is obligated under the lease terms to pay its allocable share of expenses and real estate taxes.

On April 1, 1994, Partners entered into an employee leasing agreement with the Brigham and BWH whereby Dr. Nesson is leased to Partners for services and performance of his responsibilities as Chief Executive Officer of Partners.  A copy of the agreement is attached as Exhibit A.

11(a), (b) and (c).  As a Massachusetts non-profit corporation, Partners has individual members who perform certain fundamental corporate functions such as electing trustees and amending the articles of organization and by-laws.  Partners members consist of Life Members and Elected Members.  Each person who formerly served as a Life Member of MGH has become a Life Member of Partners.  Persons who formerly served as members of MGH and Brigham have become members of Partners.  Many members are community representatives.  Members are not assessed dues and serve in accordance with the terms of the by-laws.

12(a) and (b).  Partners was organized as the parent of MGH and Brigham to enable them to work as affiliated organizations to create a comprehensive health care system capable of providing high quality health care at a lower cost than either institution could alone.  The activities will benefit the health and welfare of the residents of the communities served by MGH, Brigham and their affiliated hospitals.  Studies have indicated that MGH and Brigham's costs are considerably higher than those of community hospitals with whom they compete for secondary and tertiary care patients.  Higher costs are due in part to the cost of meeting each organization's educational and research mission and to the high cost of the advanced technology that each employs.  Partners will enable MGH and Brigham to reduce capacity without diminishing the breadth or quality of their services.  Partners will serve as the coordinator and strategic planner for Brigham, MGH and their affiliates to enable them to deliver high quality health care and to maintain their research and teaching missions in the context of a changing health care environment.

As identified in item 2 above, Partners may receive fees for providing management, planning and development services.  These fees will help offset the cost of providing such services.

PHS 000192

13 and 14.   If any pending or proposed legislation or
regulation may affect the conduct of its activities, Partners
might, either individually or in association with similar
organizations, communicate its position.   Partners intends to
maintain a policy of strict neutrality in all political campaigns
and will not endorse any candidate for public office.

PHS 000193

ATTAL  ΛΕΝΤ I

## Form 1023 - Part IV: Financial Data
## A. Statement of Revenue and Expenses

Line 17. Comparison of Officers, Directors, and Trustees[*]

|  | CURRENT TAX YEAR | PROPOSED BUDGET FOR 2 YEARS | |
|---|---|---|---|
|  | (a) From 12/15/93 to 9/30/94 | (b) 10/1/94 to 9/30/95 | (c) 10/1/95 to 9/30/96 |
| H. Richard Nesson, M.D., Chief Executive Officer |  | ** | ** |
| Samuel Thier, M.D., President | $ 50 | $228 *** | $ 389 *** |
| Robert H. Scott, Vice President | 129 | 258 | 270 |
| Ellen Zane, Vice President | 141 | 331 | 346 |
| David Donaldson, Clerk | - | - | - |
|  | $310 | $817 | $1,005 |

[*] Includes payroll taxes and fringe benefits.

** Brigham and Women's Hospital, Inc. charges Partners HealthCare System, Inc. $110,000 per quarter or $440,000 annually as a leased employee fee for the salary and fringe benefits of Dr. Nesson, representing some 80% of the time expended on the activities of Partners.

*** These amounts assume that Dr. Thier will expend 50% of his effort on Partners activities in 1995 and 80% in 1996 as a transition year for the pending retirement of Dr. Nesson.

\res\irs-01 (i); 8-29-94

## ATTACHMENT II

### Form 1023 - Part IV: Financial Data
### A. Statement of Revenue and Expenses

Line 22. Other Expenses

|  | CURRENT TAX YEAR | PROPOSED BUDGET FOR 2 YEARS | |
| --- | --- | --- | --- |
|  | (a) From 12/15/93 to 9/30/94 | (b) 10/1/94 to 9/30/95 | (c) 10/1/95 to 9/30/96 |
| Administration Fee | $ 220 | $ 440 | $ 540 |
| Advertising | 450 | 400 | 400 |
| Legal & Auditing | 320 | 450 | 550 |
| Management & Organizational Consulting | 475 | 750 | 1,000 |
| Meals & Travel | 50 | 118 | 215 |
| Miscellaneous & Other | 60 | 200 | 250 |
| Network Consulting and Legal | 450 | - | - |
|  | $2,025 | $2,358 | $2,959 |

\res\irs-O1 *(ii)*; 8-29-94

PHS 000195

EXHIBIT 3

| Form **990** | **Return of Organization Exempt from Income Tax** | | OMB No 1545-0047 |
|---|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation) | | **2002** |
| Department of the Treasury Internal Revenue Service | ► The organization may have to use a copy of this return to satisfy state reporting requirements | | Open to Public Inspection |

**A**  For the 2002 calendar year, or tax year beginning  Oct 1   , 2002, and ending  Sep 30  , 2003

| **B** Check if applicable | | | **D** Employer Identification Number |
|---|---|---|---|
| Address change | Please use IRS label | **C** Name of organization  Partners HealthCare System, Inc. | 04-3230035 |
| Name change | | Number, street (or P O  box if mail is not delivered to street address)   Room/suite | **E** Telephone number |
| Initial return | See specific Instruc- tions. | Prudential Tower, 800 Boylston St. | (617) 724-9841 |
| Final return | | City, town or country   State   ZIP code + 4 | **F** Accounting method:  Cash  [X] Accrual |
| Amended return | | Boston   MA  02199-8001 | Other (specify) ► |
| Application pending | | ● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).** | **H** and **I** are not applicable to section 527 organizations |

**H (a)**  Is this a group return for affiliates?   Yes  [X] No

**G**  Web site: ► http://www.partners.org

**H (b)**  If 'Yes,' enter number of affiliates ►

**H (c)**  Are all affiliates included?  .  .   Yes   No
(If 'No,' attach a list. See instructions.)

**J**  Organization type (check only one)  ► [X] 501(c)   3 ◄ (insert no )   4947(a)(1) or   527

**H (d)**  Is this a separate return filed by an organization covered by a group ruling?   Yes  [X] No

**K**  Check here ► ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS, but if the organization received a Form 990 Package in the mail, it should file a return without financial data Some states require a complete return.

**I**  Enter 4-digit GEN  ► N/A

**M**  Check ► ☐ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF).

**L**  Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ► 303,077,649.

| | **Part I** | **Revenue, Expenses, and Changes in Net Assets or Fund Balances** (See Instructions) | | | |
|---|---|---|---|---|---|
| | 1 | Contributions, gifts, grants, and similar amounts received | | | |
| | **a** | Direct public support | 1a | 697,545. | |
| | **b** | Indirect public support | 1b | 76,284,573. | |
| | **c** | Government contributions (grants) | 1c | | |
| | **d** | Total (add lines 1a through 1c) (cash $  76,982,118.  noncash $ _____ ) | | 1d | 76,982,118. |
| | 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | 2 | 216,279,577. |
| | 3 | Membership dues and assessments | | 3 | |
| | 4 | Interest on savings and temporary cash investments | | 4 | |
| | 5 | Dividends and interest from securities | | 5 | 2,023,610. |
| R | 6a | Gross rents | 6a | 3,999,998. | 6,495,591. |
| E | **b** | Less: rental expenses | 6b | | |
| V | **c** | Net rental income or (loss) (subtract line 6b from line 6a) | | 6c | 3,999,998. |
| E | 7 | Other investment income (describe ► ) | | 7 | |
| N | 8a | Gross amount from sales of assets other than inventory | (A) Securities  -8,449,944. | (B) Other | |
| U | | | 8a  -8,449,944. | | |
| E | **b** | Less: cost or other basis and sales expenses | 8b | | |
| | **c** | Gain or (loss) (attach schedule)  See L-8 Stmt . | 8c  -8,449,944. | | |
| | **d** | Net gain or (loss) (combine line 8c, columns (A) and (B)) | | 8d | -8,449,944. |
| | 9 | Special events and activities (attach schedule) | | | |
| | **a** | Gross revenue (not including  $ _____  of contributions reported on line 1a) | 9a | | |
| | **b** | Less  direct expenses other than fundraising expenses | 9b | | |
| | **c** | Net income or (loss) from special events (subtract line 9b from line 9a) | | 9c | |
| | 10a | Gross sales of inventory, less returns and allowances | 10a | | |
| | **b** | Less: cost of goods sold | 10b | | |
| | **c** | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | 10c | |
| | 11 | Other revenue (from Part VII, line 103) | | 11 | 5,746,699. |
| | 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | 12 | 303,077,649. |
| E | 13 | Program services (from line 44, column (B)) | | 13 | 56,229,071. |
| X | 14 | Management and general (from line 44, column (C)) | | 14 | 270,148,950. |
| P | 15 | Fundraising (from line 44, column (D)) | | 15 | |
| E | 16 | Payments to affiliates (attach schedule) | | 16 | |
| N | 17 | Total expenses (add lines 16 and 44, column (A)) | | 17 | 326,378,021. |
| A | 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | | 18 | -23,300,372. |
| S | 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | | 19 | 143,340,790. |
| E | 20 | Other changes in net assets or fund balances (attach explanation) | | 20 | 37,784,766. |
| T | 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | 21 | 157,825,184. |

**BAA  For Paperwork Reduction Act Notice, see the separate instructions.**   TEEA0101  09/05/02   Form **990** (2002)

RECEIVED AUG 2 3 2004 IRS OSC OGDEN, UT

SCANNED SEP 14 '04

Form **990** (2002)   Partners HealthCare System, Inc.                                    04-3230035        Page **2**

**Part II** | **Statement of Functional Expenses** All organizations must complete column (A). Columns (B), (C), and (D) are
required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others.

| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (att sch) | | | | | |
| (cash $ 22,475,071. STMT. non-cash $ ) | 22 | 22,475,071. | 22,475,071. | | |
| 23 Specific assistance to individuals (att sch) | 23 | | | | |
| 24 Benefits paid to or for members (att sch) | 24 | | | | |
| 25 Compensation of officers, directors, etc | 25 | 2,313,832. | | 2,313,832. | |
| 26 Other salaries and wages | 26 | 152,253,224. | | 152,253,224. | |
| 27 Pension plan contributions | 27 | 5,929,410. | | 5,929,410. | |
| 28 Other employee benefits | 28 | 22,752,395. | | 22,752,395. | |
| 29 Payroll taxes | 29 | 11,118,350. | | 11,118,350. | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | | | | |
| 32 Legal fees | 32 | 6,598,299. | | 6,598,299. | |
| 33 Supplies | 33 | 3,150,592. | | 3,150,592. | |
| 34 Telephone | 34 | 3,154,688. | | 3,154,688. | |
| 35 Postage and shipping | 35 | 1,223,401. | | 1,223,401. | |
| 36 Occupancy | 36 | 14,297,401. | | 14,297,401. | |
| 37 Equipment rental and maintenance | 37 | 14,804,324. | | 14,804,324. | |
| 38 Printing and publications | 38 | 184,620. | | 184,620. | |
| 39 Travel | 39 | 1,299,424. | | 1,299,424. | |
| 40 Conferences, conventions, and meetings | 40 | 409,048. | | 409,048. | |
| 41 Interest | 41 | 5,950,199. | | 5,950,199. | |
| 42 Depreciation, depletion, etc (attach schedule) | 42 | 10,496,196. | | 10,496,196. | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a Consulting Services | 43a | 16,169,391. | | 16,169,391. | |
| b Purchased Services | 43b | 95,217. | | 95,217. | |
| c Outside Purchsed Services | 43c | 15,786,510. | | 15,786,510. | |
| d Insurance | 43d | 15,830. | | 15,830. | |
| e See Other Expenses Stmt | 43e | 15,900,599. | 33,754,000. | -17,853,401. | |
| 44 Total functional expenses (add lines 22 - 43) Organizations completing columns (B) - (D), carry these totals to lines 13 - 15 | 44 | 326,378,021. | 56,229,071. | 270,148,950. | |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2
Are any joint costs from a combined educational campaign and fundraising solicitation reported in **(B)** Program services?    ▶☐ Yes ☒ No
If 'Yes,' enter **(i)** the aggregate amount of these joint costs        $ _____ , **(ii)** the amount allocated to program services
$ _____ ; **(iii)** the amount allocated to management and general   $ _____ , and **(iv)** the amount allocated
to fundraising   $ _____ .

**Part III** | **Statement of Program Service Accomplishments**

What is the organization's primary exempt purpose? ▶   Support affiliated exempt organizations.    Program Service Expenses (Required for 501(c)(3) and (4) organizations and 4947(a)(1) trusts, but optional for others )
All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable (Section 501(c)(3) & (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants & allocations to others.)

a See Statement 1
_____
_____
_____ (Grants and allocations $ 22,475,071. )    56,229,071.

b _____
_____
_____ (Grants and allocations $ )

c _____
_____
_____ (Grants and allocations $ )

d _____
_____
_____ (Grants and allocations $ )

e Other program services                  (Grants and allocations $ )
f **Total of Program Service Expenses** (should equal line 44, column (B), program services)    ▶    56,229,071.

Form 990 (2002)                                                                                          Page 3

| Part IV | Balance Sheets (See page 24 of the instructions.) | | | | |
|---|---|---|---|---|---|
| **Note:** | Where required, attached schedules and amounts within the description column should be for end-of-year amounts only. | | | (A) Beginning of year | | (B) End of year |

| | | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| **Assets** | 45 | Cash — non-interest-bearing.......................................... | | | 45 | |
| | 46 | Savings and temporary cash investments ........................... | | 21,285,825 | 46 | 35,618,013 |
| | 47a | Accounts receivable .................. | **47a** 2,101,156 | | | |
| | b | Less: allowance for doubtful accounts ..... | **47b** | 2,130,347 | 47c | 2,101,156 |
| | 48a | Pledges receivable ................... | **48a** 1,345,111 | | | |
| | b | Less: allowance for doubtful accounts ..... | **48b** | 928,559 | 48c | 1,345,111 |
| | 49 | Grants receivable. ...................................... | | | 49 | |
| | 50 | Receivables from officers, directors, trustees, and key employees (attach schedule)........................... | | | 50 | |
| | 51a | Other notes and loans receivable (attach schedule) ... .................. | **51a** 922,200,193 | | | |
| | b | Less: allowance for doubtful accounts ..... | **51b** | 666,445,984 | 51c | 922,200,193 |
| | 52 | Inventories for sale or use ..................................... | | | 52 | |
| | 53 | Prepaid expenses and deferred charges ......................... | | 2,604,886 | 53 | 2,899,908 |
| | 54 | Investments — securities (attach schedule)L-54 Stmt ☐ Cost ☒ FMV | | 314,194,863 | 54 | 432,310,749 |
| | 55a | Investments — land, buildings, and equipment: basis ..................... | **55a** | | | |
| | b | Less: accumulated depreciation (attach schedule) ....................... | **55b** | | 55c | |
| | 56 | Investments — other (attach schedule) ...... .. .......... | | | 56 | |
| | 57a | Land, buildings, and equipment: basis ... | **57a** 84,883,837 | | | |
| | b | Less: accumulated depreciation (attach schedule) .. L-57 Stmt ............. | **57b** 51,404,043 | 39,295,638 | 57c | 33,479,794 |
| | 58 | Other assets (describe ▶ See L-58 Stmt                  ) | | 18,361,465 | 58 | 27,592,935 |
| | 59 | **Total assets** (add lines 45 through 58) (must equal line 74) ......... | | 1,065,247,567 | 59 | 1,457,547,859 |
| **Liabilities** | 60 | Accounts payable and accrued expenses........................... | | 212,223,212 | 60 | 213,118,778 |
| | 61 | Grants payable ......... ..... . . . ......... ... .. ...... | | | 61 | |
| | 62 | Deferred revenue............................................. | | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees (attach schedule) .............................................. | | | 63 | |
| | 64a | Tax-exempt bond liabilities (attach schedule) .See L-64 Stmt ......... | | 683,843,177 | 64a | 1,083,171,898 |
| | b | Mortgages and other notes payable (attach schedule) See L-64 Stmt | | 21,000,000 | 64b | 0 |
| | 65 | Other liabilities (describe ▶ See L-65 Stmt               ) | | 4,840,388 | 65 | 3,431,999 |
| | 66 | **Total liabilities** (add lines 60 through 65) .................. ..... | | 921,906,777 | 66 | 1,299,722,675 |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| | 67 | Unrestricted.......... .......... ...................... | | 142,412,231 | 67 | 156,480,074 |
| | 68 | Temporarily restricted ....................................... | | 928,559 | 68 | 1,345,110 |
| | 69 | Permanently restricted....................... ............. | | 0 | 69 | 0 |
| | | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | | |
| | 70 | Capital stock, trust principal, or current funds ................... | | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund ...... | | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds .. | | | 72 | |
| | 73 | Total net assets or fund balances (add lines 67 through 69 or lines 70 through 72; column (A) must equal line 19; column (B) must equal line 21)........................................ | | 143,340,790 | 73 | 157,825,184 |
| | 74 | **Total liabilities and net assets/fund balances** (add lines 66 and 73) . | | 1,065,247,567 | 74 | 1,457,547,859 |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.
STF FED1923F 3

Form **990** (2002)   Partners HealthCare System, Inc.                                             04-3230035          Page **4**

| **Part IV-A** | **Reconciliation of Revenue per Audited Financial Statements with Revenue per Return** (See instructions.) | | | **Part IV-B** | **Reconciliation of Expenses per Audited Financial Statements with Expenses per Return** | | |
|---|---|---|---|---|---|---|---|
| **a** | Total revenue, gains, and other support per audited financial statements ► | **a** | 268,100,000. | **a** | Total expenses and losses per audited financial statements ► | **a** | 276,930,000. |
| **b** | Amounts included on line a but not on line 12, Form 990: | | | **b** | Amounts included on line a but not on line 17, Form 990: | | |
| | (1) Net unrealized gains on investments $ | | | | (1) Donated services and use of facilities $ | | |
| | (2) Donated services and use of facilities $ | | | | (2) Prior year adjustments reported on line 20, Form 990 $ | | |
| | (3) Recoveries of prior year grants $ | | | | (3) Losses reported on line 20, Form 990 $ | | |
| | (4) Other (specify): | | | | (4) Other (specify): | | |
| | _ _ _ _ _ _ _ _ $ _ _ _ _ _ _ _ _ _ | | | | _ _ _ _ _ _ _ _ _ $ _ _ _ _ _ _ _ _ _ | | |
| | Add amounts on lines (1) through (4) ► | **b** | | | Add amounts on lines (1) through (4) ► | **b** | |
| **c** | Line a minus line **b** ► | **c** | 268,100,000. | **c** | Line a minus line **b** ► | **c** | 276,930,000. |
| **d** | Amounts included on line 12, Form 990 but not on line a: | | | **d** | Amounts included on line 17, Form 990 but not on line a: | | |
| | (1) Investment expenses not included on line 6b, Form 990 $ | | | | (1) Investment expenses not included on line 6b, Form 990 $ | | |
| | (2) Other (specify): | | | | (2) Other (specify): | | |
| | _ _ _ _ _ _ _ _ $ 34,977,649. | | | | _ _ _ _ _ _ _ _ $ 49,448,021. | | |
| | Add amounts on lines (1) and (2) ► | **d** | 34,977,649. | | Add amounts on lines (1) and (2) ► | **d** | 49,448,021. |
| **e** | Total revenue per line 12, Form 990 (line **c** plus line **d**) ► | **e** | 303,077,649. | **e** | Total expenses per line 17, Form 990 (line **c** plus line **d**) ► | **e** | 326,378,021. |

| **Part V** | **List of Officers, Directors, Trustees, and Key Employees** (List each one even if not compensated, see instructions ) | | | | |
|---|---|---|---|---|---|
| **(A)** Name and address | **(B)** Title and average hours per week devoted to position | **(C)** Compensation (if not paid, enter -0-) | **(D)** Contributions to employee benefit plans and deferred compensation | **(E)** Expense account and other allowances | |
| See Statement 2 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | |

**75** Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? . . .       ► ☒ **Yes**    ☐ **No**

If 'Yes,' attach schedule ─ see instructions.

**BAA**                                                                                              Form **990** (2002)

Form **990** (2002)    Partners HealthCare System, Inc.                                04-3230035              Page 5

| **Part VI** | **Other Information** (See instructions.) | | | | Yes | No |
|---|---|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If 'Yes,' attach a detailed description of each activity. | | | | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? | | | | | X |
| | If 'Yes,' attach a conformed copy of the changes. | | | | | |
| 78a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | | | **78a** | X | |
| b | If 'Yes,' has it filed a tax return on **Form 990-T** for this year? | | .. | **78b** | X | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If 'Yes,' attach a statement | | | **79** | | X |
| 80a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc, to any other exempt or nonexempt organization? | | ... | **80a** | X | |
| b | If 'Yes,' enter the name of the organization ► _See Statement 3_ | | | | | |
| | _____ and check whether it is ☐ exempt or ☐ nonexempt. | | | | | |
| 81a | Enter direct or indirect political expenditures. See line 81 instructions. | **81a** | | | | |
| b | Did the organization file **Form 1120-POL** for this year? | | . | **81b** | | X |
| 82a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | | . . | **82a** | | X |
| b | If 'Yes,' you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) | **82b** | | | | |
| 83a | Did the organization comply with the public inspection requirements for returns and exemption applications? | | | **83a** | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? | | | **83b** | X | |
| 84a | Did the organization solicit any contributions or gifts that were not tax deductible? | | . | **84a** | | X |
| b | If 'Yes,' did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | **84b** | | |
| 85 | *501(c)(4), (5), or (6) organizations.* a Were substantially all dues nondeductible by members? | | | **85a** | N/A | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? | | | **85b** | N/A | |
| | If 'Yes' was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | | | |
| c | Dues, assessments, and similar amounts from members | **85c** | N/A | | | |
| d | Section 162(e) lobbying and political expenditures | **85d** | N/A | | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices | **85e** | N/A | | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) | **85f** | N/A | | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? . . , , . . . | | | **85g** | N/A | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? | | | **85h** | N/A | |
| 86 | *501(c)(7) organizations.* Enter: a Initiation fees and capital contributions included on line 12 | **86a** | N/A | | | |
| b | Gross receipts, included on line 12, for public use of club facilities . . | **86b** | N/A | | | |
| 87 | *501(c)(12) organizations.* Enter: a Gross income from members or shareholders .. | **87a** | N/A | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . | **87b** | N/A | | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? If 'Yes,' complete Part IX . . . . . | | | **88** | X | |
| 89a | *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under: | | | | | |
| | section 4911 ► _____0._ , section 4912► _____ ; section 4955► _____0._ | | | | | |
| b | *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If 'Yes,' attach a statement explaining each transaction | | | **89b** | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958. . . . . . . | | ► | | | 0. |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization | | ► | | | 0. |
| 90a | List the states with which a copy of this return is filed ► _Massachusetts_ | | | | | |
| b | Number of employees employed in the pay period that includes March 12, 2002 (See instructions.) | | | **90b** | | 3,425 |
| 91 | The books are in care of ► _Partners Finance_ _____ Telephone number ► _(617) 724-9841_ | | | | | |
| | Located at ► _Building 38, P.O. Box 9658, Boston MA_ _____ ZIP +4 ► _02114_ | | | | | |
| 92 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of **Form 1041** — Check here .. | | | | ► | ☐ |
| | and enter the amount of tax-exempt interest received or accrued during the tax year . . . ► | **92** | | | | |

BAA                                                                                    Form **990** (2002)

Form 990 (2002) Partners HealthCare System, Inc.                    04-3230035        Page **6**

## Part VII | Analysis of Income-Producing Activities (See instructions.)

| Note: *Enter gross amounts unless otherwise indicated.* | Unrelated business income | | Excluded by section 512, 513, or 514 | | **(E)** Related or exempt function income |
|---|---|---|---|---|---|
| | **(A)** Business code | **(B)** Amount | **(C)** Exclusion code | **(D)** Amount | |
| **93** Program service revenue: | | | | | |
| a Administrative Fee | | | | | 216,279,577. |
| b _____ | | | | | |
| c _____ | | | | | |
| d _____ | | | | | |
| e _____ | | | | | |
| f Medicare/Medicaid payments | | | | | |
| g Fees & contracts from government agencies | | | | | |
| **94** Membership dues and assessments | | | | | |
| **95** Interest on savings & temporary cash invmnts | | | 14 | 2,023,610. | |
| **96** Dividends & interest from securities | 525990 | 23,489. | 14 | 6,472,102. | |
| **97** Net rental income or (loss) from real estate: | | | | | |
| a debt-financed property | | | | | |
| b not debt-financed property | | | 16 | 3,999,998. | |
| **98** Net rental income or (loss) from pers prop | | | | | |
| **99** Other investment income | | | | | |
| **100** Gain or (loss) from sales of assets other than inventory | | | 18 | -8,449,944. | |
| **101** Net income or (loss) from special events | | | | | |
| **102** Gross profit or (loss) from sales of inventory | | | | | |
| **103** Other revenue: a | | * | | . | |
| b Administrative Fee | 561000 | 4,657,805. | | | |
| c Partnership Income | | | | | 297,529. |
| d Purchase Rebates | | | 01 | 26,326. | |
| e Child Care Revenue | | | 03 | 765,039. | |
| **104** Subtotal (add columns (B), (D), and (E)) | | 4,681,294. | | 4,837,131. | 216,577,106. |
| **105** Total (add line 104, columns (B), (D), and (E)). . . . | | | | ► | 226,095,531. |

Note: *Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.*

## Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes (See instructions.)

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| 93(a) | Administrative fee revenue generated from the provision of management, |
| | strategic planning, and development services to the Massachusetts General |
| | Hospital, The Brigham and Women's/Faulkner Hospitals, Inc., The North |
| | See Relationship of Activities to the Accomplishment of Exempt Purposes Statement |

## Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities (See instructions.)

| **(A)** Name, address, and EIN of corporation, partnership, or disregarded entity | **(B)** Percentage of ownership interest | **(C)** Nature of activities | **(D)** Total income | **(E)** End-of-year assets |
|---|---|---|---|---|
| Partners Community HealthCare, Inc. | 100.0000 % | Health Care Services | 101,803,996. | 68,963,497. |
| | % | | | |
| | % | | | |
| | % | | | |

## Part X | Information Regarding Transfers Associated with Personal Benefit Contracts (See instructions.)

a Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?    ☐ Yes  ☒ No
b Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . . . . . .    ☐ Yes  ☒ No
Note: *If 'Yes' to (b), file Form 8870 and Form 4720 (see instructions).*

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

Please
Sign

►  Peter K. Markell                          8/4/04
Date

Finance

| | Date | Check if self- ☐ | Preparer's SSN or PTIN (see General Instruction W) |

EXHIBIT 4

PARTNERS HEALTHCARE

# What Is Partners?

## MISSION, VISION, GOALS

### Our Mission

Partners is committed to serving the community. We are dedicated to enhancing patient care, teaching and research, and to taking a leadership role as an integrated health care system. We recognize that increasing value and continuously improving quality are essential to maintaining excellence.

### Our Vision

Partners is an integrated health care system that serves our communities by providing the full range of services from preventive primary care to long-term care. We improve our quality of care and further serve the public at large by pursuing our teaching and research missions. True to our heritage, we seek to attract the best people and to be an international leader in fulfilling our missions. We recognize that increasing value and continuously improving quality are essential to maintaining excellence.

### Our Goals

Partners' goals include targeted tasks in each of these twelve areas:

Research and education
Patient care: quality improvement
Patient care: sharing across the system
Patient care: non-acute care services
Service to the community
Labor force diversity and retention
Financial stability
PCHI
Public policy and advocacy
Communications
Aligned incentives
Disaster preparedness

© Copyright 2005 Partners HealthCare System, Inc

EXHIBIT 34

EXHIBIT 5



**ABOUT PARTNERS** | **OUR HOSPITALS AND AFFILIATES** | **RESEARCH AND TEACHING** | **INFO FOR HEALTH CARE PROVIDERS** | **PATIENT CARE AND HEALTH INFO** | **FIND A PHYSICIAN** | **CAREERS**

RESEARCH & TEACHING

- Teaching at Partners



- Graduate Medical Education
  - About Us
  - BWH-Residencies & Fellowships
  - MGH-Residencies & Fellowships
  - Office of GME
  - Trainee Policies, Benefits & Responsibilities
  - Contact Us
  - Housestaff Manual
- Research At Partners
- Clinical Trials
- IRBs / QI / Events Calendar

**Search:**

Member's Sites 

## About Us


Research and Teaching

Partners hospitals sponsor residency and fellowship programs that combine the strength of the system's faculty with outstanding clinical resources. Since Partners was founded, Massachusetts General Hospital (MGH) and Brigham and Women's Hospital (BWH) have combined forces to integrate many teaching programs and make them even stronger.

Currently, 29 residency and fellowship programs are integrated, offering trainees exposure to more varied patient populations, alternative methods of care, different clinical settings and the talents of two renowned faculties.

### RESIDENCIES AND FELLOWSHIPS

GME training programs including approximately 100 residencies and fellowships that are accredited by the ACGME (Accreditation Council for Graduate Medical Education). Select below to view a list of graduate medical education programs (as of 10/03) sponsored by:

Massachusetts General Hospital
Brigham and Women's/Faulkner Hospital

Visit the education sites at our other member hospitals:

Newton-Wellesley Hospital
Spaulding Rehabilitation Hospital Network
North Shore Medical Center

© Copyright 2005 Partners HealthCare System, Inc



EXHIBIT 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

               Plaintiff,

      v.                            Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

               Defendant.

_____/

## DEFENDANT PARTNERS HEALTHCARE SYSTEM, INC.'S
## SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S
## FIRST SET OF REQUESTS FOR ADMISSION

Defendant Partners Healthcare System, Inc. ("Partners"), by and through its undersigned

counsel, and pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, hereby submits

supplemental responses and objections to Plaintiff United States of America's First Set of

Requests for Admission.

## GENERAL OBJECTIONS

1.      Partners incorporates these General Objections into each and every one of its

responses to Plaintiff's requests for admission.

2.      Partners objects to each and every request for admission to the extent that it is

unreasonably vague, overly broad, ambiguous, repetitious, unduly burdensome, or purports to

require the disclosure of information beyond the scope of permissible discovery under the

Federal Rules of Civil Procedure or this Court's Local Rules.

3.      Partners objects to each and every request for admission to the extent that it seeks

information or documents protected by the attorney-client privilege, the attorney work product

doctrine, or other applicable privileges. The inadvertent production of any privileged information shall not signify any intent by Partners to waive any applicable privileges.

4.    Partners objects to each and every request for admission to the extent that it is not reasonably calculated to lead to the discovery of admissible information.

5.    Partners objects to each and every request for admission using "refer," relate," or "respecting," or similar terms to the extent that they are used in a manner that would render such requests overly broad, vague, or ambiguous, or require subjective judgment and speculation on the part of Partners.

6.    Partners objects to each and every request for admission to the extent that it seeks identification, descriptions, and/or production of "all" documents or "all" agreements, etc., as being overly broad and unduly burdensome.

7.    Partners objects to each and every request for admission to the extent that it calls for the production of documents or information already in the possession of the Plaintiff or publicly available to any party, on the grounds that such a request is unduly burdensome.

8.    Partners' responses are based on its current understanding of the issues involved in this litigation and the facts pertaining to those issues. Partners reserves the right to amend or supplement its responses based on its continuing investigation of this case.

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1:**    A medical student is a person who is pursuing a course of study at a medical school and has not yet received a terminal medical degree (e.g., M.D., D.D.S., D.P.M.).

**Partners' Response:**  Subject to and without waiving the General Objections, Partners admits Request No. 1.

**Request No. 2:**    A medical resident is a person who has received such a degree and is undergoing further training in a medical or dental specialty.

**Partners' Response:**  Subject to and without waiving the General Objections, Partners admits that a person who has received a degree from a medical school and is undergoing further training in a medical specialty may be a medical resident.

**Request No. 3:**    An intern is a resident in his or her first year of training out of medical school.

**Partners' Response:**  Subject to and without waiving the General Objections, Partners admits that an intern may be, but is not necessarily, a resident in his or her first year of training out of medical school.

**Request No. 4:**    A fellow is a resident who has completed a medical specialty and is pursuing a medical subspecialty.

**Partners' Response:**  Subject to and without waiving the General Objections, Partners admits that a medical resident who has completed a medical specialty and is pursuing a medical subspecialty may be a fellow.

**Request No. 5:**    For the period in issue, none of the residents in issue paid tuition or other fees to the defendant to participate or enroll in the residency program to which each such resident was assigned.

-3-

**Partners' Response:** Subject to and without waiving the General Objections, Partners admits that some residents paid an application fee and all residents pay licensing fees (to the licensing board, not the hospital) in order to participate in the residency program. None of the residents in issue paid tuition in order to participate in the residency program.

**Request No. 6:**    There were no restrictions placed on the use of the stipends paid by the defendant to the residents in issue during the period in issue.

**Partners' Response:** Subject to and without waiving the General Objections, Partners admits Request No. 6.

**Request No. 7:**    The residents in issue are not "candidates for a degree" within the meaning of Internal Revenue Code § 117(a).

**Partners' Response:** Partners objects to this request pursuant to the General Objections and on grounds that it calls for a legal conclusion.

**Request No. 8:**    Each resident in issue who successfully completed the residency program was issued a certificate of completion by the hospital that sponsored the resident's residency program.

**Partners' Response:** Subject to and without waiving the General Objections, Partners admits Request No. 8.

**Request No. 9:**    The certificate of completion permitted each resident receiving such documentation to take an exam that, if passed, would allow the resident to be board certified in his or her specialty or subspecialty.

**Partners' Response:** Subject to and without waiving the General Objections, Partners admits that a certification of completion is a prerequisite to sitting for the exam.

**Request No. 10:**    The stipends paid to the residents in issue were based upon nationally established rates by postgraduate year, with a locality adjustment.

- 4 -

**Partners' Response:** Subject to and without waiving the General Objections, Partners

denies Request No. 10.

**Request No. 11:**     As one of the conditions to receiving his or her stipend from the defendant, each resident in issue was required, under the terms of his or her graduate trainee contract, to provide patient care services.

      **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 11.

**Request No. 12:**     The hospital to which each resident in issue was assigned paid all stipends to such residents.

      **Partners' Response:** Subject to and without waiving the General Objections, Partners

denies Request No. 12.

**Request No. 13:**     Patient care is not incidental to the education of the residents in issue.

      **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 13.

**Request No. 14:**     The hospital to which each resident in issue was assigned provided fringe benefits to the residents such as malpractice insurance and eligibility to participate in the hospital's tax sheltered annuity retirement plan.

      **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits that the hospital to which each resident in issue was assigned provided fringe benefits to

the residents such as malpractice insurance and eligibility to participate in the hospital's tax

sheltered annuity plan.

**Request No. 15:**     The primary function of the hospitals to which the residents in issue were assigned is to provide patient care services.

      **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits that patient care is one of the primary functions of the hospitals.

**Request No. 16:**    It is the sponsoring hospital, such as Massachusetts General Hospital or Brigham and Women's Hospital, that accepts or rejects the applications of the medical students that are applying for an internship, residency or fellowship.

    **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 16.

**Request No. 17:**    The residents in issue do not register for any credit hours in connection with their residency program.

    **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits that no "credit hours" are issued in connection with the residency programs.

**Request No. 18:**    Each resident in issue is covered by a malpractice insurance policy for which he or she pays no premiums.

    **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 18.

**Request No. 19:**    Prior to the defendant's filing of the Forms 941c on November 12, 2003, and May 10, 2004, the defendant had always treated the medical residents' payments as wages from employment subject to the FICA tax.

    **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 19.

**Request No. 20:**    Each resident in issue was issued an IRS Form W-2, Wage and Tax Statement, with respect to the amount paid to each such resident during the period in issue.

    **Partners' Response:** Subject to and without waiving the General Objections, Partners

admits Request No. 20.

**Request No. 21:**    Exhibit 1, attached hereto is a genuine copy of the defendant's Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, Form 1023, executed on October 17, 1994, by H. Richard Nesson, Chief Executive.

-6-

**Partners' Response:**  Subject to and without waiving the General Objections, Partners admits Request No. 21.

Dated: January \[ \], 2006

_____
BENJAMIN A. GOLDBERGER (BBO No. 654357)
JOSEPH H. SELBY (BBO No. 643275, *admitted pro hac vice*)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Telephone:  (617) 535-4000
Facsimile:  (617) 535-3800
E-Mail: bgoldberger@mwe.com
          jselby@mwe.com

CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 756-8310
Facsimile:  (202) 756-8087
E-Mail: ckliefoth@mwe.com

*Attorneys for Partners Healthcare System, Inc.*

WDC99 1183600-1.057158.0039

- 7 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing DEFENDANT PARTNERS

HEALTHCARE SYSTEM, INC.'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO

PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION was served on this ⌐ day of

January, 2006 by email on:

<div align="center">

Stephen T. Lyons
Senior Trial Attorney, Tax Division
U.S. Department of Justice
555 4th Street, NW
Washington, DC 20044
(202) 307-6546

Sheryl L. Beauregard

</div>

EXHIBIT 7



▸ Close Window

**To Be Issued To: All Interns and Residents, and all Clinical and/or Clinical and Research Fellows enrolled in a clinical training program accredited by the Accreditation Council for Graduate Medical Education (ACGME).**

**GRADUATE TRAINEE BENEFITS AND RESPONSIBILITIES**

This document describes generally your responsibilities and benefits as a*[n][insert Intern, Resident, Clinical Fellow or Clinical and Research Fellow]* (hereinafter "Graduate Trainee") for the one year beginning _____, 2005. It also describes certain of the Hospital's responsibilities, and includes certain policies applicable, to graduate trainees.

Engagement:

The Hospital hereby engages the graduate trainee as a _____ *(1 st, 2 nd, 3 rd, etc.)* year graduate trainee in the _____ *Program.* **The graduate trainee acknowledges that this engagement is subject to the bylaws, policies and procedures of the Hospital's** Medical/Professional Staff and the *Department of* _____, **and is contingent** upon:

> successful completion of the Hospital and Department credentialling process, and appointment by the Board of Trustees
> fulfillment of the medical licensure requirements of the Massachusetts Board of Registration in Medicine
> maintenance of an appropriate appointment to the Medical/Professional Staff.

Graduate Trainee Responsibilities :

> The graduate trainee shall:
> provide patient care, under appropriate supervision, as assigned by the training program director or his/her designee, consistent with the educational goals of the program and the highest standards of patient care ("patient care" includes responsibility for associated documentation in the medical record, which should be completed in a timely fashion, and attendance at patient care rounds as assigned)
> make appropriate use of the available supervisory and support systems, seeking advice and input from the attending staff physician/s when and as appropriate, and in accordance with the Hospital Guidelines for Supervision of Residents and Clinical Fellows
> participate fully in the educational and scholarly activities of the training program as specified by the training program director, including attendance at didactic conferences and other responsibilities which may include a research project, completion of examinations, maintenance of procedure logs or other items
> develop a personal program of learning to foster continued professional growth, with guidance from the teaching staff
> assume responsibility, as called upon, in teaching more junior trainees and medical students, within the scope of the training program

participate in improving the quality of education provided by the training program, in part
by submitting at least annually confidential written evaluations of the faculty, the
program and the overall educational experience

adhere to established practices, procedures and policies of the Hospital, the Hospital's
Medical/Professional Staff, the Department and affiliated training sites

participate in institutional programs, councils or committees and other medical staff
activities, as appropriate

abide by the institutional and program-specific Resident Duty Hours Policies and, as
scheduled by the program director, accurately report his/her duty hours

comply with institutional requirements for annual health and safety training, vaccinations
and TB testing.

Prior to completion of the program the graduate trainee shall satisfy the following
requirements, and provide written documentation to the training program director, where
appropriate:

all United States Medical Licensing Examination requirements, or pass an acceptable
equivalent examination

all published program and/or ACGME requirements for board or other certification

any other requirements for obtaining a full medical license.

These are conditions for issuance of a certificate of completion of the training program

Program Responsibilities:

The Hospital will provide:

a suitable academic environment for educational experience in the graduate trainee's
specialty or subspecialty area

a training program that strives to meet and exceed the standards of the Essentials of
Accredited Residencies prepared by the Accreditation Council for Graduate Medical
Education, when such Essentials apply

upon satisfactory completion of the training program, documentation of completion.

Compensation and Benefits :

For the period of this engagement, the graduate trainee's annual salary will be *[insert
either "as specified in the attached schedule of salaries for the graduate trainee's
particular year of training" OR fill in the dollar amount here $_____. [note:
attachment showing Partners salary amounts by PGY to be attached to contracts for
interns and residents only; the dollar amount of a fellow's salary should be indicated
here]*.

A summary of the graduate trainee's benefits package, which includes health, life and
disability insurance options, is attached . Additional information is available from the
Human Resources Department and is provided at the time of matriculation and/or
(annual) enrollment.

The Partners Employee Assistance Program (EAP) provides confidential professional
assistance and counseling to employees (including graduate trainees) and their
families. Their services include psychological and other support services and

counseling for personal and family issues (e.g., medical care, substance abuse, work-related stress, financial concerns, relationship issues, domestic violence, etc.)

Job-related health services are provided to all employees (including graduate trainees) by Partners Occupational Health Services. Evaluation of any job-related injury or exposure is provided at no charge.

The *Department of* _____ will provide the graduate trainee with specific information regarding on-call rooms ("living quarters"), uniforms and laundry services, meals, beepers, e-mail access and parking as applicable .

Policies and Procedures:

In accordance with recommendations included in the ACGME Institutional Requirements, copies of the following policies, as currently in effect, are attached:

Graduate Trainee Adverse Action Process
Graduate Trainee Leave
Graduate Trainee Redress of Grievance
Graduate Trainee Moonlighting (i.e., Professional Activities Outside the Educational Program).

There are Partners/Hospital policies prohibiting sexual and other forms of harassment and providing a process by which allegations of workplace harassment may be reviewed. The Hospital also has a policy regarding physician impairment due to substance (drug or alcohol) abuse. These policies will be provided to a matriculating graduate trainee on or about the start of the academic year or sooner, upon request, and are, along with several other important policies as currently in effect, included in the Partners House Officers' Manual\*.

*Include the following statement, only if applicable:*

*During the term of this contract, the graduate trainee will **not** engage in any professional activities outside the scope of this training program: that is, moonlighting is prohibited.*

Professional Liability Insurance :

The Hospital shall provide appropriate professional liability coverage consistent with the coverage provided for other medical/professional practitioners. This coverage presently is provided through the Controlled Risk Insurance Company, Ltd. (CRICO). The limit of liability currently is $5 million per claim and $10 million annual aggregate per physician.

This coverage provides legal defense and protection against awards from claims for which the graduate trainee would be liable reported or filed after the completion of training if the alleged acts or omissions occurred within the scope of the education program.

Insurance provided by the Hospital generally applies only to activities performed within the scope of the training program and approved affiliations, and to certain moonlighting activities, as defined by CRICO, if (a) in compliance with the attached Graduate Trainee Moonlighting Policy and (b) approved in writing by the Department Chief or his/her

designee.

The CRICO program requires, among other things, that physicians report incidents and claims to the Hospital's Risk Management Office.

Graduate trainees shall not be liable in a suit for damages as a result of an act of omission related to rendering care in an emergency under the Commonwealth of Massachusetts "Good Samaritan" law.

Release of Information :

The graduate trainee understands and agrees that, should another institution, organization or individual to which the graduate trainee has applied for a position request a reference from the Hospital, the Hospital may share any and all appropriate information that it possesses concerning the graduate trainee, including information relating to any discipline, suspension or termination from the Program or the Hospital, or perceived inability to practice within commonly accepted standards of care. The graduate trainee hereby authorizes the Hospital to release such information under these circumstances at any time, provided such information is given in good faith and without malice.

Conditions for Re-engagement and Continuation in the Program :

This term of engagement expires at the end of the period defined above, unless sooner terminated in accordance with applicable policies. The engagement will be renewed by written notification to the graduate trainee upon successful evaluation by the training program director and/or Department Chief as to the graduate trainee's ability to continue with the Program, and satisfaction of the other conditions as stated below:

Re-appointment to the Staff and maintenance of appropriate appointment; and Successful completion of the assigned post-graduate level of the training program, as determined by the training program director. In making this determination the training program director may consider input from supervising attending physicians, chief residents and others who have worked closely with the graduate trainee during the period of this engagement. The training program director may also consider the results of an in-training examination, where applicable. The graduate trainee must, at a minimum, have completed responsibilities as appropriately assigned within the scope of the training program and attained the knowledge and skill necessary to progress to the next level of post-graduate training.

In instances where this engagement will not be renewed (other than by mutual agreement or program completion) the graduate trainee will be given written notice no later than four months prior to the agreement termination date shown above, unless the primary reason/s for and/or the decision to not renew occurs within the last four months of the term of this agreement, in which case the graduate trainee will be provided with as much advance written notice of the intent to not renew as the circumstances will reasonably allow.

Note: The Partners House Officers' Manual* contains a copy of the bylaws of the Medical/Professional Staff and institutional policies regarding residency reduction/closure, duty hours, contracts, supervision and other policies of interest to graduate trainees.

* http://www.partners.org/departments/teaching/gme/ho_mdir.htm

Signed:

_____   _____

Graduate Trainee *(type in name here)* Date

_____   _____

*Chief of Service or Training Program Director* Date

*(type in title and name here)*

Attachments:

> *Academic Year 2005-06 schedule of Resident Salaries by Post-Graduate Year [include this bullet and attach a copy of the PGY salary scale if the graduate trainee is an intern or resident; delete this bullet if this contract is being given to a fellow, and do **not** attach the PGY salary schedule]*

> Summary of benefits *[attach either the residents or the fellows benefits summary document]*

> Current policies regarding Graduate Trainee:
> Leave
> Redress of Grievance
> Adverse Action
> Professional Activities Outside the Educational Program (Moonlighting)

Print Window

▲ Back to Top

© Copyright 2003 Partners HealthCare System, Inc.



▸ Return To Main Site

Print

## Partners Residents Benefits

The following is a brief description of the Partners Residents Benefits program. To be eligible for benefits you must be regularly scheduled to work at least 87 hours per month at a standard hospital salary of at least $833.34 per month.

## Total Choice

Total Choice is designed to give you the flexibility to customize a benefits program that meets your needs (and the needs of your family). Each year, you have the opportunity to change your coverage in response to new life events and you/your family's changing needs. Partners provides core benefit coverage and also provides "Choice Pay", which you may allocate toward the purchase of those benefits which best address your current needs. The monthly amount of Choice Pay you receive changes annually; for 2005 is $173.00

You may use your Choice Pay to pay for benefit coverage, to accumulate savings for retirement, or you may elect to receive it as taxable compensation. It is your decision during each annual enrollment period how to allocate your Choice Pay for the next year.

## Medical Coverage

You have a selection of six plans representing the full spectrum of healthcare program offerings, from fee-for-service to HMOs: Master Health Plus, Partners Plus, Partners Value, Harvard Pilgrim Health Care, Neighborhood Health Plan and Tufts Health Plan.

You will receive an additional Medical Choice Pay allocation (only if you elect medical coverage) toward the purchase of health coverage, which varies depending on your level of coverage: employee only, employee plus spouse/same-sex partner, employee plus children or family.

## Pharmacy Coverage

If you enroll in a medical plan you will automatically be enrolled for pharmacy coverage. The pharmacy benefit is provided through MedcoHealth TM and provides prescription drug coverage using a network of participating pharmacies or mail order service.

## Dental Coverage

You may select from two Delta Dental plans: Major or Basic. You will receive an additional Dental Choice Pay allocation (only if you elect dental coverage) toward the purchase of dental coverage, which varies depending on your level of coverage: employee only, employee plus spouse/same-sex partner, employee plus children or family.

## Vision Coverage

Davis Vision provides coverage for basic vision services using a network of participating optometrists. A reduced level of benefit is available for out-of-network services.

## Long Term Disability

You may elect a 60% or 80% pay continuation benefit. By enrolling for Long Term Disability coverage, if you become disabled you will receive monthly income and your medical, dental, vision and basic life insurance

coverage will continue. The plan has loan repayment options, a portability provision and a feature that allows residents to protect against future earnings loss due to disability.

### Life Insurance and Accidental Death and Dismemberment (AD&D)

You receive one times your pay in life insurance as part of your core benefit program. You may choose to purchase additional life insurance or AD&D insurance, to increase your level of coverage, or you may purchase coverage for your spouse/same-sex partner and/or dependent child(ren).

## Tax Saver Accounts

You may establish reimbursement accounts for health care and/or dependent care expenses. These accounts are used to set aside pre-tax dollars to reimburse dependent care expenses and/or uninsured health care expenses. The annual maximum for the Health Care Account is $3000.00, and the maximum for the Dependent Care account is $5000.00 per family. (The IRS prohibits using reimbursement accounts to reimburse yourself for expenses incurred by domestic partners or their dependent children)

## Retirement

Tax sheltered annuities (TSA - 403B plan) permits you to voluntarily save on a pre-tax basis through salary reduction for retirement with the following vendors: TIAA-CREF, Fidelity and Vanguard.


Reviewed 02/08/05

▲ Back to Top



Return To Main Site

Print

## RESIDENT SALARIES BY POST-GRADUATE YEAR

### ACADEMIC YEAR 2005-2006

Brigham and Women's Hospital
Massachusetts General Hospital
Spaulding Rehabilitation Hospital

| PGY | Salary |
|-----|--------|
| 1 | $47,000 |
| 2 | $48,247 |
| 3 | $51,050 |
| 4 | $53,343 |
| 5 | $55,625 |
| 6 | $58,320 |
| 7 | $61,507 |

▲ Back to Top



‣ Return To Main Site

Print

## GRADUATE TRAINEE LEAVE POLICY
### (Attachment to contract issued to graduate trainees in ACGME programs)

**General Note:**

Since each graduate trainee must meet certain education requirements as defined by the program, ACGME and/or by the applicable American Board of Medical Specialties, the graduate trainee may be required by his/her Chief(s) or training program director to make up missed time upon returning from any leave prior to advancing to the next level of training and/or prior to completion of the training program. In such cases restoration of the graduate trainee's previous position beyond the term of the original appointment and provision of salary during the "make up" period are at the discretion of the Chief(s); the Hospital is not required to extend the period of training to accommodate this.

Whenever the need for leave is foreseeable, the graduate trainee will make a reasonable effort to schedule the leave so as not to unduly burden the program, and give notice no fewer than thirty (30) days before the leave is to begin. If the nature of the leave requires that the leave begin in fewer than thirty days, the graduate trainee will give notice as soon as is practicable. A graduate trainee should give the training program director notice as far in advance as possible regarding planned parental leave or family medical leave; six months (confidential) notice is requested for planned leave after the birth of a child, in order to facilitate appropriate scheduling.

Appropriate medical documentation and clearance must be provided to the Chief upon reasonable request.

I. Vacation Time

Each Chief shall determine the amount of annual paid vacation time to which graduate trainees in his/her department are entitled. The minimum entitlement is ten (10) working days annually. Vacation time must be used within the academic year.

II. Sick Time

A graduate trainee is entitled to twelve (12) paid sick days annually upon matriculation, to be used solely for illness significant enough to interfere with the performance of duty. Unused sick days may accrue to a maximum of sixty (60) days, but they may not be "cashed in".

III. Family and Medical Leave

A graduate trainee may request up to twelve (12) weeks of leave for any of the following reasons:

A. Family medical leave: taken in order to care for a spouse, child or parent with a serious health condition. (A "serious health condition" is an illness, injury, impairment or physical or mental condition that involves either inpatient care or continuing treatment by a health care provider.)

B. Personal medical leave: taken because of a serious health condition that makes the individual unable to perform the functions of his/her position.

C. Parental leave: taken in the event of childbirth or placement of a child for adoption or foster care

IV. Additional Provisions Relating to Family and Medical Leave

A. Upon return from an approved family or medical leave of absence, the graduate trainee will be restored to the position left.

B. If enrolled at the time of commencement of an approved family leave, the Hospital will maintain the graduate trainee's health and other insurance coverage at the same levels and cost to the individual during the period of leave.

C. If an intermittent or partial leave (i.e., a reduced work schedule) is requested, the Chief and/or training program director may alter the graduate trainee's work schedule in order to accommodate the leave.

V. Personal Leave of Absence

Chiefs may on occasion, in accordance with the bylaws of the Professional Staff, grant a leave of absence to a graduate trainee for any form of extended illness or disability or for other compelling reasons (i.e., personal leave of absence). Such leave must be requested in writing with maximal advance notice prior to the requested leave date.

VI. Salary Continuance

Salary will be continued as follows:

Family medical leave: Graduate trainees may use vacation time, but *not* accrued sick time, for family medical leave. Salary will be continued only in *exceptional* circumstances, at the discretion of the Chief.

Personal medical leave: The graduate trainee must use any accrued sick time while on personal medical leave. At the discretion of the Chief, the graduate trainee may use vacation time while on personal medical leave in order to provide salary continuance. An additional period of salary continuance may be given at the discretion of the Chief up to a maximum of ninety (90) days. (Long term disability insurance may apply after that period of time.)

Parental leave: Graduate trainees who have delivered a child are eligible for salary continuance for a period of up to eight weeks following childbirth, and are not required to use any accrued sick or vacation time during the leave. Graduate trainees requesting leave in the case of adoption or paternity will have salary continuance at the discretion of the Chief. For any parental leave, vacation time may be used to provide or extend a period of paid leave up to a maximum of twelve weeks.

Personal leaves of absence: Graduate trainees may use vacation time, but *not* accrued sick time, for personal leave. Salary will be continued only in *exceptional* circumstances, at the discretion of the Chief.

▲ Back to Top

PARTNERS HEALTHCARE

▸ Return To Main Site

Print

## Brigham and Women's and Massachusetts General Hospitals Institutional Policy re: Resident Duty Hours

The following provisions apply to all graduate medical education training programs sponsored by the Brigham and Women's and/or Massachusetts General Hospitals and accredited by the Accreditation Council for Graduate Medical Education (ACGME). Further, they apply to residents in these programs assigned to any other institution or clinical site as part of their GME program.

Resident duty hours are herein defined as time spent at the worksite performing clinical and/or academic activities required by the resident's GME training program, including:

patient care activities, both inpatient and ambulatory, whether scheduled or not (i.e., includes time spent in the hospital when a resident is called in from home)
administrative activities that are related to patient care
in-hospital "on call", regardless of what the resident activities are during such periods
scheduled academic activities (i.e., conferences and other didactics).

(Exclusions: beeper call from home and/or academic preparatory work that is or could be done offsite.)

The Hospital endorses the duty hour and on-call limits defined by the ACGME (paraphrased below in italics), with additional clarifications and extensions as noted:

*Residents must not be assigned duty hours in excess of 80 hours per week, averaged over a four-week period.* Note: Programs that have received approval, first from the Hospi-tal's GME Committee and then from their RRC, may assign up 88 hours of duty per week. Moonlighting hours shall be counted toward the weekly duty hours limit.
*Residents must be provided with at least one day off in seven, averaged over a four-week period.* Note: A day off is defined as a continuous 24-hour period free from assigned educational and clinical responsibilities, including offsite beeper call, rounds and conferences.
*Residents must not be assigned in-house call any more often than every third night, averaged over a four-week period.* Note: This excludes beeper call from home.
*Residents should have at least 10 hours off between regularly scheduled on-site duty shifts (including after in-house call).* Note: This is not meant to preclude short duty periods punctuated by short breaks, such as 6 hours on/2 hours off/6 hours on, which might also be considered as a single 14-hour shift.
*Residents must not be scheduled to work in excess of 24 consecutive hours.* Note: While residents may remain on duty a maximum of six additional hours to participate in didactic and certain clinical activities to maintain continuity of care, residents may not assume the care of new patients after 24 hours of continuous on-site duty, as specified by the individual RRC.

In addition to the above, the Hospital further requires that assigned clinical responsibilities (including offsite call) must not preclude adequate rest and reasonable personal time. In this regard, program directors should carefully monitor the frequency of extended shifts, moonlighting activity and instances of urgent or emergent patient care requiring the resident's return to the worksite during periods of call from home.

Each program is required to have a written duty hours policy consistent with this Institutional Policy. Such policies must also address any additional limits on resident work-hours included in the relevant ACGME (sub)specialty Program Requirements.

Programs must provide alternative coverage for a resident's clinical responsibilities if the resident is too fatigued to continue his/her assigned clinical responsibilities. Residents must promptly notify a supervising physician if they are concerned that fatigue is impairing their performance. (Unless otherwise specified by the program, residents should notify the supervising physician as outlined in the program's Resident Supervision Policy for cases of illness arising during a work shift.)

The program's duty hours policy and resident relief procedures must be communicated to all members of the faculty and resident staff.

Program directors shall define a schedule for monitoring resident work hours. During periods of monitoring, residents are required to document their workhours accurately and completely. Program directors shall periodically review the data with the goal of ensuring compliance with this and the program's duty hours policies and report their findings and responses to the GME Office and/or the Hospital's Graduate Medical Education Committee upon request.

Program Directors shall ensure that training regarding the symptoms of fatigue and their effects on performance is provided to faculty and residents.

Residents should report a pattern of excessive duty hours and/or clinical workload to their program director and/or department chief. If appropriate changes in the program or individual resident's schedules are not implemented on a timely basis, residents should so inform the Hospital's Director or Associate Director of Graduate Medical Education.

Approved by the Partners Education Committee, 3/15/04

▲ Back to Top



‣ Return To Main Site

Print

## MALPRACTICE COVERAGE

All BWH and MGH physicians are required to maintain professional liability insurance coverage once granted clinical privileges. House Officers are enrolled in the Controlled Risk Insurance Company, Ltd. (CRICO) malpractice insurance program as part of the credentialing process.

CRICO was formed in 1976 by the Harvard affiliated medical institutions to underwrite medical malpractice and general liability insurance for themselves and doctors closely affiliated with the institutions. Both physicians and non-physician employees are covered under the program for claims arising from activities within the scope of their employment. The agent for CRICO is the Risk Management Foundation.

Note: The CRICO program requires that physicians report incidents and claims to the hospital's Risk Manager at BWH (617-732-6442) or MGH (617-726-2111).

‣ Back to Top

▸ Return To Main Site



## EMPLOYEE ASSISTANCE PROGRAM

Director: Andrea Stidsen, LICSW, BCD, CEAP

|  | MGH | BWH |
|---|---|---|
| Location | VBK-Room 427 | Neville House-Room 128 |
| Telephone | 617-726-6976 | 617-732-6017 |
| Facsimile | 617-726-5941 | 617-264-6347 |

The Employee Assistance Program (EAP) is a free, confidential service which offers consultation, assessment, short-term counseling, and referrals by licensed clinicians. Assistance is available to all House Officers, fellows, Professional Staff and their family members, for issues including but not limited to work problems, family issues (child/elder care, domestic violence, relationship difficulties), mental health (stress, depression, anxiety, substance abuse), trauma, grief /bereavement, legal issues, financial difficulties, sexual orientation concerns and life transitions. Additionally, the EAP sponsors a variety of Work/Life Seminars/Educational Programs, and Work Group Interventions. Some of these Interventions include Stress Management, Critical Incident Stress Debriefing, Change Management, and Cumulative Grief. Appointments are available at MGH or BWH, Monday, Wednesday and Friday, 8:00am to 5:00pm, and Tuesday and Thursday, 8:00am to 6:00 pm. Appointments at other times are available by special arrangement. Below is a brief description of a few of the resources which the EAP helps to coordinate.

## THE MOTHER'S CORNER

Lactation Support for Working Mother's

The Mother's corner provides electric breast pumps in a private comfortable room, so working mothers can express milk while at work. Pumps are available at the MGH and BWH Main Campus', MGH East, One Constitution Plaza and Revere Health Center. In order to use the pumps you will need attachments, which can be purchased at MGH and BWH Main Campus'. The rooms are open 24-hours a day, seven days a week.

In addition to the lactation rooms, the EAP has informational packets on breastfeeding, a lending library and access to a lactation consultant to answer employee's lactation questions. If you are interested in using the Mother's Corner or accessing some of the other lactation resources, contact the EAP directly.

## PARENTS IN A PINCH, INC.

Off-site Back-up Childcare for BWH and Partners Corporate Employees
Parents in a Pinch provides back-up child-care when regular childcare services are temporarily unavailable. Back-up care is offered in three settings:

In-home care is available 24-hours a day, seven days a week. Providers are screened by Parents in a Pinch for references, criminal background, and health/safety training. Rates: $10 per hour for one child;$.1.00 per hour for each additional child. Transportation Fees: $.30 per mile when provider uses

his/her own car; taxi-fare required after 8:00 pm.

Family Daycare services place children in family daycare home screened by Parents in a Pinch. Rates: $7 per hour.

Daycare Centers are available on a temporary, back-up basis. Rates: $7 per hour.

BWH Employees should pre- register for this benefit through the BWH Staff Activities Coordinator at 617-732-6584 , and Partners Employees should pre- register through the EAP, at 617-726-6976.

To schedule back-up childcare, call 617-739-KIDS, Monday through Friday,

8:00 am to 8:00 pm. Twenty-four hour notice is appreciated. For Emergencies, call (617)731-7262, 24 hours per day. Use of this benefit is subject to a yearly limit.

▲ Back to Top



**MASSACHUSETTS GENERAL HOSPITAL**

Prudential Tower, Suite 1150
800 Boylston Street
Boston, Massachusetts 02199
Tel: 617.278.1065. Fax: 617.278.0022

Ernest M. Haddad
*Secretary*

April 24, 2000

REDACTED
Pediatric Resident
PEDI HST

Dear REDACTED

    I am pleased to advise you that the Trustees of The General Hospital Corporation, at a meeting on April 21, 2000, appointed you Third Year Resident in Pediatrics for the period from July 1, 2000 to and including June 30, 2001. You will be paid at salary level 3. As a condition of your appointment, you have agreed to abide by the Bylaws, rules, regulations and policies of the Professional Staff and the Hospital.

    The Trustees are pleased to have you as a member of the Professional Staff.

Yours faithfully,

Ernest M. Haddad
Secretary to the Trustees

EMH/kpw

cc: Chief of Service
    Doctor's Payroll
    Registrar's Office



A Teaching Affiliate of
Harvard Medical School



PARTNERS. HealthCare System Member

PHS 002003

☑004                                          12/08/05  THU 16:40  FAX

EXHIBIT 8

## PARTNERS HEALTHCARE SYSTEM, INC
### RESIDENT SALARIES BY POST-GRADUATE YEAR

Academic Year 2005/2006

**Brigham and Women's Hospital**
**Massachusetts General Hospital**
**Spaulding Rehabilitation Hospital**

| PGY | 2005/2006 | 2004/2005 | 2003/2004 | 2002/2003 | 2001/2002 | 2000/2001 |
|---|---|---|---|---|---|---|
|  | FY05 | FY04 | FY03 | FY02 | FY01 | FY00 |
| 1 | $47,000 | $45,000 | $43,685 | $42,005 | $40,389 | $38,836 |
| 2 | $48,247 | $47,152 | $45,649 | $43,893 | $42,205 | $40,582 |
| 3 | $51,050 | $49,560 | $47,805 | $45,966 | $44,198 | $42,498 |
| 4 | $53,343 | $51,900 | $50,677 | $48,728 | $46,854 | $45,052 |
| 5 | $55,625 | $54,885 | $54,165 | $52,082 | $50,079 | $48,153 |
| 6 | $58,320 | $58,250 | $56,818 | $54,633 | $52,531 | $50,511 |
| 7 | $61,507 | $61,375 | $60,358 | $58,036 | $55,804 | $53,658 |

**CONFIDENTIAL INFORMATION**

PHS Human Resources/Compensation

EXHIBIT 9A

# TABLE OF CONTENTS

Statutes

Internal Revenue Code (26 U.S.C.):

§ 117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
§ 170(a) and (b) (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 1402(a,c) (current version) (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
§ 1402(a,c) (excerpts)(version prior to 1965 social security amendments
   which excepted self-employed physicians from the social security
   tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§ 3121(a) and (b) (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


Social Security Act of 1935, ch. 531, § 811, 49 Stat. 620, 639 [original definition
   of "wages" in 1935] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Social Security Act Amendments of 1939, ch. 666, §1426(a,b) 53 Stat
   1383-86 [original student exception from social security and original
   interne exception from social security] . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477:
   §204(a), 64 Stat. 528-532 [1950 version of student exception combining
   tax-exempt and non-tax-exempt student exception and retaining
   interne exception] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   §481, 64 Stat. 541-543 [1950 addition of self-employed individuals to
   social security, excepting certain professionals, including
   physicians . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Regulations:

Treasury Regulations (26 C.F.R.)
   § 1.170A-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   § 31.3121(b)(10)-1, 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   Proposed amendments to Treas. Reg. 31.3121(b)(2)-1 and Treas. Reg.
      § 31.3121(b)(10)-2, *reprinted in* 2004-10 I.R.B. 571-581 (March 8,
      2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Legislative History (Excerpts):

Social Security Act, ch. 531, 49 Stat. 620:
   H.R. Rep. No. 74-615 (1935), *reprinted in* 1939-2 C.B. 600 . . . . . . . . . . . . . . 44
   S. Rep. No. 74-628 (1935), *reprinted in* 1939-2 C.B. 611 . . . . . . . . . . . . . . . . 50

i

Legislative History (Excerpts)(cont'd)

Social Security Act Amendments of 1939, ch. 666, 53 Stat 1360:
    H.R. Rep. No. 76-728 (1939), *reprinted in* 1939-2 C.B. 538 . . . . . . . . . . . . . . 58
Social Security Act Amendments of 1950, ch. 809, 64 Stat. 477:
    H.R. Rep. No. 81-1300 (1949), *reprinted in* 1950-2 C.B. 255  . . . . . . . . . . . . . 72

Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286:
Health Insurance for the Aged Act, Pub. L. No. 89-97, 79 Stat. 286, 290:
Old Age, Survivors, and Disability Insurance Amendments of 1965, Pub. L. No.
    89-97, 79 Stat. 286, 361:
    H.R. Rep. No. 89-213 (1965), *reprinted in* 1965-2 C.B. 733  . . . . . . . . . . . . .  84
    S. Rep. No. 89-404, pt. I (1965), *reprinted in* 1965-2 C.B. 758  . . . . . . . . . . . .  89

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085:
    H.R. Conf. Rep. No. 99-841 (1986), *reprinted in* 1986-3 C.B.
    (vol. 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  91
    Staff of the Joint Comm. on Taxation, 100th Cong., *General Explanation of*
        *the Tax Reform Act of 1986* (Comm. Print 1987) . . . . . . . . . . . . . . . . . .  96

§ 117. Qualified scholarships  (current version)

(a) General rule.--Gross income does not include any amount received as a qualified scholarship by an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii).

(b) Qualified scholarship.--For purposes of this section--

(1) In general.--The term "qualified scholarship" means any amount received by an individual as a scholarship or fellowship grant to the extent the individual establishes that, in accordance with the conditions of the grant, such amount was used for qualified tuition and related expenses.

(2) Qualified tuition and related expenses.--For purposes of paragraph (1), the term "qualified tuition and related expenses" means--

(A) tuition and fees required for the enrollment or attendance of a student at an educational organization described in section 170(b)(1)(A)(ii), and

(B) fees, books, supplies, and equipment required for courses of instruction at such an educational organization.

(c) Limitation.--

(1) In general.--Except as provided in paragraph (2), subsections (a) and (d) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship or qualified tuition reduction.

(2) Exceptions.--Paragraph (1) shall not apply to any amount received by an individual under--

(A) the National Health Service Corps Scholarship Program under section 338A(g)(1)(A) of the Public Health Service Act, or

(B) the Armed Forces Health Professions Scholarship and Financial Assistance program under subchapter I of chapter 105 of title 10, United States Code.

(d) Qualified tuition reduction.--

(1) In general.--Gross income shall not include any qualified tuition reduction.

(2) Qualified tuition reduction.--For purposes of this subsection, the term "qualified tuition reduction" means the amount of any reduction in tuition provided to an

employee of an organization described in section 170(b)(1)(A)(ii) for the education (below the graduate level) at such organization (or another organization described in section 170(b)(1)(A)(ii)) of--

> (A) such employee, or

> (B) any person treated as an employee (or whose use is treated as an employee use) under the rules of section 132(h).

(3) Reduction must not discriminate in favor of highly compensated, etc.-- Paragraph (1) shall apply with respect to any qualified tuition reduction provided with respect to any highly compensated employee only if such reduction is available on substantially the same terms to each member of a group of employees which is defined under a reasonable classification set up by the employer which does not discriminate in favor of highly compensated employees (within the meaning of section 414(q)).  For purposes of this paragraph, the term "highly compensated employee" has the meaning given such term by section 414(q).

[(4) Repealed.  Pub.L. 101-140, Title II, § 203(a)(1), (2), Nov. 8, 1989, 103 Stat. 830]

(5) Special rules for teaching and research assistants.--In the case of the education of an individual who is a graduate student at an educational organization described in section 170(b)(1)(A)(ii) and who is engaged in teaching or research activities for such organization, paragraph (2) shall be applied as if it did not contain the phrase "(below the graduate level)".

§ 170. Charitable, etc., contributions and gifts

(a) Allowance of deduction.--

(1) General rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

* * *

(b) Percentage limitations.--

(1) Individuals.--In the case of an individual, the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.

(A) General rule.--Any charitable contribution to--

(i) a church or a convention or association of churches,

(ii) an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on,

(iii) an organization the principal purpose or functions of which are the providing of medical or hospital care or medical education or medical research, if the organization is a hospital, or if the organization is a medical research organization directly engaged in the continuous active conduct of medical research in conjunction with a hospital, and during the calendar year in which the contribution is made such organization is committed to spend such contributions for such research before January 1 of the fifth calendar year which begins after the date such contribution is made,

(iv) an organization which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such

organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from the United States or any State or political subdivision thereof or from direct or indirect contributions from the general public, and which is organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a college or university which

is an organization referred to in clause (ii) of this subparagraph and which is an agency or instrumentality of a State or political subdivision thereof, or which is owned or operated by a State or political subdivision thereof or by an agency or instrumentality of one or more States or political subdivisions,

(v) a governmental unit referred to in subsection (c)(1),

(vi) an organization referred to in subsection (c)(2) which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from a governmental unit referred to in subsection (c)(1) or from direct or indirect contributions from the general public,

(vii) a private foundation described in subparagraph (E), or

(viii) an organization described in section 509(a)(2) or (3),

shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

* * *

CHAPTER 2--TAX ON SELF-EMPLOYMENT INCOME

§ 1402. Definitions (current)

(a) Net earnings from self-employment.--The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss--

* * *

(c) Trade or business.--The term "trade or business", when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses), except that such term shall not include--

* * *

(5) the performance of service by an individual in the exercise of his profession as a Christian Science practitioner; or

§ 1402. Definitions  (1964)

(a) Net earnings from self-employment.--The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(9) from any trade or business carried on by a partnership of which he is a member; . . .

* * *

(c) Trade or business.--The term "trade or business", when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses), except that such term shall not include--

* * *

(5) the performance of service by an individual in the exercise of his profession as a doctor or medicine or Christian Science practitioner; or the performance of such service by a partnership.

§ 3121.  Definitions  (current version)

(a) Wages.--For purposes of this chapter, the term "wages" means all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash;  except that such term shall not include–

* * *

(20) any benefit provided to or on behalf of an employee if at the time such benefit is provided it is reasonable to believe that the employee will be able to exclude such benefit from income under section 74(c), 117, or 132; or

* * *

(b) Employment.--For purposes of this chapter, the term "employment" means any service, of whatever nature, performed (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) within the United States, or (ii) on or in connection with an American vessel or American aircraft under a contract of service which is entered into within the United States or during the performance of which and while the employee is employed on the vessel or aircraft it touches at a port in the United States, if the employee is employed on and in connection with such vessel or aircraft when outside the United States, or (B) outside the United States by a citizen or resident of the United States as an employee for an American employer (as defined in subsection (h)), or (C) if it is service, regardless of where or by whom performed, which is designated as employment or recognized as equivalent to employment under an agreement entered into under section 233 of the Social Security Act; · except that such term shall not include--

* * *

(10) service performed in the employ of--

(A) a school, college, or university, or

(B) an organization described in section 509(a)(3) if the organization is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of a school, college, or university and is operated, supervised, or controlled by or in connection with such school, college, or university, unless it is a school, college, or university of a State or a political subdivision thereof and the services performed in its employ by a student referred to in section 218(c)(5) of the Social Security Act are covered under the agreement between the Commissioner of Social Security and such State entered into pursuant to section 218 of such Act;

if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university;

\* \* \*

     (13) service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law;

material used in the manufacture of such stamp, coupon, ticket, book, or other device, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

## DEFINITIONS

Definitions.

SEC. 811. When used in this title—

(a) The term "wages" means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash; except that such term shall not include that part of the remuneration which, after remuneration equal to $3,000 has been paid to an individual by an employer with respect to employment during any calendar year, is paid to such individual by such employer with respect to employment during such calendar year.

"Wages."

(b) The term "employment" means any service, of whatever nature, performed within the United States by an employee for his employer, except—

"Employment."

(1) Agricultural labor;

(2) Domestic service in a private home;

(3) Casual labor not in the course of the employer's trade or business;

(4) Service performed by an individual who has attained the age of sixty-five;

(5) Service performed as an officer or member of the crew of a vessel documented under the laws of the United States or of any foreign country;

(6) Service performed in the employ of the United States Government or of an instrumentality of the United States;

(7) Service performed in the employ of a State, a political subdivision thereof, or an instrumentality of one or more States or political subdivisions;

(8) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

## TITLE IX—TAX ON EMPLOYERS OF EIGHT OR MORE

Title IX—Tax on employers of eight or more.

### IMPOSITION OF TAX

Imposition of tax.

SECTION 901. On and after January 1, 1936, every employer (as defined in section 907) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in section 907) payable by him (regardless of the time of payment) with respect to employment (as defined in section 907) during such calendar year:

Percentages.

*Post,* p. 642.

(1) With respect to employment during the calendar year 1936 the rate shall be 1 per centum;

(2) With respect to employment during the calendar year 1937 the rate shall be 2 per centum;

(3) With respect to employment after December 31, 1937, the rate shall be 3 per centum.

### CREDIT AGAINST TAX

Credit against tax.

SEC. 902. The taxpayer may credit against the tax imposed by section 901 the amount of contributions, with respect to employment during the taxable year, paid by him (before the date of filing his return for the taxable year) into an unemployment fund under a

Contributions into unemployment funds.

"(b) PENALTY FOR FAILURE TO FURNISH.—Any employer who wilfully fails to furnish a statement to an employee in the manner, at the time, and showing the information, required under subsection (a), shall for each such failure be subject to a civil penalty of not more than $5." <span style="float:right">*Penalty for failure to furnish.*</span>

SEC. 604. Section 1410 of the Internal Revenue Code is amended to read as follows: <span style="float:right">*Tax on employers*<br>*Ante, p. 175.*<br>*I. R. C. § 1410.*</span>

"SEC. 1410. RATE OF TAX.

"In addition to other taxes, every employer shall pay an excise tax, with respect to having individuals in his employ, equal to the following percentages of the wages (as defined in section 1426 (a)) paid by him after December 31, 1936, with respect to employment (as defined in section 1426 (b)) after such date: <span style="float:right">*Rate of tax.*</span>

"(1) With respect to wages paid during the calendar years 1939, 1940, 1941, and 1942, the rate shall be 1 per centum.

"(2) With respect to wages paid during the calendar years 1943, 1944, and 1945, the rate shall be 2 per centum.

"(3) With respect to wages paid during the calendar years 1946, 1947, and 1948, the rate shall be 2½ per centum.

"(4) With respect to wages paid after December 31, 1948, the rate shall be 3 per centum."

SEC. 605. Section 1411 of the Internal Revenue Code is amended to read as follows: <span style="float:right">*Ante, p. 176.*<br>*I. R. C. § 1411.*</span>

"SEC. 1411. ADJUSTMENT OF TAX.

"If more or less than the correct amount of tax imposed by section 1410 is paid with respect to any payment of remuneration, proper adjustments with respect to the tax shall be made, without interest, in such manner and at such times as may be prescribed by regulations made under this subchapter." <span style="float:right">*Adjustment of tax.*</span>

SEC. 606. Effective January 1, 1940, section 1426 of the Internal Revenue Code is amended to read as follows: <span style="float:right">*Ante, p. 177.*<br>*I. R. C. § 1426.*</span>

"SEC. 1426. DEFINITIONS.

"When used in this subchapter—

"(a) WAGES.—The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash; except that such term shall not include— <span style="float:right">*Definitions.*<br>*"Wages."*</span>

"(1) That part of the remuneration which, after remuneration equal to $3,000 has been paid to an individual by an employer with respect to employment during any calendar year, is paid to such individual by such employer with respect to employment during such calendar year;

"(2) The amount of any payment made to, or on behalf of, an employee under a plan or system established by an employer which makes provision for his employees generally or for a class or classes of his employees (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment), on account of (A) retirement, or (B) sickness or accident disability, or (C) medical and hospitalization expenses in connection with sickness or accident disability, or (D) death, provided the employee (i) has not the option to receive, instead of provision for such death benefit, any part of such payment or, if such death benefit is insured, any part of the premiums (or contributions to premiums) paid by his employer, and (ii) has not the right, under the provisions of the plan or system or policy of insurance providing for such death benefit, to assign such benefit, or to receive a cash consideration in lieu of such benefit either upon his withdrawal from the plan or system providing for such benefit or upon termination of such plan or

system or policy of insurance or of his employment with such employer;

"(3) The payment by an employer (without deduction from the remuneration of the employee) (A) of the tax imposed upon an employee under section 1400 or (B) of any payment required from an employee under a State unemployment compensation law; or

*Ante, p. 1381.*

"(4) Dismissal payments which the employer is not legally required to make.

"(b) EMPLOYMENT.—The term 'employment' means any service performed prior to January 1, 1940, which was employment as defined in this section prior to such date, and any service, of whatever nature, performed after December 31, 1939, by an employee for the person employing him, irrespective of the citizenship or residence of either, (A) within the United States, or (B) on or in connection with an American vessel under a contract of service which is entered into within the United States or during the performance of which the vessel touches at a port in the United States, if the employee is employed on and in connection with such vessel when outside the United States, except—

"Employment."

*Exceptions.*
*Agricultural labor.*

"(1) Agricultural labor (as defined in subsection (h) of this section);

*Domestic service.*

"(2) Domestic service in a private home, local college club, or local chapter of a college fraternity or sorority;

*Casual labor.*

"(3) Casual labor not in the course of the employer's trade or business;

*Individual in employ of son, daughter, etc.*

"(4) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of twenty-one in the employ of his father or mother;

*Vessels not American vessels.*

"(5) Service performed on or in connection with a vessel not an American vessel by an employee, if the employee is employed on and in connection with such vessel when outside the United States;

*United States Government, etc., employees.*

"(6) Service performed in the employ of the United States Government, or of an instrumentality of the United States which is (A) wholly owned by the United States, or (B) exempt from the tax imposed by section 1410 by virtue of any other provision of law;

*Ante, p. 1383.*

*State, etc., employees.*

"(7) Service performed in the employ of a State, or any political subdivision thereof, or any instrumentality of any one or more of the foregoing which is wholly owned by one or more States or political subdivisions; and any service performed in the employ of any instrumentality of one or more States or political subdivisions to the extent that the instrumentality is, with respect to such service, immune under the Constitution of the United States from the tax imposed by section 1410;

*Ante, p. 1383.*
*Religious, etc., corporations.*

"(8) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

*Employee or employee representative.*
*Ante, p. 181.*
*I. R. O. § 1532.*
*Certain corporations exempt from income tax; conditions.*
*Ante, p. 33.*
*I. R. O. § 101.*

"(9) Service performed by an individual as an employee or employee representative as defined in section 1532;

"(10) (A) Service performed in any calendar quarter in the employ of any organization exempt from income tax under section 101, if—

"(i) the remuneration for such service does not exceed $45, or

"(ii) such service is in connection with the collection of dues or premiums for a fraternal beneficiary society, order, or associa-

tion, and is performed away from the home office, or is ritualistic service in connection with any such society, order, or association, or

"(iii) such service is performed by a student who is enrolled and is regularly attending classes at a school, college, or university;

"(B) Service performed in the employ of an agricultural or horticultural organization exempt from income tax under section 101 (1);

Agricultural, etc., organizations.
*Ante,* p. 33.
I. R. C. § 101.
Voluntary employees' beneficiary associations.

"(C) Service performed in the employ of a voluntary employees' beneficiary association providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents, if (i) no part of its net earnings inures (other than through such payments) to the benefit of any private shareholder or individual, and (ii) 85 per centum or more of the income consists of amounts collected from members for the sole purpose of making such payments and meeting expenses;

"(D) Service performed in the employ of a voluntary employees' beneficiary association providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or their designated beneficiaries, if (i) admission to membership in such association is limited to individuals who are officers or employees of the United States Government, and (ii) no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual;

"(E) Service performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax under section 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university, and the remuneration for such service does not exceed $45 (exclusive of room, board, and tuition);

Schools, colleges, etc.

*Ante,* p. 33.
I. R. C. § 101.

"(11) Service performed in the employ of a foreign government (including service as a consular or other officer or employee or a nondiplomatic representative);

Foreign government employees.

"(12) Service performed in the employ of an instrumentality wholly owned by a foreign government—

Instrumentalities wholly owned by foreign governments

"(A) If the service is of a character similar to that performed in foreign countries by employees of the United States Government or of an instrumentality thereof; and

"(B) If the Secretary of State shall certify to the Secretary of the Treasury that the foreign government, with respect to whose instrumentality and employees thereof exemption is claimed, grants an equivalent exemption with respect to similar service performed in the foreign country by employees of the United States Government and of instrumentalities thereof;

"(13) Service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law; and service performed as an interne in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law;

Student nurses; internes.

"(14) Service performed by an individual in (or as an officer or member of the crew of a vessel while it is engaged in) the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life (including service performed by any such individual as an ordinary incident to any such activity), except (A) service performed in connection with the

Taking of aquatic animals, etc.

Exceptions.

1386      PUBLIC LAWS—CH. 666—AUG. 10, 1939    [53 Stat.

catching or taking of salmon or halibut, for commercial purposes, and (B) service performed on or in connection with a vessel of more than ten net tons (determined in the manner provided for determining the register tonnage of merchant vessels under the laws of the United States) ; or

**Individuals under age of 18 delivering newspapers, etc.**

"(15) Service performed by an individual under the age of eighteen in the delivery or distribution of newspapers or shopping news, not including delivery or distribution to any point for subsequent delivery or distribution.

**Included and excluded service.**

"(c) INCLUDED AND EXCLUDED SERVICE.—If the services performed during one-half or more of any pay period by an employee for the person employing him constitute employment, all the services of such employee for such period shall be deemed to be employment; but if the services performed during more than one-half of any such pay period by an employee for the person employing him do not constitute employment, then none of the services of such employee for such period shall be deemed to be employment. As used in this subsection the term 'pay period' means a period (of not more than thirty-one consecutive days) for which a payment of remuneration is ordinarily made to the employee by the person employing him. This subsection shall not be applicable with respect to services performed in a pay period by an employee for the person employing him, where any of such service is excepted by paragraph (9) of subsection (b).

**"Employee."**

"(d) EMPLOYEE.—The term 'employee' includes an officer of a corporation.

**"State."**

"(e) STATE.—The term 'State' includes Alaska, Hawaii, and the District of Columbia.

**"Person."**

"(f) PERSON.—The term 'person' means an individual, a trust or estate, a partnership, or a corporation.

**"American vessel."**

"(g) AMERICAN VESSEL.—The term 'American vessel' means any vessel documented or numbered under the laws of the United States; and includes any vessel which is neither documented or numbered under the laws of the United States nor documented under the laws of any foreign country, if its crew is employed solely by one or more citizens or residents of the United States or corporations organized under the laws of the United States or of any State.

**"Agricultural labor."**

"(h) AGRICULTURAL LABOR.—The term 'agricultural labor' includes all services performed—

"(1) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife.

"(2) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.

**46 Stat. 1550.**
**12 U.S.C. §1141j(g).**

"(3) In connection with the production or harvesting of maple sirup or maple sugar or any commodity defined as an agricultural commodity in section 15 (g) of the Agricultural Marketing Act, as amended, or in connection with the raising or harvesting of mushrooms, or in connection with the hatching of poultry, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways used exclusively for supplying and storing water for farming purposes.

013

**524**  PUBLIC LAWS—CH. 809—AUG. 28, 1950  [64 STAT.

*Ante, p. 492.*

*Ante, p. 489.*
49 Stat. 622.
42 U. S. C. §§ 401–
410; Sup. III, § 409.
*Ante,* pp. 482, 488,
489, 492, 512, 518, 521,
522, 523.

the amount of such remuneration with respect to which such taxes have been paid shall be deemed to constitute remuneration for employment as defined in section 209 (b) of the Social Security Act as in effect prior to the enactment of this Act (but it shall not constitute wages for purposes of deductions under section 203 of such Act for months for which benefits under title II of such Act have been certified and paid prior to the enactment of this Act).

## TITLE II—AMENDMENTS TO INTERNAL REVENUE CODE

### RATE OF TAX ON WAGES

53 Stat. 175.
26 U. S. C. Sup. III,
§ 1400 (2), (3).

SEC. 201. (a) Clauses (2) and (3) of section 1400 of the Internal Revenue Code are amended to read as follows:

"(2) With respect to wages received during the calendar years 1950 to 1953, both inclusive, the rate shall be 1½ per centum.

"(3) With respect to wages received during the calendar years 1954 to 1959, both inclusive, the rate shall be 2 per centum.

"(4) With respect to wages received during the calendar years 1960 to 1964, both inclusive, the rate shall be 2½ per centum.

"(5) With respect to wages received during the calendar years 1965 to 1969, both inclusive, the rate shall be 3 per centum.

"(6) With respect to wages received after December 31, 1969, the rate shall be 3¼ per centum."

53 Stat. 176.
26 U. S. C. Sup. III,
§ 1410 (2), (3).

(b) Clauses (2) and (3) of section 1410 of the Internal Revenue Code are amended to read as follows:

"(2) With respect to wages paid during the calendar years 1950 to 1953, both inclusive, the rate shall be 1½ per centum.

"(3) With respect to wages paid during the calendar years 1954 to 1959, both inclusive, the rate shall be 2 per centum.

"(4) With respect to wages paid during the calendar years 1960 to 1964, both inclusive, the rate shall be 2½ per centum.

"(5) With respect to wages paid during the calendar years 1965 to 1969, both inclusive, the rate shall be 3 per centum.

"(6) With respect to wages paid after December 31, 1969, the rate shall be 3¼ per centum."

### FEDERAL SERVICE

53 Stat. 175.
26 U. S. C. §§ 1410,
1411; Sup. III, § 1410.
*Supra.*

SEC. 202. (a) Part II of subchapter A of chapter 9 of the Internal Revenue Code is amended by adding after section 1411 the following new section:

"SEC. 1412. INSTRUMENTALITIES OF THE UNITED STATES.

*Supra.*
53 Stat. 176.
26 U. S. C. § 1420.

"Notwithstanding any other provision of law (whether enacted before or after the enactment of this section) which grants to any instrumentality of the United States an exemption from taxation, such instrumentality shall not be exempt from the tax imposed by section 1410 unless such other provision of law grants a specific exemption, by reference to section 1410, from the tax imposed by such section."

(b) Section 1420 of the Internal Revenue Code is amended by adding at the end thereof the following new subsection:

"(e) FEDERAL SERVICE.—In the case of the taxes imposed by this subchapter with respect to service performed in the employ of the United States or in the employ of any instrumentality which is wholly owned by the United States, the determination whether an individual has performed service which constitutes employment as defined in section 1426, the determination of the amount of remuneration for such service which constitutes wages as defined in such section, and the return and payment of the taxes imposed by this subchapter, shall be

528                  PUBLIC LAWS—CH. 809—AUG. 28, 1950          [64 Stat.

*Ante, p. 524.*

*Ante, p. 514.*

*Ante, p. 525; infra; post, pp. 532, 533, 535.*

political subdivision thereof, or any instrumentality of any one or more of the foregoing; the term 'tax' or 'tax imposed by section 1400' includes, in the case of services covered by an agreement made pursuant to section 218 of the Social Security Act, an amount equivalent to the tax which would be imposed by section 1400, if such services constituted employment as defined in section 1426; and the provisions of paragraph (3) of this subsection shall apply whether or not any amount deducted from the employee's remuneration as a result of an agreement made pursuant to section 218 of the Social Security Act has been paid to the Secretary of the Treasury."

*53 Stat. 1383.*
*26 U. S. C. § 1426 (a) (1).*

(d) The amendment made by subsection (a) of this section shall be applicable only with respect to remuneration paid after 1950. In the case of remuneration paid prior to 1951, the determination under section 1426 (a) (1) of the Internal Revenue Code (prior to its amendment by this Act) of whether or not such remuneration constituted wages shall be made as if subsection (a) of this section had not been enacted and without inferences drawn from the fact that the amendment made by subsection (a) is not made applicable to periods prior to 1951.

### DEFINITION OF EMPLOYMENT

*53 Stat. 178.*
*26 U. S. C. § 1426 (b);*
*Sup. III, § 1426 (b).*

SEC. 204. (a) Effective January 1, 1951, section 1426 (b) of the Internal Revenue Code is amended to read as follows:

"(b) EMPLOYMENT.—The term 'employment' means any service performed after 1936 and prior to 1951 which was employment for the purposes of this subchapter under the law applicable to the period in which such service was performed, and any service, of whatever nature, performed after 1950 either (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) within the United States, or (ii) on or in connection with an American vessel or American aircraft under a contract of service which is entered into within the United States or during the performance of which and while the employee is employed on the vessel or aircraft it touches at a port in the United States, if the employee is employed on and in connection with such vessel or aircraft when outside the United States, or (B) outside the United States by a citizen of the United States as an employee for an American employer (as defined in subsection (i) of this section); except that, in the case of service performed after 1950, such term shall not include—

*Post, p. 533.*

*Post, p. 532.*

"(1) (A) Agricultural labor (as defined in subsection (h) of this section) performed in any calendar quarter by an employee, unless the cash remuneration paid for such labor (other than service described in subparagraph (B)) is $50 or more and such labor is performed for an employer by an individual who is regularly employed by such employer to perform such agricultural labor. For the purposes of this subparagraph, an individual shall be deemed to be regularly employed by an employer during a calendar quarter only if—

"(i) such individual performs agricultural labor (other than service described in subparagraph (B)) for such employer on a full-time basis on sixty days during such quarter, and

"(ii) the quarter was immediately preceded by a qualifying quarter.

*"Qualifying quarter."*

For the purposes of the preceding sentence, the term 'qualifying quarter' means (I) any quarter during all of which such individual was continuously employed by such employer, or (II) any subsequent quarter which meets the test of clause (i) if, after

the last quarter during all of which such individual was continuously employed by such employer, each intervening quarter met the test of clause (i). Notwithstanding the preceding provisions of this subparagraph, an individual shall also be deemed to be regularly employed by an employer during a calendar quarter if such individual was regularly employed (upon application of clauses (i) and (ii)) by such employer during the preceding calendar quarter.

"(B) Service performed in connection with the production or harvesting of any commodity defined as an agricultural commodity in section 15 (g) of the Agricultural Marketing Act, as amended, or in connection with the ginning of cotton;

<div style="float:right">46 Stat. 1550.<br>12 U. S. C. §1141j (g)</div>

"(2) Domestic service performed in a local college club, or local chapter of a college fraternity or sorority, by a student who is enrolled and is regularly attending classes at a school, college, or university;

"(3) Service not in the course of the employer's trade or business performed in any calendar quarter by an employee, unless the cash remuneration paid for such service is $50 or more and such service is performed by an individual who is regularly employed by such employer to perform such service. For the purposes of this paragraph, an individual shall be deemed to be regularly employed by an employer during a calendar quarter only if (A) on each of some twenty-four days during such quarter such individual performs for such employer for some portion of the day service not in the course of the employer's trade or business, or (B) such individual was regularly employed (as determined under clause (A)) by such employer in the performance of such service during the preceding calendar quarter. As used in this paragraph, the term 'service not in the course of the employer's trade or business' does not include domestic service in a private home of the employer and does not include service described in subsection (h) (5);

<div style="float:right">Service not in employer's business.</div>

<div style="float:right">Post, p. 533.</div>

"(4) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of twenty-one in the employ of his father or mother;

"(5) Service performed by an individual on or in connection with a vessel not an American vessel, or on or in connection with an aircraft not an American aircraft, if the individual is employed on and in connection with such vessel or aircraft when outside the United States;

<div style="float:right">Service on non-American vessel or aircraft.</div>

"(6) Service performed in the employ of any instrumentality of the United States, if such instrumentality is exempt from the tax imposed by section 1410 by virtue of any provision of law which specifically refers to such section in granting such exemption;

<div style="float:right">Service in instrumentality of U. S.<br>Ante, p. 524.</div>

"(7) (A) Service performed in the employ of the United States or in the employ of any instrumentality of the United States, if such service is covered by a retirement system established by a law of the United States;

<div style="float:right">Service in employ of U. S.</div>

"(B) Service performed in the employ of an instrumentality of the United States if such an instrumentality was exempt from the tax imposed by section 1410 on December 31, 1950, except that the provisions of this subparagraph shall not be applicable to—

<div style="float:right">Ante, p. 524.</div>

"(i) service performed in the employ of a corporation which is wholly owned by the United States;

"(ii) service performed in the employ of a national farm loan association, a production credit association, a Federal Reserve Bank, or a Federal Credit Union;

98352°—51—Pt. I——34

"(iii) service performed in the employ of a State, county, or community committee under the Production and Marketing Administration; or

"(iv) service performed by a civilian employee, not compensated from funds appropriated by the Congress, in the Army and Air Force Exchange Service, Army and Air Force Motion Picture Service, Navy Exchanges, Marine Corps Exchanges, or other activities, conducted by an instrumentality of the United States subject to the jurisdiction of the Secretary of Defense, at installations of the Department of Defense for the comfort, pleasure, contentment, and mental and physical improvement of personnel of such Department;

"(C) Service performed in the employ of the United States or in the employ of any instrumentality of the United States, if such service is performed—

"(i) as the President or Vice President of the United States or as a Member, Delegate, or Resident Commissioner, of or to the Congress;

"(ii) in the legislative branch;

"(iii) in the field service of the Post Office Department unless performed by any individual as an employee who is excluded by Executive order from the operation of the Civil Service Retirement Act of 1930 because he is serving under a temporary appointment pending final determination of eligibility for permanent or indefinite appointment;

"(iv) in or under the Bureau of the Census of the Department of Commerce by temporary employees employed for the taking of any census;

"(v) by any individual as an employee who is excluded by Executive order from the operation of the Civil Service Retirement Act of 1930 because he is paid on a contract or fee basis;

"(vi) by any individual as an employee receiving nominal compensation of $12 or less per annum;

"(vii) in a hospital, home, or other institution of the United States by a patient or inmate thereof;

"(viii) by any individual as a consular agent appointed under authority of section 551 of the Foreign Service Act of 1946 (22 U. S. C., sec. 951);

"(ix) by any individual as an employee included under section 2 of the Act of August 4, 1947 (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government; 5 U. S. C., sec. 1052);

"(x) by any individual as an employee serving on a temporary basis in case of fire, storm, earthquake, flood, or other similar emergency;

"(xi) by any individual as an employee who is employed under a Federal relief program to relieve him from unemployment;

"(xii) as a member of a State, county, or community committee under the Production and Marketing Administration or of any other board, council, committee, or other similar body, unless such board, council, committee, or other body is composed exclusively of individuals otherwise in the full-time employ of the United States; or

"(xiii) by an individual to whom the Civil Service Retirement Act of 1930 does not apply because such individual is subject to another retirement system;

46 Stat. 458.
5 U. S. C. § 691 note;
Sup. III, § 691 et seq.
Ante, pp. 314, 215,
320; post, pp. 843, 1120.

Supra.

60 Stat. 1011.

61 Stat. 727.
5 U. S. C., Sup. III,
§ 1052.

Supra.

"(8) Service (other than service which, under subsection (k), constitutes covered transportation service) performed in the employ of a State, or any political subdivision thereof, or any instrumentality of any one or more of the foregoing which is wholly owned by one or more States or political subdivisions; *Post, p. 533.*

"(9) (A) Service performed by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order;

"(B) Service performed in the employ of a religious, charitable, educational, or other organization exempt from income tax under section 101 (6), but this subparagraph shall not apply to service performed during the period for which a certificate, filed pursuant to subsection (l), is in effect if such service is performed by an employee (i) whose signature appears on the list filed by such organization under subsection (l), or (ii) who became an employee of such organization after the calendar quarter in which the certificate was filed; *Post, p. 939.* *Post, p. 535.*

"(10) Service performed by an individual as an employee or employee representative as defined in section 1532; *53 Stat. 181. 26 U. S. C. § 1532.*

"(11) (A) Service performed in any calendar quarter in the employ of any organization exempt from income tax under section 101, if the remuneration for such service is less than $50; *Post, p. 953.*

"(B) Service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university;

"(12) Service performed in the employ of a foreign government (including service as a consular or other officer or employee or a nondiplomatic representative); *Service in employ of foreign government.*

"(13) Service performed in the employ of an instrumentality wholly owned by a foreign government—

"(A) If the service is of a character similar to that performed in foreign countries by employees of the United States Government or of an instrumentality thereof; and

"(B) If the Secretary of State shall certify to the Secretary of the Treasury that the foreign government, with respect to whose instrumentality and employees thereof exemption is claimed, grants an equivalent exemption with respect to similar service performed in the foreign country by employees of the United States Government and of instrumentalities thereof;

"(14) Service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law; and service performed in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law; *Student nurse.*

"(15) Service performed by an individual in (or as an officer or member of the crew of a vessel while it is engaged in) the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life (including service performed by any such individual as an ordinary incident to any such activity), except (A) service performed in connection with the catching or taking of salmon or halibut, for commercial purposes, and (B) service performed on or in connection with a vessel of more than ten net tons (determined in the manner provided for determining *Service performed in catching aquatic life, etc.*

532                    PUBLIC LAWS—CH. 809—AUG. 28, 1950                    [64 STAT.

the register tonnage of merchant vessels under the laws of the United States);

<span style="float:left">Newspaper distribution, etc.</span>"(16) (A) Service performed by an individual under the age of eighteen in the delivery or distribution of newspapers or shopping news, not including delivery or distribution to any point for subsequent delivery or distribution;

"(B) Service performed by an individual in, and at the time of, the sale of newspapers or magazines to ultimate consumers, under an arrangement under which the newspapers or magazines are to be sold by him at a fixed price, his compensation being based on the retention of the excess of such price over the amount at which the newspapers or magazines are charged to him, whether or not he is guaranteed a minimum amount of compensation for such service, or is entitled to be credited with the unsold newspapers or magazines turned back; or

<span style="float:left">Services in international organization.<br>53 Stat. 178.<br>26 U. S. C. § 1426 (e).</span>"(17) Service performed in the employ of an international organization."

(b) Effective January 1, 1951, section 1426 (e) of the Internal Revenue Code is amended to read as follows:

"(e) STATE, ETC.—

"(1) The term 'State' includes Alaska, Hawaii, the District of Columbia, and the Virgin Islands; and on and after the effective date specified in section 3810 such term includes Puerto Rico.

<span style="float:left">Post, p. 563.</span>"(2) UNITED STATES.—The term 'United States' when used in a geographical sense includes the Virgin Islands; and on and after the effective date specified in section 3810 such term includes Puerto Rico.

<span style="float:left">Post, p. 563.</span>"(3) CITIZEN.—An individual who is a citizen of Puerto Rico (but not otherwise a citizen of the United States) and who is not a resident of the United States shall not be considered, for the purposes of this section, as a citizen of the United States prior to the effective date specified in section 3810."

<span style="float:left">Post, p. 563.<br>53 Stat. 1388.<br>26 U. S. C. § 1426 (g).</span>(c) Section 1426 (g) of the Internal Revenue Code is amended by striking out "(g) AMERICAN VESSEL.—" and inserting in lieu thereof "(g) AMERICAN VESSEL AND AIRCRAFT.—", and by striking out the period at the end of such subsection and inserting in lieu thereof the following: "; and the term 'American aircraft' means an aircraft registered under the laws of the United States."

<span style="float:left">53 Stat. 1388.<br>26 U. S. C. § 1426 (h).</span>(d) Section 1426 (h) of the Internal Revenue Code is amended to read as follows:

"(h) AGRICULTURAL LABOR.—The term 'agricultural labor' includes all service performed—

"(1) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife.

"(2) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm.

<span style="float:left">46 Stat. 1550.<br>12 U. S. C. § 1141j (g).</span>"(3) In connection with the production or harvesting of any commodity defined as an agricultural commodity in section 15 (g) of the Agricultural Marketing Act, as amended, or in connection with the ginning of cotton, or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not

540       PUBLIC LAWS—CH. 809—AUG. 28, 1950      [64 STAT.

such return shall be considered filed on March 15 of such succeeding calendar year; and

"(2) If a tax with respect to remuneration paid during any period ending with or within a calendar year is paid before March 15 of the succeeding calendar year, such tax shall be considered paid on March 15 of such succeeding calendar year.

"(d) APPLICATION OF SECTION.—The provisions of this section shall apply only to those taxes imposed by subchapter A of this chapter, or subchapter D of this chapter, which are required to be collected and paid by making and filing returns.

"(e) EFFECTIVE DATE.—The provisions of this section shall not apply to any tax paid or collected with respect to remuneration paid during any calendar year before 1951 or to any penalty or sum paid or collected with respect to such tax."

(b) (1) Section 3312 of the Internal Revenue Code is amended by inserting immediately after the words "gift taxes" (which words immediately precede subsection (a) thereof) a comma and the following: "and except as otherwise provided in section 1635 with respect to employment taxes under subchapters A and D of chapter 9".

(2) Section 3313 of the Internal Revenue Code is amended as follows:

(A) By inserting immediately after the words "and gift taxes,", where those words first appear in the section, the following: "and except as otherwise provided by law in the case of employment taxes under subchapters A and D of chapter 9,"; and

(B) By inserting immediately after the words "and gift taxes", where those words appear in the parenthetical phrase, a comma and the following: "and other than such employment taxes".

(3) Section 3645 of the Internal Revenue Code is amended by striking out "Employment taxes, section 3312." and inserting in lieu thereof the following: "Employment taxes, sections 1635 and 3312."

(4) Section 3714 (a) of the Internal Revenue Code is amended by inserting at the end thereof the following:

"Employment taxes, see sections 1635 (d) and 3312 (d)."

(5) Section 3770 (a) (6) of the Internal Revenue Code is amended by inserting at the end thereof the following:

"Employment taxes, see sections 1636 and 3313."

(6) Section 3772 (c) of the Internal Revenue Code is amended by inserting at the end thereof the following:

"Employment taxes, see sections 1636 and 3313."

SELF-EMPLOYMENT INCOME

SEC. 208. (a) Chapter 1 of the Internal Revenue Code is amended by adding at the end thereof the following new subchapter:

"SUBCHAPTER E—TAX ON SELF-EMPLOYMENT INCOME

"SEC. 480. RATE OF TAX.

"In addition to other taxes, there shall be levied, collected, and paid for each taxable year beginning after December 31, 1950, upon the self-employment income of every individual, a tax as follows:

"(1) In the case of any taxable year beginning after December 31, 1950, and before January 1, 1954, the tax shall be equal to 2¼ per centum of the amount of the self-employment income for such taxable year.

"(2) In the case of any taxable year beginning after December 31, 1953, and before January 1, 1960, the tax shall be equal to 3 per centum of the amount of the self-employment income for such taxable year.

*Margin notes:*
53 Stat. 175; 57 Stat. 126.
26 U. S. C. §§ 1400–1432, 1621–1627; Sup. III, § 1400 *et seq.*, § 1621 *et seq.*
*Ante,* p. 524 *et seq.; post,* pp. 547, 921, 927, 945.

53 Stat. 400.
26 U. S. C. § 3312.

*Ante,* p. 538.

53 Stat. 400.
26 U. S. C. § 3313.

53 Stat. 463.
26 U. S. C. § 3645.

*Ante,* p. 538; *supra.*

53 Stat. 456.
26 U. S. C. § 3714 (a).

*Ante,* p. 539; 53 Stat. 400.
26 U.S.C. § 3312 (d).
53 Stat. 669.
26 U. S. C., Sup. III, § 3770 (a) (6).
*Ante,* p. 539; *supra.*
53 Stat. 465.
26 U. S. C. § 3772 (c).

*Ante,* p. 539; *supra.*

53 Stat. 4.
26 U. S. C. §§ 1–476; Sup. III, § 11 *et seq.*
*Post,* pp. 906, 1137.

Self-Employment Contributions Act.

Footer page number.

"(3) In the case of any taxable year beginning after December 31, 1959, and before January 1, 1965, the tax shall be equal to 3¾ per centum of the amount of the self-employment income for such taxable year.

"(4) In the case of any taxable year beginning after December 31, 1964, and before January 1, 1970, the tax shall be equal to 4½ per centum of the amount of the self-employment income for such taxable year.

"(5) In the case of any taxable year beginning after December 31, 1969, the tax shall be equal to 4⅞ per centum of the amount of the self-employment income for such taxable year.

"SEC. 481. DEFINITIONS.

"For the purposes of this subchapter—

"(a) NET EARNINGS FROM SELF-EMPLOYMENT.—The term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this chapter which are attributable to such trade or business, plus his distributive share (whether or not distributed) of the ordinary net income or loss, as computed under section 183, from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary net income or loss— [margin: 53 Stat. 70. 26 U. S. C. § 183.]

"(1) There shall be excluded rentals from real estate (including personal property leased with the real estate) and deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer;

"(2) There shall be excluded income derived from any trade or business in which, if the trade or business were carried on exclusively by employees, the major portion of the services would constitute agricultural labor as defined in section 1426 (h); and there shall be excluded all deductions attributable to such income; [margin: Ante, p. 532.]

"(3) There shall be excluded dividends on any share of stock, and interest on any bond, debenture, note, or certificate, or other evidence of indebtedness, issued with interest coupons or in registered form by any corporation (including one issued by a government or political subdivision thereof), unless such dividends and interest (other than interest described in section 25 (a)) are received in the course of a trade or business as a dealer in stocks or securities; [margin: 53 Stat. 17. 26 U. S. C. § 25 (a).]

"(4) There shall be excluded any gain or loss (A) which is considered as gain or loss from the sale or exchange of a capital asset, (B) from the cutting or disposal of timber if section 117 (j) is applicable to such gain or loss, or (C) from the sale, exchange, involuntary conversion, or other disposition of property if such property is neither (i) stock in trade or other property of a kind which would properly be includible in inventory if on hand at the close of the taxable year, nor (ii) property held primarily for sale to customers in the ordinary course of the trade or business; [margin: Post, p. 933.]

"(5) The deduction for net operating losses provided in section 23 (s) shall not be allowed; [margin: 53 Stat. 867. 26 U. S. C. § 23 (s)]

"(6) (A) If any of the income derived from a trade or business (other than a trade or business carried on by a partnership) is community income under community property laws applicable to such income, all of the gross income and deductions attributable to such trade or business shall be treated as the gross income and deductions of the husband unless the wife exercises substantially all of the management and control of such trade or business, in

which case all of such gross income and deductions shall be treated as the gross income and deductions of the wife;

"(B) If any portion of a partner's distributive share of the ordinary net income or loss from a trade or business carried on by a partnership is community income or loss under the community property laws applicable to such share, all of such distributive share shall be included in computing the net earnings from self-employment of such partner, and no part of such share shall be taken into account in computing the net earnings from self-employment of the spouse of such partner;

Post, p. 946.
Post, p. 543.
Post, p. 944.

"(7) In the case of any taxable year beginning on or after the effective date specified in section 3810, (A) the term 'possession of the United States' as used in section 251 shall not include Puerto Rico, and (B) a citizen or resident of Puerto Rico shall compute his net earnings from self-employment in the same manner as a citizen of the United States and without regard to the provisions of section 252.

Post, p. 944.

If the taxable year of a partner is different from that of the partnership, the distributive share which he is required to include in computing his net earnings from self-employment shall be based upon the ordinary net income or loss of the partnership for any taxable year of the partnership (even though beginning prior to January 1, 1951) ending within or with his taxable year.

"(b) SELF-EMPLOYMENT INCOME.—The term 'self-employment income' means the net earnings from self-employment derived by an individual (other than a nonresident alien individual) during any taxable year beginning after December 31, 1950; except that such term shall not include—

"(1) That part of the net earnings from self-employment which is in excess of: (A) $3,600, minus (B) the amount of the wages paid to such individual during the taxable year; or

"(2) The net earnings from self-employment, if such net earnings for the taxable year are less than $400.

"Wages."

For the purposes of clause (1) the term 'wages' includes such remuneration paid to an employee for services included under an agreement entered into pursuant to the provisions of section 218 of the Social Security Act (relating to coverage of State employees) as would be wages under section 1426 (a) if such services constituted employment under section 1426 (b). In the case of any taxable year beginning prior to the effective date specified in section 3810, an individual who is a citizen of Puerto Rico (but not otherwise a citizen of the United States) and who is not a resident of the United States or of the Virgin Islands during such taxable year shall be considered, for the purposes of this subchapter, as a nonresident alien individual. An individual who is not a citizen of the United States but who is a resident of the Virgin Islands or (after the effective date specified in section 3810) a resident of Puerto Rico shall not, for the purposes of this subchapter, be considered to be a nonresident alien individual.

Ante, p. 514.
Ante, p. 525.
Ante, p. 528.
Post, p. 543.

"(c) TRADE OR BUSINESS.—The term 'trade or business', when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 23, except that such term shall not include—

53 Stat. 12.
26 U. S. C. § 23; Sup.
III, § 23.
Post, pp. 929, 941, 959, 1219.

"(1) The performance of the functions of a public office;

"(2) The performance of service by an individual as an employee (other than service described in section 1426 (b) (16) (B) performed by an individual who has attained the age of eighteen);

Ante, p. 532.

"(3) The performance of service by an individual as an employee or employee representative as defined in section 1532;

53 Stat. 181.
26 U. S. C. § 1532.

Case 1:05-cv-11576-DPW    Document 17-11    Filed 01/19/2006    Page 26 of 26

"(4) The performance of service by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order; or

"(5) The performance of service by an individual in the exercise of his profession as a physician, lawyer, dentist, osteopath, veterinarian, chiropractor, naturopath, optometrist, Christian Science practitioner, architect, certified public accountant, accountant registered or licensed as an accountant under State or municipal law, full-time practicing public accountant, funeral director, or professional engineer; or the performance of such service by a partnership.

"(d) EMPLOYEE AND WAGES.—The term 'employee' and the term 'wages' shall have the same meaning as when used in subchapter A of chapter 9.

> 53 Stat. 175.
> 26 U. S. C. §§ 1400-1432; Sup. III, § 1400 et seq.
> Ante, p. 524 et seq.

"SEC. 482. MISCELLANEOUS PROVISIONS.

"(a) RETURNS.—Every individual (other than a nonresident alien individual) having net earnings from self-employment of $400 or more for the taxable year shall make a return containing such information for the purpose of carrying out the provisions of this subchapter as the Commissioner, with the approval of the Secretary, may by regulations prescribe. Such return shall be considered a return required under section 51 (a). In the case of a husband and wife filing a joint return under section 51 (b), the tax imposed by this subchapter shall not be computed on the aggregate income but shall be the sum of the taxes computed under this subchapter on the separate self-employment income of each spouse.

> 53 Stat. 27.
> 26 U. S. C. § 51 (a), (b); Sup. III, § 51 (a), (b).

"(b) TITLE OF SUBCHAPTER.—This subchapter may be cited as the 'Self-Employment Contributions Act'.

"(c) EFFECTIVE DATE IN CASE OF PUERTO RICO.—For effective date in case of Puerto Rico, see section 3810.

> Infra.

"(d) COLLECTION OF TAXES IN VIRGIN ISLANDS AND PUERTO RICO.—For provisions relating to collection of taxes in Virgin Islands and Puerto Rico, see section 3811."

> Infra.

(b) Chapter 38 of the Internal Revenue Code is amended by adding at the end thereof the following new sections:

> 53 Stat. 467.
> 26 U. S. C. §§ 3790-3808; Sup. III, § 3792 et seq.
> Post, pp. 544, 946, 957, 958, 1138, 1220.

"SEC. 3810. EFFECTIVE DATE IN CASE OF PUERTO RICO.

"If the Governor of Puerto Rico certifies to the President of the United States that the legislature of Puerto Rico has, by concurrent resolution, resolved that it desires the extension to Puerto Rico of the provisions of title II of the Social Security Act, the effective date referred to in sections 1426 (e), 481 (a) (7), and 481 (b) shall be January 1 of the first calendar year which begins more than ninety days after the date on which the President receives such certification.

> 49 Stat. 622.
> 42 U. S. C. §§ 401-410; Sup. III, § 409.
> Ante, pp. 482, 488, 489, 492, 512 et seq.
> Ante, pp. 532, 542; post, p. 946.

"SEC. 3811. COLLECTION OF TAXES IN VIRGIN ISLANDS AND PUERTO RICO.

"Notwithstanding any other provision of law respecting taxation in the Virgin Islands or Puerto Rico, all taxes imposed by subchapter E of chapter 1 and by subchapter A of chapter 9 shall be collected by the Bureau of Internal Revenue under the direction of the Secretary and shall be paid into the Treasury of the United States as internal revenue collections. All provisions of the internal revenue laws of the United States relating to the administration and enforcement of the tax imposed by subchapter E of chapter 1 (including the provisions relating to The Tax Court of the United States), and of any tax imposed by subchapter A of chapter 9, shall, in respect of such tax, extend to

> Ante, p. 540; post, p. 946.
> 53 Stat. 175.
> 26 U. S. C. §§ 1400-1432.
> Ante, p. 524 et seq.

EXHIBIT 9B

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

26 CFR S 1.170A-9
26 C.F.R. § 1.170A-9
· KeyCite Citation<>
Treas. Reg. § 1.170A-9

## CODE OF FEDERAL REGULATIONS
### TITLE 26—INTERNAL REVENUE
### CHAPTER I—INTERNAL REVENUE SERVICE,
### DEPARTMENT OF THE TREASURY
### SUBCHAPTER A—INCOME TAX
### PART 1—INCOME TAXES
### NORMAL TAXES AND SURTAXES
### COMPUTATION OF TAXABLE INCOME
### ITEMIZED DEDUCTIONS FOR INDIVIDUALS
### AND CORPORATIONS
Current through July 19, 2004; 69 FR 43141

§ 1.170A-9 Definition of section 170(b)(1)(A) organization.

The term *section 170(b)(1)(A) organization* as used in the regulations under section 170 means any organization described in paragraphs (a) through (i) of this section, effective with respect to taxable years beginning after December 31, 1969, except as otherwise provided. Section 1.170-2(b) shall continue to be applicable with respect to taxable years beginning prior to January 1, 1970. The term one or more organizations described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)) as used in sections 507 and 509 of the Code and the regulations thereunder means one or more organizations described in paragraphs (a) through (e) of this section, except as modified by the regulations under part II of subchapter F of chapter 1 or under chapter 42.

(a) Church or a convention or association of churches. An organization is described in section 170(b)(1)(A)(i) if it is a church or a convention or association of churches.

(b) Educational organization and organizations for the benefit of certain State and municipal colleges and universities—(1) Educational organization. An educational organization is described in section 170(b)(1)(A)(ii) if its primary function is the presentation of formal instruction and it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. The term includes institutions such as primary, secondary, preparatory, or high schools, and colleges and universities. It includes Federal, State, and other public-supported schools which otherwise come within the definition. It does not include organizations engaged in both educational and noneducational activities unless the latter are merely

incidental to the educational activities. A recognized *university which incidentally operates a museum or sponsors concerts is an educational organization* within the meaning of section 170(b)(1)(A)(ii). However, the operation of a school by a museum does not necessarily qualify the museum as an educational organization within the meaning of this subparagraph.

(2) Organizations for the benefit of certain State and municipal colleges and universities. (i) An organization is described in section 170(b)(1)(A)(iv) if it meets the support requirements of subdivision (ii) of this subparagraph and is organized and operated exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a college or university which is an organization described in subdivision (iii) of this subparagraph. The phrase "expenditures to or for the benefit of a college or university" includes expenditures made for any one or more of the normal functions of colleges and universities such as the acquisition and maintenance of real property comprising part of the campus area; the erection of, or participation in the erection of, college or university buildings; the acquisition and maintenance of equipment and furnishings used for, or in conjunction with, normal functions of colleges and universities; or expenditures for scholarships, libraries and student loans.

(ii) To qualify under section 170(b)(1)(A)(iv), the organization receiving the contribution must normally receive a substantial part of its support from the United States or any State or political subdivision thereof or from direct or indirect contributions from the general public, or from a combination of two or more of such sources. For such purposes, the term "support" does not include income received in the exercise or performance by the organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a). An example of an indirect contribution from the public is the receipt by the organization of its share of the proceeds of an annual collection campaign of a community chest, community fund, or united fund. In determining the amount of support received by such organization with respect to a contribution of property which is subject to reduction under section 170(e), the fair market value of the property shall be taken into

account.

(iii) The college or university (including a land grant college or university) to be benefited must be an educational organization referred to in section 170(b)(1)(A)(ii) and subparagraph (1) of this paragraph which is an agency or instrumentality of a State or political subdivision thereof, or which is owned or operated by a State or political subdivision thereof or by an agency or instrumentality of one or more States or political subdivisions.

(c) Hospitals and medical research organizations—(1) Hospitals. An organization (other than one described in subparagraph (2) of this paragraph) is described in section 170(b)(1)(A)(iii) if:

(i) It is a hospital, and

(ii) Its principal purpose or function is the providing of medical or hospital care or medical education or medical research.

The term hospital includes (A) Federal hospitals and (B) State, county, and municipal hospitals which are instrumentalities of governmental units referred to in section 170(c)(1) and otherwise come within the definition. A rehabilitation institution, outpatient clinic, or community mental health or drug treatment center may qualify as a "hospital" within the meaning of subdivision (i) of this subparagraph if its principal purpose or function is the providing of hospital or medical care. For purposes of this subdivision, the term "medical care" shall include the treatment of any physical or mental disability or condition, whether on an inpatient or outpatient basis, provided the cost of such treatment is deductible under section 213 by the person treated. An organization, all the accommodations of which qualify as being part of a "skilled nursing facility" within the meaning of 42 U.S.C. 1395x(j), may qualify as a "hospital" within the meaning of subdivision (i) of this subparagraph if its principal purpose or function is the providing of hospital or medical care. For taxable years ending after June 28, 1968, the term "hospital" also includes cooperative hospital service organizations which meet the requirements of section 501(e) and § 1.501(e)-1. The term "hospital" does not, however, include convalescent homes or homes for children or the aged, nor does the term include institutions whose principal purpose or function is to train handicapped individuals to pursue some vocation. An organization whose principal purpose or function is the providing of medical education or medical research will not be considered a "hospital" within the meaning of subdivision (i) of this subparagraph, unless it is also actively engaged in providing medical or hospital care to patients on its premises or in its facilities, on an inpatient

or outpatient basis, as an integral part of its medical education or medical research functions. See, however, subparagraph (2) of this paragraph with respect to certain medical research organizations.

(2) Certain medical research organizations—(i) Introduction. A medical research organization is described in section 170(b)(1)(A)(iii) if the principal purpose or functions of such organization are medical research and if it is directly engaged in the continuous active conduct of medical research in conjunction with a hospital. In addition, for purposes of the 50 percent limitation of section 170(b)(1)(A) with respect to a contribution, during the calendar year in which the contribution is made such organization must be committed to spend such contribution for such research before January 1 of the fifth calendar year which begins after the date such contribution is made. An organization need not receive contributions deductible under section 170 to qualify as a medical research organization and such organization need not be committed to spend amounts to which the limitation of section 170(b)(1)(A) does not apply within the 5-year period referred to in this subdivision. However, the requirement of continuous active conduct of medical research indicates that the type of organization contemplated in this subparagraph is one which is primarily engaged directly in the continuous active conduct of medical research, as compared to an inactive medical research organization or an organization primarily engaged in funding the programs of other medical research organizations. As in the case of a hospital, since an organization is ordinarily not described in section 170(b)(1)(A)(iii) as a hospital unless it functions primarily as a hospital, similarly a medical research organization is not so described unless it is primarily engaged directly in the continuous active conduct of medical research in conjunction with a hospital. Accordingly, the rules of this subparagraph shall only apply with respect to such medical research organizations.

(ii) General rule. An organization (other than a hospital described in subparagraph (1) of this paragraph) is described in section 170(b)(1)(A)(iii) only if within the meaning of this subparagraph:

(A) The principal purpose or functions of such organization are to engage primarily in the conduct of medical research, and

(B) It is primarily engaged directly in the continuous active conduct of medical research in conjunction with a hospital which is (1) described in section 501(c)(3), (2) a federal hospital, or (3) an

instrumentality of a governmental unit referred to in section 170(c)(1).

However, in order for a contribution to such organization to qualify for purposes of the 50 percent limitation of section 170(b)(1)(A), during the calendar year in which such contribution is made or treated as made, such organization must be committed (within the meaning of subdivision (viii) of this subparagraph) to spend such contribution for such active conduct of medical research before January 1 of the fifth calendar year beginning after *the date such contribution is made. For the meaning of the* term "medical research" *see* subdivision (iii) of this subparagraph. For the meaning of the term "principal *purpose or functions" see* subdivision (iv) of this subparagraph. For the meaning of the term "primarily engaged directly in the continuous active conduct of *medical research" see* subdivision (v) of this subparagraph. For the meaning of the term "medical research in conjunction with a hospital" *see* subdivision (vii) of this subparagraph.

(iii) Definition of medical research. Medical research means the conduct of investigations, experiments, and studies to discover, develop, or verify knowledge relating to the causes, diagnosis, treatment, prevention, or control of physical or mental diseases and impairments of man. To qualify as a medical research organization, the organization must have or must have continuously available for its regular use the appropriate equipment and *professional personnel necessary to carry out its principal function.* Medical research encompasses the associated disciplines spanning the biological, social and behavioral sciences. Such disciplines include chemistry, (biochemistry, physical chemistry, bioorganic chemistry, etc.), behavioral sciences (psychiatry, physiological psychology, neurophysiology, neurology, neurobiology, *and social psychology, etc.),* biomedical engineering (applied biophysics, medical physics, and medical electronics, e.g., developing pacemakers and other *medically related electrical equipment),* virology, immunology, biophysics, cell biology, molecular biology, pharmacology, toxicology, genetics, pathology, physiology, microbiology, parasitology, endocrinology, bacteriology, and epidemiology.

(iv) Principal purpose or functions. An organization must be organized for the principal purpose of engaging primarily in the conduct of medical research in order to be an organization meeting the requirements of this subparagraph. An organization will normally be considered to be so organized if it is expressly organized for the purpose of conducting medical research and is actually engaged primarily in the conduct of medical research. Other facts and circumstances, however, may indicate that an organization does not meet the principal

purpose requirement of this subdivision even where its governing instrument so expressly provides. An organization that otherwise meets all of the requirements of this subparagraph (including this subdivision) to qualify as a medical research organization will not fail to so qualify solely because its governing instrument does not specifically state that its principal purpose is to conduct medical research.

(v) Primarily engaged directly in the continuous active conduct of medical research. (A) In order for an organization to be primarily engaged directly in the continuous active conduct of medical research, the organization must either devote a substantial part of its assets to, or expend a significant percentage of its endowment for, such purposes, or both. Whether an organization devotes a substantial part of its assets to, or makes significant expenditures for, such continuous active conduct depends upon the facts and circumstances existing in each specific case. An organization will be treated as devoting a substantial part of its assets to, or expending a significant percentage of its endowment for, such purposes if it meets the appropriate test contained in paragraph (c)(2)(v)(b) of this section. If an organization fails to satisfy both of such tests, in evaluating the facts and circumstances, the factor given most weight is the margin by which the organization failed to meet such tests. Some of the other facts and circumstances to be considered in making such a determination are:

(1) If the organization fails to satisfy the tests because it failed to properly value its assets or endowment, then upon determination of the improper valuation it devotes additional assets to, or makes additional expenditures for, such purposes, so that it satisfies such tests on an aggregate basis for the prior year in addition to such tests for the current year.

(2) The organization acquires new assets or has a significant increase in the value of its securities after it had developed a budget in a prior year based on the assets then owned and the then current values.

(3) The organization fails to make expenditures in any given year because of the interrelated aspects of its budget and long-term planning requirements, for example, where an organization prematurely terminates an unsuccessful program and because of long-term planning requirements it will not be able to establish a fully operational replacement program immediately.

(4) The organization has as its objective to spend less than a significant percentage in a particular year

but make up the difference in the subsequent few years, or to budget a greater percentage in an earlier year and a lower percentage in a later year.

(B) For purposes of this section, an organization which devotes more than one half of its assets to the continuous active conduct of medical research will be considered to be devoting a substantial part of its assets to such conduct within the meaning of paragraph (c)(2)(v)(a) of this section. An organization which expends funds equaling 3.5 percent or more of the fair market value of its endowment for the continuous active conduct of medical research will be considered to have expended a significant percentage of its endowment for such purposes within the meaning of paragraph (c)(2)(v)(a) of this section.

(C) Engaging directly in the continuous active conduct of medical research does not include the disbursing of funds to other organizations for the conduct of research by them or the extending of grants or scholarships to others. Therefore, if an organization's primary purpose is to disburse funds to other organizations for the conduct of research by them or to extend grants or scholarships to others, it is not primarily engaged directly in the continuous active conduct of medical research.

(vi) Special rules. The following rules shall apply in determining whether a substantial part of an organization's assets are devoted to, or its endowment is expended for, the continuous active conduct of medical research activities:

(A) An organization may satisfy the tests of paragraph (c)(2)(v)(b) of this section by meeting such tests either for a computation period consisting of the immediately preceding taxable year, or for the computation period consisting of the immediately preceding four taxable years. In addition, for taxable years beginning in 1970, 1971, 1972, 1973, and 1974, if an organization meets such tests for the computation period consisting of the first four taxable years beginning after December 31, 1969, an organization will be treated as meeting such tests, not only for the taxable year beginning in 1974, but also for the preceding four taxable years. Thus, for example, if a calendar year organization failed to satisfy such tests for a computation period consisting of 1969, 1970, 1971, or 1972, but on the basis of a computation period consisting of the years 1970 through 1973, it expended funds equaling 3.5 percent or more of the fair market value of its endowment for the continuous active conduct of medical research, such organization will be considered to have expended a significant percentage of its endowment for such purposes for the taxable years 1970 through 1974. In applying such tests for a four-year computation period, although the organization's expenditures for the entire four-year period shall be aggregated, the fair market value

of its endowment for each year shall be summed, even though, in the case of an asset held throughout the four-year period, the fair market value of such an asset will be counted four times. Similarly, the fair market value of an organization's assets for each year of a four-year computation period shall be summed.

(B) Any property substantially all the use of which is "substantially related" (within the meaning of section 514(b)(1)(A)) to the exercise or performance of the organization's medical research activities will not be treated as part of its endowment.

(C) The valuation of assets must be made with commonly accepted methods of valuation. A method of valuation made in accordance with the principles stated in the regulations under section 2031 constitutes an acceptable method of valuation. Assets may be valued as of any day in the organization's taxable year to which such valuation applies, provided the organization follows a consistent practice of valuing such asset as of such date in all taxable years. For purposes of paragraph (c)(2)(v) of this section, an asset held by the organization for part of a taxable year shall be taken into account by multiplying the fair market value of such asset by a fraction, the numerator of which is the number of days in such taxable year that the foundation held such asset and the denominator of which is the number of days in such taxable year.

(vii) Medical research in conjunction with a hospital. The organization need not be formally affiliated with a hospital to be considered primarily engaged directly in the continuous active conduct of medical research in conjunction with a hospital, but in any event there must be a joint effort on the part of the research organization and the hospital pursuant to an understanding that the two organizations will maintain continuing close cooperation in the active conduct of medical research. For example, the necessary joint effort will normally be found to exist if the activities of the medical research organization are carried on in space located within or adjacent to a hospital, the organization is permitted to utilize the facilities (including equipment, case studies, etc.) of the hospital on a continuing basis directly in the active conduct of medical research, and there is substantial evidence of the close cooperation of the members of the staff of the research organization and members of the staff of the particular hospital or hospitals. The active participation in medical research by members of the staff of the particular hospital or hospitals will be considered to be evidence of such close cooperation. Because medical research may involve substantial

investigation, experimentation and study not immediately connected with hospital or medical care, the requisite joint effort will also normally be found to exist if there is an established relationship between the research organization and the hospital which provides that the cooperation of appropriate personnel and the use of facilities of the particular hospital or hospitals will be required whenever it would aid such research.

(viii) *Commitment to spend contributions.* The organization's commitment that the contribution will be spent within the prescribed time only for the prescribed purposes must be legally enforceable. A promise in writing to the donor in consideration of his making a contribution that such contribution will be so spent within the prescribed time will constitute a commitment. The *expenditure of contributions received for plant, facilities, or equipment, used solely for medical research purposes (within the meaning of subdivision (ii) of this subparagraph), shall ordinarily be considered to be an* expenditure for medical research. If a contribution is made in other than money, it shall be considered spent for medical research if the funds from the proceeds of a disposition thereof are spent by the organization within the five-year period for medical research; or, if such property is of such a kind that it is used on a continuing basis directly in connection with such research, it shall be considered spent for medical research in the year in which it is first so used. A medical research organization will be presumed to have made the commitment required under *this subdivision with respect to any contribution if its governing instrument or by-laws require that every contribution be spent for medical research before January 1 of the fifth year which begins after the date such contribution is made.*

(ix) *Organizational period for new organizations.* A newly created organization, for its "organizational" period, shall be considered to be primarily engaged directly in the continuous active conduct of medical research in conjunction with a hospital within the meaning of subdivisions (v) and (vii) of this subparagraph if during such period the organization establishes to the satisfaction of the Commissioner that it reasonably can be expected to be so engaged by the end of such period. The information to be submitted shall include detailed plans showing the proposed initial medical research program, architectural drawings for the erection of buildings and facilities to be used for medical research in accordance with such plans, plans to assemble a professional staff and detailed projections showing the timetable for the expected accomplishment of the foregoing. The "organizational" period shall be that period which is appropriate to implement the proposed plans, giving effect to the proposed amounts involved and the magnitude and complexity of the projected medical research program, but

in no event in excess of three years following organization.

(x) *Examples.* The application of this subparagraph may be illustrated by the following examples:

*Example 1.* N, an organization referred to in section 170(c)(2), was created to promote human knowledge within the field of medical research and medical education. All of N's assets were contributed to it by A and consist of a diversified portfolio of stocks and bonds. N's endowment earns 3.5 percent annually, which N expends in the conduct of various medical research programs in conjunction with Y hospital. N is located adjacent to Y hospital, makes substantial use of Y's facilities and there is close cooperation *between the staffs of N and Y. N is directly engaged* in the continuous active conduct of medical research in conjunction with a hospital, meets the principal purpose test described in subdivision (iv) of this subparagraph, and is therefore an organization described in section 170(b)(1)(A)(iii).

*Example 2.* O, an organization referred to in section 170(c)(2), was created to promote human knowledge within the field of medical research and medical education. All of O's assets consist of a diversified portfolio of stocks and bonds. O's endowment earns 3.5 percent annually, which O expends in the conduct of various medical research programs in conjunction with certain hospitals. However, in 1974, O receives a substantial bequest of additional stocks and bonds. O's budget for 1974 does not take into account the bequest and as a result O expends only 3.1 percent of its endowment in 1974. However, O establishes that it will expend at least 3.5 percent of its endowment for the active conduct of medical research for taxable years 1975 through 1978. O is therefore directly engaged in the continuous active conduct of medical research in conjunction with a hospital for taxable year 1975. Since O also meets the principal purpose test described in subdivision (iv) of this subparagraph, it is therefore an organization described in section *170(b)(1)(A)(iii) for taxable year 1975.*

*Example 3.* M, an organization referred to in section 170(c)(2), was created to promote human knowledge within the field of medical research and medical education. M's activities consist of the conduct of medical research programs in conjunction with various hospitals. Under such programs, researchers employed by M engage in research at laboratories set aside for M within the various hospitals. Substantially all of M's assets consists of 100 percent of the stock of X corporation, which has

a fair market value of approximately 100 million dollars. X pays M approximately 3.3 million dollars in dividends annually, which M expends in the conduct of its medical research programs. Since M expends only 3.3 percent of its endowment, which does not constitute a significant percentage, in the active conduct of medical research, M is not an organization described in section 170(b)(1)(A)(iii) because M is not engaged in the continuous active conduct of medical research.

 (xi) Special rule for organizations with existing ruling. This subdivision shall apply to an organization that prior to January 1, 1970, had received a ruling or determination letter which has not been expressly revoked holding the organization to be a medical research organization described in section 170(b)(1)(A)(iii) and with respect to which the facts and circumstances on which the ruling was based have not substantially changed. An organization to which this subdivision applies shall be treated as an organization described in section 170(b)(1)(A)(iii) for a period not ending prior to 90 days after February 13, 1976 (or where appropriate, for taxable years beginning before such 90th day). In addition, with respect to a grantor or contributor under sections 170, 507, 545(b)(2), 556(b)(2), 642(c), 4942, 4945, 2055, 2106(a)(2), and 2522, the status of an organization to which this subdivision applies will not be affected until notice of change of status under section 170(b)(1)(A)(iii) is made to the public (such as by publication in the Internal Revenue Bulletin). The preceding sentence shall not apply if the grantor or contributor had previously acquired knowledge that the Internal Revenue Service had given notice to such organization that it would be deleted from classification as a section 170(b)(1)(A)(iii) organization.

• • • •

12/12/2005 14:05 FAX 2026223865          CCTEGE FRONT OFFICE                    ☒003



# PART II

# FEDERAL REGISTER

**VOLUME 25**          1934          **NUMBER 246**

*Washington, Tuesday, December 20, 1960*

# Employment Taxes;
# Applicable on and After
# January 1, 1955

HeinOnline -- 25 Fed. Reg. 13031 1960

**13050**                                          **RULES AND REGULATIONS**

him, even though such service may not involve the conduct of religious worship or the ministration of sacerdotal functions, is in the exercise of his ministry.

(ii) The rule in subdivision (i) of this subparagraph may be illustrated by the following example:

*Example.* M, a duly ordained minister, is assigned by X, the religious body constituting his church, to perform advisory service to Y Company in connection with the publication of a book dealing with the history of M's church denomination. Y is engaged in publishing books under a contract with a religious organization. M performs no other service for X or Y. M is performing service in the exercise of his ministry.

(c) Service by a minister not in the exercise of his ministry. (i) Section 3121 (b) (8) (A) does not except from employment service performed by a duly ordained, commissioned, or licensed minister of a church which is not in the exercise of his ministry.

(ii) If a minister is performing service for an organization which is neither a religious organization nor operated as an integral agency of a religious organization, and the service is not in the conduct of religious worship or the ministration of sacerdotal functions or by his ecclesiastical body or the administration of sacerdotal functions in the exercise of his ministry. See, however, subparagraph (3) of this paragraph.

(iii) The rule in subdivision (i) of this subparagraph may be illustrated by the following example:

*Example.* M, a duly ordained minister, is engaged by N University to teach history and mathematics. In performs no other service for N although from time to time he performs marriage and conducts funerals for relatives and friends. N University is neither a religious organization nor operated as an integral agency of a religious organization. M is not performing the service in pursuant to the exercise of his ministry or designation by his ecclesiastical superiors. However, service performed by M in performing marriage and conducting funerals is in the exercise of his ministry.

(3) Service performed by a duly ordained, commissioned, or licensed minister of a church as an employee of the United States, or a State, Territory, or

possession of the United States, or the District of Columbia, or a foreign government, or a political subdivision of any of the foregoing is not considered to be in the exercise of his ministry for purposes of the taxes, even though such service may involve the ministration of sacerdotal functions or the conduct of religious worship. Thus, for example, service performed by an individual as a chaplain in the Armed Forces of the United States is considered to be performed by a commissioned officer in his capacity as such, and not by a minister in the exercise of his ministry. Similarly, service performed by an employee of a State as a chaplain in a State prison is considered to be performed by a civil servant of the State and not by a minister in the exercise of his ministry.

(d) *Service in the exercise of duties required by a religious order.* Service performed by a member of a religious order in the exercise of duties required by such order includes all duties required of the member by the order. The nature or extent of such service is immaterial so long as it is a service which is directed or required to be performed by the ecclesiastical superiors.

§ 31.3121(b)(8)–3 *Service in employ of religious, charitable, educational, or certain other organizations exempt from income tax.*

(a) Service performed by an employee in the employ of a religious, charitable, educational, or other organization described in section 501(c)(3) which is exempt from income tax under section 501(a) (see example relating to such exemption in § 31.3121(b)–1.)

(b) For provisions relating to exemption from income tax of an organization described in section 501(c)(3), see Part 1 of this chapter (Income Tax Regulations). For provisions relating to waiver by an organization of the exemption from the taxes imposed by sections 3101 and 3111, see § 31.3121(b)–1. See also § 31.3121 (b) (8)–1, relating to service performed by a minister of a church in the exercise of his ministry or by a

in section 401 (a)) or under section 521, if the remuneration for such service is less than $50;

(10) Service performed in the employ of a school, college, or university if the service is performed by a student who is enrolled and regularly attending classes at such school, college, or university;

(b) *Service performed by an employee in a calendar quarter in the employ of an organization exempt from income tax* is excepted from employment if the remuneration for service is less than $50.

§ 31.3121(b)(10)–1 *Service for employee organizations exempt from income tax.*

(a) *Service performed by an employee in a calendar quarter in the employ of an organization exempt from income tax is excepted from employment if the remuneration paid in a calendar quarter. The exception applies separately with respect to each organization for which the employee renders services in a calendar quarter. For provisions relating to the determination of remuneration.

§ 31.3121(b)(10)–1 *Railroad industry.*

Service performed by an individual as an "employer representative" as defined in section 3231, are excepted from employment. For definitions of employer and employee representatives, see § 31.3231(b)–1 and § 31.3231(c)–1.

§ 31.3121(b)(10) *Statutory provisions; employment; services for remuneration of less than $50 or for certain organizations exempt from income tax under section 501 (a) (other than an organization described

Tuesday, December 20, 1960        **FEDERAL REGISTER**        13051

*§1.402(a)–1 Taxability of beneficiary under a trust which meets the requirements of section 401(a).*

(a) * * * (1) * * *

(iii) Except as provided in paragraph (b) of this section, a distribution of property by a trust described in section 401(a) and exempt under section 501(a) shall be taken into account by the distributee at its fair market value. In the case of a distribution of a life insurance contract, retirement income contract, endowment contract, or other contract providing life insurance protection, or any interest therein, the policy cash value and all other rights under such contract (including any supplemental agreements thereto and whether or not guaranteed) are included in determining the fair market value of the contract. In addition, where a trust described in section 401(a) and exempt under section 501(a) transfers property to a plan participant or beneficiary in exchange for consideration and where the fair market value of the property transferred exceeds the amount received by the trust, then the excess of the fair market value of the property transferred by the trust over the amount received by the trust is treated as a distribution by the trust to the distributee.

* * * * *

(2) * * * If, however, the contract distributed by such exempt trust is a life insurance contract, retirement income contract, endowment contract, or other contract providing life insurance protection, the fair market value of such contract at the time of distribution must be included in the distributee's income in accordance with the provisions of section 402(a), except to the extent that, within 60 days after the distribution of such contract, all or any portion of such value is irrevocably converted into a contract under which no part of any proceeds payable on death at any time would be excludable under section 101(a) (relating to life insurance proceeds). If the contract distributed by such trust is a transferable annuity contract, a life insurance contract, a retirement income contract, endowment contract, or other contract providing life insurance protection (whether or not transferable), then notwithstanding the preceding sentence, the fair market value of the contract is includible in the distributee's gross income, unless within such 60

days such contract is also made nontransferable.

* * * * *

Mark E. Matthews,
*Deputy Commissioner for Services and Enforcement.*

(Filed by the Office of the Federal Register on February 13, 2004, 8:45 a.m., and published in the issue of the Federal Register for February 17, 2004, 69 F.R. 7384)

## Notice of Proposed Rulemaking and Notice of Public Hearing

### Student FICA Exception

### REG–156421–03

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking and notice of public hearing.

SUMMARY: This document contains proposed regulations that provide guidance regarding the meaning of "school, college, or university" and "student" for purposes of the student FICA exception under sections 3121(b)(10) and 3306(c)(10)(B) of the Internal Revenue Code (Code). In addition, this document contains proposed regulations that provide guidance on the meaning of "school, college, or university" for purposes of the FICA exception under section 3121(b)(2) for domestic service performed in a local college club, or local chapter of a college fraternity or sorority by a student. This document also provides a notice of public hearing on these proposed regulations.

DATES: Written and electronic comments must be received by May 25, 2004. Outlines of topics to be discussed at the public hearing scheduled for June 16, 2004, must be received by May 25, 2004.

ADDRESSES: Send submissions to: CC:PA:LPD:PR (REG–156421–03), room 5703, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG–156421–03),

Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC. Alternatively, taxpayers may submit comments electronically, via the IRS Internet site at: *www.irs.gov/regs.*

FOR FURTHER INFORMATION CONTACT: Concerning the proposed regulations, John Richards of the Office of Associate Chief Counsel (Tax Exempt and Government Entities), (202) 622–6040; concerning submissions of comments, the hearing and/or to be placed on the building access list to attend the hearing, Treena Garret, (202) 622–7180 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

### Background

This document contains proposed amendments to 26 CFR part 31 under sections 3121(b)(10) and 3306(c)(10)(B) of the Internal Revenue Code. These sections except from "employment" for Federal Insurance Contributions Act (FICA) tax purposes and Federal Unemployment Tax Act (FUTA) purposes, respectively, service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university. In addition, this document contains proposed amendments to 26 CFR part 31 under section 3121(b)(2). This section excepts from employment for FICA purposes domestic service performed in a local college club, or local chapter of a college fraternity or sorority, by a student who is enrolled and is regularly attending cases at a school, college, or university.

### Explanation of Provisions

*A. Current Law*

Section 3121(b)(10) of the Code (the student FICA exception) excepts from the definition of employment for FICA purposes services performed in the employ of a school, college, or university (SCU) (whether or not that organization is exempt from income tax), or an affiliated organization that satisfies section 509(a)(3) of the Code in relation to the SCU ("related section 509(a)(3) organization"), if the service is performed by a student who

033

is enrolled and regularly attending classes at that SCU. Section 3306(c)(10)(B) contains a similar student exception. Thus, the *student FICA exception applies to services only if both the "SCU status" and "student status" requirements are met*. This regulation deals with both the SCU status and student status requirements.

To satisfy the SCU status requirement, the employer for whom the employee performs services (the common law employer) must be either a SCU or a related section 509(a)(3) organization. If a student is not employed by a SCU or a related section 509(a)(3) organization, then the student FICA exception is not available. *See e.g.,* Rev. Rul. 69–519, 1969–2 C.B. 185 (holding that students attending an apprenticeship school established pursuant to an agreement between a union and a contractors' association were employees of the participating contractors to whom the students were assigned.) Section 31.3121(b)(10)–2(d) of the Employment Tax Regulations provides that the term "SCU" for purposes of the student FICA exception is to be construed in its "commonly or generally accepted sense."

To satisfy the student status requirement, the employee must meet three requirements. First, under section 3121(b)(10), the employee must be a student enrolled and regularly attending classes at the SCU employing the student. Second, the employee must be pursuing a course of study at the SCU employing the student. Third, the employee must be "[a]n employee who performs services in the employ of a [SCU] as an incident to and for the purpose of pursuing a course of study at such [SCU] . . . ." Reg. §31.3121(b)(10)–2(c). The IRS's position has been that whether services are incident to and for the purpose of pursuing a course of study depends on two factors: the employee's course workload and the nature of the employee's employment relationship with the employer. *See e.g.,* Rev. Proc. 98–16, 1998–1 C.B. 403; Rev. Rul. 78–17, 1978–1 C.B. 306.

*B. Need for Regulations*

Treasury and IRS have determined that it is necessary to provide additional clarification of the terms "SCU" and "stu-

dent who is enrolled and regularly attending classes" as they are used in section 3121(b)(10). In recent years the question has arisen whether the performance of certain services that are in the nature of on the job training are excepted from employment under the student FICA exception. This issue was presented with respect to medical residents and interns in *State of Minnesota v. Apfel,* 151 F.3d 742 (8th Cir. 1998), which concluded that services performed by medical residents and interns are not employment for social security purposes. The question also applies to services performed by employees in other fields, particularly regulated fields, where on the job training is often required to gain licensure. Guidance is needed to address situations where the performance of services and pursuit of the course of study are not separate and distinct activities, but instead are to some extent intermingled.

Section 3121(a) defines "wages" as "all remuneration for employment . . . ." Under section 3121(b), "employment" means "any service . . . performed . . . by an employee for the person employing him." The Social Security Act provides nearly identical definitions of "wages" and "employment." 42 U.S.C. sections 409(a)(1)(I); 410(a). "The very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind, import a breadth of coverage." *Social Security Board v. Nierotko,* 327 U.S. 358, 365 (1946). The courts have generally found that the terms "wages" and "employment" as used in both the social security benefits and FICA tax provisions are to be interpreted broadly. *State of New Mexico v. Weinberger,* 517 F.2d 989, 993 (10th Cir. 1995); *Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir. 1998); *Moorhead v. United States,* 774 F.2d 936, 941 (9th Cir. 1985); *Abrahamsen v. United States,* 228 F.3d 1360, 1364 (Fed. Cir. 2000). The broad interpretation of these terms results from the underlying purpose of the Social Security Act, namely, "to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor." *Nierotko,* 327 U.S. at 364. See also *St. Luke's Hospital v. United States,* 333 F.2d 157, 164 (6th Cir. 1964) ("[I]n dealing

with the beneficent purposes of the Social Security Act, this court generally favors that interpretation of statutory provisions which calls for coverage rather than exclusion.").

Wage and employment questions affect both social security benefits entitlement and FICA taxes which fund the social security trust fund. Except in unusual circumstances, the Social Security Act, and the Internal Revenue FICA provisions, are to be read in *pari materia. United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 213 (2001). Thus, whether certain service is employment affects not just FICA taxation, but also social security benefits eligibility and level of benefits. Moreover, the integrity of the social security system requires symmetry between service that is considered employment for social security benefits purposes and employment for FICA taxation purposes.

Resolution of this issue has significant social security benefits and FICA tax implications. The case of medical residents illustrates the possible effect on individuals and the social security system as a whole of excepting service in the nature of on the job training from employment for social security benefits and FICA tax purposes. The Social Security Administration (SSA) reported to the General Accounting Office (GAO) that "[b]ecause many residents are married and have children and work as residents for up to 8 years, an exemption from Social Security coverage could have a very significant effect on their potential disability benefits or their family's survivor benefits." Moreover, SSA reported that if medical residents were determined to be students for purposes of the student FICA exception, 270,000 medical residents would lose some coverage over the next ten years (2001 through 2010).[1]

This regulation addresses two issues: (1) whether an organization carrying on educational activities in connection with the performance of services is a SCU within the meaning of section 3121(b)(10), and (2) whether certain employees performing services in the nature of on the job training have the status of a student who is enrolled and regularly attending classes for purposes of section 3121(b)(10).

---

[1] GAO Report B–284947, Health, Education, and Human Services Division, *Social Security: Coverage For Medical Residents* (August 31, 2000).

034

*C. Whether an Organization Carrying On Educational Activities Is a SCU*

Organizations providing on the job training typically carry on both noneducational and educational activities. The issue is whether organizations carrying on both noneducational and educational activities are SCUs within the meaning of section 3121(b)(10). For example, organizations such as hospitals typically carry on both educational and noneducational activities. In *United States v. Mayo Foundation*, 282 F. Supp. 2d 997 (D. Minn. 2003), the United States argued, consistent with the position it has maintained administratively, that the primary purpose of an organization determines whether the organization is a SCU for purposes of the student FICA exception. The court rejected this argument, finding it inconsistent with the common sense standard. The court stated, "If the [IRS] had intended the term 'SCU' in §3121(b)(10) to have the same scope and meaning as 'educational institution' (found in §170(b)(1)(A)(ii) . . . ), it could have clearly and explicitly given the phrase such scope and meaning by cross-referencing those Code provisions and their implementing regulations." Although Treasury and IRS disagree with the interpretation of the district court, the Secretary understands and is responding to the court's view by more clearly incorporating the primary purpose standard in regulations.

This regulation provides that the character of an organization as a SCU or not as a SCU is determined by its primary function. The primary function standard is consistent with the language of section 3121(b)(10) and the existing regulations thereunder, and is consistent with the intended scope of the student FICA exception as reflected in the legislative history accompanying the Social Security Amendments of 1939 and 1950.

Section 170(b)(1)(A) of the Code defines various classes of organizations for charitable deduction purposes. All of the organizations have some combination of charitable, educational, religious and/or cultural purposes. The definitions distinguish them into categories based on various criteria. One such class defined in section 170(b)(1)(A)(ii) is for any "educational organization which normally maintains a regular faculty and curriculum

and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on."

Section 1.170A–9(b)(1) of the Income Tax Regulations provides:

An educational organization is described in section 170(b)(1)(A)(ii) if its primary function is the presentation of formal instruction and it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. The term includes institutions such as primary, secondary, preparatory, or high schools, and colleges and universities. It includes Federal, State, and other public-supported schools which otherwise come within the definition. It does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities. A recognized university which incidentally operates a museum or sponsors concerts is an educational organization within the meaning of section 170(b)(1)(A)(ii). However, the operation of a school by a museum does not necessarily qualify the museum as an educational organization within the meaning of this subparagraph.

Thus, in order to qualify as an educational organization under section 170(b)(1)(A)(ii), it is not enough that the organization carries on educational activities; instead, the organization's primary function must be to carry on educational activities.

The section 170(b)(1)(A)(ii) standard applies to the organization as a whole, an approach that is consistent with §31.3121(b)(10)–2(b) of the regulations, which provides that one of "[t]he statutory tests [is] the character of the *organization* in the employ of which the services are performed as a [SCU] . . . ." Thus, the character of the organization determines whether it is a SCU, not merely whether the organization carries on some educational activities. Further, section 3121(b) provides that "the term 'employment' means any service . . . performed . . . by an employee for the *person* employing him," and §31.3121(d)–2 of the regulations provides that "every *person* is an

employer if he employs one or more employees." Under section 7701(a)(1), the term "person" means any individual, trust, estate, association, or corporation. Thus, the character of the *person* employing the employee—the legal entity recognized for federal tax purposes—determines whether the SCU status requirement is met, not merely the character of a division or function of the employer.

In addition, the primary function standard reaches a result consistent with the "commonly or generally accepted sense" standard of the existing regulation (§31.3121(b)(10)–2(d)). In common parlance, the term "hospital" is used to describe an organization with the primary function of caring for patients. The term "museum" is used to describe an organization with the primary function of maintaining a collection and displaying it to the public in a way that will educate them about the collection and related concepts. A hospital or a museum may conduct educational activities, even classes or possibly even certificate or degree programs, but the activities which define them in the public mind are patient care and maintenance and display of a collection. An organization bears the label "school" when its primary function is the conduct of classes for an identified set of students leading to the awarding of a credential demonstrating mastery of some subject matter.

Finally, defining the term "SCU" to include institutions whose primary function is other than to carry on educational activities could lead to expansion of the student FICA exception beyond what Congress intended. When Congress enacted the student FICA exception in 1939, and amended it in 1950, it contemplated that the exception would be limited in scope. The House Report to the Social Security Amendments of 1939 states the following in describing the purpose of the student FICA and other exceptions:

In order to eliminate the nuisance of inconsequential tax payments, the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax, and certain other groups. While the earnings of a substantial number of persons are excluded by this recommendation, the total amount of earnings involved is undoubtedly

very small. . . . The intent of this amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of tax is inconsequential and a nuisance. The benefit rights built up are also inconsequential. Many of those affected, such as students and the secretaries of lodges, will have other employment which will enable them to develop insurance benefits. This amendment, therefore, should simplify the administration for the worker, the employer, and the Government.

H. R. Rep. No. 728, 76th Cong. 1st Sess. (1939), 1939–2 C.B. 538, 543. The Senate Report uses similar language. S. Rep. No. 734, 76th Cong. 1st Sess. 19 (1939), 1939–2 C.B. 565, 570.

The House Report to the Social Security Amendments of 1950 continued to describe the exception as a matter of administrative convenience not meaningfully affecting social security benefits:

The bill would continue to exclude service performed for nominal amounts in the employ of tax-exempt nonprofit organizations,[2] service performed by student nurses and internes [sic],[3] and service performed by students in the employ of colleges and universities. These exclusions simplify administration without depriving any significant number of people of needed protection.

H. R. Rep. No. 1300, 81st Cong. 1st Sess. 12 (1949). The Senate Report contains similar language. S. Rep. No. 1669, 81st Cong. 2d Sess. 15 (1950). Defining "SCU" to include organizations whose primary purpose is not to carry on educational activities would create a broad exception contrary to what Congress intended. Accordingly, the term "SCU" should not be interpreted so broadly as to include organizations whose primary function is other than to carry on educational activities.

## D. Whether Certain Employees Are Students

This regulation clarifies who is a student enrolled and regularly attending classes for purposes of section 3121(b)(10). The existing regulations at §31.3121(b)(10)–2(c) provide that an employee will have the status of student only if the services are performed "as an incident to and for the purpose of pursuing a course of study" at the SCU. Thus, to qualify for the exception, the individual's predominant relationship with the SCU must be as a student, and only secondarily or incidentally as an employee.

Where an individual's employment and educational activities are separate and distinct, the extent and nature of the respective activities determine whether the employment or student aspect of the relationship with the SCU is predominant. See Rev. Proc. 98–16. In the vast majority of cases the service and the course of study are separate and distinct activities; for example, the biology major's service in the cafeteria is unrelated to his course of study. By contrast, some employees' services are arguably part of a course of study; for example, the services of a medical resident are necessary to receive a certificate in a medical specialty. The standards in Rev. Proc. 98–16—whether the employee has at least a half-time course workload, and whether the employee is eligible to receive certain employee benefits—are inadequate to determine student status in such circumstances. Where the services performed by the individual for the SCU are also earning the individual credit toward an educational credential, the determination of whether the employment relationship is the predominant relationship with the SCU must be based on other factors. This regulation is intended to provide standards to determine student status in such cases.

This regulation is intended to further Congress's intent regarding those eligible for the student FICA exception as reflected by the legislative history to the Social Security Amendments of 1939. Consistent with Congress's intent, the student FICA exception covers individuals earning small amounts who are expected to accumulate social security benefits through future employment that will follow the completion of their education. Thus, in the typical case, a student will earn a modest amount while devoting his primary time and attention to classes and study.

This regulation provides clarification in three respects. First, it describes what the individual must be doing to be considered enrolled and regularly attending classes. In order to be a class, the activity must be more than an activity that gives the individual an opportunity to acquire new skills and knowledge. It must involve instructional activities, and be led by a knowledgeable faculty member following an established curriculum for identified students. Classes can include much more than traditional classroom-based instruction, but the faculty leadership, the set curriculum, and the prescribed time frame are essential.

Second, this regulation provides standards for determining whether an employee is pursuing a course of study. The regulation provides that one or more courses conducted by a SCU the completion of which fulfills the requirements to receive an educational credential granted by the SCU is a course of study.

Third, this regulation provides standards for determining whether an employee's services are incident to and for the purpose of pursuing a course of study. The regulation provides in general that whether the employee's services are incident to and for the purpose of pursuing a course of study depends on all the facts and circumstances. This determination is made by comparing the educational aspect of the relationship between the employer and the employee with the service aspect of the relationship. The regulation provides that the employee's course workload is used to measure the scope of the educational aspect of the relationship. A relevant factor is the employee's course workload relative to a full-time course workload. The regulation further provides that where an employee has the status of a career employee, the services performed by the employee are not incident to and for the purpose of pursuing a course of study.

This regulation specifies various aspects of an individual's employment relationship with the SCU which cause conclusively the individual to have the status of a "career employee."

This regulation provides that the criteria used to identify an employee as having the status of a career employee are (1) the

---

[2] The general exception from employment for services performed for non-profit organizations was repealed in 1983 by Public Law 98–21, section 102(b).

[3] The Social Security Amendments of 1965 repealed the student intern exception under §3121(b)(13). See discussion infra.

036

employee's hours worked, (2) whether the employee is a "professional employee," (3) the employee's terms of employment, and (4) whether the employee is required to be licensed in the field in which the employee is performing services. The hours worked criteria reflects Congressional intent to limit the student FICA exception to services performed by those individuals who are predominantly students. Employees who are working enough hours to be considered full-time employees (40 hours or more per week) have filled the conventional measure of available time with work, and not study. Even if they are capable of balancing a full-time job with a heavy course load, they are earning wages at a level that exceeds Congress's intended scope for the student FICA exception. The IRS's long-standing position is that hours worked is a relevant factor in determining whether an employee has student status. Rev. Rul. 78–17, 1978–1 C.B. 306 (holding that whether an employee has student status is determined by hours worked relative to credits taken); Rev. Rul. 66–285, 1966–2 C.B. 455 (holding that services of an employee employed full-time are not incident to and for the purpose of pursuing a course of study). Rev. Rul. 85–74, 1985–1 C.B. 331, dealing with the student nurse exception, uses an hours worked standard. The student nurse exception and the student FICA exception share the same legislative history. The IRS's use of an hours worked standard was found to be a reasonable interpretation of the legislative history in *Johnson City Medical Center v. United States*, 999 F.2d 973 (6th Cir. 1993).

The regulation provides that a "professional employee" has the status of a career employee, and thus his services are not incident to a course of study. The standards defining a professional employee for purposes of this regulation closely follow existing Department of Labor standards defining certain professional employees. See 29 U.S.C. 213(a); and 29 CFR 541.3(a)(1), (b), (c), (d). Section 213(a) and the regulations thereunder provide that certain employees are exempt from the minimum wage and overtime laws. This regulation provides that a professional employee for purposes of the student FICA exception is an employee whose primary duty consists of the performance of services requiring knowledge of

an advanced type in a field of science or learning, whose work requires the consistent exercise of discretion and judgment in its performance, and whose work is predominantly intellectual and varied in character. The services of employees exhibiting these characteristics are not incident to a course of study.

This regulation provides that an employee's terms of employment may also cause an employee to have the status of a career employee. A list of terms is provided, any one of which causes the employee to have the status of a career employee. On the list are terms of employment that provide for eligibility to receive certain employee benefits typically associated with career employment, such as eligibility to participate in certain types of retirement plans or tuition reduction arrangements. The notion of a career employee standard based on eligibility to receive certain fringe benefits was recommended by the higher education community for purposes of guidance that was issued in Rev. Proc. 98–16, and Treasury and IRS believe it is an appropriate standard to use for purposes of identifying employees whose services are not incident to and for the purpose of pursuing a course of study. Rev. Proc 98–16 provides that career employee status precludes application of the safe harbor standard, but leaves the possibility that the employee could have the status of a student based on all the facts and circumstances. In contrast, this regulation provides that an employee considered as having the status of a career employee based on eligibility to receive certain employee benefits does not have the status of a student for purposes of the student FICA exception.

Finally, this regulation provides that an employee who must be licensed by a government entity in order to perform a certain function has the status of a career employee. An employee who is required to be licensed to perform the services must have received sufficient prior instruction and demonstrated sufficient mastery of the activity to receive the license. Furthermore, licensed workers typically earn more than a modest amount for their work to reflect their expertise. As discussed, the legislative history indicates that the student FICA exception is intended to cover individuals earning a small amount of wages prior to entry into meaningful

post-education employment. The exception is not intended to cover an individual who has developed enough expertise to be working in a field where he or she is already licensed and has the capacity to earn substantial wages.

The IRS requests comments on the criteria used to identify an employee as having the status of a career employee. In particular, the IRS requests comments on the licensure criterion and whether this criterion should be further refined or clarified.

IRS and Treasury believe that Congress has shown the specific intent to provide social security coverage to individuals who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees, particularly medical residents and interns. The Social Security Amendments of 1939 added section 1426(b)(13) to the Code (later redesignated section 3121(b)(13), which provided an exception from social security coverage for "service performed as an intern in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law." The House Report accompanying the legislation provides:

> Paragraph 13 excepts service performed as a student nurse in the employ of a hospital or a nurse's training school by an individual who is enrolled and is regularly attending classes . . . ; and service performed as an interne [sic] (*as distinguished from a resident doctor*) in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law.

H. R. Rep. No. 728, 76th Cong. 1st Sess. 49 (1939), 1939–2 C.B. 538, 550–51 (emphasis added); see also S. Rep. No. 734, 76th Cong. 1st Sess. 58, 1939–2 C.B. 565, 578. Thus, the services of medical interns were excepted from FICA, but the services of resident doctors were not.

Twenty-five years later, in *St. Luke's Hospital v. United States*, 333 F.2d 157 (6th Cir. 1964), the Sixth Circuit confirmed that section 3121(b)(13) of the Code applied to medical interns, but that medical residents were not specifically excepted from social security coverage. St. Luke's claimed a refund of FICA taxes for the years 1953 through 1958 based on the student intern exception under sec-

tion 3121(b)(13). The refund claims were computed based upon the remuneration paid to medical school graduates in their second or subsequent year of clinical training. The court held that the services of medical residents were not excluded under the medical intern exception.

In 1965, one year after the *St. Luke's* decision, Congress amended the Code to repeal the special exemption for medical interns. The legislative history underlying the Social Security Amendments of 1965 (Public Law 89–97) suggests that Congress intended that medical interns be covered by FICA just as medical residents already were. The House Report states:

> Coverage would also be extended to services performed by medical and dental interns. The coverage of services as an intern would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at the time when they need the family survivor and disability protection it provides. This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families. Interns would be covered on the same basis as other employees working for the same employers, beginning on January 1, 1966.

H. R. Rep. No. 213, 89th Cong. 1st Sess. 95 (1965).

The Senate Report states:

> Section 3121(b)(13) of the Internal Revenue Code of 1954 excludes from the term 'employment,' and thus from coverage under the [FICA], services performed as an intern in the employ of a hospital by an individual who has completed a 4-year course in a medical school . . . . Section 311(b)(5) of the bill amends section 3121(b)(13) so as to remove this exclusion. The effect of this amendment is to extend coverage under the [FICA] to such interns unless their services are excluded under provisions other than section 3121(b)(13). Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax

...s an organization described in section ...01(c)(3) of the Code.

...Rep. No. 404, 89th Cong. 1st Sess. ...–38 (1965). The last sentence makes ...rect reference to the exclusion from ...A for services performed for exempt ...nizations under section 3121(b)(8)(B) ...e 1954 Code. That exclusion was re-...ed by the Social Security Amendments ...983 (Public Law 98–21). Nothing in ...egislative history indicates that Con-...believed interns (or residents, who ...even further along in their medical ...ers than interns) were eligible for the ...ent FICA exception.

...addition to revoking the medical ...n exception, section 311 of the Social ...rity Amendments of 1965, entitled, ...erage for Doctors of Medicine," ...ged the law in two other ways af-...ng medical doctors. First, section ...(c)(5) of the 1954 Code was amended ...iminate the exception for physician ...ces from the definition of "trade or ...ess," thus subjecting these services ...lf-employment tax. Second, section ...(b)(6)(C)(iv) of the 1954 Code, which ...ided an exception from the definition ...mployment for "service performed ...e employ of the United States if the ...ce is performed by any individual as ...mployee included under § 5351(2) ...le 5, [U.S.C.], (relating to certain ...ns, student nurses, and other student ...oyees of hospitals of the Federal ...ernment)," was amended by adding, ...er than as a medical or dental intern or ...edical or dental resident in training." ...se provisions, taken together, indicate ...gress's intent to create a scheme un-...which all medical doctors are covered ...er the social security system, whether ...or they are still in training, whether or ...they are self-employed, or whether or ...they work for the federal government.

*...ffect on Rev. Proc. 98–16*

...Several years ago, representatives of ...ner education asked the IRS and Treas-...y for guidance on the application of ...student FICA exception. Colleges and ...versities were particularly interested ...guidance relating to students who had ...-campus jobs that were completely sep-...te and distinct from their course work. ...response, the IRS issued Rev. Proc.

98–16, which sets forth standards for determining whether services performed by students in the employ of certain institutions of higher education qualify for the exception from FICA tax provided under section 3121(b)(10). The revenue procedure provided answers to many long-standing questions.

The revenue procedure addresses different circumstances than those prompting the need for the clarifications provided in this proposed regulation. It provides a safe harbor that applies where the student's course work and the student's employment are separate activities, and are not intermingled. In clarifying the regulations interpreting section 3121(b)(10), the IRS and Treasury fully intend to retain the safe harbor in the revenue procedure. However, several discrete aspects of the safe harbor need to be updated to align with the proposed regulations. Thus, in conjunction with this notice of proposed rulemaking, the IRS is suspending Rev. Proc. 98–16 and proposing to replace it with a new revenue procedure that is revised in limited ways to align with the proposed regulations. See Notice 2004–12, to be published in I.R.B. 2004–10 (March 8, 2004). Taxpayers may rely on the proposed revenue procedure until final regulations and a final revenue procedure are issued. Also, the public is invited to comment on the proposed revenue procedure.

*F. Related Proposed Amendments*

Section 3306(c)(10)(B) of the Code excepts from "employment" for FUTA tax purposes services performed by a student who is enrolled and regularly attending classes at a SCU. This regulation provides that the standards that apply in determining whether an employer is a SCU and whether an employee is a student for purposes of section 3121(b)(10) also apply for purposes of section 3306(c)(10)(B). In addition, this regulation provides that the standards that apply for purposes of determining whether an employer is a SCU for purposes of section 3121(b)(10) also apply for purposes of section 3121(b)(2) (excluding from employment for FICA purposes domestic services performed for local college clubs, fraternities, and sororities by students who are enrolled and regularly attending classes)

038

*G. Proposed Effective Date*

It is proposed that these regulations apply to services performed on or after February 25, 2004.

**Special Analyses**

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations. In addition, because no collection of information is imposed on small entities, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply, and, therefore, a Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on the impact on small business.

**Comments and Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written or electronic comments that are submitted timely to the IRS. The IRS and Treasury Department request comments on all aspects of the proposed regulations and how they can be made easier to understand. All comments will be available for public inspection and copying.

A public hearing is scheduled for June 16, 2004, beginning at 10 a.m. in room 2615 of the Internal Revenue Building, 1111 Constitution Avenue, NW, Washington, DC. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. All visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 30 minutes before the hearing starts. For information about having your name placed on the building access list to attend the hearing, see the "FOR FURTHER INFORMATION CONTACT" section of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments at the hearing must submit electronic or written comments by May 25, 2004, and submit an outline of the topics to be discussed and the time to be devoted to each topic (signed original and eight (8) copies). A period of 10 minutes will be allotted to each person for making comments. An agenda showing the scheduling of the speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

**Drafting Information**

The principal author of these proposed regulations is John Richards of the Office of Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities). However, other personnel from the IRS and Treasury Department participated in their development.

* * * * *

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 31 is proposed to be amended as follows:

**PART 31—EMPLOYMENT TAXES**

Paragraph 1. The authority citation for part 31 continues to read in part, as follows:

Authority 26 U.S.C. 7805 * * *

Par. 2. In §31.3121(b)(2)–1, paragraph (d) is revised to read as follows:

*§31.3121(b)(2)–1 Domestic service performed by students for certain college organizations.*

* * * * *

(d) *A school, college, or university* is described in section 3121(b)(2) if its primary function is the presentation of formal instruction, it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.

* * * * *

Par. 3. Section 31.3121(b)(10)–2 is amended by:

1. Adding headings for paragraphs (a), (b).

2. Revising paragraphs (c) and (d).

3. Redesignating paragraph (e) as (g).

4. Adding paragraphs (e) and (f).

The revisions and additions read as follows:

*§31.3121(b)(10)–2 Services performed by certain students in the employ of a school, college, or university, or of a nonprofit organization auxiliary to a school, college, or university.*

(a) *General rule.* (1)* * *

(b) *Statutory tests.* * * *

(c) *School, College, or University.* A school, college, or university is described in section 3121(b)(10) if its primary function is the presentation of formal instruction, it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.

(d) *Student Status—general rule.* Whether an employee has the status of a student performing the services shall be determined based on the relationship of the employee with the organization for which the services are performed. In order to have the status of a student, the employee must perform services in the employ of a school, college, or university described in paragraph (c) of this section at which the employee is enrolled and regularly attending classes in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study within the meaning of paragraph (d)(3) of this section at such school, college, or university. An employee who performs services in the employ of an affiliated organization described in paragraph (a)(2) of this section must be enrolled and regularly attending classes at the affiliated school, college, or university within the meaning of paragraph (c) of this section in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study within the meaning of paragraph (d)(3) of this section at such school, college, or university.

039

(1) *Enrolled and regularly attending classes.* An employee must be enrolled and regularly attending classes at a school, college, or university within the meaning of paragraph (c) of this section at which the employee is employed to have the status of a student within the meaning of section 3121(b)(10). An employee is enrolled within the meaning of section 3121(b)(10) if the employee is registered for a course or courses creditable toward an educational credential described in paragraph (d)(2) of this section. In addition, the employee must be regularly attending classes to have the status of a student. For purposes of this paragraph (d)(1), a class is an instructional activity led by a knowledgeable faculty member for identified students following an established curriculum. Traditional classroom activities are not the sole means of satisfying this requirement. For example, research activities under the supervision of a faculty advisor necessary to complete the requirements for a Ph.D. degree may constitute classes within the meaning of section 3121(b)(10). The frequency of events such as these determines whether the employee may be considered to be regularly attending classes.

(2) *Course of study.* An employee must be pursuing a course of study in order to have the status of a student. A course of study is one or more courses the completion of which fulfills the requirements necessary to receive an educational credential granted by a school, college, or university within the meaning of paragraph (c) of this section. For purposes of this paragraph, an educational credential is a degree, certificate, or other recognized educational credential granted by an organization described in paragraph (c) of this section. In addition, a course of study is one or more courses at a school, college or university within the meaning of paragraph (c) of this section the completion of which fulfills the requirements necessary for the employee to sit for an examination required to receive certification by a recognized organization in a field.

(3) *Incident to and for the purpose of pursuing a course of study.* An employee's services must be incident to and for the purpose of pursuing a course of study in order for the employee to have the status of a student. Whether an employee's services are incident to and for the purpose of pursuing a course of study shall

be determined on the basis of the relationship of such employee with the organization for which such services are performed. The educational aspect of the relationship, as compared to the service aspect of the relationship, must be predominant in order for the employee's services to be incident to and for the purpose of pursuing a course of study. The educational aspect of the relationship between the employer and the employee is established by the employee's course workload. The service aspect of relationship is established by the facts and circumstances related to the employee's employment. In the case of an employee with the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section, the service aspect of the relationship with the employer is predominant. Standards applicable in determining whether an employee's services are considered to be incident to and for the purpose of pursuing a course of study are provided in paragraphs (d)(3)(i) and (ii) of this section.

(i) *Course workload.* The educational aspect of an employee's relationship with the employer is evaluated based on the employee's course workload. Whether an employee's course workload is sufficient in order for the employee's employment to be incident to and for the purpose of pursuing a course of study generally depends on the particular facts and circumstances. A relevant factor in evaluating an employee's course workload is the employee's course workload relative to a full-time course workload at the school, college or university within the meaning of paragraph (c) of this section at which the employee is enrolled and regularly attending classes.

(ii) *Career employee status.* Services of an employee with the status of a career employee are not incident to and for the purpose of pursuing a course of study. An employee has the status of a career employee if the employee is described in paragraph (d)(3)(ii)(A), (B), (C) or (D) of this section.

(A) *Hours worked.* An employee has the status of a career employee if the employee regularly performs services 40 hours or more per week.

(B) *Professional employee.* An employee has the status of a career employee if the employee is a professional employee. A professional employee is an employee—

(*1*) Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education, from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

(*2*) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(*3*) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) *Terms of employment.* An employee with the status of a career employee includes any employee who is—

(*1*) Eligible to receive vacation, sick leave, or paid holiday benefits;

(*2*) Eligible to participate in any retirement plan described in section 401(a) that is established or maintained by the employer, or would be eligible to participate if age and service requirements were met;

(*3*) Eligible to participate in an arrangement described in section 403(b), or would be eligible to participate if age and service requirements were met;

(*4*) Eligible to participate in a plan described under section 457(a), or would be eligible to participate if age and service requirements were met;

(*5*) Eligible for reduced tuition (other than qualified tuition reduction under section 117(d)(5) provided to a teaching or research assistant who is a graduate student) because of the individual's employment relationship with the institution;

(*6*) Eligible to receive employee benefits described under sections 79 (life insurance), 127 (qualified educational assistance), 129 (dependent care assistance programs), or 137 (adoption assistance); or

(*7*) Classified by the employer as a career employee.

(D) *Licensure status.* An employee is a career employee if the employee is required to be licensed under state or local law to work in the field in which the employee performs services

040

(e) *Examples.* The following examples illustrate the principles of paragraphs (c) and (d) of this section:

*Example 1.* (i) Employee C is employed by State University T to provide services as a clerk in T's administrative offices, and is enrolled and regularly attending classes at T in pursuit of a B.S. degree in biology. C has a course workload which constitutes a full-time course workload at T. C performs services on average 20 hours per week, but from time to time works 40 hours or more during a week. C receives only hourly wages and no other pay or benefits. C is not required under state or local law to be licensed to perform the services for T.

(ii) In this *example,* C is employed by T, a school, college, or university within the meaning of paragraph (c) of this section. C is enrolled and regularly attending classes at T in pursuit of a course of study. C's hours worked do not cause C to have the status of a career employee, even though C may occasionally work 40 hours or more during a week. C's part-time employment relative to C's full-time course workload indicates that C's services are incident to and for the purpose of pursuing a course of study. C is not a professional employee, and C's terms of employment and licensure status do not cause C to have the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, C has the status of a student. Accordingly, C's services are excepted from employment under section 3121(b)(10).

*Example 2.* (i) Employee D is employed in the accounting department of University U, and is enrolled and regularly attending classes at U in pursuit of an M.B.A. degree. D has a course workload which constitutes a half-time course workload at U. D's work does not require the consistent exercise of discretion and judgment, and is not predominantly intellectual and varied in character. D regularly performs services full-time (40 hours per week), and is eligible to participate in a retirement plan described in section 401(a) maintained by U.

(ii) In this *example,* D is employed by U, a school, college, or university within the meaning of paragraph (c) of this section. In addition, D is enrolled and regularly attending classes at U in pursuit of a course of study. However, D has the status of a career employee because D regularly works 40 hours per week, and is eligible to participate in U's section 401(a) retirement plan. Because D has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section, D's services are not incident to and for the purpose of pursuing a course of study. Accordingly, D's services are not excepted from employment under section 3121(b)(10).

*Example 3.* (i) Employee E is employed by University V to provide patient care services at a teaching hospital that is an unincorporated division of V. These services are performed as part of a medical residency program in a medical specialty sponsored by V. The residency program in which E participates is accredited by the Accreditation Council for Graduate Medical Education. Upon completion of the program, E will receive a certificate of completion, and be eligible to sit for an examination required to be certified by a recognized organization in the medical specialty. E regularly performs services more than 40 hours per week. E's patient care services require knowledge of an advanced type in the field of medicine, and are pre-

dominantly intellectual and varied in character. Further, although E is subject to supervision, E's services require the consistent exercise of discretion and judgment regarding the treatment of patients. In addition, E receives vacation, sick leave, and paid holiday benefits; and salary deferral benefits under an arrangement described in section 403(b). E is a first-year resident, and thus is not eligible to be licensed to practice medicine under the laws of the state in which E performs services.

(ii) In this *example,* E is employed by V, a school, college, or university within the meaning of paragraph (c) of this section. However, because of E's hours worked, professional employee status, and employee benefits, E has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, E's services are not incident to and for the purpose of pursuing a course of study. Accordingly, E's services are not excepted from employment under section 3121(b)(10).

*Example 4.* (i) Employee F is employed in the facilities management department of University W. F has a B.S. degree in engineering, and is completing the work experience required to sit for an examination to become a professional engineer eligible for licensure under state or local law. F is not attending classes at W in pursuit of a course of study leading to an educational credential. F regularly performs services 40 hours or more per week. F receives certain employee benefits including vacation, sick leave, and paid holiday benefits. F also receives retirement benefits under an arrangement described in section 457.

(ii) In this *example,* F is employed by W, a school, college, or university within the meaning of paragraph (c) of this section. However, F is not enrolled and regularly attending classes at W in pursuit of a course of study for purposes of paragraph (d)(2) of this section. In addition, because of F's hours worked and employment benefits, F has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, F's services are not incident to and for the purpose of pursuing a course of study. Accordingly, F's services are not excepted from employment under section 3121(b)(10).

*Example 5.* (i) Employee G is employed by Employer X as an apprentice in a skilled trade. X is a subcontractor providing services in the field in which G wishes to specialize. G is pursuing a certificate in the skilled trade from Community College C. G is performing services for X pursuant to an internship program sponsored by C under which its students gain experience, and receive credit toward a certificate in the trade.

(ii) In this *example,* G is employed by X. X is not a school, college or university within the meaning of paragraph (c) of this section. Thus, the exception from employment under section 3121(b)(10) is not available with respect to G's services for X.

*Example 6.* (i) Employee H is employed by a cosmetology school Y at which H is enrolled and regularly attending classes in pursuit of a certificate of completion. Y's primary function is to carry on educational activities to prepare its students to work in the field of cosmetology. Prior to issuing a certificate, Y requires that its students gain experience in cosmetology services by performing services for the general public on Y's premises. H performs services

less than 40 hours per week. H's work does not require knowledge of an advanced type in a field of science or learning, nor is it predominantly intellectual and varied in character. H receives remuneration in the form of hourly compensation from Y for providing cosmetology services to clients of Y, and does not receive any other compensation or benefits. H is not required to be a licensed cosmetologist in the state in which H performs services while participating in the training program.

(ii) In this *example,* H is employed by Y, a school, college or university within the meaning of paragraph (c) of this section, and is enrolled and regularly attending classes at Y in pursuit of a course of study. In addition, because H works less than 40 hours per week, H is not a professional employee, and H's terms of employment, and licensure status do not indicate that H has the status of a career employee, H is not a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, H's services are incident to and for the purpose of pursuing a course of study. Accordingly, H's services are excepted from employment under section 3121(b)(10).

*Example 7.* (i) Employee J is a teaching assistant at University Z. J is enrolled and regularly attending classes in pursuit of a graduate degree at Z. J has a course workload which constitutes a full-time course workload at Z. J performs services less than 40 hours per week. J's duties include grading quizzes, providing class and laboratory instruction pursuant to a lesson plan developed by the professor, and preparing laboratory equipment for demonstrations. J receives no employee benefits. J receives a cash stipend and a qualified tuition reduction within the meaning of section 117(d)(5) for the credits earned for being a teaching assistant. J is not required under state or local law to be licensed to perform the activities of a teaching assistant.

(ii) In this *example,* J is employed as a teaching assistant by Z, a school, college, or university within the meaning of paragraph (c), and is enrolled and regularly attending classes at Z in pursuit of a course of study. J's full-time course workload relative to J's employment workload indicates that J's services are incident to and for the purpose of pursuing a course of study. J is not a professional employee because J's work does not require the consistent exercise of discretion and judgment in its performance. In addition, J's terms of employment and licensure status do not cause J to have the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, J has the status of a student. Accordingly, J services are excepted from employment under section 3121(b)(10).

(f) *Effective date.* Paragraphs (c), (d), and (e) of this section apply to services performed on or after February 25, 2004.

* * * * *

Par. 4. In §31.3306(c)(10)–2 is revised as follows:

1. Paragraph (c) is revised.

2. Paragraph (d) and (e) are added.

The revision and addition read as follows:

041

§31.3306(c)(10)–2 Services of student in employ of a school, college, or university.

\* \* \* \* \*

(c) General rule. (1) For purposes of this section, the tests are the character of the organization in the employ of which the services are performed and the status of the employee as a student enrolled and regularly attending classes at the school, college, or university described in paragraph (c)(2) of this section, in the employ of which he performs the services. The type of services performed by the employee, the place where the services are performed, and the amount of remuneration for services performed by the employee are not material.

(2) School, college, or university. A school, college, or university is described in section 3306(c)(10)(B) if its primary function is the presentation of formal instruction, and it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.

(d) Student Status—general rule. Whether an employee has the status of a student within the meaning of section 3306(c)(10)(B) performing the services shall be determined based on the relationship of the employee with the organization for which the services are performed. In order to have the status of a student, the employee must perform services in the employ of a school, college, or university described in paragraph (c)(2) of this section at which the employee is enrolled and·regularly attending classes in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study at such school, college, or university within the meaning of paragraph (d)(3) of this section.

(1) Enrolled and regularly attending classes. An employee must be enrolled and regularly attending classes at a school, college, or university within the meaning of paragraph (c)(2) of this section at which the employee is employed to have the status of a student within the meaning of section 3306(c)(10)(B). An employee is enrolled within the meaning of sec-

tion 3306(c)(10)(B) if the employee is registered for a course or courses creditable toward an educational credential described in paragraph (d)(2) of this section. In addition, the employee must be regularly attending classes to have the status of a student. For purposes of this paragraph (d)(1), a class is a didactic activity in which a faculty member plays a leadership role in furthering the objectives of an established curriculum. Traditional classroom activities are not the sole means of satisfying this requirement. The frequency of events such as these determines whether the employee may be considered to be regularly attending classes.

(2) Course of study. An employee must be pursuing a course of study in order to have the status of a student within the meaning of section 3306(c)(10)(B). A course of study is one or more courses the completion of which fulfills the requirements necessary to receive an educational credential granted by a school, college, or university within the meaning of paragraph (c)(2) of this section. For purposes of this paragraph, an educational credential is a degree, certificate, or other recognized educational credential granted by an organization described in paragraph (c)(2) of this section. In addition, a course of study is one or more courses at a school, college, or university within the meaning of paragraph (c)(2) of this section the completion of which fulfills the requirements necessary for the employee to sit for an examination required to receive certification by a recognized organization in a field.

(3) Incident to and for the purpose of pursuing a course of study. An employee's services must be incident to and for the purpose of pursuing a course of study in order for the employee to have the status of a student within the meaning of section 3306(c)(10)(B). Whether an employee's services are incident to and for the purpose of pursuing a course of study shall be determined on the basis of the relationship of such employee with the organization for which such services are performed. The educational aspect of the relationship, as compared to the service aspect of the relationship, must be predominant in order for the employee's services to be incident to and for the purpose of pursuing a course of study. The educational aspect of the relationship between the employer and the employee is established by

the employee's course workload. The service aspect of relationship is established by the facts and circumstances related to the employee's employment. In the case of an employee with the status of a career employee, the service aspect of the relationship with the employer is predominant. Standards applicable in determining whether an employee's services are considered to be incident to and for the purpose of pursuing a course of study are provided in paragraphs (d)(3)(i) and (ii) of this section.

(i) Course workload. The educational aspect of an employee's relationship with the employer is evaluated based on the employee's course workload. Whether an employee's course workload is sufficient for the employee's employment to be incident to and for the purpose of pursuing a course of study generally depends on the particular facts and circumstances. A relevant factor in evaluating the employee's course workload is the employee's course workload relative to a full-time course workload at the school, college or university·within the meaning of paragraph (c)(2) of this section at which the employee is enrolled and regularly attending classes.

(ii) Career employee status. Services of an employee with the status of a career employee are not incident to and for the purpose of pursuing a course of study. An employee has the status of a career employee if the employee is described in paragraph (d)(3)(ii)(A), (B), (C), or (D) of this section.

(A) Hours worked. An employee has the status of a career employee if the employee regularly performs services 40 hours or more per week.

(B) Professional employee. An employee has the status of a career employee if the employee is a professional employee. A professional employee is an employee—

(1) Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education, from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

(2) Whose work requires the consistent exercise of discretion and judgment in its performance; and

042

(3) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) *Terms of employment.* An employee with the status of a career employee includes any employee who is—

(1) Eligible to receive vacation, sick leave, or paid holiday benefits;

(2) Eligible to participate in any retirement plan described in section 401(a) that is established or maintained by the employer, or would be eligible to participate if age and service requirements were met;

(3) Eligible to participate in an arrangement described in section 403(b), or would be eligible to participate if age and service requirements were met;

(4) Eligible to participate in a plan described under section 457(a), or would be eligible to participate if age and service requirements were met;

(5) Eligible for reduced tuition (other than qualified tuition reduction under section 117(d)(5) provided to a teaching or research assistant who is a graduate student) because of the individual's employment relationship with the institution;

(6) Eligible to receive employee benefits described under sections 79 (life insurance), 127 (qualified educational assistance), 129 (dependent care assistance programs), or 137 (adoption assistance); or

(7) Classified by the employer as a career employee.

(D) *Licensure status.* An employee is a career employee if the employee is required to be licensed under state or local law to work in the field in which the employee performs services.

(e) *Effective date.* Paragraphs (c) and (d) of this section apply to services performed on or after February 25, 2004.

Mark E. Matthews,
*Deputy Commissioner for
Services and Enforcement.*

(Filed by the Office of the Federal Register on February 24, 2004, 8.45 a.m., and published in the issue of the Federal Register for February 25, 2004, 69 F.R. 8604)

## Changes to Reporting Requirements for Certain 2002 Forms Because of Changes in the Tax Rates and Holding Period Rules for Qualified Dividends

## Announcement 2004–11

### BACKGROUND

Under current law, qualified dividends received after 2002 are taxed at the new lower capital gain tax rates (5% or 15%). The new rates do not apply to dividends passed through from fiscal year partnerships, S corporations, or estates for their fiscal year beginning in 2002, even if the dividends were received in 2003.

Also, to qualify for the lower rates under current law, you must hold a stock for at least 61 days of a 120-day period. That period begins 60 days before the day a stock trades without its dividend (the "ex-dividend date"), and ends 59 days after the ex-dividend date. In the case of dividends attributable to periods of more than 366 days that were received on preferred stock, you must hold the stock for at least 91 days of a 180-day period. That period begins 90 days before the ex-dividend date, and ends 89 days after the ex-dividend date.

### TECHNICAL CORRECTION

Section 2 of the Tax Technical Corrections Act of 2003 (H.R. 3654, S. 1984), which has not yet been enacted, would amend current law to allow partnerships, S corporations, and estates (including revocable trusts treated as part of an estate) with fiscal years beginning in 2002 to pass through dividends received in 2003 from domestic corporations and qualified foreign corporations as qualified dividends to their partners, shareholders, and beneficiaries (to the extent otherwise permitted by law). In addition, the legislation would amend the holding period rules for qualified dividends by changing the 120-day period to a 121-day period and the 180-day period to a 181-day period. These periods would end one day later than under current law. Both amendments would be treated as if included in section 302 of the Jobs and

Growth Tax Relief Reconciliation Act of 2003. The Commissioner of Internal Revenue has agreed to allow taxpayers to apply section 2 of the Tax Technical Corrections Act of 2003 as if the legislation were presently enacted.

As a result, there are changes in the reporting requirements for the following 2002 forms (these forms and their instructions do not reflect this legislation) filed by entities with 2002–2003 fiscal years:

- Schedules K and K–1 for partnerships and S corporations and

- Schedule K–1 for estates.

Also, the tax computation (for both the regular tax and the alternative minimum tax) for estates with 2002–2003 fiscal years and qualified dividends received in 2003 is affected by this change.

Note: *Dividends received in a tax year beginning in 2002 and ending in 2003 are not qualified dividends for individuals with 2002–2003 fiscal years, even if the dividends are received during 2003.*

The necessary changes are described in the following sections.

### FISCAL YEAR ESTATES: REPORTING QUALIFIED DIVIDENDS AND FIGURING TAX FOR 2002–2003

Estates with 2002–2003 fiscal years and qualified dividends received in 2003 must attach to their 2002 Form 1041 a computation similar to that shown in Part V of the 2003 Schedule D (Form 1041) or the Qualified Dividends Tax Worksheet on page 22 of the 2003 Instructions for Form 1041 and Schedules A, B, D, G, I, J, and K–1. These estates may use the 2003 Schedule D (Form 1041) or the Qualified Dividends Tax Worksheet to figure their 2002 tax. To do so, these filers must:

- Enter qualified dividends received in 2003 on line 20 of the 2003 Schedule D (Form 1041) or line 2 of the Qualified Dividends Tax Worksheet (whichever applies).

- Modify the computation in Part V of Schedule D (Form 1041) or the Qualified Dividends Tax Worksheet by using the 2002 Tax Rate Schedule instead of the 2003 Tax Rate Schedule.

043

EXHIBIT 9C

1940, and therefore have no effect whatsoever on any litigation now in the courts with respect to what constitutes agricultural labor under present law.

The managers on the part of the House also desire to state that there are two very important proposals to which the conferees gave a great deal of attention. These are the so-called Connally amendment, providing for greater Federal matching in the case of old-age assistance, and the Massachusetts plan which would enable the States to make a State-wide reduction in unemployment compensation contribution rates under certain conditions. The conferees believe that a comprehensive study of the subject matter covered by these two proposals should be undertaken which will enable the Congress to deal more intelligently with the problems involved than is possible at the present time.

<div style="text-align:right">

R. L. DOUGHTON,
THOS. H. CULLEN,
JOHN W. MCCORMACK,
JERE COOPER,
ALLEN T. TREADWAY,
FRANK CROWTHER,
THOMAS A. JENKINS,
*Managers on the part of the House.*

</div>

1939—47—10

## THE SOCIAL SECURITY BILL.

[House of Representatives Report No. 615, Seventy-fourth Congress, First Session.]

[April 5, 1935.]

Mr. Doughton, from the Committee on Ways and Means, submitted the following report [to accompany H. R. 7260]:

\* \* \* \* \* \* \*

### PART I. GENERAL STATEMENT.

#### CONTENTS OF BILL.

This bill provides for various grants-in-aid to the States; establishes a Federal old-age benefit system and a Social Security Board; and imposes certain taxes, hereinafter described.

\* \* \* \* \* \* \*

Title VIII: An income tax, measured by a certain percentage of wages (beginning with 1 per cent in 1937 and increasing to 3 per cent by 1949), is levied on most wage earners, with certain large groups, such as domestic servants and agricultural laborers, exempted. An excise tax, measured at the same rates on wages paid, is levied on employers, with similar exemptions. These taxes first take effect on January 1, 1937.

Title IX: An excise tax is levied on employers of 10 or more persons (with certain exemptions), measured by 1 per cent of wages payable for 1936, and increasing to 3 per cent by 1938. This tax goes into effect on January 1, 1936, and is first payable a year later. Credits against the tax are allowed for contributions which the taxpayer may have made to State unemployment funds under State unemployment compensation laws.

Title X: This title contains general definitions and miscellaneous provisions applying to the whole Act.

### HISTORY OF LEGISLATION.

Legislation on the subject of social security was promised the country in a Presidential message of June 8, 1934, in which he said:

"Our task of reconstruction does not require the creation of new and strange values. It is rather the finding of the way once more to known, but to some degree forgotten, ideals and values. If the means and details are in some instances new, the objectives are as permanent as human nature.

601          [Misc.

"Among our objectives I place the security of the men, women, and children of the Nation first.

"This security for the individual and for the family concerns itself primarily with three factors. People want decent homes to live in; they want to locate them where they can engage in productive work; and they want some safeguard against misfortunes which can not be wholly eliminated in this man-made world of ours."

Subsequently, the President (by Executive order) created the Committee on Economic Security, composed of the Secretary of Labor (chairman), the Secretary of the Treasury, the Attorney General, the Secretary of Agriculture, and the Federal Emergency Relief Administrator, instructing the committee to study the entire problem and to make recommendations which might serve as the basis for consideration of legislation by the present Congress.

The Committee on Economic Security devoted six months to this study in which it was assisted by a staff of specialists and by 14 advisory groups, representative of every interest concerned with the problems of economic security, including capital, labor, and the general public.  *  *  *  The committee made a unanimous report to the President in January of this year, which the President transmitted to both Houses of the Congress, with his indorsement of the legislation recommended therein, in a special message on January 17, 1935 the concluding paragraphs of which were as follows:

"The establishment of sound means toward a greater future economic security of the American people is dictated by a prudent consideration of the hazards involved in our national life. No one can guarantee this country against the dangers of future depressions but we can reduce these dangers. We can eliminate many of the factors that cause economic depressions, and we can provide the means of mitigating their results. This plan for economic security is at once a measure of prevention and a method of alleviation.

"We pay now for the dreadful consequence of economic insecurity—and dearly. This plan presents a more equitable and infinitely less expensive means of meeting these costs. We can not afford to neglect the plain duty before us. I strongly recommend action to attain the objectives sought in this report."

These recommendations were incorporated in H. R. 4120, on which this committee held extended hearings from January 21 to February 12, at which more than 1,000 pages of testimony were taken. Since the conclusion of the hearings the measure has received the constant attention of the committee until the present moment, and numerous changes in the content and form were agreed upon. These changes involved a complete revision resulting in the drafting and introduction of H. R. 7260, herewith recommended for passage.

PURPOSE AND SCOPE.

The need for legislation on the subject of social security is apparent at this time. On every hand the lack of such security is evidenced by human suffering, weakened morale, and increased public expenditures.

This situation necessitates two complementary courses of action: We must relieve the existing distress and should devise measures to reduce destitution and dependency in the future.

Thus far in the depression, we have merely attempted to relieve existing distress, but the time has come for a more comprehensive and constructive attack on insecurity. The foundations of such a program are laid in the present bill.

Work for the employables on relief is contemplated in the work-relief bill; a second vital part of the program for security is presented in this bill. The bill is designed to aid the States in taking care of the dependent members of their population, and to make a beginning in the development of measures which will reduce dependency in the future. It deals with four major subjects: Old-age security, unemployment compensation, security for children, and public health. These subjects are all closely related, all being concerned with major causes of dependency. Together they constitute an important step in a well-rounded, unified, long-range program for social security.

     *       *       *       *       *       *

UNEMPLOYMENT COMPENSATION.

     *       *       *       *       *       *

The failure of the States to enact unemployment insurance laws is due largely to the fact that to do so would handicap their industries in competition

209196°—40——20

assessment and collection set forth under section 1109 of the Revenue Act of 1926, as amended, also apply to the taxes levied under this title.  Likewise the periods of limitation upon refunds and credits prescribed in section 3228 of the Revised Statutes will apply to the taxes under this title.  If the tax or any part thereof is not paid when due, the unpaid portion will bear interest at the rate of 1 per cent per month from the time the tax became due until paid. The Board of Tax Appeals has no jurisdiction over these taxes.  If they are not paid when due, they may be collected by distraint as provided in section 3187 of the Revised Statutes, leaving the taxpayer to his remedy by way of claim and suit for refund.  In order that the employer, who collects and withholds the tax due from the employee, may be treated as a trustee or proceeded against by distraint, the provisions of section 607 of the Revenue Act of 1934 are also made to apply to this title.  Section 607 of the Revenue Act of 1934 impresses the amount of taxes withheld or collected with a trust and makes applicable for the enforcement of the Government's claim the administrative provisions for assessing and collecting taxes.

For administrative reasons, a fractional part of a cent is disregarded unless it amounts to one-half cent or more, in which event it is treated as 1 cent. This corresponds to a similar provision appearing in the Revenue Acts.

### RULES AND REGULATIONS.

**Section 808**: This section gives the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, authority to make and publish rules and regulations for the enforcement of this title.

### SALE OF STAMPS BY POSTMASTERS.

**Section 809**: This section authorizes the sale of stamps, coupons, or other devices prescribed for the collection or payment of the taxes under this title by the various postmasters of the United States.  The postmasters are required to deposit the receipts from such sales with the Postmaster General and render accounts to him at such time and in such form as he shall prescribe.  The Postmaster General is given authority to require a bond from the various postmasters receiving such stamps or other devices in such increased amount as he may find necessary to protect the interests of the Government.  The Postmaster General is required to transfer the receipts from the sale of such stamps or other devices monthly to the Treasury as internal revenue collections.

### PENALTIES.

**Section 810(a)**: This subsection imposes a fine of $10,000, or imprisonment for not more than six months, or both, for using, transferring, exchanging, or pledging any stamp or other device prescribed by the Commissioner of Internal Revenue for the collection or payment of the taxes under this title in any manner except as authorized by law or regulations made thereunder.

**Section 810(b)**: This subsection imposes a fine of $5,000, or imprisonment for not more than five years, or both, in the following cases where there is an intent to defraud: (1) Altering, forging, or counterfeiting any stamp or other device prescribed by the Commissioner of Internal Revenue for the collection or payment of taxes due under this title; (2) using, selling, lending, or having in possession any such altered, forged, or counterfeited stamp or other device; and (3) making, using, selling, or having possession of any material in imitation of the material used in the manufacture of such stamp or other device.

### DEFINITIONS.

**Section 811(a)**: This subsection defines "wages."  Wages include not only the cash payments made to the employee for work done, but also compensation for services in any other form, such as room, board, etc.  The term "wages" does not necessarily apply to the total remuneration received from the employer by the employee; the term includes only the first $3,000 of wages received by an employee from his employer with respect to employment during the calendar year.  The following example will illustrate how the rule applies: Employer A pays employee B a salary of $500 a month beginning with the calendar year 1937.  At the end of the sixth month B has received from his employer $3,000.

The balance of h...
respect to the emp...
case where the em...
throughout the ye...
June 30, 1937, and...
with employer C at...
employer C and em...
received during the...

Section 811(b):...
service of whatever...
for his employer.
Includes in the de...
instance, resident a...
States are subject t...
formed outside the...
or by a nonresident...
is defined in section...
District of Columbi...
of certain kinds of e...
even though perfor...
domestic service in...
employer's trade or...
in the course of an...
ment store employed...
its trade or business...
from taxation under...
of a crew on a vesse...
foreign country are...
administrative diffic...
was regarded as aln...
were granted, it wo...
coolies working on A...
Exemption from t...
Federal and State or...

Services performe...
or educational instit...
benefit of any privat...
imposed by this title...
ization is exempt, th...
of the exemption ra...
For instance, if a ch...
income which is dev...
poses, it will not be...
exempt from such ta...
institutions not opera...
Y. M. H. A., the Sal...
from income tax und...
Exemption is likew...
of individuals who ha...

### TA...

This title levies upo...
wages, and allows ea...
tributions he has paid...

**Section 901**: An an...
in section 907) on the...
payable annually, will...
him with respect to en...
1936.  This means tha...
remuneration for servi...
time when the actual...

The rate of tax, aft...
per cent for 1937, and...

046

The balance of his salary for 1937 is not subject to taxation either with respect to the employer's tax or the employee's tax. However, this is only the case where the employee continues in the employment of the same employer throughout the year. If the employee leaves the service of employer A on June 30, 1937, and enters the service of employer C on that date and continues with employer C at the same salary throughout the remainder of the year, both employer C and employee B will be liable for the tax in respect of the wages received during the remaining portion of the calendar year 1937.

Section 811(b): This subsection defines the term "employment" as any service of whatever nature performed within the United States by an employee for his employer. It should be noted in this connection that section 1001(a)6 includes in the definition of "employee" an officer of a corporation. For instance, resident and nonresident aliens performing services within the United States are subject to the tax under this title. On the other hand, service performed outside the United States, whether by a citizen of the United States or by a nonresident alien, is not subject to the tax. The term "United States" is defined in section 1001(a)2 to include the States, Alaska, Hawaii, and the District of Columbia. Due to the difficulties in collecting the tax in the case of certain kinds of employment, the following services are exempt from taxation even though performed within the United States: (1) Agricultural labor; (2) domestic service in a private home; (3) casual labor not in the course of the employer's trade or business. This would not exempt casual labor performed in the course of an employer's trade or business. For instance, if a department store employed emergency help during the rush season in connection with its trade or business, the services performed by such help would not be exempt from taxation under this title; (4) services performed by an officer or a member of a crew on a vessel documented under the laws of the United States or of any foreign country are also exempt from the taxes imposed by this title. The administrative difficulty of following the wages of officers and seamen of crews was regarded as almost insurmountable. For instance, unless this exemption were granted, it would be necessary to keep track of the wages of Chinese coolies working on American ships.

Exemption from taxation under this title is also granted in the case of Federal and State or political subdivision employees.

Services performed in the employ of religious, charitable, scientific, literary, or educational institutions, no part of the net earnings of which inures to the benefit of any private shareholder or individual, are also exempt from the tax imposed by this title. For the purpose of determining whether such an organization is exempt, the use to which the income is applied is the ultimate test of the exemption rather than the source from which the income is derived. For instance, if a church owns an apartment building from which it derives income which is devoted to religious, charitable, educational, or scientific purposes, it will not be denied the exemption. The organizations which will be exempt from such taxes are churches, schools, colleges, and other educational institutions not operated for private profit, the Y. M. C. A., the Y. W. C. A., the Y. M. H. A., the Salvation Army, and other organizations which are exempt from income tax under section 101(6) of the Revenue Act of 1932.

Exemption is likewise granted from taxation under this title in the case of individuals who have attained the age of 65 years.

## TAX IX. TAX ON EMPLOYERS OF 10 OR MORE

This title levies upon employers an excise tax payable annually, measured by wages, and allows each taxpayer to credit against his tax the amount of contributions he has paid under State unemployment compensation laws.

### IMPOSITION OF TAX.

Section 901: An annual excise tax is imposed on each employer (as defined in section 907) on the privilege of having individuals in his employ. His tax, payable annually, will be at a rate of 1 per cent of the total wages payable by him with respect to employment (as defined in section 907) in the calendar year 1936. This means that the tax is measured by wages which are payable as remuneration for services performed during that calendar year, regardless of the time when the actual payment is made.

The rate of tax, after being 1 per cent for the year 1936, shall increase to 2 per cent for 1937, and 3 per cent thereafter.

guaranteed as to both principal and interest by the United States. In order to provide suitable investments for this purpose, authority is given for the issuance of special obligations to the fund from time to time as required. Such obligations shall bear an interest rate equal to the average rate of interest, computed as of the end of the calendar month next preceding the date of such issue, borne by all interest-bearing obligations of the United States then forming part of the public debt; except that where such average rate is not a multiple of one-eighth of 1 per cent, the rate of interest shall be the multiple of one-eighth of 1 per cent next lower than such average rate. In addition to such special obligations, outstanding obligations may be purchased at the market price, and original issues may be acquired at par, if the yield thereupon will be not less than the yield which would be required in the case of special obligations. Such special obligations (under the provisions of subsection (c)) may be redeemed at par plus accrued interest; while all other obligations may be sold at the market price.

Subsections (d) and (e) provide that the fund shall be invested as a single fund, but that the Secretary of the Treasury shall maintain a separate book account for each State agency and shall credit quarterly to each such account a proportionate part of the earnings of the fund for such quarter.

The Secretary of the Treasury (under subsection (f)) is directed to pay out of the amount to the credit of a State agency such amounts as the State agency shall duly requisition, not to exceed the amount standing to the credit of such State agency.

### ADMINISTRATION, REFUNDS, AND PENALTIES.

Section 905: Subsection (a) of this section provides that the tax shall be collected by the Bureau of Internal Revenue and shall be paid into the Treasury as internal-revenue collections.

Subsection (b) requires returns of the tax to be made by each employer not later than January 31 of each year in respect to employment in the preceding calendar year.

Subsection (c) makes the returns filed, under this title, open, to inspection according to the rules laid down for income-tax returns under the Revenue Act of 1926.

Subsection (d) allows the taxpayer to pay his tax in equal quarterly installments as is the case with the Federal income tax.

Subsection (e) gives the Commissioner the right to give extensions of time for the payment of tax or installments thereof, and subsection (f) provides that in the payment of tax a fractional part of a cent shall not be counted unless it amounts to one-half cent or more, in which case it shall be counted as 1 cent.

### INTERSTATE COMMERCE.

Section 906: This section provides that no person required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate commerce, or that the State law does not distinguish between employees engaged in interstate commerce and those engaged in intrastate commerce.

### DEFINITIONS.

Section 907: The definitions set up by this section are very important in connection with the application and scope of the entire title. They are as follows:

(a) Employer: The term "employer" includes only those persons who, in each of at least 20 weeks in the year, have a total number of 10 or more employees. This means that if on 1 day a week for 20 weeks (which need not be consecutive) there are 10 employees, the employer is covered. The employees (who need not necessarily be the same people) need not all be employed at the same moment; it is enough if during the day the total number is at least 10. The employees are not counted unless they are employed in "employment", as defined in this section.

(b) Wages: The term "wages" is defined to mean all remuneration for employment, including the cash value of all remuneration paid in any other medium than cash. That is, in addition to money payments, it includes payments in kind, rent, food, lodging, etc.

(c) The term "employment" is defined to mean any service performed within the United States by an employee for his employer with the following exceptions:

Misc.]                    610

(1) Agricultural labor.
(2) Domestic service in a private home.
(3) Service performed as an officer or member of the crew of a vessel on the navigable waters of the United States. (This does not exempt the services of longshoremen and others who work in connection with loading vessels.)
(4) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under 21 in the employ of his parent.
(5) Service performed in the employ of the United States Government or of an instrumentality of the United States.
(6) Service performed in the employ of a State, or political subdivision thereof, or an instrumentality of one or more States or political subdivisions.
(7) Service performed in the employ of corporations or organizations organized exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the net earnings of which accrue to any private individual or shareholder.
If the service is within the excepted classes, the employer is exempt from tax on the wages payable with respect to such service.
(d) The term "State agency" is defined to mean any State officer, board, or other authority, designated under a State law to administer the State unemployment fund.
(e) The term "unemployment fund" is defined to mean a special fund, established by State law and administered by a State agency, for the payment of unemployment compensation. It is required that the assets of the fund be mingled and undivided, and that no separate account be maintained with respect to any person.
(f) The term "contributions" is defined to mean payments required to be made by an employer under a State law into an unemployment fund, except that any payments which have been or may be deducted from the wages of the individuals in his employ are not to be considered as contributions under the definition.
(g) The term "compensation" is defined to mean cash benefits payable to individuals with respect to their unemployment.

RULES AND REGULATIONS.

Section 903: This section authorizes and directs the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to make and publish such rules and regulations for the enforcement of this title as are necessary. The exception is made, however, that the authorization and direction above noted do not apply to section 903, relating to certification of State laws, and to section 904, relating to the unemployment trust fund.

TITLE X. GENERAL PROVISIONS.

DEFINITIONS.

Section 1001 contains definitions of "State," "United States," "person," "corporation," "shareholder," and "employee."
Section 1001(d) provides that nothing in this Act shall be construed as authorizing any Federal official in carrying out the provisions of this Act to take charge, in violation of the law of a State, of any child over the objection of the parents.

RULES AND REGULATIONS.

Section 1002 provides for the making of regulations by the Secretary of the Treasury, the Secretary of Labor, and the Social Security Board, respectively, for carrying out the functions with which each is charged.

SEPARABILITY.

Section 1003 is the usual separability clause.

RESERVATION OF POWER.

Section 1004 reserves to Congress the right to alter, amend, or repeal any portion of the Act.

SHORT TITLE.

Section 1005 provides that the Act may be cited as the "Social Security Act."

611                                    [Misc.

1939-48-10106

# THE SOCIAL SECURITY BILL.

[Senate Report No. 628, Seventy-fourth Congress, First Session.]

## [May 13 (calendar day, May 20), 1935.]

Mr. Harrison, from the Committee on Finance, submitted the following report
[to accompany H. R. 7260]:

*     *     *     *     *     *     *

### PART I. GENERAL STATEMENT.

#### CONTENTS OF THE BILL.

*     *     *     *     *     *

Title VIII. Taxes with respect to employment.
Title IX. Tax upon employers of four or more.

*     *     *     *     *     *

Title XII. General provisions.

As the titles of the bill indicate, it consists of a series of related measures
designed as a unified, well-rounded program of attack upon the principal causes
of insecurity in our economic life. These measures may be divided into five
broad fields: (1) Old-age security, (2) unemployment compensation, (3) aid to
dependent children, (4) public health measures, and (5) aid to the blind.

The principal causes of destitution and want of millions of American families,
forcing them to rely upon public charity for an existence, are well known. They
are unemployment, dependency in old age, loss of the wage earner of the family,
and illness. Upon these major causes of dependency this bill makes a unified
attack. Each measure is closely related to the others, and together they consti-
tute a broad, practicable plan to safeguard the security of the American family.

The pressing need for social security legislation at this time is apparent on
every hand. For the last five years we have been paying a frightful cost of in-
security in the toll of human suffering, weakened morale of our people, and
mounting public expenditures for public charity. So far in the depression we
have taken emergency steps, designed to relieve distress, and to take care of
the immediate situation. The time has come for a comprehensive, constructive
program to avoid the repetition of such a disaster in the future. The founda-
tion for such a program is laid in this bill.

#### HISTORY OF THE LEGISLATION.

Nearly a year ago, on June 8, 1934, the President, in a message to the Congress,
announced his intention to present at this session of Congress a program for
social security. Shortly afterward, by Executive order, he created the Committee
on Economic Security, consisting of the Secretary of Labor (chairman), the
Secretary of the Treasury, the Attorney General, the Secretary of Agriculture,
and the Federal Emergency Relief Administrator. This committee was instructed
to study the whole aspect of insecurity in our economic life, and to make recom-
mendations. Since that time the Committee on Economic Security has carried on
extensive studies of the various problems involved, assisted by a staff of specialists
and by 14 advisory groups of citizens, representing the various interests of society
in security legislation. The Committee had the advice of many outstanding
citizens of broad experience and expert information in the several aspects of the
problem.

On January 17 of this year the President transmitted to both Houses of Congress
the unanimous report of the Committee on Economic Security, with a message
endorsing the recommendations made therein. Identical bills incorporating these
recommendations were introduced in both Houses, upon which the Ways and
Means Committee of the House and the Senate Finance Committee held extended
public hearings in January and February. At these hearings representatives of
all interests concerned were given a full opportunity to present their views. The
published hearings of the Finance Committee of the Senate upon this measure

Misc.]                    612

contain some 1,350 pages of printed testimony, and the hearings of the Ways and Means Committee of the House are of similar length. For more than four months this measure has been under active consideration in both Houses of Congress. Few legislative measures have ever received such thorough and extended consideration. H. R. 7260, passed by the House on April 19 of this year, is herewith reported with the following principal changes:

*          *          *          *          *

6. The coverage of the tax upon employers in Title IX has been changed from employers having 10 or more employees, within 20 weeks during the year, to 4 or more employees, within 13 weeks during any year. This change has been made to avoid substantial administrative problems in connection with employers who may attempt to avoid the tax, and also to extend its coverage.

7. The requirement that State unemployment compensation funds shall be of the "pooled" type, in which all funds are mingled and undivided, as a condition to qualify for the credit against the Federal tax under Title IX, has been stricken. This will permit States to enact whatever type of unemployment compensation law they desire.

8. Two new sections have been inserted (909 and 910) to give additional credit to employers who, under State laws, are permitted to lower their rate of compensation because of favorable employment experience. These sections are designed to permit States to give an incentive to employers to stabilize employment.

*          *          *          *          *

UNEMPLOYMENT COMPENSATION.

Unemployment compensation is financed the world over through contributions measured as a percentage of pay roll. These contributions are required either from the employers alone, the employers and employees, or the employers, employees, and the State. While pay-roll contributions of this kind have sometimes been called "sales taxes" they are no more sales taxes than premiums paid for workmen's compensation insurance, which likewise are always measured on a pay-roll basis. Sales taxes are taxes upon consumption for the general support of Government, and are wholly unlike pay-roll contributions for unemployment compensation. Partial compensation during a relatively short period following unemployment, while a workman is seeking other employment or waiting to return to his old job, is very properly to be regarded a part of the legitimate costs of production, to be paid for by the consumer.

This bill does not set up a Federal unemployment compensation system. What it seeks to do is merely to make it possible for the States to establish unemployment compensation systems and to stimulate them to do so. This objective is carried out through grants-in-aid to the States (in Title III), in the administration of unemployment compensation laws and through the imposition of a uniform pay-roll tax on employers (in Title IX) against which a credit is allowed for contributions made by them to unemployment compensation funds set up pursuant to State law.

The rate of the Federal tax is 1 per cent for the year 1936, 2 per cent in 1937, and 3 per cent in 1938 and thereafter. No tax will actually be payable, however, until 1937. Against the tax a credit is allowed up to 90 per cent of the tax for contributions to State unemployment compensation funds, which are established under laws which meet the conditions prescribed in section . These conditions do not prescribe what sort of unemployment compensation laws the States shall enact; they are intended merely to make certain that the States actually have unemployment compensation laws, rather than mere relief measures. In States which have genuine unemployment compensation laws the employers can present as a credit against the Federal tax the contributions which they have made to the unemployment compensation funds of these States. This credit, however, is allowed only up to 90 per cent of the Federal tax, 10 per cent being payable into the Federal Treasury in any event.

This tax offset device is modeled after the provision in the Federal estate tax law, under which a credit is allowed up to 80 per cent of the Federal tax

have unemployment compensation systems during the entire time these systems were in operation. Unemployment compensation will not completely eliminate the necessity for unemployment relief. To the extent, however, that unemployment reserves are accumulated, they will reduce the necessity for relief. In normal periods, unemployment compensation will provide a sufficient safeguard for most of the unemployment that will occur, and in depression periods, will very materially reduce the burden of relief costs. It will tend to maintain purchasing power at times when most needed, and should encourage the regularization of employment.

Unemployment compensation, under the plan we propose, will not involve any impossible burdens on employers, or materially increase costs to consumers. No Federal tax will be payable under Title IX until 1937, and the rate then will be only 1 per cent of the pay roll. The maximum rate under this title will be 3 per cent, which will not come into operation until the third year. Since this rate is computed upon the pay roll, it affects only the labor item in the cost of production. For all manufactured goods, the direct labor costs, as shown by the Census of Manufactures of 1933, averaged only 21 per cent of the value of the manufactured products. The total labor cost, including all stages of production and distribution, amounts to less than two-thirds of the consumer's cost. However, large groups of workers (agricultural workers, employees in small establishments, etc.) embracing approximately one-half of all gainful workers will not be brought under unemployment compensation. This means that, on the average, a 1 per cent contribution rate for unemployment compensation purposes will increase costs to the consumers by only about one-third of 1 per cent. Such small increased costs may well be offset by reductions in costs brought about through regularizing employment and maintaining the purchasing power of unemployed workers.

The present is a most opportune moment for launching unemployment compensation in this country. Not only is there great interest in the subject, but with improving industrial conditions, there is every prospect that considerable reserves can be built up in the next years. While many workmen are still unemployed, the turnover rate in industry is now much less than in the best years of the past decade. Should the establishment of unemployment compensation funds be delayed, the reserves which will be available when the next crisis comes will be correspondingly lessened and the burden of relief costs increased.

Unemployment compensation in this country has been long delayed. The principal explanation is that the States have not been able to establish unemployment-compensation laws because, in doing so, they would have been compelled to handicap their industries in competition with those of other States not having such laws. Under the plan proposed in this bill, this handicap will be removed, and it will be possible to set up unemployment-compensation laws through State action.

\*      \*      \*      \*      \*      \*      \*

## TAXES.

Two types of taxes are levied in Title VIII, namely, (1) an income tax upon employees, and (2) an excise tax upon employers based upon wages paid. The provisions of these taxes are summarized in Table VIII and the estimated number of employees covered and the revenue receipts are given in the tables following.

TABLE VIII.—*Summary of provisions relating to taxes under Title VIII.*

COVERAGE (SECTION 811 (B)).

Employment in any service performed within the United States, Alaska, and Hawaii, or upon vessels documented under the laws of the United States, except:

1. Agricultural labor.
2. Domestic service in a private home.
3. Casual labor not in the course of employer's business.
4. Employees of the United States Government.
5. Employees of a State or political subdivision.
6. Employees of institutions operated for religious, charitable, scientific, literary or educational purposes, or for the prevention of cruelty to children or animals, and which are not operated for profit.

Title IX provides an excise tax upon employers of four or more employees, with certain classes exempted, starting at 1 per cent of wages paid in 1936, 2 per cent in 1937, and 3 per cent in 1938, and thereafter. A credit of up to 90 per cent of this tax is allowable for payments into State unemployment compensation funds meeting certain conditions. The details of this tax are set forth in the second part of this report, and the operation of the tax is discussed under the section above on unemployment compensation. The estimated number of employees covered and the revenue receipts are given in the tables below.

TABLE XI.—*Estimate of number of employees covered under the tax provided in Title IX.*

[Based upon 1930 Census.]

| | |
|---|---:|
| Total number of gainful workers | 48, 830, 000 |
| Total number of owners, operators, self-employed (including the professions) | 12, 087, 000 |
| Total number of workers excluded because of occupation (farm labor, domestics, teachers, and governmental and institutional workers) | 9, 389, 000 |
| Total number of workers in ineligible occupations | 27, 354, 000 |
| Estimated number of workers attached to establishments with 3 or less employees | 2, 600, 000 |
| Estimated number of workers attached to establishments of 4 and more employees (including unemployed) April, 1930 | 24, 754, 000 |
| Average 1936 (4 per cent increase) | 25, 744, 000 |

The actual number of employees covered by the tax would be considerably smaller than 25,744,000 due to unemployment. All workers employed during a part of the year, however, in establishments covered by the tax, would be covered with respect to that employment.

TABLE XII.—*Revenue estimates (from tax on employers of 4 or more under Title IX, with no allowance for 90 per cent credit).*

| Calendar year with respect to which tax is levied. | Fiscal year received into Treasury. | Estimated receipts. | Rate of tax. |
|---|---|---:|---:|
| | | | *Per cent* |
| 1936 | 1937 | $247, 000, 000 | 1 |
| 1937 | 1938 | 595, 000, 000 | 2 |
| 1938 | 1939 | 826, 000, 000 | 3 |
| 1939 | 1940 | 831, 000, 000 | 3 |
| 1940 | 1941 | 838, 000, 000 | 3 |
| 1942 | 1943 | 849, 000, 000 | 3 |
| 1945 | 1946 | 876, 000, 000 | 3 |
| 1950 | 1951 | 908, 000, 000 | 3 |

NOTE.—The tax levied by Title IX is subject to a credit of 90 per cent of the amount of such tax for contributions into State unemployment funds. Therefore the minimum amount of revenue each year from this tax will be 10 per cent of the above amounts. What part of the above estimates, greater than 10 per cent of same, will be retained by the Treasury is problematical, being dependent on the number of States enacting unemployment insurance laws, and the rates and coverage thereof.

## CONCLUSION.

The depression has demonstrated the great cost to the public, as well as to the victims, of the failure to make timely provision for social security. The vast amount of human suffering and the enormous relief costs, which inevitably will result in increased taxes, show conclusively the folly of failure to give thought to the security of men, women, and children.

Complete security is unattainable and it well may be doubted whether absolute security is desirable. That we must have a greater degree of security than has prevailed heretofore, however, if our social order is to endure, is tragically evident.

Misc.]                    620

Appeals has no jurisdiction over these taxes. If they are not paid when due, they may be collected by distraint as provided in section 3187 of the Revised Statutes, leaving the taxpayer to his remedy by way of claim and suit for refund. In order that the employer, who collects and withholds the tax due from the employee, may be treated as a trustee or proceeded against by distraint, the provisions of section 607 of the Revenue Act of 1934 are also made to apply to this title. Section 607 of the Revenue Act of 1934 impresses the amount of taxes withheld or collected with a trust and makes applicable for the enforcement of the Government's claim the administrative provisions for assessing and collecting taxes.

For administrative reasons, a fractional part of a cent is disregarded unless it amounts to one-half cent or more, in which event it is treated as 1 cent. This corresponds to a similar provision appearing in the Revenue Acts.

### RULES AND REGULATIONS.

Section 808: This section gives the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, authority to make and publish rules and regulations for the enforcement of this title.

### SALE OF STAMPS BY POSTMASTERS.

Section 809: This section authorizes the sale of stamps, coupons, or other devices prescribed for the collection or payment of the taxes under this title by the various postmasters of the United States. The postmasters are required to deposit the receipts from such sales with the Postmaster General and render accounts to him at such time and in such form as he shall prescribe. The Postmaster General is given authority to require a bond from the various postmasters receiving such stamps or other devices in such increased amount as he may find necessary to protect the interests of the Government. The Postmaster General is required to transfer the receipts from the sale of such stamps or other devices monthly to the Treasury as internal revenue collections.

### DEFINITIONS [810] PENALTIES.

Section 810(a): This subsection imposes a fine of $10,000, or imprisonment for not more than six months, or both, for using, transferring, exchanging, or pledging any stamp or other device prescribed by the Commissioner of Internal Revenue for the collection or payment of the taxes under this title in any manner except as authorized by law or regulations made thereunder.

Section 810(b): This subsection imposes a fine of $5,000, or imprisonment for not more than five years, or both, in the following cases where there is an intent to defraud: (1) Altering, forging, or counterfeiting any stamp or other device prescribed by the Commissioner of Internal Revenue for the collection or payment of taxes due under this title; (2) using, selling, lending, or having in possession any such altered, forged, or counterfeited stamp or other device; and (3) making, using, selling, or having possession of any material in imitation of the material used in the manufacture of such stamp or other device.

### DEFINITIONS.

Section 811(a): This subsection defines "wages." Wages include not only the cash payments made to the employee for work done, but also compensation for services in any other form, such as room, board, etc. The term "wages" does not necessarily apply to the total remuneration received from the employer by the employee; the term includes only the first $3,000 of wages received by an employee from his employer with respect to employment during the calendar year. The following example will illustrate how the rule applies: Employer A pays employee B a salary of $500 a month beginning with the calendar year 1937. At the end of the sixth month B has received from his employer $3,000. The balance of his salary for 1937 is not subject to taxation either with respect to the employer's tax or the employee's tax. However, this is only the case where the employee continues in the employment of the same employer throughout the year. If the employee leaves the service of employer A on June 30, 1937, and enters the service of employer C on that date and continues with employer C at the same salary throughout the remainder of the year, both employer C and employee

will be liable for the tax in respect of the wages received during the remaining portion of the calendar year 1937.

Section 811(b): This subsection defines the term "employment" as any service of whatever nature performed within the United States or on an American vessel by an employee for his employer. It should be noted in this connection that section 1001(a)6 includes in the definition of "employee" an officer of a corporation. For instance, resident and nonresident aliens performing services within the United States are subject to the tax under this title. On the other hand, service performed outside the United States (unless on an American vessel), whether by a citizen of the United States or by a non-resident alien, is not subject to the tax. The term "United States" is defined in section 1001(a)2 to include the States, Alaska, Hawaii, and the District of Columbia. Due to the difficulties in collecting the tax in the case of certain kinds of employment, the following services are exempt from taxation even though performed within the United States: (1) Agricultural labor; (2) domestic service in a private home; (3) casual labor not in the course of the employer's trade or business. This would not exempt casual labor performed in the course of an employer's trade or business. For instance, if a department store employed emergency help during the rush season in connection with its trade or business, the services performed by such help would not be exempt from taxation under this title.

Exemption from taxation under this title is also granted in the case of Federal and State or political subdivision employees.

Services performed in the employ of religious, charitable, scientific, literary, humane, or educational institutions, no part of the net earnings of which inures to the benefit of any private shareholder or individual, are also exempt from the tax imposed by this title. For the purpose of determining whether such an organization is exempt, the use to which the income is applied is the ultimate test of the exemption rather than the source from which the income is derived. For instance, if a church owns an apartment building from which it derives income which is devoted to religious, charitable, educational, humane, or scientific purposes, it will not be denied the exemption. The organizations which will be exempt from such taxes are churches, schools, colleges, and other educational institutions not operated for private profit, the Y. M. C. A., the Y. W. C. A., the Y. M. H. A., the Salvation Army, and other organizations which are exempt from income tax under section 101(6) of the Revenue Act of 1932.

The committee amended the House bill, so that service on an American vessel is now considered as employment under this title; and further amended the House bill so that individuals over 65 years of age are not exempt from taxation under this title.

### TITLE IX. TAX ON EMPLOYERS OF FOUR OR MORE.

This title levies upon employers an excise tax payable annually, measured by wages, and allows each taxpayer to credit against his tax the amount of contributions he has paid under State unemployment compensation laws.

#### IMPOSITION OF TAX.

Section 901: An annual excise tax is imposed on each employer (as defined in section 907) on the privilege of having individuals in his employ. His tax, payable annually, will be at a rate of 1 per cent of the total wages payable by him with respect to employment (as defined in section 907) in the calendar year 1936. This means that the tax is measured by wages which are payable as remuneration for services performed during that calendar year, regardless of the time when the actual payment is made.

The rate of tax, after being 1 per cent for the year 1936, shall increase to 2 per cent for 1937, and 3 per cent thereafter.

#### CREDIT AGAINST TAX.

Section 902: A taxpayer may credit against his tax the total amount of contributions he has paid to State unemployment compensation funds in accordance with State unemployment compensation laws. The credit against the tax measured by wages payable with respect to employment in a calendar year will be allowed only for contributions which themselves are paid (before the date

623                                    [Misc.

public debt; except that where such average rate is not a multiple of one-eighth of 1 per cent, the rate of interest shall be the multiple of one-eighth of 1 per cent next lower than such average rate. In addition to such special obligations, outstanding obligations may be purchased at the market price, and original issues may be acquired at par, if the yield thereupon will be not less than the yield which would be required in the case of special obligations. Such special obligations (under the provisions of subsection (c)) may be redeemed at par plus accrued interest, while all other obligations may be sold at the market price.

Subsections (d) and (e) provide that the fund shall be invested as a single fund, but that the Secretary of the Treasury shall maintain a separate book account for each State agency and shall credit quarterly to each such account a proportionate part of the earnings of the fund for such quarter.

The Secretary of the Treasury (under subsection (f)), is directed to pay out of the amount to the credit of a State agency such amounts as the State agency shall duly requisition, not to exceed the amount standing to the credit of such State agency.

### ADMINISTRATION, REFUNDS, AND PENALTIES.

Section 905: Subsection (a) of this section provides that the tax shall be collected by the Bureau of Internal Revenue and shall be paid into the Treasury as internal-revenue collections.

Subsection (b) requires returns of the tax to be made by each employer not later than January 31 of each year in respect to employment in the preceding calendar year.

Subsection (c) makes the returns filed under this title open to inspection according to the rules laid down for income-tax returns under the Revenue Act of 1926.

Subsection (d) allows the taxpayer to pay his tax in equal quarterly installments as is the case with the Federal income tax.

Subsection (e) gives the Commissioner the right to give extensions of time for the payment of tax or installments thereof, and subsection (f) provides that in the payment of tax a fractional part of a cent shall not be counted unless it amounts to one-half cent or more in which case it shall be counted as 1 cent.

### INTERSTATE COMMERCE.

Section 906: This section provides that no person required under a State law to make payments to an unemployment fund shall be relieved from compliance therewith on the ground that he is engaged in interstate commerce, or that the State law does not distinguish between employees engaged in interstate commerce and those engaged in intrastate commerce.

### DEFINITIONS.

Section 907: The definitions set up by this section are very important, in connection with the application and scope of the entire title. They are as follows:

(a) Employer: The term "employer" includes only those persons who, in each of at least 13 weeks in the year, have a total number of 4 or more employees. (In the House bill it was 20 weeks and 10 or more employees.) This means that if on 1 day a week for 13 weeks (which need not be consecutive) there are 4 employees, the employer is covered. The employees (who need not necessarily be the same people) need not all be employed at the same moment; it is enough if during the day the total number is at least 4. The employees are not counted unless they are employed in "employment" as defined in this section.

(b) Wages: The term "wages" is defined to mean all remuneration for employment, including the cash value of all remuneration paid in any other medium than cash. That is, in addition to money payments, it includes payments in kind, rent, food, lodging, etc.

(c) The term "employment" is defined to mean any service performed within the United States by an employee for his employer with the following exceptions:

(1) Agricultural labor.

(2) Domestic service in a private home.

(3) Service performed as an officer or member of the crew of a vessel on the navigable waters of the United States. (This does not exempt the services of longshoremen and others who work in connection with loading vessels.)

(4) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under 21 in the employ of his parent.

(5) Service performed in the employ of the United States Government or of an instrumentality of the United States.

(6) Service performed in the employ of a State, or political subdivision thereof, or an instrumentality of one or more States or political subdivisions.

(7) Service performed in the employ of corporations or organizations organized exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the net earnings of which accrue to any private individual or shareholder.

If the service is within the excepted classes, the employer is exempt from tax on the wages payable with respect to such service.

(d) The term "State agency" is defined to mean any State officer, board, or other authority, designated under a State law to administer the State unemployment fund.

(e) The term "unemployment fund" is defined to mean a special fund established by State law and administered by a State agency, for the payment of unemployment compensation. A committee amendment strikes out the requirement of the House bill that the assets of the fund be mingled and undivided, and that no separate account be maintained with respect to any person.

(f) The term "contributions" is defined to mean payments required to be made by an employer under a State law into an unemployment fund, except that any payments which have been or may be deducted from the wages of the individuals in his employ are not to be considered as contributions under the definition.

(g) The term "compensation" is defined to mean cash benefits payable to individuals with respect to their unemployment.

### RULES AND REGULATIONS.

Section 908: This section authorizes and directs the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to make and publish such rules and regulations for the enforcement of this title as are necessary. The exception is made, however, that the authorization and direction above noted do not apply to section 903, relating to certification of State laws, and to section 904, relating to the unemployment trust fund.

### ALLOWANCE OF ADDITIONAL CREDIT.

Section 909: The committee has added this section, and its companion section 910, to the House bill. Subsection (a) provides that a taxpayer under section 901 may, for 1938 or any taxable year thereafter, obtain an additional credit against his taxes, under certain conditions. Let us assume, for the purpose of giving a relatively simple example, that he carries on business in only one State. He will credit against the tax the amount of his contributions under the law of that State; and, under this new section, he will also credit the amount by which his contributions are less than they would have been if he had been contributing at the maximum rate in the State. The additional credit, however, is limited by not allowing it to exceed the difference between the actual amount paid and the amount he would have paid at a 2.7 per cent rate; and subsection (b) also provides for limiting the additional credit to the proper difference allowed by the State law, diminishing it if the employer has failed to make any of the contributions required of him.

In figuring what contributions the employer would have paid at the maximum rate, the highest rate applicable to any employer each time when contributions are payable is the rate considered.

Subsection (c) provides that even if an employer is getting credit under section 902 and additional credit under this section, he shall never credit against tax more than 90 per cent of the tax.

### CONDITIONS OF ADDITIONAL CREDIT ALLOWANCE.

Section 910: This section places restrictions on the allowance of the additional credit under section 909.

(1) The taxpayer whose case was considered in the discussion of section 909 may have been contributing to a pooled fund in the State. If he is contributing at a lower rate than that imposed on other employers in the State, he will get

EXHIBIT 9D

probably soon to be filled. This need has been especially impressed upon the Tax Division of the Department of Justice in as much as the function of handling revenue litigation rests with it.

It is evident that the confusion existing by reason of the number of Revenue Acts, containing in many instances the same basic provisions, to which reference must be made in the handling of cases arising under the various Acts, constitutes a burden to the courts and counsel alike. Furthermore, several of these statutory provisions have been amended by Executive order, but, since such changes have not appeared on the face of the statutes it has been necessary to refer to the Executive orders to ascertain their nature and extent. The proposed codification will be particularly helpful in that it eliminates these sources of confusion.

I am confident that the enactment of the codification will be a definite step toward obtaining clarity, certainty, and simplicity in our revenue laws and will be of substantial aid to this Division in the handling of revenue litigation.

The staff of the joint committee deserves to be commended for its valuable contribution to the tax law.

Very truly yours,

JAMES W. MORRIS,
*Assistant Attorney General.*

In a letter from George M. Morris, Esquire, Chairman of the Standing Committee on Federal Taxation of the American Bar Association, dated January 24, 1939, Mr. Morris said:

"An examination of the codification of the Internal Revenue Laws as prepared by the staff of the Joint Committee on Internal Revenue, indicates that a highly sensible idea has been brought to a most satisfactory fruition.

"Unless one has had experience handling questions which involve the statutes treating with our internal revenue for a span of years (not at all an unusual experience in tax disputes), he can have little idea of the difficulty of achieving certainty as to what the applicable statute law is. If for taxpayers and their counsel these difficulties and uncertainties can be eliminated, the reduction of expense of tax controversies, and even the elimination of such controversies, should be greatly furthered.

"Not only does it seem highly advisable that this painstakingly prepared codification should be enacted into law but it should be apparent that the sooner such action is taken the more beneficial will be the effect, particularly in the consideration of any revenue legislation during the present session of Congress. An intelligent consideration of any proposal for change would seem to require an assured knowledge of the law which it is proposed to change."

———————

1939-35-9935

SOCIAL SECURITY ACT AMENDMENTS OF 1939.

[House of Representatives Report No. 728, Seventy-sixth Congress, First Session.]

[June 2, 1939.]

Mr. Doughton, from the Committee on Ways and Means, submitted the following report [to accompany H. R. 6635]:

\*      \*      \*      \*      \*      \*      \*

GENERAL STATEMENT.

DIVISIONS OF THE BILL.

This bill amends the Social Security Act and certain sections of Subchapter A and C of Chapter 9 of the Internal Revenue Code (formerly Titles VIII and IX of the Social Security Act).

The bill is divided into nine titles:

\*      \*      \*      \*      \*      \*      \*

Title VI—Amendments to the Internal Revenue Code (provisions formerly in Titles VIII and IX of the Social Security Act).

\*      \*      \*      \*      \*      \*      \*

Title VIII—Amendments to Title XI of the Social Security Act (general provisions).

Title IX—Miscellaneous amendments.

ly impressed upon the
h as the function of

he number of Revenue
ons, to which reference
the various Acts, con
rmore, several of these
order, but, since such
it has been necessar
ture and extent. The
at it eliminates these

will be a definite ste
revenue laws and wil
revenue litigation.
ended for its valuabl

AMES W. MORRIS,
nt *Attorney General*

rman of the Standi
ar Association, da

Revenue Laws as
evenue, indicates that
ctory fruition.
ich involve the statu
(not at all an unu
e difficulty of achievi
for taxpayers and the
inated, the reduction
t of such controvers

stakingly prepared co
pparent that the soon
fect, particularly in
ent session of Congres
would seem to requi
to change."

1939–35

3 OF 1939.

ongress, First Session

ns, submitted the fol

sections of Subchap
ormerly Titles VIII

(provisions former

urity Act (general p

---

## SUMMARY OF PRINCIPAL CONTENTS OF BILL

### TAXES.

1. The old-age insurance tax has been frozen at 1 per cent on the worker and 1 per cent on the employer for the three years 1940, 1941, and 1942 as against the 1½ per cent rates on each under the present Act. This will save employers and workers about $275,000,000 in 1940, or a total of $825,000,000 in the three years.

2. Provision is made so that the States may reduce their unemployment-insurance contributions if a certain reserve fund has been attained and minimum benefit standards have been provided. All except about five States will be able to take advantage of this change during 1940. This may save employers from $200,000,000 to $250,000,000 during 1940, if the States reduce their contribution rates from an average of 2.7 to 2 per cent.

3. Only the first $3,000 an employer pays an employee for a year is taxed under the unemployment-compensation provisions. This is already the case in old-age insurance. This will save employers about $65,000,000 a year.

4. Provision is made for refunds and abatements to employers who paid their 1936, 1937, and 1938 unemployment-compensation contributions late to the States. This will save employers about $15,000,000.

5. Thus the savings above mentioned, through 1940, may aggregate some $580,000,000. In addition, such savings for the ensuing two years may amount to approximately $1,130,000,000. This represents total savings of approximately $1,710,000,000.

### COVERAGE.

1. Certain services, including services for agricultural and horticultural associations, voluntary employees' beneficiary associations, local or ritualistic services for fraternal beneficiary societies, and services of employees earning nominal amounts (less than $45 per quarter) of nonprofit institutions exempt from income tax, are exempted from old-age insurance and unemployment compensation in order to eliminate the nuisance cases of inconsequential tax payments.

2. The term "agricultural labor" is defined so as to clarify its meaning and to extend the exemption to certain types of service which, although not at present exempt, are an integral part of farming activities.

3. About 1,100,000 additional persons (seamen, bank employees, and employed persons over 65 and over) are brought under the old-age insurance system and about 200,000 under unemployment insurance (chiefly bank employees).

### ADMINISTRATION.

1. A Federal old-age and survivor insurance trust fund is created for safeguarding the insurance benefit funds. The Secretary of the Treasury, the Secretary of Labor, and the Chairman of the Social Security Board are made trustees of this fund.

2. Provision is made to restrict the use of information concerning recipients of State old-age assistance (particularly their names and addresses) to purposes directly connected with the administration of old-age assistance. This is designed to prevent the use of such information for political and commercial purposes.

3. Other amendments are recommended to simplify and clarify administration of the law.

### HISTORY OF LEGISLATION.

The Social Security Act became law on August 14, 1935, after many months of deliberation in Congress. The bill was passed by an overwhelming majority, in both the House and the Senate, the votes being 372 to 33 and 77 to 6, respectively. The insurance provisions of the Act (substantially as reported out by this committee) were upheld by the United States Supreme Court in the cases of *Steward Machine Co.* v. *Davis*, (301, U. S., 548), *Helvering* v. *Davis* (301. U. S., 619), and, *Carmichael* v. *Southern Coal Co.* (301. U. S., 495).

The enactment of the Social Security Act marked a new era, the Federal Government accepting, for the first time, responsibility for providing a systematic program of protection against economic and social hazards. Though admittedly

not perfect or all-inclusive, the Social Security Act did embrace the broadest program for social security ever launched at one time by any government.

 &bull;  &bull;  &bull;  &bull;  &bull;  &bull;  &bull;

*Unemployment compensation.*—The incentives provided in the Social Security Act stimulated rapid passage of State unemployment compensation laws. Before the Act was passed, only 1 State, Wisconsin, had a going system of unemployment insurance; now all the 48 States and Alaska, Hawaii, and the District of Columbia have approved laws. Benefits are already being paid to unemployed covered workers under all but two of these laws; the last two States (Illinois and Montana) will start benefit payments on July 1 of this year. More than 27,500,000 workers are covered by these laws and about 3,800,000 temporarily unemployed workers received benefits amounting to nearly $400,000,000 during the year 1938. In addition, about $145,000,000 has been paid to unemployed workers during the first four months of 1939.

*Old-age insurance.*—The full effect of the Federal old-age insurance program will not be felt until monthly benefits begin to be paid. In the meantime, however, the Social Security Board has established wage-record accounts for nearly 44,000,000 persons, of whom more than 32,000,000 have already had wages reported in either 1937 or 1938, thus enabling these individuals to build up rights to protection for themselves and their dependents upon a sound basis. In addition, lump-sum benefits, amounting to 3½ per cent of accumulated covered earnings, totaling about $17,200,000, have been paid up to April 30, 1939, to or on behalf of nearly 345,000 who reached age 65 or died.

*Revision of Social Security Act.*—Tremendous as is the scope of this program, it was recognized from the beginning that changes would have to be made as experience and study indicated lines of revision and improvement. Congress, therefore, expressly provided in the Social Security Act that the Social Security Board should study and make recommendations as to methods of providing more effective economic security.

Further to facilitate necessary revision, an Advisory Council on Social Security was created in May, 1937. It was composed of outstanding citizens representing employers, employees, and the public. The Advisory Council spent more than a year in study and deliberation and transmitted its final report and recommendations on December 19, 1938.

The recommendations of the Social Security Board, based upon three years of intensive study, were submitted to the President of the United States on December 30, 1938. The President transmitted the Board's report to Congress with a special message on January 16, 1939. The President's message and the Board's report were then referred to this committee.

The committee held extended public hearings on these recommendations and alternative proposals relating to social security, including more than 90 bills introduced in the House. These hearings lasted from February 1 to April 7, during which period the committee sat 48 days and took 2,500 pages of testimony. Among the 164 individuals who testified in person there were 3 Senators, 41 Congressmen, 14 Government officials (Federal and State), 21 labor representatives, 27 employer representatives, 16 economists, and 42 others, representing themselves or various organized groups of citizens. Many of these witnesses filed supplementary statements for the record. Some 20 or 30 other statements from individuals unable to appear before the committee in person were also placed in the record.

Since the conclusion of the public hearings these various proposals have received the constant attention of the committee. Executive sessions have been held over a period of six weeks. The committee has realized the importance of this subject and has taken seriously its responsibility to recommend to Congress the best possible legislation for supplementing and improving our system of social security. The committee therefore recommends immediate enactment of this bill.

### GENERAL PURPOSE AND SCOPE OF AMENDMENTS.

The present bill aims to strengthen and extend the principles and objectives of the Social Security Act. The foundations of a permanent program have been laid and it seems wise to build upon the present structure.

Old-age insurance, unemployment compensation, and public assistance are now accepted as permanent in our fabric of social services. The present bill is designed to widen the scope and to improve the adequacy and the administration

541 [Misc.

of these programs without altering their essential features. Benefits will continue to be payable as a matter of right to workers covered by the insurance programs; aid will continue to be related to need under the assistance programs.

* * * * * *

## FINANCING.

Certain amendments are proposed which affect the financial framework of the old-age insurance system. First, the old-age reserve account is changed to a Federal old-age and survivor insurance trust fund with the Secretary of the Treasury, the Secretary of Labor, and the Chairman of the Social Security Board, all ex officio, acting as a board of trustees. The board of trustees will supervise the fund and will report to Congress annually and whenever the trust fund becomes unduly small or exceeds three times the highest annual expenditure anticipated in the ensuing 5-fiscal-year period. The Secretary of the Treasury will serve as managing trustee of the fund. All assets credited to the reserve account as of January 1, 1940, are transferred to the trust fund when the reserve account is abolished on that date. It is further proposed that an amount equal to the full amount of the old-age insurance taxes collected in the future be permanently appropriated to the trust fund. Provision is made for the administrative costs of the plan to be met from the trust fund.

The method of investing that portion of the trust fund not needed for current claims or administrative purposes will be like that now provided in the case of the unemployment trust fund. Instead of a minimum 3 per cent interest on the investments of the present old-age reserve account, the Federal old-age and survivor insurance trust fund, like the unemployment trust fund, will earn interest at the current average rate of interest borne by all outstanding interest-bearing obligations composing the public debt. At the present time the rate of interest being paid to the unemployment trust fund is 2½ per cent.

The present tax schedule is amended so that the current rate of 1 per cent on employers and 1 per cent on employees is continued until 1943. This postponement in the tax step-up will save employers and workers about $275,000,000 for 1940 or a total of $825,000,000 for the three years 1940, 1941, and 1942. However, no change is made in the tax schedule thereafter. The rates will still increase to 2 per cent in 1943, 2½ per cent in 1946, and 3 per cent in 1949 and thereafter.

The result of the committee's recommendations with respect to taxes and benefits on the size of the reserve and the amount of the benefit payments is shown in table 6. It should be noted that the maximum reserve built up in the period shown will be between seven and eight billion dollars. It should also be noted that the size of the reserve will conform closely to the recommendation of the Secretary of the Treasury of an "eventual reserve amounting to not more than three times the highest prospective annual benefits in the ensuing five years."

TABLE 6.—*Progress of reserve under the intermediate retirement estimate of benefit disbursements with interest at 2½ per cent. Tax rate at 2 per cent until Jan. 1, 1943, and thereafter following the present schedule.*

[In millions of dollars]

| | 1940 | 1941 | 1942 | 1943 | 1944 | 1946 | 1950 | 1955 |
|---|---|---|---|---|---|---|---|---|
| Net tax receipts (gross receipts minus administrative expenses) | $501 | $505 | $504 | $919 | $1,067 | $1,078 | $1,751 | $1,849 |
| Less benefit payments | 88 | 211 | 350 | 508 | 598 | 713 | 1,389 | 1,930 |
| Net cash receipts, Government | 413 | 294 | 154 | 411 | 469 | 385 | 362 | −81 |
| Add interest at 2½ per cent | 41 | 51 | 58 | 66 | 79 | 91 | 153 | 190 |
| Total addition to fund | 454 | 345 | 212 | 477 | 548 | 456 | 515 | 109 |
| Fund at end of year | 1,884 | 2,229 | 2,441 | 2,918 | 3,466 | 3,922 | 6,449 | 7,752 |

NOTE.—Fund at end of 1939 is estimated to be $1,430,000,000. The benefit payments exceed the net tax receipts in 1954.

It should be clearly understood that the estimates presented are subject to a margin of error. Changes in average wages, death rates, birth rates, the rate of retirement, the proportion of the aged in the total population, and shifts

between insured and uninsured groups may result in substantial changes in these figures in the future. It is impossible, therefore, to predict accurately the future trends of all the factors influencing the long-run aspects of the old-age insurance program. The further one projects estimates of future income and benefit payments, the greater is the margin of error. Constant study and frequent revaluations are, therefore, essential for the long-run financing of our social insurance system. This is one of the reasons why the committee has recommended that the board of trustees make an annual report to Congress on the actuarial status of the system, and report to Congress whenever the trust fund is unduly small, or exceeds three times the highest annual expenditures expected in the next 5-fiscal-year period.

According to the best expert information available to the committee, the estimates presented here are reasonable approximations of the income and outgo of the insurance plan for the next 15 years. The actual figures will no doubt vary somewhat from those shown in table 6. However, the benefit payments shown, although based upon an intermediate estimate as regards rate of retirement, probably represent maximum amounts payable under the provisions of the bill. A serious downswing in business conditions might increase the rate of old age retirement and decrease the estimated amount of tax receipts, but such variations would probably not alter the fact that the contributions and interest will cover all benefit payments for the next 10 to 15 years. It is only when consideration is given to the income and outgo of the system for 40 to 45 years, or even more, that it becomes quite impossible to predict the future status of the system.

Table 6 shows that the annual contributions from workers and employers will probably be sufficient until 1955 to meet all the annual benefit payments under the revised plan. If the original actuarial assumptions of 1935 prove to be correct, it is possible that benefits for all time to come can be financed from the present schedule of taxes and the interest from the fund, even with the recommended postponement of the tax step-up until 1943. However, upon the basis of additional data developed since 1935, it would appear that the actuarial calculations of 1935 represent a minimum estimate of the future tax costs. Therefore, it is possible that the annual cost of the benefits may begin to exceed the annual tax collections about 1955 or even somewhat sooner.

Only after experience has been obtained in paying benefits for several years will we have a better picture of the probable future development of the system. Even then continual change will be necessary in the estimates due to the many variable factors which go into making such estimates.

In making the changes in the present plan the committee has kept constantly in mind the fact that, while disbursements are relatively small in the early years of the program, far larger total disbursements are inevitable in the future.

The plan recommended by this committee is designed to safeguard workers, employers, and the general public. In fact the committee believes the revised plan is a much safer one than the present plan. As has already been pointed out, while the annual costs under the revised plan are greater in the early years of operation, the future annual costs of the benefits when the system reaches maturity are materially lower than under the present law and the over-all average cost is kept about the same. Consequently, it is believed that there is not the same danger as exists in the present benefit schedule, the cost of which, while deceptively small in the early years, mounts very steeply as the years progress.

Unforeseen contingencies may, however, change the entire operation of the plan. It is important, therefore, that Congress be kept fully informed of the probable future obligations being incurred under the insurance plan as well as the public-assistance plans. Each generation may then meet the situation before it in such manner as it deems best.

If future annual pay-roll tax collections plus available interest are insufficient to meet future annual benefits it will be necessary, in order to pay the promised benefits, to increase the pay-roll tax or provide for the deficiency out of other general taxes, or do both. Broadening the coverage of the system to bring in those persons now excluded will not only make the system more effective in providing protection but also strengthen its actuarial base by still further eliminating the possibility of unearned benefits to the worker who moves from uninsured to insured employment.

substantial changes in
) predict accurately the
aspects of the old-age
of future income and
onstant study and fre-
;-run financing of our
hy the committee has
report to Congress on
:ss whenever the trust
.t annual expenditures

he committee, the esti-
the income and outgo
figures will no doubt
the benefit payments
regards rate of retire-
r the provisions of the
crease the rate of old-
ax receipts, but such
tributions and interest
   It is only when con-
for 40 to 45 years, or
: future status of the

:rs and employers will
:nefit payments under
of 1935 prove to be
i be financed from the
even with the recom-
.vever, upon the basis
ır that the actuarial
future costs. There-
y begin to exceed the

fits for several years
)pment of the system.
ates due to the many

c has kept constantly
:e relatively small in
ents are inevitable in

o safeguard workers,
: believes the revised
already been pointed
ter in the early years
ı the system reaches
d the over-all average
that there is not the
cost of which, while
s the years progress.
ire operation of the
.lly informed of the
ance plan as well as
t the situation before

erest are insufficient
to pay the promised
ficiency out of other
: system to bring in
m- more effective in
:y still further elimi-
·r who moves from

## COVERAGE.

Four years ago, when the old-age insurance program was being planned, it was expected that the Act as passed would provide old-age security for about half of the gainful workers in the country. It was realized, of course, that many workers who might not be insured under the Act at any one time would later obtain protection by shifting into insured occupations. It was generally supposed, however, that the group so shifting would be small compared with the great mass of workers, who, throughout their working life, would remain continuously either in the insured category or in the uninsured category.

Operation of the Act shows that the extent of migration, temporary or permanent, from uninsured to insured employment is far greater than was assumed by the President's Committee on Economic Security in 1935. As a consequence of the migration, a much larger proportion of the total population of the United States will qualify under the contributory system for old-age benefits than had been expected.

The most important excluded groups are agricultural labor, domestic service, and certain nonprofit organizations; here the committee decided unanimously that it would be unwise to remove the exemptions from these three groups at the present time. The present bill does, however, extend old-age insurance coverage to some 1,100,000 more workers by removing the exemption of maritime employment, wages earned after 65, and certain Federal instrumentalities such as national banks and State banks which are members of the Federal Reserve System.

In order to eliminate the nuisance of inconsequential tax payments the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax, and certain other groups. While the earnings of a substantial number of persons are excluded by this recommendation, the total amount of earnings involved is undoubtedly very small. No estimate is available of the number of persons or amount of earnings so excluded. The intent of the amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of the tax is inconsequential and a nuisance. The benefit rights built up are also inconsequential. Many of those affected, such as students and the secretaries of lodges, will have other employment which will enable them to develop insurance benefits. This amendment, therefore, should simplify the administration for the worker, the employer, and the Government.

Seven other coverage amendments are proposed. They are as follows:

1. *Agricultural labor.*—The present Act excludes "agricultural labor" from coverage. The bill continues the exemption of agricultural labor and defines the term so as to clarify its meaning and to extend the meaning to certain services which are an integral part of farming activities. These provisions are explained in detail in a subsequent part of this report, in connection with the definition of "agricultural labor" as defined in section 209(1) of the bill.

2. *Exclusion of payments to employer welfare plans.*—The term "wages" is amended so as to exclude from tax payments made by an employer on account of a retirement, sickness, or accident disability plan, or for medical and hospitalization expenses in connection with sickness or accident disability. Dismissal wages which the employer is not legally required to make, and payments by an employer of the worker's Federal insurance contributions or a contribution required of the worker under a State unemployment-compensation law are also excluded from tax. This will save employers time and money but what is more important is that it will eliminate any reluctance on the part of the employer to establish such plans due to the additional tax cost.

3. *Definition of "employee."*—The bill includes a definition of the term "employee" designed to cover salesmen not already covered by the Act.

4. *State employment.*—The exemption relating to employment by State instrumentalities is so defined as to apply only to an instrumentality wholly owned by the State or political subdivision, or tax exempt under the Constitution.

5. *Foreign governments.*—Provision is made for the exemption of foreign governments, and their instrumentalities under certain conditions, from the old-age insurance taxes.

6. *Family employment.*—Service performed by an individual for his son, daughter, wife, or husband, and service by a child under 21 for his parent, is

excluded so as to make the old-age insurance coverage identical in this respect with unemployment compensation coverage.

7. *Included and excluded services.*—The law is changed with respect to services of an employee performing both included and excluded employment for the same employer so that the services which predominate in a pay period determine his status with that employer for that period.

#### ADMINISTRATIVE CHANGES.

1. A provision is included requiring employers to furnish employees a statement, which they may retain, showing the amount of taxes deducted from their wages under the old-age insurance system.

2. Provision is made for making more equitable the recovery by the Federal Government of incorrect payments to individuals.

3. Provision is made respecting the practice of attorneys and agents before the Board.

4. Detailed provisions have been added relating to rules and regulations, hearings, and decisions with respect to insurance benefits, procedure for judicial review of the Board's decisions, and delegation of authority by the Board.

5. Provision is made for giving an opportunity for a hearing to a wage earner or interested individual with respect to any entry, omission, or revision of the Board's wage record within four years after the year any wages were paid or alleged to be paid, and as to the finality of the record.

6. Subchapter A, Chapter 9, of the Internal Revenue Code (formerly Title VIII of the Social Security Act) is given the short title " Federal Insurance Contributions Act."

*      *      *      *      *      *      *

#### OTHER UNEMPLOYMENT COMPENSATION CHANGES.

Under the proposed State-wide reduction plan, described above, employers would still be allowed to obtain their full 90 per cent credit against the Federal pay-roll tax. The Federal tax would remain at 3 per cent, but additional credits would be provided for all employers in States which were in a position to reduce their contribution rates below 2.7 per cent.

This State-wide reduction plan would not alter present individual experience rating provisions. The States which could make general tax reductions after building up the necessary reserve fund and raising their minimum benefit standards, might still allow further contribution reductions to individual employers with favorable employment experience. States which did not meet the new minimum benefit standards or whose reserve fund was inadequate, could continue under their present laws, with or without individual employer experience rating systems, provided they maintained contribution rates, producing a total amount equal to 2.7 per cent of the taxable pay rolls. The bill provides that the provisions with respect to maintenance of the average 2.7 per cent will not go into effect until January 1, 1942, with respect to a pooled fund or to a partially pooled account or to a separate reserve account. Those States which do not wish to take advantage of the horizontal reduction plan but wish to maintain the individual employer experience rating system would do so without having to make any legislative changes at this time.

Further saving to employers would be effected by the proposed amendment granting relief to employers who paid their State unemployment-compensation contributions for the years 1936, 1937, and 1938 too late to qualify for the Federal credit. Employers who pay their delinquent taxes for these years before the sixtieth day after the enactment of these amendments would receive full credit against their Federal taxes for 1936, 1937, and 1938. This would amount to an aggregate sum of about $15,000,000. Further the provisions as to loss of credit on account of future delinquency would be relaxed by (1) increasing from 60 to 90 days the maximum period for which the Commissioner of Internal Revenue is permitted to grant an extension for the filing of Federal tax returns, and (2) by providing that employers who pay their taxes after January 31 but before July 1 next following the close of the taxable year would lose only 10 per cent of their allowable credit.

Another of the amendments would result in a saving to employers as well as in considerable simplification of reporting procedures. This is the amendment

545 , [Misc.

to limit unemployment-compensation taxes to the first $3,000 of annual wages. Such a limitation already exists in the case of old-age insurance and there are distinct advantages to providing a uniform tax base for both programs. It is estimated that this new limitation would result in a saving to employers of about $65,000,000 a year.

Again in the interests of simplification and uniform reporting, the present bill proposes to change the tax base for unemployment compensation from " wages payable " to the " wages paid " definition used in old-age insurance.

Many of the same changes in coverage are provided in this bill with respect to unemployment compensation as have already been discussed under old-age insurance. The cases involving taxes of small consequence, which would be exempt under old-age insurance, would also be exempt from the Federal Unemployment Tax Act. The agricultural-labor exemption is defined and extended as in old-age insurance. The bill proposes to extend coverage to one of the groups now excluded, namely, employees of certain Federal instrumentalities such as national banks, and State bank members of the Federal Reserve System. This amendment would bring about 200,000 additional persons under the unemployment-compensation program, provided the States amend their laws accordingly.

Provision is made in section 902(h) of the bill granting relief to taxpayers and States in those cases in which the highest court of a State has held contributions paid under the State unemployment compensation law for 1936 or 1937 not to have been validly required under such law. This provision is to take care of the situation in North Carolina where the State supreme court recently held that the provisions of the State law requiring contributions for 1936 were invalid because they were retroactive. The effect of the proposed amendment is to enable North Carolina to keep about $3,000,000 in its reserve fund for use in the payment of unemployment compensation benefits.

Other changes affecting unemployment compensation are:

1. Authorization is given to the States to make their unemployment-compensation laws applicable to services performed on land or premises owned, held, or possessed by the United States Government, such as services performed as employees of hotels in national parks. Congress has already enacted a statute giving the States authority to apply their workmen's compensation laws to such employees.

2. The language excluding State instrumentalities is defined, as in old-age insurance so that the exemption applies only to an instrumentality wholly owned by the State or political subdivision, as well as those exempt from tax under the Constitution.

3. As in old-age insurance, the definition of " wages " is amended so as to exclude from tax the payments made by an employer on account of a retirement, sickness, or accident disability plan, or for medical or hospitalization expense in connection with sickness or accident disability. Dismissal wages, which the employer is not legally required to pay; and payments by an employer of the worker's Federal insurance contributions; or a contribution required of the worker under a State unemployment-compensation law; are also excluded from tax.

4. Provision is made, as in old-age insurance, for the exemption of foreign governments and their instrumentalities from the unemployment-compensation tax.

5. The law is changed with respect to services of an employee performing both included and excluded employment for the same employer, so that the services which predominate in a pay period determine his status with that employer for the period. The same provision is made in connection with old-age insurance.

6. The " merit rating " or " individual employer experience rating " provisions are clarified.

7. A provision has been inserted requiring the State laws to provide for the expenditure of Federal grants for the administration of their unemployment compensation laws in accordance with the Federal Act and requiring the replacement of any moneys lost or expended for other purposes.

8. Extension of time is given for the allowance of credit against the Federal tax in cases where the employer has paid his State tax on time but has paid it to the wrong State.

9. The time is also extended in those cases where taxpayer's assets are in the custody or control of a receiver, trustee, or other fiduciary under the control of a court.

10. The "tax on employers of eight or more" now contained in Subchapter C of Chapter 9 of the Internal Revenue Code (formerly Title IX of the Social Security Act) is given the short title "Federal Unemployment Tax Act."

\* \* \* \* \* \* \*

### GENERAL

Two amendments of a general character have been recommended by the committee. These are:

1. An amendment to prohibit the disclosure of information obtained by the Board or its employees except under certain restricted conditions related to proper administration.

2. Penalties are provided for certain frauds and for impersonation in securing information concerning an individual's date of birth, employment, wages, or benefits of any individual.

### DETAILED EXPLANATION OF THE BILL

#### SHORT TITLE

Section 1 of the bill provides that the Act may be cited as the "Social Security Act Amendments of 1939."

\* \* \* \* \* \* \*

### TITLE VI—AMENDMENTS TO THE INTERNAL REVENUE CODE

#### FEDERAL INSURANCE CONTRIBUTIONS ACT

##### TAXES UNDER SECTIONS 1400 AND 1410 OF THE INTERNAL REVENUE CODE (FORMERLY SECTIONS 801 AND 804 OF THE SOCIAL SECURITY ACT)

Sections 601 and 604: Under the existing provisions of sections 1400 and 1410 of the Internal Revenue Code (formerly sections 801 and 804, respectively, of the Social Security Act) the rate of tax on employees and the rate of tax on employers are each scheduled to increase on January 1, 1940, from 1 per cent of the wages to $1\frac{1}{2}$ per cent, with a further increase of $\frac{1}{2}$ per cent at the expiration of succeeding 3-year periods until the maximum rate of 3 per cent on employees and 3 per cent on employers is reached in 1949. Under the amendment the increase scheduled for January 1, 1940, would be eliminated, and the rate of each tax would be as follows:

| | Per cent. |
|---|---|
| For the calendar years 1939, 1940, 1941, and 1942 | 1 |
| For the calendar years 1943, 1944, and 1945 | 2 |
| For the calendar years 1946, 1947, and 1948 | $2\frac{1}{2}$ |
| For the calendar year 1949 and subsequent calendar years | 3 |

A further change is made by this amendment. Sections 1400 and 1410 of the Internal Revenue Code now provide that the rate of tax applicable to wages is the rate in effect at the time of the performance of the services for which the wages are paid. This will unnecessarily complicate the making of returns and the collection of the taxes in later years when the rate of tax has been increased. For example, in 1943 the rate of tax increases from 1 per cent to 2 per cent. Thus, wages which are paid in 1943 for services performed in 1942 will be subject to the 1 per cent rate, while wages paid in 1943 for services performed in that year will be subject to the 2 per cent rate. Provision must therefore be made in the return for 1943 for the reporting of wages subject to the different rates, and, in auditing the returns, it will be necessary to ascertain not merely the time when the wages were paid and received, but also the year of the rendition of the services for which the wages are paid. If employers have failed to make the proper distinction, many refunds and additional assessments will doubtless be necessary and confusion will result. Under the amendment the rate applicable would be the rate in effect at the time that the wages are paid and received without reference to the rate which was in effect at the time the services were performed.

547                                                [Misc.

### ADJUSTMENTS OF OVERPAYMENT AND UNDERPAYMENT OF EMPLOYEES' TAX.

Section 602: Present section 1401(c) of the Internal Revenue Code (formerly section 802(b) of the Social Security Act) is designed to permit the employer to adjust, without interest, overpayments and underpayments of employees' tax without the necessity in the former case of requiring the filing of a claim for refund and in the latter case of the making of a demand by the collector for the additional tax. The existing provisions of the section require that the adjustment be made in connection with subsequent wage payments. The different types of situations obtaining at the time the error is discovered and should be corrected are numerous. For example, the employee may be continuously employed and receiving remuneration at regular intervals, or he may be entitled to no remuneration for some time to come, or if he is entitled to remuneration, it may not be taxable because his service is rendered temporarily, or for an indefinite time, in a foreign country, or because he has already received $3,000 from the employer for services rendered during the calendar year, the maximum taxable remuneration under section 1426(a) of the Internal Revenue Code (formerly section 811(a) of the Social Security Act), or the employee's connection with the employer who made the error may have been severed. Moreover, undercollections require a procedure different from that in the case of overcollections. The use of the term "wage payments" causes difficulty since the term "wages" has a restricted meaning for the purpose of this tax. Furthermore, it may prove desirable in certain circumstances to provide for adjustments at times other than in connection with subsequent payments of remuneration to the individual. This amendment, by use of the word "remuneration" instead of "wage" and by leaving the manner and time of the adjustment to be prescribed by regulations, will enable the administrative officers to meet the varied situations which arise.

### RECEIPTS FOR EMPLOYEES.

Section 603: This section amends Subchapter A of Chapter 9 of the Internal Revenue Code (formerly Title VIII of the Social Security Act) by inserting a new section in such subchapter. Subsection (a) of the new section requires every employer to furnish each employee with a written statement or statements, in a form suitable for retention by the employee, showing the taxable wages paid to the employee after December 31, 1939, for services rendered in his employ, and the amount of tax imposed by section 1400 with respect to such wages. In addition, the names of the employer and employee, and the period covered by the statement, are to be shown. Each statement, or receipt, must cover one or more, but not more than four, calendar quarters. Under existing Treasury regulations the employer is required to file a return for each calendar quarter with the collector of internal revenue, showing the amount of wages paid to each employee. By requiring the receipts to cover one or more calendar quarters, the employer is enabled, in making out such receipts, to use the amounts of wages of each employee as shown on the copies of the quarterly returns which the employer retains. Returns, under existing Treasury regulations, must be filed with the collector within the calendar month following the close of the quarter. The section gives employers an additional month within which to furnish their employees with the receipts. However, when an employee leaves the employ of the employer, the final receipt, covering the period from the termination of the period covered by the last preceding receipt furnished the employee, is to be given the employee when the final payment of wages is made to him. If the employer chooses, he may under the section furnish a receipt to an employee at the time of each payment of wages during a calendar quarter, in lieu of covering in a single receipt the total wages paid to the employee during such quarter.

Subsection (b) provides that any employer who willfully fails to furnish a statement to an employee in the manner, at the time, and showing the information, required under subsection (a), shall for each such failure be subject to a civil penalty of not more than $5.

067

TAXES UNDER SECTION 1410 OF THE INTERNAL REVENUE CODE (FORMERLY SECTION 804 OF THE SOCIAL SECURITY ACT).

**Section 604:** See section 601, supra.

### ADJUSTMENT OF EMPLOYERS' TAX.

**Section 605:** The amendment made by this section to section 1411 of the Internal Revenue Code (formerly section 805 of the Social Security Act), relating to adjustments of employers' tax, is intended to accomplish the same purpose as the corresponding amendment to section 1401(c) of the Code, relating to adjustments of employees' tax. See section 602, supra.

### DEFINITIONS.

**Section 606:** This section, effective January 1, 1940, amends section 1426 of the Internal Revenue Code, containing definitions applicable in the case of the old-age insurance taxes.

*Definition of wages.*—Section 1426(a): This subsection continues the present definition of wages, but excludes certain payments heretofore included. Paragraph (2) excludes all payments made by the employer to or on behalf of an employee or former employee, under a plan or system providing for retirement benefits (including pensions), or disability benefits (including medical and hospitalization expenses), but not life insurance. These payments will be excluded even though the amount or possibility of such payments is taken into consideration in fixing the amount of remuneration and even though such payments are required, either expressly or impliedly, by the contract of employment. Since it is the practice of some employers to provide for such payments through insurance or the establishment and maintenance of funds for the purpose, the premiums or insurance payments and the payments made into or out of any fund will likewise be excluded from wages. Paragraph (3) expressly excludes from wages the payment by an employer (without deduction from the remuneration of, or other reimbursement from, the employee) of the employee's tax imposed by section 1400 of the Internal Revenue Code (formerly section 801 of the Social Security Act) and employee contributions under State unemployment compensation laws. Paragraph (4) excludes dismissal payments which the employer is not legally obligated to make.

*Definition of employment.*—Section 1426(b): This term is defined to mean any service performed prior to January 1, 1940, which constituted employment as defined in this section prior to such date; and to mean any service performed after December 31, 1939, by an employee for the person employing him, irrespective of the citizenship or residence of either, (A) within the United States or (B) on or in connection with an American vessel (defined in subsection (h)) under a contract of service entered into within the United States or during the performance of which the vessel touches a port therein, if the employee is employed on and in connection with the vessel when outside the United States. No substantive change in existing law is effected by the introductory paragraph of this provision except the extension of the definition to include service on American vessels. This extension is designed to include, with the qualifications noted, all service which is attached to or connected with the vessel (e. g., service by officers and members of the crew and other employees such as those of concessionaires). Individuals who are passengers on the vessel in the generally accepted sense, such as an employee of an American department store going abroad, will not be included because such service has no connection with the vessel. Service performed on or in connection with an American vessel within the United States will be on the same basis as regards inclusion as other service performed within the United States.

Under existing law service performed within the United States (which otherwise constitutes employment) is covered irrespective of the citizenship or residence of the employer or employee. The amendment makes clear that this will be true also in the case of maritime service covered by the amendment, regardless of wheather performed within or without the United States. The basic

549                                    [Misc.

(FORMERLY SECTION 804.)

reasons which caused the original coverage to be made without distinctions on account of citizenship or residence apply in the case of seamen. The number of foreign seamen who may be employed on American vessels engaged in trade is limited under our shipping laws.

The definition of the term "employment" under the amendment, as applied to service rendered prior to January 1, 1940, retains the exemptions contained in the present law. The definition applicable to service rendered on and after that date continues unchanged some of the present exemptions, revises, others, and adds certain additional ones.

Paragraph (1) continues the exception of agricultural labor, but a new subsection (1) defines the term for purposes of the exclusion.

Paragraph (2) continues the present exception of domestic service in a private home, but adds to the exception such service in a local college club, or local chapter of a college fraternity or sorority (not including alumni clubs or chapters). Thus services of cook, waiter, chambermaid, and the house mother, performed for these local clubs and chapters, are exempt.

Paragraph (3) continues the present exception of casual labor not in the course of the employer's trade or business.

A new paragraph (4) excludes service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of 21 in the employ of his parent. This exclusion is already contained in the Federal unemployment tax provisions of the existing law. The old paragraph (4), which excluded service performed by an individual who has attained the age of 65, is repealed.

Paragraphs (5) to (13), inclusive, are identical with the same paragraphs in section 209 (b) of the Social Security Act. For detailed analysis of such paragraphs see pages 46-49 of this report. [The material referred to is as follows:

[Paragraph (5), which takes the place of the existing exclusion of service on documented vessels, excludes service performed on or in connection with a vessel not an American vessel, if the employee is employed on and in connection with such vessel when outside the United States. This provision excludes all service, although performed within the United States, which is rendered by an employee who was rendering service on and in connection with such a vessel upon its entry into the United States or who is rendering such service upon departure of the vessel from the United States. Thus, officers and members of the crew and other employees whose service is rendered both on and in connection with the vessel (such as employees of concessionaires and others whose service is similarly connected with the vessel) when on its voyage are excluded even though the vessel is within the United States, if they come into or go out of the United States with the vessel.

[Paragraph (6) continues the exemption of service performed in the employ of the United States but, with respect to instrumentalities of the United States, limits the exemption to those instrumentalities which are (A) wholly owned by the United States or (B) exempt from the tax imposed by section 1410 of the Internal Revenue Code (formerly section 804 of the Social Security Act) by virtue of any other provision of law. The change in this provision brings within this title of the Act certain Federal instrumentalities not falling within clause (A) or (B), above, such as national banks.

[Paragraph (7) continues the exemption of service for State governments, their subdivisions and instrumentalities, but limits the exemption with respect to instrumentalities so that it applies only to an instrumentality which is wholly owned by a State or political subdivision or which would be immune from the tax imposed by section 1410 of the Internal Revenue Code (formerly section 804 of the Social Security Act) by the Constitution. The amendment thus narrows the present exemption and in no case broadens it.

[Paragraph (8) continues the exemption of religious, charitable, scientific, literary, or educational organizations, but brings the language of the exemption into conformity with the corresponding exemption from income tax under section 101(6) of the Internal Revenue Code, by adding a specific disqualifying clause applicable where any substantial part of the activities of the organization is carrying on propaganda or otherwise attempting to influence legislation.

[Paragraph (9) continues without change the present provisions of law exempting services of employees covered by the railroad-retirement system. This provision leaves unchanged the exemption of the service of an individual in the employ of an employer subject to the railroad retirement system even though the individual receives remuneration in a form, e. g., tips, not recognized as

compensation under the Railroad Retirement Act and Subchapter B of Chapter 9 of the Internal Revenue Code (formerly the Carriers Taxing Act of 1937), and leaves unchanged the inclusion of service in case it is performed by an employee in the segregable nonrailroad activities of an employer where segregation of the railroad activities from nonrailroad activities is found necessary in the interpretation and administration of the laws relating to the social security system and the railroad retirement system.

[Paragraph (10) provides several new exclusions from employment. Clause (A) exempts certain service in any calendar quarter performed in the employ of an organization exempt from income tax under section 101 of the Internal Revenue Code, if (i) the remuneration for such service does not exceed $45; or (ii) without regard to amount of remuneration, if the service is performed in connection with the collection of dues or premiums (away from the home office) for a fraternal beneficiary society, order, or association, or is ritualistic service (wherever performed) in connection with such an organization; or (iii), without regard to amount of remuneration, if the service is performed by a student enrolled and regularly attending classes at a school, college, or university. Organizations so exempt from income tax and thus within this provision include the following: Certain labor, agricultural, and horticultural organizations, mutual savings banks, fraternal beneficiary societies, building and loan associations, cooperative banks, credit unions, cemetery companies, business leagues, chambers of commerce, real estate boards, boards of trade, civic leagues, local associations of employees, social clubs, local benevolent life insurance associations, mutual irrigation and telephone companies, farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations, farmers' cooperative marketing and purchasing associations, corporations organized to finance crop operations, voluntary employees' beneficiary associations, and religious or apostolic associations or corporations.

[Paragraph (10), clause (B), excepts service in the employ of an agricultural or horticultural organization, regardless of the amount of remuneration. These organizations are identical with agricultural and horticultural organizations exempt from income tax under section 101(1) of the Internal Revenue Code.

[Paragraph (10), clause (C), excepts service in the employ of a voluntary employees' beneficiary association, providing for payment of life, sick, accident, or other benefits to the members of such association or their dependents, if (i) no part of its net earnings inures (other than through such payments) to the benefit of any private shareholder or individual, and (ii) 85 per cent or more of the income consists of amounts collected from members for the sole purpose of making such payments and meeting expenses. This exemption is identical with that of these organizations under section 101(16) of the Internal Revenue Code and will have the same scope.

[Paragraph (10), clause (D), excepts all service performed in the employ of a voluntary employees' beneficiary association providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if (i) admission to membership in such association is limited to individuals who are employees of the United States Government, and (ii) no part of the net earnings inures (other than through such payments) to the benefit of any private shareholder or individual.

[Paragraph (10), clause (E), excepts service performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax, if such service is performed by a student enrolled and regularly attending classes at such school, college, or university, and the remuneration for such service does not exceed $45. In determining the remuneration, for purposes of the $45 limitation, the value of room, board, and tuition, if furnished by the school, college, or university as part of the remuneration, would be excluded.

[A calendar quarter is any period of three calendar months ending on March 31, June 30, September 30, or December 31.

[Paragraph (11) excepts service performed in the employ of a foreign government, and paragraph (12) similarly excepts, on a basis of reciprocity, service performed in the employ of an instrumentality wholly owned by a foreign government. These paragraphs are, by section 902(f) of the bill, made retroactively effective to the date of the enactment of the Social Security Act.

[Paragraph (13) excepts service performed as a student nurse in the employ of a hospital or a nurse's training school by an individual who is enrolled and is regularly attending classes in such a school chartered or approved pursuant to State law; and service performed as an interne (as distinguished from a resident doctor) in the employ of a hospital by an individual who has completed

chapter B of Chapter
king Act of 1937), and
ormed by an employee
ere segregation of the
essary in the interpre-
l security system and

employment. Clause
rmed in the employ of
f the Internal Revenue
ed $45; or (ii) without
ned in connection with
office) for a fraternal
service (wherever per-
ii), without regard to
a student enrolled and
sity. Organizations so
include the following:
, mutual savings banks,
ons, cooperative banks,
,bers of commerce, real
ons of employees, social
rrigation and telephone
, or fire insurance com-
nd purchasing associa-
, voluntary employees'
ions or corporations.
iploy of an agricultural
f remuneration. These
icultural organizations
nal Revenue Code.
employ of a voluntary
of life, sick, accident, or
r dependents, if (i) no
iayments) to the benefit
cent or more of the in-
sole purpose of making
s identical with that of
nal Revenue Code and

rmed in the employ of a
or the payment of life,
ociation or their depend-
bership in such associa-
ited States Government,
ires (other than through
or individual.
d in any calendar quar-
xempt from income tax,
:ularly attending classes
on for such service does
urposes of the $45 limi-
by the school, college, or
ed.
iths ending on March 31.

iloy of a foreign govern-
s of reciprocity, service
iwned by a foreign gov-
f the bill, made retro-
ial Security Act.
ent nurse in the employ
ual who is enrolled and
d or approved pursuant
is distinguished from a
idual who has completed

a four years' course in a medical school chartered or approved pursuant to State law.]

Section 1426(c) : This subsection relates to an employee who has both included and excluded service for the same employer during a pay period. It provides that if one-half or more of the services constitutes included employment, all of such service will be included; but that if less than one-half constitutes included employment, all will be excluded.

The provision does not apply to the service of an employee in a pay period if any of the service of the employee in the pay period is covered under Subchapter B of Chapter 9 of the Internal Revenue Code (formerly the Carriers Taxing Act of 1937).

*Definition of employee.*—Section 1426(d) : This definition is identical with the definition in section 1101(a)6 of the Social Security Act, which is applicable to Title II (see section 801 of the bill). The amendment to the definition relates to salesmen. In some instances where remuneration is by way of commission and the services are performed away from the place of business of the person for whom they are performed, the individual performing the services is held to be an employee, while in others he is held not to be an employee. A restricted view of the employer-employee relationship should not be taken in the adminis-tration of the Federal old-age and survivors insurance system in making cover-age determinations. The tests for determining the relationship laid down in cases relating to tort liability and to the common-law concept of master and servant should not be narrowly applied. In certain cases even the most liberal view as to the existence of the employer-employee relationship will fall short of covering individuals who should be covered, for example, certain classes of sales-men. In the case of salesmen, it is thought desirable to extend coverage even where all of the usual elements of the employer-employee relationship are wholly lacking and where accordingly even under the liberal application of the law the court would not ordinarily find the existence of the master-and-servant relationship. It is the intention of this amendment to set up specific standards so that individuals performing services as salesmen may be uniformly covered without the necessity of applying any of the usual tests as to the relationship of employer and employee.

A salesman in business as a broker or factor is excluded if the services are performed as part of such business, and, in furtherance of such business, similar services are performed for other persons and one or more employees of such salesman perform a substantial part of such services; and an individual whose services as a salesman are casual services, not in the course of such individual's principal trade, business, or occupation, is not included in the definition.

This definition is not intended to affect the employer-employee status of a salesman and the employee of such salesman. Thus, the business chauffeur who has been an employee of a salesman will remain solely the employee of such salesman.

*Definition of employer.*—Section 1426(e) : This new definition is for the pur-pose of making clear that the extension of the broadened employee concept also broadens the employer concept. Thus, where a salesman is held to be an employee, the person for whom the salesman performs the services is the employer. For example, an insurance solicitor who executes a contract with an insurance company under which he performs services as a salesman would be the employee of the insurance company and not of the general agent of the company.

Section 1426 (f) and (g), defining the terms "State" and "person," respec-tively, makes no change in the existing definitions of those terms.

*Definitions of American vessel and agricultural labor.*—Subsections (h) and (i) of section 1426 are identical with subsections (d) and (l) of section 209 of the Social Security Act. For detailed analysis of such subsections see pages 49 and 51 of this report. [The material referred to is as follows:

[*Definition of American vessel.*—Section 209(d) : This term is defined to mean any vessel documented or numbered under the laws of the United States; and also to include any vessel neither so documented nor numbered nor docu-mented under the laws of any foreign country while the crew is in the employ only of citizens or residents of the United States or corporations organized under the laws of the United States or of any State.

\*        \*        \*        \*        \*        \*        \*

# EXHIBIT 9E

ed in remanufacture by melti
he provisions of this section a
on granted by section 1 of

: Act shall be effective a
warehouse, for consump
of the enactment of this
t shall also be effective a
warehouse, for consump
idation of the entry or wi
exaction or decision rela
handise, has not become
0.

# COMMITTEE REPORTS

---

1950–21–13454

## SOCIAL SECURITY ACT AMENDMENTS OF 1949 [1950]

[House of Representatives Report No. 1300, Eighty-first Congress, First Session]

### [August 22, 1949]

Mr. Doughton, from the Committee on Ways and Means, submitted the following report [to accompany H. R. 6000]:

The Committee on Ways and Means, to whom was referred the bill (H. R. 6000) to extend and improve the Federal old-age and survivors insurance system, to amend the public assistance and child welfare provisions of the Social Security Act, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### INTRODUCTION

#### I. PURPOSE AND SCOPE OF THE BILL

The President advised the Congress in his message on the state of the Union on January 5, 1949:

"The present coverage of the social security laws is altogether inadequate, and benefit payments are too low. One-third of our workers are not covered. Those who receive old-age and survivors insurance benefits receive an average payment of only $25 a month. Many others who cannot work because they are physically disabled are left to the mercy of charity. We should expand our social security program, both as to size of benefits and extent of coverage, against the economic hazards due to unemployment, old age, sickness, and disability."

\*    \*    \*    \*    \*    \*    \*

#### II. BACKGROUND AND HISTORY OF LEGISLATION

*A. Social Security Act of 1935.*

This Act provided a system of old-age insurance for persons working in industry and commerce as a long-run safeguard against the occurrence of old-age dependency. To help alleviate immediate needs, Federal grants were provided to States for three forms of public assistance: For the needy aged, the needy blind, and dependent children. The old-age insurance plan provided monthly benefits (beginning in 1942) only for the insured worker in his old age and also lump-sum death benefits. A tax was imposed on employers and employees at a rate of 1 percent each for 1937–39, 1½ percent for 1940–42, 2 percent for 1943–45, 2½ percent for 1946–48, and 3 percent thereafter. An old-age reserve account was created, to which Congress annually appropriated funds in amounts "determined on a reserve basis in accordance with accepted actuarial principles"; in actual practice these appropriations closely approximated the tax receipts less administrative costs which were met out of the general treasury.

*B. 1939 revision of the Social Security Act.*

The amendments considerably broadened the protection of the old-age insurance system. Supplementary benefits were provided for the eligible wife and children of a retired worker and for the surviving widow and children (in certain instances also for surviving dependent parents). The beginning date for payment of monthly benefits was advanced to January 1940. Benefits payable in the early years were increased, while benefits were reduced for unmarried workers with high earnings who would retire after many years of coverage.

(255)

256

This was accomplished by basing the benefits on average covered wages rather than on total covered wages. The tax rate on employers and employees was held at 1 percent each through 1942, and was then to follow the original schedule. Further, it was provided that an amount equal to the tax collections would be appropriated to the fund and the requirement as to annual appropriations being "determined on a reserve basis in accordance with accepted actuarial principles" was removed.

\* \* \* \* \* \* \*

### C. Legislation during 1940–45.

In 1943 and in subsequent years legislation was passed to maintain the old-age and survivors insurance contribution rate at 1 percent each on employers and employees, rather than letting it rise as scheduled in the 1939 amendments. In 1943 the law was changed to authorize appropriation from general revenues to the trust fund of "such additional sums as may be required to finance the benefits and payments under the insurance program" (to date no appropriations have been made under this provision).

### D. The 1946 amendments.

Provision was made for survivors insurance benefits in respect to World War II veterans who die within 3 years of discharge from the armed forces, provided that such survivors are not entitled to pensions under veterans' laws. The amendments also froze the old-age and survivors insurance contribution rate at 1 percent for 1947 and made a number of technical changes which slightly liberalized benefits and simplified certain aspects of the program.

### E. Amendments after 1946.

In 1947 the old-age and survivors insurance contribution rate was again frozen at 1 percent effective through 1949; the rate was to be 1½ percent in 1950–51 and 2 percent thereafter. The increased grants for public assistance provided in the 1946 amendments, scheduled to expire in December, were extended through June 1950.

In 1948 Congress amended the Social Security Act by passing two bills over the President's veto. Public Law 492, Eightieth Congress, excluded certain newspaper vendors from the coverage of old-age and survivors insurance. Public Law 642, Eightieth Congress, amended the definition of "employee" so as to deprive of coverage those who were not employees under the usual common-law rules applicable in determining employer-employee relationship. \* \* \*

### F. Hearings of 1949.

Your committee has attentively followed the operation of the social security program throughout the years and had a thorough study prepared by a special staff of experts in 1945. It has had the advantage of the studies of special committees composed of outstanding citizens such as the Social Security Advisory Council of the Senate Committee on Finance which submitted an extensive and exhaustive report and recommendations in 1948. It has studied the annual recommendations of the Social Security Administration. It has conducted extended public hearings on several occasions.

This year your committee conducted public hearings on the public assistance and welfare features of social security from February 28 through March 23, and on old-age, survivors, and disability insurance from March 24 through April 27. At the hearings on public assistance and public welfare, oral testimony was given by 88 persons, including 14 Members of Congress, 22 officials of State and local welfare organizations, 8 Federal officials, and 44 other persons, most of whom represented special groups interested in welfare activities. At the hearings on old-age, survivors, and disability insurance the committee heard 105 individuals who testified in person, among whom were 5 Members of Congress, 9 Federal officials, 7 officials of State and local governments, 56 representatives of employee and labor organizations, 36 employer representatives, and 52 other persons representing themselves or various organized groups of citizens. In addition to the direct testimony, several witnesses filed supplementary statements at both hearings, and a number of persons who were unable to appear before your committee placed statements in the record. In all, your committee took 1,079 pages of testimony on public assistance and public welfare and 1,471 pages on old-age, survivors, and disability insurance.

Your committee has held executive sessions over a period of 16 weeks and has painstakingly considered the social security program both as to the operation of specific proposals and the effect of the program on the economy. Your com-

is convinced that
tial to the smooth func

III. SUMMARY (
*d-age and survivors i*
*Extension of coverage.*
ded to add approxima
covered during an ave
re as follows:
Nonfarm self-emplo
paths, veterinarians,
ners, publishers, and
llurgical, or mining e
$400 or more per year
Employees of State
ntary compact with th
ers who are covered (
or an existing retireme
t beneficiaries of the
y (about 3.8 million).
Domestic servants
ted for profit), whose
26 days or more per q
Employees of nonpr
ious orders, but. if t
ployer's tax, the employ
wages for the employee
,000).
(e) Agricultural process
entially commercial or
yees of nonprofit agricul
(f) Federal employees
nporary workers, electiv
farm loan and producti
(g) Americans employe
demployees on America
(h) Employees and self
ested by the legislatur
(i) Salesmen, and cert
oyees by Public Law (
(about 500,000 to 750,(
\*
*Financing of old-age, s*
*Taxable wage base.—*
mputed and contribution
2. Contribution schedul
nally, with the rate for
ercent) :

endar years:
1950 _____
1951–59 _____
1960–64 _____
1965–69_____
1970 and after_____
e self-employed who are

\* \*

OLD-

IV. EXTENSION OF O
General.
The old-age and survivor
uring the course of an av
,000,000 of the 25,000,0

mittee is convinced that a sound and effective social-insurance program is essential to the smooth functioning of our democratic society.

## III. SUMMARY OF PRINCIPAL PROVISIONS OF THE BILL

### A. Old-age and survivors insurance.

1. *Extension of coverage.*—Old-age and survivors insurance coverage would be extended to add approximately 11,000,000 new persons to the 35,000,000 persons now covered during an average week. The groups added to the system under the bill are as follows:

(a) Nonfarm self-employed persons (other than physicians, lawyers, dentists, osteopaths, veterinarians, chiropractors, optometrists, Christian Science practitioners, publishers, and aeronautical, chemical, civil, electrical, mechanical, metallurgical, or mining engineers) whose net earnings from self-employment total $400 or more per year (about 4.5 million).

(b) Employees of State and local governments, if the State enters into a voluntary compact with the Federal Security Agency (except for certain transit workers who are covered compulsorily), provided that such employees who are under an existing retirement system shall be covered only if such employees and adult beneficiaries of the retirement system shall so elect by a two-thirds majority (about 3.8 million).

(c) Domestic servants in a private home (but not if employed on a farm operated for profit), whose cash earnings are $25 or more per quarter, and who work 26 days or more per quarter, for one employer (about 950,000).

(d) Employees of nonprofit institutions other than ministers and members of religious orders, but, if the employer does not elect voluntarily to pay the employer's tax, the employee would receive credit with respect to only one-half his wages for the employee's tax which is compulsorily imposed upon him (about 600,000).

(e) Agricultural processing workers off the farm and certain other types of essentially commercial or industrial border-line agricultural labor; also employees of nonprofit agricultural and horticultural organizations (about 200,000).

(f) Federal employees not covered under any retirement system except temporary workers, elective officials, "dollar-a-year" employees, etc.; employees of farm loan and production credit organizations (about 100,000).

(g) Americans employed by American employer outside the United States and employees on American aircraft outside the United States (about 150,000).

(h) Employees and self-employed in the Virgin Islands (about 5,000) and, if requested by the legislature, in Puerto Rico (about 250,000).

(i) Salesmen, and certain other employees, who were deprived of status as employees by Public Law 642, Eightieth Congress, the so-called Gearhart resolution (about 500,000 to 750,000).

\*     \*     \*     \*     \*     \*     \*

### B. Financing of old-age, survivors, and disability insurance.

1. *Taxable wage base.*—The total annual earnings on which benefits would be computed and contributions paid is raised from $3,000 to $3,600.

2. *Contribution schedule.*—Employers and employees would continue to share equally, with the rate for each being as follows (since 1936 the rate has been 1 percent):

| Calendar years: | Rate, percent |
|---|---|
| 1950 | 1½ |
| 1951–59 | 2 |
| 1960–64 | 2½ |
| 1965–69 | 3 |
| 1970 and after | 3¼ |

The self-employed who are covered would pay 1½ times the above rates.

\*     \*     \*     \*     \*     \*     \*

### OLD-AGE AND SURVIVORS INSURANCE

## IV. EXTENSION OF OLD-AGE AND SURVIVORS INSURANCE COVERAGE

### A. General.

The old-age and survivors insurance system now covers some 35,000,000 workers during the course of an average week. The bill would extend coverage to about 11,000,000 of the 25,000,000 workers not now covered. Specifically, coverage

258

would be extended to self-employed persons other than farmers and certain professional groups, employees of State and local governments, domestic servants employed on a regular basis in other than farm homes, employees of nonprofit organizations, and certain other smaller groups that will be described hereafter.

The bill would not extend coverage to persons engaged in agriculture (whether as self-employed individuals or as employees), Federal employees covered under retirement systems, members of the Armed Forces, railroad employees, the self-employed professional groups mentioned previously, and certain other small groups of workers.

Your committee has given extensive consideration to the advisability of extending coverage to agricultural employees, to self-employed farm operators, and other self-employed groups excluded under the bill. However, your committee believes that further study must be given to the special problems involved in the coverage of these groups.

## B. Specific coverage groups added.

1. *The nonfarm self-employed.*—During the hearings on the 1939 amendments to the Social Security Act, testimony was presented to the effect that coverage of self-employed persons appeared to involve difficult problems of administration and that it should therefore be postponed until the administrative agencies had further experience with the coverage of employees in industry and commerce. Since that time, practicable administrative procedures for coverage of the self-employed have been developed. After a careful consideration of the proposed methods for extending coverage to the nonfarm self-employed, your committee believes that the insurance system should now be extended to this group, except for certain professional classes.

Under the bill the coverage of the self-employed is compulsory. Your committee gave thorough consideration to the possibility of coverage on a voluntary basis, but there are fundamental objections to that approach. The history of voluntary social insurance in the United States and in other countries indicates definitely that only a very small proportion of all eligible individuals actually elect to participate. Moreover, those who do elect are usually not persons of below-average income who are in the greatest need of such protection. In addition, voluntary coverage would probably attract almost exclusively people who are already aged and others who can foresee a large possible return for their contributions; as a result, the program would be faced with adverse selection of risks, and consequently there would be a serious drain on the trust fund.

The total number of nonfarm self-employed persons who would be covered during an average week is about 4.5 million. Between 35 and 40 percent of the total number are storekeepers and other retailers, including, for example, proprietors of unincorporated shoe stores, clothing stores, grocery stores, restaurants, and filling stations. Approximately 20 to 25 percent are proprietors of such service establishments as hotels, boarding houses, garages, laundries, barber shops, and places of amusement. From 12 to 15 percent are engaged in the construction industry, including small-scale plumbing, painting, and electrical contractors. The remaining 25 to 30 percent is made up of wholesale merchants, agents and brokers, small-scale manufacturers, independent taxicab owners, and proprietors of real estate and insurance enterprises. The professional groups which are excluded—namely, doctors, dentists, osteopaths, chiropractors, Christian Scientist practitioners, optometrists, veterinarians, lawyers, publishers, and engineers—number approximately 400,000 persons.

An individual will report his self-employment income by transferring the information from his income tax return to a simple supplementary form, or an additional item on the income tax return might be provided. Unless his net earnings from self-employment amount to $400 or more in any given year, he pays no self-employment tax on such income and receives no credit toward old-age, survivors, and disability insurance benefits.

If wages are earned in covered employment (upon which employment tax is payable), such wages are deducted from the $3,600 annual maximum in determining the amount of net earnings from self-employment that is taxable and creditable in any year. Thus, as far as is practicable, self-employment income is taken into account for benefit purposes to the same extent as wages, but income from casual self-employment would not be taxed or credited.

2. *Employees of State and local governments.*—State and local governmental units in this country employ about 3.8 million workers in an average week. Except for certain transit-company employees, coverage of employees of State

and local governments would be effected only by a voluntary compact between a State and the Federal Security Administrator.

The voluntary agreements are made with respect to defined coverage groups. In general, a coverage group comprises all the employees of a State or of a political subdivision of a State. For any group to be covered, all of the employees in that group (with certain possible specified exceptions such as part-time workers or elected officials) would have to be covered. This is necessary in order to avoid adverse selection. Members of an existing retirement system would be treated as a separate coverage group, and coverage could not be extended to them unless the employees and beneficiaries so elect by a two-thirds majority vote in a written referendum, and it is intended that this be accomplished by secret ballot. The provision for a referendum is included so as to assure those covered by adequate existing systems (such as firemen, policemen, and teachers) that adequate safeguards are present so that their present pension plans will not be destroyed. Many employees in private industry have the protection of both the social insurance system and supplementary private plans. The Federal program may provide types of protection not available under a State or local plan and, in all instances, can serve as a basic protection to employees who shift between public and private employment.

Provisions are also included for the orderly termination of Federal-State compacts. In order to safeguard the interest of all parties concerned the States would not be allowed to terminate until the agreement had been in force for 5 years, and then would have to give advance notice of at least 2 years. In order to prevent in-and-out movements disadvantageous to the financing of the program, if coverage of a particular group is terminated, that group can never be covered again.

If a State fails to pay the required contributions while a compact is in effect, the Federal Government may deduct such amount plus interest from payments otherwise due to the States under other titles of the Social Security Act (chiefly Federal grants for public assistance).

Compulsory coverage has been provided for certain employees of privately owned transit companies taken over by governmental units. Such employees are frequently in an unfortunate position since their coverage is terminated under present law when the company becomes publicly owned, even though their duties may remain the same. Where the transit company was acquired by a governmental unit after 1936 but before 1950, persons working for such company on the date when it was taken over would be covered, beginning in 1950, unless the employing governmental unit elects against such coverage within a specified period. If a transit company is acquired by a governmental unit after 1949, coverage of those employees taken over from the private employer would continue to be compulsory.

3. *Employees in domestic service.*—From the beginning of the insurance program, it has been recognized that domestic workers need the protection of social insurance as much as any other occupational group. Your committee believes that regularly employed domestic workers can now be covered without undue administrative difficulties. Consistent with the fact that coverage is not extended to farm operators or farm workers, domestic workers in private homes on farms operated for profit are not covered. In order for domestic servants in other private homes to be covered, such workers must be paid $25 or more in cash wages by the particular employer during a calendar quarter and, in addition, must be employed by such employer for at least 26 days during such quarter (or else have been employed for at least 26 days by this employer in the previous calendar quarter). Under this definition of a "regular" worker, most domestic employees who are hired on a weekly or monthly basis will be covered, while most part-time workers, and all casual or intermittent workers, will be excluded from coverage.

The bill also extends coverage to nonstudent domestic workers of local college clubs, fraternities, and sororities, whose remuneration is at least $100 in a calendar quarter. Students performing domestic work for such employers will continue to be excluded from coverage.

There are certain types of nonbusiness services which are not, strictly speaking, domestic service in private homes but which are difficult to distinguish from domestic service. To facilitate coverage determinations, the same requirements for coverage are applied to both domestic and other nonbusiness service, namely, cash remuneration of at least $25 in a calendar quarter and employment in at least 26 days of such quarter.

260

It is difficult to estimate what the effects of the restrictions on coverage of domestic service will have on the total number of domestic workers who are covered, but it is believed that there will be about 950,000 covered.

4. *Employees of nonprofit organizations.*—The bill would cover all employees of religious, charitable, and other nonprofit organizations except members of the clergy and religious orders. About 600,000 such employees would be covered in the course of an average week. Such organizations have expressed almost unanimously a desire for coverage provided that their traditional tax-exempt status would not thereby be threatened. Under the bill, their exempt status would be safeguarded. Although the regular compulsory employee contribution of the program would be imposed on their employees, exemption from the employer tax of the program would be continued for nonprofit organizations unless the organization elects to pay the employer tax by waiving the tax exemption. In such case, the employees would be given full credit toward benefits for wages received. Otherwise, only one-half of the employee's wages would be credited toward benefits.

A waiver of tax exemption would be applicable to all employees and could not be terminated by the employer until it had been in effect for at least 5 years, and then the employer would have to give 2 years' advance notice. Statements by nonprofit organizations indicate that the great majority of such organizations would elect to pay the employer contribution, and so provide full insurance protection for their employees.

The bill would continue to exclude service performed for nominal amounts in the employ of tax-exempt nonprofit organizations, service performed by student nurses and internes, and service performed by students in the employ of colleges and universities. These exclusions simplify administration without depriving any significant number of people of needed protection. On the other hand, coverage would be extended, except where the services are performed for nominal amounts, to certain ritualistic or dues-collecting services for fraternal beneficiary societies, service for agricultural and horticultural organizations, and for voluntary employees' beneficiary associations, and certain services performed by students in the employ of tax-exempt organizations.

5. *Border-line "agricultural" labor.*—Certain types of services now excluded as agricultural are essentially commercial and industrial. The bill would modify the definition of "agricultural labor" to provide insurance protection for individuals performing such services. It is estimated that this change would extend coverage to about 200,000 persons in the course of an average week.

Coverage has been extended under this new definition to services performed off the farm in connection with the raising or harvesting of mushrooms, the hatching of poultry, and the operation or maintenance of irrigation ditches, and to services performed in the processing of maple sap into maple sirup or maple sugar (as distinguished from the gathering of maple sap).

Coverage would also be provided for individuals performing post-harvesting services in the employ of commercial handlers of fruit and vegetables, or in the employ of farmers' cooperatives, irrespective of the agricultural commodity in connection with which the services are performed.

6. *Federal civilian employees not covered under any retirement system.*—The bill would extend coverage to about 100,000 civilian employees of the Federal Government and its instrumentalities in the course of an average week. Employees who are now covered by a federally established retirement system would not be included. Certain employees who are not under retirement systems would also remain excluded; they are, in general, employees who are temporary workers or whose employment will eventually be covered under some other Federal benefit system. The purpose of the exclusions is to avoid the nuisance of reporting inconsequential amounts for which no significant benefit rights would be given. Members of the legislative branch and elected officials in the executive branch of the Government would also be excluded.

7. *Americans employed outside the United States.*—During the course of an average week about 150,000 American citizens work outside the United States for American employers, and the number is increasing. Because old-age and survivors insurance coverage does not, in general, extend beyond the geographical boundaries of the United States, the insurance protection of persons who take such jobs is interrupted. The bill would extend coverage to this group.

The bill would also extend coverage to employment performed on American aircraft outside the United States, under the conditions which now apply to maritime service performed outside the United States.

280

cludes from employment casual labor not in the course of the employer's trade or business. Subparagraph (A) of the new paragraph (2) excludes from employment services not in the course of the employer's trade or business (including domestic service in a private home of the employer) performed on a farm (as defined in section 1426(h)) which is operated for profit. Generally, a farm is not operated for profit, if it is occupied primarily for residential purposes, or is used primarily for the pleasure of the occupant or his family such as for the entertainment of guests or as a hobby of the occupant or his family. Subparagraph (B) of the new paragraph (2) excludes from employment domestic service performed in a local college club, or local chapter of a college fraternity or sorority, by a student who is enrolled and is regularly attending classes at a school, college, or university.

The new paragraph (3) excludes from employment service not in the course of the employer's trade or business (including domestic service in a private home of the employer) performed in any calendar quarter by an employee, but only if the cash remuneration paid to an individual for such service is less than $25, or such service is performed by an individual who is not regularly employed by the employer to perform such service. The amendment substitutes a cash and regularity-of-employment test for the test set forth in existing law governing casual labor. The cash test refers to the cash paid for services performed during a calendar quarter, regardless of when paid. Paragraph (3) provides that an individual shall be deemed, for the purposes of such paragraph, to be regularly employed by an employer during a calendar quarter only if (1) such individual performs for such employer service of the prescribed character during some portion of at least 26 days during the calendar quarter, or (2) such individual was regularly employed (determined in accordance with the test hereinbefore referred to in this sentence) by such employer in the performance of service of the prescribed character during the preceding calendar quarter. As used in paragraph (3), the term "cash remuneration" includes checks and other monetary media of exchange.

Paragraph (4) continues without change the present family employment exclusion.

Paragraph (5) continues without change the present exclusion of service performed on or in connection with a vessel not an American vessel, but extends the exclusion to service performed by an individual on or in connection with an aircraft not an American aircraft if such individual is employed on and in connection with such aircraft when it is outside the United States.

Paragraphs (6) and (7) supersede paragraph (6) of existing law. The existing paragraph excludes from employment service in the employ (1) of the United States or (2) of an instrumentality of the United States which is either wholly owned by the United States or exempt from the employers' tax imposed by section 1410 of the Code by virtue of any other provision of law. The effect of the new paragraphs (6) and (7) is to include as employment a portion of the Federal services excluded from employment under existing law.

The new paragraph (6) excludes from employment service performed in the employ of any instrumentality of the United States, if such instrumentality is exempt from the employers' tax imposed by section 1410 of the Code by virtue of any other provision of law which specifically refers to section 1410 of the Code in granting the exemption from the tax imposed by such section. (In connection with paragraph (6), see the explanation of section 1413, added by section 203(a) of the bill.)

The new paragraph (7) excludes from employment service performed in the employ of the United States Government; or in the employ of any instrumentality of the United States which is partly or wholly owned by the United States, but only if (1) such service is covered by a retirement system, established by a law of the United States, for employees of the United States or of such instrumentality, or (2) the service is of the character described in any one of a list of 13 special classes of excepted services. Determinations as to whether the particular service is covered by a retirement system of the requisite character are to be made on the basis of whether such service is covered under a law enacted by the Congress of the United States which specifically provides for the establishment of such retirement system.

The special classes of excepted Federal services (in addition to services covered under a federally established retirement system) are as follows:

(A) Service performed by the President or Vice President of the United States or by a Member of the Congress of the United States, a Delegate to the Congress, or a Resident Commissioner;

923830°—51——19

281

(B) Service performed in the legislative branch of the United States Government (service in the judicial branch of the United States Government is excluded from employment under paragraph (7) by reason of the fact that all service performed in such branch is covered by a retirement system established by congressional enactment);

(C) Service performed in the field service of the Post Office Department;

(D) Service performed in or under the Bureau of the Census of the Department of Commerce by temporary employees employed for the actual taking of any census (exclusive of clerical or other employees employed for work other than in the actual taking of the census);

(E) Service performed by an employee who is excluded by Executive order from the operation of the Civil Service Retirement Act of May 29, 1930, because of payment on a contract or fee basis;

(F) Service performed by an employee for nominal compensation of $12 or less per annum;

(G) Service performed in a hospital, home, or other institution of the United States by a patient or inmate thereof;

(H) Service performed by an employee who is excluded by Executive order from the operation of the Civil Service Retirement Act of May 29, 1930, because such employee is serving under a temporary appointment pending final determination of eligibility for permanent or indefinite appointment;

(I) Service performed by a consular agent appointed under the authority of section 551 of the Foreign Service Act of 1946;

(J) Service performed by student nurses, medical or dental interns, residents-in-training, student dietitians, student physical therapists, or student occupational therapists, assigned or attached to a hospital, clinic, or medical or dental laboratory operated by any department, agency, or instrumentality of the Federal Government, or by certain other student employees described in section 2 of the Act of August 4, 1947;

(K) Service performed in the employ of the Tennessee Valley Authority in a position which is covered by a retirement system established by such Authority;

(L) Service performed by an employee serving on a temporary basis in case of fire, storm, earthquake, flood, or other emergency; or

(M) Service performed by an employee who is employed under a Federal relief program to relieve him from unemployment.

The new paragraphs (6) and (7) have the effect of extending coverage to Federal service (including service in the employ of instrumentalities of the United States) not covered under a Federal retirement system and not included in one of the special classes listed above in paragraphs (A) to (M), inclusive. Service performed by most civilian and all military personnel of the United States will be excluded from employment since such services are covered by a retirement system established by a law of the United States. On the other hand, service (which otherwise constitutes employment) in the employ of some instrumentalities of the United States, such as Federal credit unions, Federal home loan banks, Federal Reserve banks, national farm loan associations, and production credit associations, will be covered employment under the amendments made by the bill.

Paragraph (8) supersedes the existing exclusion from employment of service performed for State governments, their political subdivisions, and certain of their instrumentalities. The new paragraph (8) is divided into subparagraphs (A) and (B). Subparagraph (A) excludes from employment service (other than service to which subparagraph (B) is applicable—that is, certain service performed in the employ of a political subdivision of a State in connection with the operation of a public transportation system) performed in the employ of a State, or any political subdivision thereof, or any instrumentality of any one or more of the foregoing which is wholly owned by one or more States or political subdivisions. Although State and local government employees (other than those to whom coverage is extended under subparagraph (B)) are not covered for the purposes of the taxes imposed under the Federal Insurance Contributions Act, provision is made under title II of the Social Security Act for the coverage of such employees for purposes of benefits by means of State compacts. Subparagraph (B) excludes from employment service performed in the employ of any political subdivision of a State (including an instrumentality of one or more political subdivisions of a State) in connection with the operation of any public transportation system, subject to the exception set forth in such subparagraph.

079

282

The effect of such exception is to include as employment service performed by an employee in the employ of any political subdivision of a State (including an instrumentality of one or more political subdivisions) in connection with the operation of any public transportation system whose service is not included under an agreement entered into pursuant to section 218 of the Social Security Act (relating to the coverage of State and local government employees for the purposes of title II of the Social Security Act) and (1) who became an employee of such political subdivision in connection with and at the time of its acquisition after 1936 of such transportation system or any part thereof; and (2) who prior to such acquisition rendered services which constituted employment in connection with the operation of such transportation system or part thereof. However, in the case of an employee described in clauses (1) and (2) of the preceding sentence who became such an employee in connection with an acquisition made prior to January 1, 1950, service of the prescribed character performed by such employee will not constitute employment if the political subdivision employing him files with the Commissioner of Internal Revenue prior to January 1, 1951, a statement that it does not favor the inclusion under subparagraph (B) of any employee acquired in connection with any such acquisition made prior to January 1, 1950.

Paragraph (9), which takes the place of the existing exclusion from employment of service performed for certain religious, charitable, scientific, literary, educational, or humane organizations, excludes service performed by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order. The change in this provision extends coverage to service performed for such nonprofit organizations, except as such service may be excluded under the new paragraph (9) or other numbered paragraphs of section 1426(b) of the Code. The exclusion contained in the new paragraph (9) applies to the performance of services which are ordinarily the duties of such ministers or members of religious orders. The duties of ministers include the ministration of sacerdotal functions and the conduct of religious worship, and the control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination.

Paragraph (10) continues without change the existing exclusion of service performed by an employee or employee representative covered by the railroad retirement system.

Paragraph (11) revises certain exclusions contained in paragraph (10) of existing law, and omits others. Subparagraph (A) of paragraph (11) excludes service performed in any calendar quarter in the employ of any organization exempt from income tax under section 101 of the Code, if the remuneration for such service is less than $100 ($45 or less under existing law). The dollar test under subparagraph (A) is the amount earned in a calendar quarter and not the amount paid in a calendar quarter. Subparagraph (B) excludes service performed in the employ of a school, college, or university, whether or not exempt from income tax under section 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university.

Paragraphs (12) and (13) continue without change the present exclusion of service performed in the employ of a foreign government or of a wholly owned instrumentality of a foreign government under certain prescribed conditions.

Paragraph (14) continues without change the exclusion of service performed by certain student nurses and interns.

Paragraph (15) continues without change the present exclusion of certain fishing services.

Paragraph (16) continues without change the present exclusion of services performed in the delivery and distribution of newspapers, shopping news, and magazines under certain prescribed conditions.

Paragraph (17) continues without change the present exclusion of service performed for an international organization.

Paragraph (18) excludes from employment service performed by an individual in the sale or distribution of goods or commodities for another person, off the premises of such person, under an arrangement whereby such individual receives his entire remuneration (other than prizes) for such service directly from the purchasers of such goods or commodities, if such person makes no provision (other than by correspondence) with respect to the training of such individual for the performance of such service and imposes no requirement upon such individual with respect to (1) the fitness of such individual to perform such

ice, (2) the geographical area in which the volume of goods or commodities tion or solicitation of customers. ide a requirement as to the age or ubsection (b) of section 205 of the ection (e) of section 1426 of the C subsection (e) contains three s aragraph (1) defines the term "St ate" includes Alaska, Hawaii, and nt also includes within such term tive date specified in section 1633 visions of title II of the Social Se rto Rico. The new paragraph (2 en used in a geographical sense er the effective date specified in s ph (3), relating to the term "citiz lividual who is a citizen of Puerto ited States) and who is not a re sidered, for the purposes of secti ited States prior to the effective ) is designed to exclude from emplo section 1633) services performed b Puerto Rico (or elsewhere includi erican employer (as defined in sec Subsection (c) of section 205 of the the Code, which defines the term e heading of such subsection and by rcraft." The term "American aircr nsurance Contributions Act, to mea e United States. Subsection (g) o mendment made by subsection (c) ervices performed after December 3 Subsection (d) of section 205 of the f the Code, which defines the term ederal Insurance Contributions Act. our numbered paragraphs. The ne numbered paragraphs. Paragraph (1 erformed on a farm, in the employ raising or harvesting any agricultura (2) of existing law relates primarily wner, tenant, or other operator of a f gement, conservation, improvement, nd equipment, if the major portion o iew paragraphs (1) and (2) contin raphs (1) and (2) of existing law. Paragraph (3) of exsting law inc services even though not performed o ith the production or harvesting of i ty defined as an agricultural comm Marketing Act, as amended, or in co mushrooms, or in connection with the kinning of cotton, or in connection wi canals, reservoirs, or waterways us water for farming purposes. The ne abor only services performed in conn any commodity defined as an agricu Agricultural Marketing Act, as amen cotton. The effect of the amendmen definition of agricultural labor servi duction or harvesting of maple sap, o ing of mushrooms, or in connection services are performed on a farm (a lees performed in connection with th as part of a poultry or other farm, amendment services performed in t gathering) of maple sap into maple s cultural labor, even though such ser

g out his contract
ade name. Of ne
eneral contractor, b
on of the project as
(4) of the definiti
h relationship as th
s but will end u
ct of all the facto
but is engaged

ance company ent
general agent a
hereby he is giv
soliciting agents,
territory covere
ctivity to the solic
nformity with p
e company's polic
the applications
required to procu
which he is expe
tions for insura
s when the for
icant is known to
te records and bo
space, stenogra
lmes furnishes bo
vities of the ge
ents contract thro
d generally the
tees to the solici
ms of the agreem

s, or loans are ma
d at the risk of t
al investment in t
eral agent is in
soliciting agents,
p may be terminat

e general agent,
ance of the serv
inuity and is no
rformance of se
l agent and his
g life insurance.
depends for muc
he must exercis
supervising his
ilities for the w
unities for profit
iance of the ag
uccessful solicito
eives commission
ates, as in the
il plant operato
which one busi
ization to perfor
ct of all the fac
service in the p
yee under parag

a manufacturer
ts. Sale by do
y's products. T

company enters into an agreement with a salesman giving him the right to purchase the company's products at wholesale on short-term credit for door-to-door resale at prices suggested by the company. The agreement specifies the territory of the salesman, and provides that the profit from the sale is his sole remuneration for the services. While no requirement is imposed either under the contract or in fact with respect to a sales quota, discounts are allowed for maintaining a specified volume of business; and the salesman devotes full time to the sale of X company's products. A cash deposit is required of the salesman to establish credit with the company and to cover samples. The agreement states that the company shall not have any right to exercise control over the performance of the services or methods employed in effecting sales, and expressly negates any requirement to make reports or attend sales meetings. There is no requirement either express or implied that the salesman is to furnish services with respect to designated or regular customers or customers along a prescribed route. The agreement expressly denies the existence of the employer-employee relationship, and designates the salesman an independent contractor. The company, however, provides training courses, selling aids, advertising, forms, leads, and other services for its salesmen. Such services are utilized by the salesman. The agreement is terminable by the company on 60 days' notice and provides for a refund to the salesman of his deposit and of the price paid for products unsold and returned. His earnings from the relationship are dependent upon the volume of his sales. He has no place of business distinct from his home, and he is not prohibited from furnishing the same or similar services for any other person.

[Though the salesman might not be considered an employee under paragraph (2) or (3) of the definition, he is nevertheless an employee under paragraph (4). The services of door-to-door vendors are the essence of the distribution system of the company. The right of the company to terminate the relationship on short notice is evidence of some degree of control of the type contemplated by paragraph (4) of the definition.

[The agreement between the company and the salesman contemplates a continuing or permanent relationship. The cash deposit required is not such an outlay as to constitute an investment for the carrying on of an independent business. Although some skill may be required, he devotes no capital to a going business of his own. His relationship with the company is permanent and the performance of service for the company is both frequent and regular. Since the cash deposit is refundable and unsold goods are returnable, the salesman undertakes little or no risk of loss. Despite the declarations of the parties in the contract, the combined effect of the factors clearly shows that the salesman is an employee.]

Subsection (b) of section 206 of the bill provides that the amendment made by subsection (a) shall be applicable only with respect to services performed after December 31, 1949.

### SELF-EMPLOYMENT INCOME

Section 207: Subsection (a) of this section amends chapter 9 of the Internal Revenue Code by adding thereto subchapter F, entitled "Tax on Self-Employment Income." Subchapter F, the short title of which is the "Self-Employment Contributions Act," is comprised of sections 1640 to 1647, both inclusive.

*Rate of tax.*

Section 1640 imposes an income tax for each taxable year beginning after December 31, 1949, upon the self-employment income of every individual. (The term "self-employment income" is defined in section 1641(b), which section is discussed below.) The rates of the tax on such income for the respective taxable years are as follows:

| For taxable years: | Percent |
| --- | --- |
| Beginning in 1950 | 2¼ |
| Beginning after Dec. 31, 1950, and before Jan. 1, 1960 | 3 |
| Beginning after Dec. 31, 1959, and before Jan. 1, 1965 | 3¾ |
| Beginning after Dec. 31, 1964, and before Jan. 1, 1970 | 4½ |
| Beginning after Dec. 31, 1969 | 4⅛ |

*Definitions.*

Section 1641 defines certain terms for the purposes of the Self-Employment Contributions Act.

298

While a nonresident alien individual who derives income from a trade or business carried on within the United States (whether by his agents or employees or by a partnership of which he is a member) is taxed on such income under chapter 1 of the Code, such individual (if he is treated under the Self-Employment Contributions Act as a nonresident alien) will not pay a self-employment tax on any portion of such income.

*Trade or business.*

Subsection (c) of section 1641 provides that, for the purposes of the Self-Employment Contributions Act, the term "trade or business" shall have the same meaning as when used in section 23 of the Code, except that such term shall not include the performance of certain functions and services described in paragraphs (1) to (5), both inclusive.

Paragraph (1) provides that the performance of the functions of a public office does not constitute a trade or business. The term "public office" includes any elective or appointive office of the Federal Government or of a State or its political subdivision or of a wholly owned instrumentality of any one or more of the foregoing, such as President, Vice President, governor, mayor, secretary of state, Member of Congress, State representative, county commissioner, judge, county or city attorney, marshal, sheriff, register of deeds, or notary public.

Paragraph (2) provides that the performance of service by an individual as an employee as defined in the Federal Insurance Contributions Act, with two exceptions, does not constitute a trade or business. The exceptions are as follows:

(1) Service performed by an employee, who has attained the age of 18, in, and at the time of, the sale of newspapers or magazines to ultimate consumers, under an arrangement under which the newspapers or magazines are to be sold by the employee at a fixed price, his compensation being based on the retention of the excess of such price over the amount at which the newspapers or magazines are charged to him, whether or not he is guaranteed a minimum amount of compensation for such service, or is entitled to be credited with the unsold newspapers or magazines turned back; or

(2) Service performed by an employee, who has attained the age of 18, in the sale or distribution of goods or commodities for an employer, off the premises of the employer, under an arrangement whereby the employee receives his entire remuneration (other than prizes) for such service directly from the purchasers of such goods or commodities, if such employer makes no provision (other than by correspondence) with respect to the training of the employee for such service and imposes no requirement upon the employee with respect to his fitness to perform such service, the geographical area in which such service is to be performed, the volume of goods or commodities to be sold or distributed, or the selection or solicitation of customers.

Paragraph (3) provides that the performance of service by an individual as an employee or employee representative as defined in section 1532 of the Code, that is, an individual covered under the railroad retirement system, does not constitute a trade or business.

Paragraph (4) provides that the performance of service by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order does not constitute a trade or business. This exception applies to the performance of services which are ordinarily the duties of such ministers or members of religious orders. The duties of ministers include the ministration of sacerdotal functions and the conduct of religious worship, and the control, conduct, and maintenance of religious organizations (including the religious boards, societies, and other integral agencies of such organizations), under the authority of a religious body constituting a church or church denomination.

Paragraph (5) provides that the performance of service by an individual in the exercise of a profession as a physician, lawyer, dentist, osteopath, veterinarian, chiropractor, or optometrist, or as a Christian Science practitioner, or as an aeronautical, chemical, civil, electrical, mechanical, metallurgical, or mining engineer, or the performance of such service by a partnership, does not constitute a trade or business. The designations in this paragraph are to be given their commonly accepted meaning. Thus, the term "physician" means an individual who is legally qualified to practice medicine; and the term "lawyer" means an individual who is legally qualified to practice law. In the case of a partnership whose trade or business consists in the performance of service in the exercise of any of the designated professions, the partnership shall not be

sidered as earr
nt Contribution
such partners!
ployment of an
rtnership is eng
fessions, each
loss of such p
nt, irrespective
e of such profes
lp.

*efinition of empl*

Subsection (d)
mployment Cont
hall have the sar
ons Act.   (For a
ld 206 of the bill

*efinition of taxal*

Subsection (e)
mployment Cont
eaning as when
des that the tax:
ent Contribution
ifferent taxable :
ear of such indiv
ct shall be the
ayer's net incom
ls taxable year
hall be such fisc
eriod or for son
or a fractional p
mployment Cont
eturn is made ui
o placing net ini
hange in account
ngs from self-em
ct.   If a taxabl
nated by the (
ode, the taxable
ontributions Act

*ondeductibility o*

Section 1642 pro
ent income shal
ls net income fo
osed by chapter 1

*Collection and pay*

Section 1643 m
self-employment i
h self-employme:
Bureau of Interna
and shall be paid
collections.

Subsection (b)
ncome is not pai
at the rate of 6
aid.

Subsection (c)
nue, with the app
ner, times, and co
ions Act, under
and paid.

Subsection (d)
self-employment i
it amounts to one-

from a trade or
cents or employee
ich income under
. Self-Employment
mployment tax on

oses of the Self-
all have the same
ch term shall not
ed in paragraph

tions of a public
c office" includes
or of a State, or
any one or more
mayor, secretary,
missioner, judge,
notary public.
an individual as
s Act, with two
is are as follows:
the age of 18, in
ultimate consum-
r magazines are
a being based on
which the news
is guaranteed a
s entitled to be
back; or
d the age of 18,
employer, off the
y the employee
service directly
employer makes
the training of
no requirement
uch service, the
, the volume of
on or solicitation

individual as an
f the Code, that
, does not con-

. duly ordained,
his ministry or
d by such order
to the perform-
or members of
n of sacerdotal
l, conduct, and
oards, societies,
authority of a

an individual
osteopath, vet-
ce practitioner,
etallurgical, or
rship, does not
raph are to be
ian" means an
term "lawyer"
the case of a
e of service in
ip shall not be

considered as carrying on a trade or business for purposes of the Self-Employment Contributions Act, and none of the distributive shares of income or loss of such partnership shall be included in computing net earnings from self-employment of any member of the partnership. On the other hand, where a partnership is engaged in a trade or business not within any of the designated professions, each partner must include his distributive share of the income or loss of such partnership in computing his net earnings from self-employment, irrespective of whether such partner is also engaged in the practice of one of such professions and contributes his professional services to the partnership.

## Definition of employee and wages.

Subsection (d) of section 1641 provides that, for the purposes of the Self-Employment Contributions Act, the term "employee" and the term "wages" shall have the same meaning as when used in the Federal Insurance Contributions Act. (For an explanation of these terms, see the discussion of sections 204 and 206 of the bill.)

## Definition of taxable year.

Subsection (e) of section 1641 provides that, for the purposes of the Self-Employment Contributions Act, the term "taxable year" shall have the same meaning as when used in chapter 1 of the Code. The subsection further provides that the taxable year of an individual for the purposes of the Self-Employment Contributions Act shall be a calendar year unless the individual has a different taxable year for the purposes of chapter 1; in which case the taxable year of such individual for the purposes of the Self-Employment Contributions Act shall be the same as his taxable year under chapter 1. Thus, if a taxpayer's net income under chapter 1 is computed upon the basis of a fiscal year, his taxable year for the purposes of the Self-Employment Contributions Act shall be such fiscal year. Likewise, if by reason of a change in accounting period or for some other reason a taxpayer makes a return under chapter 1 for a fractional part of a year, his taxable year for the purposes of the Self-Employment Contributions Act shall be the same period as that for which his return is made under chapter 1. However, section 47(c) of the Code, relating to placing net income on an annual basis for purposes of chapter 1 due to a change in accounting period, is not applicable to the computation of net earnings from self-employment for purposes of the Self-Employment Contributions Act. If a taxable year of a taxpayer under chapter 1 of the Code is terminated by the Commissioner of Internal Revenue under section 146 of the Code, the taxable year of the taxpayer for purposes of the Self-Employment Contributions Act is likewise terminated.

## Nondeductibility of tax.

Section 1642 provides that the tax imposed by section 1640 upon self-employment income shall not be allowed as a deduction to the taxpayer in computing his net income for any taxable year for the purposes of the income tax imposed by chapter 1 of the Code or by any Act of Congress in substitution therefor.

## Collection and payment of tax.

Section 1643 makes provision for the collection and payment of the tax on self-employment income. Subsection (a) of section 1643 provides that the tax on self-employment income imposed by section 1640 shall be collected by the Bureau of Internal Revenue, under the direction of the Secretary of the Treasury, and shall be paid into the Treasury of the United States as internal revenue collections.

Subsection (b) of section 1643 provides that, if the tax on self-employment income is not paid when due, there shall be added as part of the tax interest at the rate of 6 percent per annum from the date the tax became due until paid.

Subsection (c) of section 1643 authorizes the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to prescribe the manner, times, and conditions, not inconsistent with the Self-Employment Contributions Act, under which the tax on self-employment income shall be collected and paid.

Subsection (d) of section 1643 provides that in the payment of the tax on self-employment income a fractional part of a cent shall be disregarded unless it amounts to one-half cent or more, in which case it shall be increased to 1 cent.

is no corre-
le to provide
a particular
:in to run in
rn. In addi-
ions, instead
r a calendar
properly in-
herein. The

:emption for
;arding their
om the date
:uture years.
n under this
e January 1,

vided for re-
1 gasoline is
t after June

which is un-
-des with an

TAX

he wagering
n which the
er is placed
amendment.

irresponding
on tires and
ugh a manu-
as delivered
recedes.

)UCTION

of Economic
fore June 30
effects of the

;G,

EOGH,
RNES,
:TIS,

he House.

## [H.R. 6675] [1]
## SOCIAL SECURITY AMENDMENTS OF 1965

[House of Representatives Report No. 213, Eighty-ninth Congress, First Session]

[March 29, 1965]

Mr. MILLS, from the Committee on Ways and Means, submitted the following report to accompany H.R. 6675.

The Committee on Ways and Means, to whom was referred the bill (H.R. 6675) to provide a hospital insurance program for the aged under the Social Security Act with a supplementary health benefits program and an expanded program of medical assistance, to increase benefits under the old-age, survivors, and disability insurance system, to improve the Federal-State public assistance programs, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

*　　*　　*　　*　　*　　*　　*

## II. SUMMARY OF PRINCIPAL PROVISIONS OF THE BILL

*　　*　　*　　*　　*　　*　　*

### C. OLD-AGE, SURVIVORS, AND DISABILITY INSURANCE AMENDMENTS

*　　*　　*　　*　　*　　*　　*

#### 2. COVERAGE CHANGES

The following coverage provisions were included:

(a) *Physicians and interns*

Self-employed physicians would be covered for taxable years ending after December 31, 1965. Interns would be covered beginning on January 1, 1966.

(b) *Farmers*

Provisions of existing law with respect to the coverage of farmers would be amended to provide that farm operators whose annual gross earnings are $2,400 or less (instead of $1,800 or less as in existing law) can report either their actual net earnings or 66⅔ percent (as in present law) of their gross earnings. Farmers whose annual gross earnings are over $2,400 would report their actual net earnings if over $1,600, but if actual net earnings are less than $1,600, they may instead report $1,600. (Present law provides that farmers whose annual gross earnings are over $1,800 report their actual net earnings if over $1,200, but if actual net earnings are less than $1,200, they may report $1,200.)

(c) *Cash tips*

Coverage of cash tips received by an employee in the course of his employment as wages would be provided, effective as to tips received after 1965.

(i) *Reporting of tips.*—The employee would be required to report to his employer in writing the amount of tips received and the employer would report the employee's tips along with the employee's regular wages. The employee's report to his employer would include tips paid to him through the employer as well as those received directly from customers of the employer. Tips received by an employee which do not amount to a total of $20 a month in connection with his work for any one employer would not be covered and would not be reported.

(ii) *Tax on tips.*—The employer would be required to withhold social security taxes only on tips reported by the employee to him. Unlike the provision in last year's House bill, this provision requires the employer to withhold income tax on such reported tips.

The employer would be responsible for the social security tax on tips only if the employee reported the tips to him within 10 days after the end of the month

---

[1] Public Law 89-97, p. 601, this Bulletin.

(733)

084

in which the tips were received.  The employer would be permitted to gear these new procedures into his usual payroll periods.  The employer would pay over his own and the employee's share of the tax on these tips and would include the tips with his regular reports of wages.  If at the time the employee report is due (or, in cases where the report is made earlier—if between the making of the report and the time it is due), the employer does not have unpaid wages or remuneration of the employee under his control sufficient to cover the employee's share of the social security tax applicable to the tips reported, the employee will pay his share of the tax with his report.

If the employee does not report his tips to his employer within 10 days after the end of the month involved, the employer would have no liability.  In such a case the employee alone would be liable not only for the amount of the employee tax but also an additional amount equal to the employee tax.

For purposes of withholding income tax on tips, the employer is required to deduct and withhold only on the tips reported to him and only to the extent that the tax can be deducted and withheld before the close of the calendar year from wages (excluding tips, but including funds turned over to the employer by the employee for such purpose) under the control of the employer.

### (d)  State and local government employees

Several changes made by the bill would facilitate social security coverage of additional employees of State and local governments.

### (e)  Exemption of certain religious sects

Members of certain religious sects may be exempt from the tax on self-employment income and from social security coverage upon application which would be accompanied by a waiver of benefit rights.

An individual eligible for the exemption must be a member of a recognized religious sect (or a division of a sect) who is an adherent of the established teachings of such sect by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance, making payments in the event of death, disability, old-age, or retirement, or making payments toward the cost of or providing services for, medical care (including the benefits of any insurance system established by the Social Security Act).

The Secretary of Health, Education, and Welfare must find that such sect has such teachings and has been in existence at all times since December 31, 1950, and that it is the practice for members of such sect to make provision for their dependent members which, in the Secretary's judgment, is reasonable in view of their general level of living.  The exemption for previous years (taxable years ending prior to December 31, 1965) must be filed by April 15, 1966.

The exemption would be effective as early as taxable years beginning after December 31, 1950.

\*         \*         \*         \*         \*         \*         \*

## III. GENERAL DISCUSSION OF THE BILL

\*         \*         \*         \*         \*         \*         \*

### D. GENERAL DISCUSSION OF OLD-AGE, SURVIVORS, AND DISABILITY INSURANCE PROVISIONS

\*         \*         \*         \*         \*         \*         \*

#### 9. COVERAGE EXTENSIONS AND MODIFICATIONS

Your committee's bill would extend social security coverage to self-employment income from the practice of medicine, and to the wages of interns, cover tips as wages, facilitate coverage of additional State and local government employees, provide additional coverage for employees of certain nonprofit organizations, extend coverage to temporary employees of the District of Columbia, increase the amount of gross income which farmers may use under the optional method of computing farm self-employment income for social security purposes, and permit exemption from the social security self-employment tax for persons who follow certain teachings of a religious sect of which they are members.

### (a)  Coverage of self-employed physicians and interns

Self-employed doctors of medicine are the only group of significant size whose self-employment income is excluded from coverage under social security.  Large

735

r these
ver his
he tips
ie (or,
report
·ration
of the
ay his

ter the
a case
·ee tax

red to
it that
r from
by the


age of


uploy-
would

;nized
lished
to ac-
nts in
·ward
·f any

·t has
1950,
their
ew of
years

after


∗


∗


⅄CE

,


ploy-
· tips
yees,
ions,
rease
·thod
and
who


hose
arge

numbers of doctors have requested coverage. Your committee knows of no valid reason why this single professional group should continue to be excluded. It runs counter to the general view that coverage should be as universal as possible. There are no technical or administrative barriers to the coverage of self-employed doctors of medicine.

Moreover, more than half of the physicians in private practice have obtained some social security credits through work other than their self-employment as physicians, or through their military service. As indicated, many requests for coverage have been received from those who have not obtained social security credits in this way and from physicians who have some credits but wish to obtain full social security protection.

Your committee's bill would cover the self-employment income of the approximately 170,000 self-employed doctors of medicine on the same basis as the self-employment income of other professional groups, effective for taxable years ending after December 31, 1965.

Coverage would also be extended to services performed by medical and dental interns. The coverage of services as an intern would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at the time when they need the family survivor and disability protection it provides. This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families. Interns would be covered on the same basis as other employees working for the same employers, beginning on January 1, 1966.

*(b) Computation of self-employment income from agriculture*

Under present law, persons with net earnings from farm self-employment have the following option in reporting for social security purposes: (a) If annual gross income from agricultural self-employment is not over $1,800, either actual net earnings or 66⅔ percent of gross income may be reported; (b) if gross income from agricultural self-employment is over $1,800 and net earnings are less than $1,200, either net earnings or $1,200 (two-thirds of $1,800) may be reported; and (c) if the annual gross income is more than $1,800 and net earnings are $1,200 or more, actual net earnings must be reported.

The bill approved by your committee would retain the present option in the reporting of farm self-employment income but would raise the level of income which may be reported under the gross income option by increasing the $1,800 figure to $2,400 and the $1,200 figure to $1,600.

Thus, persons with agricultural self-employment would be permitted to use the following option in reporting their earnings from agricultural self-employment for social security purposes: (a) If annual gross income from agricultural self-employment is not over $2,400, either actual net earnings or 66⅔ percent of gross income may be reported; (b) if gross income from agricultural self-employment is over $2,400 and actual net earnings are less than $1,600, either actual net earnings or $1,600 may be reported; and (c) if gross earnings are more than $2,400 and net earnings are more than $1,600, the actual net earnings must be reported. This change would be effective for taxable years beginning after December 31, 1965.

*(c) Coverage of tips*

The problem of extending social security coverage to tips has engaged the attention of your committee for many years. The principal difficulty has been to devise a fair and practical system for obtaining information on amounts of tips received by an individual which could serve as a basis for contributions and benefit credits. Another problem has been the question of whether tips should be taxed as wages or as self-employment income.

It is a matter of common knowledge that in occupations where employees customarily receive tips, the regular wages of these employees are generally far below those of other employees with comparable training and duties. It was reported to the committee, for example, that under a bargaining agreement covering hotel employees in a large city the wages of waiters and waitresses were about 30 percent under those of a dishwasher, one of the lowest paid kitchen workers, and the wages of bellhops were one-half of those of reservation clerks. On the basis of such wage and tipping practices, the committee has concluded that it would be appropriate to treat tips as wages for social security purposes.

by a taxpayer before he attains the age of 65 for insurance covering medical care for the taxpayer, his spouse, or a dependent after the taxpayer attains the age of 65 are to be treated as expenses paid during the taxable year for insurance which constitutes medical care if premiums for such insurance are payable (on a level payment basis) under the contract—

    (1) for a period of 10 years or more, or

    (2) until the year in which the taxpayer attains age 65 (but in no case for a period of less than 5 years).

*Maximum limitation in certain cases*

Section 106(d) of the bill amends section 213(g) of the code (which provides for an increased maximum limitation on the medical expense deduction allowable to a taxpayer who has attained the age of 65 and is disabled or whose spouse has attained the age of 65 and is disabled) to eliminate the requirement of attaining age 65 so that the increased maximum limitation is applicable in any case where either the taxpayer or his spouse is disabled.

*Effective date*

Section 106(e) of the bill provides that the amendments made by section 106 shall apply to taxable years beginning after December 31, 1966.

## SECTION 107. RECEIPTS FOR EMPLOYEES MUST SHOW TAXES SEPARATELY

Section 107 of the bill amends section 6051(c) of the Internal Revenue Code of 1954 to provide that the statement (form W-2) furnished to an employee pursuant to section 6051 of the code must show the proportion of the amounts withheld as tax under section 3101 which is for financing the cost of hospital insurance benefits under part A of title XVIII of the Social Security Act.

   \*      \*      \*      \*      \*      \*      \*

## TITLE III—SOCIAL SECURITY AMENDMENTS

Section 300 of the bill provides that title III of the bill may be cited as the "Old-Age, Survivors, and Disability Insurance Amendments of 1965".

   \*      \*      \*      \*      \*      \*      \*

## SECTION 311. COVERAGE FOR DOCTORS OF MEDICINE

   \*      \*      \*      \*      \*      \*      \*

*Amendments to the Internal Revenue Code of 1954*

*Removal of exclusion for doctors of medicine*

Under existing law, services performed by a self-employed person in the exercise of his profession as a doctor of medicine, or as a member of a partnership engaged in the practice of medicine, are excepted from the term "trade or business" under section 1402(c)(5) of the Internal Revenue Code of 1954. Section 311(b)(1) of the bill amends section 1402(c)(5) of the code by removing the exception provided for services performed as a doctor of medicine or as a member of a partnership engaged in the practice of medicine. In general, the effect of this amendment is to subject the net earnings derived by an individual from the practice of medicine on his own account or by a partnership of which he is a member to the self-employment tax.

Section 311(b)(2) of the bill conforms the provisions of the last two sentences of section 1402(c) of the code to the amendment made by section 311(b)(1).

*Technical amendments*

Section 311(b)(3) of the bill conforms the language of sections 1402(e)(1) and 1402(e)(2) of the code to the amendment made by section 311(b)(1).

*Removal of exclusion for interns in Federal hospitals*

Section 3121(b)(6)(C)(iv) of the Internal Revenue Code of 1954 excludes from the term "employment," and thus from coverage under the Federal Insurance Contributions Act, services performed by certain interns, student nurses, and other student employees of hospitals of the Federal Government. Section 311(b)(4) of the bill amends section 3121(b)(6)(C)(iv) of the code so as to remove the exclusion insofar as it pertains to medical or dental interns and

ig medical
ttains the
insurance
yable (on

in no case

i provides
allowable
se spouse
ement or
ile in any

-ction 106

.XES

e Code of
ee pursu-
withheld
nsurance

*

d as the

*

*

.

he exer-
nership
or busi-
4.  Sec-
moving
or as a
ral. the
lividual
f which

ntences
(1).

(e)(1)
).

cludes
Insur-
nurses,
Section
) as to
is and

medical or dental residents-in-training. The effect of this amendment is to make the remuneration of such individuals for services performed by them as such interns or residents-in-training in the employ of hospitals of the Federal Government subject to the Federal Insurance Contributions Act.

*Removal of exclusion for student interns*

Section 3121(b)(13) of the Internal Revenue Code of 1954 excludes from the term "employment." and thus from coverage under the Federal Insurance Contributions Act. services performed as an intern in the employ of a hospital by an individual who has completed a 4-year course in a medical school chartered or approved pursuant to State law. Section 311(b)(5) of the bill amends section 3121(b)(13) so as to remove this exclusion. The effect of this amendment is to extend coverage under the Federal Insurance Contributions Act to such interns unless their services are excluded under provisions other than section 3121(b)(13). Thus; the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the code. If the intern is employed by a hospital which is exempt from income tax and which has a waiver certificate in effect under section 3121(k) of the code, he is not excluded from coverage by section 3121(b)(8)(B) of the code if coverage was effected under such certificate.

### Effective Date

Section 311(c) of the bill provides that the amendments made by paragraphs (1) and (2) of section 311(a) and by paragraphs (1), (2), and (3) of section 311(b), relating to the self-employment coverage of doctors of medicine, are effective for taxable years ending after December 31, 1965. The amendments made by paragraphs (3) and (4) of section 311(a) and by paragraphs (4) and (5) of section 311(b), relating to social security coverage of interns and residents-in-training. are effective with respect to services performed after 1965.

## SECTION 312. GROSS INCOME OF FARMERS

\*        \*        \*        \*        \*        \*        \*

*Same: Amendments to the Internal Revenue Code of 1954*

Section 312(b) of the bill amends section 1402(a) of the Internal Revenue Code of 1954 to increase from $1,800 to $2,400 the maximum gross income from agricultural activity that a self-employed farmer may use under the optional method of computing his net earnings from self-employment as a farmer. Under present law. an individual whose gross income from agricultural self-employment (including his distributive share of gross income from a farm partnership) is $1,800 or less may, at his option, treat as net earnings from such self-employment two-thirds of his gross income from farming; if such individual's gross income is more than $1,800 and his net earnings from self-employment as a farmer are less than $1,200, he may treat $1,200 as net earnings from self-employment; if his net earnings from self-employment as a farmer are $1,200 or more. he must report his actual net earnings from self-employment as a farmer. Under the amendments made by section 312(b), an individual whose gross income from agricultural self-employment (including his distributive share of gross income from a farm partnership) is $2,400 or less may, at his option, treat as net earnings from such self-employment two-thirds of his gross income from farming; if he has gross income from farming of more than $2,400 and his net earnings from self-employment as a farmer are less than $1,600, he may report $1,600 as net earnings from self-employment as a farmer: if his net earnings from self-employment as a farmer are $1,600 or more. he must report his actual net earnings from such self-employment.

### Effective Date

Section 312(c) of the bill provides that the amendments made by sections 312(a) and 312(b) will apply with respect to taxable years beginning after December 31, 1965.

## SECTION 313. COVERAGE OF TIPS

Section 313 of the bill provides for treating tips received by an employee in the course of his employment as wages paid by the employer for social security

**EXHIBIT 9F**

758

Thus service performed by an employee as defined in section 3231(b) of the code (the Railroad Retirement Tax Act) constitutes employment, unless excluded under some paragraph (other than paragraph (9)) of section 3121(b), for purposes of determining wages subject to the employee and employer taxes imposed by the new sections 3101(b) and 3111(b).

*Effective dates*

Section 321(d) of the bill provides that the amendments made by section 321(a) will apply only with respect to taxable years which begin after December 31, 1965, and that the amendments made by sections 321(b) and 321(c) will apply with respect to remuneration paid after December 31, 1965.

\*        \*        \*        \*        \*        \*        \*

---

## [H.R. 6675] [1]

## SOCIAL SECURITY AMENDMENTS OF 1965

[Senate Report No. 404, Part 1, Eighty-ninth Congress, First Session, Calendar No. 389]

[June 30 (legislative day, June 29), 1965]

Mr. Long of Louisiana, from the Committee on Finance, submitted the following report together with individual, additional and supplemental views, to accompany H.R. 6675.

The Committee on Finance, to whom was referred the bill (H.R. 6675) to provide a hospital insurance program for the aged under the Social Security Act with a supplementary health benefits program and an expanded program of medical assistance, to increase benefits under the old-age, survivors, and disability insurance system, to improve the Federal-State public assistance programs, and for other purposes, having considered the same report favorably thereon with amendments and recommend that the bill do pass.

\*        \*        \*        \*        \*        \*        \*

## II. PRINCIPAL PROVISIONS OF THE BILL

\*        \*        \*        \*        \*        \*        \*

### C. Old-Age, Survivors, and Disability Insurance Provisions

\*        \*        \*        \*        \*        \*        \*

#### 2. coverage changes

The following coverage provisions were included:

\*        \*        \*        \*        \*        \*        \*

**(c) *Cash tips***

The bill provides that cash tips received by a worker would be covered as self-employment income. Effective as to taxable years beginning after December 31, 1965.

\*        \*        \*        \*        \*        \*        \*

**(e) *Exemption of certain religious sects***

Members of certain religious sects who have conscientious objections to insurance (including social security) by reason of their adherence to the established tenets or teachings of such sects could be exempt from the social security tax on self-employment income upon application accompanied by a waiver of benefit rights.

**(f) *Nonprofit organizations***

Nonprofit organizations, and their employees who concur, could elect social security coverage effective retroactively for a period up to 5 years (rather than 1 year, as under present law). Also, wage credit could be given for the earnings of certain employees of nonprofit organizations who were erroneously reported for social security purposes.

---

[1] Public Law 89–97, p. 601, this Bulletin.

759

*(g) District of Columbia employees*

The bill provides for social security coverage of certain employees of the District of Columbia (primarily substitute schoolteachers).

*(h) Ministers*

Social security credit could be obtained for the earnings of certain ministers which were reported but which cannot be credited under present law.

### 3. MISCELLANEOUS

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

*(h) Tax on certain corporations*

The bill provides that when an employee works for a corporation which is a member of an affiliated group of corporations and is then transferred to another corporation which is a member of such group, the total employer social security tax payable by the two corporations for the years in which the employee is transferred will not exceed the amount that would be paid by a single corporation. (Under present law, such treatment is provided for the employee.)

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

## III. GENERAL DISCUSSION OF PROVISIONS SHOWING DIFFERENCE IN HOUSE BILL

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

### D. OLD-AGE, SURVIVORS, AND DISABILITY INSURANCE PROVISIONS

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

#### 12. COVERAGE EXTENSIONS AND MODIFICATIONS

The committee's bill would extend social security coverage to self-employment income from the practice of medicine, and to the wages of interns, cover tips as self-employment income, facilitate coverage of additional State and local government employees, provide additional coverage for employees of certain nonprofit organizations, extend coverage to temporary employees of the District of Columbia, increase the amount of gross income which farmers may use under the optional method of computing farm self-employment income for social security purposes, and permit exemption from the social security self-employment tax for persons who follow certain teachings of a religious sect of which they are members.

*(a) Coverage of self-employed physicians and interns*

Self-employed doctors of medicine are the only group of significant size whose self-employment income is excluded from coverage under social security. The committee knows of no valid reason why this single professional group should continue to be excluded. It runs counter to the general view that coverage should be as universal as possible. There are no technical or administrative barriers to the coverage of self-employed doctors of medicine.

Moreover, more than half of the physicians in private practice have obtained some social security credits through work other than their self-employment as physicians, or through their military service.

The committee's bill would cover the self-employment income of the approximately 170,000 self-employed doctors of medicine on the same basis as the self-employment income of other professional groups. The committee amended the provision in the House bill so as to make social security coverage for self-employed doctors of medicine effective for taxable years ending on or after December 31, 1965. Under the House bill, coverage could be effective for taxable years ending after December 31, 1965. This change would make it possible for most self-employed physicians to obtain social security protection 1 year earlier than under the House bill—for calendar year 1965.

Coverage would also be extended to services performed by medical and dental interns. They would be covered on the same basis as other employees working for the same employers, beginning on January 1, 1966.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

| 99TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 99–841 |
| --- | --- | --- |

# TAX REFORM ACT OF 1986

## CONFERENCE REPORT

TO ACCOMPANY

## H.R. 3838



## Volume II of 2 Volumes

SEPTEMBER 18, 1986.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

63–556 O                    WASHINGTON : 1986

091

## C. Exclusions from Income

### 1. Unemployment compensation

#### *Present Law*

Present law provides a limited exclusion from gross income for unemployment compensation benefits received under a Federal or State program (sec. 85). If the sum of the taxpayer's unemployment compensation benefits and AGI does not exceed a base amount, then the entire benefit amount is excluded from income. The base amount is $12,000 in the case of an unmarried individual; $18,000, in the case of married individuals filing a joint return; and zero, in the case of married individuals filing separate returns.

If the base amount is exceeded, then the amount of unemployment compensation benefits that is includible in gross income equals the lesser of (1) one-half of the excess of the taxpayer's combined income (modified AGI plus benefits) over the base amount, or (2) the amount of the unemployment compensation benefits.

#### *House Bill*

Under the House bill, all unemployment compensation benefits are includible in gross income, effective for amounts received after December 31, 1986, in taxable years ending after that date.

#### *Senate Amendment*

The Senate amendment is the same as the House bill.

#### *Conference Agreement*

The conference agreement follows the House bill and the Senate amendment.

### 2. Scholarships and fellowships

#### *Present Law*

*In general.*—Present law provides an exclusion from gross income for (1) amounts received as a scholarship at an educational institution (described in sec. 170(b)(1)(A)(ii)), or as a fellowship grant, and (2) incidental amounts received and spent for travel, research, clerical help, or equipment (sec. 117).

In the case of an individual who is not a candidate for a degree, the exclusion applies only if the grantor of the scholarship or fellowship is a tax-exempt organization, international organization, or government agency, and the amount of the exclusion is limited to (1) $300 per month up to a maximum lifetime exclusion of $10,800 plus (2) the amount of incidental expenses for travel, research, clerical help, or equipment.

II–14

092

II–15

An educational institution is described in section 170(b)(1)(A)(ii) if it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. This definition encompasses primary and secondary schools, colleges and universities, and technical schools, mechanical schools, and similar institutions, but not noneducational institutions, on-the-job training, correspondence schools, night schools, and so forth (Reg. secs. 1.117–3(b), 1.151–3(c)). The term candidate for a degree means (1) an undergraduate or graduate student at a college or university who is pursuing studies or conducting research to meet the requirements for an academic or professional degree and (2) a student who receives a scholarship for study at a secondary school or other educational institution (Reg. sec. 1.117–3(e)).

*Payments for services.*—In general, amounts paid to an individual to enable pursuit of studies or research are not excludable from income if they represent compensation for past, present, or future services, or if the studies or research are primarily for the benefit of the grantor or are under the direction or supervision of the grantor.[2] In the case of degree candidates, the statute specifically provides that the exclusion does not apply to any portion of an otherwise qualifying scholarship or fellowship grant that represents payment for teaching, research, or other services in the nature of part-time employment required as a condition of receiving the scholarship or fellowship grant. However, an exception permits the exclusion for payments for services if all candidates for a particular degree must perform such services.

*Federal grants.*—Under another exception, grants received under a Federal program requiring the recipient to perform future services as a Federal employee nonetheless are excludable to the extent used for tuition and required fees, books, supplies, and equipment.

### House Bill

*In general.*—The House bill limits the section 117 exclusion for scholarships or fellowship grants (1) to a scholarship or fellowship grant received by an individual who is a candidate for a degree at an educational institution (described in sec. 170(b)(1)(A)(ii)), and (2) to the amount of the scholarship or fellowship grant received by the degree candidate that is required to be used, and in fact is used, for tuition and course-required fees, books, supplies, and equipment ("course-related expenses"). Any other amount of a scholarship or fellowship grant received by a degree candidate (for example, amounts for room, board, or incidental expenses) is includible in gross income, as is the full amount of any scholarship or fellowship grant received by an individual who is not a degree candidate. The repeal of the exclusion in the case of nondegree candidates does not affect whether the section 127 exclusion may apply to employer-provided educational assistance to nondegree candidates, or whether unreimbursed educational expenses of some non-

[2] Treas. Reg. sec. 1.117–4(c)(1); *Bingler* v. *Johnson*, 394 U.S. 741 (1969) (describing scholarships and fellowships as "relatively disinterested, 'no strings' education grants, with no requirement of any substantial quid pro quo from the recipients").

II-16

degree candidates may be deductible as trade or business expenses if the requirements of section 162 are met.

*Payments for services.*—The House bill repeals the exception under present law permitting scholarship or fellowship grants received by degree candidates representing payment for services to be excludable under section 117 if all candidates for the particular degree are required to perform such services. Thus, under the House bill, the general rule applies requiring inclusion in gross income and wages of amounts received that represent payment for services required as a condition of receiving the grant. This inclusion rule applies both to such grants received in cash and to amounts (representing payment for services) by which the tuition of the person who performs services is reduced, whether or not pursuant to a tuition reduction plan described in section 117(d).

*Federal grants.*—The House bill also repeals the present-law exception permitting the exclusion of certain Federal grants under section 117 even though the recipient is required to perform future service as a Federal employee. Thus, to the extent the amount received represents payments for past, present, or future services required to be performed as a condition of the grant, then the amount received is not excludable under the House bill.

*Effective date.*—These provisions are effective for scholarships and fellowships granted after September 25, 1985.

### Senate Amendment

No provision.

### Conference Agreement

The conference agreement follows the House bill, with a modification to the definition of a qualified scholarship or fellowship grant ("qualified scholarship") and a modification to the effective date. The exclusion as allowed under the conference agreement for an otherwise qualified scholarship is not limited to a grant that by its express terms is required to be used for tuition and course-related expenses. Instead, the amount of an otherwise qualified scholarship received by a degree candidate is excludable (taking into account the amount of any other grant to the individual eligible for exclusion) up to the aggregate amount incurred by the candidate for tuition and course-related expenses during the period to which the grant applies, provided that the terms of the grant do not earmark or designate its use for other purposes (such as room or board) and do not specify that the grant cannot be used for tuition or course-related expenses. The conference agreement clarifies that in the case of individuals other than students attending a primary or secondary school or pursuing a degree at a college or university, the term candidate for a degree means a student (whether full-time or part-time) who receives a scholarship for study at an educational institution (described in sec. 170(b)(1)(A)(ii)) that (1) provides an educational program that is acceptable for full credit toward a bachelor's or higher degree, or offers a program of training to prepare students for gainful employment in a recognized occupation, und (2) is authorized under Federal or State law to provide such a

ness expenses

he exception
ip grants re-
or services to
he tuition
s, under the
sion in gross
payment for
t. This inclu-
cash and to
h the tuition
r or not pur-
17(d).

esent-law ex-
grants under
rform future
e amount re-
e services re-
t, then the

scholarships

th a modifi-
r fellowship
he effective
reement for
rant that by
course-relat-
fied scholar-
ing into ac-
eligible for
e candidate
od to which
do not ear-
as room or
l for tuition
larifies that
; a primary
university,
er full-time
educational
rovides an
t toward a

program and is accredited by a nationally recognized accreditation agency.

The amendments made by the conference agreement are effective for taxable years beginning on or after January 1, 1987, except that present law continues to apply to scholarships and fellowships granted before August 17, 1986. Under this rule, in the case of a scholarship or fellowship granted after August 16, 1986 and before January 1, 1987, any amount of such scholarship or fellowship grant that is received prior to January 1, 1987 and is attributable to expenditures incurred prior to January 1, 1987 (such as tuition, room, and board attributable to the period prior to January 1, 1987) is eligible for the present-law exclusion under section 117.

The conference agreement also clarifies that only for purposes of the rule that a child eligible to be claimed as a dependent on the return of his or her parents may use the standard deduction only to offset the greater of $500 or earned income (see I.A.3., above), any amount of a noncompensatory scholarship or fellowship grant that is includible in gross income as a result of these amendments to section 117 (including the repeal of any section 117 exclusion for nondegree candidates) constitutes earned income. (Amounts received as payment for teaching or other services also constitute earned income.)

### 3. Prizes and awards

#### Present Law

*Scientific, etc. achievement awards.*—Prizes and awards received by the taxpayer, other than scholarships and fellowship grants excludable under section 117, generally are includible in gross income (sec. 74(a)). However, a limited exclusion applies for prizes and awards (other than scholarships or fellowship grants) received for achievements in fields such as the sciences, charity, or the arts, but only if the recipient (1) has not applied specifically for the prize or award (e.g., by entering a contest), and (2) is not required to render services as a condition of receiving it (sec. 74(b)).

*Employee awards.*—Section 61 provides that "gross income means all income from whatever source derived," including compensation for services whether in the form of cash, fringe benefits, or similar items. However, an item transferred from an employer to an employee, other than a prize or award that is includible under section 74, may be excludable from gross income if it qualifies as a gift under section 102.

The U.S. Supreme Court, in a case involving payments made "in a context with business overtones," has defined excludable gifts as payments made out of "detached and disinterested generosity" and not in return for past or future services or from motives of anticipated benefit (*Comm'r* v. *Duberstein*, 363 U.S. 278 (1960)). Under this standard, the Court said, transfers made in connection with employment constitute gifts only in the "extraordinary" instance.

If an award to an employee constitutes a gift excludable from income under section 102, the employer's deduction is limited pursuant to section 274(b). That provision generally disallows business deductions for gifts to the extent that the total cost of all gifts of cash, tangible personal property, and other items to the same indi-

[JOINT COMMITTEE PRINT]

# GENERAL EXPLANATION
## OF THE
## TAX REFORM ACT OF 1986

### (H.R. 3838, 99TH CONGRESS;
### PUBLIC LAW 99–514)

———————

PREPARED BY THE STAFF

OF THE

## JOINT COMMITTEE ON TAXATION



MAY 4, 1987

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1987

72-226

JCS-10-87

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, DC 20402

38

The question of whether it is unreasonable or administratively impracticable (within the meaning of sec. 132(e)(1)) to account for an item may be affected by the existence of a program whereby the taxpayer regularly accounts for other like items and complies with the statutory reporting requirements. Moreover, in some cases the fact that a particular employee receives items having the maximum fair market value consistent, respectively, with the employee achievement award and the de minimis fringe benefit exclusions may suggest that the employer's practice is not de minimis. This is particularly so when employee awards and other items, purportedly within the scope of section 132(e)(1), are provided to the same individual in the same year.

The Congress intended that the exclusion under section 132(e)(1) for a de minimis fringe benefit is to apply, under appropriate circumstances, to traditional retirement gifts presented to an employee on his or her retirement after completing lengthy service, even if the section 74(c) exclusion for length of service awards does not apply because the employee received such an award within the prior four years. In considering whether an item presented upon retirement so qualifies, the duration of the employee's tenure with the employer generally has relevance. For example, in the case of an employee who has worked for an employer for 25 years, a retirement gift of a gold watch may qualify for exclusion as a de minimis fringe benefit even though gold watches given throughout the period of employment would not so qualify for that exclusion.

### Effective Date

The provisions relating to the tax treatment of prizes and awards are effective for prizes and awards granted after December 31, 1986.

### Revenue Effect

The provisions relating to the tax treatment of prizes and awards are estimated to decrease fiscal year budget receipts by $21 million in 1987, $59 million in 1988, $63 million in 1989, $66 million in 1990, and $69 million in 1991.

## 3. Scholarships and fellowships (sec. 123 of the Act and sec. 117 of the Code) [19]

### Prior Law

#### In general

Prior law generally provided an unlimited exclusion from gross income for (1) amounts received by a degree candidate as a scholarship at an educational institution (described in sec. 170(b)(1)(A)(ii)), or as a fellowship grant, and (2) incidental amounts received by such individual and spent for travel, research, clerical help, or equipment (sec. 117). The term scholarship meant an amount paid or allowed to, or for the benefit of, a student to aid in pursuing

---

[19] For legislative background of the provision, see: H.R. 3838, as reported by the House Committee on Ways and Means on December 7, 1985, sec. 123; H.Rep. 99-426, pp. 99-103; and H.Rep. 99-841, Vol. II (September 18, 1986), pp. 14-17 (Conference Report).

studies; similarly, a fellowship grant was defined as an amount paid or allowed to, or for the benefit of, an individual to aid in pursuing studies or research (Treas. Reg. sec. 1.117-3).

In the case of an individual who was not a candidate for a degree, the prior-law exclusion was available only if the grantor of the scholarship or fellowship was an educational institution or other tax-exempt organization described in section 501(c)(3), a foreign government, certain international organizations, or a Federal, State, or local government agency. The prior-law exclusion for a nondegree candidate in any one year could not exceed $300 times the number of months in the year for which the recipient received scholarship or fellowship grant amounts, and no further exclusion was allowed after the nondegree candidate had claimed exclusions for a total of 36 months (i.e., a maximum lifetime exclusion of $10,800). However, this dollar limitation did not apply to that portion of the scholarship or fellowship received by the nondegree candidate for travel, research, clerical help, or equipment.

Under prior and present law, an educational institution is described in section 170(b)(1)(A)(ii) if it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on. This definition encompasses primary and secondary schools, colleges and universities, and technical schools, mechanical schools, and similar institutions, but does not include noneducational institutions, on-the-job training, correspondence schools, and so forth (Treas. Reg. secs. 1.117-3(b); 1.151-3(c)). Under prior law, the term candidate for a degree was defined as (1) an undergraduate or graduate student at a college or university who was pursuing studies or conducting research to meet the requirements for an academic or professional degree and (2) a student who received a scholarship for study at a secondary school or other educational institution (Treas. Reg. sec. 1.117-3(e)).

### Payments for services

Under prior and present law, amounts paid to an individual to enable him or her to pursue studies or research are not excludable from income if they represent compensation for past, present, or future services, or if the studies or research are primarily for the benefit of the grantor or are under the direction or supervision of the grantor (Treas. Reg. sec. 1.117-4(c)). These regulations have been upheld by the U.S. Supreme Court, which described excludable grants as "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients" (*Bingler* v. *Johnson*, 394 U.S. 741 (1969)).

In the case of degree candidates, prior law also specifically provided that the exclusion did not apply to any portion of an otherwise qualifying scholarship or fellowship grant that represented payment for teaching, research, or other services in the nature of part-time employment required as a condition of receiving the scholarship or fellowship grant (prior-law sec. 117(b)(1)). However, an exception under prior law provided that such services would not be treated as employment for this purpose if all degree candidates had to perform such services; in that case, the recipient could ex-

40

clude the portion of the scholarship or fellowship grant representing compensation for such services.

Under another prior-law exception, amounts received by an individual as a grant under a Federal program that would be excludable from gross income as a scholarship or fellowship grant, but for the fact that the recipient must perform future services as a Federal employee, were not includible in gross income if the individual established that the amount was used for qualified tuition and related expenses (prior-law sec. 117(c)).

### *Tuition reduction plans*

Section 117(d) provides that a reduction in tuition provided to an employee of an educational institution is excluded from gross income if (1) the tuition is for education below the graduate level provided by the employer or by another educational institution; (2) the education is provided to a current or retired employee, a spouse or dependent child of either, or to a widow(er) or dependent children of a deceased employee; and (3) certain nondiscrimination requirements are met. P.L. 98-611 provided that, for taxable years beginning after December 31, 1983 and ending on or before December 31, 1985, the section 117(d) exclusion also applied to qualified tuition reduction for graduate-level education provided by an educational institution to a graduate student who was employed by that institution in teaching or research activities (Code sec. 127(c)(8)).

### *Reasons for Change*

By extending the exclusion for scholarships or fellowship grants to cover amounts used by degree candidates for regular living expenses (such as meals and lodging), prior law provided a tax benefit not directly related to educational activities. By contrast, students who are not scholarship recipients must pay for such expenses out of after-tax dollars, just as individuals who are not students must pay for their food and housing costs out of wages or other earnings that are includible in income. The Congress concluded that the exclusion for scholarships should be targeted specifically for the purpose of educational benefits, and should not encompass other items that would otherwise constitute nondeductible personal expenses. The Congress also determined that, in the case of grants to nondegree candidates for travel, research, etc., that would be deductible as ordinary and necessary business expenses, an exclusion for such expenses is not needed, and that an exclusion is not appropriate if the expenses would not be deductible.

In addition, under the Act, the Congress has increased the tax threshold, i.e., the income level at which individuals become subject to tax. Thus, the receipt of a nonexcludable scholarship amount by a student without other significant income will not result in tax liability so long as the individual's total income does not exceed the personal exemption (if available) and either the increased standard deduction under the Act or the taxpayer's itemized deductions. Under the Act, any nonexcludable amount of a scholarship or fellowship grant is treated as earned income, so that such amount can be offset by the recipient's standard deduction

41

nt represent-
d by an indi-
ld be exclud-
grant, but for
es as a Feder-
he individual
uition and re-

rovided to an
l from gross
raduate level
nstitution; (2)
oyee, a spouse
pendent chil-
imination re-
able years be-
ore December
qualified tui-
by an educa-
loyed by that
127(c)(8)).

owship grants
ilar living ex-
l a tax benefit
rast, students
expenses out
students must
ither earnings
d that the ex-
y for the pur-
ss other items
nal expenses.
nts to nonde-
be deductible
usion for such
appropriate if

eased the tax
s become sub-
e scholarship
come will not
l income does
either the in-
xpayer's item-
amount of a
ncome, so that
ard deduction

even if the recipient can be claimed as a dependent on his or her parents' return.

Under prior law, controversies arose between taxpayers and the Internal Revenue Service over whether a particular stipend made in an educational setting constituted a scholarship or compensation for services. In particular, numerous court cases have involved resident physicians and graduate teaching fellows who have sought—often notwithstanding substantial case authority to the contrary—to exclude from income payments received for caring for hospitalized patients, for teaching undergraduate college students, or for doing research which inures to the benefit of the grantor.[20] The limitation on the section 117 exclusion made by the Act, and the repeal of the special rule relating to degree candidates who must perform services as a condition of receiving a degree, should lessen these problems of complexity, uncertainty of tax treatment, and controversy.

The Congress concluded that the section 117 exclusion should not apply to amounts representing payment for teaching, research, or other services by a student, whether or not required as a condition for receiving a scholarship or tuition reduction, and that this result should apply whether the compensation takes the form of cash, which the student can use to pay tuition, or of a tuition reduction, pursuant to which there is no exchange of cash for payment of tuition. Thus, where cash stipends received by a student who performs services would not be excludable under the Act as a scholarship even if the stipend is used to pay tuition, the Congress believed that the exclusion should not become available merely because the compensation takes the form of a tuition reduction otherwise qualifying under section 117(d). The Congress concluded, consistently with the overall objectives of the Act, that principles of fairness require that all compensation should be given the same tax treatment; that is, some individuals (e.g., students who perform teaching services for universities) should not receive more favorable tax treatment of their compensation than all other individuals who earn wages.

The Congress concluded that it was inappropriate under prior law for recipients of certain Federal grants who were required to perform future services as Federal employees to obtain special tax treatment which was not available to recipients of other types of grants who were required to perform services as a condition of receiving the grants. Thus, under the Act, the general exclusion rule and the limitations apply equally to all grant recipients.

---

[20] As the U.S. Tax Court stated in one case: "Interns and residents have been flooding the courts for years seeking to have their remuneration declared a 'fellowship grant' and hence partially excludable from income. They have advanced such illuminating arguments as they could have earned more elsewhere and they were enjoying a learning experience so therefore what they did receive must have been a grant. They have been almost universally unsuccessful and deservedly so. Why the amounts received by a young doctor just out of school should be treated differently from the amounts received by a young lawyer, engineer, or business school graduate has never been made clear." (*Zonkerman v. Comm'r*, 36 T.C.M. 6, 9 (1977), aff'd (4th Cir. 1978))

42

### Explanation of Provisions

#### In general

*Degree candidates.*—In the case of a scholarship or fellowship grant received by a degree candidate, an exclusion under section 117 is available only to the extent the individual establishes that, in accordance with the conditions of the grant, the grant was used for (1) tuition and fees required for enrollment or attendance of the student at an educational institution (within the meaning of sec. 170(b)(1)(A)(ii)), and (2) fees, books, supplies, and equipment required for courses of instruction at the educational institution ("course-related expenses").[31] This rule applies to all types of scholarship or fellowship grants, whether funded by a governmental agency, college or university, charitable organization, business, or other source, and whether designated as a scholarship or by some other name (e.g., "allowance").

The exclusion available under the Act for degree candidates is not limited to a scholarship or fellowship grant that by its express terms is required to be used for tuition or course-related expenses. Also, there is no requirement that the student be able to trace the dollars paid for tuition or course-related expenses to the same dollars that previously had been deposited in his or her checking account, for example, from a scholarship grant check. Instead, the amount of an otherwise qualified grant awarded to a degree candidate is excludable (after taking into account the amount of any other grant or grants awarded to the individual that also are eligible for exclusion) up to the aggregate amount incurred by the candidate for tuition and course-related expenses during the period to which the grant applies; any excess amount of the grant is includible in income. No amount of a grant is excludable if the terms of the grant earmark or designate its use for purposes other than tuition or course-related expenses (such as for room or board, or "meal allowances") or specify that the grant cannot be used for tuition or course-related expenses, even if the amount of such grant is less than the amount payable by the student for tuition or course-related expenses.

For purposes of the section 117 exclusion as modified by the Act, the term candidate for a degree means (1) a student who receives a scholarship for study at a primary or secondary school; (2) an undergraduate or graduate student at a college or university who is pursuing studies or conducting research to meet the requirements for an academic or professional degree, and (3) a student (whether full-time or part-time) who receives a scholarship for study at an educational institution (described in sec. 170(b)(1)(A)(ii)) that (1) provides an educational program that is acceptable for full credit toward a bachelor's or higher degree, or offers a program of train-

---

[31] Two Code provisions applicable to private foundations contain references to scholarship or fellowship grants "subject to the provisions of section 117(a)" (secs. 4941(d)(2)(G)(ii); 4945(g)(1)). The amendments made by the Act to the section 117 exclusion are not intended to treat scholarship or fellowship grants by a private foundation that would not have triggered section 4941 or 4945 excise taxes under prior law as self-dealing acts or taxable expenditures merely because such grants exceed the amount excludable by degree candidates under section 117 as amended by the Act or are made to nondegree candidates (up to the amount excludable under prior law). A technical amendment may be needed so that the statute reflects this intent.

43

or fellowship
under section
itablishes that,
grant was used
endance of the
leaning of sec.
equipment re-
nal institution
types of schol-
governmental
n, business, or
hip or by some

e candidates is
 by its express
lated expenses.
le to trace the
) the same dol-
er checking ac-
k. Instead, the
a degree candi-
amount of any
t also are eligi-
red by the can-
g the period to
grant is includ-
if the terms of
other than tui-
n or board, or
be used for tui-
of such grant is
ition or course-

fied by the Act,
 who receives a
hool; (2) an un-
iversity who is
e requirements
student (whether
for study at an
(ii)) that (1) pro-
for full credit
rogram of train-

ences to scholarship or
1(d)(2)(G)(ii); 4945(g)(1)).
tended to treat scholar-
iggered section 4941 or
itures included because
ection 117 as amended
idable under prior law).
itent.

ing to prepare students for gainful employment in a recognized oc-
cupation, and (2) is authorized under Federal or State law to pro-
vide such a program and is accredited by a nationally recognized
accreditation agency.

*Nondegree candidates.*—The Act repeals the limited prior-law ex-
clusion under section 117 for grants received by nondegree candi-
dates. Thus, no amount of a scholarship or fellowship grant re-
ceived by an individual who is not a degree candidate is excludable
under section 117, whether or not such amount is used for or is less
than the recipient's tuition and course-related expenses. This provi-
sion does not affect whether the exclusion under section 127 for
certain educational assistance benefits may apply to employer-pro-
vided educational assistance to nondegree candidates if the require-
ments of that section are met (see sec. 1162 of the Act, extending
the exclusion under Code sec. 127), or whether unreimbursed edu-
cational expenses of some nondegree candidates may be allowable
to itemizers as trade or business expenses if the requirements of
section 162 are met.

### Performance of services

The Act repeals the special rule of prior law under which schol-
arship or fellowship grants received by degree candidates that rep-
resented payment for services nonetheless were deemed excludable
from income provided that all candidates for the particular degree
were required to perform such services. The Act expressly includes
in gross income any portion of amounts received as a scholarship
or fellowship grant that represent payment for teaching, research,
or other services required as a condition of receiving the grant
(Code sec. 117(c)).

To prevent circumvention of the rule set forth in section 117(c),
that rule is intended to apply not only to cash amounts received,
but also to amounts (representing payment for services) by which
the tuition of the person who performs services is reduced, whether
or not pursuant to a tuition reduction plan described in Code sec-
tion 117(d). The Act therefore explicitly provides that neither the
section 117(a) exclusion nor the section 117(d) exclusion applies to
any portion of the amount received that represents payment for
teaching, research, or other services by the student required as a
condition of receiving the scholarship or tuition reduction.    If an
amount representing reasonable compensation (whether paid in
cash or as tuition reduction) for services performed by an employee
is included in the employee's gross income and wages, then any ad-
ditional amount of scholarship award or tuition reduction remains
eligible for the section 117 exclusion as modified by the Act.

As noted, employees who perform required services for which
they include in income reasonable compensation continue to be eli-
gible to exclude amounts of tuition reduction. In addition, section
1162 of the Act extends the availability of the tuition reduction ex-
clusion for certain graduate students an additional two taxable
years beyond its previously scheduled expiration for taxable years
beginning after December 31, 1985, as part of the extension of Code
section 127 under the Act.

The Act also repeals the special rule under prior law that per-
mitted the exclusion of certain Federal grants as scholarships or

44

fellowship grants, even though the recipient was required to perform future services as a Federal employee. Thus, any portion of a Federal scholarship or fellowship grant that represents payment for past, present, or future services required to be performed as a condition of the grant is includible in gross income. As a result, services performed as a Federal employee are not entitled to more favorable tax treatment than services performed for other employers.

### Treatment of nonexcludable amounts

Under the Act, a child eligible to be claimed as a dependent on the return of his or her parents may use the standard deduction only to offset the greater of $500 or earned income (see I.A.3., above). Only for purposes of that rule, any amount of a noncompensatory scholarship or fellowship grant that is includible in gross income as a result of the amendments to section 117 made by the Act (including the repeal of any sec. 117 exclusion for nondegree candidates) constitutes earned income. [22]

### Compliance with new rules

Under the Act, the IRS is not required to exercise its authority to require information reporting by grantors of scholarship or fellowship grants to the grant recipients or the IRS, even though some amounts of such grants may be includible in gross income under section 117(a) as amended by the Act. (Of course, any amount of a grant that constitutes payment for services described in sec. 117(c) is subject to income tax withholding, employment taxes, and reporting requirements applicable to other forms of compensation paid by the payor organization.) The Congress anticipated that the IRS will carefully monitor the extent of compliance by grant recipients with the new rules and will provide for appropriate information reporting if necessary to accomplish compliance.

### Effective Date

The modifications made by the provision are effective for taxable years beginning on or after January 1, 1987, except that prior law continues to apply to any scholarship or fellowship granted before August 17, 1986. [23] Under this rule, in the case of a scholarship or fellowship granted after August 16, 1986 and before January 1, 1987, any amount of such scholarship or fellowship grant that is received prior to January 1, 1987 and that is attributable to expenditures incurred prior to January 1, 1987 is subject to the provi-

---

[22] Amounts received as payment for teaching or other services also constitute earned income.
[23] For this purpose, a scholarship or fellowship is to be treated as granted before August 17, 1986 to the extent that the grantor made a firm commitment, in the notice of award made before that date, to provide the recipient with a fixed cash amount or a readily determinable amount. If the scholarship or fellowship is granted for a period exceeding one academic period (e.g., if the grant is made for three semesters), amounts received in subsequent academic periods are to be treated as granted before August 17, 1986 only if (1) the amount awarded for the first academic period is described in the original notice of award as a fixed cash amount or readily determinable amount, (2) the original notice of award contains a firm commitment by the grantor to provide the scholarship or fellowship amount for more than one academic period, and (3) the recipient is not required to reapply to the grantor in order to receive the scholarship or fellowship grant in future academic periods. A requirement that the recipient must file periodic financial statements to show continuing financial need does not constitute a requirement to reapply for the grant.

45

uired to per-
portion of a
nts payment
rformed as a
As a result,
itled to more
ther employ-

lependent on
rd deduction
e (see I.A.3.,
a noncompen-
lible in gross
made by the
or nondegree

its authority
larship or fel-
even though
gross income
course, any
ices described
employment
forms of com-
ress anticipat-
compliance by
for appropri-
compliance.

ive for taxable
that prior law
granted before
scholarship or
re January 1,
grant that is
ibutable to ex-
ct to the provi-

titute earned income.
ed before August 17,
otice of award made
readily determinable
one academic period
ent academic periods
awarded for the first
sh amount or readily
nitment by the grant-
idemic period, and (3)
ve the scholarship or
ent must file periodic
a requirement to re-

sions of section 117 as in effect prior to the amendments made by
the Act.

### Revenue Effect

The provision is estimated to increase fiscal year budget receipts
by $8 million in 1987, $64 million in 1988, $130 million in 1989,
$160 million in 1990, and $164 million in 1991.

EXHIBIT 10

# BRIGHAM AND WOMEN'S HOSPITAL

ABO
BRIGHAM AND

For Patients & Visitors    Clinical Services    Health Information    Research Information    Fo Pro

home    find a BWH doctor    request an appointment    about BWH    job listings    conta

**About Brigham and Women's**

Mission, Vision and Values

Milestones in BWH History

Brigham and Women's/Faulkner

Frequently Called Phone Numbers

About our Website

Offices and Services

Connors Center for Women's Health

Deland Fellowship

Friends of BWH

Human Resources

Make a Donation

Press Room

Security Office

Volunteer Opportunities

Women, Family & Community Programs

# Mission, Vision, and Values

**Mission:**

Brigham and Women's Hospital is dedicated to serving the needs of the community. It is committed to providing the highest quality health care to patients and their families, to expanding the boundaries of medicine through research, and to educating the next generation of health care professionals.

**Vision:**

Brigham and Women's/Faulkner Hospitals will be the academic and community teaching hospitals and physicians of choice with the most distinguished caliber of physician and professional healthcare staff. We will create the highest quality of care through our commitment to patients and their families, the innovation inherent in our academic programs, and the strength of partnerships with members of Partners HealthCare System, Dana Farber Cancer Institute, Harvard University, and our local community, as well as our unique relationships with care provider groups such as Harvard Vanguard Medical Associates.

**Values:**

- **Quality Patient Care:** Delivering quality patient care is the center of everything we do.
- **Teaching Excellence:** We seek to uphold the highest standards in training health care professionals.
- **Research Leadership:** We continuously seek new ways to demonstrate our leadership role in research.
- **Customer Focus:** Our focus is to serve our customers.
- **Respect for the Individual:** We recognize and value the contributions of every individual.
- **Teamwork:** We work toward a unified approach to developing health care solutions.
- **Embracing Change:** Embracing change will help us to be successful.
- **Operational Efficiency:** We strive for efficient and effective delivery of services.

This page was last modified on 9/21/2004