## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

          Plaintiff,

     v.                                                  Case No.  05-11576-DPW

PARTNERS HEALTHCARE                        **ORAL ARGUMENT**
SYSTEM, INC.,                                        **REQUESTED**

          Defendant.

_____/

## DEFENDANT PARTNERS HEALTHCARE SYSTEM, INC.'S
## OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BENJAMIN A. GOLDBERGER (No. 654357)
JOSEPH H. SELBY (No. 643275, *admitted pro hac vice*)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Telephone: (617) 535-4000
Facsimile:  (617) 535-3800
E-Mail: bgoldberger@mwe.com
       jselby@mwe.com

CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*
SARAH E. HANCUR (No. 652607, *admitted pro hac vice*)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005
Telephone: (202) 756-8000
Facsimile:  (202) 756-8087
E-Mail: ckliefoth@mwe.com
       shancur@mwe.com

*Attorneys for Partners Healthcare System, Inc.*

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ................................................................................1

STATEMENT OF FACTS.............................................................................................3

LEGAL STANDARD....................................................................................................3

ARGUMENT ................................................................................................................4

I.  Plaintiff's First Argument Is Premised on a Legal Position Partners
    Does Not Assert, Therefore, Plaintiff Fails to Present an Issue
    Capable of Summary Disposition Concerning Whether Partners'
    Resident Stipends Are FICA Wages .................................................................4

II. Even Assuming the Resident Stipends Qualify as Paid "Wages"
    They Are Exempt from the FICA Tax Under the Student Exception ..................8

    A.  The Language of the Student Exception Is Unambiguous.......................8

    B.  Because the Statutory Language of the Student Exception
        Is Unambiguous, It Is Neither Necessary Nor Appropriate
        to Look to Legislative History for Interpretation ....................................9

    C.  Administrative Guidance Applies the "Facts and
        Circumstance" Test to Determine Student Exception
        Eligibility............................................................................................11

    D.  The Required "Facts and Circumstance" Analysis Reveals
        the Educational Nature of Partners' Residency Programs
        and the Applicability of the Student Exception to Its
        Residents and the Wage Exception to the Stipend Payments .................12

        1.  Partners' Modern Residency Program Is
            Fundamentally Different than Residencies of the
            1960s and 1970s.........................................................................12

        2.  The Focus of Partners' Residency Program Is on
            Education ...................................................................................13

3.  For All Practical Purposes, Medical School
    Graduates Cannot Practice Medicine without
    Completing a Residency .................................................................. 14

4.  Residency Programs Must Follow Strict
    Educational Standards to Remain Accredited and to
    Receive Medicare Funding .............................................................. 14

E.  In *Minnesota v. Apfel, United States v. Mayo* and
    *Minnesota v. Chater,* the Courts Found Residents to Be
    Eligible to Claim the Student Exception .................................................... 15

F.  Assuming a Resort to Legislative History Is Permissible,
    Plaintiff's Motion Still Fails Because the Legislative
    History Proves That Residents Are Eligible, As a Matter of
    Law, for the Student Exception ................................................................... 17

    1.  The History of the Employment Exceptions to the
        FICA Tax Shows the Student Exception and Intern
        Exception to Be Separate and Independent Bases
        for FICA Tax Exemption .................................................................. 18

        a.  The 1939 Amendments ............................................................ 18

        b.  The 1965 Amendments ............................................................ 20

    2.  Partners' Interpretation of the Student Exception
        Does Not Render the Original Intern Exception
        Superfluous ...................................................................................... 21

G.  *United States v. Mount Sinai* was Decided Incorrectly and
    Has No Precedential Value ......................................................................... 23

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………………………3

*Barnhill v. Johnson*, 503 U.S. 393 (1992)……………………………………………………9

*Blum v. Stenson*, 465 U.S. 886 (1984)………………………………………………………9

*CSX Transp. v. Recovery Express,* No. 04-12293-1064
 2006 U.S. Dist. LEXIS 3770 (Dist. Mass. Feb. 1, 2006)……………………………………3

*Minnesota v. Apfel*, 151 F.3d 742 (8th Cir. 1998)………………………………15, 16, 17, 23

*Minnesota v. Chater*, No. 4-96-756, 1997 WL 33352908
(D. Minn. May 21, 1997)……………………………………………………15, 16, 22, 23

*Mizell v. United States*, 663 F.2d 772 (8th Cir. 1981)……………………………………6

*Mullane v. Chambers*, 333 F.3d 322 (1st Cir. 2003)……………………………………9

*O'Connor v. Steeves,* 994 F.2d 905 (1st Cir. 1993)………………………………………3

*Proskey v. Comm'r*, 51 T.C. 918 (1969)…………………………………………………6

*Ratzlaf v. United States*, 510 U.S. 135 (1994)…………………………………………9

*St. Luke's Hosp. Ass'n v. United States,*
333 F.2d 157 (6th Cir. 1964)………………………………………………19, 20, 22

*Toibb v. Radloff*, 501 U.S. 157 (1991)……………………………………………………9

*Transco v. Comm'r*, 949 F.2d 837 (5th Cir. 1992)………………………………………12

*United States v. LaBonte*, 520 U.S. 751 (1997)…………………………………………10

*United States v. Mayo Found. for med. Educ. and Research,*
282 F. Supp. 2d 997 (D. Minn. 2003)……………………………………15, 16, 17, 23, 24

*United States v. Mt. Sinai Med. Ctr.*, 353 F. Supp. 2d 1217 (S.D. Fla. 2005)………………23, 24

*United States v. One Parcel of Real Prop.,* 960 F.2d 200 (1st Cir. 1992)............................3

**Statutes**

26 U.S.C. § 3121(a) ..........................................................................................................passim

26 U.S.C. § 3121(b) ..........................................................................................................passim

26 U.S.C. § 3121(b)(7) ...........................................................................................................21

26 U.S.C. § 3121(b)(10) ...................................................................................................passim

26 U.S.C. § 3121(b)(13) ...................................................................................................passim

26 U.S.C. § 3121(b)(19) ..........................................................................................................21

26 U.S.C. § 3121(d) .................................................................................................................18

42 U.S.C. § 1395 ww(h).............................................................................................................12

53 Stat. 1385, § 1426(b)(10) of the Internal Revenue Code of 1939................................18

53 Stat. 1385, § 1426(b)(13) of the Internal Revenue Code of 1939................................19

Social Security Amendments of 1950, Pub. L. No. 87-734, § 104(a),
64 Stat. 477, 497, 531 (1950)............................................................................................19, 24

IRC § 117................................................................................................................................4

IRC § 117(a)...................................................................................................................1, 4, 5, 7

IRC § 117(c)..............................................................................................................................8

IRC § 3121(a)(20)..................................................................................................................1, 4

IRC § 3121(d)(3).....................................................................................................................10

**Other Authorities**

20 C.F.R. § 404.1028(c).........................................................................................................11

26 C.F.R. § 31.3121(b)(10)-2(b) and (c) ....................................................................8, 19, 24

Chief Counsel Advice (CCA) 200029030 (July 21, 2000)..............................................11

Chief Counsel Advice (CCA) 200212029 (March 22, 2002)............................................11

H.R. Rep. 89-213, 89th Cong., 1st Sess. 216, 1965-2 C.B. 747...........................11, 20, 22

S. Rep. No. 89-404...............................................................................................11

Rev. Rul. 56-87, 1956-1 C.B. 463...........................................................................22

Rev. Rul. 60-378...................................................................................................5

Rev. Rul. 68-38.....................................................................................................7

Rev. Rul. 71-378................................................................................................5, 6

Rev. Rul. 72-340...................................................................................................7

Treas. Reg. § 1.117-3........................................................................................4, 6

Treas. Reg. § 1.117-4(c)(2)....................................................................................6

Treas. Reg. § 31.3121(b)-4(a) ....................................................................21, 22, 24

Treas. Reg. § 31.3121(b)(10)-2(c).........................................................................11

Proposed Treas. Reg. § 117-6(d)(3).........................................................................8

**Rules**

FED. R. CIV. P. 56(c)..............................................................................................3

## SUMMARY OF THE ARGUMENT

Defendant Partners Healthcare System, Inc. ("Partners") hereby opposes the January 19, 2006 Motion for Summary Judgment of Plaintiff United States of America. Neither of the two "Issues Presented" in Plaintiff's Brief concerning whether Partners' residents should be subject to the Federal Insurance Contributions Act ("FICA") can be resolved in Plaintiff's favor. Rather, the material facts essential to this Court's summary disposition of the case favor Partners and confirm that the stipends paid to Partners' residents are not taxable as FICA wages.

First, Plaintiff wrongly contends that Partners is asserting that the stipends paid to its residents are excludable from "gross income" under Section 117(a) of the Internal Revenue Code of 1986 ("IRC") and, thereby, are also excludable "wages" under IRC Section 3121(a)(20). In fact, Partners has not raised a question as to whether its stipends are properly included as gross income. Instead, Partners contends that the stipends are FICA exempt scholarships or fellowships for training ("scholarships"). The stipends are not FICA wages under IRC Section 3121(a) because training stipends are not "remuneration for services rendered." Plaintiff's Motion wholly fails to reach this legal argument. Moreover, a determination of whether a payment is a scholarship or fellowship is inherently a factual matter. Plaintiff's Statement of Undisputed Facts – to the extent it can be deemed relevant – includes as "undisputed" facts that are disputed and omits other undisputed facts that support a finding that the medical stipends are, as Partners contends, not FICA wages under IRC Section 3121(a). Accordingly, no ground exists for awarding Plaintiff judgment under its first Issue Presented.

Second, even assuming that Partners' resident stipends are deemed remuneration for services rendered and hence "wages" for FICA purposes, Plaintiff wholly fails to disprove

Partners' eligibility for the so-called "Student Exception" to FICA under IRC Section 3121(b)(10). Plaintiff's chief argument – that Congress' decision to eliminate a specific FICA tax exception for interns in IRC Section 3121(b)(13) necessarily resulted in the elimination of all other FICA tax exceptions available for residents, including under IRC Section 3121(b)(10) – is not supported by the plain language of the statute itself, its implementing regulations, or its legislative history. Rather, the express statutory text requires a factual, case-by-case analysis to determine whether Partners' residents qualify for the Student Exception. Plaintiff rashly urges this Court to depart from this accepted case-specific approach and advocates instead that the Court create a bright-line rule that would unwarrantedly and improperly disallow FICA tax exceptions for all residents enrolled in a training program.

Moreover, Plaintiff insufficiently supports its argument against the Student Exception in Partners' case on selections from the legislative history of the Social Security Act and the Student Exception to the FICA tax. Because the statutory language of the Student Exception is unambiguous on its face, such reliance on legislative history is improper and should be rejected. But even if resort to the legislative history were appropriate, the relevant legislative history (uncited by Plaintiff) shows that residents are eligible, as a matter of law, to seek exemption from FICA taxation pursuant to the Student Exception. Treasury Department guidance and regulations reflect this interpretation by requiring a case-by-case analysis to determine if a resident qualifies for the Student Exception. Other courts have so held and rejected Plaintiff's contention that, as a matter of law, residents can never be exempt as students from FICA taxation. Plainly then, Plaintiff fails to sustain its burden on summary judgment with regard to disproving Partners' eligibility for the Student Exception as raised in its second Issue Presented.

- 2 -

In sum, Plaintiff fails to disprove the existence of all genuine issues of material fact in dispute concerning whether stipends paid by Partners to its residents should be subject to FICA taxation. Accordingly, Partners respectfully requests that this Court deny Plaintiff's Motion.

## STATEMENT OF FACTS

Please refer to Partners' Response to Plaintiff's Statement of Undisputed Material Facts, which Partners incorporates by reference and provide pursuant to Local Rule 56.1 as its counterstatement of material facts in dispute.[1]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is only appropriate if the moving party demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law. *CSX Transp. v. Recovery Express*, No. 04-12293-1064, 2006 U.S. Dist. LEXIS 3770, at *8 (D. Mass. Feb. 1, 2006). A genuine issue exists where the evidence about the material fact "is such that a reasonable jury could resolve the point in favor of the nonmoving party." *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992). Significantly, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). All reasonable inferences and ambiguities must be drawn in the nonmoving party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

---

[1] Partners' Response to Plaintiff's Statement of Undisputed Material Facts is filed concurrently herewith and contains both Partners' Response to Plaintiff's Statement of Undisputed Material Facts and also Partner's Additional Material Facts (hereinafter referred to as "Partners' Statement of Undisputed Material Facts" or "SUMF").

# ARGUMENT

I. **Plaintiff's First Argument Is Premised on a Legal Position Partners Does Not Assert, Therefore, Plaintiff Fails to Present an Issue Capable of Summary Disposition Concerning Whether Partners' Resident Stipends Are FICA Wages.**

Plaintiff mistakenly argues that it is Partners' position that the stipends paid to both surgical and medical residents ("residents") receiving a graduate medical education are excludable from <u>gross income</u> under IRC Section 117(a) and are, therefore, also excludable from "wages" taxable under IRC Section 3121(a)(20). Because Partners does not assert that position, Plaintiff's first Issue Presented and, concomitantly, its first argument section, require no consideration or adjudication by this Court.

What Partners does assert is that the undisputed facts and circumstances prove the stipends it pays to residents are in the nature of "scholarships or fellowships" as defined in the regulations under IRC Section 117,[2] which are not wages subject to FICA taxes under the operative, or flush, language of IRC Section 3121(a). There is no need to go beyond this language to the separately numbered wage exclusions such as Section 3121(a)(20). That such stipends are not "qualified scholarships," and thus are properly includable as gross income under IRC Section 117(a), is immaterial and not in dispute.

Critically here, Plaintiff's incorrect anticipation of the statutory basis for Partners' position means there is no dispute at bar regarding Partners' actual FICA wages argument under IRC Section 3121(a). Moreover, it should not be necessary for Partners to provide a further exposition of its FICA wages argument under the operative provisions of IRC Section 3121(a). Partners' position that the operative language of IRC Section 3121(a) permits the FICA

---

[2] *See* Treas. Reg. § 1.117-3.

exemption stands unrebutted and constitutes sufficient grounds for denying Plaintiff's motion.

There is no cognizable argument Plaintiff can assert that it has somehow briefed the facts and law relevant to Partners' actual claim. The sum total of Plaintiff's contentions is that if the stipends do not constitute "qualified scholarships," they must necessarily be treated as wages subject to FICA taxation. (Pl.'s Br. at 1-6). But there is a significant difference between a "qualified scholarship" as Plaintiff's Motion discusses and a scholarship or fellowship that is excludable from FICA wages. It is true that if a scholarship is a "qualified scholarship" that is excludable from gross income, then it is also excludable from FICA wages. However, the converse is not true. Regardless of whether a scholarship is wholly or partially includible in gross income, its characterization as FICA wages depends solely on a factual determination of whether the payment is compensatory or noncompensatory. Only wages from employment are subject to FICA taxes. *See* Rev. Rul. 60-378, 1960-2 C.B. 38; Rev. Rul. 71-378, 1971-2 C.B. 95; IRS Notice 87-31, 1987-1 C.B. 475.

In short, the fact that a scholarship is not a "qualified scholarship" for income tax purposes has no bearing on whether the scholarship or fellowship is wages for FICA tax purposes. Any assertion by Plaintiff to the contrary must be rejected out of hand. Moreover, because the launching point for Plaintiff's entire argument is that Partners must prove that training stipends are excludable from gross income as IRC Section 117(a) "qualified scholarships" to be FICA exempt (*see* Pl.'s Br. at 2), Plaintiff's entire Argument Section I is properly discarded.

Left wholly unaddressed then by Plaintiff are the law and facts actually at issue. Generally speaking, a scholarship or fellowship grant is any amount paid to, or for the benefit of,

an individual to aid the individual in the pursuit of study or research. Moreover, no requirement exists that an amount need be formally designated as a scholarship or fellowship grant. *See* Treas. Reg. § 1.117-3(a) and (c).

Where sufficient facts and circumstances exist to satisfy this regulatory definition, a resident stipend will not represent payment for services rendered.[3] As evidenced by the facts presented in Partners' Statement of Undisputed Material Facts, the undisputed facts of this case reveal that Partners' resident stipends are in the nature of scholarships or fellowship grants to enable its residents to pursue an in-depth program of education, training, and formalized study designed to qualify them to become board certified and to practice medicine. *See generally* Partners' SUMF.

The FICA tax exception for scholarships and fellowships has been recognized by the IRS for more than fifty years, including in revenue rulings and numerous private letter rulings involving comparable facts to those presented.[4] For example, in Revenue Ruling 71-378, amounts paid by a nonprofit hospital to discharged medical corpsmen to assist them with the transition to private medical practice were scholarships excluded from FICA wages. In addition

---

[3] Treas. Reg. § 1.117-4(c)(2) states that such amounts will be treated as scholarships if "the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation." In determining whether amounts paid to residents are income tax exempt as "qualified scholarships" or fellowships, the courts have consistently applied a facts and circumstances test under IRC Section 117. *See Mizell v. United States*, 663 F.2d 772, 775 (8th Cir. 1981) ("it is well settled in this circuit, as well as others, that the ultimate question of whether a payment is an excludable scholarship or fellowship within the meaning of section 117 is, nevertheless, a question of fact"); *Proskey v. Comm'r*, 51 T.C. 918, 922 (1969) ("[w]hether a particular amount satisfies this general definition [of a scholarship] depends upon the nature of the activities carried on by the recipient"). Although Congress has modified the income tax exclusion for scholarships, the "facts and circumstance" test has not changed regarding the FICA taxation of scholarships.

[4] *See* Private Letter Rulings 200607017, 200226005, 200042027, 200013026, 200010033, 199933021, 199908041, 199910050, 199910049, 199910048, 199910047, and 19851002. *See also* CCA 200441029. Partners recognizes that such private letter rulings have no precedential value except as between the IRS and the taxpayer to which the letter is issued.

to direct medical services, the federally-funded training program included didactic and clinical study under the direct supervision of physicians. *See also* Rev. Rul. 68-38, 1968-1 C.B. 446; Rev. Rul. 72-340, 1972-2 C.B. 31.

Partners received one of the aforementioned IRS rulings in 1998. *See* PLR 199910047 (IRS internal tracking citation of PLR-109348-98), attached hereto as Exhibit A. Partners' IRS ruling holds that the stipends awarded to its research fellows in training are noncompensatory scholarships or fellowships to support the trainees while they conduct research to develop their research skills. According to the ruling, Partners' research fellow stipends are not taxable for FICA purposes. However, since these research stipends are not qualified scholarships under IRC Section 117(a), the stipends are includable in the research fellows gross income for income tax purposes. Importantly, Partners' graduate medical education training program has facts that are substantially similar to those in that ruling. Both Partners' research and residency programs provide post-graduate training. The stipends paid under these programs assist the trainees with the payment of living expenses, but do not compensate the trainees for any incidental services provided. Accordingly, the basis for the position actually asserted by Partners, with respect to its residents, is consistent with the legal analysis contained in PLR 199910047 that the stipends are in the nature of a scholarship or fellowship for the limited purpose of the FICA wage exclusion.

In summary, only wages from employment are FICA taxable. Noncompensatory scholarships or fellowships are not wages under IRC Section 3121(a). A determination of whether a training stipend is a scholarship or fellowship is based upon an analysis of the facts. The unique facts of Partners' residency program demonstrate that the primary purpose of the stipends is in the nature of a scholarship or fellowship for training and that no portion of the

- 7 -

stipend is intended as a *quid pro quo* for any incidental patient care services performed by residents. In fact, the undisputed evidence confirms that the primary purpose of the stipends in question was, in fact, not remuneration for services rendered. Instead, the primary and undisputed purpose was to enable Partners' residents to receive a graduate medical education.[5]

## II.    Even Assuming the Resident Stipends Qualify as Paid "Wages" They Are Exempt from the FICA Tax Under the Student Exception.

Even assuming *arguendo* that the Partners resident stipends qualify as wages because they are "remuneration for services rendered" under IRC Section 3121(a), this Court should find that Partners' residents qualify as students under the statute and regulations and, therefore, the Student Exception to FICA in IRC Section 3121(b)(10) applies. But at the very least, the Court should recognize that a genuine issue is in dispute regarding whether Partners' residents so qualify, and, therefore, permit Partners to prove its case at trial.

### A.    The Language of the Student Exception Is Unambiguous.

The Student Exception excludes from taxable employment:

> services performed in the employ of a school, college or university
> . . . if such service is performed by a student who is enrolled and
> regularly attending classes at such school, college or university.

IRC § 3121(b)(10). The "amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are immaterial." 26 C.F.R. § 31.3121(b)(10)-2(b) and (c) (2004). Thus,

---

[5] Even if this Court ultimately decides that the facts and circumstances indicate that the stipends are intended to partially compensate the residents as remuneration for services, both the Section 117(c) statutory changes and regulatory changes (which post-date the body of Section 117 income tax cases involving residents) require, effective beginning in 1987, a factual allocation be made between the portion of the stipend that is remuneration for services and the portion of the stipend that is in the nature of a scholarship or living expenses to allow the residents to pursue their required graduate medical education. *See* Prop. Treas. Reg. § 1.117-6(d)(3); IRS Notice 87-31.

the express and unambiguous language of the Student Exception supports the conclusion that
residents are eligible as a matter of law to qualify for a FICA exception.

**B.    Because the Statutory Language of the Student Exception is Unambiguous, it Is Neither Necessary Nor Appropriate to Look to Legislative History for Interpretation.**

The Supreme Court has consistently rejected litigants' efforts to use legislative history to
effectively amend a statute. "Where, as here, the resolution of a question of federal law turns on
a statute and the intention of Congress, we look first to the statutory language and then to the
legislative history if the statutory language is unclear." *Toibb v. Radloff*, 501 U.S. 157, 162
(1991) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)). "[A]ppeals to statutory history are
well taken only to resolve 'statutory ambiguity.'" *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992)
(quoting *Toibb*, 501 U.S. at 162). The First Circuit has recently explained the process for
interpreting statutory language, noting:

> In construing the terms of a statute, we start with the statutory text,
> according it its ordinary meaning by reference to the specific
> context in which that language is used, and the broader context of
> the statute as a whole. When the statutory language is plain and
> unambiguous, judicial inquiry is complete, except in rare and
> exceptional circumstances.

*Mullane v. Chambers*, 333 F.3d 322, 330 (1st Cir. 2003) (citations and quotation marks omitted);
*see also Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[Even where] there are . . .
contrary indications in the statute's legislative history. . . . we do not resort to legislative history
to cloud a statutory text that is clear.").

No ambiguity exists in the text of the Student Exception that justifies a resort to
legislative history. The express terms of the exception exclude from taxable employment for
FICA purposes "service performed in the employ of a school, college or university . . . if such

- 9 -

service is performed by a student who is enrolled and regularly attending classes at such school, college or university." 26 U.S.C. § 3121(b)(10). On its face, there is nothing confusing or ambiguous about this phrase or any of the terms within it. The only question to ask is whether this exception applies in a particular circumstance. Whether an employer qualifies as a school, and whether services performed and training received by residents are sufficiently educational in nature to qualify as those of a student, are fact-intensive questions and thus not suitable to disposition on a motion for summary judgment.

The text of the statute clearly does not preclude residents and their employers from relying on this provision. Plaintiff does little to identify any ambiguity justifying resort to legislative history. (*See* Pl.'s Br. at 7). The fact that Congress in 1965 repealed an entirely separate exception for interns under Section 3121(b)(13) (the "Intern Exception"), to which Plaintiff places great and inordinate emphasis, is irrelevant to the question of whether the text of the Student Exception applies to today's residents who are in factually distinct residency programs from those of 40 years ago. Partners' SUMF ¶¶ 66-77. If Congress in 1965 had intended to impose mandatory FICA taxation on all residents and preclude any application of the student FICA exception, it could easily have done so as it has for other professions. *See* IRC Section 3121(d)(3) (imposing mandatory FICA taxation on commission drivers, full-time life insurance salesmen, home workers and traveling salesmen). It did no such thing, and the import of Congress' inaction – *i.e.*, the decision not to preclude in express terms all residents – is that the statute must be taken at face value lest Congress' intent be distorted. *See United States v. LaBonte*, 520 U.S. 751, 757 (1997) ("We do not start from the premise that [the statutory] language is imprecise. Instead, we assume that in drafting this legislation, Congress

- 10 -

said what it meant."). Further, Congress' express intent appears to support the education of America's residents, as evidenced by Medicare's continued funding of residency programs.[6]

### C. Administrative Guidance Applies the "Facts and Circumstance" Test to Determine Student Exception Eligibility.

For the Court to rule in favor of Plaintiff, it would have to find contrary to IRS revenue procedures, the IRS' own internal published opinions and, more significantly, it would specifically have to invalidate former and current Treasury regulations. For example, the Treasury regulations finalized in 2005 provide, by a specific medical resident example, that a resident is not *per se* ineligible to claim the Student Exception. Instead, the regulations contemplate a case-by-case examination to determine if an individual's relationship with a school qualifies for the Student Exception. *See* Treas. Reg. § 31.3121(b)(10)-2(c) ("[t]he status of the employee as a student performing the services shall be determined on the basis of the relationship of such employee with the organization for which the services are performed"). As these regulations set forth, the nature of a claimant's "relationship" with its employer cannot be determined without a full, factual inquiry.[7] *See also* 20 C.F.R. § 404.1028(c).

---

[6] The federal government, through Medicare, provides the primary funding for Partners' graduate education program. In establishing Medicare funding of residency programs in the United States in 1965, Congress recognized that resident "educational activities enhance the quality of care in an institution, and it is intended, until the community undertakes to bear such education costs in some other way, that a part of the net cost of such activities (including stipends to trainees, as well as compensation to teachers and other costs) should be borne to an appropriate extent by [Medicare]." H.R. Rep. No. 89-213, at 32 (1965) and S. Rep. No. 89-404, at 36 (1965).

[7] Over the past decade, the Treasury Department has consistently and unambiguously provided that residents may assert the Student Exception. For example, in interpreting Section 3121(b)(10), the IRS Chief Counsel has stated that "[t]his does not mean that residents could not possibly be students; rather, whether medical residents are students depends upon the facts and circumstances in each case." CCA 200212029 (March 22, 2002) at 4, attached hereto as Exhibit B. In Chief Counsel Advice 200029030 published on July 21, 2000, the IRS stated that "[a] *per se* position that medical residents are not students within the meaning of § 3121(b)(10) would be inconsistent with the [Section 3121(b)(10)] regulations...." and that a case-by-case analysis is necessary to evaluate a resident's claim under the Student Exception. CCA 200029030 at 25 (footnote omitted), attached hereto as Exhibit C. In short, even the IRS concedes that the application of the Student Exception under Section 3121(b)(10) necessarily requires a facts and circumstances analysis of each case. While not precedential, this guidance is significant since it discloses

- 11 -

**D.    The Required "Facts and Circumstance" Analysis Reveals the Educational Nature of Partners' Residency Programs and the Applicability of the Student Exception to Its Residents and the Wage Exception to the Stipend Payments.**

In Plaintiff's motion, Plaintiff improperly presumes that medical education today is comparable to medical education throughout the history of FICA taxation.  Because medical education is dramatically different now than it was when Congress dealt with the Intern Exception in 1965, reference to decades old facts and cases when discussing Congress' supposed intent is not helpful, but rather misleading.  Whatever application the Intern Exception or the Student Exception may have had on residents in the 1960s is wholly irrelevant to the application of the statutory text of the Student Exception to the circumstances of Partners' current  residency programs.  Today, Partners' residents unquestionably qualify for the Student Exception.

