# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

            Plaintiff,

        v.                        Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

            Defendant.

_____/

## DEFENDANT PARTNERS HEALTHCARE SYSTEM, INC.'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PARTNERS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

       Defendant Partners Healthcare System, Inc. ("Partners") respectfully submits this

Response to Plaintiff's Statement of Undisputed Material Facts and Partners' Statement of

Additional Undisputed Material Facts in Support of its Opposition to Plaintiff's Motion for

Summary Judgment.  Because Plaintiff did not number each factual allegation in its Statement,

Partners simply lists the factual allegations that are disputed.  All factual allegations not

expressly disputed below are either undisputed and immaterial or undisputed and material.

**Plaintiff's Material Fact No. 1:**  The defendant was formed as a support organization in order
to provide efficiencies in administering two large hospital networks.

      Partners' Response:  Disputed.  Partners' Articles of Organization state, in part, that the

      purpose of the corporation is to "organize, operate and support a comprehensive health

      care system, including without limitation hospital and other health care services for all

      persons, and education and research for the prevention, diagnosis, treatment and cure of

all forms of human illness." *See* Partners' Articles of Organization.[1]  Moreover, Partners'

tax exempt, non-private foundation status is not that of a supporting organization.

According to Partners' IRS Determination Letter, the IRS has recognized Partners as a

publicly supported organization as described in IRC Sections 509(a)(1) and

170(b)(1)(A)(vi).  Also, Partners lists this status on its Form 990 – Report of

Organization Exempt from Income Tax which is annually filed with the IRS.  *See*

Partners' IRS Determination Letter, dated February 10, 1999;[2] Schedule A to Partners'

2003 Form 990.[3]

**Plaintiff's Material Fact No. 2:**  According to a document submitted to the IRS, the defendant
stated that its primary function was to "coordinate and to provide strategic planning opportunities
for" MGH and BWH.

    Partners' Response:  Disputed in part.  This statement is improperly taken out of context.

*See* Plaintiff's Exhibit 2 at page 4 to its Memorandum of Law in Support of its Motion

for Summary Judgment.

**Plaintiff's Material Fact No. 3:**  The mission of the hospitals is patient care, research and
medical education through patient care services.

    Partners' Response:  Disputed in part.  The hospitals' missions do not specify that

education is accomplished "through patient care services."  *See* Massachusetts General

Hospital's ("MGH") website at http://www.massgeneral.org/about.html (MGH's mission

is "[t]o provide the highest quality care to individuals and to the local and distant

communities we serve, to advance care through excellence in biomedical research, and to

educate future academic and practice leaders of the health care professions."); *see also*

---

[1] Partners' Articles of Organization are attached hereto as Exhibit A.
[2] Partners' IRS Determination Letter, dated February 10, 1999, is attached hereto as Exhibit B.
[3] Schedule A to Partners' 2003 Form 990 is attached hereto as Exhibit C.

Brigham and Women's Hospital's ("BWH") website at

http://www.brighamandwomens.org/general/mission.asp ("Brigham and Women's

Hospital is dedicated to serving the needs of the community.  It is committed to providing

the highest quality health care to patients and their families, to expanding the boundaries

of medicine through research, and to educating the next generation of health care

professionals.").

**Plaintiff's Material Fact No. 4:**  In that agreement, by reference to the by-laws of the sponsoring hospital, the hospital reserves the right to terminate the resident at any time for cause. Also the contract between the resident or intern and the hospital to which he or she is assigned provides that the hospital agrees to pay such resident a <u>salary</u> depending on the resident's or intern's post graduate year (PGY).

> <u>Partners' Response</u>:  Disputed in part.  Partners admits that the above mentioned
>
> agreement contains similar language to Material Fact No. 4, but disputes that any
>
> payment made to residents served as compensation for services.  (Declaration of Debra
>
> Weinstein ("Weinstein Decl.") ¶ 21[4]; Declaration of George Thibault ("Thibault Decl.") ¶
>
> 11).[5]

**Plaintiff's Material Fact No. 5**:  There is no dispute that the residents are employees of an organization who receive a salary from that organization based on their PGY.

> <u>Partners' Response</u>:  Disputed.  Partners' residents do not receive salaries.  The ACGME
>
> requires sponsoring institutions to provide all residents with appropriate financial support
>
> and benefits.  This support is necessary to ensure that residents are able to fulfill the
>
> responsibilities of their educational programs.  The purpose of the resident stipend is to
>
> defray living costs while residents endeavor to complete their goals of medical education

---

[4] The Weinstein Declaration is attached hereto as Exhibit D.
[5] The Thibault Declaration is attached hereto as Exhibit E.

and Board certification.  These stipends are not a *quid pro quo* exchange for ancillary

services rendered by the residents.  (Weinstein Decl. ¶¶ 21-22; Thibault Decl. ¶ 11).

**Plaintiff's Material Fact No. 6:**  The only issues that must be decided in this motion are whether the salary payments to the residents are qualified scholarships and whether the student exception in IRC § 3121(b)(10) can apply to medical residents and interns.

> Partners' Response:  Disputed.  There is no issue to be resolved with respect to "salary
>
> payments" and "qualified scholarships."

**Plaintiff's Material Fact No. 7:**  As part of a resident's compensation package, the hospitals provide the resident access to a number of employee benefits.

> Partners' Response:  Disputed.  Neither Massachusetts General Hospital, nor Brigham
>
> and Women's Hospital provide any compensation or benefits to Partners' residents.
>
> Partners disputes that residents receive a compensation package.  Partners provides a
>
> stipend and certain trainee benefits to its residents.  *See* Partners' House Officers Manual
>
> at http://www.partners.org/research/gme/houseofficermanuals/directory.html.

**Plaintiff's Material Fact No. 8:**  After having reported the wages paid to its residents for many years on its Form 941, Employer's Quarterly Federal Tax Return, defendant changed its longtime position and filed two claims for refund for the period in issue, alleging that these wages should not have been included on its Employment Tax Returns.

> Partners' Response:  Disputed in part.  Partners did not file refund claims.  Instead,
>
> Partners filed Forms 941c with its Forms 941 to correct Social Security and Medicare
>
> wages for residents in training who had been erroneously classified as employees.
>
> Partners did not change the income tax reporting for the residents in training on the
>
> Partners' Forms 941c or Forms 941 for the period at issue.  *See* Partners' 2001 Form
>
> 941c.[6]

---

[6] Partners' 2001 Form 941c is attached hereto as Exhibit F.

**Plaintiff's Material Fact No. 9:**  These two claims were made on employment tax returns that were filed for the third quarter of 2003 and the first quarter of 2004.  These claims were eventually allowed and the refunds paid on March 22, 2004 ($7,333,274.00) and September 6, 2004 ($16,887,034.49).  These refunds were made by crediting the amounts claimed against other FICA liabilities of the defendant.

> Partners' Response:  Disputed in part.  Partners did not file refund claims and never
>
> received actual payment from the IRS.  Instead, Partners filed Forms 941c with their
>
> Forms 941 to correct its payroll information.  The requested adjustments were credited to
>
> Partners' payroll account with the IRS.  Partners has not withdrawn or otherwise used
>
> these resident FICA credits.  As such, the IRS continues to have the use of these funds.
>
> *See* Partners' 2001 Form 941c.

**Plaintiff's Material Fact No. 10:**  A detailed description of a typical hospital's residency programs is found in the Regional Director's Decision and Order attached as an appendix to the decision in *Boston Medical Center Corp.*, 330 NLRB 152, 1999 WL 1076118 (NLRB) (1999).

> Partners' Response:  Disputed.  The only facts that control this case are facts specific to
>
> Partners.  For this reason, any description of another residency training program is not
>
> "typical" of Partners' program.

**Plaintiff's Material Fact No. 11:**  The defendant makes two contentions as to why the refunds were not erroneous.  It first contends that the salary payments to the residents were exempt from income tax pursuant to IRC §117 as qualified scholarships and thus eligible for the FICA exception in IRC § 3121(a)(20).  It also contends that even if the payments are not qualified scholarships, each resident in question was a "student" who was employed, enrolled and regularly attending classes at a school, college or university and therefore was exempt from FICA coverage under the exception found in IRC § 3121(b)(10).  It is the position of the United States that the salary payments were not qualified scholarships because, inter alia, as admitted by the defendant, they were paid only on the condition the residents perform patient care services.

> Partners' Response:  Disputed.  Partners does not contend that the stipends paid to its
>
> residents were exempt from income tax pursuant to IRC § 117 as qualified scholarships
>
> and thus eligible for the FICA exception in IRC § 3121(a)(20).  Partners requires

residents to perform patient care services as a condition for receiving training, not for

receiving stipends.

### PARTNERS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### Significant Key Facts

1.      Stipends paid to Partners' residents are not a *quid pro quo* exchange for services

rendered by the residents. (Thibault Decl. ¶ 11; Weinstein Decl. ¶ 22).

2.      Patient care is an incidental by-product of Partners' resident training. (Declaration

of Andrew L. Warshaw ("Warshaw Decl.") ¶ 12).[7]

3.      Each resident within a particular class-year is paid the same amount regardless of

the "value" they may incidentally provide to Partners. (Weinstein Decl. ¶ 22).

4.      When students graduate from medical school they are not competent to perform

independent patient care. (Warshaw Decl. ¶ 5; Declaration of Michael J. Zinner ("Zinner Decl.")

¶ 5).[8]

5.      Graduation from medical school does not legally enable one to practice medicine.

Most states, including Massachusetts, require a medical school graduate to complete at least one

year of an accredited residency program before it will grant a physician's license.  (Weinstein

Decl. ¶ 10).

6.      Even with a license, it is unlikely a medical school graduate could obtain

employment as a practicing physician without first completing an accredited residency training

program. (Weinstein Decl. ¶ 10).

---

[7] The Warshaw Declaration is attached hereto as Exhibit G.
[8] The Zinner Declaration is attached hereto at Exhibit H.

7.      To be eligible to sit for a specialty board examination, a resident must satisfactorily complete an accredited residency program. (Weinstein Decl. ¶ 27; Warshaw Decl. ¶ 3).

8.      In order to obtain privileges at a Partners' hospital, a physician must at least be eligible to take a specialty board exam. (Ausiello Decl. ¶¶ 7, 25; Warshaw Decl. ¶ 5; Weinstein Decl. ¶ 10).

9.      The purpose of Partners' residency program is not to fulfill the hospital's service needs.  (Warshaw Decl. ¶ 12; Zinner Decl. ¶ 11).

**Partners is a Significant Provider of Graduate Medical Education**

10.     Partners is an integrated, quality healthcare delivery system of Harvard teaching hospitals, community hospitals, physicians groups, and other caregivers.  (Weinstein Decl. ¶ 3).

11.     Partners was established in 1994 by MGH and BWH.  Since then, it has become one of the nation's leading integrated health care delivery systems, based on a mission that includes patient care, medical education and research.  Partners is committed to personalized, patient-centered care and to furthering a tradition of excellence in medical education and research.  In fulfilling its commitment to medical education, Partners sponsors Graduate Medical Education ("GME") training programs, principally through two of its member hospitals, MGH and BWH.  (Weinstein Decl. ¶ 3).

12.     Partners, as well as each of the MGH and BWH, have a three-part mission: medical education, medical research, and patient care.  Each mission is equally important. (Thibault Decl. ¶ 3; Weinstein Decl. ¶ 4).

13.     Partners is a major teaching affiliate of Harvard Medical School.  MGH and BWH

serve as two of the principal tertiary and quaternary academic resources for Harvard Medical School. (Weinstein Decl. ¶ 4; Thibault Decl. ¶ 4).

14.    All of the attending physicians at MGH and BWH are faculty at Harvard Medical School.  All of Partners' residency programs are overseen by a Director who is a member of the Harvard Medical School faculty.  (Thibault Decl. ¶ 4).

15.    MGH's and BWH's commitment to teaching includes providing world-renowned graduate medical education programs in most of the recognized specialties and subspecialties of medicine.  (Weinstein Decl. ¶ 5).

16.    Partners is recognized by the Internal Revenue Service as an entity exempt from Federal income taxation under I.R.C. § 501(c)(3) and I.R.C. § 170(b)(1)(A)(vi).  MGH and BWH are recognized by the IRS as entities exempt from Federal income taxation under I.R.C. § 501(c)(3) and I.R.C. § 170(b)(1)(A)(iii) and are full service academic medical centers. (Weinstein Decl. ¶ 6).

17.    Training residents at MGH and BWH is imperative to these hospitals fulfilling the "teaching" aspect of their institutional missions.  Providing the highest quality medical care is a commitment shared by the residents and the attending physicians at Partners' hospitals.  Patient care is not, however, the primary goal or purpose of resident training; rather, the primary purpose of resident training is education and the development of practical skills, along with achievement of individual certifications that require completion of residency training and may be necessary for the practice of medicine (such as full/independent licensure and (sub)specialty board certification).  (Weinstein Decl. ¶ 7).

18.    As a health care system, Partners recognizes the critical importance of medical

education, including residency training programs, and has established an organizational structure to best fulfill its educational goals. Thus, at MGH and BWH, each Department has its own faculty committee that oversees training programs within that Department, each hospital has its own hospital-wide faculty committee, and Partners has a central faculty committee that coordinates the graduate medical education programs. Furthermore, following their affiliation through Partners, MGH and BWH have combined certain resident training programs into one integrated program, but only when a determination was made that a combined program would best accomplish the educational goals of that specific residency program. An example of such an integrated program is neurology. Medical students apply for admission to the Partners' combined neurology residency training program (usually through the Match program), and train at both MGH and BWH in the Department of Neurology. (Thibault Decl. ¶ 6).

### Medical Education in the United States

19.    The training of physicians in the United States occurs in two major phases: education at medical school and post-graduate medical education. (Weinstein Decl. ¶ 8).

20.    The first phase is education at an accredited medical school. Medical school programs are typically completed in a minimum of four years. Accreditation of medical schools is granted by the Liaison Committee on Medical Education. Upon successful completion of medical (or osteopathic) school, a student is granted the M.D. (or D.O.) degree. (Weinstein Decl. ¶ 9).

21.    Graduation from medical school does not legally enable one to practice medicine. Most states, including Massachusetts, require a medical school graduate to complete at least one year of an accredited residency program before it will grant a physician's license. Even with a

license, however, it is unlikely a medical school graduate could obtain a position as a practicing physician without first completing an accredited residency training program. (Weinstein Decl. ¶ 10).

22.     The second phase of medical education is graduate medical education. Graduate medical education programs are often referred to as residency training (providing education in a specialty of medicine), or fellowship training, which is advanced training in a subspecialty. Most residency training programs - such as in Internal Medicine, Radiology, Emergency Medicine, General Surgery, Psychiatry, etc. - extend over three to five years (with a maximum of seven to eight years), depending upon the specialty. (Weinstein Decl. ¶ 11).

23.     The Accreditation Council for Graduate Medical Education ("ACGME") is a voluntary association formed by five member organizations which include: 1) the American Board of Medical Specialties; 2) the American Hospital Association; 3) the American Medical Association; 4) the Association of American Medical Colleges; and 5) the Council of Medical Specialty Societies. The ACGME provides Institutional Requirements for those institutions which sponsor graduate medical education programs. The ACGME also provides Program Requirements for each graduate medical education specialty or subspecialty program for which ACGME accreditation is offered. (Weinstein Decl. ¶ 14).

24.     Accreditation is the process for determining whether an educational program is in substantial compliance with established educational standards as promulgated in ACGME institutional, common program and individual, specialty program requirements. Program accreditation is required for federal reimbursement of residency training costs under Medicare and in many cases for (sub)specialty board eligibility of the program's graduates. Accredited

residency programs undergo regular and rigorous internal and external review to ensure educational quality. (Weinstein Decl. ¶ 15).

25.    Many U.S. graduate medical education programs are accredited by the ACGME (and in some areas by other national organizations, such as the Council on Dental Accreditation). Programs are sponsored by institutions (*e.g.* medical schools, teaching hospitals), which must be separately accredited by the ACGME. (Weinstein Decl. ¶ 12).

26.    Following completion of a residency training program, a resident may proceed into an advanced GME training program, usually referred to as a clinical fellowship or fellowship program. Fellowship programs generally require an additional one to three years of training. Both residency training programs and clinical fellowship programs are referred to herein collectively as residency training (programs). During residency training, residents gain exposure to the breadth of health problems cared for by a particular (sub)specialty. (Weinstein Decl. ¶ 11).

27.    Upon completion of this phase of medical education, a resident is prepared to undertake independent medical practice in his/her (sub)specialty and the certificate of completion from the residency program is considered affirmation of competence. (Weinstein Decl. ¶ 11).

## ACGME Requirements

28.    According to the ACGME, "[t]he single most important responsibility of any sponsoring institution of GME is to ensure the provision of *organized educational programs* with guidance and supervision of the resident, facilitating the resident's professional and personal development while ensuring safe and appropriate care for patients. A resident takes on

progressively greater responsibility throughout the course of a residency, consistent with individual growth in clinical experience, knowledge, and skill. The education of resident physicians relies on an integration of didactic activity in a *structured curriculum* with diagnosis and management of patients under appropriate levels of supervision and scholarly activity aimed at developing and maintaining life-long learning skills. The quality of this experience is directly related to the quality of patient care, which is always the highest priority. Educational quality and patient care quality are interdependent and must be pursued in such a manner that they enhance one another. A proper balance must be maintained so that a program of GME does not rely on residents to meet service needs at the expense of educational objectives." (*Graduate Medical Education Directory* 2002-2003 at 19-20).

29. ACGME outlines specific institutional requirements in the *Graduate Medical Education Directory*. Institutional requirements apply to all institutions which sponsor programs in graduate medical education. In general, the *Graduate Medical Education Directory* specifies that sponsoring institutions must be appropriately organized for the conduct of GME training in a scholarly environment and committed to excellence in both education and medical care. Sponsoring institutions must ensure that residents have the opportunity to participate in appropriate levels of supervised patient care and to participate fully in the educational and scholarly activities of their program. The educational goals of the program and learning objectives of the residents must not be compromised by excessive reliance on residents to fulfill institutional service obligations. (Weinstein Decl. ¶ 16; *see also* the ACGME website *www.acgme.org*).