**1.    Partners' Modern Residency Program is Fundamentally Different than Residencies of the 1960s and 1970s.**

As a result of stringent oversight by the Department of Health and Human Services which funds the residency programs, and the Accreditation Council for Graduate Medical Education ("ACGME") which determines and enforces standards for accreditation,[8] the residency programs are now much more focused on education than they were in decades past.  Partners' SUMF ¶¶ 66-77.  In the past, there was far less supervision of residents.  *Id.* at ¶¶ 66, 70.  Residents often made decisions on their own with respect to patient care.  *Id.*  Residents are subject to much more intensive supervision today.  *Id.*  Only attending physicians make final decisions regarding patient care.  *Id.*  Residents are now supervised in virtually everything they do.  *Id.*  In fact, the

---

the interpretation of the statute by the agency charged with administering and interpreting the tax laws.  *Transco v. Comm'r,* 949 F. 2d 837 (5th Cir. 1992) ("Although the Commissioner is entitled to change his mind, he ought to do more than stride to the dais and simply argue in the opposite direction.").
[8] 42 U.S.C § 1395ww(h).

number of hours residents can be "on duty" has been greatly reduced.  In 2003, the ACGME

imposed a weekly limit of 80 hours for all residents.  *Id.* at ¶ 72.  Hospitals that do not comply

with this rule compromise their accreditation status with the ACGME.  *Id.* at ¶ 24.  Residents no

longer have time for, nor are expected to, provide routine care to lighten the workload of an

attending physician.  Much of this care is now provided by "physician extenders," such as a

physician assistant or nurse practitioner.  *Id.* at ¶ 74.

   In the 1960's, teaching hospitals held far fewer teaching conferences and lectures than

today.  *Id.* at ¶ 67.  Now, residents are expected to learn basic medical knowledge through

departmental lectures, conferences, morbidity and mortality conferences, and assigned resident

presentations.  *Id.* at ¶¶ 117-124.  For example, a first year resident in internal medicine at MGH

is expected to attend 15 hours a week of regularly scheduled lectures and conferences, and

residents in their second and third years are required to attend 20 hours a week of regularly

scheduled lectures and conferences.  *Id.* at ¶ 118.  Residents in some programs are also given

more traditional classroom reading assignments and are required to attend conferences to discuss

available medical literature on certain topics.  *Id.* at ¶ 117.

   **2.**   **The Focus of Partners' Residency Program is on Education.**

   Partners was formed in 1994 with three equally important missions:  medical education,

patient care, and research.  *Id.* at ¶ 12.  As such, Partners' residency programs are almost entirely

focused on educational objectives.  *Id.* at ¶¶ 11-15.  The purpose of Partners' residency program

is not to fulfill the hospital's service needs.  *Id.* at ¶ 9.  The primary purpose of resident training

is education and the development of practical skills, along with achievement of individual

certifications that require completion of residency training and may be necessary for the practice

of medicine. *Id.* at ¶ 17. To fulfill its educational goals, Partners is a major teaching affiliate of Harvard Medical School. *Id.* at ¶ 13. In fact, MGH and BWH serve as two of the principal tertiary and quaternary academic resources for Harvard Medical School. *Id.* All physician staff members at MGH and BWH hold Harvard Medical School teaching appointments. *Id.* at ¶ 14.

### 3.    For All Practical Purposes, Medical School Graduates Cannot Practice Medicine without Completing a Residency.

Upon graduation from medical school, one is not legally or practically able to become a practicing physician. *Id.* at ¶¶ 4-5. Most states, including Massachusetts, require a medical school graduate to complete at least one year of an accredited residency program before it will grant a physician's license. *Id.* at ¶ 5. Even with a license, however, it is unlikely a medical school graduate could obtain employment as a practicing physician without first completing an accredited residency training program. *Id.* at ¶ 6. In practical terms, only upon completion of this phase of medical education is a resident prepared to undertake independent medical practice. *Id.* at ¶¶ 7-8, 135. Residents, therefore, do not engage in residency programs as gainful employment, but rather to further their education so that they can become independent physicians. *Id.* at ¶ 136.

### 4.    Residency Programs Must Follow Strict Educational Standards to Remain Accredited and to Receive Medicare Funding.

The most significant change in how residency programs were run in the past is that now teaching hospitals are closely overseen by outside authorities, such as Medicare and the ACGME. *Id.* at ¶¶ 23-24. These institutions set the educational standards, such as the length of its programs, the educational content, and its levels of supervision, that Partners must adhere to in order to continue to receive Medicare funding and accreditation. *Id.* Further, Medicare will

- 14 -

not reimburse teaching hospitals for any procedure performed by a resident. *Id.* at ¶¶ 53-65.

Additionally, according to the ACGME, sponsoring institutions should provide all residents with appropriate financial support and benefits. *Id.* at ¶ 37. The purpose of the resident stipend is to defray living costs while the residents work towards their goal of completing their medical education and obtaining Board certification. *Id.* at ¶ 38. Current (academic year 2005-06) stipend amounts for Partners' residents are $47,000 in post-graduate year one; $48,247 in year two; and $51,050 in year three. *Id.* at ¶ 39. The amount of a resident's stipend amounts is far lower than the amounts paid to a professional with an equivalent post-graduate education. *Id.* at ¶ 38.

The ACGME requires a program to establish a system of trainee evaluation that documents the progress of each resident in meeting the goals of the program. *Id.* at ¶¶ 125-134. The overall performance of each resident must be evaluated at least semiannually to determine if the resident has learned what is expected at that particular stage of the training. *Id.* at ¶ 125. In addition, a written final evaluation must be provided for each resident that completes the program. *Id.* Finally, in order for a resident to sit for a specialty board examination, he or she must satisfactorily complete an accredited program. *Id.* at ¶ 7.

E.    In *Minnesota v. Apfel, United States v. Mayo* and *Minnesota v. Chater,* the Courts Found Residents to Be Eligible to Claim the Student Exception.

The courts have addressed the question of whether residents are, as a matter of law, eligible to assert the Student Exception. In all but one instance, courts hearing the United States' argument rejected it. The U.S. Court of Appeals for the Eighth Circuit, in *Minnesota v. Apfel*, 151 F.3d 742 (8th Cir. 1998), and the U.S. District Court for the District of Minnesota, in *United States v. Mayo Found. for Med. Educ. and Research*, 282 F. Supp. 2d 997 (D. Minn. 2003) and

- 15 -

*Minnesota v. Chater*, No. 4-96-756, 1997 WL 33352908 (D. Minn. May 21, 1997), attached

hereto as Exhibit D, consistently, and correctly in Partners' estimation, addressed this identical

issue.  Respectfully, this Court should adopt the rulings established by the U.S. Court of Appeals

for the Eighth Circuit and the U.S. District Court for the District of Minnesota.

First, in *Chater*, the U.S. District Court for the District of Minnesota rejected the

government's statutory construction argument based on the differences between interns and

residents.  *See Chater*, 1997 WL 33352908, at *10.  On appeal, the U.S. Court of Appeals for the

Eighth Circuit affirmed the district court's ruling.  *See Apfel*, 151 F.3d at 747-48.  In its

alternative holding, the court in *Apfel* stated that in order to determine whether a claimant

qualifies for the Student Exception, the "focus . . . [is] on the nature of the residents' relationship

with the University."  *Id.* at 747.  The court stated further that "if the residents' participation in

the University's residency program is primarily educational, the residents should be considered

students.  If their purpose is to earn a living, however, they do not fit within the definition of the

[Student Exception]."  *Id.*  After considering the relevant facts, the court of appeals affirmed the

conclusion that the residents did qualify for the Student Exception.  Plaintiff criticizes this

decision on the basis that the court did not consider the legislative history of the FICA tax.  (Pl.'s

Br. at 20).  This critique is without merit, as resort to legislative history is wholly inappropriate

where statutory text is unambiguous, as it is here.

Second, in *Mayo,* the district court similarly rejected the legislative argument that the

United States makes in its present motion.  In *Mayo*, the court concluded that in affirming

*Chater*, the court of appeals "explicitly reject[ed] the . . . assertion that courts should defer to a

'bright-line' agency ruling that medical residents can never be exempted from FICA taxation as

- 16 -

students." *Mayo*, 282 F. Supp. 2d at 1006 (citing *Apfel*, 151 F.3d at 748). Moreover, the court

analyzed the relevant differences between interns and residents discussed in Plaintiff's motion

and determined that, given the nature of their participation in graduate medical education, the

Student Exception was applicable to residents. *See Mayo*, 282 F. Supp. 2d at 1007. Specifically,

the court found that:

> to practice medicine in a given field, and in most cases to be
> admitted to a hospital staff, an individual holding an M.D. degree
> typically must (1) complete an accredited residency training
> program of at least three years' duration in a clinical specialty
> field, and (2) become certified by a specialty board that is a
> member of the American Board of Medical Specialties.

*Id.* By so ruling, the court recognized the educational element of the residency program and

refused to apply a "bright-line" rule establishing that residents enrolled in a graduate medical

education program are ineligible to assert the Student Exception to FICA taxation. *See id.*

**F.      Assuming a Resort to Legislative History Is Permissible, Plaintiff's Motion
Still Fails Because the Legislative History Proves That Residents Are
Eligible, As a Matter of Law, for the Student Exception.**

Even were this Court to disregard the existence of unambiguous statutory language and

examine instead the legislative history of the Student Exception, as Plaintiff has done, the Court

still must find that not all residents are *per se* ineligible to claim the Student Exception.

Plaintiff attempts to establish its position to the contrary by examining the legislative history of

Section 3121(b)(13), the so-called Intern Exception. (Pl.'s Br. at 12-17). Plaintiff fails,

however, to identify anything in the legislative history of the FICA exception at issue – the

Student Exception under Section 3121(b)(10) – that evidences an intent to exclude or otherwise

preclude any resident from claiming the Student Exception if they are students employed by a

school, college, or university. Consequently, Plaintiff's focus on the legislative history of the

- 17 -

Intern Exception is, at best, a distraction.

> **1.    The History of the Employment Exceptions to the FICA Tax Shows the Student Exception and Intern Exception to Be Separate and Independent Bases for FICA Tax Exemption.**

The Social Security Act, enacted on August 14, 1935, provides a system of old age pensions and disability benefits.  The IRS administers the assessment and collection provisions of this Act through the Federal Insurance Contributions Act.  FICA imposes a tax on both employers and employees on "wages" paid (26 U.S.C. § 3121(a)) to an "employee" (26 U.S.C. § 3121(d)) with respect to "employment" (26 U.S.C. § 3121(b)).  The determination of each of these three required elements is inherently a facts-and-circumstances determination.  Twenty-one types of services are exempt from the definition of "employment."  *See* 26 U.S.C. § 3121(b). These services, even if performed by an employee, do not constitute "employment" as defined by the statute and, accordingly, payment for these services are not subject to FICA taxes.

> **a.    The 1939 Amendments.**

In 1939, Congress amended the Social Security Act to include the Student Exception. The 1939 Student Exception stated, in relevant part:

> (10)(A) Service performed in any calendar quarter in the employ of any organization exempt from income tax . . . if . . . (iii) such service is performed by a student who is enrolled and is regularly attending classes at a school, college or university [53 Stat. 1385, § 1426(b)(10)(A) of the Internal Revenue Code of 1939] . . . .
>
> (10)(E) Service performed in any calendar quarter in the employ of a school, college or university . . . if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university, and the remuneration for such service does not exceed $45 (exclusive of room, board, and tuition)."

53 Stat. 1385, § 1426(b)(10) of the Internal Revenue Code of 1939.  In 1950, Congress

- 18 -

eliminated the minimum dollar threshold requirement for the Student Exception.[9]  Social

Security Amendments of 1950, 64 Stat. 477, 497, 531 (1950).  The language of the Student

Exception is not different today.  Section 3121(b)(10) currently provides that the term

"employment" shall not include "(10) service performed . . . if such service is performed by a

student who is enrolled and regularly attending classes at such school, college or university[.]"

In 1939, Congress also amended the Social Security Act to include the Intern Exception,

Section 3121(b)(13), which exempted interns from FICA taxation under the following terms:

> (13) . . . service performed as an interne in the employ of a hospital
> by an individual who has completed a four years' course in a
> medical school chartered or approved pursuant to State Law.

53 Stat. 1385, § 1426(b)(13) of the Internal Revenue Code of 1939.

In 1964, St. Luke's Hospital, challenged this separate Intern Exception, claiming that

residents were entitled to the same exception from FICA taxation as interns.  *See St. Luke's*

*Hosp. Ass'n v. United States*, 333 F.2d 157 (6th Cir. 1964).  The Sixth Circuit thoroughly

analyzed the differences and similarities between interns and residents that existed at the time

Congress enacted the Intern Exception.  Specifically, the court noted that in 1939, the term

"intern," "as used and understood by doctors and hospitals . . . generally referred to a medical

student who was seeking a year of hospital training in order to complete his requirements for a

medical degree and admission to practice."  *See id.* at 161.  Conversely, the court noted, the term

"resident" in 1939 included graduate physicians, licensed to practice medicine who were either

serving on the staff of the hospital (a "resident doctor") or seeking "further training for use

---

[9] Plaintiff asserts that the exclusion under Section 3121(b)(10) only applies to *de minimis* or nominal payments.  Not only did Congress eliminate a minimum dollar threshold, but the applicable regulations for the years at issue provide that "the amount of remuneration for services performed by the [student] . . . are immaterial" 26 C.F.R. § 31.3121(b)(10)-2(b) and (c).

- 19 -

ultimately in private practice. . . ." (a "resident-in-training").  *See id.*

The sole issue in *St. Luke's* was whether the Intern Exception applied to residents as well as interns.  *See id.*  In ruling that the Intern Exception did not apply to residents, that court recognized the distinctions in 1939 between the two categories of physicians, but commented that these distinctions had "blurred" over time.  *See id.*  The court concluded that although the differences between interns and residents had been greatly reduced, this nevertheless did not warrant inclusion of residents under the Intern Exception.  *Id.* at 164.  Instead, the Sixth Circuit left that question open for congressional action.  *See id.*

### b.     The 1965 Amendments.

The 1965 Social Security amendments eliminated the Intern Exception but permitted interns and/or residents to assert other FICA taxation exceptions.  In 1965, Congress amended IRC Section 3121(b) and eliminated the Intern Exception found in subsection (b)(13).  In so doing, Congress reiterated that "[t]he effect of this amendment is to extend coverage under the [FICA] to such *interns unless their services are excluded under provisions other than section 3121(b)(13).*"  H.R. Rep. 89-213, 89th Cong., 1st Sess. 216, 1965-2 C.B. 747 (emphasis added). By making this statement, Congress recognized that interns might qualify for and were eligible to claim a FICA taxation exception under the terms of other exceptions found in Section 3121(b).

In particular, interns could qualify for the Student Exception because it certainly was, and is, <u>another provision</u> of Section 3121(b).[10]  Moreover, given that few differences between interns and residents existed in 1965, residents, like interns, should also be eligible to seek exception

_____

[10]  Had Congress meant to prevent residents from claiming exception under Section 3121(b)(10), as a matter of law, then it would have made this intention explicit as it did in Section 3121(b)(7), or it could have specifically included residents for mandatory FICA coverage as it has done for specific types of workers in Section 3121(d)(3).

from employment and FICA taxation pursuant to other exceptions such as under Section

3121(b)(10). As such, residents are, as a matter of law, eligible to claim an exception from FICA

taxation pursuant to 26 U.S.C. § 3121(b)(10). Congress made its intent implicit that residents

would be subject to FICA taxation, *absent the applicability of another service exception in*

*Section 3121(b)*. Thus, a resident is *eligible* to assert the Student Exception, which then requires

a case-by-case analysis to determine if a resident *qualifies* for the Student Exception.

**2.      Partners' Interpretation of the Student Exception Does Not Render the Original Intern Exception Superfluous.**

Plaintiff argues that if residents were permitted to assert a FICA taxation exception

pursuant to the Student Exception, the repealed Intern Exception would be rendered superfluous,

thus violating the rules of statutory construction. (Pl.'s Br. at 19). If this were true, then by

eliminating the Intern Exception in 1965, Congress would have rendered all FICA employment

exceptions, including the Student Exception, off limits to all residents.

Each of the twenty-one numbered paragraphs under Section 3121(b) sets forth a separate

stand-alone exclusion. Services for an employer may qualify for more than one such exception,

including the exception from employment for services performed by a student. *See* Treas. Reg. §

31.3121(b)-4(a) (2004).[11] This regulation specifically provides that "[s]ervices performed by an

employee for an employer do not constitute employment for purposes of the taxes if they are

specifically excepted from employment under <u>any</u> of the numbered paragraphs of section

---

[11]   Section 3121(b)'s stand-alone nature can also be illustrated by a fairly routine student example in today's educational environment. "Service which is performed by a nonresident alien individual for the period he is temporarily present in the United States as a nonimmigrant under subparagraph (F), (J), (M), or (Q) of section 101(a)(15) of the Immigration and Nationality Act" is exempted from FICA taxation. *See* 26 U.S.C. § 3121(b)(19). As such, pursuant to the terms of this exemption, a nonresident alien student working at his or her school, college or university could claim an exemption to FICA taxation through either the Student Exemption or through the provisions found in Section 3121(b)(19). That a nonresident alien can make such a claim does not render either provision superfluous, but rather illustrates the independent nature of each exemption in Section 3121(b).

3121(b)."  Treas. Reg. § 31.3121(b)-4(a) (emphasis added).  This regulation is consistent with

Congress's intention that "[t]he effect of this amendment is to extend coverage under the Federal

Insurance Contributions Act to such interns unless their services are excluded under provisions

other than section 3121(b)(13)."  H.R. Rep. 89-213, 89th Cong., 1st Sess. 216, 1965-2 C.B.

747.[12]

        Additionally, the historical difference between residents and interns necessitated the

separate Intern Exception in 1939.  As noted by the Sixth Circuit in *St. Luke's*, the term

"resident" in 1939 covered two different types of physicians; one working for the hospital and

one training in a specific medical specialty.  *See St. Luke's*, 333 F.2d at 161.  Conversely, the

term "intern" in 1939 "referred to a medical student who was seeking a year of hospital training

in order to complete his requirements for a medical degree and admission to practice."  *Id.*

Courts have found that this distinction created the need for the separate Intern Exception.

Indeed, in *Minnesota v. Chater*, 1997 WL 33352908, at *10, attached hereto as Exhibit D, the

U.S. District Court for the District of Minnesota stated:

> [T]he fact that Congress did not specifically exclude medical residents at
> the same time as it excluded interns from coverage under the [Social
> Security] Act does not compel a finding that Congress intended to have
> residents covered under the Act. . . . Since, in 1939, the term resident
> encompassed both residents-in-training . . . and regular staff physicians, it
> is understandable that Congress would not want to exclude all "residents"
> as the term was then defined.  Instead, in light of the educational purpose
> of resident training programs, it was proper for Congress to allow the
> coverage status of residents to depend on whether they qualified for the
> student exclusion.

*Id.*  The historical difference does not create an inconsistency or render the Intern Exception

---

[12] Rev. Rul. 56-87, 1956-1 C.B. 463 also clearly illustrates the stand alone aspects of each of the Section 3121(b) employment exceptions, particularly the overriding nature of Section 3121(b)(10).

superfluous because, "'[w]hile both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of a residency was (and is) on education.'" *Mayo*, 282 F. Supp. 2d at 1006 (quoting *Chater*, 1997 WL 33352908, at *11). Thus, it was not inconsistent for Congress to establish a specific exception for interns and permit residents to seek a FICA taxation exception pursuant to some other numbered paragraph in Section 3121(b). Similarly, it was not inconsistent for Congress to continue to permit residents to seek FICA taxation exceptions under Section 3121(b)'s other exceptions even after Congress repealed the specific Intern Exception.

G.    *United States v. Mount Sinai* Was Decided Incorrectly and Has No Precedential Value.

The only case in which a court has found that residents cannot, as a matter of law, claim the Student Exception is *United States v. Mt. Sinai Medical Center*, 353 F. Supp. 2d 1217 (S.D. Fla. 2005), which will be appealed. There, the district court did not analyze the unambiguous text of the Student Exemption or address whether residents are students. Rather, the court reasoned that Congress' 1965 repeal of the Intern Exception evidenced Congress' intent that residents should not be allowed to qualify under the student FICA exception under any circumstances. *Id.* at 1228. That is in direct conflict with *Apfel* and *Mayo*. *See Minnesota v. Apfel*, 151 F.3d at 747 ("if the residents' participation in the . . . residency program is primarily educational, the residents should be considered students"); *Mayo*, 282 F. Supp. 2d at 1006 (rejecting the "assertion that courts should defer to a 'bright-line' agency ruling that medical residents can never be exempted from FICA taxation as students").

The district court cited nothing in the text of the statute or the regulations to support its result, or even acknowledge the rulings of the Fifth Circuit and the Supreme Court which sharply

limit reliance on "legislative history."  The district court's speculation about Congressional

intent, for the purpose of effectively amending the Student Exception so as to make it

unavailable to one class of students, *i.e.*, residents, is clear error.

The *Mt. Sinai* opinion is premised on several other erroneous suppositions or

misstatements.  For example, the district court relied heavily – as does Plaintiff in its motion (*see*

Pl.'s Br. at fn. 16) – on the Student Exception being enacted and interpreted as only extending to

nominal compensation.  *Mt. Sinai*, 353 F. Supp. 2d at 1223-24.  The district court  failed to cite

or discuss the binding Treasury regulations that specifically provide the "amount of remuneration

for services performed by the employee in the calendar quarter . . . [is] immaterial."  26 C.F.R. §

31.3121(b)(10)-2(b) and (c).  Further, the decision completely ignores the fact that Congress has

specifically eliminated the dollar cap for the Student Exception in the 1950's.  Social Security

Amendments of 1950, 64 Stat. 477, 497, 531 (1950).

The district court also relied upon the premise that it has been "Treasury's longstanding

interpretation of § 3121(b)(10) that workers such as medical residents cannot qualify for the

student exception."  *Mt. Sinai*, 353 F. Supp. 2d at 1228 n.6.[13]  Actually, just the opposite is true.

The district court failed to address the separate applications of each of the numbered exceptions

from "employment" under IRC Section 3121(b) as stand-alone exclusions, a point long

acknowledged in the Treasury Regulations.  Treas. Reg. § 31.3121(b)-4(a).  Moreover, Partners

---

[13] The district court also stated as a basis for its decision:  "I accept the United States' interpretation of the history of the Social Security Act and the position of the United States that medical residents have never been excluded from social security taxation."  *Mt. Sinai*, 353 F. Supp. 2d at 1223.  This statement is wrong in several respects.  As discussed herein, the Treasury Department's official position, including in binding regulations and official procedures has consistently been that under specified facts and circumstances residents can qualify for the student FICA exception.

knows of no published interpretation of the Treasury Department where it has taken the position that a resident cannot qualify for the Student Exception from FICA as a matter of law.

## CONCLUSION

For all the foregoing reasons, this Court should rule that neither Issue Presented by the Plaintiff – specifically, (1) whether the stipends paid to Partners' residents are remuneration for services rendered; and (2) whether Partners' residents qualify to claim the Student Exception to FICA – can be resolved as matter of law in Plaintiff's favor.  Partners respectfully requests that this Court deny the relief requested by Plaintiff in its Motion for Summary Judgment.

Dated:  February 24, 2006

                    _____/s/  Sarah E. Hancur_____
BENJAMIN A. GOLDBERGER (No. 654357)
JOSEPH H. SELBY (No. 643275, *admitted pro hac vice*)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Telephone: (617) 535-4000/Facsimile:  (617) 535-3800
E-Mail: bgoldberger@mwe.com
        jselby@mwe.com

CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*
SARAH E. HANCUR (No. 652607, *admitted pro hac vice*)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005
Telephone: (202) 756-8000/Facsimile:  (202) 756-8087
E-Mail: ckliefoth@mwe.com
        shancur@mwe.com

*Attorneys for Partners Healthcare System, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants on February 24, 2006.


___/s/__ Sarah E. Hancur _____
Sarah E. Hancur


WDC99 1201007-4.057158.0039

**Internal Revenue Service**                    Department of the Treasury

UIL Index No.:  0117.05-00                   Washington, DC 20224

Partners Healthcare Systems, Inc.            Person to Contact:
Prudential Tower Suite 1150                   Jonathan Strum
800 Boylston Street                           Telephone Number:
Boston, MA 02199-8001                         (202) 622-4960
                                              Refer Reply to:
                                              CC:DOM:IT&A:06/PLR-109348-98
                                              Date:
                                                      SEP   3   '99

Legend:

    A    =  Partner's Healthcare Systems Inc.
             EIN No. = 04-3230035

    B    =  Massachusetts General Hospital
             EIN No. = 04-2697983

    C    =  Massachusetts General Physicians Organization
             EIN No. = 04-2807148

    D    =  Brigham and Women's Hospital, Inc.
             EIN No. = 04-2312909

    E    =  Mclean Hospital
             EIN No. = 04-2697981

Dear Sir or Madam:

     This is in response to your authorized representative's
submission dated April 13, 1998, which requested certain rulings
regarding the proper federal income tax treatment, including any
reporting and/or withholding obligations, for certain stipends
paid by your organization and the other above referenced
taxpayers to individuals in connection with the research training
programs briefly described below.

     The information submitted indicates that A is recognized as
exempt from federal income tax under section 501(c)(3) of the
Internal Revenue Code, and is a full service acute care and non-
acute care teaching, research and healthcare system.  A's
affiliate hospitals include B, C, D and E (herein after referred
to as the "affiliates"), all of which are also recognized as
exempt from federal income tax under section 501(c)(3).

     The information submitted further indicates that A and
affiliates conduct extensive research, training, and educational
programs including clinical fellowships and research fellowships.
There are more than 5,000 research projects being conducted at A
and its affiliates for the 1998 fiscal year.

     A and affiliates' research training programs are modeled
after the National Institutes of Health's (NIH's) National

2

Research Service Awards (NRSA) program, and are designed to
mirror it.  The focus of the programs is research training and
the development of research skills, and not the performance of
research services.  A and affiliates' research fellows do not
serve as medical residents or as laboratory technicians as part
of the research programs, and are not replacements or substitutes
for either.  The activities of the research fellows during their
training programs does not materially benefit A or its
affiliates.  Research issues are determined by the research
fellows in conjunction with their faculty mentors after selection
into the programs.  NRSA grants partially fund A and its
affiliates' research programs, and the activities of their
research fellows and NRSA fellows are the same.  Research fellows
are not required to have performed past services or to agree to
perform future services for A and its affiliates, as a condition
to receiving a research training program stipend.

     The federal tax treatment of qualified scholarships and
fellowship grants is addressed in section 117 of the Code.
Section 117(a) provides that gross income does not include any
amount received as a qualified scholarship by an individual who
is a candidate for a degree at an educational organization
described in section 170(b)(1)(A)(ii) (describing, generally, a
school).

     To be considered a scholarship or fellowship grant, an
amount need not be formally designated as such.  Generally, a
scholarship or fellowship grant is any amount paid or allowed to,
or for the benefit of, an individual to aid such individual in
the pursuit of study or research.  A scholarship or fellowship
grant may, for example, be in the form of a reduction in the
amount owed by the recipient to an educational organization for
tuition, room and board, or any other fee.

     Only "qualified scholarships" may be excluded from income.
A qualified scholarship is defined as an amount expended for
"qualified tuition and related expenses."  Qualified tuition and
related expenses are tuition and fees required for the enrollment
or attendance of a student at an educational institution, and
fees, books, supplies, and equipment required for courses of
instruction at such an educational organization.  Amounts
received for room, board, travel, and incidental living expenses
are not related expenses.  Thus, scholarship receipts that exceed
expenses for tuition, fees, books, supplies, and certain
equipment are not excludable from a recipient's gross income
under section 117.  Fellowship stipends made to non-degree
candidates for general living expenses are a typical example of
includible scholarship amounts.