30. These general Institutional Requirements are embraced by Partners. As is

- 12 -

evidenced by the missions of its teaching hospitals and its reputation worldwide, Partners is committed to excellence in education and medical care. This is also evidenced by the high percentage of BWH and MGH residents who pass their certification exams on the first attempt. (Weinstein Decl. ¶ 17).

31.    The goal of the residency program is to provide each resident with world-class academic experiences that will help to shape his or her professional future and achieve certification necessary for practice in the desired specialty or subspecialty. The program's purpose is to provide the graduate physician with opportunities for mastery of fundamental skills, practical application of knowledge acquired in medical school, the development of specialized skills and to cultivate and ensure a high level of professional behavior interacting as a physician member of the health care team. The overarching purpose of these established responsibilities is to educate residents to become highly competent physicians. (Weinstein Decl. ¶ 18).

32.    To ensure that the educational goals of a program are attained, the ACGME Institutional Requirements require an administrative system to oversee all ACGME residency programs sponsored by the institution. As part of this system, one person must be designated to have the authority and the responsibility for the oversight and administration of the graduate medical education programs. Further, institutions must establish a graduate medical education committee with various responsibilities; the GME Committee is required to meet a minimum of four times per academic year. The responsibilities of the committee include, but are not limited to, implementing policies which affect the educational quality of all residency programs and establishing institutional guidelines and policies for the selection, evaluation, promotion, and dismissal of residents. (Weinstein Decl. ¶ 19).

- 13 -

33.    Partners has appointed a "Designated Institutional Official" responsible for ACGME accreditation and GME oversight; the BWH and MGH have also appointed graduate medical education committee Chairs who have authority and responsibility for the activities of the graduate medical education committees. The graduate medical education committees at Partners (including the Partners Education Committee, the BWH Education Committee and MGH's Executive Committee for Teaching and Education) perform the required activities and meet regularly to ensure that the educational goals of the programs are satisfied. (Weinstein Decl. ¶ 20).

34.    The ACGME's Residency Review Committees ("RRCs") determine (sub)specialty-specific "Program Requirements" to which GME programs in that (sub)specialty must adhere. (Weinstein Decl. ¶ 12).

35.    The RRCs develop Program Requirements specific to each specialty graduate medical education program. The Program Requirements set forth guidelines regarding educational content, instructional activities, responsibilities for patient care and supervision, as well as the necessary facilities accredited programs must provide in each particular specialty. (Weinstein Decl. ¶ 24).

36.    The accredited GME programs at Partners are required to substantially meet or exceed the standards established by the RRCs in order to maintain accreditation. BWH and MGH sponsor 86 ACGME-accredited training programs. None of these programs have had accreditation withdrawn. (Weinstein Decl. ¶¶ 13, 25).

37.    Additionally, according to the Institutional Requirements, sponsoring institutions should provide all residents with appropriate financial support and benefits. This support is

necessary to ensure that residents are able to fulfill the responsibilities of their educational

programs.  (Weinstein Decl. ¶ 21).

38.     The purpose of the resident stipend is to defray living costs while the residents

work towards their goal of completing their medical education and obtaining Board certification.

The amount of a resident's stipend amounts is far lower than the amounts paid to a professional

with an equivalent post-graduate education. It is only after a resident has completed a training

program and becomes eligible to take the Board exam, or becomes Board certified, that he or she

is able to command a salary that is more in keeping with the market for equivalent professional

services.  (Thibault Decl. ¶ 11).

39.     Residents at Partners are provided with a stipend adequate to ensure that they are

able to fulfill the responsibilities of their educational program.  Current (academic year 2005-06)

stipend amounts for Partners' residents are $47,000 in post-graduate year one; $48,247 in year

two; and $51,050 in year three (approximately 75% of residents at Partners are in the first three

years of training).  Partners currently withholds income taxes and social security on stipends paid

to residents.  The relatively small stipend received by the residents reflects their role as trainees

rather than what would be a usual salary for practicing physicians.  (Weinstein Decl. ¶ 22).

40.     Stipend amounts are minimal compared to the salaries the residents can expect

when they enter the market and begin to practice following the completion of graduate medical

education programs.  (Thibault Decl. ¶ 11; Weinstein Decl. ¶ 23).

41.     Partners' residents receive stipends in connection with their residency training.

These stipends are not a *quid pro quo* exchange for ancillary services rendered by the residents.

(Thibault Decl. ¶ 11).

- 15 -

**The Federal Government Funds Graduate Medical Education through Medicare**

42.     Since the Medicare program was formed in 1965, Congress intended to fund costs of medical education.  The legislative history of the original legislation provides:  "Many hospitals engage in substantial education activities, including the training of medical students, internship and residency programs, the training of nurses and the training of various paramedical personnel.  Educational activities enhance the quality of care in an institution, and it is intended, until the community undertakes to bear such education costs in some other way, that a part of the net costs of such activities . . . should be considered as an element in the cost of patient care, to be borne, to an appropriate extent, by the [Medicare] program."  H.R. Rep. No. 213, 89th Cong., 1st Sess., 32 (1965).

43.     Since its inception, Medicare has shared in the costs of training residents in Medicare approved programs by making Direct Medical Education ("DME") and Indirect Medical Education ("IME") payments to teaching hospitals with approved residency programs. (Declaration of Charles Adams ("Adams Decl.") [9] ¶¶ 2-3; Declaration of John Belknap ("Belknap Decl.") ¶ 2).[10]

44.     Medicare payments which help support these programs have been indispensable in permitting teaching hospitals and their affiliated medical schools to train residents so that they may become the physicians of the future and satisfy the increasing demand for health care services.  (Adams Decl. ¶ 2).

45.     Medicare has become the largest explicit financing source for residency education and training programs.  (Adams Decl. ¶ 3).

---

[9] The Adams Declaration is attached hereto as Exhibit I.
[10] The Belknap Declaration is attached hereto as Exhibit J.

46.    In fiscal year 2004, Medicare made an estimated $2.7 billion in DME payments and $5.8 billion in IME payments to teaching hospitals. (Dept. of Health and Human Services Office of Inspector General "Alternative Medicare Payment Methodologies for the Costs of Training Medical Residents in Non-Hospital Settings," Report to Congress, December, 2004).

47.    DME payments are made to teaching hospitals to compensate them for a portion of the hospital's costs directly related to graduate training of physicians. Such costs include residents' stipends, faculty salaries, administrative expenses, and institutional overhead allocated to residency programs. (Adams Decl. ¶ 4).

48.    The amount of DME payments differs for every hospital. DME payments are calculated based on a hospital-specific, per resident amount. (Adams Decl. ¶ 5).

49.    Since 1997, Medicare has imposed a limit on the number of residents a teaching hospital can count towards DME payments. The amount of the DME payment for each resident within that limit is based on the particular hospital's direct graduate medical education costs from fiscal year 1984 or 1985. This amount is adjusted for inflation every year. To calculate the amount of a hospital's DME payment, Medicare multiplies the per resident amount by the number of allowed residents being trained at the particular institution, and then by the proportion of a hospital's inpatient days attributable to Medicare beneficiaries. Thus, a hospital that treats a large proportion of Medicare patients, has a large number of residents, and a high per resident amount, will receive larger DME payments than a teaching hospital with fewer residents and/or a lower per resident amount. (Adams Decl. ¶ 6).

50.    IME adjustments represent additional amounts paid by Medicare to teaching hospitals to compensate them for the added costs associated with the operation of teaching

programs. IME adjustments recognize the additional indirect costs created by training programs, such as additional tests, inefficiencies associated with the physician's teaching responsibilities, and/or the potentially duplicative nature of an attending and resident treatment of the same patient. (Adams Decl. ¶ 7).

51.     The IME adjustment is based on a teaching hospital's ratio of residents to beds ("IRB"). The IRB ratio is inserted into a formula established by Medicare for the calculation of the IME adjustment. Essentially, IME adjustments provide a teaching hospital with a greater cost reimbursement for teaching hospitals than for non-teaching hospitals, and a teaching hospital with higher IRB ratio will receive larger payments for treating Medicare patients than a teaching hospital with a lower IRB ratio. (Adams Decl. ¶ 8).

52.     Partners' teaching hospitals are reimbursed by Medicare for medical education (DME and IME) as described above. As a result, Medicare provides a significant amount of funds to cover not only residents' stipends, but also the cost associated with the teaching programs themselves. (Adams Decl. ¶ 9).

**Medicare Billing Rules for Physician Services Enhance Resident Education**

53.     Medicare pays for physician services which may be rendered in part by a resident, provided that the documentation reflects that the physician's supervision of that resident, and the physician's direct interaction with the patient, satisfies specific standards. (Belknap Decl. ¶ 2).

54.     Medicare specifically excludes the activities of residents in approved graduate medical education programs from any payment for "physician services." This exclusion applies regardless of whether the resident is licensed to practice medicine. (Belknap Decl. ¶ 6).

55.     The "Medicare teaching physician rule," as published in the Medicare Carriers Manual, establishes strict standards for when and how a physician may bill for services rendered to Medicare patients ("physician services") when a resident participates in the clinical care. These rules set minimum standards for the interactions between attending physicians and resident trainees, and the documentation of such interactions, in order to bill for the attending physician's services.  The MGH generally applies the Medicare standards to all payers. (Belknap Decl. ¶ 3).

56.     The Medicare Teaching Physician Rule has resulted in significantly more direct supervision by teaching physicians over residents' patient care activities.  Since the teaching physician is now required to be present for the key portion of any procedure in order to receive payment for that service, teaching physicians are nearly always present for those procedures. (Belknap Decl. ¶ 5).

57.     Partners complies with the Teaching Physician Rule and uses these same documentation and billing requirements for its private payers.  (Belknap Decl. ¶ 3).

58.     At MGH and BWH, with respect to examinations and non-surgical procedures, unless an attending physician physically sees a patient, no bill for physician services is generated.  (Belknap Decl. ¶ 5).

59.     At MGH, with respect to outpatient visits and other non-surgical care, unless an attending physician physically sees a patient, no bill for physician services is generated.  For surgical procedures, no bill may be generated unless (1) an attending was physically present during all critical portions of the procedure; and (2) an attending was immediately available at all other times.  (Belknap Decl. ¶ 5).

60.     After a patient is examined or a procedure is performed, the attending physician must dictate a report of the examination or procedure.  The attending physician may delegate the dictation of the report to a resident.  If dictation is delegated for a surgical procedure, the attending must write an addendum indicating that the attending was physically present for the critical portions of the procedure and was immediately available at all other times for consultation.  For non-surgical patient care services, the attending physician must complete personal documentation describing their involvement in providing the services.  (Belknap Decl. ¶ 8).

61.     Attending physicians are educated about the Medicare billing requirements by Partners.  (Belknap Decl. ¶ 9).

62.     To ensure compliance, my office regularly audits the documentation by each attending physician.  (Belknap Decl. ¶ 9).

63.     An increasing number of private payers will pay for physician services only if the physician has completed an approved training program in the applicable specialty, and as such has become board eligible.  (Belknap Decl. ¶ 10).

64.     Partners does not bill for patient care provided by residents.  (Belknap Decl. ¶ 5).

65.     As such, a relatively small percentage of patients are seen only by residents. Generally, there is no financial incentive for patients to be seen only by residents.  Even when patients are seen only by residents, attending physicians are always on site for consultation. (Belknap Decl. ¶ 7).

## Residency Programs Have Evolved into Educational
## Programs During the Last 40 Years

66.     In today's educational environment, residents are supervised in every clinical
setting.  (Declaration of Dennis Ausiello ("Ausiello Decl.") ¶ 37).[11]

67.     In the 1960's before the government started funding graduate medical educations,
there were many fewer teaching rounds, conferences, and lectures at Partners' hospitals than is
the case today.  Now, Partners' hospitals hold rounds, conferences and seminars, some daily,
some weekly, and some monthly.  (Warshaw Decl. ¶ 27; Thibault Decl. ¶ 7; *see also* Ausiello
Decl. ¶ 38).

68.     Residencies in medicine lasted only two years then.  Now residencies in internal
medicine are three years. (Ausiello Decl. ¶ 36).

69.     Partners' residency programs are very different today than they were in the early
1970's.  Today, residents are given far less autonomy.  The educational demands on residents are
more intense as a result of the expanding knowledge base and new technology in medicine, more
rigorous program requirements for accreditation by ACGME – including specific curriculum and
supervision requirements - and the public demand to meet their expectations for a higher quality
of care than was available years ago.  (Thibault Decl. ¶ 7).

70.     In the past, there was far less supervision of residents.  Residents often made
decisions on their own with respect to patient care, without prior consultation with the attending.
Residents are subject to much more intensive supervision today.  Only attending physicians
make final decisions regarding patient care.  Residents are now supervised in virtually everything
they do.  (Zinner Decl. ¶ 26; Warshaw Decl. ¶ 25; Ausiello Decl. ¶ 37).

---

[11] The Ausiello Declaration is attached hereto as Exhibit K.

71.     One major impetus for the evolution of residency programs has been the more formal, rigorous, and highly structured standards and goals set by outside authorities such as the ACGME.  At the same time, Medicare billing requirements have also led to a higher degree of supervision of residents.  As a result, teaching hospitals have become far better at providing the education and clinical experience that is needed in order for a physician to be competent to practice medicine.  (Thibault Decl. ¶ 8).

72.     Decades ago there was no cap on the number of hours a resident could work.  In 2003, the ACGME imposed an 80 duty hour per week limit for all residents.  Over the years, there has been a monumental growth in the amount of information and complexity of subject matter that residents must learn, and the set of skills that must be acquired has increased dramatically.  As a result, residency training programs have become much more focused on education and training in order to maximize the educational experience.  (Zinner Decl. ¶ 28; Warshaw Decl. ¶ 28).

73.     The implementation of the 80 hour per week restriction has resulted in a more concentrated educational environment.  (Thibault Decl. ¶ 7).

74.     Because the educational experience is more demanding, and must be accomplished in a limited period of time, residents no longer have time for, nor are they expected to, provide routine care to lighten the workload of an attending.  The more routine clinical responsibilities are now carried out by physician extenders, such as physician assistants or nurse practitioners.  (Zinner Decl. ¶ 29; Ausiello Decl. ¶ 39).

75.     The complexity of subject matter that residents must learn has grown enormously; *i.e.*, there used to be a defined five years of training in a surgical residency.  However, with the

- 22 -

development of new knowledge, sub-specialties have evolved which require more training. Residents are now required to spend up to three to four additional years of training. (Warshaw Decl. ¶ 26).

76.     Additionally, hospitalized patients were less sick decades ago and stayed in the hospital far longer. This resulted in residents having more time to evaluate patients with less complicated diagnostic and treatment options than today. (Ausiello Decl. ¶ 40).

77.     Many residents pursue academic based careers, or careers in basic scientific research. Even residents who don't pursue such careers are exposed to, and learn about, the academic and research perspectives in surgery. (Warshaw Decl. ¶ 29).

**ACGME Program Requirements In Internal Medicine Provide Educational Guidelines**

78.     In order for a residency program in internal medicine to be accredited by the ACGME, the program must provide 36 months of supervised graduate education. A residency program in a medical specialty must provide up to 3 years of additional education in order to receive ACGME accreditation. The ACGME requirements are designed to ensure that every resident training program is educational in nature. The educational program is intended to ensure that residents acquire the knowledge, judgment, skills, and attitudes necessary to practice internal medicine, or a medical specialty. (Ausiello Decl. ¶ 3).

79.     MGH does not rely on residents or the resident training programs to meet its staffing needs. MGH's curricula for its medical resident programs are set by national curriculum standards established by ACGME. A number of structures have been put into place to protect the educational experience from undue service responsibilities. (Ausiello Decl. ¶ 4).

80.    In accordance with ACGME requirements, the educational components of every medical residency program must be established and memorialized via a written curriculum. For example, for each rotation or major learning experience, ACGME requires that the written curriculum include the educational purpose (goals and objectives), the teaching methods and educational resources to be used, and the method for evaluating residents. (Ausiello Decl. ¶ 5).

81.    ACGME describes the required elements of formal teaching and learning in all medical residency programs. These include assigned reading from a textbook and medical literature, rounds, conferences, lectures, and other didactic activities. In accordance with AGCME requirements, these also include learning through supervised patient care experiences. Finally, the teaching tools include written and oral evaluations and examinations. (Ausiello Decl. ¶ 6).

**Specific Patient Care Experience Is Necessary To Become A Practicing Physician**

82.    In addition to the educational activities described above, ACGME requires that the education program teach the resident through direct patient care experiences, including but not limited to the clinical care of ambulatory care patients, hospitalized patients, and emergency room patients. (Ausiello Decl. ¶ 16).

83.    In order for residents who are training to become independent practicing clinicians, supervised experience in direct patient care is essential. One cannot learn to be a practicing physician without first being directly involved in the patient care experience in a supervised, teaching environment. The resident needs real and practical clinical experience that cannot be acquired by reading and teaching conducted in a classroom. (Thibault Decl. ¶ 9).

- 24 -

84.    MGH residents' activities are actively supervised.  Attending physicians are in charge of managing, approving and participating in resident training.  At MGH, the program director and faculty assess the competence of each resident individually in order to determine the rate at which he or she may take on progressively greater responsibilities, and the extent to which he or she may participate in the diagnostic process and decisions as to an appropriate plan of treatment.  This gradual, supervised progression is an essential part of the education necessary to prepare the resident to make independent decisions after completion of the training program. (Ausiello Decl. ¶ 17).

85.    During these specific patient care experiences, a resident's knowledge, technical skills and judgment are developed.  The attending then modifies the nature and scope of the education and training that is appropriate and necessary for each resident at each stage of the residency program. ACGME requires supervision of residents during these patient care experiences. (Ausiello Decl. ¶ 18).