     Section 117(c) of the Code, implementing changes made by the
Tax Reform Act of 1986, Pub. L. No. 99-514, provides that the
exclusion for qualified scholarships shall not apply to that

3

portion of any amount received which represents payment for
teaching, research, or other services by the student required as
a condition for receiving the qualified scholarship or
fellowship. Regulations governing the includibility of
compensatory grants in income have been upheld by the Supreme
Court of the United States, which has described excludable grants
as "relatively disinterested, 'no-strings' educational grants,
with no requirement of any substantial quid pro quo from the
recipient." Bingler v. Johnson, 394 U.S. 741 (1969).

A scholarship or fellowship grant represents payment for
services when the grantor requires the recipient to perform
services in return for the granting of the scholarship or
fellowship. A requirement that the recipient pursue studies,
research, or other activities primarily for the benefit of the
grantor is treated as a requirement to perform services. A
scholarship or fellowship grant conditioned upon either past,
present, or future services by the recipient, or upon services
that are subject to the direction or supervision of the grantor,
represents payment for services.

A scholarship or fellowship grant that is includible in
gross income under section 117(c) of the Code is considered
"wages" for purposes of section 3401(a). The grantor of such an
amount is subject to certain withholding and reporting
requirements respecting wages, including withholding for income
taxes and the filing of Forms W-2. The application of Federal
Insurance Contributions Act (FICA) and Federal Unemployment Tax
Act (FUTA) taxes depends on the nature of the employment and the
status of the grantor. See Notice 87-31, 1987-1 C.B. 475.

Although payments for research services are not excludable
under current law, not all payments for research activities
represent payment for services. The Code and regulations make
clear that a scholarship includes any amount paid or allowed to
aid an individual in the pursuit of study or research;
accordingly, research activities by a student may qualify for
exclusion from gross income to no less an extent than formal
classroom studies. It is only where the research required by the
grantor falls within the ambit of section 117(c), that inclusion
in income is required. Determining whether a particular awards
program makes compensatory payments within the contemplation of
section 117(c) of the Code is an inherently factual matter,
requiring a consideration of the nature and extent of the
impositions and duties imposed upon the participants, and of all
other relevant facts and circumstances of the program.

Based on the information presented and representations
furnished, and assuming A, B, C, D and E's research training
programs are conducted substantially as described, we have
determined that the scholarship and/or fellowship stipends
awarded thereunder do not represent compensation for services

4

within the meaning of section 117(c) of the Code. The awards are not paid for or in connection with the performance of services, and appear to be relatively disinterested grants to participants to enable them to pursue programs of independent research, training, and original study, focusing on the experience to be gained by the recipient rather than on any grantor benefit. We note that the Service does not regard the research and research training activities sponsored by institutional NRSA awards as constituting the performance of services within the contemplation of either current or prior law. See Rev. Rul. 83-93, 1983-1 C.B. 364. Such grants remain eligible for exclusion from federal income tax under section 117 of the Code to the extent of the recipient's qualified tuition and related expenses. X's grants are awarded under programs substantially similar, if not identical, to the NRSA awards program, and are thus entitled to similar tax treatment.

Accordingly, such amounts do not constitute "wages" for purposes of section 3401(a). Additionally, such amounts are not subject to section 3402 (relating to withholding for income taxes at source), section 3102 (relating to withholding under the Federal Insurance Contribution Act (FICA)), or section 3301 (relating to the Federal Unemployment Tax Act (FUTA)). A, B, C, D and E are not required to file Forms W-2, or any returns of information under section 6041, with respect to such grants. Finally, since A, B, C, D and E's research training stipends do not represent payment for services, such amounts are also not subject to Self Employment Contribution Act (SECA) taxes imposed by section 1401 of the Code. See Spiegelman v. Commissioner, 102 T.C. 394 (1994). See, also, Rev. Rul. 60-378, 1960-2 C.B. 38, which states the Service's position that noncompensatory scholarship and fellowship grants do not constitute income from a trade or business, whether or not such amounts are required to be included in gross income.

The recipient of a scholarship or fellowship grant is responsible for determining whether such grant is, in whole or in part, includible in gross income for federal income tax purposes. Where participants are degree candidates, such grants will ordinarily be excludable from the recipients' gross incomes to the extent of their qualified tuition and related expenses. In the case of non-degree candidates, the entire amount of scholarship or fellowship awards is includible in gross income. You may wish to advise participants in your research programs that the amount of their scholarship or fellowship stipends that exceeds their qualified tuition and related expenses, if any, is generally includible in gross income for federal income tax purposes.

This letter ruling is based on the facts and representations provided by the taxpayer, and is limited to the matters specifically addressed. No opinion is expressed as to the tax

5

treatment of the transactions considered herein under the provisions of any other sections of the Code or regulations which may be applicable thereto, or the tax treatment of any conditions existing at the time of, or effects resulting from, such transactions which are not specifically addressed herein.

Final regulations pertaining to one or more of the issues addressed in this ruling have not yet been adopted. Therefore, this ruling may be modified or revoked by adoption of final regulations, to the extent the regulations are inconsistent with any conclusions in this ruling. <u>See</u> section 12.04 of Rev. Proc. 98-1, 1998-1 I.R.B. 7, 47. However, when the criteria in section 12.05 of Rev. Proc. 98-1 are satisfied, a ruling is not revoked or modified retroactively, except in rare or unusual circumstances.

Because it could help resolve federal tax issues, a copy of this letter should be maintained with <u>A</u>, <u>B</u>, <u>C</u>, <u>D</u> and <u>E</u>'s permanent records.

This ruling is directed only to the taxpayer who requested it. Section 6110(j)(3) of the Internal Revenue Code provides that it may not be used or cited as precedent.

Sincerely yours,

Assistant Chief Counsel
(Income Tax & Accounting)

By _William A. Jackson_
William A. Jackson
Chief, Branch 6

Enclosures:
    Copy of this letter
    Copy for section 6110 purposes



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

CHIEF COUNSEL

January 24, 2002

Number: **200212029**
Release Date: 3/22/2002
UIL: 3121.02-10

CC:TEGE:EOEG:ET2

MEMORANDUM FOR VICTOR PICHON
                EO Technical Advisor
                Health Care/Colleges and Universities

FROM:           Mary Oppenheimer
                Assistant Chief Counsel (CC:TEGE:EOEG)

SUBJECT:      Medical Resident FICA Refund Claims

This memorandum supplements our earlier memoranda dated April 19, 2000, August 23, 2001, and December 14, 2001. You have asked for our advice on handling FICA refund claims stemming from the Minnesota v. Apfel decision. The April 19, 2000, memorandum described medical residency programs generally and discussed the relevant facts to be developed in examining medical resident FICA refund claims. The August 23, 2000, memorandum provided our views on whether a teaching hospital could be considered a school, college or university ("S/C/U") for purposes of the student FICA exception. This analysis was supplemented by our memorandum dated December 14, 2001, on whether a teaching hospital is a related § 509(a)(3) organization. The remaining question therefore is whether medical residents are students–the subject of this memorandum.

**Fact Development**

As a result of Minnesota v. Apfel, 151 F3d 742 (8th Cir. 1998), the Service received many refund claims from hospitals and universities. Our office assisted the EO division in selecting what we believe are a representative sample of cases with the hope that the findings from these cases could be applied to the remaining claims. We selected cases that exhibit each of the common organizational structures identified in Exhibit 2 of our April 19, 2000, memorandum. In addition, we identified several common residency programs, as well as two subspecialty programs, that we believed were representative of the different types of residency programs. We hoped to gather information in order to compare and contrast the various specialty and subspecialty programs.[1] Finally, our

---

[1] The specialty programs selected for examination are diagnostic radiology, family practice, general surgery, internal medicine, obstetrics/gynecology (OB/GYN), pediatrics and radiation oncology. The subspecialty programs selected are neurological surgery and thoracic surgery.

2

office assisted the EO division in developing uniform Information Document Requests (IDRs) in order to ensure consistency in factual development.[2]

The examining agents have substantially finished their audit work and prepared reports summarizing their findings. The agents gathered information from IDRs, resident and attending physician interviews, and from public sources such as the Internet and the American Medical Association's Graduate Medical Education Directory (the "Greenbook"). Attorneys from the Office of Chief Counsel reviewed the reports and met with the agents to discuss their findings.

**Applicable Law**

Section 3121(b)(10) excepts from the definition of "employment" "service in the employ of a [S/C/U] or an organization described in section 509(a)(3) . . . if such service is performed by a student who is enrolled and regularly attending classes at such [S/C/U]" (the "student FICA exception").

Although we concluded in our memorandum dated August 23, 2001, that teaching hospitals are not S/C/Us, it is nevertheless necessary to determine whether medical residents are students because some teaching hospitals may be part of the same legal entity as a university (see the April 19, 2000, memorandum) and it is possible that teaching hospitals could be § 509(a)(3) organizations in relation to a S/C/U (see the December 14, 2001, memorandum).

Section 31.3121(b)(10)-2(c) provides:

> The status of the employee as a student performing services shall be determined on the basis of the relationship of such employee with the organization for which the services are performed. An employee who performs services in the employ of a [S/C/U] as an incident to and for the purpose of pursuing a course of study at such [S/C/U] has the status of student in the performance of such services.

---

[2]For sponsoring institutions, the standardized IDRs asked for information regarding: (1) whether its specialty and subspecialty programs were accredited; (2) who supervised patient care activities at participating hospitals; and (3) resident characteristics such as whether residents were enrolled, paid tuition and registered for credit. For each specialty program, the standardized IDRs asked for information regarding: (1) the general characteristics of the individual specialty program, such as the number of residents and whether the residency was accredited by the ACGME; (2) participating institutions, such as the amount of time residents spent at each participating institution; (3) reimbursement arrangements with participating institutions; (4) who supervised the day-to-day activities of the residents, such as whether regular faculty or clinical faculty supervised residents; and (5) documentation required to meet ACGME standards with respect to educational activities.

3

Under § 31.3121(b)(10)-2(b), if the employee has the status of student, "the amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are immaterial."

**Rev. Rul. 78-17.**[3]  Rev. Rul. 78-17, 1978-1 C.B. 306, considered whether services performed by employees in three situations were excepted from employment under the student FICA exception.  The Rev. Rul. describes the facts as follows:

> Situation 1.  A is enrolled in a Master of Education program at the university.  During the current academic term A is registered for four courses totaling 12 points of credit.  The maximum course load in all programs is 18 points of credit.  A is also employed 15 hours per week by the university.

> Situation 2.  B is enrolled in a Master of Education program at the university.  During the current academic term B is registered for two courses totaling 6 points of credit.  B is also employed 40 hours per week by the university.

> Situation 3.  C is enrolled in a Doctor of Education program at the university and has completed the requisite course work.  C's dissertation topic has been approved and C is currently conducting the research and experimentation needed for the dissertation.  During the current academic term C is registered at the university for dissertation advisement under the supervision of a committee of faculty members.  C is also employed 6 hours per week by the university.

For Situation 1, the Service held that because A is (1) enrolled and is regularly attending classes, (2) taking a substantial course load, and (3) employed only on a part-time basis, A's services are excepted from employment.

For Situation 2, the Service held that although B is enrolled and regularly attending classes, because B is employed on a full-time basis and is taking only two courses worth 6 points of credit (a full-time course load is 15 points), B's employment is not incident to and for the purpose of pursuing a course of study.  Thus, B's services are not excepted from employment.

For Situation 3, the Service noted that C is enrolled and registered for dissertation advisement.  The Service recognized that a certain amount of non-classroom study may be necessary to obtain an academic degree.  Thus, C's pursuance of a regular course of study necessary to receive the desired degree, in accordance with the

---

[3]Rev. Proc. 98-16 did not revoke any earlier Service guidance.

4

requirements of the school, satisfies the requirement of regularly attending classes. Further, the Service held that C's employment on a part-time basis is incident to and for the purpose of pursuing a course of study.

Thus, the Service held the following factors to be relevant in determining student status: (1) whether the employee is enrolled and regularly attending classes; (2) the extent of the employee's course load; and (3) whether the employee is employed on a part-time or full-time basis. Further, the "regularly attending classes" requirement may be met if the employee is conducting research and experimentation required by a S/C/U to earn an academic degree.

**Rev. Proc. 98-16.** Revenue Procedure 98-16, 1998-1 C.B. 403, sets forth generally applicable objective standards for determining whether services performed by an employee of certain institutions of higher education are excepted from FICA tax under § 3121(b)(10). However, the objective standards do not apply to, inter alia, medical residents "because the services performed by [medical residents] cannot be assumed to be incidental to and for the purpose of pursuing a course of study." This does not mean that medical residents could not possibly be students; rather, whether medical residents are students depends upon the facts and circumstances in each case.

The Rev. Proc. substantially modified the holdings in Rev. Rul. 78-17. For example, the Rev. Proc. modified the holding in Situation 1 by providing an objective course load standard and eliminating the requirement that the employment be on a part-time basis, and modified the result in Situation 2 both by applying the course load standard and by applying an analysis of whether the employee was a "career employee" as opposed to whether he or she was a full-time employee. While Rev. Proc. 98-16 does not provide controlling standards for medical residents, we note that its approach is similar to Rev. Rul. 78-17. Both consider (1) whether the employee is enrolled in classes for credit; (2) the extent of course load; and (3) the nature of the employment relationship.

**The Student FICA Exception as Applied to Medical Residents**

**Social Security Ruling 78-3.** In Social Security Ruling 78-3, the Social Security Administration (SSA) considered, inter alia, whether medical residents performing services at Maricopa County General Hospital in Arizona during the years 1970 through 1974 were students and thus excluded from the State's § 218 agreement. Apparently the State had elected to exclude students from coverage under the § 218 agreement. The SSA noted that the 1965 Amendments to the Social Security Act (the "Act") provided that effective January 1, 1966, the services of medical and dental interns would no longer be excluded from coverage. The SSA concluded that medical interns were not excluded from social security coverage under the State's § 218 agreement. The SSA found support for this position in St. Lukes Hospital Assoc. v. United States, 333 F.2d 157 (6th Cir. 1994) (see Appendix).

**The University of Minnesota Decisions.** In Minnesota v. Chater, 1997 U.S. Dist. LEXIS 7506, (D. Minn. 1997), the State of Minnesota sought a redetermination of an

5

SSA determination that medical residents employed in the University of Minnesota ("University") medical residency programs during 1985 and 1986 were covered under social security pursuant to the State's § 218 agreement.[4]  The State argued that medical residents were not included in a coverage group under the § 218 agreement, or, alternatively, that the residents were excluded under the general student exclusion that the State elected to place in the agreement.[5]  The court concluded that University residents were not included in a coverage group, but, in any event, it determined them to be students within the meaning of § 210(a)(10) of the Act, and thus excepted from coverage under the § 218 agreement.[6]

In concluding that the medical residents were students, the court noted the following facts:

• 
•    University medical residents were enrolled at the University, paid tuition and registered for approximately 15 credit hours per semester.
•    Although the residents did provide patient care, this was a necessary part of their medical education. "A future physician cannot adequately develop skills if not permitted to perform procedures on real patients."  The court found significant that residents are subject to varying levels of supervision depending upon their

---

[4]State of Minnesota involved the tax years 1985 and 1986.  Under the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, the IRS became responsible for determining liability for social security taxes under a § 218 agreement with respect to remuneration for services paid after December 31, 1986.  See the April 19, 2000, memorandum for a discussion of coverage under § 218 agreements.

[5]Section 218(c)(5) of the Act (42 U.S.C. § 418(c)(5)) provides:

Such agreement shall, if the state requests it, exclude (in the case of any coverage group) any agricultural labor, or service performed by a student, designated by the State.  This paragraph shall apply only with respect to service which is excluded from employment by any provision of section 210(a) other than paragraph (7) of such section and service the remuneration for which is excluded from wages by subparagraph (B) of section 209(a)(7).

[6]The statutory language is the same under § 210(a)(10) of the Act and § 3121(b)(10) of the Code.  Section 210(a)(10) of the Act (42 U.S.C. § 410(a)(10)) excepts from employment:

Service performed in the employ of (A) a school, college, or university, or (B) an organization described in section 509(a)(3) of the Internal Revenue Code of 1986 if the organization is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of a school, college, or university and is operated, supervised, or controlled by or in connection with such school, college, or university, unless it is a school, college, or university of a State or a political subdivision thereof and the services in its employ performed by a student referred to in section 218(c)(5) are covered under the agreement between the Commissioner of Social Security and such State entered into pursuant to section 218;

if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university.

6

experience and skill level.  The court noted that "like students in other disciplines, residents are evaluated on their performance."

- In addition to the clinical component, other educational experiences included daily rounds, lectures and formal didactic courses.
- Residents in their first year are not eligible to be licensed in the State and residents beyond their first year are not required to be licensed because the State considered them to be students.
- The University classified residents as holding "student/professional training" positions.
- Residents have been characterized as "students" in other contexts in Minnesota. For example, for workers' compensation purposes, the Minnesota statute defined the term "employee" to include "students enrolled and regularly attending the medical school of the [University] in the graduate school program [(M.D. program)] or postgraduate program."
- Finally, failure to make satisfactory progress could result in the dismissal of the resident from the program.

On appeal, the Eighth Circuit upheld the district court's determination that the medical residents were students, citing only that the residents were (1) enrolled at the university, (2) paid tuition, and (3) were registered for approximately 15 credit hours per semester. 151 F.3d at 748.  The court also noted its finding in <u>Rockswold v. United States</u>, 620 F.2d 166, 167 (8th Cir. 1980), that the medical residency program "is designed to educate and train physicians so that they can pursue careers in academic medicine and medical research." 151 F.3d at 747-48.  The court refused to grant deference to Social Security Ruling 78-3, finding it contrary to the social security regulations, which require a case-by-case examination of the facts. <u>Id.</u> at 748.

In response to the <u>Minnesota</u> decision, the SSA issued Acquiescence Ruling 98-5 (8), 63 F.R. 58444.  Ruling 98-5 applies only to employers located in the 8th Circuit (Minnesota, the Dakotas, Nebraska, Iowa, Missouri and Arkansas).  The ruling provides that, in applying the student services exclusion within the 8th Circuit, SSA will make a case by case examination of the relationship of medical residents with the employer S/C/U to determine whether the residents meet the statutory criteria of being enrolled and regularly attending classes.  In evaluating the relationship, the SSA will consider all the facts and circumstances.[7]


**Analysis of the Facts and Circumstances**

**A.  The Legal Standards**

Following the Eighth Circuit decision, there are two key legal standards against which we must analyze the facts to determine student status for purposes of § 3121(b)(10):

---

[7]Unlike the SSA, the Service applies a facts and circumstances approach in all circuits.

7

- The employee must be enrolled and regularly attending classes;
- The relationship between the employee and S/C/U must be examined to determine whether the services were incident to and for the purpose of pursuing a course of study.

Under regulations § 31.3121(b)(10)-2(c), the status of an employee as a student performing the services is determined on the basis of the <u>relationship</u> of the employee with the organization for which the services are performed.  In determining the nature of the relationship, we believe it is appropriate to examine the relationship from both the perspective of the employer and the employee.  In examining a relationship to determine student status, it is not practical to determine a person's subjective reasons for engaging in certain activities.  Instead, the more practical and reliable approach is to examine the objective facts.  We believe the true nature of a relationship is manifested by the activities of the parties.[8]  Thus, our analysis concentrates on what the residents do; how the institutions structure the activities of the residents; and what activities predominate in terms of time spent and in terms of relative priority.  We have also found it useful to compare residents to other types of students and employees in order to determine whether their relationship with the sponsoring and participating institutions most resembles that of a student/employee or a non-student/employee.

This memorandum discusses certain aspects of the relationship between medical residents and teaching hospitals that we believe have the greatest force in determining the nature of the relationship.  The facts discussed were developed by Service agents in examining the FICA refund claims.  In addition, where appropriate, the memorandum discusses the legislative history of the student FICA exception.

## B.  The Minnesota Factors

The appellate court cited the following facts in concluding that residents were students: (1) the residents were enrolled at the university, (2) paid tuition and (3) and were registered for approximately 15 credit hours per semester.  It was our sense that these facts were uncommon among residency programs before the examinations began, and the agents' findings confirmed this general impression.  Indeed, in none of the examined cases did the residents pay tuition or register for course credit at a university. The residents did not receive a university degree upon completion of the program, but instead received a certificate of completion.

_____

[8]The Social Security Regulations at 20 C.F.R. § 404.1028(c) state: "Whether you are a student for purposes of this section depends on your relationship with your employer.  If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment."  We note the Employment Tax Regulations, which look to whether the services were "incident to and for the purpose of pursuing a course of study," is more clearly an objective standard.  The Employment Tax Regulations provide the controlling standards in these cases, and, moreover, the court in <u>Minnesota</u> looked to the objective facts, although apparently it was presented with limited facts upon which to judge the relationship between the University and the medical residents.

8

The Tax Court noted the unique nature of the University of Minnesota residency program in a 1982 decision considering whether stipends paid to University of Minnesota residents were excludable under § 117 of the Code. "Unlike the typical medical residency program, the residency program in the instant case combined an academic phase with the traditional clinical phase, the two of which in combination satisfied the requirements for an advanced degree." Yarlott v. Commissioner, 78 T.C. 585, 597 (1982), aff'd, 717 F.2d 439 (8th Cir. 1983). See also Rockswold, 620 F.2d at 167 (noting that the University of Minnesota program combined a clinical phase with an academic phase leading to an advanced degree).

Another unusual fact cited by the district court in Minnesota is that first year medical residents could not be licensed, and residents beyond their first year of training need not obtain a license to practice medicine because they were treated as students under State law. By contrast, the agents found that medical residents generally obtained provisional licenses to practice medicine within an accredited residency program during their internship year (first year) and thereafter residents were generally eligible to become fully-licensed, and, indeed, were responsible under their employment contracts to become licensed to practice medicine in the state.[9]

Yet another fact that appears to be unique to Minnesota is that residents were characterized as "students" under the state's workers' compensation laws. The Minnesota statute specifically treated as employees for workers' compensation purposes "students enrolled and regularly attending the medical school of the [University] in the graduate school program or postgraduate program." In none of the cases examined by our agents did the state find it necessary to specifically include medical residents within the definition of employees covered for purposes of workers' compensation. Nor are we aware of other states that specifically bring medical residents within the workers' compensation statute or that refer to medical residents as "students." Most states cover all employees under their workers' compensation laws unless specifically excepted. In reported cases involving injured interns and residents, coverage for purposes of workers' compensation is assumed to exist without question or discussion. The issues in dispute deal with other matters. John Doe v. Yale University, 252 Conn. 641 (1999) (whether a joint venture is the "employer" of the resident under the Connecticut workers' compensation act); Gedon v. University Medical Residents Services, et al., 677 NYS 2d 397 (1998) (whether the injury sustained by the resident arose out of and in the course of his employment); Mermelstein v The City of New York and New York City Health and Hospitals Corporation , 571 NYS 2d 261 (1991) (who was the employer of residents responsible for paying workers' compensation benefits). Perhaps the unique nature of Minnesota

---

[9]After completing a period of graduate medical education (GME) (typically one year, as determined by the state) and passing part three of the U.S. medical licensing exam, a resident is eligible to become fully-licensed to practice medicine. A resident must complete two years of GME to be licensed in Connecticut, Michigan, New Hampshire, New Mexico, Pennsylvania, South Dakota, Utah and Washington. Nevada requires three years of GME to be licensed. Longer periods apply to graduates of medical schools outside of the United States and Canada. See 2000-2001 Greenbook, page 1260.

9

statutes derives from the unique nature of the University's graduate medical education program.

## C. The Primacy of Patient Care

When we seek to apply the statute and regulations, the key issue is whether the services (patient care) performed by the residents are incident to and for the purpose of pursuing a course of study. The facts developed by the agents consistently demonstrate that although residency programs have a significant educational component, patient services are not incident to a course of study. Instead, patient care is the paramount activity in the relationship between the resident and the employer.

**Hours Worked.** In examining the nature of the relationship between residents and teaching hospitals, the agents identified a number of facts indicating the primacy of patient care. The most significant fact is the number of hours that residents work. The agents confirmed our understanding that residents in most cases work in excess of 80 hours per week (including on-call time). Some residents reported routinely working in excess of 100 hours per week. For example, residents in surgical and OB/GYN residencies reported working in excess of 100 hours per week. In addition, certain rotations, such as rotations in an intensive care unit, require in excess of 100 hours per week. Diagnostic radiology residents reported working fewer hours (approximately 50 to 60 hours per week). There is also some variation based upon the year of the residency. Interns worked the most hours with the hours decreasing as the resident progressed through the residency. In addition, there appeared to be some variation based upon the size of the hospital and the area in which the hospital is located. Large hospitals in metropolitan areas seemed to require longer hours by residents in order to meet their patient care needs.[10]

The agents' findings indicate somewhat longer hours than reported by the American Medical Association (AMA) in the following chart.[11]

---

[10]Recent newspaper articles have reported on the long hours that residents work and the effect that fatigue has on their ability to function properly. See N.R. Kleinfield, Life, Death, and Managed Care, New York Times (November 14-17, 1999); S. Jauhar, Medical Residents, Yes, But Workers, Too, New York Times (April 18, 2000); Abigail Trafford, Sweatshop Conditions Can't Give Quality Care, Washington Post, page HE5 (March 27, 2001); Low Experience, High Expectations, Washington Post, page HE12 (March 27, 2001); A Day (and a Half) in the Life of an Intern, Washington Post, page HE16 (March 27, 2001). In addition, an OSHA complaint was recently filed requesting that residents' hours be limited to 80 hours per week. The complaint was filed by the consumer group, Public Citizen; the Committee for Interns and Residents, a union representing 11,000 residents; and the American Medical Student Association, which represents 30,000 medical students. This complaint is summarized in, Ted Rohrlich, Curbs Urged on Interns' Workweek, Los Angeles Times, page A16 (May 1, 2001).

[11]The statistical information in the above chart was obtained from a document published by the American Medical Association entitled Characteristics of Graduate Medical Education Programs and Resident Physicians By Specialty, Table 12 (1999).

10

| The Average Hours on Duty Per Week During the First Year of Selected ACGME-Accredited Residency Program (1998-1999) | |
|---|---|
| Specialty/Subspecialty | Hours on Duty Per Week |
| Family Practice | 64.1 |
| Internal Medicine | 66.1 |
| Ob/Gyn | 74.8 |
| Pediatrics | 71.4 |
| Radiology | 51.1 |
| General Surgery | 79.9 |
| Thoracic Surgery | 73.1 |

One Radiation Oncology resident said there were no set hours; rather, residents were allowed to go home only after all the patients had been seen.  In response to an agent's request for information on the work schedules of surgical residents one taxpayer stated: "When the OR schedule runs late, as often happens, the resident and the involved teaching physician mutually decide when the resident may leave or be relieved.  The guiding principles are patient care and resident education (in that order)."

The Service has held that the hours worked by an employee are relevant in determining whether the employee's services are incident to and for the purpose of pursuing a course of study.  See Rev. Rul. 78-17.  Rev. Proc. 98-16 did not revoke Rev. Rul. 78-17 and its holdings are not inconsistent with this view.  The Rev. Proc. provides that if its objective standards do not apply because an employee's services cannot be presumed to be incident to and for the purpose of pursuing a course of study, then student status is determined based upon the facts and circumstances.  In a facts and circumstances analysis, we believe that hours worked continue to be a relevant factor.

**The Social Security Act Amendments of 1939**.  The legislative history and other authorities support an analysis that looks to hours worked as a relevant factor in determining student status.  The student FICA exception was enacted by the Social Security Act Amendments of 1939 ("SSA of 1939"), Pub. L. No. 76-379, § 606.  Rev. Rul. 78-17 cited the following legislative history in support of its holding:

> In order to eliminate the nuisance of inconsequential tax payments the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax and certain other groups.  While the earnings of a substantial number of persons are excluded by this recommendation, the total amount of earnings involved is undoubtedly very small. . . .  **The intent of this exclusion is to exclude those persons and those organizations in which the employment is part-time or intermittent** and the total amount of earnings is only nominal, and the payment of tax is inconsequential or a nuisance.  The

11

> benefit rights that are built up are also inconsequential. **Many of those**
> **affected, such as students** and the secretaries of lodges, will have other
> employment which will enable them to build up insurance benefits. This
> amendment, therefore, should simplify the administration for the worker,
> the employer, and the government.