86.    Residents at Partners' teaching hospitals participate in the specific patient care experiences described above and residents receive the supervision required by the ACGME guidelines.  Residents are supervised in every clinical setting. (Ausiello Decl. ¶ 19).

87.    Supervision includes discussion with the attending physician, and his or her confirmation or adjustment of any preliminary patient management decisions made by the resident, after a patient evaluation by the attending.  (Ausiello Decl. ¶ 20).

88.    Residents learn to become competent practicing clinicians through supervised patient care practices.  It is not possible to disassociate the clinical care component of training from medical education itself.  The practice of medicine is the last of the apprentice based

training professions.  Book learning and vicarious experiences are not enough in and of themselves to train a physician.  For example, it is not sufficient for an attending physician to tell a resident what a normal or abnormal heartbeat sounds like; the resident can only truly learn to identify and differentiate the sounds of a heartbeat by listening to a patient's heartbeat.  As another example, the resident must learn how to elicit a medical history from the patient and family, which is necessary to make diagnostic and treatment decisions. The resident also learns how to communicate with the patient and family during every medical encounter.  Although some of these skills may be discussed in medical school, the learning is only theoretical, with no application to the real world of human patients.  Thus, real patient care experience is an essential part of the residency training process. (Ausiello Decl. ¶ 21).

89.    Participating in direct patient care is a fundamental and necessary component of the education of residents.  (Ausiello Decl. ¶ 22).

90.    Students in medical school may spend only a few months in their third or fourth year in hospitals with exposure to real patients.  Even then, the students' experience is vigorously supervised and heavily dependant on observation.  Anything short of the full human experience is insufficient for the proper training of a physician during the residency program. (Ausiello Decl. ¶ 23).

91.    Upon graduation, medical students have a general but diffuse intellectual knowledge of various medical specialties.  Their studies do not train them for specialization.  In applying for a residency, residents must choose a specific area of practice, such as internal medicine, general surgery, radiology, pathology.  Through their specialized training program, residents see and experience a full spectrum of medical problems and procedures handled by the

attending physicians. They are embedded in the patient care delivery process and are immersed in the educational process. (Ausiello Decl. ¶ 24).

92.    Because an emergency may come up when an attending physician is not physically present, residents and attending physician discuss possible complications or other medical events and how they should be handled. Furthermore, when the attending is not physically present, a relatively experienced resident is available with the training and skills to act in the event of an emergency. For example, a doctor may have from thirty seconds to three minutes to intervene in the event of a heart attack. If a heart attack occurs when an attending physician is not physically present, the resident or residents on the floor have been trained as to how to handle the situation. (Ausiello Decl. ¶ 26).

93.    Delivering patient care is not the purpose of a residency training program. The purpose is to develop practical clinical knowledge and skills through supervised patient care activities and feedback that accompany these activities. (Ausiello Decl. ¶ 27).

94.    In many ways, the MGH could operate more efficiently without resident services. When the diagnosis and treatment of a patient must be supervised, as is the case when being performed by a resident, they take longer to be completed. (Ausiello Decl. ¶ 28).

### ACGME Program Requirements in Surgery Provide Educational Guidelines for Partners' Residency Programs

95.    In order for residency training programs in general surgery to be accredited by the ACGME, and in order for a resident to acquire the necessary knowledge, technical skill, and judgment to practice as a general surgeon, a residency program must include five years of training after graduation from medical school. A residency program in a surgical specialty

requires up to three to four years of additional training.  Furthermore, in order for a resident to be eligible to sit for the Board examination in General Surgery, or in the applicable Surgical Specialty, he or she must complete the required number of years of ACGME accredited training. The ACGME requirements are designed to ensure that the focus of a residency training program is educational, and that any patient care services performed by a resident are educational in nature and not rendered in order to meet a hospital's staffing needs.  The goal is for residents to gain the necessary knowledge, technical skill, and judgment to practice as a surgeon.   (Warshaw Decl. ¶ 3; Zinner Decl. ¶ 3).

96.     The educational program of a surgical residency includes ongoing studies from a textbook and other written materials, supervised operative experience, supervised pre-operative and post-operative patient care, and a full spectrum of educational rounds, lectures and conferences. The residents also learn through the ongoing testing, evaluation and feedback process during the residency program.  (Zinner Decl. ¶ 4; Warshaw Decl. ¶ 4).

97.     The educational program of a surgical residency includes operative experience, supervised patient care, outpatient responsibilities, and educational conferences.  The residents also learn through the testing and evaluation process and the certifying examination process. (Zinner Decl. ¶ 4; Warshaw Decl. ¶ 4).

**Operative Experience Is Required To Become A Surgeon**

98.     Operative skill is essential for the surgeon and can be acquired only through direct personal experience.  The extent to which a resident may participate in a surgical procedure is based on their level of  knowledge, experience and demonstrated skill.  Supervision is required to ensure patient safety and to maximize the educational experience.  Such supervision requires that

teaching staff is always available for consultation.  (Warshaw Decl. ¶ 8).

99.     It is only through operative experiences that a resident can adequately be trained as a surgeon.  It is impossible to train surgeons without practicing on actual patients.  Learning to care for patients is like learning to ride a bike.  You can read and study for years about how to ride the bike, but the only way you can really learn to ride one is to get on the bike and do it. (Warshaw Decl. ¶ 9).

100.     Patient care is an incidental by-product of the learning process.  The fact that resident training also involves taking care of patients is critical to their training.  (Warshaw Decl. ¶ 12).

101.     When medical school students graduate, they are not competent to perform surgery.  (Zinner Decl. ¶ 5; Warshaw Decl. ¶ 5).

102.     In the first year of residency, residents are taught how to hold an instrument. They are taught how to tie a knot. (Zinner Decl. ¶ 5; Warshaw Decl. ¶ 5).

103.     In their first year, residents progress gradually under direct supervision.  Even though under state law a surgical resident may obtain a license to practice after just one year of residency, this does not mean that the resident is competent to practice surgery.  A doctor must have hospital privileges in order to use its surgical facilities.  I am not aware of any hospital that would grant surgical privileges to a physician who has not successfully completed a full residency program at an accredited institution.  (Warshaw Decl. ¶ 5; Zinner Decl. ¶ 5).

104.     As residents progress through the program, the competence of each is evaluated individually in order to determine the extent to which they may participate in the diagnostic process, decisions as to the appropriate surgical plan, and the actual surgical procedure.

Residents are not permitted to participate in patient care based solely on the number of years they have completed in the residency program. During the process of evaluating each resident, the teaching physician tailors the nature and extent of the education and training that is necessary and appropriate for that resident at that point in time. Thus, residents are gradually exposed to different disease processes and surgical procedures, and taught how to make a diagnosis and perform an operation. The complexity of the cases and surgical procedures increases during the training. However, an attending surgeon is always responsible for the care of the patient, and is always present for the critical portion of any surgery. It is the responsibility of the attending surgeon to make a judgment about the capability of each resident. (Zinner Decl. ¶ 6; Warshaw Decl. ¶ 6).

105.    During the five years of a general residency program, the trainee gets limited exposure to surgical specialties, including but not limited to Oncology, Trauma, Pediatric, Burn, Transplant, Plastic, Vascular, and Thoracic. Residents are also taught how to communicate effectively and appropriately with individual patients and their families. In addition to these standard training experiences, between their third and fourth years, residents take an elective period to develop a research interest or refine clinical skills. (Zinner Decl. ¶ 7; Warshaw Decl. ¶ 7).

106.    A resident must perform a minimum of 500 procedures during the 5 year period, and a minimum of 150 procedures in their 5th year of training, including a specified number of major surgical procedures. (Zinner Decl. ¶ 8).

107.    If a resident does not master the information and skills expected of a resident during a rotation or completion of a year of training, remedial action is taken to assist the

resident. This may take the form of assigning additional reading, providing additional supervision, arranging for additional experience in a particular aspect of surgical care, repeating a rotation or a year of training, or other educational assistance or clinical practice to allow the resident to progress to the next stage of training. Rarely, but on occasion, a resident is not able to complete a surgical residency program. (Warshaw Decl. ¶ 10).

108. In many cases, attending physicians fully integrate their residents into the patient care process. Every single case is a teaching case, with constant communication and constant dialogue. Attending physicians can oftentimes do the operations twice as fast, but choose to invest their time in the teaching aspect. (Warshaw Decl. ¶ 11).

109. At BWH, a resident in surgery generally accumulates an average of 1000 cases over the 5 years. A written log is kept, tracking the number and nature of procedures performed by each resident. (Zinner Decl. ¶ 8).

110. During the week, an attending physician visits his or her inpatients everyday. This is done in the morning, in the context of daily morning rounds with the resident team, where the attending interacts with the residents in making decisions as to clinical management and treatment plan for each individual patient. Junior residents see and evaluate patients at least twice a day on rounds. They discuss each patient and make a care plan recommendation to one or more senior residents. Senior residents evaluate these recommendations and then discuss them with the attending physician. (Zinner Decl. ¶ 9).

111. Residents could train on virtual patients if they only treated computer models, which obviously is not the case. The primary purpose of the residency program is to make the residents qualified to perform surgery, and the teaching function comes first. The purpose is not

to fill the hospital's staffing needs.  (Zinner Decl. ¶ 11).

112.    Many times, attending physicians could perform a procedure much faster than a resident could.  (Warshaw Decl. ¶ 11).

113.    An attending physician will typically personally visit his or her patients every day.  (Zinner Decl. ¶ 9).

114.    Junior residents will see and evaluate patients at least twice a day on rounds. They discuss each patient and make a care plan recommendation to senior residents.  Senior residents will evaluate these recommendations and then discuss them with the attending physician.  Attending physicians make the final decisions regarding patient. (Zinner Decl. ¶ 10).

115.    Although residents are given increasing responsibility to make preliminary clinical decisions as they gain experience, the ultimate decision is always made by an attending physician.  (Zinner Decl. ¶ 10).

116.    The primary purpose of the residency program is to make residents competent surgeons.  The purpose is not to fulfill the hospital's service needs.  The patient care component is essential to the educational process.  (Warshaw Decl. ¶ 12; Zinner Decl. ¶ 11).

### Conferences, Seminars, and Teaching Rounds
### Contribute To A Rich Educational Environment

117.    The residency program includes rounds and conferences that also make up an essential component of the educational process.  There is a full spectrum of regularly scheduled presentations, ranging from rounds to review the case management of specific patients, to more didactic lectures on a specific topic.   Types of conferences which must exist in a surgical residency program include a weekly review of all current complications and deaths, courses to

ensure coverage of the basic and clinical sciences fundamental to surgery in general and regular organized clinical teaching, such as ward rounds and clinical conferences. Resident attendance at rounds, and at many of the conferences and lectures, is mandated. Residents have required reading from a textbook, as well as specific reading from medical literature assigned on an ongoing basis. (Warshaw Decl. ¶ 13; Zinner Decl. ¶¶ 13-15; Ausiello Decl. ¶ 15).

118.    A first year resident in internal medicine at MGH is expected to attend 15 hours a week of regularly scheduled lectures and conferences, and residents in their second and third years are required to attend 20 hours a week of regularly scheduled lectures and conferences. (Ausiello Decl. ¶ 14).

119.    Partners' surgical residents participate in all the required conferences. Residents are expected to learn basic medical knowledge through departmental lectures, conferences, morbidity and mortality conferences, and assigned resident presentations. Practice based learning is taught by critique of personal practice outcomes in morbidity and mortality conferences, daily discussion of patient care plan and outcomes with faculty, and assignment of literature review. Surgical residents are taught to maintain high standards of ethical behavior and sensitivity through daily interaction with faculty on clinical rotations, appropriate conferences and discussions, and the Partners' core curriculum. Each service has a weekly morbidity and mortality conference which all residents and staff attend. (Zinner Decl. ¶¶ 13, 15; Warshaw Decl. ¶¶ 13, 16).

120.    Pursuant to the ACGME requirements, Partners requires its residents to participate in teaching and other rounds. Residents at Partners experience supervised training

through rounds more frequently than is mandated by the ACGME residency program requirements. (Ausiello Decl. ¶ 9).

121.     Clinical rounds are as critical to the education of residents as the reading, conferences and other more didactic forms of training.  (Ausiello Decl. ¶ 11).

122.     Rounds include both teaching rounds and patient care management rounds by an attending physician.  During both types of rounds, the residents are supervised and taught by the attending physician.  Teaching rounds are patient-based sessions in which a few cases are presented as a basis for discussion of certain items.  Patient care management rounds involve direct interaction between the resident and the attending physician to discuss the clinical management and treatment plan for each inpatient under the care of the attending and the associated "team" of residents.  Residents are required to participate in both teaching and patient care management rounds, as well as other rounds.   Other rounds include weekly Medical Grand Rounds led by senior faculty at Harvard Medical School and national and international leaders in academic medicine.  Weekly Case Directed rounds, which are held for internal medicine and each medical specialty and organized by the Chief Resident, focus on clinical-pathological correlations and review management decisions in the context of patient specific complications or outcomes.  (Ausiello Decl. ¶ 8; Warshaw Decl. ¶¶ 14-15).

123.     In accordance with ACGME requirements, MGH residents also participate in monthly Journal Club which provides a forum for the discussion of recent, significant research articles.  Residents select articles from the basic science or clinical literature and lead discussions in which residents, fellows, and attending physicians participate. (Ausiello Decl. ¶ 13).

124.     In combination, the rounds, conferences and lectures give the surgical residents a

medical and scientific knowledge base, an understanding of the most recent advances in surgery, a clinical review of potential complications and specific practice outcomes, and an organized structure that promotes the spirit of inquiry and scholarship as well as the clinical knowledge needed in order for each resident to take on progressive responsibility for patient management. (Warshaw Decl. ¶ 16).

### Partners' Residents Undergo Regular Testing And Evaluations

125.    The ACGME requires a program to establish a system of trainee evaluation that documents the progress of each resident in meeting the goals of the program.  The overall performance of each resident must be evaluated at least semiannually to determine if the resident has learned what is expected at the particular stage of the training.  The program director evaluates each resident as to their knowledge base and intellectual abilities, their clinical and interpersonal skills, relationship building, and the development of professional attitudes expected of physicians.  In addition, a written final evaluation must be provided for each resident who completes the program.  (Weinstein Decl. ¶ 26; Warshaw Decl. ¶ 17; Zinner Decl. ¶ 18). (Ausiello Decl. ¶ 31).

126.    In accordance with ACGME requirements, at the conclusion of each rotation, the attending physicians prepare a written evaluation that is shared and discussed in person with each resident. (Ausiello Decl. ¶ 30).

127.    General surgery residents at Partners are given written evaluations.  Each faculty member in each clinical rotation must write an evaluation for each resident.  Additionally, as required, a final written evaluation is provided to each resident upon completion of the program. (Warshaw Decl. ¶ 18; Zinner Decl. ¶ 19).

128.    At least twice a year, every resident meets personally with the residency program director to review the resident's evaluations and to discuss their educational experience.  At least once a year, residents sometimes meet with the head of their department also, to review the resident's evaluations and personal experience.  (Warshaw Decl. ¶ 19).

129.    Surgery residents at BWH evaluate the experience on that rotation, as well as each attending.  (Zinner Decl. ¶ 19).

130.    Partners utilizes the American Board of Surgery Basic Science In-Service Examination, faculty evaluation of clinical services, and performance on the Department Oral Examination as tools for the evaluation of its residents.  Partners administers the examinations throughout the training program to monitor the residents' educational progress.  These examinations are crucial in determining if residents are retaining the essential information being taught during each stage of the training.  If residents are unable to demonstrate an understanding of these required materials, they will not proceed to the next stage of their training program. (Warshaw Decl. ¶ 22; Zinner Decl. ¶¶ 21-22).

131.    In addition, at the end of the forth and fifth years of surgical residency program, the residents are given a Department Oral Examination, which serves as a "mock" or practice examination in preparation for the oral portion of the exam given by the American Board of Surgeons.  These oral examinations are also used as a tool for evaluating the educational progress of the resident.  (Warshaw Decl. ¶ 20; Zinner Decl. ¶ 21).

132.    All of these evaluations and examinations are crucial in determining whether residents have mastered the information being taught during each stage of the training.  The written examinations are crucial in determining if residents are retaining the essential

information being taught during each stage of the training.  If a resident has not mastered the necessary information, remedial action is taken which may take the form of assigning additional reading, providing additional supervision, arranging for additional experience in a particular aspect of surgical care, repeating a rotation or a year of training, or other educational assistance or clinical practice to allow the resident to progress to the next stage of training.  (Warshaw Decl. ¶ 21; Ausiello Decl. ¶ 29).

133.    The examinations also provide Partners with a method to gauge whether the teaching methods being utilized are appropriate for communicating important materials to the residents.  For example, unacceptable results from a large number of residents on a certain examination, or section of an examination, may suggest that a teaching method being utilized is not the appropriate means to help learn certain materials or skills.  (Warshaw Decl. ¶ 22; Zinner Decl. ¶ 23; Ausiello Decl. ¶ 32).

134.    To some extent, a residency training program is adjusted in response to ongoing evaluations of the knowledge and skills of each individual resident.  Thus, based on the evaluation of a resident's performance, he or she may be assigned additional reading, additional practice of specific skills, more time on a particular rotation, or even repeating a rotation or a year of training. Some residents merely require extra supervision.  Occasionally, a resident does not complete the training program and does not go on to become a practicing clinician, or pursues a different specialty.  (Thibault Decl. ¶ 10).

### The Goal of the Residency Program is for Partners' Residents to Pass Their Board Certification Examinations

135.    To be eligible to take a Board Certification Examination, a physician must

- 37 -

complete a residency program. In order to become Board certified, a physician must pass the applicable Board exam. Most hospitals will not hire a physician unless he or she is Board certified or eligible to be Board certified. (Ausiello Decl. ¶ 7; Warshaw Decl. ¶ 5).

136. Most, if not all, hospitals require that a physician be board eligible or board certified as a condition for granting hospital privileges which include the authority to admit or discharge a patient and to practice medicine on the hospital premises. (Weinstein Decl. ¶ 10; Ausiello Decl. ¶¶ 7, 25; Warshaw Decl. ¶ 3).