H.R. Rep. No. 728, 76th Cong. 1st Sess. (1939), 1939-2 C.B. 538, 543 (emphasis
added). The Senate Report uses similar language. S. Rep. No. 734, 76th Cong. 1st
Sess. (1939), 1939-2 C.B. 565, 570.

This legislative history was also the basis for the standards set forth in Revenue Ruling
85-74, 1985-1 C.B. 331, dealing with the student nurse exception under § 3121(b)(13)
of the Code. This section excludes from the definition of employment "service
performed as a student nurse in the employ of a hospital or a nurses' training school by
an individual who is enrolled and is regularly attending classes at a nurses' training
school chartered or approved pursuant to State law." Based upon the legislative history
to the SSA of 1939 set forth above, and the statutory language providing the exception
from employment for "service performed as a student nurse," the Revenue Ruling
promulgated the following three-part test for determining whether a nurse's services are
excepted from FICA under the student nurse exception:

> (1) The employment is substantially less than full-time,
>
> (2) The total amount of earnings in nominal, and
>
> (3) The only services performed by the student nurse for the employer are
> incidental parts of the student nurse's training toward a degree which will qualify
> him or her to practice as a nurse or in a specialized area of nursing.

Rev. Rul. 85-74 was challenged in <u>Johnson City Medical Center v. United States</u>, 999
F.2d 973 (6th Cir. 1993). The court, applying a <u>Chevron</u>[12] analysis, first held that the
statute was not unambiguous. <u>Id.</u> at 976. Continuing its <u>Chevron</u> analysis, the court
found that the standard to be applied with respect to a revenue ruling is whether "it
conflicts with the statute it supposedly interprets or with the statute's legislative history
or if it is otherwise unreasonable." The court concluded that the Rev. Rul. reflected the
legislative history, and was not unreasonable in any way. Thus, the court accorded
deference to the Rev. Rul. based upon the standards set forth in <u>Chevron</u>. <u>Id.</u> at 977.
In addition, the court upheld the district court's determination that the remuneration
received by the nurses was more than nominal. <u>Id.</u> at 977-78.

Thus, we believe that consideration of hours worked in determining student status
reflects Congress' intent in enacting the student FICA exception. We believe that the

---

[12]<u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984).
Under <u>Chevron</u>, if an agency has been explicitly authorized by Congress to promulgate regulations, such
regulations are given controlling weight unless they are arbitrary and capricious. If the authority to
provide rules is not express, but rather implied, then a court may not substitute its own statutory
construction if the agency's interpretation is reasonable.

12

long hours worked by residents strongly suggests that their services are not incident to and for the purpose of pursuing a course of study.

**Didactic Activities Secondary.**  The agents generally found that didactic activities were secondary to patient care.  Some conference time was considered "protected," meaning that others were responsible for covering patient care during that time.  However, if a patient needed a resident's attention, didactic activities generally gave way to patient care needs.  Residents reported that it was not uncommon to be "beeped out" in order to handle a patient emergency.  This is consistent with the Greenbook, which states:

> The education of resident physicians relies on an integration of didactic activity in a structured curriculum with diagnosis and management of patients under appropriate levels of supervision and scholarly activity aimed at developing and maintaining life-long learning skills.  The quality of this experience is always related to the quality of patient care, <u>which is always the highest priority</u> (emphasis added).[13]

**House Staff Manuals.**  The house staff manuals and handbooks also demonstrated that the overarching purpose of the relationship between a resident and a teaching hospital is to provide patient care.  The house staff manual in one case stated that the primary responsibility of the medical resident is to participate in the care of the patient under appropriate supervision.

**Supervision of Patient Care.**  Much of a resident's day-to-day work is conducted without direct participation by a faculty member/attending physician.  The residents reported that an attending physician was typically actually present about two hours per day.  Instead, much of the supervision is done by phone or pager and records are later signed by the attending physician.[14]  For example, medical residents may do the paper-work in connection with an admission or a discharge, with the attending physician signing-off on the admission or discharge after the fact.  Third and fourth year residents develop treatment plans which are presented to the attending physician.  In addition, third year residents are in charge of code cases with the attending physician only providing support.  The attending physician was always advised as to medication changes and patient condition or care changes, but attending physicians often post-review these actions.  Most routine tests, prescriptions, lab work, blood work up and CT scans are requested without the prior approval of an attending physician.  However, radiation oncology residents may not prescribe radiation treatment without the prior approval of an attending physician, and the attending physician must be present during the "key portion" of a surgical procedure.  One resident stated that after the first six months, the medical residents made the decisions, with the attending physician simply approving the plan of care.  Indeed, the residents indicated that they were supposed to

---

[13]2000-2001 Greenbook, page 31.

[14]However, the agents found that emergency rooms and intensive care units generally have attending physicians present at all times.

13

demonstrate independence, and thus it was not viewed favorably if a resident asked for too much assistance.

Instead, the residents relied heavily on the senior residents and the chief resident for guidance and supervision. Residents are expected after their first year to demonstrate leadership skills. Chief residents are responsible for preparing work schedules and for insuring adequate patient coverage at all times. The chief resident plans the schedules and draws up house staff teams consisting of medical students, interns, residents and a senior resident. The chief resident may supervise three house staff teams. In hospital wards, the senior residents are typically in charge of patient care overnight with no supervision from attending physicians. A PGY-5 surgical resident is expected to manage his own surgical team, including assigning surgical cases to the more junior surgical residents.

The residents themselves provide much of the training on specific procedures. The popular saying in residency programs is "see one, do one, teach one." After a resident becomes "certified" or obtains "privileges" for a particular procedure, the resident may perform that procedure and supervise another resident who is not certified in performing that procedure. All procedures must be performed a certain number of times before a resident can be certified in that procedure. These procedures range from the relatively simple such as a blood draw to more complex procedures such as a colonoscopy.

Indeed, in some cases we learned that the residents are designated as faculty in supervising the services performed by medical students and are given faculty appointments. In addition, fellows[15] in some cases were regular or voluntary faculty members and at the same time residents. In one house officer's agreement, the house officer was appointed as an adjunct faculty member, and was granted the privileges associated with such status.

**Attending Physicians Often Not Hired as Teachers.** The primary purpose of the relationship between teaching hospitals and attending physicians/faculty members in many cases also seemed to be patient care. Although there is an expectation that staff physicians at a teaching hospital will train residents, medical staff are generally selected based upon their medical knowledge and training, not whether they are effective teachers, or even whether they have any teaching experience. Although there was significant variation in the examined cases, the agents found that most of the "faculty" at the teaching hospitals were "clinical faculty." Clinical faculty are physicians who are not members of the regular teaching staff of a medical school, but instead are staff physicians, or physicians with hospital privileges who have volunteered to train residents. Clinical faculty are generally not compensated for training residents. The

---

[15]The ACGME defines a "fellow" as "[a]n individual undertaking post-residency training in a field of research that is not accredited by the ACGME. Some specialities also use 'fellow' to designate resident physicians in subspecialty GME programs." The agents found that residents in accredited subspecialties were referred to as "fellows." The ACGME prefers that individuals in subspecialties be referred to as "residents." See 2000-2001 Greenbook, page 1270.

14

agents found that appointment to the faculty of an affiliated medical school was automatic upon becoming a member of the physician staff, and likewise faculty status automatically ended upon ceasing to be a staff member of the hospital. An agent noted that in one reaccreditation application it was stated that other aspects of the faculty member's responsibilities such as research, paper writing, grant proposals and meetings must not interfere with insuring the proper functioning of the ward service.

**Residents Meet a Hospital's Operational Needs.** As would be expected, during these long hours residents provide substantial patient care services. The agents typically found that medical residents fulfilled a substantial portion of the operational needs of a hospital. In one case, out of      beds, approximately      beds were under the care of house staff teams. In another case, the average census per internal medicine intern was eight to ten patients per day with an average stay of seven days. In another case, a second year radiation oncology resident reported performing approximately ten consults, 10 -15 follow ups and caring for 20 treatment patients per week. A fourth year radiation oncology resident saw approximately 40 patients per week plus 20 patients undergoing treatment. Surgical residents reported seeing between 10 and 40 patients on a daily basis.[16] Thus, from the perspective of the institution responsible for patient care, it is difficult to describe the patient care provided by the resident as a mere incident to an educational program.

## D. Educational Activities

**Curriculum.** The requirements that residents be "enrolled and regularly attending classes" and "pursuing a course of study" suggest that the learning must be more structured than simply the experiences arising from the treatment of whatever patients happen to be admitted to the hospital. We believe this language requires that a curriculum exist. In practice, the curriculum presented to our agents generally consisted of the rotations that residents perform. The ACGME establishes the rotations that must be performed in each specialty.[17] For example, a few of the "focused experiences" for family practice residents are: (1) human behavior and mental health; (2) adult medicine; (3) maternity and gynecological care; (4) care of the surgical patient; (5) sports medicine; and (6) care of neonates, infants, children and adolescents. For internal medicine residents, a few of the "major learning experiences" are: (1) ambulatory patients, (2) continuity ambulatory patients, (3) hospitalized patients, (4) emergency medicine patients, and (5) critical care patients.[18]

---

[16]In Boston Medical Center v. National Labor Relations Board, 330 N.L.R.B. No. 30, 1999 NLRB Lexis 821, *31 (1999), the American Public Health Association filed an amicus brief for the petitioner. It noted that "house staff provide the bulk of physician-type services to the traditionally underserved in hospital emergency rooms and clinics, and that it would perhaps be insulting, if not disquieting, to the under served to be told that their care is being provided not by 'doctors' but by 'students.' "

[17]The larger institutions had many nonaccredited fellowship programs. These nonacredited programs were in subspecialties that have not been recognized by the ACGME. Examples of nonaccredited residency programs include breast imaging, a subspecialty of diagnostic radiology; gynecological oncology, a subspecialty of OB/GYN; and neurophysiology, a subspecialty of neurology.

[18]Greenbook, pages 82-85 (family practice), pages 96-99 (internal medicine).

15

Although residents generally progressed from simpler to more demanding responsibilities, our agents were not presented with evidence of a curriculum of the type expected in an academic program. Instead, what residents learned depended upon what the patients presented. We believe that this type of training is a form of structured on-the-job training that might be found in other professions or trades requiring highly-skilled and highly-specialized workers. We note that as in any on-the-job training, the specific learning experiences depend upon the job at hand, which, in the case of medical residents, depends upon the patients. We do not believe that structured on-the-job training equates to a "course of study" for purposes of the student FICA exception.

**"Classes."** Assuming for the sake of discussion that a curriculum exists, it must be determined whether the medical residents were "regularly attending classes." We do not believe "classes" should be interpreted so narrowly to include merely traditional lecture/discussion and lab sessions. Instead, a variety of events and activities, whether or not in a classroom, including lectures, demonstrations, tutorials, and teaching rounds, at which a faculty member plays a leadership role in furthering the objectives of an established curriculum, may be considered classes for purposes of the student FICA exception. The frequency of events such as these determines whether the medical resident may be considered to be regularly attending classes.

The agents identified certain activities that were didactic in nature and that could reasonably be considered "classes" for purposes of the student FICA exception. For example, teaching rounds, certain lectures and conferences and supervised research projects in many cases could reasonably be considered classes. The agents found that these activities were primarily intended to educate medical residents on a specific topic. These activities typically arose in the context of a case that presented an opportunity for learning about a particular subject matter.

However, taxpayers in many of the cases asserted that any supervised activity should be considered a class. We believe that it is not enough that an activity was supervised, because attending physicians are responsible for supervising all patient care. As we have discussed in our memorandum, attending physicians have dual roles, namely, (1) he or she is the attending physician of record having ultimate responsibility for patient care, and (2) generally he or she is considered a "faculty" member of an affiliated medical school or the teaching hospital itself with responsibility for overseeing the residents' training. We believe that the existence of a curriculum and activities furthering that curriculum under the supervision of a faculty member distinguish a class that is part of a course of study from on-the-job training or work experiences.

In addition, it is necessary to distinguish between industry quality control standards and classes that are part of a course of study for residents. The agents noted that in many cases the activities which the taxpayer claimed were "classes" within the meaning of § 3121(b)(10) were activities that would have occurred based upon the quality control systems in place at the hospital. For example, mortality/morbidity conferences and tumor conferences would occur regardless of whether the hospital participated in a GME program. The agents found that certain activities, like the review of a radiology

16

film by the attending physician, could be viewed as a quality control measure, because in many institutions two physicians review films. One diagnostic radiology resident noted that when moonlighting another physician reviews his slides in accordance with standard quality control practices.

The agents also learned that activities such as grand rounds and certain other conferences qualify for Continuing Medical Education (CME) credit for state licensing purposes. We question the appropriateness of considering these activities to be "classes" within the meaning of § 3121(b)(10) since the activities appear to merely be the continuing education in which all professionals generally participate.

It is also necessary to distinguish between activities that are primarily patient care and activities that are part of a medical resident's course of study. For example, the agents found that "work rounds" or "morning rounds" should not be considered "classes." The purpose of work rounds is to check on the patient's condition overnight. In most cases, the work rounds were not supervised by attending physicians, but rather the more senior residents conducted the rounds in which junior residents and medical students participated. During work rounds, the patients' statuses are reviewed and discussed and a plan of treatment is formulated. These rounds typically last about two hours. A pediatrics residency intern described his duties in connection with work rounds as taking vitals, temperature, pulse, fluid information, performing a physical exam and making assessments. This information is provided to the senior resident and then to the attending physician. These rounds are primarily intended to ensure that patients receive good care. While work rounds provide valuable work experience, they should not be considered classes for purposes of the student FICA exception.[19]

Finally, a large portion of a typical residents' day is spent performing routine activities that could not reasonably be argued were "class-type" activities. For example, writing orders, blood draws and IVs and other so-called "scut work" are common tasks, particularly among junior residents. In addition, residents answer patient questions and document patient histories. The residents stated that they perform these relatively routine tasks to assist the attending physician so he or she does not get bogged down. The residents reported that this type of work tapered off by the fourth year. In addition, the amount of scut work varied among specialties and among institutions. These tasks are generally learned in medical school. Repeating these types of activities is not educational and certainly cannot be considered classes.

---

[19]The ACGME distinguishes among "teaching rounds," "work rounds" and "management rounds." Teaching rounds are "patient-based sessions in which a few cases are presented as a basis for discussion of such points as interpretation of clinical data, pathophysiology, differential diagnosis, specific management of the patient, the appropriate use of technology, and disease prevention." The purpose of management rounds is for the attending physicians to "interact at intervals with his or her patients and to communicate effectively and frequently with the resident staff participating in the care of these patients." "Work rounds are rounds in which a senior resident supervises a junior resident's patient care activities, without an attending physician present." 2000-2001 Greenbook, page 97. Thus, "teaching rounds" are intended to be for educational purposes, whereas "management rounds" and "work rounds" are primarily for the purpose of ensuring adequate patient care.

17

**Teaching Rounds.**  The agents found that some activities could more reasonably be considered to be "classes."  For example, there often times are "attending rounds" or "teaching rounds" that follow the house staff team's rounds.  The purpose of these rounds is to discuss the plan of treatment for each patient.  A resident may be responsible for "presenting" patient cases to the attending physician and the team several times during a year.  When presenting a case, the resident is expected to be prepared to field questions from the attending physician.  We believe it is reasonable to consider teaching rounds to be classes for purposes of the student FICA exception.

The agents noted some variations for radiation oncology residencies.  Teaching rounds and morning conferences occurred twice per week for about one hour.  At weekly "chart rounds," attending physicians, residents, fellows, therapists, and physicists all attend to discuss treatment.  In addition, radiotherapy planning conference is held daily during which all new patients are presented.  During these conferences, the presenting resident is questioned by faculty and other medical residents in attendance.  Residents report spending many hours preparing for a case presentation.  These too are reasonably considered classes.

**Noon Conferences.**  Common among the programs were lectures scheduled every day around noon while the residents were eating lunch.  The subject matter of noon conferences typically centered on current patients.  The residents generally stated that attendance was considered mandatory, but in most cases attendance was not taken.  Attendance was typically 60 - 70 percent of the residents.  There were also so-called "pizza conferences" in another case that appeared to serve the same purpose as noon conferences.  It is not unreasonable to also consider noon conferences to be classes for purposes of the student FICA exception.

**Grand Rounds and Other Conferences.**  Grand rounds generally occur at all teaching hospitals.  Grand rounds might have a large audience including attending physicians and other staff members.  In one case, diagnostic radiology grand rounds were held once per month and included an invited speaker.  In addition, from time to time attending physicians give lectures or talks on complex or interesting topics or cases.  In one family practice residency, residents were expected to attend a lecture once per week for four hours.  In addition, while rotating through a department, a family practice resident was expected to attend the department's conferences.

The agents found that attendance at grand rounds and other conferences is sporadic.  If a resident misses a lecture or conference due to patient care requirements there is no make-up available.  Residents on rotations outside the hospital will not attend conferences.  In addition, the agents found that attending physicians and other medical staff members receive CME credit for grand rounds and some of the other conferences that medical residents attend.  Thus, we believe that grand rounds and other conferences in many cases are not reasonably considered classes.  However, conferences or lectures held specifically for the purpose of educating residents are reasonably considered classes.

18

Diagnostic radiology and radiation oncology residencies seemed to have more didactic activities. In one diagnostic radiology residency, conferences consisting of lecture and film review were held twice per day at 12:30 and 4:00. In addition, fourth year radiology residents were required to take a physics class. Radiation oncology residents were required to take physics courses at an affiliated institution. These activities are reasonably considered classes. However, the relevance of course work outside the hospital is questionable because the employee must be enrolled and regularly attending classes at the institution where the employee is employed.

**Morbidity/mortality Conferences and Tumor Conferences.** Generally all staff members participate in morbidity/mortality conferences. These conferences appear to be quality control measures. In addition, the agents learned that states generally allow CME credit for these conferences. Thus, we believe that these conferences are not reasonably considered classes.

**Journal Club.** Journal club was common in all the cases. In journal club, residents discuss recent medical journal articles. Journal club typically met once per week for one or two hours, and may have been held in a bar or restaurant. One resident said that there was usually a designated topic but invariably the discussion turned to another topic. It was our impression from the agents' reports that faculty members generally did not participate in journal club. Whether a journal club meeting is reasonably considered a class depends upon whether a faculty member participates in the meeting.

**Research Projects.** Research projects are encouraged, but generally are not mandatory. Rather, as in any professional field, research and writing is viewed as a career enhancer. For some residencies, a research project was required to be completed during the residency. In these cases, residents were given time to complete the project, but some patient care was required because Medicare does not reimburse for a resident who is only conducting research. (See the discussion of Medicare below). In some cases, on-call time was used to satisfy the patient care requirement for Medicare purposes. For radiation oncology residencies, a research project of publishable quality was expected to be completed during the final year of the residency. Weekly meetings were held with a faculty member to discuss the project. Again, in a case where a faculty member is involved in supervising a research project, this activity is reasonably considered a class.

**Testing.** It would be expected that a student would be tested to determine whether he or she has satisfactorily mastered the subject matter of the class. Residents' knowledge of the material covered during teaching rounds, grand rounds and other conferences is not tested. The evaluation of residents is not focused primarily on cognitive knowledge; rather, they are primarily evaluated by their performance on-the-job. (See discussion below of performance appraisals.) Although residents may take a yearly standardized in-service examination, the agents learned that in-service testing is used in large part to measure a program's strengths and weaknesses and to prepare residents for board examinations. For certain specialities, such as radiation oncology and general surgery, residents maintain a log of the procedures they have performed.

19

But again, this record is required so that the resident can sit for board exams, not to measure whether a resident has mastered the subject matter of a class.

**Conclusion.**  The agents found that didactic activities, including teaching rounds, and lectures and conferences, were generally between four and twelve hours per week. The agents found generally that the time spent in didactic activities did not change much from year to year.  Even if the most liberal definition of "classes" is used, including the time spent in work rounds, residents spent only 10 to 20 percent of their time in didactic activities.  Thus, even assuming for the sake of discussion that a "course of study" or a curriculum existed, the time spent in patient care activities compared to the time spent in didactic activities indicates that the services performed by residents were not incident to and for the purpose of pursuing a course of study. Rather, the educational activities appear to have been incidental to the patient care services.

## E.  Structure of the Relationship

The agents found residents' employment contracts, job descriptions, performance appraisals and compensation and benefits to be instructive in determining the nature of the relationship.  The agents found that the structure of the relationship between a resident and his or her employer reflected the preeminence of the service aspect of the relationship.

**Employment Contracts.**  The employment contracts/appointment letters resembled an employment contract of a typical non-student/employee.  Residents entered into annual contracts with the employer setting forth their respective responsibilities and compensation and benefits.  The annual contract typically stated that the teaching hospital will provide malpractice insurance; the resident agrees to supervise the services of other residents and medical students; and the resident is responsible for obtaining the required permits and licenses to practice medicine in the state.  Annual contracts stated the bases upon which residents would be evaluated, such as competence and demeanor and behavior.

**Job Description.**  The job descriptions also resembled what might be expected in the case of a non-student/employee position.  For example, the responsibilities of a general surgery resident were listed as:  1) assessment of patients; 2) forming and carrying out a problem-based plan of care; 3) communicating promptly, respectfully and accurately with patients, family members and supervising physicians; 4) keeping pertinent, legible and timely records; 5) performing selected procedures with the  appropriate level of supervision; and 6) educating patients.

**Compensation and Benefits.**  The compensation and benefits that residents receive is typical of a non-student/employee relationship.  Medical residents are typically provided health insurance, eligibility to participate in salary deferral arrangements under § 403(b), housing assistance or allowances, short term disability, workers' compensation coverage, flexible spending accounts (cafeteria plans), discounts on auto/homeowners/renters insurance, employee assistance programs, meal allowances

20

while on call, free parking and uniforms.  Residents also accrue sick leave and vacation time, receive unpaid leave under the Family Medical Leave Act (FMLA) and receive maternity leave.

The question arises whether the amount of compensation that residents receive is significant in determining student status.  Residents generally received in the range of $35,000 to $50,000 per year in salary plus benefits.[20]  Regulations § 31.3121(b)(10)-2(b) provides that "the amount of remuneration for services performed by the employee in the calendar quarter . . . [is] immaterial. . . .  The statutory tests are (1) the character of the organization . . . and (2) the status of the employee as a student . . . ."

The language that "the amount of remuneration for services performed by the employee in the calendar quarter . . . [is] immaterial" is best explained by the quarterly limit that existed when the student FICA exception was first enacted.  Before 1950, services performed by a student enrolled and regularly attending classes for a S/C/U not exempt from income tax were not "employment" to the extent the remuneration for these services did not exceed $45 in a "calendar quarter"; however, remuneration for student services performed for a S/C/U exempt from income tax were not subject to a dollar limit per calendar quarter.[21]  In 1950, the quarterly limit on remuneration paid to an employee/student of a non-exempt S/C/U was eliminated and the separate student exclusion provisions for exempt and non-exempt entities were combined.[22]  We believe the regulations' curious reference to the "amount of remuneration . . . in the calendar quarter" was intended to clarify that the $45 limit per quarter for services performed by students for non-exempt S/C/U is no longer in effect; it does not mean that the amount of remuneration is wholly irrelevant in determining student status.  This view is consistent with Service position in Rev. Proc. 98-16.  At § 3.04, the Service stated, "If the employee does perform services as an incident to and for the purpose of pursuing a course of study and, therefore, has the status of student, the amount of remuneration for services performed by the employee . . . [is] immaterial."

---

[20]According to the AMA, the average compensation of residents for 1998 was $38,177.61. Characteristics of Graduate Medical Education Programs and Resident Physicians By Specialty, Table 11 (1999).

[21]Social Security Act Amendments of 1939, Pub. L. No. 76-379, §§ 201, 606, 53 Stat. 1360, 1374-75, 1384-85 (1939).  Section 1426(b)(10)(A) of the Code excepted from employment "[s]ervice performed in any calendar quarter in the employ of any organization exempt from income tax . . . if . . . (iii) such service is performed by a student who is enrolled and regularly attending classes at a school, college, or university."

Section 1426(b)(10)(E) of the Code excepted from employment

[s]ervice performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax under section 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university, and the remuneration for such services does not exceed $45 (exclusive of room, board, and tuition).

[22]Social Security Amendments of 1950, Pub. L. No. 81-734, § 104(a), 64 Stat. 477, 497, 531 (1950).

21

Indeed, concluding that the amount of remuneration is wholly irrelevant to student status ignores the legislative history which provides:

> The intent of this exclusion is to exclude those persons and those organizations in which the employment is part-time or intermittent **and the total amount of earnings is only nominal, and the payment of tax is inconsequential or a nuisance.  The benefit rights that are built up are also inconsequential.  Many of those affected, such as students** and the secretaries of lodges, will have other employment which will enable them to build up insurance benefits.  This amendment, therefore, should simplify the administration for the worker, the employer, and the government.

H.R. Rep. No. 728, 76th Cong. 1st Sess. (1939), 1939-2 C.B.  538, 543 (emphasis added).

In Rev. Rul. 85-74, the Service cited this language in concluding that whether "the total amount of earnings is nominal" determines, in part, whether an employee's services are excepted from employment under the student nurse exception under § 3121(b)(13).  As discussed, the Sixth Circuit in Johnson City Medical Center found Rev. Rul. 85-74 to be a reasonable reflection of the legislative history upon which we rely.

Medical residents' compensation and benefits certainly are not "nominal," and the FICA taxes on their salaries is more than "inconsequential."  Moreover, the benefits rights that are built-up are not inconsequential.[23]  While residents' compensation is much less than they now earn, or will earn upon completion of their residencies, this is similar to many professionals and other highly skilled workers who earn a fraction in the early years of their career compared to their earnings after they have gained some valuable work experience.
We do not want to overemphasize this argument, however, because we believe that while the amount of compensation and benefits has some relevancy, other factors have more force in determining the nature of the relationship, namely, the primacy of patient care in relation to the educational aspect of the relationship.

**Performance Appraisals.**  A medical resident's performance appraisal resembles that of a typical non-student/employee.  At the end of a rotation, residents are evaluated by the attending physician.  Residents are also evaluated annually by the department head.  Residents are evaluated based on certain criteria such as clinical judgment, basic medical knowledge, technical skills, interpersonal skills, ascertaining and documenting health status and health risk factors, diagnosis skills, communicating effectively with patients and staff, providing appropriate supervision of patients and

---

[23]The Social Security Administration reported to the Government Accounting Office that if residents are determined to not be subject to FICA tax, the expected loss of revenue to the OASDI trust funds will be $3.9 billion for the years 2001 through 2010.  In addition, the SSA estimates that 270,000 medical residents will lose some coverage over the next ten years if medical residents' services are excluded from coverage under the FICA.  Social Security Coverage for Medical Residents (GAO/HREHS/GGD-00-184R, August 31, 2000).

22

support personnel, administering effectively, charting, history taking and continued professional growth and self-discipline. The narrative comments are typically directed toward the medical resident's work habits, interpersonal skills, teaching skills, punctuality, attitude and fund of knowledge.

**Dismissal.** The causes for dismissal and the dismissal process are also similar to what might be expected in a non-student/employee relationship. A resident may be dismissed from a residency program, but that is very rare. Any attrition is generally due to residents quitting the residency program. If a resident is dismissed from a residency program, it is generally because of the quality of the resident's clinical work, not the resident's academic performance. In addition, grievance procedures also typically exist in the event an institution wishes to take an adverse action against a resident.