137. In order to be eligible to take a Board exam, residents must complete training in subject matters specified by the particular Board. Some Boards have very specific requirements, such as mandating that a resident perform a certain number of procedures, participate in the diagnosis and treatment of a certain number of diseases, and spend a particular amount of time training in a specified department. As such, hospitals must allow residents the opportunities to learn about the required topics, regardless of the hospitals' staffing needs. (Warshaw Decl. ¶ 3; Weinstein Decl. ¶ 27).

138. Further, in order for a program to remain accredited, ACGME requires that graduates of a surgical residency program achieve certain pass rates on certification examinations. If more than 60% of a program's residents from the most recent five year period fail the certification examination on their first try, the program is in danger of losing its accreditation. (Warshaw Decl. ¶ 23; Zinner Decl. ¶ 24; Ausiello Decl. ¶ 34).

139. Partners' residents significantly surpass these pass rate requirements. MGH has a 99% pass rate. (Warshaw Decl. ¶ 24; Zinner Decl. ¶ 25; Ausiello Decl. ¶ 35).

Dated:  February 24, 2006          _____/s/  Sarah E. Hancur_____

BENJAMIN A. GOLDBERGER (No. 654357)
JOSEPH H. SELBY (No. 643275, *admitted pro hac vice*)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Telephone: (617) 535-4000
Facsimile:  (617) 535-3800
E-Mail: bgoldberger@mwe.com
        jselby@mwe.com

CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*
SARAH E. HANCUR *(admitted pro hac vice)*
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005
Telephone: (202) 756-8310
Facsimile:  (202) 756-8087
E-Mail: ckliefoth@mwe.com

*Attorneys for Partners Healthcare System, Inc.*

WDC99 1182315-2.057158.0039

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and

paper copies will be sent to those indicated as non-registered participants on February 24, 2006.


_____/s/__Sarah E. Hancur _____
Sarah E. Hancur

# The Commonwealth of Massachusetts

## OFFICE OF THE MASSACHUSETTS SECRETARY OF STATE
### MICHAEL J. CONNOLLY, Secretary
ONE ASHBURTON PLACE, BOSTON, MASSACHUSETTS 02108

### ARTICLES OF ORGANIZATION
(Under G.L. Ch. 180)

#### ARTICLE I

The name of the corporation is:

MGH/BRIGHAM HEALTH CARE SYSTEM, INC.

#### ARTICLE II

The purpose of the corporation is to engage in the following activities:

(i) To organize, operate and support a comprehensive health
care system, including without limitation hospital and other health
care services for all persons, and education and research for the
prevention, diagnosis, treatment and cure of all forms of human illness:
(ii) to improve the health and welfare of all persons: (iii) to operate
for the benefit of and to support  The Massachusetts General Hospital,
The Brigham Medical Center, Inc., their respective affiliated corporations
and such other charitable, scientific or educational organizations which
are or are affiliated with teaching hospitals in  the Greater Boston Area:
and (iv) to carry on any other activity that may lawfully be carried on by
a corporation formed under Chapter 180 of the Massachusetts General Laws
which is exempt under section 501(c)(3) of the Internal Revenue Code.

93—349560

C ☐
P ☒
M ☐
R.A. ☐

Name
Approved

10

P.C.

Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on separate 8½ x 11 sheets of pa
leaving a left hand margin of at least 1 inch. Additions to more than one article may be continued on a single sheet so long as each article requir
each such addition is clearly indicated.

PHS 000229

## ARTICLE III

If the corporation has one or more classes of members, the designation of such classes, the manner of election or appointments, the duration of membership and the qualification and rights, including voting rights, of the members of each class, may be set forth in the by-laws of the corporation or may be set forth below.

```
The designation of classes of members, if any, the manner
of election or appointment, the term of office, and the
qualifications and rights of members are set forth in the
by-laws of the Corporation.
```

## ARTICLE IV

* Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or members, or of any class of members, are as follows:

```
See Continuation Sheets IV-A through IV-D attached
hereto and incorporated herein by reference.
```

* If there are no provisions, state "None".

Note: The preceding four (4) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.

PHS 000230

ARTICLE V

By-laws of the corporation have been duly adopted and the initial directors, president, treasurer and clerk or other presiding, financial or recording officers, whose names are set out below, have been duly elected.

## ARTICLE VI

effective date of organization of the corporation shall be the date of filing with the Secretary of the Commonwealth or if a later date is desired, specify date. (not more than 30 days after date of filing).

The information contained in ARTICLE VII is NOT a PERMANENT part of the Articles of Organization and may be changed ONLY by filing the appropriate form provided therefor.

## ARTICLE VII

a. The post office address of the initial principal office of the corporation IN MASSACHUSETTS is:

c/o Ropes & Gray, One International Place, Boston, MA 02110

b. The name, residence and post office address of each of the initial directors and following officers of the corporation are as follows:

| NAME | RESIDENCE | POST OFFICE ADDRESS |
|------|-----------|---------------------|
| President: | See Continuation Sheet VII(b) attached hereto and incorporated herein by reference. | |
| Treasurer: | | |
| Clerk: | | |

Directors: (or officers having the powers of directors).

| NAME | RESIDENCE | POST OFFICE ADDRESS |
|------|-----------|---------------------|
| | See Continuation Sheet VII(b) attached hereto and incorporated herein by reference. | |

c. The fiscal year of the corporation shall end on the last day of the month of: September

d. The name and BUSINESS address of the RESIDENT AGENT of the corporation, if any, is:

I/We the below-signed INCORPORATORS do hereby certify under the pains and penalties of perjury that I/We have not been convicted of any crimes relating to alcohol or gaming within the past ten years. I/We do hereby further certify that to the best of my/our knowledge the above-named principal officers have not been similarly convicted. If so convicted, explain.

IN WITNESS WHEREOF and under the pains and penalties of perjury, I/WE, whose signature(s) appear below as incorporator(s) and whose names and business or residential address(es) ARE CLEARLY TYPED OR PRINTED beneath each signature do hereby associate with the intention of forming this corporation under the provisions of General Laws Chapter 180 and do hereby sign these Articles of Organization as incorporator(s) this 9th day of December, 19 93

David M. Donaldson

Ropes & Gray
One International Place
Boston, MA 02110

NOTE: If an already-existing corporation is acting as incorporator, type in the exact name of the corporation, the state or other jurisdiction where it was incorporated, the name of the person signing on behalf of said corporation and the title he/she holds or other authority by which such action is taken.

PHS 000231

## MGH/BRIGHAM HEALTH CARE SYSTEM, INC.

IV. Other Lawful Provisions for Conduct and Regulation of the Business and Affairs of the Corporation, for its Voluntary Dissolution, and for Limiting, Defining and Regulating the Powers of the Corporation and of its Trustees and Members.

4.1.  The corporation shall have in furtherance of its corporate purposes all of the powers specified in Section 6 of Chapter 180 and in Sections 9 and 9A of Chapter 156B of the Massachusetts General Laws (except those provided in paragraph (m) of said Section 9) as now in force or as hereafter amended, and may carry on any operation or activity referred to in Article 2 to the same extent as might an individual, either alone or in a joint venture or other arrangement with others, or through a wholly or partly owned or controlled corporation; provided, however, that no such power shall be exercised in a manner inconsistent with said Chapter 180 or any other chapter of the Massachusetts General Laws or which would deprive it of exemption from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code.

4.2.  The by-laws may authorize the trustees to make, amend or repeal the by-laws in whole or in part, except with respect to any provision thereof which by law, the articles of organization or the by-laws requires action by the members.

4.3.  Meetings of the members may be held anywhere in the United States.

4.4.  No trustee or officer of the corporation shall be personally liable to the corporation or its members for monetary damages for breach of fiduciary duty as such trustee or officer, notwithstanding any provision of law imposing such liability, except to the extent that such exemption from liability is not permitted under Chapter 180 of the Massachusetts General Laws.

4.5.(a)  The corporation shall, to the extent legally permissible, indemnify each person who serves as one of its members, trustees or officers, or who serves at its request as a member, trustee or officer of another organization or in a capacity with respect to any employee benefit plan (each such person being called in this Section 4.5 a "Person") against all liabilities and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and

IV-A

JOCADPRO.PS

PHS 000232

counsel fees, reasonably incurred by such Person in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal, in which such Person may be involved or with which such Person may be threatened, while in office or thereafter, by reason of being or having been such a Person, except with respect to any matter as to which such Person shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his or her action was in the best interests of the corporation or, to the extent that such matter relates to service at the request of the corporation for another organization or an employee benefit plan, in the best interests of such organization or of the participants or beneficiaries of such employee benefit plan. Such best interests shall be deemed to be the best interests of the corporation for the purposes of this Section 4.5.

(b)  Notwithstanding the foregoing, as to any matter disposed of by a compromise payment by any Person, pursuant to a consent decree or otherwise, no indemnification either for said payment or for any other expenses shall be provided unless such compromise shall be approved as in the best interests of the corporation, after notice that it involves such indemnification, (a) by a disinterested majority of the trustees then in office; or (b) by a majority of the disinterested trustees then in office, provided that there has been obtained an opinion in writing of independent legal counsel to the effect that such Person appears to have acted in good faith in the reasonable belief that his or her action was in the best interests of the corporation; or (c) by a majority of the disinterested members entitled to vote, voting as a single class.

(c)  Expenses, including counsel fees, reasonably incurred by any Person in connection with the defense or disposition of any such action, suit or other proceeding may be paid from time to time by the corporation in advance of the final disposition thereof upon receipt of an undertaking by such Person to repay the amounts so paid if such Person ultimately shall be adjudicated to be not entitled to indemnification under this Section 4.5.  Such an undertaking may be accepted without reference to the financial ability of such Person to make repayment.

(d)  The right of indemnification hereby provided shall not be exclusive.  Nothing contained in this Section shall affect any other rights to indemnification to which any Person or other corporate personnel may be entitled by contract or otherwise under law.

(e)  As used in this Section 4.5, the term "Person" includes such Person's respective heirs, executors and administrators, and

IV-B

JOCADPRO.PS

PHS 000233

a "disinterested" member, trustee or officer is one against whom in such capacity the proceeding in question, or another proceeding on the same or similar grounds, is not then pending.

4.6.(a)  No person shall be disqualified from holding any office by reason of any interest.  In the absence of fraud, any trustee, officer or member of this corporation, or any concern in which any such trustee, officer or member has any interest, may be a party to, or may be pecuniarily or otherwise interested in, any contract, act or other transaction (collectively called a "transaction") of this corporation, and

(1)  such transaction shall not be in any way invalidated or otherwise affected by that fact; and

(2)  no such trustee, officer, member or concern shall be liable to account to this corporation for any profit or benefit realized through any such transaction;

provided, however, that such transaction either was fair at the time it was entered into or is authorized or ratified either (i) by a majority of the trustees who are not so interested and to whom the nature of such interest has been disclosed, or (ii) by vote of a majority of each class of members of the corporation entitled to vote for trustees, at any meeting of members the notice of which, or an accompanying statement, summarizes the nature of such transaction and such interest.  No interested trustee or member of this corporation may vote or may be counted in determining the existence of a quorum at any meeting at which such transaction shall be authorized, but may participate in discussion thereof.

(b)  For purposes of this Section 4.6, the term "interest" shall include personal interest and also interest as a trustee, officer, stockholder, shareholder, director, member or beneficiary of any concern; and the term "concern" shall mean any corporation, association, trust, partnership, firm, person or other entity other than this corporation.

(c)  No transaction shall be avoided by reason of any provisions of this paragraph 4.6 which would be valid but for such provisions.

4.7.  No part of the assets or net earnings of the corporation shall inure to the benefit of any member, officer or trustee of the corporation or any individual; no substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation except to the extent permitted by Section 501(h) of the Internal Revenue Code; and the corporation shall not participate in, or

IV-C

PHS 000234

intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office. It is intended that the corporation shall be entitled to exemption from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code and shall not be a private foundation under Section 509(a) of the Internal Revenue Code.

4.8. If and so long as the corporation is a private foundation (as that term is defined in Section 509 of the Internal Revenue Code), then notwithstanding any other provisions of the articles of organization or the by-laws of the corporation, the following provisions shall apply:

A) the income of the corporation for each taxable year shall be distributed at such time and in such manner as not to subject the corporation to the tax on undistributed income imposed by Section 4942 of the Internal Revenue Code, and

B) the corporation shall not engage in any act of self dealing (as defined in Section 4941(d) of the Internal Revenue Code), nor retain any excess business holdings (as defined in Section 4943(c) of the Internal Revenue Code), nor make any investments in such manner as to subject the corporation to tax under Section 4944 of the Internal Revenue Code, nor make any taxable expenditures (as defined in Section 4945(d) of the Internal Revenue Code).

4.9. Upon the liquidation or dissolution of the corporation, after payment of all of the liabilities of the corporation or due provision therefor, all of the assets of the corporation shall be disposed of pursuant to Massachusetts General Laws, Chapter 180, Section 11A, to The Massachusetts General Hospital and The Brigham Medical Center, Inc. if exempt from taxation as organizations described in Section 501(c)(3) of the Internal Revenue Code or, if both are not, to one or more organizations with similar purposes and similar tax exemption.

4.10. All references herein: (i) to the Internal Revenue Code shall be deemed to refer to the Internal Revenue Code of 1986, as now in force or hereafter amended; (ii) to the General Laws of The Commonwealth of Massachusetts, or any chapter thereof, shall be deemed to refer to said General Laws or chapter as now in force or hereafter amended; and (iii) to particular sections of the Internal Revenue Code or said General Laws shall be deemed to refer to similar or successor provisions hereafter adopted.

IV-D

PHS 000235

MGH/BRIGHAM HEALTH CARE SYSTEM, INC.

Continuation Sheet VII(b)

| | Name | Residence or Post Office Address |
|---|---|---|
| **Officers** | | |
| Vice-President | J. Robert Buchanan, M.D. | 25 Commonwealth Avenue Boston, MA 02116 |
| President | H. Richard Nesson, M.D. | 565 Boylston Street Brookline, MA 02146 |
| Treasurer | Richard A. Spindler | 210 Schoolmaster Lane Dedham, MA 02026 |
| Clerk | David M. Donaldson | 22 Weston Road Lincoln Center, MA 01773 |
| **Trustees** | W. Gerald Austen, M.D. | 163 Wellesley Street Weston, MA 02193 |
| | Eugene Braunwald, M.D. | 75 Scotch Pine Road Weston, MA 02193 |
| | J. Robert Buchanan, M.D. | 25 Commonealth Avenue Boston, MA 02116 |
| | Francis H. Burr | 44 Prince Street Beverly, MA 01915 |
| | Ferdinand Colloredo-Mansfeld | Winthrop Street Hamilton, MA 01982 |

AJWCNTNS.LM

VII(b)-1

PHS 000236

MGH/BRIGHAM HEALTH CARE SYSTEM, INC.

Continuation Sheet VII(b)

| Name | Residence or Post Office Address |
|---|---|
| John H. McArthur | Fowler 10 Soldiers Field Boston, MA  02134 |
| H. Richard Nesson, M.D. | 565 Boylston Street Brookline, MA  02146 |
| Richard A. Spindler | 210 Schoolmaster Lane Dedham, MA  02026 |

VII(b)-2

AJWCNTNS.LM

PHS 000237

449104

# THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF ORGANIZATION

### GENERAL LAWS, CHAPTER 180

I hereby certify that, upon an examination of the within-written articles of organization, duly submitted to me, it appears that the provisions of the General Laws relative to the organization of corporations have been complied with, and I hereby approve said articles; and the filing fee in the amount of $35.00 having been paid, said articles are deemed to have been filed with me this *15TH*

day of *December*    19 *93*.

Effective date

*Michael Joseph Connolly*

MICHAEL J. CONNOLLY
*Secretary of State*

**A PHOTOCOPY OF THESE ARTICLES OF ORGANIZATION SHALL BE RETURNED**

TO: David M. Donaldson, Esq.

Ropes & Gray

One International Place, Boston, MA 02110

Telephone: (617) 951-7250

PHS 000238

The Commonwealth of Massachusetts

## MICHAEL J. CONNOLLY

*Secretary of State*

ONE ASHBURTON PLACE, BOSTON, MASS. 02108

FEDERAL IDENTIFICATI
NO. 000 449104

### ARTICLES OF AMENDMENT

General Laws, Chapter 180, Section 7

This certificate must be submitted to the Secretary of the Commonwealth within sixty days after the date of the vote of members or stockholders adopting the amendment. The fee for filing this certificate is $15.00 as prescribed by General Laws, Chapter 180, Section 11C(b). Make check payable to the Commonwealth of Massachusetts.

We,    H. Richard Nesson     , President/~~Vice President~~ and
       David M. Donaldson     , Clerk/~~Assistant Clerk~~ of

MGH/BRIGHAM HEALTH CARE SYSTEM, INC.

(Name of Corporation)

located at    One International Place, Boston, MA 02110

do hereby certify that the following amendment to the articles of organization of the corporation was duly adopted a meeting held on    March 14     , 19 94  by vote of _____ all _____ membe ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxx~~

That the Articles of Organization of this corporation be and they hereby are amended to change the name of the corporation to "Partners HealthCare System, Inc."

Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on separate 8 sheets of paper leaving a left hand margin of at least 1 inch for binding. Additions to more than one article may be contin a single sheet so long as each article requiring each such addition is clearly indicated.

The foregoing amendment will become effective when these articles of amendment are filed in accordance
Chapter 180, Section 7 of the General Laws unless these articles specify, in accordance with the vote adopt
amendment, a later effective date not more than thirty days after such filing, in which event the amendment v
come effective on such later date.