## F. Contrast with Medical Students.

Because modern undergraduate medical training has a strong clinical component, it could appear that a residency merely continues a student status that we have acknowledged for M.D. candidates. However, the facts developed by the residents demonstrates that there are striking differences.

Medical students are enrolled for credit at a medical school and pay tuition. Medical students participate in clinical clerkships at a teaching hospital for which they receive grades and credits toward a M.D. degree. During the typical 2 years in clinical rotations, medical students learn to identify diseases and possible treatment plans and obtain basic knowledge of how hospital services function. They generally observe and perform only very simple procedures. They do not get paid for the services they perform; receive employee benefits; develop and initiate specific patient treatment plans; order tests and write prescriptions; make any independent medical decisions—such as changing medicine dosages; or take charge of a ward or other service areas, especially during the night. They are generally not even allowed to write notes for the medical record. In addition, the agents found that medical students at affiliated universities are not permitted to work more than 19 hours per week and do not receive benefits. Residents, unlike medical students, generally have temporary or permanent licenses. Absent this license, their responsibilities may be limited to those of a medical student. One house staff manual stated that residents who have not obtained their medical license must act as a medical student until the license is obtained.

## G. Moonlighting.

Given the number of hours worked per week, it is difficult in many cases for medical residents to moonlight. However, in many residency programs residents with an unrestricted license to practice medicine may moonlight. As noted, a resident can generally receive an unrestricted medical license after completing one year as a resident in an accredited residency program and passing part three of the U.S. Medical Licensing Exam. Residents stated that while moonlighting they performed many of the same tasks that they performed within the residency program, such as patient physicals

23

and histories, writing patient care orders, ordering tests and medications, and performing routine procedures.

Fellows and residents nearing the end of their residencies are more likely to moonlight. For one OB/GYN program, medical residents indicated that moonlighting was reserved for residents in their third or fourth year. In one internal medicine program, a work study program was available during a four month block during which the resident was paid at the normal staff physician rate of pay of more than $100,000 per year. In another case, high performing residents were allowed to moonlight within the department and receive the pay of a regular staff physician. In some cases, agents noted that medical residents had W-2s reporting wages in excess of $100,000. This could be because of moonlighting, work study, or a resident who had completed a residency during the year and become a regular staff physician.

The FICA taxes with respect to moonlighting compensation in some cases were included in the refund claims. It is correct that if an employee of a S/C/U has the status of student at the S/C/U, then all of the compensation for services for the S/C/U are excepted from FICA. However, by the same token, all of the services must be considered in determining whether the services are incident to and for the purpose of pursuing a course of study. To use our extreme example again, if a resident earns $100,000 (e.g., $50,000 from the residency and $50,000 for moonlighting at the institution), it would be difficult, if not impossible, to conclude that the resident's services were incident to and for the purpose of pursuing a course of study.

## H.  Economic Aspects

Initially, we observe that medical residents provide patient care–the activity which is a hospital's core business. We believe this fact is relevant in determining the nature of the relationship.

The agents commented on the economic relationship between medical residents and a teaching hospital, feeling that the economics color the nature of the relationship. The agents observed that a teaching hospital would require the services of other health care professionals, such as nurse practitioners, physicians' assistants and additional staff physicians to replace the services of medical residents. Moreover, the agents noted that teaching hospitals receive approximately $100,000 per year or more for each medical resident in the form of Medicare and Medicaid payments.[24]

**Medicare.**  The Federal Government makes payments to teaching hospitals in connection with resident services under Medicare part A and part B. Under part A, teaching hospitals receive reimbursement for a portion of the cost of GME. Medicare part A payments comprise two elements. First, Medicare makes "direct" payments to

---

[24]Medicare payments for GME totaled $6.2 billion in 1999. In addition, states subsidize GME through Medicaid payments. Assuming there were 90,000 residents in 1999, that equates to approximately $69,000 for each resident. As discussed below, the amount received by a particular institution will vary in part based upon the number of Medicare patients at the hospital.

24

reimburse teaching hospitals for the stipends paid to residents and other program costs such as the salaries of supervising faculty.[25]  These direct GME payments reflect the product of three components.  The first component is the teaching hospital's direct GME costs for 1984, the "base-year," as adjusted for inflation.[26]  The second component is the hospital's current number of residents.  The third component is Medicare's share of the hospital's inpatient days.  Second, Medicare makes "indirect" payments in the form of a percentage add-on to the teaching hospital's basic diagnostic related group (DRG) operating payments.  The add-on percentage is based upon the hospital's ratio of residents to its beds.  Indirect payments are intended to reflect the higher costs that teaching hospitals incur per case because it is assumed they provide care that is generally more complex and technologically sophisticated.[27]

Teaching hospitals also are indirectly compensated for resident services under Medicare part B.  The attending physician must be the physician of record for Medicare part B payments, but the resident often times provides the services or performs the procedure subject to the attending physician's supervision.[28]  The agents also learned that in some cases the supervising physician could be a resident or fellow who is "credentialed" to perform the procedure.  In addition, fellows in some cases have "attending level privileges" and thus act as the attending physician.

Taxpayers typically assert that although residents provide services, their services could more efficiently be performed by other health care professionals, such as nurse practitioners or physicians assistants.  Leaving aside whether these workers can perform services such as reading film or performing surgery, anecdotal and empirical evidence suggests that use of residents may be beneficial to teaching hospitals financially.

**Anecdotal Evidence.**  By way of anecdotal evidence, an agent noted that a GME committee in its recorded minutes expressed fear that reducing residents' hours would create a financial burden for the institution.  As further anecdotal evidence, In Boston Medical Center and House Officers' Association/Committee of Interns and Residents, 330 N.L.R.B. No. 30 (1999), 1999 NLRB Lexis821, *202, the petitioner cited a 1994

---

[25]42 CFR § 413.86.

[26]The Centers for Medicare & Medicaid Services (CMS, formerly the Health Care Financing Administration) advised the Service that the base-year costs upon which reimbursement rates are computed presumably included FICA taxes on resident salaries, because FICA taxes would have been considered an allowable cost under the Medicare program.  Thus, it appears that institutions are seeking refunds of some amounts that have already been reimbursed by the Federal Government.

[27]42 CFR § 412.105.  See Report to Congress by the Medicare Payment Advisory Commission, Rethinking Medicare's Payment Policies for Graduate Medical Education and Teaching Hospitals, page xi (August, 1999).

[28]42 CFR §§ 415.170, 415.172 and 415.174 provides the Medicare rules on the supervision required to bill for services under Medicare part B.  In order to bill under Medicare part B, the attending physician be "present" during the "key portion" of a procedure. 42 CFR §§ 415.172.  For certain services in a clinic setting, however, the attending physician's presence is not required.  42 CFR § 415.174.

25

recommendation by a committee at the former Boston City Hospital stating that "[u]nder the current reimbursement system, the cost of house staff and attending physicians is virtually free. The cost of providing services without a teaching program would be significantly higher." The budget report stated that all GME costs at Boston City Hospital were reimbursed, as well as a portion of indirect overhead costs. Overall, more than 82 percent of total GME costs were reimbursed. The report also noted that the cost of alternate providers such as physicians assistants and nurse practitioners was higher than the cost of residents, and the availability of alternative providers was problematic. The report concluded that a service delivery model without a teaching relationship did not appear to be a viable option.[29]

**Empirical Evidence.** Although some taxpayers assert that the use of medical residents is economically inefficient, there is empirical evidence that residents do allow teaching hospitals to carry out their mission more cheaply than if they did not use residents. First, we note that the Balanced Budget Act of 1997 changed the Medicare reimbursement system because the existing system allegedly encouraged teaching hospitals to train more physicians than the market could bear.[30] In addition, we note three studies that have concluded that teaching hospitals benefit economically by employing residents to provide patient care instead of hiring other higher paid health care professionals. One study was conducted in New York in the late 1980's to determine the economic effect on teaching hospitals as a result of the reforms to combat the problem of resident impairment that arose in the wake of the Libby Zion incident. The study concluded that the services of up to 4,000 additional health care professionals, at a cost of $220 to $270 million annually, would be required to replace the lost patient care services by medical residents in New York due to the reforms.[31] Another study concluded that the net cost of replacing resident services at D.C. General Hospital would be in excess of $17 million annually.[32] Moreover, a recent study published by the American College of Chest Physicians concluded that "[p]atients [greater than or equal to] 65 years old cared for by a faculty hospitalist service with the active participation of medical residents appear to have a 1-day [length of stay]

---

[29]In addition, there are many cases considering whether residents' stipends are excludable under § 117 in which the courts have nearly uniformly concluded that medical residents are compensated for the valuable services they provide to teaching hospitals. See, for example, Meek v. Commissioner, 608 F.2d 368, 373 (9th Cir. 1979) ("Although the hospital evidently could continue to provide medical care without the services of interns, the interns did perform valuable services which, if the interns were excused from performance, would have to be performed by others.").

[30]P.L. No. 105-33, §§ 4621 through 4630. Congress also enacted a program of incentive payments to encourage residency programs to reduce the number of residents.

[31]Kenneth E. Thorpe, Director, Program on Health Care Financing, Harvard University School of Public Health, A Revolution in Graduate Medical Education: The Implications of Regulatory Reform in New York State (February, 1989).

[32]Alan Sager, Ph.D., Professor of Health Services, Boston University School of Public Health, D.C. General Hospital Should be Renewed, Not Closed or Converted (Sept. 18, 2000).

26

reduction, significant total cost reductions, and significantly lower subspecialty consultation rates than comparable control subjects receiving routine private care."[33]

Thus, the agents' general impression of the economic relationship between residents and teaching hospitals is supported both by empirical and anecdotal evidence.  We are not economics experts, and we recognize that some may dispute whether teaching hospitals save money from using medical residents.  However, the evidence suggests that teaching hospitals do, in fact, benefit economically from the services that medical residents provide.  Some teaching hospitals may have financial difficulties, but perhaps this is not because of using medical residents, rather it may be that some teaching hospitals have come upon hard times despite using medical residents.

## I.  On-the-Job Training.

Finally, we wish to emphasize our view that on-the-job training should not fall within the student FICA exception.  The Greenbook states that "GME focuses on the development of clinical skills and professional competencies and on the acquisition of detailed factual knowledge in a medical specialty."[34]  We are certain that residents gain in confidence, judgment, independence and experience as they go through their residencies.  However, this describes what occurs generally in on-the-job training, and, indeed, in all work experience, especially for professionals and other highly-skilled workers.  When asked to identify educational activities, residents routinely responded that every time he or she sees a patient, learning occurs.  Indeed, a physician who is a radiation oncologist with many years of experience proclaimed: "I'm still learning."  Hopefully, we all are learning as we carry on our day-to-day activities.  That, however, does not mean we are all students for purposes of the student FICA exception.  We do not believe Congress could have intended that result.

## J.  Conclusion.

On balance, we have concluded that the services that medical residents provide are not incident to and for the purpose of pursuing a course of study.  Instead, we believe that medical residents are engaged in a structured form of on-the-job training.  We conclude therefore that it is appropriate to deny the examined refund claims.

---

[33]Dani Hackner, The Value of Hospitalist Service, American College of Chest Physicians, Chest No. 2, Vol. 119, page 580 (February 1, 2001).

[34]2000-2001 Greenbook, page 31.

27

**Appendix**

Finally, we wish to supplement our discussion in the April 19, 2000, memorandum of the significance of the repeal of the medical intern exception in 1965. Specifically, we believe it is important to consider the <u>St. Lukes</u> decision, which we believe provides context in which to view Congress' actions in 1965.

**The Medical Intern Exception.** The SSA of 1939 amended the Code with respect to medical interns. Section 1426(b)(13) of the Code excepted:

> Service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law; and service performed as an intern in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law.

The House Report provides:

> Paragraph 13 excepts service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes . . . ; and services performed as an intern **(as distinguished from a resident doctor)** in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law.

H. R. Rep. No. 728, 76th Cong. 1st. Sess. 49 (1939), 1939-2 C.B. 538, 550-51 (emphasis added); see also S. Rep. No. 734, 76th Cong. 1st Sess. 58, 1939-2 C.B. 565, 578. Thus, Congress distinguished interns from residents. This suggests that Congress intended to exclude interns from coverage, but not residents.

**St. Lukes Hospital v. United States, 333 F.2d 157 (6th Cir. 1964).** St. Lukes claimed a refund of FICA taxes based upon the student intern exception under § 3121(b)(13) of the Code. The years at issue were before 1965. The refund claims were computed based upon the remuneration paid to medical school graduates in their second or subsequent year of clinical training.

At trial, the plaintiff's witnesses stated that in 1939 the ordinary and accepted meaning of the word "intern" was the same as the ordinary and accepted meaning of the word "resident." The plaintiff asserted that although members of the medical profession used these terms differently, the public used these terms interchangeably. The Government countered with testimony that these terms had different meanings in 1939. It asserted that the term "intern" meant a medical school graduate in his or her first year of training, whereas the term "resident" meant an individual who had completed one year of training and endeavored to gain additional training to become a specialist. The trial judge sided with the plaintiff finding that it was appropriate to ascribe to Congress the public's understanding of these terms, which was not to distinguish between the terms "resident" and "intern."

28

On appeal, the Sixth Circuit found that the terms "intern" and "resident" had different meanings in 1939. The court noted, however, that between 1939 and date of the hearing some significant changes had taken place affecting the use of these terms. The court noted that the lines between interns and residents had blurred since 1939, but from 1939 to 1961 an "intern" had been regarded as an individual receiving hospital training during the first year following medical school, and the main qualification of a resident is the completion of an internship. The court noted that Congress in 1939 explicitly distinguished residents from interns by using the language "(as distinguished from a resident doctor)." Id. at 163. See H. R. Rep. No. 728, 76th Cong. 1st. Sess. 49 (1939), 1939-2 C.B. 538, 550-51.

The plaintiff persuaded the trial court that imposing FICA tax would lead to an absurd result because it would required residents to pay for something which would never be of any benefit to them. However, the appellate court received information from the Social Security Administration that a resident could benefit in the form of disability benefits and death benefits to the resident's family. Id. at 163-64.

Finally, the court noted that exceptions from social security coverage are to be narrowly construed. Id. at 164

The court concludes the opinion by stating:

> In all of the above we do not ignore the fact that distinctions between interns and residents-in-training have been substantially reduced in the years since 1939. The resident training program has been greatly expanded and its educational aspects have been greatly enhanced. No doubt these developments lend some weight to the argument for expansion of the intern exemption to cover residents-in-training. **It seems clear to us, however, that meeting these changed conditions, if indeed there is warrant for dong so at all, is the function of legislation and not that of judicial interpretation.**

Id. (emphasis added).

As discussed below, the Social Security Amendments of 1965 (SSA of 1965) repealed the medical intern exemption, covered medical doctors under SECA, and covered medical residents and interns working in federal hospitals under the FICA. These changes affecting medical doctors are arguably Congress' response to St. Lukes. That response arguably was: "Not only do we think that medical residents should be covered under the FICA, as the court in St. Lukes held, but we believe that interns should be covered as well."

**The Social Security Amendments of 1965**. The legislative history underlying the SSA of 1965, Pub. L. No. 89-97, suggests that Congress intended that medical residents be covered under the FICA. Section 311(b)(5) of the SSA of 1965 amended § 3121(b)(13) by striking the medical intern exception.

With respect to the repeal of the medical intern exclusion, the Senate Report states:

29

> Section 3121(b)(13) of the Internal Revenue Code of 1954 excludes from the term "employment," and thus from coverage under the [FICA], services performed as an intern in the employ of a hospital by an individual who has completed a 4-year course in a medical school . . . . Section 311(b)(5) amended section 3121(b)(13) so as to remove this exclusion.  The effect of this amendment is to extend coverage under the [FICA] to such interns unless their services are excluded under provisions other than section 3121(b)(13).  Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the Code.

S. Rep. No. 404, 89th Cong. 1st Sess. 237-38 (1965).  The last sentence makes indirect reference to the exclusion from FICA for services performed for exempt organizations under § 3121(b)(8)(B) of the 1954 Code.  That exclusion was repealed by the Social Security Amendments of 1983 (Pub. L. No. 98-21).  Nothing in the legislative history indicates that Congress believed interns (or residents, who were even further along in their medical careers than interns) were eligible for the student FICA exception.

In addition to revoking the medical intern exception, § 311 of the SSA of 1965, entitled, "Coverage for Doctors of Medicine," changed the law in two other ways which affected medical doctors.  First, § 1402(c)(5) of the 1954 Code was amended to eliminate the exception from the definition of "trade or business" for physician services, thus making these services subject to self-employment tax.  Second, § 3121(b)(6)(C)(iv) of the 1954 Code, which provided an exclusion from the definition of employment for "service performed in the employ of the United States if the service is performed by any individual as an employee included under § 5351(2) of title 5, [U.S.C.], (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government)," was amended to add, "other than as a medical or dental intern or a medical or dental resident in training."

These provisions, taken together, appear to indicate Congress' intent to create a scheme under which all medical doctors are covered under the social security system, whether or not they are still in training, whether or not they are self-employed, or whether or not they work for the federal government.



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

OFFICE OF
CHIEF COUNSEL

April 19, 2000

UILC: 3121.02-10
Number: **200029030**
Release Date: 7/21/2000

CC:EBEO
SPR-114083-99 WLI #1

MEMORANDUM FOR STEVEN T. MILLER
DIRECTOR (T:EO )

FROM:              Mary Oppenheimer
                   Assistant Chief Counsel (CC:EBEO)

SUBJECT:                        FICA Refund Claims

     You have been contacted by field offices about various Federal Insurance
Contributions Act ("FICA") refund claims that have been filed around the country.
You in turn contacted this office for advice.  Because this advice will be distributed
to the field offices, it constitutes conduit Chief Counsel Advice subject to disclosure
under § 6110 of the Internal Revenue Code.

     The purpose of this memo is to provide our analysis of how TE/GE and IRS
Exam personnel should approach the legal issues involved in FICA refund claims
filed with respect to medical residents.  This memo begins with a general
description of medical residency programs and the student FICA exception.[1]  This
memo next explains that whether the student FICA exception applies, or whether a
resident is a student within the meaning of the student exclusion under the Social
Security Act (the "Act"), is determined with reference to the common law employer.
In this regard, this memo discusses many of the relevant facts in identifying the
common law employer.  Next, this memo discusses the special considerations if the
employer is a state or local government entity, including determining whether the
residents' services are covered under an agreement with the Social Security
Administration (SSA) to cover state and local government employees under social
security (a "§ 218 agreement").  If residents' services performed for a state or local
government entity are not covered under a state's § 218 agreement, or if the
common law employer is a nongovernmental employer, then it must be determined
whether the requirements under § 3121(b)(10) ("the student FICA exception") have
been met, including the employer status and student status requirements.  Finally,
the memo discusses the refund claim procedural requirements that an employer

---

[1]FICA refund claims have been filed also with respect to residents in other health care fields, such as
dentistry.  The same legal analysis applies in those cases as in medical resident cases.

2

must meet in order to receive a refund of employment taxes.  See Exhibit 1 for a Student FICA exception analysis flow-chart.

Medical Residency Programs[2]

A medical residency program prepares a medical doctor (that is, a person who has graduated from medical school and earned a medical degree) for practice in a medical specialty.  The medical doctors in a residency program are referred to as "residents."[3]  Most residents are in residency programs accredited either by the Accreditation Council for Graduate Medical Education (ACGME) or the American Osteopathic Association (AOA).  These accrediting bodies require that a sponsoring institution abide by detailed program requirements covering all aspects of the training program.  The largest number of residency programs are in the areas are family practice, internal medicine, pediatrics, obstetrics/gynecology, radiology, and general surgery.  The program requirements vary depending upon the type of program.[4]  In completing an accredited program, a resident typically completes the education requirements for certification by a specialty board recognized by the American Board of Medical Specialties (ABMS).  The resident is then eligible to take the board examination in a medical specialty area.[5]

To become a resident, an individual must have graduated from medical school and have passed parts one and two of the U.S. medical licensing exam. The individual is then eligible to receive a temporary license from the appropriate state medical licensing board.  The temporary license permits the resident to practice under the auspices of the residency program in which the resident participates.  After completing a period of graduate medical education (GME)

---

[2]The description of medical residency programs in this memo is based largely upon information in the American Medical Association's, Graduate Medical Education Directory (2000/2001) (commonly referred to as the "Green Book").

[3]The term "intern" historically referred to an individual participating in a one-year training program that was a prerequisite to admission into a residency program.  Internship programs were discontinued across the country in 1975, and residency programs have since included medical school graduates in their first year of graduate medical education.  First year residents are often referred to as interns. Residents may also be referred to as "house staff" or "house officers."

[4]The program requirements for ACGME accredited programs are set forth in the Green Book. For example, the program requirements for family practice and internal medicine are set forth starting on pages 78 and 93 respectively.

[5]Being eligible to take a board examination or having passed a board examination is often a prerequisite to obtaining staff privileges or participating as a provider in health insurance plans.

3

(typically one year, as determined by the state[6]) and passing part three of the U.S. medical licensing exam, a resident is eligible to become fully licensed to practice medicine. At this point, the resident can legally practice outside the residency program, either by leaving the residency program, or by "moonlighting" while still in the residency program.

GME programs have a "sponsoring institution" and may have other "participating institutions."[7] An "institution" is an organization having the primary purpose of providing education or health care services (e.g., a medical school or a hospital).[8] The sponsoring institution is usually a medical school or a hospital. A hospital that is a sponsoring institution will often have some affiliation with a medical school. The sponsoring institution establishes the residency program and has overall authority and is responsible for the residents' GME. A sponsoring institution generally sponsors residency programs in several specialty areas. The participating institutions provide additional opportunities to obtain medical experiences within a residency program. Both sponsoring and participating hospitals are commonly referred to as "teaching hospitals." Although the organization structure of GME programs vary, see Exhibit 2 for models of common structures.

Most training programs require periods of residency of from three to seven years depending upon the specialty area.[9] The duties and responsibilities of a medical resident may change as the training program progresses. Residents take on more responsibility according to their level of education, ability and experience, including supervising the work of more junior residents along with attending physicians.

Residents are supervised by "attending physicians." Attending physicians generally play two roles with respect to medical residents. First, attending physicians are responsible for patient care services. An attending physician must

_____

[6]Nevada requires three years of GME; Connecticut, Michigan, New Hampshire, New Mexico, Pennsylvania, South Dakota, Utah and Washington require two years.

[7]The terms "sponsoring institution" and "participating institution" are used by the American Medical Association's Green Book.

[8]For purposes of this memo, the term "hospital" means any facility that has as its purpose the provision of medical care to patients, including outpatient medical clinics that provide outpatient services.

[9]For example, family practice and internal medicine typically require a 3 year training period, whereas general surgery typically requires a 5 year training program which may be extended by one or two years if the resident participates in a subspecialty program. See Green Book, pages 78, 93, 339, 344.

4

be the physician of record for every patient. In this regard, the attending physician may be acting as an agent of the hospital with respect to patient care services depending upon the attending physician's relationship with the hospital. The relationship with the hospital may be either as an employee or independent contractor. The attending physician may be paid by the hospital or may merely have staff privileges at the hospital.

Second, attending physicians also have a duty to the sponsoring institution to train medical residents and monitor their progress. Regardless of whether the sponsoring institution is a medical school or hospital, attending physicians generally hold faculty appointments at the sponsoring institution and are referred to as "faculty," even though they may or may not be part of the regular faculty of the medical school. Attending physicians may or may not be compensated by a sponsoring institution for services performed in training residents.

The entity responsible for providing patient care services could also be a faculty practice plan affiliated with a university medical school. Medical school faculty, as part of their duties as medical school professors, may treat patients at hospitals affiliated with the medical school under the auspices of a faculty practice plan. Faculty practice plans may or may not be legal entities apart from the medical schools with which they are affiliated. The patient care fees generated by faculty practice plans accrue to the affiliated medical school. Medical residents are often involved in patient care services provided by faculty practice plans.

The Student FICA Exception Under § 3121(b)(10)

Sections 3101-3126 of the Internal Revenue Code impose Federal Insurance Contribution Act (FICA) taxes on the wages of employees. FICA taxes consist of an old-age, survivors, and disability insurance portion (usually called social security tax) and a Medicare portion.

Section 3121(b)(10) of the Code excepts from the definition of employment for FICA purposes services performed in the employ of a school, college, or university ("S/C/U") (whether or not that organization is exempt from income tax), or an affiliated organization that satisfies section 509(a)(3) of the Code in relation to the S/C/U ("related § 509(a)(3) organization") if the service is performed by a student who is enrolled and regularly attending classes at that S/C/U. Thus, the student FICA exception applies to services only if both the "employer status" and "student status" requirements are met.

The employer status requirement means that the employer for whom the employee performs services (the common law employer) must be either a S/C/U or a related § 509(a)(3) organization. The student status requirement means that the employee must have the status of a student at the S/C/U. If either the student

5

status or employer status requirement is not met, the student FICA exception does not apply, and the resident would be covered under the FICA unless the resident's services qualify for some other exception.[10]

Determining the Common Law Employer

The first step in determining whether a medical resident is subject to FICA is to determine the entity that is the common law employer of the resident. Section 31.3121(b)(10)-2(c) of the Employment Tax Regulations provides that "the status of the employee as a student performing the services shall be determined on the basis of the relationship of such employee with the organization for which the services are performed." Thus, the identity of the common law employer is essential to determining whether the exclusion under § 3121(b)(10) applies because the common law employer must be a S/C/U. Identifying the common law employer is also essential to determining whether the resident is covered by a § 218 agreement (discussed below).

This issue arises because the residency program may include assignments ("rotations") at institutions other than the sponsoring institution. For example, the sponsoring institution may be a medical school but all clinical aspects of the residency may be performed at participating institutions whose only affiliation with the medical school is by contract ("affiliation agreement") (see Exhibit 2, Model C). The sponsoring institution may assert that the participating hospital where the services are performed is not the common law employer. Thus, the issue arises whether the sponsoring institution or the hospital where the resident performs services is the resident's common law employer.[11]

The common law employer is the party that has the right to direct and control the medical resident. Direction and control is the test not just for determining whether the worker is an employee versus independent contractor, but also determines which party is the employer when the worker has a relationship with more than one entity. See the training materials that you received on employee versus independent contractor status. "Independent Contractor or Employee?" Training 3320-102 (Rev. 10-96) TPDS 84238I.

---

[10]For example, if the employer is a state or local government, the resident's services are not covered under a § 218 agreement, and the resident is a participant in a retirement system under section 3121(b)(7)(F), the resident's services would not be considered employment for FICA purposes. Section 3121(b)(7)(F) became effective with respect to services performed after July 1, 1991. However, the resident's services would probably be subject to Medicare tax under § 3121(u)(2).

[11]The institutions filing refund claims do not assert that the medical residents were independent contractors.

6

Section 3121(d)(2) of the Code provides that the term "employee" means any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.  The question of whether an individual is an employee under the common law rules or an independent contractor is one of fact to be determined after consideration of the facts and the application of the law and regulations in a particular case.  Guides for determining the existence of that status are found in three substantially similar sections of the Employment Tax Regulations; namely, sections 31.3121(d)-1, 31.3306(i)-1 and 31.3401(c)-1 relating to the FICA, the Federal Unemployment Tax Act (FUTA), and federal income tax withholding, respectively.

In describing when an employment relationship exists, § 31.3121(d)-1(c)(2) of the regulations provides that

> "[g]enerally, such relationship exists when the person for whom the services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished.  That is, an employee is subject to the will and control of the employer not only as to what shall be done but as to how it shall be done.  In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he or she has the right to do so."

The regulations generally identifying employers speak of them as persons who employ employees (§§ 31.3121(d)-2 and 31.3306(a)-1 of the regulations) and as any person for whom services are performed as an employee (§ 31.3401(d)-1 of the regulations).