IN WITNESS WHEREOF AND UNDER THE PENALTIES OF PERJURY, we have hereto signed our nat
                    18th    day of         March                    , in the year 1994

_H. Richard Nesson_ _____ President/Xxxx

_____ Clerk/Xxxx

PHS 000227

INTERNAL REVENUE SERVICE                          DEPARTMENT OF THE TREASURY
DISTRICT DIRECTOR
P. O. BOX 2508
CINCINNATI, OH  45201

                                        Employer Identification Number:
Date:   FEB 10 1999                        04-3230035
                                        DLN:
                                           17053002723049
PARTNERS HEALTHCARE SYSTEM INC          Contact Person:
C/O CATHERINE J ROBBINS                     THOMAS E O'BRIEN          ID# 31187
PRUDENTIAL TOWER 800 BOYLSTON ST        Contact Telephone Number:
BOSTON, MA  02199                          (877) 829-5500
                                        Our Letter Dated:
                                           May 1995
                                        Addendum Applies:
                                           No


Dear Applicant:

     This modifies our letter of the above date in which we stated that you
would be treated as an organization that is not a private foundation until the
expiration of your advance ruling period.

     Your exempt status under section 501(a) of the Internal Revenue Code as an
organization described in section 501(c)(3) is still in effect.  Based on the
information you submitted, we have determined that you are not a private
foundation within the meaning of section 509(a) of the Code because you are an
organization of the type described in section 509(a)(1) and 170(b)(1)(A)(vi).

     Grantors and contributors may rely on this determination unless the
Internal Revenue Service publishes notice to the contrary.  However, if you
lose your section 509(a)(1) status, a grantor or contributor may not rely on
this determination if he or she was in part responsible for, or was aware of,
the act or failure to act, or the substantial or material change on the part of
the organization that resulted in your loss of such status, or if he or she
acquired knowledge that the Internal Revenue Service had given notice that you
would no longer be classified as a section 509(a)(1) organization.

     If we have indicated in the heading of this letter that an addendum
applies, the addendum enclosed is an integral part of this letter.

     Because this letter could help resolve any questions about your private
foundation status, please keep it in your permanent records.

     If you have any questions, please contact the person whose name and
telephone number are shown above.

                              Sincerely yours,


                              C. Ashley Bullard


                              District Director



                                        Letter 1050 (DO/CG)

**Internal Revenue Service**                    Department of the Treasury

Washington, DC 20224

Person to Contact: Lawrence M. Brauer

Partners HealthCare System, Inc.
c/o H. Richard Nesson, M.D.                     Telephone Number: (202) 622-6466
Brigham & Women's Hospital
75 Francis Street                               Refer Reply to:    CP:E:EO:T:1:LMB
Boston, MA   02115

Date:

MAY  4 1995

```
         Employer Identification Number: 04-3230035
                            Key District: Brooklyn
                  Accounting Period Ending: September
            Foundation Status Classification: 509(a)(1) & 170(b)(1)(A)(vi)
                Advance Ruling Period Begins: December 15, 1993
                  Advance Ruling Period Ends: September 30, 1998
                Effective Date of Exemption: December 15, 1993
                          Form 990 Required: Yes
```

Dear Applicant:

Based on the information supplied, and assuming your
operations will be as stated in your application for recognition
of exemption, we have determined you are exempt from federal
income tax under section 501(a) of the Internal Revenue Code as
an organization described in section 501(c)(3).

Because you are a newly created organization, we are not now
making a final determination of your foundation status under
section 509(a) of the Code.  However, we have determined that you
can reasonably be expected to be a publicly supported
organization described in the section(s) indicated above.

Accordingly, you will be treated as a publicly supported
organization, and not as a private foundation, during an advance
ruling period.  This advance ruling period begins and ends on the
dates indicated above.

Within 90 days after the end of your advance ruling period,
you must submit to your key district office information needed to
determine whether you have met the requirements of the applicable
support test during the advance ruling period.  If you establish
that you have been a publicly supported organization, you will be
classified as a section 509(a)(1) or 509(a)(2) organization as
long as you continue to meet the requirements of the applicable
support test.  If you do not meet the public support requirements
during the advance ruling period, you will be classified as a

- 2 -

Partners HealthCare System, Inc.


private foundation for future periods.  Also, if you are classified as a private foundation, you will be treated as a private foundation from the date of your inception for purposes of sections 507(d) and 4940.

Donors may deduct contributions to you as provided in section 170 of the Code.  Bequests, legacies, devises, transfers, or gifts to you or for your use are deductible for federal estate and gift tax purposes if they meet the applicable provisions of Code sections 2055, 2106, and 2522.

Donors (including private foundations) may rely on the advance ruling that you are not a private foundation until 90 days after your advance ruling period ends.  If you submit the required information within the 90 days, donors may continue to rely on the advance ruling until we make a final determination of your foundation status.  However, if notice that you will no longer be treated as the type of organization indicated above is published in the Internal Revenue Bulletin, donors may not rely on this advance ruling after the date of such publication.  Also, donors (other than private foundations) may not rely on the classification indicated above if they were in part responsible for, or were aware of, the act that resulted in your loss of that classification, or if they acquired knowledge that the Internal Revenue Service had given notice that you would be removed from that classification.  Private foundations may rely on the classification as long as you were not directly or indirectly controlled by them or by disqualified persons with respect to them.  However, private foundations may not rely on the classification indicated above if they acquired knowledge that the Internal Revenue Service had given notice that you would be removed from that classification.

If your sources of support, or your purposes, character, or method of operation change, please let your key district know so that office can consider the effect of the change on your exempt status.  In the case of an amendment to your organizational document or bylaws, please send a copy of the amended document or bylaws to your key district.  Also, you should inform your key district office of all changes in your name or address.

As of January 1, 1984, you are liable for taxes under the Federal Insurance Contributions Act (social security taxes) on remuneration of $100 or more you pay to each of your employees during a calendar year.  You are not liable for the tax imposed under the Federal Unemployment Tax Act.

- 3 -

Partners HealthCare System, Inc.

Organizations that are not private foundations are not subject to the excise taxes under Chapter 42 of the Code. However, if it is determined that you are a private foundation, you will be subject to excise taxes under Chapter 42. You also may be subject to other federal excise taxes. If you have any questions about excise, employment, or other federal taxes, please contact your key district office.

Contribution deductions are allowable to donors only to the extent that their contributions are gifts, with no consideration received. Ticket purchases and similar payments in conjunction with fund-raising events may not necessarily qualify as fully deductible contributions, depending on the circumstances. If your organization conducts fund-raising events such as benefit dinners, shows, membership drives, etc., where something of value is received in return for payments, you are required to provide a written disclosure statement informing the donor of the fair market value of the specific items or services being provided. To do this you should, in advance of the event, determine the fair market value of the benefit received and state it in your fund-raising materials such as solicitations, tickets, and receipts in such a way that the donor can determine how much is deductible and how much is not. Your disclosure statement should be made, at the latest, at the time payment is received. Subject to certain exceptions, your disclosure responsibility applies to any fund-raising circumstance where each complete payment, including the contribution portion, exceeds $75. In addition, donors must have written substantiation from the charity for any charitable contribution of $250 or more. For further details regarding these substantiation and disclosure requirements, see the enclosed copy of Publication 1771. For additional guidance in this area, see Publication 1391, Deductibility of Payments Made to Organizations Conducting Fund-Raising Events, which is available at many IRS offices or by calling 1-800-TAX-FORM (1-800-829-3676).

In the heading of this letter we have indicated whether you must file Form 990, Return of Organization Exempt from Income Tax. If Yes is indicated, you are required to file Form 990 only if your gross receipts each year are normally more than $25,000. If your gross receipts each year are not normally more than $25,000, we ask that you establish that you are not required to file Form 990 by completing Part I of that Form for your first year. Thereafter, you will not be required to file a return until your gross receipts exceed the $25,000 minimum. For guidance in determining if your gross receipts are "normally" not more than the $25,000 limit, see the instructions for the Form 990. If a return is required, it must be filed by the 15th day of the fifth month after the end of your annual accounting

- 4 -

Partners HealthCare System, Inc.

period.  A penalty of $10 a day is charged when a return is filed late, unless there is reasonable cause for the delay.  The maximum penalty charged cannot exceed $5,000 or 5 percent of your gross receipts for the year, whichever is less.  This penalty may also be charged if a return is not complete, so please be sure your return is complete before you file it.

You are required to make your annual return available for public inspection for three years after the return is due.  You are also required to make available a copy of your exemption application, any supporting documents, and this exemption letter. Failure to make these documents available for public inspection may subject you to a penalty of $10 per day for each day there is a failure to comply (up to a maximum of $5,000 in the case of an annual return).  See Internal Revenue Service Notice 88-120, 1988-2 C.B. 454, for additional information.

You are not required to file federal income tax returns unless you are subject to the tax on unrelated business income under section 511 of the Code.  If you are subject to this tax, you must file an income tax return on Form 990-T, Exempt Organization Business Income Tax Return.  In this letter we are not determining whether any of your present or proposed activities are unrelated trade or business as defined in section 513 of the Code.

In this letter, we have not determined the effect on your tax-exempt status of financing your activities with the proceeds of tax-exempt bonds since you have not indicated that you intend to use such methods now or in the future.

You need an employer identification number even if you have no employees.  Please use that number on all returns you file and in all correspondence with the Internal Revenue Service.

We are informing your key district office of this ruling. Because this letter could help resolve any questions about your exempt status and foundation status, you should keep it in your permanent records.

If you have any immediate questions about this ruling, please contact the person whose name and telephone number are shown in the heading of this letter.  For other matters, including questions concerning reporting requirements, please contact your key district office.

- 5 -

Partners HealthCare System, Inc.


In accordance with the Power of Attorney currrently on file
with the Internal Revenue Service, we are sending a copy of this
letter to your authorized representative.



Sincerely,


Marvin Friedlander
Chief, Exempt Organizations
   Technical Branch 1

Enclosures:
   Form 872-C
   Pub. 1771

Schedule A (Form 990 or 990-EZ) 2003    **Partners HealthCare System, Inc.**    04-3230035    Page 2

| **Part III** Statements About Activities (See instructions.) | | **Yes** | **No** |
|---|---|---|---|
| 1  During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If 'Yes,' enter the total expenses paid or incurred in connection with the lobbying activities  ▶ $  **975,280.**  STMT 5 <br> (Must equal amounts on line 38, Part VI-A, or line I of Part VI-B.) | 1 | X | |
| Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A. Other organizations checking 'Yes,' must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities | | | |
| 2  During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? *(If the answer to any question is 'Yes,' attach a detailed statement explaining the transactions.)* | | | |
| a Sale, exchange, or leasing of property? | 2a | | X |
| b Lending of money or other extension of credit? | 2b | | X |
| c Furnishing of goods, services, or facilities?    See Part V, Form 990 | 2c | | X |
| d Payment of compensation (or payment or reimbursement of expenses if more than $1,000)? | 2d | X | |
| e Transfer of any part of its income or assets? | 2e | | X |
| 3a Do you make grants for scholarships, fellowships, student loans, etc? (If 'Yes,' attach an explanation of how you determine that recipients qualify to receive payments.) | 3a | | X |
| b Do you have a section 403(b) annuity plan for your employees? | 3b | X | |
| 4  Did you maintain any separate account for participating donors where donors have the right to provide advice on the use or distribution of funds? | 4 | | |

| **Part IV** Reason for Non-Private Foundation Status (See instructions.) |
|---|

The organization is not a private foundation because it is: (Please check only **ONE** applicable box.)

5 ☐ A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i).

6 ☐ A school. Section 170(b)(1)(A)(ii). (Also complete Part V.)

7 ☐ A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii).

8 ☐ A Federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v).

9 ☐ A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii). **Enter the hospital's name, city, and state ▶**

10 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv). (Also complete the **Support Schedule** in Part IV-A.)

11a ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

11b ☐ A community trust. Section 170(b)(1)(A)(vi). (Also complete the **Support Schedule** in Part IV-A.)

12 ☐ An organization that normally receives: **(1)** more than 33-1/3% of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc, functions — subject to certain exceptions, and **(2) no more than 33-1/3%** of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2). (Also complete the **Support Schedule** in Part IV-A.)

13 ☐ An organization that is not controlled by any disqualified persons (other than foundation managers) and supports organizations described in: **(1)** lines 5 through 12 above, or **(2)** section 501(c)(4), (5), or (6), if they meet the test of section 509(a)(2). (See section 509(a)(3).)

| Provide the following information about the supported organizations. (See instructions.) | |
|---|---|
| **(a)** Name(s) of supported organization(s) | **(b)** Line number from above |
| | |
| | |
| | |
| | |

14 ☐ An organization organized and operated to test for public safety. Section 509(a)(4). (See instructions.)

BAA    TEEA0402  01/19/04    Schedule A (Form 990 or Form 990-EZ) 2003

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

               Plaintiff,

      v.                            Case No. 05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

               Defendant.

_____/

## DECLARATION OF DEBRA WEINSTEIN, M.D.

I, Debra Weinstein, M.D., make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1.     I am Vice-President of, and Director of Graduate Medical Education for, Partners Healthcare System, Inc. ("Partners"). In this capacity, I am responsible for overseeing and supporting Partners residency and fellowship programs, which includes serving as a liaison to and Designated Institutional Official (DIO) for the Accreditation Council for Graduate Medical Education ("ACGME"); coordinating the activities of the Partners' Education Committee and of the education committees at Massachusetts General Hospital ("MGH") and Brigham and Women's Hospital ("BWH"); reviewing internal review reports on individual residency programs; and overseeing the various activities of the GME offices at BWH and MGH. I make this declaration in support of Partners' Opposition to the United States' Motion for Summary Judgment.

2.     I completed my residency and fellowship training at MGH. I have also served as director of a residency program at MGH.

## Partners HealthCare System, Inc.

3.      Partners is an integrated, quality healthcare delivery system of Harvard teaching hospitals, community hospitals, physicians groups, and other caregivers. Partners was established in 1994 by MGH and BWH. Since then, it has become one of the nation's leading integrated health care delivery systems, based on a mission that includes patient care, medical education and research. Partners is committed to personalized, patient-centered care and to furthering a tradition of excellence in medical education and research. In fulfilling its commitment to medical education, Partners sponsors Graduate Medical Education (GME) training programs, principally through two of its member hospitals, MGH and BWH.

4.      Partners has a three-part mission: patient care, teaching and research. Partners is a major teaching affiliate of Harvard Medical School. MGH and BWH serve as two of the principal tertiary and quaternary academic resources for Harvard Medical School. Most of the physician ("attending") staff at MGH and BWH hold Harvard Medical School faculty appointments.

5.      MGH's and BWH's commitment to teaching includes providing world-renowned graduate medical education programs in most of the recognized specialties and subspecialties of medicine.

6.      Partners is recognized by the Internal Revenue Service as an entity exempt from Federal income taxation under I.R.C. §501(c)(3) and I.R.C. §170(b)(1)(A)(vi). MGH and BWH are recognized by the IRS as entities exempt from Federal income taxation under I.R.C. §501(c)(3) and I.R.C. §170(b)(1)(A)(iii) and are full service academic medical centers.

7.      Training residents at MGH and BWH is imperative to these hospitals fulfilling the "teaching" aspect of their institutional missions. Providing the highest quality medical care is a

WDC99 1198578-2.057158.0039

commitment shared by the residents and the attending physicians at Partners hospitals. Patient care is not, however, the primary goal or purpose of resident training; rather, the primary purpose of resident training is education and the development of practical skills, along with achievement of individual certifications that require completion of residency training and may be necessary for the practice of medicine (such as full/independent licensure and (sub)specialty board certification).

## Medical Education in the United States

8.      The training of physicians in the United States occurs in two major phases: education at medical school and (post-)graduate medical education.

9.      The first phase is education at an accredited medical school. Medical school programs are typically completed in a minimum of four years. Accreditation of medical schools is granted by the Liaison Committee on Medical Education. Upon successful completion of medical (or osteopathic) school, a student is granted the M.D. (or D.O.) degree.

10.     Graduation from medical school does not legally enable one to practice medicine. Most states, including Massachusetts, require a medical school graduate to complete at least one year of an accredited residency program before it will grant a physician's license. Even with a license, however, it is unlikely a medical school graduate could obtain a position as a practicing physician without first completing an accredited residency training program.

11.     The second phase of medical education is graduate medical education. Graduate medical education programs are often referred to as residency training (providing education in a specialty of medicine), or fellowship training, which is advanced training in a subspecialty. Most residency training programs—such as in Internal Medicine, Radiology, Emergency Medicine, General Surgery, Psychiatry, etc.— extend over three to five years (with a maximum

WDC99 1198578-2.057158.0039

of 7-8 years), depending upon the specialty. Following completion of a residency training program, a resident may proceed into an advanced GME training program, usually referred to as a clinical fellowship or fellowship program. Fellowship programs generally require an additional one to three years of training. Both residency training programs and clinical fellowship programs are referred to herein collectively as residency training (programs). During residency training, residents gain exposure to the breadth of health problems cared for by a particular (sub)specialty. Upon completion of this phase of medical education, a resident is prepared to undertake independent medical practice in his/her (sub)specialty and the certificate of completion from the residency program is considered affirmation of competence.

12.    Many U.S. graduate medical education programs are accredited by the Accreditation Council for Graduate Medical Education (and in some areas by other national organizations, such as the Council on Dental Accreditation). Programs are sponsored by institutions (e.g. medical schools, teaching hospitals), which must be separately accredited by the ACGME. The ACGME's Residency Review Committees ("RRCs") determine (sub)specialty-specific "Program Requirements" to which GME programs in that (sub)specialty must adhere.

13.    BWH and MGH are significant providers of graduate medical education. Specifically, BWH and MGH sponsor 86 ACGME-accredited training programs. BWH and MGH also maintain a large and active full-time faculty who provide clinical (and other types of) training.

### ACGME Accreditation of Graduate Medical Education Programs

14.    The ACGME is a voluntary association formed by five member organizations which include: 1) the American Board of Medical Specialties, 2) the American Hospital Association, 3) the American Medical Association, 4) the Association of American Medical

- 4 -

Colleges, and 5) the Council of Medical Specialty Societies. The ACGME provides Institutional Requirements for those institutions which sponsor graduate medical education programs. The ACGME, through its specialty RRCs, also provides Program Requirements for each graduate medical education specialty or subspecialty program for which ACGME accreditation is offered.