*The Entity Which Pays the Resident is Not Automatically the Employer*

The fact that the sponsoring institution pays the resident and treats the resident as an employee for payroll purposes does not mean that the resident is the common law employee of the sponsoring institution.  The sponsoring institution could instead be the statutory employer (the person having control over the payment of wages) under § 3401(d)(1).[12]  Alternatively, the sponsoring institution may be an agent for purposes of employment tax obligations under § 3504, may be a common paymaster under § 3121(s), or may merely be acting as a common law agent for payroll purposes.  Although a statutory employer, agent, or common

---

[12]Section 3401(d)(1) defines the term "employer" for purposes of income tax withholding.  This section has been made applicable for FICA purposes under Otte v. United States, 419 U.S. 43 (1974) and later cases.

7

paymaster (but not a common law agent) is liable for any FICA tax due, whether the student FICA exclusion applies is determined with reference to the common law employer.

*Authorities Involving Three-Party Relationships*

Several cases involving three-party employment arrangements have considered which entity, if any, is the common law employer. In <u>Professional & Executive Leasing, Inc. v. Commissioner</u> 89 T.C. 225, 232-233  (1987), <u>aff'd</u>, 862 F.2d 751 (9th Cir. 1988) ("PEL"), PEL furnished workers to client businesses and treated the workers as its employees.  PEL covered the workers in pension, profit-sharing, and fringe benefit plans.  PEL also issued paychecks to the workers, paid the related federal and state employment taxes, and provided workmen's compensation coverage.  PEL received a fee for each worker provided to the client. By contract PEL had the right to terminate or reassign a worker.  The workers generally had a preexisting employment and ownership relationship with the clients for whom they worked.  PEL reviewed the workers' qualifications only for the proper professional licenses.  The client businesses provided equipment, tools and office space for the workers.  In appropriate cases, the client was required to provide malpractice insurance naming PEL as an insured.

Among the factors considered by the courts in PEL were the degree of control over the details of the work; investment in the work facilities; withholding of taxes, workmen's compensation and unemployment insurance funds; right to discharge; permanency of the relationship; and the relationship the parties think they are creating. Citing <u>Bartels v. Birmingham</u>, 332 U.S. 126 (1947), the Tax Court noted that a contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist.

The court found that an employment relationship did not exist between PEL and the workers because PEL exercised minimal, if any, control over the workers; rather, each client and the worker controlled the details of the work and the selection of assignments.  PEL did not have a genuine right to terminate or reassign the workers.  In addition, PEL had no investment in the work facilities; the clients provided office space, tools and equipment.  Despite the contract terms giving PEL control over the workers and labeling the relationship between PEL and the workers as employment, the court found that PEL merely performed a payroll and bookkeeping function.  The court held that the workers were not employees of PEL, but of the clients.

In <u>Burnetta v. Commissioner</u>, 68 T.C. 387 (1977), a company was formed to do the selection, hiring, training and instruction of workers who would then be contracted out to client businesses, such as Burnetta's.  However, in actual

8

practice, the clients did the screening and selection of workers.  The client also had the right to discharge a worker and determined the workers' pay.  The worker completed time sheets, which the client approved and submitted to the company.  The company prepared the workers' paychecks, deducting applicable employment taxes, and mailed them to the clients to give to the workers.  The company billed the client monthly and sometimes paid the workers before being paid by the client.  The company received a fee based on a percentage of the workers' gross compensation.

The court held that the workers were employees of the clients, not of the company.  The court found that the company essentially provided payroll and recordkeeping services for the clients.  "In short, Staff simply relieved its business clients (including the petitioner corporations) of the burden of providing their payroll and recordkeeping functions and did not have the right to control its clients' employees in the manner normally associated with and contemplated by the typical common law employer-employee relationship."[13]  It was the client, not the company, that interviewed and hired the workers, determined their salaries, and fired them if dissatisfied with their work.  The court noted also that the right to control the workers as to the result to be accomplished by their work and the details and means by which the result was accomplished rested with the clients.  The company never provided job-related instructions to the workers or had substantial contact with the workers during their employment.

In re Critical Care Support Services, Inc., 138 B.R. 378 (E.D.N.Y. 1992), involved an agency that provided critical care nurses to hospitals.  The agency screened the nurses for their qualifications, including licenses, skills and insurance.  The agency determined whether to send a nurse to any hospital and also determined the hospitals, duties and shifts to which the nurse was assigned.  The agency paid the nurses and billed the hospitals for the nursing services.  If a hospital was dissatisfied with a nurse's performance, it notified the agency not to send the nurse again.  The agency then decided whether to send the nurse on future assignments to other hospitals.

The agency argued that it was not the employer of the nurses because the agency did not actually control the nurses in their performance of services at hospitals; rather the nurses were controlled by the hospital. The court observed that it is difficult to demonstrate the existence of a right to control without evidence of actual exercise of the right.  The court noted, however, that the professional critical care nurses, who were carefully screened by the agency, did not have to be actually controlled in their every movement by the agency.  The agency retained the right to control the nurses as reflected in its right to assign them to any hospitals (or

---

[13]68 T.C. at 391 and 399.

9

none at all) or duties, specifying the time and place of the work. The agency also paid the nurses directly, regardless of whether receiving payment from the hospitals. The court held that the nurses were employees of the agency.

In Hospital Resource Personnel, Inc. v. United States, 68 F.3d 421 (11th Cir. 1995), another case involving a nurse staffing agency, in addition to considering whether the taxpayer was entitled to relief under section 530 of the Revenue Act of 1978, the court considered whether the staffing agency was the common law employer of the nurses. In concluding that the agency was not the common law employer, the court found persuasive the facts that the agency did not instruct or train the nurses; it did not mandate full-time employment; it was the nurses themselves who provided transportation, incidental expenses, uniforms, tools, and materials; and, in contrast to Critical Care Support Services, supra, it neither scheduled the tasks nor set the number of hours the nurses must have worked. In addition, the nurses did not work on the agency's premises, and they were free to provide their services directly to hospitals and to register with other similar nursing agencies.

In Revenue Ruling 57-21, 1957-1 C.B. 317, the IRS considered whether a licensed physician in residency at a hospital was an employee of an organization for which the physician worked on a part-time basis as part of the physician's clinical training. Under the facts of the ruling, the physician's services were made available to the organization for four hours per week under special arrangements with the hospital. As staff physician for the organization, the physician prescribed medication and recommended treatment for the organization's handicapped workers. The physician directed the nurse in her duties and suggested phases of development for the medical program. The resident did not carry on a private practice. The IRS concluded that the physician was an employee of the organization.[14]

*The Dual Functions of GME Programs*

Determining which institution is the common law employer is complicated by the dual functions that GME programs have. While the primary purpose of GME programs is to train medical doctors in a medical specialty, they also provide residents who perform patient care services. Although it is clear that the sponsoring institution is responsible for resident training, the question arises as to which entity has the right to direct and control the resident's performance of patient care services. The fact that the sponsoring institution evaluates the resident's

---

[14]See also Rev. Rul. 55-500, 1955-2 C.B. 398 (IRS held that students assigned to a manufacturing corporation by their college pursuant to an agreement between the college and the manufacturing corporation were employees of the corporation for employment tax purposes).

10

training progress does not necessarily mean that it has the right to direct and control the resident's patient care services.  In <u>State of Minnesota v. Apfel</u>, 151 F.3d 742 (8th Cir. 1998), discussed below, the status of the medical school as the employer appears not to have been questioned, so it was not considered or addressed by the court.[15]  The case therefore is not legal authority for the proposition that the medical school is the common law employer of medical residents who perform services at a hospital that is not part of the medical school or its university.

*Liability in Tort for Resident Negligence*

In analyzing which entity has the right to direct and control residents in performing patient care services, it is instructive to consider which entity may be liable for the negligent act of a resident based upon the application of common law agency principles because these same principles determine whether a common law employment relationship exists.[16]  If liability is not determined by the affiliation agreement, liability would be based upon application of agency principles, including the doctrine of respondeat superior.

Under the doctrine of respondeat superior, the common law employer is liable in tort for the negligent act of its employee so long as the employee is acting within the scope of employment.[17]  One writer has suggested that most courts would find that the hospital where services are performed is the "general employer" of the resident and thus would be liable for the resident's negligence based upon respondeat superior.[18]

---

[15]<u>State of Minnesota</u> involved liability under Minnesota's § 218 agreement, which covered employees of the University of Minnesota.  Nothing in the opinion suggests that either side ever questioned whether the University was the employer.  In fact, the Government's case was based on coverage of University employees under Minnesota's § 218 agreement.  The court opinion does not mention whether the residents were performing services at University facilities or elsewhere.  The opinion assumes that the residents were common law employees of the University, but concluded they were not "employees" within the meaning of the section 218 agreement.

[16]Of course, residents may held liable for their own negligent act, but plaintiffs will usually seek to hold another party vicariously liable.

[17]<u>Restatement (Second) of Agency</u> § 243 (1958).

[18]Stewart R. Reuter, M.D., J.D., <u>Professional Liability in Postgraduate Medical Education, Who is Liable for Resident Negligence?</u>, 15 J. L. Medicine 485, 503-04 (1994) ("The second question [(after examining the affiliation agreement)] is whether the resident is an employee of the hospital.  Most courts would answer yes.") citing, for example, <u>Newton County Hospital v. Nickolson</u>, 207 S.E.2d 659 (Ga. App. 1974) ("[W]hen a person is taken directly to a hospital as where he is rendered unconscious in an accident, and a physician hired by the hospital, such as an intern or resident, is guilty of malpractice . . .

11

However, the writer also suggests that alternative liability may rest the attending physician or medical school based upon other agency theories. For example, the attending physician may be liable as a "borrowing employer" based upon the borrowed servant doctrine. Under this theory, the hospital remains the general employer, but if the attending physician exercises sufficient control with respect to a particular act, the attending physician may be considered the borrowing employer."[19] In addition, the writer suggests that the attending physician or medical school faculty member may be liable along with the hospital under the joint employment theory. Under this theory, alternative liability may be based upon the fact that the attending physician or faculty member has a strong right to control the conduct of a resident who cares for the physician's patient.[20]

*Which Entity Benefits Economically From Resident Services?*

It is also instructive to consider for whose benefit (other than the patient) the resident's services are being performed. In this regard, it is instructive to consider which entity benefits economically from resident services; in other words, who receives payment for resident services? It is our understanding that a hospital does not bill directly for resident services. Instead, as in the case of nursing services, charges for resident services are subsumed within the overall amount billed to a patient receiving care at the hospital. In addition, Medicare subsidizes teaching hospitals for their GME costs, but Medicare does not subsidize medical schools for their GME costs.[21] Thus, the hospital benefits economically from resident patient

---

a different situation arises. Such physician usually stands in a position with the hospital, which, under the normal tests of the existence of a master-servant relationship, would call for a ruling that he was the hospital's servant.").

[19]Id. at 504-07; Restatement (Second) of Agency § 227(1958) provides that "[a] servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." Comment b. provides that "[i]n the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it".

[20]Id. at 507-09; The Restatement (Second) of Agency § 226 (1958) provides that "a person may be the servant of two masters, not joint employers, at one time and as to one act, if the service to one does not involve abandonment of the service to the other." Under comment b., joint employment occurs when two employers agree to share the services of an employee for a single act.

[21]Medicare payments comprise two elements. First, Medicare makes "direct" payments, which are determined based upon the number of residents employed by the hospital. 42 CFR § 413.86. Second, Medicare makes "indirect" payments in the form of increases to the teaching hospital's basic diagnostic

12

care services--the activity for which the resident is being compensated.[22]

### Developing the Facts Regarding Direction and Control

As a starting point, the agent should determine (1) the identity of the sponsoring institution, (2) the type and duration of the residency programs at issue in the claim, (3) the number of residents in each program, and (4) whether rotations are performed at participating institutions and the duration of any such rotations. This information may be obtained from the claim, the taxpayer, or from other sources such as the Green Book or through Internet research.[23]

Documentary evidence involving medical residents and sponsoring institution faculty (attending physicians), such as employment contracts and position descriptions, is highly relevant for purposes of determining the facts with respect to behavioral control, financial control, and the relationship of the parties.  In addition, the affiliation agreements between the sponsoring institution and any affiliated teaching hospitals are relevant for purposes of determining the parties' intent with respect to the relationship as well as in determining  the entity that has the right to direct an control the resident.[24]  In this regard, the following documents are relevant in developing the facts in these cases:

--------

related group (DRG) operating payments.  42 CFR § 412.105.

[22]The August 1999 report to Congress by the Medicare Payment Advisory Commission entitled, Rethinking Medicare's Payment Policies for Graduate Medical Education and Teaching Hospitals, page 8, describes resident stipends as follows:

> Residents earn a stipend because they provide patient care and perform other services that are of value to the hospital.  Other things being equal, this stipend reflects the value of services residents furnish minus the cost of their training.  The direct cost of their training is reflected in the remaining direct GME expenses for faculty supervision, administrative staff, and faculty overhead.  In principle then, the direct GME costs that hospitals report on their Medicare cost reports represent the net value of the patient care services residents provide.

[23]General information regarding the residency program at issue can likely be obtained through Internet research, including FREIDA online (Fellowship and Residency Electronic Interactive Database Access) at www.ama-assn.org//frieda.

[24]Of course the substance of the relationship, not the label placed on it, governs the resident's status.  § 31.3121(d)-1(a)(3) of the regulations; Bartels, supra (the Supreme Court determined that orchestra leader was the employer of the orchestra members despite contracts which designated the dance halls where the orchestra performed as the common law employer).  However, the designation or description of the relationship is important in close cases.  See Illinois Tri Seal Prods. Inc., v. United States, 353 F.2d 216, 218 (Ct. Cl. 1965).

13

- Any written policies/procedures relating to limits on the patient service aspects of the program.
- Any contracts/affiliation agreements between the sponsoring institution and the participating institution(s) with respect to the GME program.
- Any agreements a resident must sign upon entering the residency program.[25] (Determine if there are additional agreements signed as the training program progresses).
- A resident handbook or bulletin, if any, provided to residents.
- Position description(s) for Medical Residents, if any.  Does the position description change as the training program progresses?
- Any contracts between the sponsoring institution and its attending physicians/faculty members that address the attending physicians' responsibilities with respect to the supervision of resident patient care services.  Check on whether separate contracts exist between the participating hospitals and the attending physicians with respect to the supervision of resident services.
- The sponsoring institution's position description(s), if any, for an attending physician/faculty member.  What does the position description say with respect to the supervision of resident services or the training/education of residents?

In addition, if the residency program is accredited, the specific program requirements as set forth by the accrediting body should be reviewed to identify any other pertinent documents.[26]

In determining whether an individual is an employee under the common law rules, case law and rulings have looked to a variety of facts as indicating whether sufficient control is present to establish an employer-employee relationship.  As noted above, the same facts will determine which of two entities is the employer.  The degree of importance of the facts varies depending upon the occupation and the factual context in which the services are performed.  See Revenue Ruling 87-41, 1987-1 C.B. 296, 298-99.   To analyze the relevant facts, items of evidence can be grouped into the following three main categories:  behavioral control, financial control, and the relationship of the parties.

1.  **Behavioral control.**   Evidence in this category include facts regarding whether a business has the right to direct and control how the worker performs the specific tasks for which the worker is hired.  Facts that show behavioral control include the type and degree of instructions given to the worker and the training the

---

[25]The ACGME requires a written agreement setting forth the conditions of the appointment.

[26]See supra, note 4.

14

business gives the worker.  It is important to remember that there will typically be some facts indicating behavioral control by both the sponsoring and participating institutions.

There are certain facts which will generally be consistent from case to case which indicate that a hospital where services are performed has behavioral control over residents.  The hospital will generally determine the hours a resident is to work.[27]  In addition, the hospital receives payment for resident patient care services, including Medicare reimbursement; thus creating an incentive to monitor their services.

There are other facts which are properly viewed as neutral facts because they are common to all hospital-physician relationships.  These include the facts that the services will be performed on the hospital's premises, the hospital sets policies and procedures with respect to patient care, and the resident will generally use the hospital's equipment, facilities and support staff.  Instead, facts indicating that the hospital generally has more detailed policies and procedures with respect to patient care services performed by residents than for other physicians are more relevant for purposes of determining behavioral control (see facts to be developed below).

Certain facts will typically indicate that the sponsoring institution has behavioral control over residents.  Sponsoring institution faculty provide instructions and training to residents with respect to the provision of patient care services.  These instructions may be very detailed, especially in the early years of a residency.  Also, an accredited sponsoring institution will have an evaluation system in place which serves as means to direct and control the performance of services by a medical resident.

Other facts to be developed with respect to behavioral control include:

•    To what extent does the hospital or sponsoring institution require the resident to make time/activity reports?
•    Do the contracts/affiliation agreements between the sponsoring institution and the participating hospitals address supervision of resident patient care services?  Do these contracts designate an entity as the employer having the

---

[27]In New York, the hospital is responsible for seeing that the so-called "Libby Zion regulations" are followed.  These regulations, which are set forth at § 405.4 of the New York Health Code (10 NYCRR 405.4), require that the hospital establish certain limits and monitor the working hours of medical residents.  These regulations also require that hospitals adopt and enforce specific policies regarding moonlighting to ensure that medical residents are not fatigued when performing patient care services.  Similar laws do not exist in other states, but limits may be imposed by the programs.

15

     right to direct and control the medical residents?  Do these contracts
     designate an entity that would be liable in the event of resident negligence?

- Does the hospital have in place separate safeguards/controls or policies, possibly set forth in a "house staff manual," governing patient care services performed by residents?  Are any of these special procedures mandated by federal or state law (such as Medicare)?
- Do contracts with faculty/attending physicians address supervision of patient care services performed by residents?
- What procedures are in place with respect to attending physicians' reporting to the sponsoring institution regarding a resident's performance?  Are there forms used for this purpose?
- To what extent are residents subject to less supervision as their training program progresses?  To what extent do more senior medical residents (second year residents and beyond) supervise less senior residents?
- Does the hospital or the sponsoring institution assign the attending physicians who are to supervise the resident's services?

     2.  **Financial Control.**  Evidence under this category include facts regarding whether there is a right to direct and control how the economic aspects of the worker's activities are conducted.  The fact that the sponsoring institution generally pays the residents notwithstanding whether it receives payment from the participating hospital suggests financial control by the sponsoring institution.  With respect to financial control, other facts to be developed include:

- Does the hospital or the sponsoring institution provide medical malpractice insurance to residents?
- Does the hospital or sponsoring institution have a policy with respect to outside employment?  Does any such policy change as the resident proceeds through the residency program?
- If the resident incurs expenses that are reimbursable, which entity reimburses them?
- Do the participating hospitals provide benefits to residents in addition to the stipend and benefits (if any) paid to the resident by the sponsoring institution?

     3.  **Relationship of the Parties.**  Evidence under this category includes facts which illustrate how the parties perceive their relationship.  Relevant facts include those which show the intent of the parties with respect to control.

     Certain facts suggest that the parties perceive the sponsoring institution to be the employer.  Residents might have a more permanent relationship with the sponsoring institution than with a hospital where services are performed.  In addition, the sponsoring institution can terminate the resident for failure to make satisfactory progress in the training program.

16

On the other hand, the services performed by residents for a hospital are a key aspect of the regular business of the hospital. As a result, there is an increased probability that the hospital will direct and control their activities. Other facts relevant to how the parties perceive their relationship include:

- Did the hospital where services were performed play any role in determining which candidates were accepted into the residency program or which residents would be assigned to the hospital?
- Did either entity provide the resident with benefits normally associated with an employment relationship such as retirement, worker's compensation, health care, and vacation benefits?
- In the case of poor performance by the resident, does the hospital have the authority to terminate the resident or preclude the resident from performing further services at the hospital?
- Did the hospital independently verify that a resident had the required license/credentials?
- Do contracts between the sponsoring institution and residents place an employer-employee label on the relationship?
- Do contracts between the sponsoring institution and participating hospitals state that either party is the residents' employer?
- Does state law place any particular status on residents? For example, does state law classify them as employees for worker's compensation insurance purposes? Has the hospital ever used state worker's compensation laws to limit liability with respect to a claim made by a resident?
- Have the residents attempted to negotiate collectively with the sponsoring institution or participating hospitals?

Based upon the facts and circumstances, if it is determined that the common law employer is a state or local government entity, such as a state university, it must be determined whether the resident's services are covered under a § 218 agreement.

## FICA Coverage of State and Local Government Employees

FICA taxes can apply to services performed by residents who are state and local government employees in either of two ways. First, an employee's service can be covered by a § 218 agreement between the state and the SSA. Such agreements provide state and local government employees with social security coverage.[28] Second, if an employee's service is not covered under a § 218 agreement, then whether FICA tax applies depends on whether the employee's

---

[28]Section 3121(b)(7)(E) of the Code provides that service covered under a § 218 agreement constitutes employment for purposes of the FICA.

17

service is subject to FICA tax under §§ 3101-3126 of the Code.   Before 1991, social security coverage of state and local government employees was available only under a § 218 agreement; those employees were excluded from coverage under the FICA.  However, since 1991, § 3121(b)(7)(F) provides that state and local government employees are covered under the FICA unless they participate in a retirement system that provides them with minimum retirement benefits that are comparable to the retirement benefits provided under social security.

*Section 218 Agreements*

If the employer is a state or local government entity, the IRS must determine whether the resident's service is covered by the state's section 218 agreement. When a state enters into a § 218 agreement with the SSA, employees of the state and its political subdivisions are brought under the agreement in groups known as "coverage groups."  The Act gives each state the right to decide which coverage groups to include under its § 218 agreement.  Coverage groups fall into two categories: employees who are not covered under a state retirement system and employees who are covered under a retirement system.  For example, one possible coverage group is the employees of each institution of higher education who are covered under the state retirement system.

Each state designates an official to act for the state in matters involving the SSA and its § 218 agreement.  This person is known as the "State Social Security Administrator" (SSSA).  Further information on the procedures for obtaining information from SSSA will be provided soon.  The State Social Security Administrator or the SSA can help answer questions on whether a particular employer's employees are included within a coverage group.  See Exhibit 3 for a list of SSSAs.

The state's § 218 agreement determines which employees within each coverage group are covered by its terms.  In addition to certain mandatory exclusions from coverage under a § 218 agreement, § 218(c) of the Act provides that certain services may be excluded from coverage upon election by the state. For example, under § 218(c)(5), a state has the option of excluding the services of students.  Section 218(c)(5) provides that the optional exclusion will apply only to students who would be excluded under the general student exclusion provided under § 210(a)(10).  Section 210(a)(10) provides for a general exclusion from social security coverage for services performed for a S/C/U (or an organization that is a related § 509(a)(3) organization with respect to the S/C/U) by a student who is enrolled and regularly attending classes at the S/C/U.[29]  But if a state chooses not to exclude student services under its agreement, those services will be covered

_____

[29]Section 210(a)(10) of the Act is the parallel provision to § 3121(b)(10) of the Code.

18

under social security notwithstanding the general student exclusion under § 210(a)(10) of the Act.[30]  Thus, if the state covers student services under its § 218 agreement, medical resident services will be covered under the FICA even if the requirements for the student FICA exception are otherwise met.

Even if the state's § 218 agreement excludes students from coverage as permitted by § 218(c)(5) of the Act, the exclusion might not apply to medical residents.  This will depend upon whether the resident is a student within the meaning of § 210(a)(10) of the Act.  The SSA has jurisdiction over the proper interpretation of § 218 agreements and the pertinent provisions of the Act for purposes of determining whether an individual is entitled to social security benefits, including whether a medical resident is a student within the meaning of § 210(a)(10) of the Act.  The SSA litigated the issue of whether residents were covered under a § 218 agreement in State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998).[31]

State of Minnesota involved medical residents who were enrolled in the GME program at the University of Minnesota ("University").  One issue considered by the court was whether the residents were students within the meaning of § 210(a)(10) of the Act and thus excluded from coverage under Minnesota's § 218 agreement.  The SSA asserted that the purpose of the stipends paid to the residents was primarily compensatory and therefore the purpose of the relationship must have been primarily to earn a livelihood.  In addition, the SSA cited Social Security Ruling 78-3, which sets forth SSA position that resident physicians are not "students" for purposes of the student services exclusion under § 210(a)(10) of the Act.

In rejecting the SSA's arguments, the court cited 20 C.F.R. § 404.1028(c), which provides that "[w]hether you are a student for purposes of this section depends on your relationship with your employer.  If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student

---

[30]Section 2023 of Public Law 105-277 (the Balanced Budget Act), enacted October 21, 1998, provided an exception to the general rule that states may not amend their § 218 agreements to exclude certain groups from coverage.  The legislation provided a limited window of time for states to modify their existing § 218 agreements to exclude services performed by students employed by the public school, college, or university where they are regularly attending classes.  The legislation provides that to obtain this exclusion, the § 218 agreement must have been modified after December 31, 1998, and before April 1, 1999.  Any modification made under this section will be effective with respect to services performed after June 30, 2000.

[31]State of Minnesota involved the tax years 1985 and 1986.  Under the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, the IRS became responsible for determining liability for social security taxes under a § 218 agreement with respect to remuneration for services paid after December 31, 1986.

19

and your work is not considered employment." Thus, the court held that it was not determinative that the stipends are paid for services performed; rather, the critical inquiry is the nature of the relationship between the University and the medical residents.[32]  The court also rejected SSR 78-3 because its "bright-line rule" is inconsistent with the approach set forth at 20 C.F.R. § 404.1028(c), which contemplates a case-by-case examination of the individual's relationship with the S/C/U.[33]  In examining the facts, the court found persuasive that the residents were enrolled at the University, paid tuition, and were registered for approximately fifteen credit hours per semester.  Based upon these facts, the court concluded that the primary purpose of the residents' participation in the program was to pursue a course of study rather than to earn a livelihood.[34]

In response to the State of Minnesota decision, the SSA issued Acquiescence Ruling  98-5 (8), 63 F.R. 58444.  Ruling 98-5 applies only to employers located in the 8th Circuit (Minnesota, the Dakotas, Nebraska, Iowa, Missouri and Arkansas).  The ruling provides that, in applying the student services exclusion within the 8th Circuit, SSA will make a case by case examination of the relationship of medical residents with the employer S/C/U to determine whether the residents meet the statutory criteria of being enrolled and regularly attending classes.  In evaluating the relationship, the SSA will consider all the facts and circumstances.

Employer Status Requirement

Under § 3121(b)(10), the Student FICA exception is available only with respect to services performed in the employ of a S/C/U or a related § 509(a)(3) organization.  Section 31.3121(b)(10)-2(d) of the regulations provides that the term "school, college, or university" for purposes of the student FICA exception is to be construed in its "commonly or generally accepted sense."  A medical school will clearly qualify as a S/C/U.  However, if the hospital where services are performed is the common law employer, but is not part of the medical school, the question arises whether the hospital qualifies as a S/C/U or a related § 509(a)(3) organization to a S/C/U.

---

[32]151 F.3d at 747.

[33]Id. at 748.

[34]Id.

20

*Revenue Procedure 98-16*

Revenue Procedure 98-16, 1998-5 I.R.B. 19, sets forth generally applicable standards for determining whether services performed by students in the employ of certain institutions of higher education qualify for the exception from FICA tax provided under § 3121(b)(10).  For purposes of Rev. Proc. 98-16, the term "institution of higher education" includes any public or private nonprofit school, college, university, or affiliated organization described in § 509(a)(3) of the Code that meets the requirements set forth in Department of Education (DOE) regulations at 34 C.F.R. § 600.4.  These regulations define an institution of higher education, in relevant part, as an institution that (1) is in a state, (2) admits only high school graduates, (3) is authorized by the state to provide a post-secondary educational program, and (4) is accredited or preaccredited by a "nationally recognized accrediting agency" as defined in the DOE regulations at 34 C.F.R. § 600.2.