15.    Accreditation is the process for determining whether an educational program is in substantial compliance with established educational standards as promulgated in ACGME institutional, common program and individual specialty program requirements. Program accreditation is required for federal reimbursement and in many cases for (sub)specialty board eligibility of the program's graduates. Accredited residency programs undergo regular and rigorous internal and external review to ensure educational quality.

## ACGME Institutional Requirements

16.    ACGME outlines specific institutional requirements in the *Graduate Medical Education Directory*, also posted on the ACGME website (*www.acgme.org*). Institutional requirements apply to all institutions which sponsor programs in graduate medical education. In general, the *Graduate Medical Education Directory* specifies that sponsoring institutions must be appropriately organized for the conduct of GME training in a scholarly environment and committed to excellence in both education and medical care. Sponsoring institutions must ensure that residents have the opportunity to participate in appropriate levels of supervised patient care and to participate fully in the educational and scholarly activities of their program. The educational goals of the program and learning objectives of the residents must not be compromised by excessive reliance on residents to fulfill institutional service obligations.

17.    These general Institutional Requirements are embraced by Partners. As is

- 5 -

evidenced by the missions of its teaching hospitals and its reputation worldwide, Partners is committed to excellence in education and medical care. This is also evidenced by the high percentage of BWH and MGH residents who pass their certification exams on the first attempt.

18.    The goal of the residency program is to provide each resident with world-class academic experiences that will help to shape his or her professional future and achieve certification necessary for practice in the desired specialty or subspecialty. The program's purpose is to provide the graduate physician with opportunities for mastery of fundamental skills, practical application of knowledge acquired in medical school, the development of specialized skills and to cultivate and ensure a high level of professional behavior interacting as a physician member of the health care team. The overarching purpose of these established responsibilities is to educate residents to become highly competent physicians.

19.    To ensure that the educational goals of a program are attained, the ACGME Institutional Requirements require an administrative system to oversee all ACGME residency programs sponsored by the institution. As part of this system, one person must be designated to have the authority and the responsibility for the oversight and administration of the graduate medical education programs. Further, institutions must establish a graduate medical education committee with various responsibilities; the GME Committee is required to meet a minimum of four times per academic year. The responsibilities of the committee include, but are not limited to, implementing policies which affect the educational quality of all residency programs and establishing institutional guidelines and policies for the selection, evaluation, promotion, and dismissal of residents.

20.    Partners has appointed me as the "Designated Institutional Official" responsible for ACGME accreditation and GME oversight; the BWH and MGH have also appointed

- 6 -

graduate medical education committee Chairs who have authority and responsibility for the activities of the graduate medical education committees. The graduate medical education committees at Partners (including the Partners Education Committee, the BWH Education Committee and MGH's Executive Committee for Teaching and Education) perform the required activities and meet regularly to ensure that the educational goals of the programs are satisfied.

21.     Additionally, in accordance with the ACGME Institutional Requirements, sponsoring institutions are expected to provide all residents with appropriate financial support and benefits. This support is necessary to ensure that residents are able to fulfill the responsibilities of their educational programs.

22.     Residents at Partners are provided with a stipend adequate to ensure that they are able to fulfill the responsibilities of their educational program. Current (academic year 2005-06) stipend amounts for Partners' residents are $47,000 in post-graduate year one; $48,247 in year two; and $51,050 in year three (approximately 75% of residents at Partners are in the first three years of training). Partners currently withholds income taxes and social security on stipends paid to residents. The relatively small stipend received by the residents reflects their role as trainees rather than what would be a usual salary for practicing physicians.

23.     Stipend amounts are minimal compared to the salaries the residents can expect when they begin to practice following the completion of their graduate medical education.

**ACGME Program Requirements**

24.     As noted above, the RRCs develop Program Requirements specific to each specialty graduate medical education program. The Program Requirements set forth guidelines regarding educational content, instructional activities, responsibilities for patient care and supervision, as well as the necessary facilities accredited programs must provide in each

- 7 -

particular specialty.

25.     The accredited GME programs at Partners are required to substantially meet or exceed the standards established by the RRCs in order to maintain accreditation.  None of these programs have had accreditation withdrawn.

### Testing and Evaluations

26.     The ACGME requires each program to establish a system of trainee evaluation that documents the progress of each resident in meeting the educational goals of the program. BWH and MGH have institutional policies as well, that require the overall performance of each resident to be evaluated at least semiannually, to determine if the resident has learned what is expected at the particular stage of the training.   GME programs are generally required to provide a written final evaluation for each resident who has completed the program.

27.     In order for a resident to "sit" for a specialty board examination, s/he must satisfactorily complete an accredited program.

I declare under penalty of perjury that the foregoing is true and correct.

_Debra J. Weinstein_
DEBRA WEINSTEIN, M.D.

Executed on February 23, 2006

- 8 -

02/24/06 FRI 10:50 FAX 617 726 1885   PARTNERS HEALTHCARE OGC   ☒003
02/24/06 FRI 09:40 FAX 617 278 1047   PARTNERS HEALTHCARE   ☒002

Case 1:05-cv-11576-DPW    Document 36    Filed 02/24/2006    Page 1 of 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

      v.

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

Case No. 05-11576-DPW

## DECLARATION OF GEORGE THIBAULT, M.D.

I, George Thibault, M.D., make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1. I am Vice President for Clinical Affairs at Partners Healthcare System, Inc. ("Partners"). In this capacity, I am responsible for overseeing physician relationships, setting standards for the quality of patient care, promoting patient safety, and coordinating patient care, across the entire Partners integrated health care system. I am also a member of the active medical staff at the Massachusetts General Hospital (MGH) and the Brigham and Women's Hospital (BWH), and a full professor at Harvard Medical School. I make this declaration in support of Partners' Opposition to the United States' Motion for Summary Judgment.

2. From 1969-1976, I trained at MGH for three and one-half years in internal medicine, and for one year in cardiology. During this time I also spent six months training in London and two years at the National Institutes of Health. Since then I have been a member of the Active Medical Staff at MGH, supervised residents and directed the medical residency program at the MGH, served as Chief of the Medical Service at the Harvard affiliated VA Hospital, and served as Chief Medical Officer at Brigham and Women's Hospital ("BWH") (which

- 1 -

included oversight of all the educational programs at the BWH). During part of my tenure as Partners Vice President of Clinical Affairs, I was the Senior Officer for Education at Partners. In my capacity as a Harvard professor, I direct the Academy of Medical Educators, and I still conduct rounds with medical residents on a routine basis.

3. Partners, as well as each of the MGH and BWH, have a three-part mission: medical education, medical research, and patient care. Each mission is equally important.

4. All of Partners' residency programs are affiliated with Harvard Medical School. All of the attending physicians at MGH and BWH are faculty at Harvard Medical School. All of the Partners residency programs are overseen by a Director who is a member of the Harvard Medical School faculty.

5. Partners' residents are eligible for an appointment as a resident trainee or fellow at Harvard Medical School. The responsibility of a teaching fellow is analogous to that of a graduate student, and part of their education is to engage in the teaching of more junior residents and medical students.

6. As a health care system, Partners recognizes the critical importance of medical education, including residency training programs, and has established an organizational structure to best fulfill its educational goals. Thus, at the MGH and BWH, each Department has its own faculty committee that oversees training programs within that Department, each hospital has its own hospital-wide faculty committee, and Partners has a central faculty committee that coordinates the graduate medical education programs. Furthermore, following their affiliation through Partners, the MGH and BWH have combined certain resident training programs into one integrated program, but only when a determination was made that a combined program would best accomplish the educational goals of that specific residency

- 2 -

02/24/06 FRI 10:51 FAX 617 726 1685    PARTNERS HEALTHCARE OGC    Ø005
02/24/06 FRI 08:41 FAX 617 278 1041    PARTNERS HEALTHCARE

Case 1:05-cv-11576-DPW    Document 36    Filed 02/24/2006    Page 3 of 4

program.  An example of such an integrated program is neurology.  Medical students apply for admission to the Partners combined neurology residency training program and train at both the MGH and BWH in the Department of Neurology.

7. Partners' residency programs are very different today than they were when I trained in the early 1970's.  Today, residents are given far less autonomy.  The educational demands on residents are more intense as a result of the expanding knowledge base and new technology in medicine, more rigorous program requirements for accreditation by the Accreditation Counsel for Graduate Medical Education (ACGME) – including specific curriculum and supervision requirements - and the public demand to meet their expectations for a higher quality of care than was available years ago.  In addition, the implementation of the 80 hour workweek restriction has resulted in a more concentrated educational environment.

8. One major impetus for the evolution of residency programs has been the more formal, rigorous, and highly structured standards and goals set by outside authorities such as the ACGME.  At the same time, Medicare billing requirements have also led to a higher degree of supervision of residents.  As a result, teaching hospitals have become far better at providing the education and clinical experience that is needed in order for a physician to be competent to practice medicine.

9. In order for medical residents training to become independent practicing clinicians, supervised experience in direct patient care is essential.  One cannot learn to be a practicing physician without first being directly involved in the patient care experience in a supervised, teaching environment.  The resident needs real and practical clinical experience that cannot be acquired by reading and teaching conducted in a classroom. Academic experiences other than participation in patient care remain an important part of the training, and therefore

- 3 -

Partners' teaching hospitals provide other educational opportunities for its residents separate from patient care, including conferences and seminars, and research opportunities.

10. To some extent, a residency training program is adjusted in response to ongoing evaluations of the knowledge and skills of each individual resident. Thus, based on the evaluation of a resident's performance, he or she may be assigned additional reading, additional practice of specific skills, more time on a particular rotation, or even repeating a rotation or a year of training. Some residents merely require extra supervision. Occasionally, a resident does not complete the training program and does not go on to become a practicing clinician, or pursues a different specialty.

11. The purpose of the resident stipend is to defray living costs while the residents work towards their goal of completing their medical education and obtaining Board certification. The amount of a resident's stipend amounts is far lower than the amounts paid to a professional with an equivalent post-graduate education. It is only after a resident has completed a training program and becomes eligible to take the Board exam, or becomes Board certified, that he or she is able to command a salary that is more in keeping with the market for equivalent professional services.

I declare under penalty of perjury that the foregoing is true and correct.



GEORGE THIBAULT, M.D.


Executed on February 23, 2006

88483


- 4 -

| Form **941c** | **Supporting Statement To Correct Information** | OMB No. 1545-0256 |
|---|---|---|
| (Rev. October 1998) | **Do Not File Separately** | Page No. |
| Department of the Treasury Internal Revenue Service | ► File with Form 941, 941-M, 941-SS, 943, 945, or 843. | |

| Name | Employer identification number |
|---|---|
| PARTNERS HEALTHCARE SYSTEM, INC. | 04-3230035 |
| Telephone number (optional) | |

**A** This form supports adjustments to:  Check one box.
[X] Form 941  [ ] Form 941-SS  [ ] Form 945
[ ] Form 941-M  [ ] Form 943

**B** This form is filed with the return for the period ending

(month, year) ► 09/2003

**C** Enter the date you discovered the error(s) reported on this form. (If you are making more than one correction and the errors were not discovered at the same time, please explain in Part V.) ........ ► 08/2003

---

**Part I**  **Signature and Certification** (You **MUST** complete this part for the IRS to process your adjustments for overpayments.) Skip Part I if all your adjustments are underpayments. (See the instructions for Part I.)

I certify that **Forms W-2c**, Corrected Wage and Tax Statement, have been filed (as necessary) with the Social Security Administration, and that (check appropriate boxes):   Please see Statement 1

[ ] All overcollected income taxes for the current calendar year and all social security and Medicare taxes for the current and prior calendar years have been repaid to employees. For claims of overcollected employee social security and Medicare taxes in earlier years, a written statement has been obtained from each employee stating that the employee has not claimed and will not claim refund or credit of the amount of the overcollection.

[X] All affected employees ~~have~~ WILL given their written consent to the allowance of this credit or refund. For claims of overcollected employee social security and Medicare taxes in earlier years, a written statement ~~will be~~ obtained from each employee stating that the employee has not claimed and will not claim refund or credit of the amount of the overcollection.

[ ] The social security tax and Medicare tax adjustments represent the employer's share only. An attempt was made to locate the employee(s) affected, but the affected employee(s) could not be located or will not comply with the certification requirements.

[ ] None of this refund or credit was withheld from employee wages.

| **Sign Here** | Signature ► | Title ► | Date ► |
|---|---|---|---|

---

**Part II**  **Income Tax Withholding (Including Backup Withholding) Adjustment**

| | (a) Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | (b) Withheld Income Tax Previously Reported for Period | (c) Correct Withheld Income Tax for Period | (d) Withheld Income Tax Adjustment |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | Net withheld income tax adjustment. If more than one page, enter total of **ALL** columns (d) on first page only. Enter here and on the **appropriate** line of the return with which you file this form ...... ► | | **5** | |

---

**Part III**  **Social Security Tax Adjustment** (Use the tax rate in effect during the period(s) corrected. You must also complete Part IV.)

| | (a) Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | (b) Wages Previously Reported for Period | (c) Correct Wages for Period | (d) Tips Previously Reported for Period | (e) Correct Tips for Period | (f) Social Security Tax Adjustment |
|---|---|---|---|---|---|---|
| 1 | 12/31/2001 | 150,107,283.53 | 102,193,425.92 | | | (5,941,318.34) |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | Totals. — If more than one page, enter totals on first page only. ► | 150,107,283.53 | 102,193,425.92 | | | (5,941,318.34) |
| 6 | Net social security tax adjustment. If more than one page, enter total of **ALL** columns (f) on first page only. Enter here and on the appropriate line of the return with which you file this form ............. ► | | | | **6** | (5,941,318.34) |
| 7 | Net wage adjustment. If more than one page, enter total of **ALL** lines 7 on first page only. If line 5(c) is smaller than line 5(b), enter difference in parentheses ............................ ► | | | | **7** | (47,913,857.61) |
| 8 | Net tip adjustment. If more than one page, enter total of **ALL** lines 8 on first page only. If line 5(e) is smaller than line 5(d), enter difference in parentheses ............................ ► | | | | **8** | |

For Paperwork Reduction Act Notice, see page 4.
ISA
STF FED1753F.1

Form **941c** (Rev. 10-98)

Form 941c (Rev. 10-98)

Page **2**

### Part IV  Medicare Tax Adjustment

| | (a)<br>Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | (b)<br>Wages and Tips Previously Reported for Period | (c)<br>Correct Wages and Tips for Period | (d)<br>Medicare Tax Adjustment |
|---|---|---|---|---|
| 1 | 12/31/2001 | 169,676,607.14 | 121,678,104.75 | (1,391,956.57) |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | Totals. If more than one page, enter totals on first page only .... ▶ | 169,676,607.14 | 121,678,104.75 | (1,391,956.57) |
| 6 | Net Medicare tax adjustment. If more than one page, enter total of ALL columns (d) on first page only. Enter here and on the appropriate line of the return with which you file this form .............. ▶ | | **6** | (1,391,956.57) |
| 7 | Net wage and tip adjustment. If more than one page, enter totals of ALL lines 7 on first page only. If line 5(c) is smaller than line 5(b), enter difference in parentheses ......................... ▶ | | **7** | (47,998,502.39) |

### Part V  Explanation of Adjustments

AMOUNTS PAID TO RESIDENTS IN TRAINING ARE SCHOLARSHIP GRANTS FOR TRAINING. SUCH TRAINING GRANTS ARE NOT "PAYMENTS FOR SERVICES" WITHIN THE MEANING OF I.R.C. SEC 117(c). CONSEQUENTLY, THESE TRAINING GRANTS ARE NOT SUBJECT TO FICA (SOCIAL SECURITY AND MEDICARE) TAXES. FURTHERMORE, RESIDENTS ARE PRIMARILY ENGAGED IN A COURSE OF STUDY AND ARE ELIGIBLE, PER I.R.C. SEC 3121(b)(10), FOR THE STUDENT EXEMPTION FROM FICA (SOCIAL SECURITY AND MEDICARE) TAXES.

AMOUNTS PAID TO RESIDENTS IN TRAINING WERE ORIGINALLY INCLUDED IN THE FICA (SOCIAL SECURITY AND MEDICARE) WAGES FOR PERIODS INCLUDED IN THIS FORM 941C. WE ARE ADJUSTING THE FICA (SOCIAL SECURITY AND MEDICARE) WAGES TO EXCLUDE THE AMOUNTS PAID TO RESIDENTS IN TRAINING SINCE THESE AMOUNTS ARE NOT SUBJECT TO FICA (SOCIAL SECURITY AND MEDICARE) TAXES.

PARTNERS HEALTHCARE SYSTEM, INC.
Attachment to Form 941c for the year ended December 31, 2001
Federal Identification Number: 04-3230035

This claim relates to social security and Medicare taxes withheld on participants who
have been erroneously classified as employees.  After receiving the credit requested on
Form 941c and after the statute of limitations expires, the Partners HealthCare System,
Inc will forward to each participant their respective share of the credit and will file the
appropriate Forms W-2c.  Due to the recent discovery of the error, there has not been
enough time to obtain the statements from the individual participants.  Partners
HealthCare System, Inc is currently in the process of obtaining the written statements
from its participants.  These statements will indicate that the participants have not
claimed, and will not claim a refund or credit for social security and Medicare taxes
previously withheld for the year ended December 31, 2001.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                    Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

_____/

## DECLARATION OF ANDREW L. WARSHAW, M.D.

I, Andrew L. Warshaw, M.D., make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

    1.     I am Surgeon-in-Chief and Chairman of the Department of Surgery at Massachusetts General Hospital ("MGH"). I am also the W. Gerald Austen Professor of Surgery at Harvard Medical School. I make this declaration in support of Partners Healthcare System, Inc's ("Partners") Opposition to the United States' Motion for Summary Judgment.

    2.     I completed my residency training at MGH on June 30,1970, and continued my studies as a Clinical Research Fellow from July 1, 1970 through December 31, 1970.