The revenue procedure provides at § 2.02 that the standards contained in it do not apply to the treatment of postdoctoral students, postdoctoral fellows, medical residents, or medical interns because services performed by these employees cannot be presumed to be for the purpose of pursuing a course of study.  Thus, whether a hospital is a S/C/U must be considered in light of the "commonly or generally accepted sense" test set forth in the regulations. While the tests under the DOE regulations are relevant in determining whether a hospital may be considered a S/C/U for purposes of § 3121(b)(10), whether any hospital meets or fails to meet the DOE standards is not a controlling standard as it is in the case of an institution that seeks to use the safe harbor of the revenue procedure.[35]  However, we believe that a hospital that is not part of the same legal entity as a medical school or university generally does not fit within the common or generally accepted meaning of the term "school, college, or university."[36]

*Is the Hospital Part of the Medical School or University?*

If the resident is employed by a hospital that is part of a university, the question arises whether the hospital is a separate employer from the university.

---

[35]We note that the ACGME is not a "nationally recognized accrediting agency" within the meaning of the regulations at 34 CFR § 600.2.  It is our understanding that the ACGME has not sought recognition by the DOE as a nationally recognized accrediting agency.

[36]In construing a statute, courts generally seek the plain and literal meaning of its language.  United States v. Locke, 471 U.S. 84, 93, 95-96 (1985).  More specifically, words in a revenue act generally are interpreted in their " 'ordinary, everyday senses.' "  Commissioner v. Soliman, 506 U.S. 168, 174 (1993) (quoting Malat v. Riddell, 382 U.S. 669, 571 (1966) (quoting Crane v. Commissioner 331 U.S. 1, 6 (1947))); see also Helvering v. Horst, 311 U.S. 112, 118 (1940) ("[c]ommon understanding and experience are the touchstones for the interpretation of revenue laws.").

21

This is important because, as stated, a university medical school is clearly a S/C/U, whereas a hospital generally is not. If they are incorporated separately under state law, they are separate legal entities for purposes of applying the employment tax provisions, including the student FICA exception. A simple starting point in making this determination is whether the hospital and the university have different EINs. If they have different EINs, they generally should be separate employers and assertions that they are not should be carefully examined.

If the hospital and medical school report wages under the same EIN, they may or may not be a single employer. Even if wages paid to university employees and medical residents are reported under the same EIN, the university may be merely acting as a common paymaster under § 3121(s) with respect to wages paid by the two separate legal entities. Thus, if wages are reported under the same EIN, it must be determined whether the university hospital is incorporated separately under state law.

If the hospital and university medical school are separate employers, the employer status requirement is not met unless the hospital is a § 509(a)(3) organization in relation to the S/C/U.[37]

*Section 509(a)(3) Organizations*

Under § 3121(b)(10)(B) of the Code, the student FICA exception may be available if a hospital is a related § 509(a)(3) organization with respect to an affiliated S/C/U. Some other type of affiliation between the hospital and a S/C/U is not enough. Section 3121(b)(10)(B) and § 31.3121(b)(10)-2(a)(2) of the regulations are very specific about the relationship required when the employer is not a S/C/U. It appears that the word "affiliated" in § 31.3121(b)(10)-2(b) and (c) of the regulations has caused some tax advisors to believe that a contractual relationship created by an affiliation agreement with a participating institution is sufficient to satisfy the employer status requirement. It is not; "affiliated" when used in § 31.3121(b)(10)-2(b) and (c) means having a § 509(a)(3) relationship. Any other interpretation would be inconsistent not only with § 31.3121(b)(10)-2(a)(2), but also with § 3121(b)(10)(B), that is, the statute itself.[38]

---

[37]Note that *State of Minnesota* does not stand for the proposition that a university hospital and a university medical school are a single employer for purposes of § 3121(b)(10). The case involved the interpretation of the State's § 218 agreement which referred only to employees of the University of Minnesota generally. As discussed above, the court did not address the issue of whether the University was the common law employer.

[38]Note also that *State of Minnesota* does not establish a legal basis for accepting any relationship other than a § 509(a)(3) relationship. As discussed above, the court did not consider or decide the question of whether the University was in fact the employer of the medical residents. In addition, *State*

22

Section 3121(b)(10)(B) provides that the student FICA exception applies with respect to services performed in the employ of an organization described in § 509(a)(3) if (1) the organization is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions, or to carry out the purpose of a S/C/U, and (2) is operated, supervised and controlled by or in connection with the S/C/U. This section's language incorporates the tests set forth under § 509(a)(3)(A) and (B) of the Code. In addition, § 509(a)(3)(C) requires that the § 509(a)(3) organization may not be controlled, directly or indirectly, by disqualified persons (as defined in § 4946). Thus, a § 509(a)(3) organization must meet four requirements:

(1)  An organizational test (§ 509(a)(3)(A)).
(2)  An operational test under § 509(a)(3).
(3)  A relationship test (§ 509(a)(3)(B)).
(4)  An absence of disqualified persons (§ 509(a)(3)(C)).

If the taxpayer is claiming that the employer-status requirement is met by virtue of the fact that it is § 509(a)(3) organization in relation to a S/C/U, the taxpayer's organizing instruments (articles of incorporation and bylaws) must be analyzed to determine whether the organizational test has been met.[39]

For a hospital that is part of a university, the "organizational" and "absence of disqualified persons" tests will generally be met. In addition to being organized as a § 509(a)(3) organization, the entity must also at all times be operated exclusively for the benefit of, to perform the functions of or to carry out the purposes of the S/C/U. The organization's actual activities must be analyzed to determine whether the operational test is met.[40]

The relationship test offers three alternatives for qualification:

The hospital would have to be:

(1) Operated, supervised or controlled by the university.
(2) Supervised or controlled in connection with the university.
(3) Operated in connection with the university.

_____

of Minnesota does not stand for the proposition that a university hospital is a S/C/U because, to the extent that the employer's status as a S/C/U was relevant, it would have been taken for granted since the University was assumed to be the employer.

[39]See Income Tax regulations § 1.509(a)-4(c).

[40]See Income Tax regulations § 1.509(a)-4(e).

23

The relationship under the first test is comparable to a parent/subsidiary relationship and is established by fact that a majority of the officers, directors or trustees of the hospital are elected or appointed by the university.  The relationship under the second test contemplates a brother/sister relationship.  This is established by finding common supervision or control by persons supervising or controlling both organizations.  The third test contemplates two independent organizations but with a strong commonality of purpose and operation.  This test is met if the hospital is both "responsive to" the university and operates as an "integral part" of the university.[41]

If the common law employer is other than a medical school, it should be considered whether the common law employer is a related § 509(a)(3) organization. For example, if a university hospital associated with a university medical school is the common law employer (and if the university hospital is not part of the same legal entity as a university or university hospital), the IRS should consider whether the hospital is a related § 509(a)(3) organization by virtue of the hospital's relationship with the university or the university medical school.  We note that, as stated, the existence of an affiliation agreement, without more, will not render a participating institution a related § 509(a)(3) organization.

Similarly, if a medical school faculty practice plan (which is not part of the same legal entity as the medical school or university) is the common law employer, the IRS should determine whether the faculty practice plan is a related § 509(a)(3) organization with respect to the university or the university medical school.

Although an entity is a related § 509(a)(3) organization, the student FICA exception might not be available if the S/C/U is a state or local government employer.  Under § 3121(b)(10)(B), if the related S/C/U is an entity that participates in a state's § 218 agreement, and that state has chosen to cover students under its agreement, then the student FICA exception is not available to the related § 509(a)(3) organization.  The legislative history to this provision states that "[§ 3121(b)(10)(B)] would not exclude from coverage services of a student for an auxiliary nonprofit organization connected with a public school, college, or university whose student employees are covered under social security pursuant to a State coverage agreement with the Secretary."[42]  Thus, although the employees of the § 509(a)(3) organization are not themselves covered under a § 218 agreement, § 3121(b)(10)(B) requires that the IRS look to the § 218 agreement for purposes of determining whether the student FICA exception is even available.

---

[41]The responsiveness and integral part tests are set forth in the regulations at § 1.509(a)-4(i).

[42]H.R. Rep. No. 231, 92d Cong., 1st Sess. 63 (1971); S. Rep. No. 1220 92d Cong., 2d Sess. 150 (1972).

24

To summarize, the employer status requirement is met only if the employer is a S/C/U or a related § 509(a)(3) organization.  A medical school is a S/C/U within the meaning of § 3121(b)(10).  A hospital, standing alone, would generally not be considered a S/C/U for purposes of the student FICA exception because it is not a S/C/U within the common or generally accepted sense.  However, an entity such as a university hospital may be considered a S/C/U either because it is part of the same legal entity as the university or because it is a related § 509(a)(3) organization.  A faculty practice plan may also satisfy the S/C/U requirement if it is a related § 509(a)(3) organization.  If the S/C/U is a state or local government entity, the student FICA exception is not available with respect to services performed for the related § 509(a)(3) organization if the state has chosen to cover student services under its § 218 agreement.

The Student Status Requirement

In addition to the employer status requirement under § 3121(b)(10), a resident with respect to whom the refund claim is filed must be a "student who is enrolled and regularly attending classes at [the S/C/U]."  Section 31.3121(b)(10)-2(c) of the regulations provides that whether an employee has the status of a student is determined on the basis of the employee's relationship with the S/C/U for which the services are being performed.  An employee who performs services in the employ of a S/C/U "as an incident to and for the purpose of pursuing a course of study" at the S/C/U has the status of a student in the performance of those services.  Section 31.3121(b)(10)-2(b) provides that if an employee has the status of a student, then "the amount of remuneration for services performed by the employee in the calendar quarter,[43] the type of services performed by the employee, and the place where the services are performed are immaterial" for purposes of the student FICA exception.  Thus, the fact that a resident's pay is higher than students generally or much lower than a board certified physician is irrelevant.  In addition, the fact that residents provide patient care services does not of itself preclude student status.

Although we believe the employer status requirement is not met in the case of a resident who participates in a hospital-sponsored residency program (if the

---

[43]Before 1950, services performed by a student enrolled and regularly attending classes for a S/C/U not exempt from income tax were not "employment" to the extent the remuneration for these services did not exceed $45 in a calendar quarter; however, remuneration for student services performed for a S/C/U exempt from income tax were not subject to a dollar limit per quarter.  Social Security Act Amendments of 1939, Pub. L. No. 76-379, §§ 201, 606, 53 Stat. 1360, 1374-75, 1384-85 (1939).  In 1950, the quarterly limit on remuneration paid to an employee/student of a nonexempt S/C/U was eliminated and the separate student exclusion provisions for exempt and nonexempt entities were combined.  Social Security Amendments of 1950, Pub. L. No. 81-734, § 104(a), 64 Stat. 477, 497, 531 (1950).

25

hospital is not a related § 509(a)(3) organization), we recommend that in all cases the facts regarding student status be developed.

Even though Revenue Procedure 98-16 provides that the objective standards contained in the revenue procedure do not apply to, inter alia, medical residents because the services performed by medical residents cannot be assumed to be incidental to and for the purpose of pursuing a course of study, this does not mean they cannot be students. Instead, it means that determination of the status of these employees as students requires examination of the facts and circumstances and cannot be determined only by reference to the guidelines set forth in Revenue Procedure 98-16. A per se position that medical residents are not students within the meaning of § 3121(b)(10) would be inconsistent with the regulations and Revenue Procedure 98-16.[44]

Although State of Minnesota involved status as a student under § 210(a)(10) of the Act, it is instructive as to the facts and circumstances a court may consider in determining student status. In State of Minnesota, the court framed the issue by stating that "if the residents' participation in University's training program is primarily educational, the residents should be considered students. If their purpose is to earn a living, however, they do not fit within the definition of student exclusion."[45] In determining whether the services were primarily educational or for the purpose of earning a living, the court found persuasive the facts that the residents were enrolled at the University, paid tuition, and were registered for approximately fifteen credit hours per semester.

*Developing The Facts Regarding Student Status*

As an initial matter, if the residency program is accredited, the educational program requirements of the accrediting body should be determined. For example, in the case of an ACGME-accredited residency program, the ACGME educational program requirements for the type of residency program should be determined.[46] If

---

[44]We note, however, that based upon the description of residents' day to day activities and responsibilities in the recent NLRB decision (Boston Medical Center and Committee of Interns and Residents, 330 NLRB No. 30, 1999 NLRB Lexis 821) and the recent series of articles in the New York Times (N.R. Kleinfield, Life, Death, and Managed Care, November 14-17, 1999), it would be difficult to characterize residents' activities as primarily for the purpose of pursuing a course of study. See also, S. Jauhar, Medical Residents, Yes, But Workers, Too, New York Times, April 18, 2000.

[45]151 F.3d at 748.

[46]The educational program requirements may vary based on the type of residency program. For example, the ACGME education program requirements for internal medicine appear to be more detailed than those for Radiology. Compare the Green Book requirements for internal medicine (page 96) with

26

a formal educational program existed, the facts should be developed regarding whether the educational program was followed in practice.

The following are relevant facts and circumstances to be developed in addition to those found to be relevant in <u>State of Minnesota</u>:

- How are residents taught?  For example, are there regularly scheduled lectures and classroom time?  Do the residents participate in formal "teaching rounds"?  If so, is there a record of the teaching rounds that have taken place?
- Are the medical residents evaluated by faculty members of the S/C/U based upon academic standards?  Is there a standard program of tasks/assignments based upon increased knowledge and performance evaluations?
- Can a resident be terminated from the residency program for failure to meet academic standards (which may, of course, include clinical performance)?
- Are the residents required to take exams or prepare research projects?
- What percentage of the residents' time is spent in direct patient contact versus the time spent in classroom study or formal teaching rounds?
- What percentage of patient care time is spent in patient care in which the resident's actions must be approved in advance?
- If a university is the employer, how is the resident classified by the university? (Can the resident receive the benefits that other students are entitled to such as student health insurance, discount event tickets, student housing, and library access?)
- Will the training program lead to obtaining a degree or certificate?
- Is the resident provided with benefits, e.g., sick leave, disability coverage, vacation, eligibility to participate in a retirement plan, which are typically associated with career employment status?
- If the employer has a section 403(b) plan, does the employer treat residents as eligible to participate in the plan?

It must be determined whether the facts and circumstances relative to student status change as the resident proceeds from one year to the next through the program.  For example, does the amount of classroom time or other didactic activities change after the first year of residency?  If formal teaching rounds are part of the educational program, does the time spent on teaching rounds as opposed to "management rounds" or "work rounds," which are not primarily for the

---

those for radiology (page 321).

27

purpose of teaching, change as the training program progresses?[47]  In addition, does a resident at some stage in the residency become actively involved in supervising less experienced residents?

*The Resident Must Have Been Enrolled and Regularly Attending Classes*

The student must be "enrolled and regularly attending classes" at the S/C/U. This language may be read to suggest that Congress envisioned a traditional classroom environment. The question therefore arises whether the employee must participate in traditional classroom activity or whether other didactic activities, including research activities and supervised practice, may fulfill this requirement. Revenue Ruling 78-17, 1978-1 C.B. 306, situation 3, considered whether services performed for a university by a Doctor of Education student, who was conducting research and experimentation needed for the student's dissertation, were excepted under the student FICA exception.  The IRS concluded that the service was excepted from employment because the dissertation was required to obtain the desired academic degree and the student was actually enrolled at the university. Thus, the ruling carves out an exception to the "regularly attending classes" requirement in circumstances where the employee is enrolled at the university and is completing the requirements for an academic degree.

We do not believe "classes" should be interpreted narrowly to include merely traditional lecture/discussion and lab sessions.  Instead, regularly scheduled events, whether or not in a classroom, including lectures, demonstrations, tutorials, and teaching rounds at which a faculty member plays a leadership role in furthering the objectives of an established curriculum may be considered classes for purposes of the student FICA exception.  The frequency of events such as these determines whether the medical resident may be considered to be "regularly attending classes."

It should be noted that residency programs fulfill the requirements for certification in a particular specialty area and thus are similar in some respects to the requirements that other professionals such as architects and accountants must meet to receive licensing/certification.  For example, accountants undergo a similar post-secondary process.  Accountants must obtain a Bachelor's degree and complete a period of work experience before being eligible for a Public Accountant's license.[48]  Similarly, architects must complete a five-year bachelor of

---

[47]See, e.g., Green Book, page 97 (in describing the formal teaching program requirements for internal medicine residency programs, the ACGME distinguishes between teaching rounds, which are intended to be for educational purposes, and "management rounds" and "work rounds," which appear to be primarily for the purpose of ensuring adequate patient care).

[48]Information obtained from the American Institute of Certified Public Accountants (AICPA).

28

arts program or a six-year masters program followed by a working internship which generally lasts three years. After completing the internship, the architect may take a certification exam, which the architect must pass in order to become fully licensed.[49]

To summarize, whether a medical resident is a student depends upon examination of all the facts and circumstances. A particular claim should be examined on a program by program and a year by year basis . Thus, the written educational program of each residency program should be reviewed and it should be determined whether this written educational program changes from year to year as a residency progresses. It is also necessary to determine how the program operates in practice; in other words, whether in practice the written program requirements have been followed. In this regard, any contemporaneous records of events such a teaching rounds, seminars and other activities as described above as being the equivalent to classroom activities are highly relevant in determining whether the resident is a student.

<u>Refund Claim Procedures Must be Followed</u>

The employer must fulfill certain procedural requirements in order to receive a refund of the employer and employee portions of FICA tax. Generally, the employer has a duty to first "adjust" the employee portion of FICA as a condition to receiving a refund for the employer and employee portions of FICA.[50] The following provisions describe the conditions which must be met in order for an employer to receive a refund of employee and employer portions of FICA, and under what circumstances an employer can receive a refund of only the employer portion of FICA.[51]

Section 6413(a) of the Code provides that if more than the correct amount of employer or employee FICA tax is paid on any payment of remuneration, proper adjustments, of both the tax and the amount to be deducted, must be made, without interest, as prescribed by regulations.

---

[49]Information obtained from the American Institute of Architects (AIA).

[50]<u>Atlantic Department Stores, Inc v. United States</u>, 557 F.2d 957 (2d Cir. 1977). <u>See also</u>, Rev. Proc. 81-69, 1981-2 C.B. 726.

[51]Fulfilling these requirements is not a jurisdictional requirement; thus, these requirements need not be satisfied at the time the claim is filed. Rather, these requirements are a prerequisite to the IRS being required to pay a refund claim. <u>Chicago Milwaukee Corporation v. United States</u>, 40 F.3d 373; GCM 38,786.

29

Section 6413(b) of the Code provides that if more than the correct amount of employer or employee FICA tax is paid on any remuneration, and the overpayment cannot be adjusted under section 6413(a) (because the overpayment relates to a period with respect to which the return has already been filed), the amount of the overpayment must be refunded as prescribed by regulations.

Section 31.6413(a)-1(b)(1)(i) of the regulations provides that when the employer ascertains that it has paid more than the correct amount of employee tax under section 3101 after the return reporting the payment has been filed, the employer "shall repay or reimburse the employee" if the error is ascertained within the applicable limitations period. However, the employer is exempted from the refund requirement if the overcollection and overpayment to the district director is "made the subject of a claim . . . for refund or credit, and the employer elects to secure the written consent of the employee to the allowance of the refund or credit under the procedure provided in [§ 31.6402(a)-2(a)(2)(i)]."

Section 31.6402(a)-2(a)(2)(i) of the regulations provides that every claim for refund or credit of employee tax under § 3101 collected from an employee shall include a statement that the employer has repaid the tax to such employee or has secured a written consent of such employee to the allowance of the refund or credit.

Section 31.6402(a)-2(a)(2)(ii) of the regulations provides that if the claim relates to employee tax collected in a year prior to the year in which the credit or refund is claimed, the employer must also submit a statement that it has obtained from the employee a written statement (a) that the employee has not claimed refund or credit of the amount of the overcollection, or if so, such claim has been rejected, and (b) that the employee will not claim a refund or credit of such amount.

Revenue Ruling 81-310, 1981-2 C.B. 241, considered whether attempting to secure employee consents to the allowance of refunds in accordance with § 31.6402(a)-2(a)(2)(i) of the regulations would fulfill the employer's duty to first adjust overpaid employee FICA tax so that the employer could claim a refund of the employer portion of FICA. The ruling holds that when the employer notifies its employees of the overpaid employee FICA tax, and requests their consents to its filing a refund claim on their behalf, it has made reasonable efforts to protect their interests. Thus, the employer's notification and request for employee consents should be treated as fulfilling its duty to first "adjust" employee overcollection even if the employee refuses to sign a consent.

To summarize, a taxpayer may receive a refund of the employee portion of FICA collected in a year prior to the year in which the refund claim is made only if the taxpayer provides a statement that (1) the taxpayer has obtained the

30

employee's consent to the allowance of the refund and (2) that it has obtained a statement from the employee that the employee has not claimed (or if claimed, it has been rejected) and will not claim a refund for such amount. Thus, in examining a resident refund claim involving both portions of FICA, resident consents (or a sample of consents) should be requested from the taxpayer prior to approval of the claim. If the employer is claiming a refund of just its portion of FICA, the employer must provide a statement that it has made reasonable attempts to first adjust the employee's account, which generally means that the employer has notified the employee and requested the employee's consent.

Conclusion

The first step in any medical resident refund case is to identify the common law employer. Identifying the common law employer is critical for two reasons. First, if the common law employer is a state or local government entity, resident services may be covered under a § 218 agreement with the SSA. Second, the student FICA exception applies only if the common law employer is a S/C/U or a related § 509(a)(3) organization. A medical school is a S/C/U within the meaning of § 3121(b)(10). A hospital is generally not a S/C/U; however, service performed for a hospital may qualify for the student FICA exception if the hospital is a related § 509(a)(3) organization. Whether a resident is a student depends upon examination of all the facts and circumstances. The student FICA exception is available only with respect to students who are enrolled and regularly attending classes. If it is determined that the student FICA exception requirements have been met, then the taxpayer seeking a refund of employment taxes must satisfy certain procedural requirements.

31

Appendix

1965 Revocation of the Medical Intern Exception

The legislative history underlying the Social Security Amendments of 1965, Pub. L. No. 89-97 (SSA of 1965) indicate Congress' intent that medical residents be covered under the FICA. Prior to the SSA of 1965, § 3121(b)(13) of the 1954 Code excluded from the definition of employment "service performed as an intern in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law." Section 311(b)(5) of the SSA of 1965 amended § 3121(b)(13) by striking this provision.

In addition to revoking the medical intern exception, § 311 of the SSA of 1965, entitled, "Coverage for Doctors of Medicine," changed the law in two other ways which affected medical doctors. First, § 1402(c)(5) of the 1954 Code was amended to eliminate the exception from the definition of "trade or business" for physician services (for SECA tax purposes). Second, § 3121(b)(6)(C)(iv) of the 1954 Code, which provided an exclusion from the definition of employment for "service performed in the employ of the United States if the service is performed by any individual as an employee included under § 5351(2) of title 5, [U.S.C.], (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government)," was amended to add, "other than as a medical or dental intern or a medical or dental resident in training."

These provisions taken together indicate Congress' intent to create a scheme under which all medical doctors are covered under the social security system, whether or not they are still in training, whether or not they are self-employed, or whether or not they work for the federal government.

With respect to the repeal of the medical intern exclusion, the Senate Report states,

> Section 3121(b)(13) of the Internal Revenue Code of 1954 excludes from the term "employment," and thus from coverage under the [FICA], services performed as an intern in the employ of a hospital by an individual who has completed a 4-year course in a medical school . . . . Section 311(b)(5) amended section 3121(b)(13) so as to remove this exclusion. The effect of this amendment is to extend coverage under the [FICA] to such interns unless their services are excluded under provisions other than section 3121(b)(13). Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the Code.

32

After stating that interns are covered under the FICA "unless their services fall within another exclusion," Congress indicates that the exception it had in mind was the exclusion provided under § 3121(b)(8)(B) of the 1954 Code for service performed for tax exempt organizations. If Congress believed that under the FICA, in many cases intern services would be excluded under another section of the Code, such as the student FICA exception, it likely would have said so as it did in the case of services performed for an exempt organization.

The Congressional Record also provides some anecdotal evidence that Congress  chose to cover interns along with all other medical doctors under the FICA because young doctors and their families in particular need the protection provided by social security.  In speaking against a proposed amendment to strike section 311, Senator Ribicoff of Connecticut recounted the following story:

> A charming, educated woman of the age of 38 came into my office. She had three young children.  She had married a young man while he was still in medical school.  Her husband had just about reached the stage at which he had gone through an internship, through a residency, and had gone out to the State of Oregon to begin the practice of medicine.  He died within a year.  The young doctor was indebted because of borrowing to open his practice.   He left his widow without a nickel. . . .  I believe that we have a problem concerning the coverage of doctors, and that we, as Senators, owe an obligation to the wives and children.  We should not seek to exclude them from the coverage of social security.

111 Cong. Rec. 16106 (1965).

Congress' repeal of the medical intern exception in conjunction with the legislative history evidence its concern that young doctors be covered under social security. Thus, Congress' intent would arguably be frustrated by a broad interpretation of the student FICA exception to except all resident services.

33



Exhibit 1

Student FICA Exception Analysis

34



**Exhibit 2**                    <u>**Model A**</u>                    (Participating Institutions)

General Characteristics of Model:
• State University Medical School is the Sponsoring Institution.
• State University employees are covered under the State's section 218 agreement, but the State has chosen to exclude student services.
• Residents perform rotations at State University Hospital and Participating Teaching Hospitals.
• State University Hospital is part the same legal entity as the University or the University Medical School.
• Participating Teaching Hospitals have entered into "affiliation agreements" with the State University Medical School.
• Residents are supervised by attending physicians who are "faculty" members of State University Medical School.
• State University has been paying the residents and treating then as employees for employment tax purposes.

35

**Exhibit 2**                **Model B**          (Participating Institutions)



General Characteristics of Model:
- Private University Medical School is the Sponsoring Institution.
- Residents perform rotations at University Hospital and Participating Teaching Hospitals.
- University Hospital is a separate legal entity which may be owned or controlled by the Private University.
- Participating Teaching Hospitals have entered into "affiliation agreements" with the University Medical School.
- Residents are supervised by attending physicians who are "faculty" members of University Medical School.
- University has been paying the residents and treating then as employees for employment tax purposes.

36

**Exhibit 2**                    **Model C**



(Teaching  Hospitals, one of which
may be the sponsoring institution)

General Characteristics of Model:
• Either a Teaching Hospital or the University Medical School is the sponsoring institution.
• The Teaching hospitals are independent of the University Medical School except for an "affiliation agreement" with respect to the GME program.
• A University Hospital may or may not be part of the overall structure
• Residents perform rotations at Teaching Hospitals.
• Residents are supervised by attending physicians who are "faculty" members of University Medical School.
• Affiliated Teaching Hospitals pay the residents and treat them as employees for employment tax purposes.

37

**Exhibit 2**                    <u>**Model D**</u>



General Characteristics of Model:
• Teaching Hospital has no affiliation with a medical school.
• Residents perform services at Teaching Hospital.
• Residents are supervised by attending physicians who are on the staff of Teaching Hospital.
• Teaching Hospital pays the residents and treats them as employees for employment tax purposes.

Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)

Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.
STATE of Minnesota, Plaintiff,
v.
Shirley S. CHATER, Commissioner of Social Security, and Social Security Administration, Defendants.
No. Civ. 4-96-756.
May 21, 1997.

<u>John W. Windhorst, Jr.</u>, <u>Thomas Tinkham</u>, and <u>William R. Goetz</u>, Dorsey & Whitney, L.L.P., Minneapolis, Minnesota, and <u>William P. Donohue</u>, Special Attorney and mark <u>B. Rotenberg</u>, General Counsel for the University of Minnesota, Minneapolis, Minnesota, for Plaintiff.
<u>Lonnie F. Bryan</u>, Assistant United States Attorney, Minneapolis, Minnesota for Defendants.