## ACGME Program Requirements and Board Certification Requirements in Surgery

    3.     In order for residency training programs in general surgery to be accredited by the Accreditation Counsel for Graduate Medical Education ("ACGME"), and in order for a resident to acquire the necessary knowledge, technical skill, and judgment to practice as a general surgeon, a residency program must include five years of training after graduation from medical school. A residency program in a surgical specialty requires up to 3-4 years of additional training. Furthermore, in order for a resident to be eligible to sit for the Board examination in

General Surgery, or in the applicable Surgical Specialty, he or she must complete the required number of years of ACGME accredited training. The ACGME requirements arc designed to ensure that the focus of a residency training program is educational, and that any patient care services performed by a resident are educational in nature and not rendered in order to meet a hospital's staffing needs.

4.      The educational program of a surgical residency includes ongoing studies from a textbook and other written materials, supervised operative experience, supervised pre-operative and post-operative patient care, and a full spectrum of rounds, lectures and conferences.

### Clinical Experience

5.      When students graduate after four years of medical school, they are not competent to perform surgery. In their first year, residents observe and learn the very basics of surgery, such as how to hold an instrument or how to tie a knot, and they progress gradually under direct supervision. Even though under state law a surgical resident may obtain a license to practice after just one year of residency, this does not mean that the resident is competent to practice surgery. A doctor must have hospital privileges in order to use its surgical facilities. I am not aware of any hospital that would grant surgical privileges to a physician who has not successfully completed a full residency program at an accredited institution.

6.      As residents progress through the program, the competence of each resident is evaluated individually in order to determine the extent to which he or she may participate in the diagnostic process, decisions as to the appropriate surgical plan, and the actual surgical procedure. Residents are not permitted to participate in patient care based solely on the number of years they have completed in the residency program. During the process of evaluating each resident, the teaching physician tailors the nature and extent of the education and training that is

- 2 -

necessary and appropriate for that resident at that point in time. Thus, residents are gradually

exposed to different disease processes and surgical procedures, and taught how to make a

diagnosis and perform an operation. The complexity of the cases and surgical procedures

increases during the training. However, an attending surgeon is always responsible for the care

of the patient, and is always present for the critical portion of any surgery. It is the responsibility

of the attending surgeon to make a judgment about the capability of each resident.

7.       During the five years of a general residency program, the trainee gets limited

exposure to surgical specialties, including but not limited to Oncology, Trauma, Pediatric, Burn,

Transplant, Plastic, Vascular and Thoracic. In addition to these standard training experiences,

between their third and fourth years, residents take an elective period to develop a research

interest or refine clinical skills.

8.       Operative skill is essential for the surgeon and can be acquired only through direct

personal experience. The extent to which a resident may participate in a surgical procedure is

based on their level of knowledge, experience and demonstrated skill. Supervision is required to

ensure patient safety and to maximize the educational experience. Such supervision requires that

teaching staff is always available for consultation.

9.       It is only through operative experiences that a resident can adequately be trained

as a surgeon. It is impossible to train surgeons without practicing on actual patients. Learning to

care for patients is like learning to ride a bike. You can read and study for years about how to

ride the bike, but the only way you can really learn to ride one is to get on the bike and do it.

10.      If a resident does not master the information and skills expected of a resident

during a rotation or completion of a year of training, remedial action is taken to assist the

resident. This may take the form of assigning additional reading, providing additional

- 3 -

supervision, arranging for additional experience in a particular aspect of surgical care, repeating a rotation or a year of training, or other educational assistance or clinical practice to allow the resident to progress to the next stage of training. Rarely, but on occasion, a resident is not able to complete a surgical residency program.

11.     In my practice, residents are fully integrated into the patient care process. That is how I teach them. Every single case is a teaching case, with constant communication and constant dialogue. It is my responsibility that each operation is done correctly. I could do the operations twice as fast myself, but my time is invested in the teaching aspect.

12.     The primary purpose of the residency program is to turn residents into competent surgeons. The purpose is not to fulfill the hospital's service needs. Patient care is an incidental byproduct of the learning process. Unequivocally, MGH's surgical residency program is a training program. The patient care component is essential to the educational process.

### Rounds, Conferences and Seminars

13.     The residency program includes rounds and conferences that also make up an essential component of the educational process. There is a full spectrum of regularly scheduled presentations, ranging from rounds to review the case management of specific patients, to more didactic lectures on a specific topic. Resident attendance at rounds, and at many of the conferences and lectures, is mandated. Residents have required reading from a textbook, as well as specific reading from medical literature assigned on an ongoing basis.

14.     Inpatient rounds are held every morning to discuss the clinical management and treatment plan for each inpatient under the care of the attending and the associated "team" of residents, which team may vary from time to time as to the number and seniority of the residents. In addition, weekly morbidity and mortality conferences are held for each surgical specialty, as

well as weekly meetings to discuss one or more interesting or unusual cases.

15.    Chief's Rounds are held weekly, using the Socratic method of teaching. Materials are distributed in advance, with a reading assignment and a series of related questions. A teaching session follows, run by the senior (5th year) resident with an attending present. Grand Rounds are also held weekly, during which a resident presents an unusual case, and there is a speaker present to engage the residents in a dialogue, which is another component of the educational process.

16.    In combination, the rounds, conferences and lectures give the surgical residents a medical and scientific knowledge base, an understanding of the most recent advances in surgery, a clinical review of potential complications and specific practice outcomes, and an organized structure that promotes the spirit of inquiry and scholarship as well as the clinical knowledge needed in order for each resident to take on progressive responsibility for patient management.

### Testing and Evaluations

17.    The ACGME requires a program to establish a system of trainee evaluation that documents the progress of each resident in meeting the educational goals of the program. The overall performance of each resident must be evaluated at least semiannually to determine if the resident has learned what is expected at the particular stage of the training.

18.    All surgery residents at MGH are given written evaluations. At the end of each clinical rotation, every attending on that rotation must prepare a written evaluation of each resident. At the same time, each resident evaluates the experience on that rotation, as well as each attending

19.    At least twice a year, every resident meets personally with the residency program director to review the resident's evaluations and to discuss their educational experience. At least

- 5 -

once a year, every resident meets with me, as Surgeon-in-Chief, also to review the resident's evaluations and personal experience.

20.     Every January, the MGH surgical residency programs gives the American Board of Surgery Basic Science In-Service Examination, and each resident is gauged according to certain benchmarks in terms of their basic scientific knowledge. This allows the faculty to identify any areas that require additional study, and to provide feedback to the resident. In addition, at the end of the 4th and 5th year of the program, the residents are given a Department Oral Examination, which serves as a "mock" or practice examination in preparation for the oral portion of the exam given by the American Board of Surgery. These oral examinations are also used as a tool for evaluating the educational progress of the resident.

21.     All of these evaluations and examinations are crucial in determining whether residents have mastered the information being taught during each stage of the training. If a resident has not mastered the necessary information, remedial action is taken which may take the form of assigning additional reading, providing additional supervision, arranging for additional experience in a particular aspect of surgical care, repeating a rotation or a year of training, or other educational assistance or clinical practice to allow the resident to progress to the next stage of training

22.     The examinations also provide the program with a method to gauge whether the teaching methods being utilized are appropriate for communicating necessary information and skills to the residents. For example, poor results by a large number of residents on a certain examination, or section of an examination, may suggest that one or more components of the training program needs to be modified. By way of example, this might include additional reading assignments or more practice experience in the patient care environment.

- 6 -

## Certifying Examination

23.    In order for a program to remain accredited, ACGME requires that residents who have complete the surgical residency program achieve certain pass rates on examinations given by the American Board in General Surgery, or in an applicable Surgical Specialty. If more than 60% of a program's residents from the most recent five year period fail the Board certification examination on their first try, the training program will lose its ACGME accreditation.

24.    MGH residents routinely surpass these pass rate requirements.

## Changes in Residency Programs over the Past 40 Years

25.    There was far less supervision of residents in the 1960's than there is today.

26.    When I trained 40 years ago, there were 5 years of defined training in a surgical residency. Since then, with the development of subspecialties, residents are required to spend up to 3-4 additional years in training.

27.    In the 1960's, MGH held fewer rounds, conferences and lectures than today. MGH holds rounds, conferences and seminars, some daily, some weekly, and some monthly.

28.    Until 2003 there was no cap on the number of hours a resident could work. In 2003, the ACGME imposed an 80 hour workweek limit for all residents. At the same time, the amount of information and complexity of subject matter that residents must learn has grown, and the set of skills that must be acquired has increased dramatically. As a result, residency training programs have become much more focused on education and training in order to maximize the educational experience.

29.    Many residents pursue academic based careers, or careers in basic scientific research. Even residents who don't pursue such careers are exposed to, and learn about, the academic and research perspectives in surgery.

WDC99 1198577-1.057158.0039

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 22, 2006

_Andrew L. Warshaw_

ANDREW L. WARSHAW, M.D.

88463

WDC99 1198577-1.057158.0039

- 8 -

02/24/06  FRI 10:35 FAX 617 726 1665    PARTNERS HEALTHCARE OGC    ☒003

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                       Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

_____/

## DECLARATION OF MICHAEL J. ZINNER, M.D.

I, Michael J. Zinner, M.D., make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1.    I am Chief of Surgery ("Surgeon-in-Chief") at the Brigham and Woman's Hospital ("BWH"). I am also the Moseley Professor of Surgery at Harvard Medical School. I make this declaration in support of Partners Healthcare System Inc.'s ("Partners") Opposition to the United States' Motion for Summary Judgment.

2.    I completed my residency training at Johns Hopkins Medical School in 1979.

## ACGME Program Requirements in Surgery

3.    In order for residency training programs in general surgery to be accredited by the Accreditation Counsel for Graduate Medical Education ("ACGME"), and in order for a resident to acquire the necessary knowledge, technical skill, and judgment to practice as a general surgeon, a residency program must include five years of training after graduation from medical school. A residency program in a surgical specialty requires up to 3 years of additional training. Furthermore, in order for a resident to be eligible to sit for the Board examination in General Surgery, or in the applicable Surgical Specialty, he or she must complete the required number of

- 1 -

WDC99 1198576-1.057158.0039

years (i.e., 5 to 10 years) of ACGME accredited training.  The ACGME requirements are designed to ensure that the focus of a residency training program is educational, and that any patient care services performed by a resident are educational in nature and not rendered in order to meet a hospital's staffing needs.

4.      The educational program of a surgical residency includes ongoing studies from a textbook and other written materials, supervised operative experience, supervised pre-operative and post-operative patient care, and a full spectrum of educational rounds, lectures and conferences. The residents also learn through the ongoing testing, evaluation and feedback process during the residency program.

## Clinical Teaching Experience

5.      When students graduate after four years of medical school, they are not competent to perform surgery.  In their first year, residents observe and learn the very basics of surgery, such as how to hold an instrument and make an incision, and they progress gradually under direct supervision.  Even though under state law a surgical resident may obtain a license to practice after just one year of residency, this does not mean that the resident is competent to practice surgery.  A doctor must have hospital privileges in order to use its surgical facilities.  I am not aware of any hospital that would grant surgical privileges to a physician who has not successfully completed a full residency program at an accredited institution.

6.      As residents progress through the program, the competence of each is evaluated individually in order to determine the extent to which they may participate in the diagnostic process, decisions as to the appropriate surgical plan, and the actual surgical procedure. Residents are not permitted to participate in patient care based solely on the number of years they have completed in the residency program.  During the process of evaluating each resident, the

- 2 -

teaching physician tailors the nature and extent of the education and training that is necessary and appropriate for that resident at that point in time. Thus, residents are gradually exposed to different disease processes and surgical procedures, and taught how to make a diagnosis and perform an operation. The complexity of the cases and surgical procedures increases during the training. However, an attending surgeon is always responsible for the care of the patient, and is always present for the critical portion of any surgery. It is the responsibility of the attending surgeon to make a judgment about the capability of each resident.

7.   During the five years of a general residency program, the trainee gets limited exposure to surgical specialties, including but not limited to Oncology, Trauma, Pediatric, Burn, Transplant, Plastic, Vascular, and Thoracic. Residents are also taught how to communicate effectively and appropriately with individual patients and their families. In addition to these standard training experiences, between their second and third years, or third and fourth years, residents take an elective period to develop a research interest or refine clinical skills.

8.   Operative skill is essential for a surgeon and can be acquired only through personal experience and training. The extent to which a resident may participate in a surgical procedure is based on their level of knowledge, experience, and demonstrated skill. Supervision is required to ensure patient safety and to maximize the educational experience. Such supervision requires that teaching staff always be available for consultation. A resident must perform a minimum of 500 procedures during the 5 year period, and a minimum of 150 procedures in their 5th year of training, including a specified number of major surgical procedures. At BWH, a resident in surgery generally accumulates and average of 1000 cases over the 5 years. A written log is kept, tracking the number and nature of procedures performed by each resident.

- 3 -

9.      During the week, an attending physician visits his or her inpatients everyday. This is usually done in the morning, and the attending interacts with the residents in making decisions as to clinical management and treatment plan for each individual patient. Junior residents will see and evaluate patients at least twice a day on rounds. They discuss each patient and make a care plan recommendation to one or more senior residents. Senior residents evaluate these recommendations and then discuss them with the attending physician. In my capacity as an attending surgeon, I expect the senior resident to call me at least once a day to give me a report on my patients, and to call if and when there are any new developments or complications.

10.      Although residents are given increasing responsibility to make preliminary clinical decisions as they gain experience, the ultimate decision is always made by an attending physician.

11.      It is only through operative experiences that a resident can be appropriately trained as a surgeon. Residents could train on virtual patients if they only treated computer models, which obviously is not the case. The primary purpose of the residency program is to make the residents qualified to perform surgery, and the teaching function comes first. The purpose is not to fill the hospital's staffing needs.

12.      BWH does not allow moonlighting during the clinical portion of the training program.

## Conferences and Seminars

13.      The residency program includes rounds and conferences that also make up an essential component of the educational process. There is a full spectrum of regularly scheduled presentations, ranging from rounds to review the case management of specific patients, to more

- 4 -

didactic lectures on a specific topic.  Resident attendance is mandatory at rounds and required conferences.

14.    Surgical residents at BWH are also required to read a textbook and assignments are given on a weekly basis.  There are also reading assignments relative to medical literature on a wide range of topics.

15.    Morbidity and mortality conferences are held each week, for each surgical specialty.  These rounds include a review of case specific complications and death, and discussion of one or more interesting or unusual cases.  Attendance by residents is mandatory.

16.    Grand rounds are also held weekly.  These rounds consist of a lecture covering a particular topic and given by a member of the Harvard faculty or a visiting professor.

17.    Residents are required to attend a number of additional didactic conferences and seminars throughout their training.

## Testing and Evaluations

18.    The ACGME requires a program to establish a system of trainee evaluation that documents the progress of each resident in meeting the goals of the program.  The overall performance of each resident must be evaluated at least semiannually to determine if the resident has learned what is expected at each particular stage of the training.

19.    All surgery residents at BWH are given written evaluations.  At the end of each clinical rotation, every attending on that rotation must prepare a written evaluation of each resident.  At the same time, each resident evaluates the experience on that rotation, as well as each attending.

20.    At least twice a year, every resident meets personally with the residency program

- 5 -

director to review the resident's evaluations and to discuss their educational experience.

21.    Every year the BWH surgical residency programs gives the American Board of Surgery Basic Science In-Service Examination, and each resident is gauged according to certain benchmarks in terms of their basic scientific knowledge.  This allows the faculty to identify any areas that require additional study, and to provide feedback to the resident.  In addition, at the end of the 4th and 5th year of the program, the residents are given a Department Oral Examination, which serves as a "mock" or practice examination in preparation for the oral portion of the exam given by the American Board of Surgeons.  These oral examinations are also used as a tool for evaluating the educational progress of the resident.

22.    All of these evaluations and examinations are crucial in determining whether residents have mastered the information being taught during each stage of the training.  If a resident has not mastered the necessary information, remedial action is taken which may take the form of assigning additional reading, providing additional supervision, arranging for additional experience in a particular aspect of surgical care, repeating a rotation or a year of training, or other educational assistance or clinical practice to allow the resident to progress to the next stage of training

23.    The examinations also provide the program with a method to gauge whether the teaching methods being utilized are appropriate for communicating necessary information and skills to the residents.  For example, poor results by a large number of residents on a certain examination, or section of an examination, may suggest that one or more components of the training program needs to be modified.  By way of example, this might include additional reading assignments or more practice experience in the patient care environment.

- 6 -

### Certifying Examination

24.     In order for a program to remain accredited, ACGME requires that residents who have completed the surgical residency program achieve certain pass rates on examinations given by the American Board in General Surgery, or in an applicable surgical specialty.

25.     BWH residents routinely surpass these pass rate requirements.

### Changes in Residency Programs over the Past 30 Years

26.     When I was in training, residents were not supervised as closely as they are now. There is a dramatic difference between the level of supervision when I trained and what is required now. Residents are subject to much more intensive supervision.

27.     Residents were required to work much longer hours when I was a resident. Residents could arrive on Sunday night and leave the hospital on Saturday morning. Residents could go home for dinner on a periodic basis, if they lived close enough, but there was every-night-coverage. Now BWH only requires every 3rd night coverage.

28.     Decades ago there was no cap on the number of hours a resident could work. In 2003, the ACGME imposed an 80 hour workweek limit for all residents. Over the years, there has been a monumental growth in the amount of information and complexity of subject matter that residents must learn, and the set of skills that must be acquired has increased dramatically. In addition, the acuity of hospitalized patients is much higher. As a result, residency training programs have become much more focused on education and training in order to maximize the educational experience.

29.     Because the educational experience is more demanding, and must be accomplished in a limited period of time, there is simply no time for residents to perform routine

- 7 -

work. The more routine clinical responsibilities are now carried out by physician extenders, such as physician assistants or nurse practicitioners.

30.   BWH's residency programs are teaching programs, first and foremost.

I declare under penalty of perjury that the foregoing is true and correct.

MICHAEL J. ZINNER, M.D.