MEMORANDUM OPINION AND ORDER

<u>MONTGOMERY</u>, J.

Introduction

**\*1** This case challenges the applicability of social security coverage of stipends paid by the University of Minnesota to medical residents in the years 1985 and 1986. On January 11, 1994, the Commissioner affirmed an assessment dated September 13, 1990 ("Assessment") of additional social security contributions for 1985 and 1986. These funds were allegedly due from the State under a 1958 agreement ("Section 218 Agreement") between the State and the Secretary of Health, Education and Welfare made pursuant to Section 218 of the Social Security Act, as amended ("Act")("<u>42 U.S.C. § 418</u>") relating to the social security coverage of medical residents at the University of Minnesota ("University"). *See* Administrative Record ("AR") 275-277. The Assessment asserts that the State is liable for social security contributions of $3,951,158.40 for 1985 and $4,007,203.20 for 1986 attributable to stipends paid by the University to medical residents and not reported by the University. <u>FN1</u> In this action, the State seeks a redetermination of the correctness of the Commissioner's decision under <u>42 U.S.C. § 418(t)</u>. Jurisdiction is bestowed upon this Court by <u>42 U.S.C. § 418(t)(1)</u>.<u>FN2</u> This matter is before the Court on the parties cross-motions for summary judgment. For the reasons set forth below, the Court will grant the State's motion and deny the Commissioner's motion.

> FN1. The assessed amounts were based on estimated information, not on the University's actual payroll records. On September 24, 1996, the parties filed a stipulation in which they agreed that if the Assessment were held to be valid, the amounts of the social security contributions for which the State is liable on the stipends paid to the residents would be $2,313,464.92 for 1985 and $2,379,958.26 for 1986, plus interest as provided by statute, plus $290.00 in health insurance tax and interest as assessed by the Internal Revenue Service, instead of the amount provided in the Assessment.

> FN2. <u>42 U.S.C. §§ 218(s)</u> and <u>218(t)</u> were repealed on October 21, 1986. *See*<u>Pub.L. 99-509, § 9002(c)(1), 100 Stat.1971 (1986)</u>. However, both provisions apply to this case because they remain effective for contributions due prior to January 1, 1987. *See*<u>Pub.L. 99-509, § 9002(d), 100 Stat.1972 (1986).</u>

Background

When the Social Security system was first created in 1935, questions concerning the constitutionality of imposing such a tax on employees of states and local governments caused Congress to exclude them from mandatory participation in the system. However, in 1950, under pressure from the states, Congress enacted <u>Section 218</u> of the Act (<u>42 U.S.C. § 418</u>), which permitted the states to obtain social security coverage for

designated state and local governmental employees by voluntarily entering into agreements ("Section 218 agreements") with the Secretary of Health, Education and Welfare ("HEW").

In 1955, the State of Minnesota enacted legislation authorizing the execution of a Section 218 agreement, and on August 29, 1955 the State entered into a Section 218 Agreement with the Secretary of HEW. See AR 1-5. The original Agreement did not apply to any employees of the University of Minnesota. Thereafter, the State entered into certain modifications of the Agreement. These modifications extended coverage of the Agreement to additional State and local governmental employees. Modification No. 1 (executed in November/December 1955) covered University employees who were participants in the Faculty Retirement Plan. See AR 6. Modification No. 3 (executed in December 1957) covered University employees who were participants in the State Employees Retirement Association. See AR 12. Neither Modification No. 1 nor Modification No. 3 applied to medical residents enrolled at the University because they were not participants in the Faculty Retirement Plan or the State Employees Retirement Association.

*2 In October/November 1958, Modification No. 8 was executed, extending coverage to "services" performed by "employees" of the University not covered by any public retirement system. See AR 13. Modification No. 8 defined the additional "coverage group" FN3 as follows:

> FN3. For purposes of coverage under Section 218 Agreements, employees were categorized into certain units called "coverage groups."

Services performed by individuals as employees of the following political subdivision of the State of Minnesota, as members of a coverage group (as defined in Section 218(b)(5) of the Social Security Act.)
University of Minnesota
Effective Date of Coverage: July 1, 1958
Excluded Services: All services of an emergency nature
Any service performed by a student
All positions the compensation for which is on a fee basis.
Part-time positions of lecturers, instructors, assistant professors, research fellows and research associates.
Id.

The University did not consider that Modification No. 8 covered medical residents and thus did not begin to withhold or pay social security contributions with respect to the residents' stipends after its execution in 1958. For the next 30 plus years, the University maintained its position that residents' stipends were exempt from coverage under the Act.

After some inquires from a former medical resident under the Freedom of Information Act ("FOIA") in 1989, the Social Security Administration ("SSA") began an inquiry into the treatment of residents' stipends at the University. Under 42 U.S.C. § 418(q)(2)(A), the final day for assessment for amounts due with respect to 1985 was April 15, 1989. Prior to that date, SSA requested the State to enter into an agreement under 42 U.S.C. §§ 418(q)(4)(A) and 418(r)(2)(A) extending the assessment period to October 15, 1989. On March 30, 1989 and April 3, 1989, the State and the Secretary of Health and Human Services ("HHS"), respectively, executed Extension Agreement No. 36, purportedly extending the assessment period to October 15, 1989. See AR 262. Subsequent extension agreements (Extension Agreements 36A and 36B) extended the period to October, 1990. See AR 944, 352. The period for assessment with respect to 1986 was similarly extended to October, 1990. See Extension Agreement 37, AR 354.

On September 13, 1990, SSA assessed an amount of $7,958,361.60 against the State for contributions allegedly due on stipends paid to medical residents. See AR 275-277. The SSA determined that medical residents were covered under Modification No. 8 of the State's Section 218 Agreement. The State requested review of the September 13, 1990 assessment, but the assessment was affirmed on January 11, 1994. Thereafter, the State filed the instant action seeking a "redetermination of the correctness of the assessment of the amount due" under 42 U.S.C. § 418(t). The State raises three grounds in support of its argument that the Commissioner erred in determining that the State is liable for social security contributions with respect to stipends paid in 1985 and 1986 to the University's medical residents. The State argues that: (1) the Section 218 agreement does not cover medical residents because they are not employees of the University; (2) even if medical residents are deemed employees, they are nevertheless excluded from coverage under the agreement as "students"; and (3) even assuming both that they are deemed employees and are not excluded as students, the assessments are barred by the statute of limitations because the "Extension Agreements" were invalid and thus the September 13, 1990 assessment was untimely. Conversely, the Commissioner and the SSA contend that the assessment was properly made in all respects and should be upheld.

Discussion

I. *Summary Judgment Standard.*

**\*3** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in *Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552-2553 (1986)*:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Bell Lumber and Pole Co. v. United States Fire Insurance Co., 847 F.Supp. 738, 743 (D.Minn.1994).* However, the nonmoving party may not "rest on mere allegations or denials." *Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir.1995).* Rather, "the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial." *Bell Lumber, 847 F.Supp. at 743, citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).*

If reasonable minds could differ as to the import of the evidence, summary judgment is not warranted. *Id.* However, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." *Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir.1992), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986).* In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Krenik, 47 F.3d at 959.*

The parties concede that this case is properly resolved on summary judgment.

II. *Standard of Review.*

As a threshold matter, the applicable standard of review must be determined. The State contends that a *de novo* standard should be applied, whereas the Commissioner asserts that the underlying administrative decision is entitled to deference.

Courts have been cautioned to accord considerable weight to an agency's construction of a statutory scheme. *See Chevron, U.S.A., Inc. v. Natural Resources Defense, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782 (1984).* Thus, courts should "defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering ." *Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 116 S.Ct. 1730, 1732 (1996).* However, " 'that deference does not permit abdication of the judicial responsibility to determine whether the challenged [action] is contrary to statute, ··· devoid of administrative authority[,]' or is otherwise unreasonable ." *Pelofsky v. Wallace, 102 F.3d 350, 353 (8th Cir.1996)(citing Aerolineas Argentinas v. United States, 77 F.3d 1564, 1574 (Fed.Cir.1996).* Moreover, 42 U.S.C. § 418(t) requires a "reconsideration" by the Court. This standard is less deferential than the standard of judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) which permits an agency decision to be set aside only if it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law." *See Hennepin County Medical Center v. Shalala, 81 F.3d 743, 748 (8th Cir.1996).* Therefore, while the administrative decision here is entitled to some deference, the Court must determine that it is not unreasonable.

III. *Employees.*

**\*4** The first issue is whether medical residents are employees for purposes of coverage under Modification No. 8.

The State argues that medical residents do not qualify as employees under Modification No. 8 because: (1) the "Identification No., Etc. Information" sheet of Modification No. 8 represented that 225 employees were covered by Modification No. 8 (AR 243), whereas 422 residents were enrolled at the University in the fall quarter of 1958 (AR 961, 964); (2) the minutes of the University's Board of Regents meeting in which Modification No. 8 was authorized referred to a coverage group consisting of "full-time lecturers and full-time

appointees of instructors or research fellows and above ···" (AR 236), the named positions were faculty positions (except for lecturers which were a special category for classroom instruction)( *see* Bailly Aff., AR 1000-1001), the reference to "above" included only the positions of assistant professor (or research associate), associate professor and professor ( *Id.*), and medical residents did not fall within any of the classifications because they did not hold faculty appointments; and (3) IRS rulings in effect at the time Modification No. 8 was enacted determined that stipends paid to residents were excludible from income as "scholarships" or "fellowships" because the primary purpose of stipends was to further their education and training rather than to compensate for services (AR 249-252) and thus medical residents could not have been considered employees at the time Modification No. 8 was enacted.

On the other hand, the Commissioner argues that the residents are employees because they perform services for which they are compensated. The Commissioner relies on *St. Luke's Hospital Association of Cleveland v. United States,* 333 F.2d 157 (6th Cir.1964), which determined that residents were not exempt under the intern exception to employment and thus were required to pay social security taxes; and *Rockswold v. United States,* 471 F.Supp. 1385 (D.Minn.1979), *aff'd.*620 F.2d 166 (8th Cir.1980), where the Court found that medical residents are considered employees of the University. The Commissioner also argues that the IRS rulings relied on by the State are irrelevant; that the SSA has always treated medical residents as employees (relying on Social Security Ruling ("SSR") 78-3); and the terms of the Section 218 Agreement and Modification No. 8 must be interpreted under the law as it existed in 1985 and 1986, not as it was in 1958.

In analyzing the issue, the Court is persuaded by the reasoning of the State that medical residents were not covered as employees under Modification No. 8 to the State's Section 218 agreement. First, it must be understood that Modification No. 8 is a contract and must be interpreted as such. *See* Handbook for State Social Security Administrators, "Each modification, like the original agreement, is a Federal-State contract." In interpreting a contract, courts must give effect to the intent of the parties. *See Enos v. Key Pharmaceuticals, Inc.,* 106 F.3d 838, 839 (8th Cir.1997).

**\*5** In this case, the evidence is uncontradicted that the State did not intend to cover medical residents at the time it executed Modification No. 8. First, the "Identification No. Etc., Information" page of Modification No. 8 indicated that the modification would cover only 225 employees, whereas there were 422 medical residents enrolled in the University during the fall quarter of 1958. Obviously, if the residents were to be covered, the number would be something closer to 650. Second, the minutes of the Board of Regents meeting shows that Modification No. 8 was intended to cover only certain faculty positions (except for the special classification of lecturers), which did not include medical residents. Third, prior to entering Modification No. 8, two IRS rulings had determined that stipends paid to medical residents were excludible from wages for IRS purposes because the stipends were primarily paid to further the residents' education and training. *See* AR 249-252. While these rulings were issued by the IRS, not the SSA, the rulings would have necessarily led to the conclusion that the stipends would not be considered wages from employment under the Social Security Act. *See* AR 271. Therefore, residents were not considered employees when Modification No. 8 was executed. Finally, after entering into Modification No. 8, the University did not begin to withhold or pay social security contributions on the residents' stipends as would be expected if the residents were intended to be covered by Modification No. 8. Instead, for more than 30 years, the University consistently treated the residents' stipends as excluded.

The Commissioner's arguments are without merit. While medical residents were found to be employees in cases subsequent to Modification No. 8, *see Rockswold,* 471 F.Supp. 1385, and in a Social Security Ruling ( *see* SSR 78-3, AR 14-15), this does not change their status as of the time of the execution of Modification No. 8.

Further, the Commissioner's reliance on *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41 (1986)("POSSE") is misplaced. From the enactment of 42 U.S.C. § 418 in 1950 through 1983, states had the right to withdraw from coverage under § 418 upon giving two years notice. *Id.* However, in 1983, Congress amended § 418 to eliminate states' rights to withdraw from § 218 agreements. In *POSSE,* the State of California brought suit challenging the validity of this amendment. *Id.* After the District Court found the amendment unconstitutional, the Supreme Court determined that Congress had expressly reserved the right to "alter, amend, or repeal any provision" of the Act and by amending the Act, to alter § 218 agreements entered under the Act. *Id.* at 54.

Based on *POSSE,* the Commissioner argues that the § 218 Agreement here and particularly Modification No. 8 must be interpreted under the revisions to the law caused by SSR 78-3 and cases such as *St. Luke's,* 333 F.2d 157. *POSSE,* however, is inapplicable to the instant case because Congress has not acted. Under the theory of *POSSE,* if Congress amended the Act in such a way as to change the meaning of Modification No. 8, the amendment would be permissible. However, POSSE does not stand for the proposition that the meaning

of § 218 agreements can be changed through ruling by the SSA or through subsequent case law developments regarding the employment status of medical residents. Thus, the Court does not find that Modification No. 8, executed in 1958, must be interpreted under the law as it existed in 1985.
**6* To find that the University's medical residents are covered as employees, the clear intention of the State in entering into Modification No. 8 must be disregarded. In 1958, when the State agreed to Modification No. 8, it intended to cover certain faculty positions (and a special class of lecturers), not non-faculty medical residents. The law in effect at the time supported the University's belief that medical residents were not employees. Subsequent developments have not changed the fact that medical residents were not covered under Modification No. 8. The Commissioner's administrative decision to the contrary is unreasonable and the State's motion for summary judgment must be granted.

### IV. *Student Exclusion.*

Assuming *arguendo,* that medical residents were considered employees for purposes of coverage, the State next argues residents would nevertheless be excluded from coverage under the student exclusion set forth in Modification No. 8, which specifically excludes "[a]ny service performed by a student." Under the Act, the student exclusion applies to service performed in the employ of a school, college or university "if such service is performed by a student who is enrolled and regularly attending classes at such school, college or university."42 U.S.C. §§ 410(a)(10), 418(c)(5). The applicable regulations provide: "Whether you are a student for purposes of this section depends on your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment."20 C.F.R. § 404.1028(c).
The State contends that medical residents qualify as students under the Act and the applicable regulations. First, the residents are enrolled at the University, pay student tuition and are registered for course work consisting of approximately 15 credit hours per quarter. The location and style of the courses include regular classroom type settings, laboratory research, and clinical experiences in which the resident is involved in the performance of a medical task under the supervision of a faculty member. *See* Cavert Aff., ¶ 6. Second, residents in their first year are not eligible for state licensure to practice medicine and residents beyond their first year are not required to become licensed because they are considered students engaged in the duties of a resident or equivalent "postgraduate" work. *See*Minn.Stat. §§ 147.02, 147 .09(5). Third, although residents do have regular contact with patients, this contact is part of the educational process of the residents and is evaluated by the assigned faculty member. Fourth, failure to make satisfactory progress can result in dismissal of a resident from his or her program. *See Ross v. University of Minnesota,* 439 N.W.2d 28, 29-31 (Minn.Ct.App.1989). Fifth, residents are classified as holding "student/professional training," positions. *See* Drehmel Aff., ¶ 3. Finally, residents have been found to be students in other contexts. *See Ross v. University of Minnesota,* 00214C-T-87 (Sept. 29, 1987)(AR 255-259); and *Ross,* 439 N.W.2d 28.
**7* Conversely, the Commissioner contends that the residents cannot fall within the student exclusion because: (1) the student exclusion, along with other similar exclusions, was enacted only to cover situations involving nominal income; (2) the didactic portion of a resident's training is only a complement or a supplement to the actual practice of medicine; and (3) the enactment and subsequent repeal of the "intern" exclusion demonstrates that Congress did not intend for medical residents to be covered by the student exclusion.
The Court finds that even if the residents could be considered employees, they fit the applicable definition of a student and would be excluded from coverage under the student exclusion. Like regular students, the residents are enrolled at the University, pay student tuition and are registered for course work amounting to approximately 15 credit hours per quarter.
Medical residents have significant patient contact and assume substantial responsibilities for patient care [FN4] as a necessary part of their medical education. A future physician cannot adequately develop skills if not permitted to perform actual procedures on real patients. However, residents are not entrusted with sole responsibility for patient care and instead are subjected to varying degrees of supervision depending on the resident's level of skill and seniority. In fact, the residents, like students in other disciplines, are evaluated on their performance.

FN4. As set forth in *Rockswold v. United States,* 620 F.2d 166, 167 (8th Cir.1980), the duties of a resident include:

making daily rounds with a staff physician; ordering prescriptions; writing treatment orders for

patient care; taking patient's physical and medical histories; ordering special reports including consultations, x-rays, and chemical laboratory analysis; assessing and diagnosing patients; ··· preparing progress notes, case summaries and discharge notes; commencing the administration of intravenous fluids; inserting nasal gastric tubes; scheduling operating room appointments; preparing patients for operations; preparing operating notes; changing dressings; removing sutures and working in the emergency room.

The State does not contend that a resident's duties, depending on the area of specialty, have significantly changed since the *Rockswold* decision was rendered in 1980.

Moreover, the clinical portion of the residency is only one component of the resident's educational experience. Residents also are taught on daily rounds, through lectures and formal didactic courses. Furthermore, residency programs are aimed at teaching and education. *See* AR 114 ("The [Family Practice residency] program is officially accredited by the Accreditation Council for Graduate Medical Education.··· The ··· program is designed to teach the knowledge, attitudes, and skills prospective family physicians need to provide continuous and comprehensive care to individuals.···"); AR 412 ("The University of Minnesota Neurology Residency Program affords an outstanding educational experience for the future clinician and academician."); and AR 420 ("It is the objective of the graduate program in orthopaedic surgery to provide a comprehensive educational experience in the management of diseases and injuries of the musculoskeletal system for the physician seeking accreditation as an orthopaedic surgeon.). The emphasis on education, including through patient care and treatment, supports the finding that residents are students for purposes of the Act.

The student status of residents is also evident when they are compared to "regular" doctors. Unlike "regular" doctors who must be licensed to practice medicine, residents in their first year are not eligible for licensure and residents beyond their first year need not obtain a license because they are considered "students" under Minnesota law. *See* Minn.Stat. § 147.09(5). At the same time, like nonresident students, residents who are performing poorly and not making sufficient progress may be dismissed from their program. *See Ross v. University of Minnesota*, 439 N.W.2d 28, 33 (Minn.Ct.App.1989)("The decision to terminate a resident from a hospital-based residency program is the same as any other decision to fail a graduate student for inability to meet academic requirements.").

***8** Additionally, residents are classified by the University as holding "student/professional training" positions, which further supports their categorization as students. Moreover, in other contexts, residents are classified as students. Under the Minnesota Workers' Compensation statute, the definition of employee includes "students enrolled in and regularly attending the medical school of the University of Minnesota in the graduate school program or the postgraduate program." *See* Minn.Stat. § 176.011(18). For purposes of dismissal from a residency program, the Minnesota Court of Appeals determined a resident to be a student rather than an employee. *See Ross,* 439 N.W.2d at 33. Finally, a resident was found to be exempted from unemployment coverage because he was a "student" at the University of Minnesota. *See* AR 255-59 ( *Ross v. University of Minnesota*, No. 00214C-T-87).

After consideration of all these factors, the Court finds that the "main purpose" of a resident at the University of Minnesota is to pursue a course of study, rather than earn a livelihood. Through their residency programs, residents seek the necessary education and training to enable them to practice in their chosen field. While a resident is paid a stipend while enrolled in the residency program, the main purpose is obtaining an education, not earning a livelihood. Accordingly, under the applicable standard, residents qualify as students and are excluded from coverage under the Act.

The Commissioner's arguments to the contrary are not convincing. First, the Commissioner argues that the student exclusion was enacted only to cover situations of "nominal" earnings; that residents' stipends, which range between $20,000 and $28,000 annually, are not nominal; and thus residents cannot qualify for the student exclusion under the Act.

In 1939, the student exclusion was added to the Act. In fact, Congress enacted two separate student exclusions. For students at tax-exempt schools, like the University of Minnesota, the statute excluded: Service performed in any calendar quarter in the employ of any organization exempt from income tax ··· if-

(i) the remuneration for such service does not exceed $45.00, or

···

(iii) such service is performed by a student who is enrolled and is regularly attending classes at a school, college, or university.···

Social Security Act Amendments of 1939 ("SSA Amendments of 1939), Pub.L. No. 76-379, §§ 201, 606, 53 Stat. 1360, 1374, 1384-85 (1939). Thus, the exclusion for students at exempt schools did not contain a

remuneration limit. Conversely, the student exclusion applicable to students at non-exempt schools established a remuneration ceiling of $45 per quarter (exclusive of room, board and tuition). *See* SSA Amendments of 1939, §§ 201, 606, 53 Stat. 1360, 1375, 1385 (1939). Since there was no dollar limit for students at tax-exempt institutions like the University, the Commissioner's argument is without merit.

**\*9** In addition, in 1950, Congress consolidated the two "student" exclusions and removed the remuneration limit applicable to students at non-exempt schools. *See* Social Security Act Amendments of 1950, Pub.L. No. 81-734, §§ 104(a), 204(a), 64 Stat. 477, 497, 531 (1950). This amendment further supports the determination that the amount of remuneration received by an individual is immaterial to a determination of whether said individual qualifies for the student exemption under the Act.

Second, the Commissioner contends that the didactic portion of a residency is merely a "complement" or a "supplement" to the practice of medicine. As discussed *supra,* the education of a resident consists of several components including a didactic portion. Each portion of a resident's program, including the didactic and clinical components, are essential to properly educate and train a resident in a specialty. Consequently, the Commissioner's argument is unavailing.

Finally, the Commissioner relies on the enactment and subsequent repeal of the "intern" exclusion to argue that Congress did not intend to allow medical residents to be covered under the "student" exclusion. In 1939, Congress created an exclusion from Social Security coverage for interns. In enacting the exclusion, a House Ways and Means Committee report explained that the intern exemption, "excepts ··· service performed as an intern (as distinguished from a resident doctor) in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law."[FN5] H.R.Rep. No. 728, 76th Cong., 1st Sess. 49 (1939), (quoted in *St. Luke's,* 333 F.2d at 163).

> FN5. An intern was an individual who had completed four years of medical school and was performing a one-year stint in a hospital for training purposes. As explained in *St. Luke's,*" 'intern' as used and understood by doctors and hospitals in 1939 generally referred to a medical student who was seeking a year of hospital training in order to complete his [or her] requirements for a medical degree and admission to practice." *Id.* at 161. By the time of the *St. Luke's* decision, the completion of a one-year internship was no longer a requirement for a medical degree. However, successful completion of an internship was a prerequisite to the admission to a residency program. Therefore, during the existence of internship programs, a medical student would complete four years of medical school, then serve a one-year internship and finally, if specialization was desired, complete a residency program. Internship programs were discontinued across the country, including at the University, in 1975.

The Commissioner contends that since Congress exempted both students and interns in 1939, Congress did not intend to exempt residents because it could have done so under the same provision and at the same time as it exempted interns. The Commissioner also argues that the enactment of the intern exclusion is inconsistent with the broad reading of the student exclusion proposed by the State. Under the Commissioner's theory, if the student exclusion covered both students in medical school and medical residents, it would also cover interns and thus the separate intern exclusion would be superfluous. Such an interpretation would violate accepted tenets of construction. *See In re Bellenca Aircraft Corp., 850 F.2d 1275, 1280 (8th Cir.1988)*("A statute should not be interpreted so as to render the legislature's language mere surplusage.").

Finally, the Commissioner asserts that permitting residents to be excluded under the student exception would create an anomaly. In 1965, Congress repealed the intern exclusion. Thus, after 1965, under the State's theory, both students in medical school and medical residents would be excluded from Social Security coverage, while interns, just graduated from medical school, would be covered. The Commissioner argues that such a result would be irrational and therefore medical residents must not be covered by the student exclusion.

**\*10** While this argument is superficially logical, further analysis reveals flawed premises. First, the fact that Congress did not specifically exclude medical residents at the same time as it excluded interns from coverage under the Act does not compel a finding that Congress intended to have residents covered under the Act. As set forth in *St. Luke's,* 333 F.2d at 161,

The term 'resident' as used by doctors and hospitals in 1939 referred to a graduate physician, licensed to practice medicine, who served on the staff of the hospital. He might be seeking further training for use ultimately in private practice, or he might be a regular staff physician.

Since, in 1939, the term resident encompassed both residents-in-training (like the residents of today) and

regular staff physicians, it is understandable that Congress would not want to exclude all "residents" as the term was then defined. Instead, in light of the educational purpose of resident training programs, it was proper for Congress to allow the coverage status of residents to depend on whether they qualified for the student exclusion.

In addition, there is nothing inconsistent or anomalous about excluding residents under the student exclusion. While both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of an internship was (and is) on education. *See* Cavert Aff., ¶ 18. The difference between interns and residents was evident in their treatment by the University. Interns at the University appeared as employees on the payroll of the University of Minnesota Hospital and Clinic; they were paid through the University's central payroll office; they were assigned payroll code number 9707, classified as "non-student academic;" and they were not enrolled as students. *See* Fearing Aff., ¶ 3 (AR 999); and Pladsen Aff., ¶ 2 (AR 1003). Furthermore, the University did not withhold income taxes from residents' stipends until January 1, 1982 (after the appropriate tax treatment had been established in several rulings), but the University always withheld income tax from medical interns salaries. *See* Pladsen Aff., ¶ 3 (AR 1004). The difference between residents and interns was noted by the IRS when it ruled that stipends received by interns were taxable because they were required to perform hospital services, whereas stipends paid to residents were found not to be taxable. *See* AR 249-50.

In light of the substantive differences between interns and residents, it was not inconsistent to establish a specific exclusion for interns while allowing residents to be excluded under the more general student exclusion, nor was it an anomaly to allow residents to be excluded from coverage under the Act after interns were no longer excluded following the repeal of the intern exclusion.

In conclusion, under the Social Security regulations, an individual is deemed to be a student if her main purpose is pursing a course of study, rather than earning a livelihood: While residents are paid stipends, their main purpose is to obtain the necessary education and training to permit them to earn a livelihood in their chosen speciality. Accordingly, residents fall within the Act's definition of a student and are excluded from coverage. The Commissioner's decision to the contrary is unreasonable and must be rejected.

Conclusion

***11** Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:

1. The State of Minnesota's Motion for Summary Judgment is GRANTED; [FN6]

> [FN6.] In light of the Court's decision, the State's statute of limitations argument need not and will not be discussed.

2. The Commissioner's Motion for Summary Judgment is DENIED; and

3. The Commissioner's determination that the State is liable for social security contributions with respect to stipends paid in 1985 and 1986 to medical residents enrolled at the University of Minnesota is incorrect and unreasonable and is, therefore, overturned. LET JUDGMENT BE ENTERED ACCORDINGLY.

AMENDED ORDER

The May 21, 1997 Order issued by the undersigned in this case contained the following sentence,
While both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of an internship was (and is) on education.
The use of the second "internship" was an error. The word "residency" should have been used.
Accordingly, based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that the second sentence of the first full paragraph on page 22 of the May 21, 1997 Memorandum Opinion and Order is amended to read:
While both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of a residency was (and is) on education.
D.Minn.,1997.
State v. Chater
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.