Executed on February 23, 2006

88546

- 8 -

WDC99 1198576-1.057158.0039

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

         Plaintiff,

     v.                         Case No. 05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

         Defendant.

_____/

### DECLARATION OF CHARLES ADAMS

I, Charles Adams, make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1. I am Director of Reimbursement and Revenue Analysis at Partners Healthcare System, Inc. ("Partners"). In this capacity, I am responsible for approving the cost reports associated with applying services to Medicare beneficiaries for Massachusetts General Hospital ("MGH") and Brigham and Women's Hospital ("BWH"). I make this declaration in support of Partners' Opposition to the United States' Motion for Summary Judgment.

### Funding of Graduate Medical Education

2. Since its inception, Medicare has funded a proportionate share of the direct costs associated with the education of health professionals, including costs associated with residency training programs. Medicare payments which help support these programs have been indispensable in permitting teaching hospitals and their affiliated medical schools to train residents so that they may become the physicians of the future and satisfy the increasing demand for health care services.

3. Medicare has become the largest explicit financing source for residency education

- 1 -

and training programs.  Medicare supports the costs of these medical education programs by giving Direct Medical-Education ("DME") payments and Indirect Medical-Education ("IME") adjustments to teaching hospitals with approved residency programs.

### Direct Medical-Education Payments

4.      DME payments are made to teaching hospitals to compensate them for a portion of the hospital's costs directly related to graduate training of physicians.  Such costs include residents' stipends, faculty salaries, administrative expenses, and institutional overhead allocated to residency programs.

5.      The amount of DME payments differs for every hospital.  DME payments are calculated based on a hospital-specific per resident, amount.

6.      Since 1997, Medicare has imposed a limit on the number of residents a teaching hospital can count towards DME payments.  The amount of the DME payment for each resident within that limit is based on the particular hospital's direct graduate medical education costs from fiscal year 1984 or 1985.  This amount is adjusted for inflation every year.  To calculate the amount of a hospital's DME payment, Medicare multiplies the per resident amount by the number of allowed residents being trained at the particular institution, and then by the proportion of a hospital's inpatient days attributable to Medicare beneficiaries.  Thus, a hospital that treats a large proportion of Medicare patients, has a large number of residents, and a high per resident amount, will receive larger DME payments than a teaching hospital with fewer residents and/or a lower per resident amount.

### Indirect Medical-Education Adjustments

7.      IME adjustments represent additional amounts paid by Medicare to teaching hospitals to compensate them for the added costs associated with the operation of teaching

- 2 -

programs. IME adjustments recognize the additional indirect costs created by training programs, such as additional tests, inefficiencies associated with the physician's teaching responsibilities, and/or the potentially duplicative nature of an attending and resident treatment of the same patient.

8.     The IME adjustment is based on a teaching hospital's ratio of residents to beds ("IRB"). The IRB ratio is inserted into a formula established in writing for the calculation of the IME adjustment. Essentially, IME adjustments provide a teaching hospital with a greater cost reimbursement for teaching hospitals than for non-teaching hospitals, and a teaching hospital with higher IRB ratio will receive larger payments for treating Medicare patients than a teaching hospital with a lower IRB ratio.

9.     Partners' teaching hospitals are reimbursed by Medicare for medical education (DME and IME) as described above. As a result, Medicare provides a significant amount of funds to cover not only residents' stipends, but also the cost associated with the teaching programs themselves.

I declare under penalty of perjury that the foregoing is true and correct.

_____
CHARLES ADAMS

Executed on February 22, 2006

88466

- 3 -

WDC99 1198580-1.057158.0039

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

      v.

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

Case No. 05-11576-DPW

## DECLARATION OF JOHN BELKNAP

I, John Belknap, make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1. I am Director of Billing Compliance for Massachusetts General Hospital ("MGH"). In this capacity, I am responsible for ensuring the appropriateness of physician documentation of services rendered and supervision of resident trainees in order to bill Medicare and other payors for the physician's service(s). I make this declaration in support of Partners Healthcare System, Inc.'s ("Partners") Opposition to the United States' Motion for Summary Judgment.

## Payment for Teaching Physician and Resident Services

2. Since its inception, Medicare has paid for physician services which may be rendered in part by a resident, provided that the documentation reflects that the physician's supervision of that resident, and the physician's direct interaction with the patient, satisfies specific standards.

3. The "Medicare teaching physician rule", as published in the Medicare Carriers Manual, establishes strict standards for when and how a physician may bill for services rendered

to Medicare patients ("physician services") when a resident participates in the clinical care. These rules set minimum standards for the interactions between attending physicians and resident trainees, and the documentation of such interactions, in order to bill for the attending physician's services. The MGH generally applies the Medicare standards to all payors.

4.    In order to meet the Medicare billing requirements, physicians at teaching hospitals must conform to supervision and documentation standards, and if they don't, they are prohibited from billing Medicare for the services rendered.

5.    At MGH, with respect to outpatient visits and other non-surgical care, unless an attending physician physically sees a patient, no bill for physician services is generated. For surgical procedures, no bill may be generated unless (1) an attending was physically present during all critical portions of the procedure; and (2) an attending was immediately available at all other times.

6.    Medicare specifically excludes the activities of residents in approved graduate medical education programs from any payment for "physician services." This exclusion applies regardless of whether the resident is licensed to practice medicine under the laws of the State in which he or she performs the service.

7.    As such, a relatively small percentage of patients are seen only by residents. Generally, there is no financial incentive for patients to be seen only by residents. Even when patients are seen only by residents, attending physicians are always on site for consultation.

8.    After a patient is examined or a procedure is performed, the attending physician must dictate a report of the examination or procedure. The attending physician may delegate the dictation of the report to a resident. If dictation is delegated for a surgical procedure, the attending must write an addendum indicating that the attending was physically present for the

critical portions of the procedure and was immediately available at all other times for

consultation. For non-surgical patient care services, the attending physician must complete

personal documentation describing their involvement in providing the services.

9.    Attending physicians are educated about the Medicare billing requirements by my

office. To ensure compliance, my office regularly audits the documentation by each attending

physician.

10.    An increasing number of private payors will pay for physician services only if the

physician has completed an approved training program in the applicable specialty, and as such

has become board eligible.


I declare under penalty of perjury that the foregoing is true and correct.


                                        *John Belknap*
                            JOHN BELKNAP


Executed on February 21, 2006



88472

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                       Case No. 05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

## DECLARATION OF DENNIS AUSIELLO, M.D.

I, Dennis Ausiello, M.D., make this declaration based on my own personal knowledge and, if called upon to testify, I am competent to testify as follows:

1.      I am Chief of Medical Services ("Physician-in-Chief") at Massachusetts General Hospital ("MGH"). I am also the Jackson Professor of Clinical Medicine at Harvard Medical School. I make this declaration in support of Partners Healthcare System, Inc.'s ("Partners") Opposition to the United States' Motion for Summary Judgment.

2.      I completed my residency and fellowship at MGH in 1976.

### ACGME Program Requirements in Medicine

3.      In order for a residency program in internal medicine to be accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), the program must provide 36 months of supervised graduate education. A residency program in a medical specialty must provide up to 3 years of additional education in order to receive ACGME accreditation. The ACGME requirements are designed to ensure that every resident training program is educational in nature. The educational program is intended to ensure that residents acquire the knowledge, judgment, skills, and attitudes necessary to practice internal medicine, or a medical specialty.

4.    MGH does not rely on residents or the resident training programs to meet its staffing needs. MGH's curricula for its medical resident programs are set by national curriculum standards established by ACGME. A number of structures have been put into place to protect the educational experience from undue service responsibilities. One example is the cardiac access unit.

5.    In accordance with ACGME requirements, the educational components of every medical residency program must be established and memorialized via a written curriculum. For example, for each rotation or major learning experience, ACGME requires that the written curriculum include the educational purpose (goals and objectives), the teaching methods and educational resources to be used, and the method for evaluating residents.

6.    ACGME describes the required elements of formal teaching and learning in all medical residency programs. These include assigned reading from a textbook and medical literature, rounds, conferences, lectures, and other didactic activities. In accordance with AGCME requirements, these also include learning through supervised patient care experiences. Finally, the teaching tools include written and oral evaluations and examinations.

## Board Eligibility and Certification Requirements

7.    Residents must complete three years in a residency program to be eligible to take the Board exam in internal medicine. Residents must complete up to three additional years of training to be eligible to take the Board exam in a medical specialty   In order to become Board certified, a physician must take and pass the applicable Board exam. I am not aware of any hospital that will grant privileges to a physician who is not Board eligible or Board certified.

### Rounds

8.      Rounds include both teaching rounds and patient care management rounds by an attending physician.  During both types of rounds, the residents are supervised and taught by the attending physician.  Teaching rounds are patient-based sessions in which a few cases are presented as a basis for discussion of certain items.  Patient care management rounds involve direct interaction between the resident and the attending physician to discuss the clinical management and treatment plan for each inpatient under the care of the attending and the associated "team" of residents.  Residents are required to participate in both teaching and patient care management rounds, as well as other rounds.   Other rounds include weekly Medical Grand Rounds led by senior faculty at Harvard Medical School and national and international leaders in academic medicine.  Weekly Case Directed rounds, which are held for internal medicine and each medical specialty and organized by the Chief Resident, focus on clinical-pathological correlations and review management decisions in the context of patient specific complications or outcomes.

9.      Pursuant to the ACGME requirements, MGH requires its residents to participate in teaching and other rounds.  It is important to note, however, that the residents at MGH experience supervised training through rounds more frequently than is mandated by the ACGME residency program requirements.

10.     In addition, subspecialty fellows and other members of the Medical Service are asked to review pertinent topics related to the cases presented.  Lastly, weekly Physical Finding Rounds focus on interesting physical findings of patients on the inpatient service.

11.    Clinical rounds are as critical to the education of residents as the reading, conferences and other more didactic forms of training.

## Conferences and Seminars

12.    According to the ACGME, conferences, seminars, and literature review activities should occur regularly and cover both general medicine and the medical specialties.

13.    Residents and medical students participate in a weekly Clinico-Pathologic Conference where guest speakers discuss particularly challenging cases, and the transcripts of which are later published in the New England Journal of Medicine.  In accordance with ACGME requirements, MGH residents also participate in monthly Journal Club which provides a forum for the discussion of recent, significant research articles.  Residents select articles from the basic science or clinical literature and lead discussions in which residents, fellows, and attending physicians participate

14.    At MGH, medical residents attend a significant number of conferences and lectures to ensure that they acquire the knowledge and skills to prepare them for independent clinical practice.  Daily teaching conferences supplement rounds, allowing additional opportunities to present current subjects in clinical medicine.  Both staff members and residents participate in the preparation and presentation of conferences.  Attendance at most of the conferences is mandatory.  A first year resident in internal medicine at MGH is expected to attend 15 hours a week of regularly scheduled lectures and conferences, and residents in their second and third years are required to attend 20 hours a week of regularly scheduled lectures and conferences.

15.    The series of multiple conferences expand the knowledge base of the residents in core subjects as well as more advanced topics, offer critical reviews of clinical literature, and instruct residents with respect to the clinical diagnosis and decision-making process.

### Required Patient Care Experience

16.    In addition to the educational activities described above, ACGME requires that the education program teach the resident through direct patient care experiences, including but not limited to the clinical care of ambulatory care patients, hospitalized patients, and emergency room patients.

17.    MGH residents' activities are actively supervised.  Attending physicians are in charge of managing, approving and participating in resident training.  At MGH, the program director and faculty assess the competence of each resident individually in order to determine the rate at which he or she may take on progressively greater responsibilities, and the extent to which he or she may participate in the diagnostic process and decisions as to an appropriate plan of treatment.  This gradual, supervised progression is an essential part of the education necessary to prepare the resident to make independent decisions after completion of the training program.

18.    During these specific patient care experiences, a resident's knowledge, technical skills and judgment are developed.  The attending then modifies the nature and scope of the education and training that is appropriate and necessary for each resident at each stage of the residency program. ACGME requires supervision of residents during these patient care experiences.

19.    Residents at Partners' teaching hospitals participate in the specific patient care experiences described above and residents receive the supervision required by the ACGME guidelines.  Residents are supervised in every clinical setting.

20.     Supervision includes discussion with the attending physician, and his or her confirmation or adjustment of any preliminary patient management decisions made by the resident, after a patient evaluation by the attending.

21.     Residents learn to become competent practicing clinicians through supervised patient care practices.  It is not possible to disassociate the clinical care component of training from medical education itself.  The practice of medicine is the last of the apprentice based training professions.  Book learning and vicarious experiences are not enough in and of themselves to train a physician.  For example, it is not sufficient for an attending physician to tell a resident what a normal or abnormal heartbeat sounds like; the resident can only truly learn to identify and differentiate the sounds of a heartbeat by listening to a patient's heartbeat.  As another example, the resident must learn how to elicit a medical history from the patient and family, which is necessary to make diagnostic and treatment decisions. The resident also learns how to communicate with the patient and family during every medical encounter.  Although some of these skills may be discussed in medical school, the learning is only theoretical, with no application to the real world of human patients.  Thus, real patient care experience is an essential part of the residency training process.

22.     Participating in direct patient care is a fundamental and necessary component of the education of residents.

23.     Students in medical school may spend only a few months in their third or fourth year in hospitals with exposure to real patients.  Even then, the students' experience is vigorously supervised and heavily dependant on observation.  Anything short of the full human experience is insufficient for the proper training of a physician during the residency program.

24.     Upon graduation, medical students have a general but diffuse intellectual

- 6 -

knowledge of various medical specialties. Their studies do not train them for specialization. In applying for a residency, residents must choose a specific area of practice, such as internal medicine, general surgery, radiology, pathology. Through their specialized training program, residents see and experience a full spectrum of medical problems and procedures handled by the attending physicians. They are embedded in the patient care delivery process and are immersed in the educational process.

25. Residents do not have hospital privileges as do attending physicians. They do not have the authority to admit or discharge hospital patients.

26. Because an emergency may come up when an attending physician is not physically present, residents and attending physician discuss possible complications or other medical events and how they should be handled. Furthermore, when the attending is not physically present, a relatively experienced resident is available with the training and skills to act in the event of an emergency. For example, a doctor may have from 30 seconds to three minutes to intervene in the event of a heart attack. If a heart attack occurs when an attending physician is not physically present, the resident or residents on the floor have been trained as to how to handle the situation.

27. Delivering patient care is not the purpose of a residency training program. The purpose is to develop practical clinical knowledge and skills through supervised patient care activities and feedback that accompany these activities.

28. In many ways, the MGH could operate more efficiently without resident services. When the diagnosis and treatment of a patient must be supervised, as is the case when being performed by a resident, they take longer to be completed.

- 7 -

### Testing and Evaluations

29.     Internal medicine residents undergo formative and summative evaluations during residency training programs.  MGH utilizes written examinations as an additional tool for the evaluation of its residents.  The written examinations are crucial in determining if residents are retaining the essential information being taught during each stage of the training.  There are preliminary exams during the second and fourth years of medical school and the first year of residency.

30.     MGH administers an examination every year during the training program to monitor the residents' educational progress at that juncture.  In accordance with ACGME requirements, at the conclusion of each rotation, the attendings prepare a written evaluation that is shared and discussed in person with each resident.

31.     Formal evaluations occur semi-annually, and they include a meeting with each resident, the Program Director, and the resident's assigned "Firm Chief".  The program director evaluates each resident as to their knowledge base and intellectual abilities, their clinical and interpersonal skills, relationship building, and the development of professional attitudes expected of physicians. The resident's semi-annual written evaluations are again discussed.  These meetings are also an opportunity for career counseling, which frequently involves additional meetings with the Program Director, "Firm Chief", and/or the Chief of Medicine.  Attending physicians provide written feedback to residents on the general medical service, intensive care rotations and other inpatient rotations.  Written evaluations are also submitted by Ambulatory Preceptors and for many elective rotations.

32.     The examinations also provide the program with a method to gauge whether the teaching methods being utilized are appropriate for communicating important medical

- 8 -

information to the residents. For example, unacceptable results from a large number of residents on a certain examination, or section of an examination, may suggest that a teaching method being utilized is not the most appropriate means to help residents learn certain materials.

## Certifying Examinations

33.     Residents who have completed their training in general medicine or a medical specialty take national exams given by the American Board of Internal Medicine, or the Board in the applicable medical specialty.

34.     In order for a program to remain accredited, the ACGME requires an internal medicine residency program's graduates to achieve required pass rates on certifying examinations. ACGME requires at least 70% of a program's graduates for the most recent three year period to pass the internal medicine certifying examination on their first attempt. Further, at least 80% of those completing the training program within the most recent three year period must have taken the certifying examination.

35.     MGH's residents have exceeded the requirements set by the ACGME with a pass rate of 99%.

## Changes in Residency Programs Since the Inception of Medicare

36.     When I was a resident at MGH in the 1970's, we worked longer hours and saw more patients. Residencies in medicine lasted only two years then. Now residencies in internal medicine are three years.

37.     In the past there was far less supervision of residents. Residents often made decisions on their own with respect to patient care, without prior consultation with the attending. These days, only attending physicians make final decisions regarding patient care. Residents are

- 9 -

now supervised in virtually everything they do.

38.     We did not attend daily conferences, and there were not as many lectures.

39.     There is far more to learn now than there was when I trained. Because of the enormous growth in medical knowledge and treatment options, there is more substantive knowledge that residents are now expected to acquire. With the 80 hour workweek limitation imposed by the ACGME, residency programs must remain even more focused on educational objectives in order to ensure that residents learn all that is required of them before the completion of their program. They no longer have time for, nor are they expected to, provide routine care to lighten the workload of an attending. Most of this care has been be provided by a "physician extender," such as a physician assistant or nurse practitioner.

40.     Additionally, hospitalized patients were less sick decades ago and stayed in the hospital far longer. This resulted in residents having more time to evaluate patients with less complicated diagnostic and treatment options than today.

I declare under penalty of perjury that the foregoing is true and correct.

DENNIS AUSIELLO, M.D.

Executed on February 23, 2006

88430

- 10 -