UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                            Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.

UNITED STATES' REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

MICHAEL J. SULLIVAN
United States Attorney

STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6546

Barbara Healy Smith
Assistant United States Attorney

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARGUMENT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . .  . . . . . . . . .   . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bingler v. Johnson*, 394 U.S. 741 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rockswold v. U.S.*, 471 F.Supp. 1385, affm'd 620 F. 2d. 166 (8th Cir. 1980) . . . . . . . . . . . . . . . 7

*Vons v. U.S.*, 51 Fed. Cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

### FEDERAL STATUTES

*IRC §117* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*IRC §6110(k)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 17

*IRC §3121* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

### TREASURY REGULATIONS

*Treas. Reg. §§1.117-3,4* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Treas. Reg. 31.3121(b)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Treas. Reg. §31.3121(b)(10)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,14

*Prop. Treas. Reg. §1.117-6(d)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Prop. Treas. Reg. §1.117-6(d)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

### MISCELLANEOUS

*69 Fed.Reg. 8604* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*

*Notice 87-31, 1987-1 C.B. 475* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

iii

## REVISED ISSUES PRESENTED[1]

1.      The Internal Revenue Code (IRC) imposes a social security and Medicare tax on all wages. The Code defines wages as remuneration for employment.  Wages do not include amounts received as scholarships. A scholarship is generally defined in Treas. Reg. §1.117-3(a) as an amount received by a student to aid the student in pursuing his or her studies.  An amount is not received as a scholarship, however, if IRC §117(c) applies. IRC §117(c) and Treas. Reg. §117-4(c) provide that the amount received shall not be treated as a scholarship if such amount represents payment for services that are required as a condition to receiving such amount.  Each resident in issue was required to sign a contract that required him or her to perform patient care services at the teaching hospital to which he or she was assigned as a condition to both admittance into the residency program and to receiving the  payments in question. The payment was denominated as a salary in the contract.  The defendant has admitted that, under the terms of the contract, each resident must provide patient care services as a condition to receiving the payment. All residents received a Form W-2 for the payment they received for these services showing them to be wages.  Were the payments received by the residents received as scholarships within the meaning of IRC §117?

2.      The IRC imposes a social security and Medicare tax on all wages.  The Code defines wages as remuneration for employment and, in turn, it defines employment as any service performed by an employee for the person employing him.  In 1939, Congress amended the Social Security Act by providing an exception, in what is now Code §3121(b)(10), to the definition of employment "for service performed in the employ of a school, college or university, or a related organization, if such

---

[1]In our original brief we described issue one as a question of whether the payments were "qualified scholarships" within the meaning of IRC §117(b). The defendant has abandoned issue one and in its place made another argument why the resident salary payments are scholarships and thus not subject to social security coverage.  For this reason, issue one has been revised.  Issue two remains the same as stated in our opening brief.

iv

service is performed by a student who is enrolled and regularly attending classes at such school, college or university."  In that same 1939 amendment, Congress separately excepted medical interns from the definition of employment.  In the legislative history of the intern exception, Congress stated that interns, as distinguished from resident doctors, were to be excepted from the definition of employment, as were self-employed physicians.  In the 1965 social security amendments, Congress expanded the social security coverage of young doctors by repealing the exception for interns and self-employed physicians.   Does the legislative and statutory history of the Social Security Act and its amendments, together with the language of the statute, establish that medical residents and interns are covered by Social Security?

STATEMENT

In the defendant's initial response to the United States' interrogatory number 1, it stated that it contended that the residents' payments, which it characterizes as "stipends", were exempt from social security tax under IRC §3121(a)(20) because they were qualified scholarships.[2]  Thus the United States, in its brief in support of its motion for summary judgment,[3] based upon the sworn responses of the defendant in existence at the time the brief was filed, presented its contention why it believed such an argument to be without merit.  Now the defendant states that it makes no such contention.  Def. br. p. 4.[4]  Instead, the defendant now makes another scholarship argument. It admits that the payments are not "qualified scholarships", but contends that the residents' salary stipends are noncompensatory scholarships and thus not wages within the meaning of IRC §3121(a).[5]  That is, the defendant argues that the salary stipends are paid to the residents to aid them in their training and the receipt of such salary stipends are not conditioned on the performance of patient care services by the residents.  See IRC §117(c).  As shown below, while we agree that the residents are in training, under the uncontroverted material facts here, the residents' payments are conditioned on performing patient care services and thus they are not scholarships.  See IRC §117(c).  Because the scholarship

---

[2]  In a supplemental response to interrogatory 1, the defendant amended that answer and stated that it had not decided whether to make such a contention.  Thus, at the time the United States filed its brief, it was forced to assume that the defendant was making such a contention.

[3] All abbreviations and citations used in our opening brief will be carried over to this brief.

[4] The taxpayer in the <u>Mount Sinai</u> case, who was represented by the same counsel as the defendant herein, did precisely the same thing when it abandoned its IRC §3121(a)(20) scholarship argument after the United States filed its motion for summary judgment.

[5] The difference between a qualified scholarship and a noncompensatory scholarship is that the former is not subject to either income or employment tax whereas the latter is only exempt from income tax to the extent the scholarship is used for qualified tuition and related expenses, but it is exempt from employment tax regardless of its income tax treatment.  See Notice 87-31, 1987-1 C.B. 475.  As a practical matter, because this case involves only social security taxes, it does not matter which theory defendant chooses to rely upon.  Because the defendant indicated it would be relying upon the "qualified scholarship" theory, that is the theory we discussed in our opening brief.  We now discuss defendant's current theory. As noted in our opening brief (p. 4), the salary payments were not used for a qualified purpose and thus they could not constitute a "qualified scholarship" in any event.

2

contention that the defendant now makes arises out of the same basic facts as the contention it has

abandoned, there are no additional facts that have to be added to our statement of uncontested

material facts.

The plaintiff, in its response to our statement of material facts, does not raise any issue of

material fact, although it does dispute some of our factual allegations.[6]  Those disputes relate only to

background facts which are not material to the resolution the issues in this motion.  For example, it

alleges (def. res. to pl. mat. facts 1-2) that the United States' description of the purposes for which

the defendant was organized are factually inaccurate.  While we disagree with the defendant's

allegations on this point, because the United States' allegations were based upon submissions by the

defendant to the IRS (see pl. exs. 2,3), the purposes for which the defendant was organized are not

issues that are relevant to our motion.  Another instance where the defendant raises issues of fact that

are not material to a decision on our motion are found at defendant's response to United States'

material fact no. 5 where it alleges that the mission statements of the hospitals do not state that

education is accomplished through patient care services.  Whatever may be said of the content of the

mission statements on this topic, the affidavits submitted by the defendant show beyond question

that the education of a resident takes place through performing patient care services, just as other on-

the-job training is accomplished by employees doing their job.  Once again, how the residents are

---

[6]The United States contends that as a condition to receiving the salary payments, the residents must provide patient care services (i.e., a *quid pro quo*).  The defendant attempts to raise a material issue of fact by alleging (def. res. to pl. mat. fact nos. 4, 5 and para. 1 of its add. undis. mat. facts) that the stipends are not received as a *quid pro quo* for the performance of patient care services.  As noted below in the text in Arg. I, the defendant has not provided any evidence, documentary or otherwise, to support such an assertion.  The defendant's admission (pl. ex. 6, res. to req. to admit no. 11) that one of the conditions to a resident receiving his or her stipends was the performance of patient care services coupled with the unequivocal terms of the resident's contract that required the resident to provide patient care services as a condition to receiving the salary stipend, are just two of the reasons why there is simply no factual dispute that there was a *quid pro quo* provided by the residents as a condition to receiving their salary stipends.

3

actually educated is not a relevant issue.

In its response to the United States' material fact no. 7, the defendant states that the hospitals do not provide compensation or benefits to the residents nor do residents receive a "compensation package", yet the contract between the hospital and resident states (pl. ex. 7, p. 2) that the hospital will provide both compensation and a "benefits package". While defendant's statement is contrary to their own contracts, who compensates the residents and whether the compensation is called a "compensation package" or a "benefits package" or some combination are not relevant issues. The defendant's response to the United States' material facts nos. 8,9 alleges that it did not file a claim for refund and it did not receive actual payment of what it believes are overpayments of employment taxes and thus the United States still has use of these funds. Whether the defendant's Form 941c is denominated a claim for refund (the attachment to the Form 941c refers to it as a claim), a claim for a credit, or something else, it has the effect of claiming a refund by way of a credit against the defendant's other admitted employment tax liabilities. In fact, the defendant admits it received such a credit. Thus, the defendant's suggestion that the United States is still depriving it of the use of the funds borders on the frivolous. Lastly, the defendant, in its response to the United States' material facts no. 11, alleges that Partners requires its residents to perform patient care services as a condition to receiving training, not of receiving the salary payments. This allegation makes no sense. While it is no doubt true that a condition of on-the-job training is that the job be done, that in no way undercuts the fact that performing the job is also a condition of obtaining the related compensation. In addition, the allegation that the performance of patient care services is not a condition of receiving the salary stipend is in direct contravention to the defendant's responses in both its original and supplemental answers to the United States' requests to admit no. 11 where the defendant admitted that as a condition to receiving the salary stipend, the resident had to perform patient care services.

4

While all of the factual disputes raised by the defendant are not material to deciding our motion (the issue regarding whether the salary stipends were received as a *quid pro quo* for the performance of patient care services is not a factual issue as discussed below), we are somewhat puzzled why, in raising some of these immaterial factual disputes, the defendant feels compelled to directly contradict the language in its own documents.

The defendant has also submitted 139 paragraphs of what it claims are statements of undisputed material facts. With one exception noted above (paragraph 1), these statements portray what the defendant contends is a detailed description of its residency programs and how they relate to Medicare. The details of the residency programs and their relation to Medicare are, however, not relevant to this part of the case as it involves only questions of law which require very little background information. We also note that we have not pointed out and responded to every irrelevant factual allegation the defendant has made. We do, however, reserve the right to contest these other factual allegations in the event our motion for summary judgment is denied.

ARGUMENT

I

THE SALARIES PAID TO THE RESIDENTS WERE NOT RECEIVED
AS SCHOLARSHIPS UNDER IRC §117 AND THUS ARE WAGES WITHIN THE
MEANING OF IRC §3121(a)

The defendant contends that the salary stipends paid to its residents are not wages for the purposes of IRC §3121(a) (i.e., the salary stipends are not remuneration for employment) and thus such payments are not subject to the social security tax.[7] Specifically, the defendant contends (def. br. pp. 4-5) the residents' salary stipends are in the nature of noncompensatory scholarships under

---

[7]Dr. Weinstein, the defendant's vice-president for Graduate Medical Education, alleges (Def. SUMF, Ex. D, para. 22) that income and social security taxes are withheld from the salary stipends. Since IRC §3402(a) provides that such taxes shall be withheld from wages, the defendant, by its own actions, has characterized the salary stipends as wages.

5

IRC §117.[8]  To qualify as a noncompensatory scholarship under IRC §117, a payment must be received as a scholarship.  See Treas. Reg. §§1.117-3,4.  Although not defined in IRC §117, the term "scholarship" is defined in Treas. Reg. §1.117-3(a).  That regulation provides that a scholarship is generally an amount paid for the benefit of a student to aid such student in pursuing his studies.  IRC §117(c) provides, however, that an amount is not received as a scholarship if, as a condition to receiving such amount, the recipient is required to perform services.  See Treas. Reg. §1.117-4(c)(1) (amounts paid to enable an individual to pursue studies or research that are compensation for past, present or future employment services are not considered to be amounts received as a scholarship).  See also Prop. Treas. Reg. §1.117-6(d)(2) which interprets IRC §117(c) (the scholarship grant is payment for services where the grantor requires the recipient to perform services in order to receive the grant).  Thus, IRC §117 and the regulations thereunder provide a two-part test that the defendant must satisfy before the salary stipends paid to the residents can be properly characterized as having been received as a scholarship (i.e., they are noncompensatory scholarships).  First, the payment must be a scholarship.  Second, to be considered as having been received as a scholarship, performance of services by the residents can not be a condition to receipt of the payments.  IRC §117(c).[9]

    Applying this two-part test to the uncontested material facts of this case, it is seen that the

---

[8]If a payment is properly characterized as a noncompensatory scholarship, it is not subject to social security tax and may, as previously noted, be partially or totally exempt from income tax, depending on whether the funds were used to pay for qualified expenses.  The income tax treatment of the salary payments is not, however, in issue here.

[9]While issue one of our opening brief dealt with whether the payment was a "qualified scholarship" within the meaning of IRC §117, an issue that the defendant has now abandoned (issue two dealt with the student exception), the discussion of that issue nevertheless related to aspects of the current scholarship issue since IRC §117(c) must be satisfied regardless of which "scholarship" provision is relied upon.  See Pl. br. pp. 1-6.  The discussion of IRC §117(c) in our original brief will not be repeated here except where necessary to give proper context to our contentions relating to the new scholarship issue.  Thus, the defendant incorrectly asserts (def. br. p. 5) that we have not in any way briefed the facts and law of its current claim.  In fact, as noted above, we do not need to add any facts to our statement of uncontested material facts to fully brief the new scholarship issue raised by the defendant.

6

defendant utterly fails to meet the second part.  As shown on Exhibit 6, def. res. to req. no. 11, the

defendant admits that, as one of the conditions to receiving his or her stipend, each resident was

required, under the terms of each resident's contract, to perform patient care services.  This

admission, standing alone, is sufficient to defeat the defendant's claim that the resident's salary

stipends are noncompensatory scholarships.

There are several other reasons why the salary stipends do not qualify as noncompensatory

scholarships.  The Supreme Court, in 1969, in interpreting Treas. Reg. §§1.117-3(a, c) and 1.117-

4(c), which remain unchanged up to today, defined scholarships or fellowships under those sections

as "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial

quid pro quo from the recipients."[10]  Bingler v. Johnson, 394 U.S. 741, 751 (1969).  As noted above,

there is one very large string attached to the receipt of the salary stipends: Each resident is

contractually required to perform patient care services.[11]  Even if thee contract did not specifically

require it, an essential aspect of on-the-job training is that the job be performed.  Thus, under the

Supreme Court's 1969 definition of scholarship and fellowship, which was based on the same

regulations that are in issue here, salary payments paid as part of an on-the-job training program are

not received as scholarships by the residents and are therefore wages within the meaning of IRC

§3121(a).

In addition, the defendant's argument that the salary stipends are noncompensatory

scholarships was long ago put to rest.[12]  As pointed out in our opening brief at pages 2-3, residents

had litigated hundreds of times, prior to 1986, the issue as to whether the salary stipends were

---

[10]The Supreme Court's interpretation of these regulations was codified in IRC §117(c) in 1986.  See pl. ex. 9F, p. 99.

[11]The resident's contract is the only document that defines his relationship to the hospital.

[12]In fact, the defendant has always reported the salary stipends paid to the residents as wages from employment until it filed its claims for refund.  Pl. Ex. 6, resp. to req. to adm. 19.

7

scholarships.  They were almost universally unsuccessful (i.e., the courts almost always found the salary stipends not to qualify for scholarship treatment under IRC §117 because the salary stipends were paid in return for valuable patient care services).[13]  For example, in <u>Rockswold v. U.S.</u>, 471 F. Supp. 1385 (D. Minn. 1979), affm'd 620 F. 2d. 166 (8th Cir. 1980), the district court stated (p. 1390) that "the reasoning of these [many reported] cases, simply stated, is that interns and residents are normally considered the employees of the hospitals in which they work, and are paid in exchange for the extensive and valuable services they render.  In other words, the 'quo' of payments is given in return for the 'quid' of services."

The defendant contends throughout its discussion of this issue that whether the salary stipends are received as scholarships is a question of fact and thus the issue is not ripe for summary judgment.  The defendant submitted 139 paragraphs, over 33 pages, of what it claims are additional undisputed material facts, to support its position the salary stipends paid to the residents are received as scholarships.  Only at paragraph one (and p. 8 of its brief) does the defendant even mention the second prong of the §117 test where it states, in a conclusory way, that the residents' salary payments are not a *quid pro quo* for providing patient care services.  This statement is based on two self-serving declarations of two employees of the defendant whose statements do not even remotely come close to supporting the assertion in paragraph one.  The basis of the two statements is identical: residents are paid a salary that, in relation to the salaries received by practicing physicians, is paltry

---

[13]In its statement of undisputed material facts, the defendant has provided affidavits from several doctors that state that over the last 30-40 years residency programs have changed in that there is now more direct supervision of the residents and there is more to learn.  Although nowhere mentioned in its brief, the defendant is no doubt suggesting that, because of this alleged change in residency programs, all of these cases that decided that residents' stipends were compensatory rather than scholarships are no longer valid.  What has not changed in these residency programs is that the core finding of those cases remains the same even today: residents must still render valuable patient care services in return for their stipend.  In addition, medical education, both in 1939 and today, is still made up of two basic parts, medical school and a residency.  Thus, contrary to the defendant's implied inference based on the affidavits, those cases remain good law today.

8

and thus the payments must be for something other than patient care services.[14]  The size of the

wage, however, has nothing to do with whether the performance of the residents' services were a

condition of receiving the salary stipend. That the residents were required to perform patient care

services in order to receive their salary stipend has been conclusively shown, and without any factual

dispute, by both the terms of the residents' contracts and the defendant's response to the United

States' Request for Admission 11 where it admitted that a condition to the residents receiving their

salary stipends was the performance of patient care services.  In fact, the defendant, in its entire

discussion of this issue in its brief, never even once mentioned the residents' contracts or their stated

obligation to perform patient care services.  The defendant has only discussed whether the payments

to the residents were scholarships, but that is only half of the equation.  The defendant has, quite

understandably, ignored the other half of the equation.  Under the undisputed facts of this case, there

can be no question that the residents were required to perform patient care services as a condition to

receiving their salary stipend.  Thus, there is no question of fact that the salary stipends were not

received by the residents as scholarships within the meaning of IRC §117.

     The defendant relies (def. br. p. 6, fn. 4) on numerous private letter rulings and a Chief

Counsel Advisory to support its position that the salary stipends paid to the residents in this case

should be characterized as noncompensatory scholarships.  First of all, by statute, none of these

written determinations can be cited as precedent.  IRC §6110(k)(3).  See also <u>Vons v. U.S.</u>, 51 Fed.

Cl. 1,12 (2001)(such determinations can not be cited to for any purpose and are not entitled to any

precedential weight).  Even if they could be cited, they would be of no help to the defendant.  All of

---

[14]Many young prosecutors work for the government for a wage that is paltry relative to other lawyers because they also receive on-the-job training that will benefit their careers.  That fact does not make their wages a scholarship.  As the value to the employee of the training goes up, the amount the employer has to pay to obtain the services goes down.

9

these written determinations concern National Research Service Award (NRSA) fellowships or fellowships that mirror them. These awards are made in order that the recipient can learn how to do research. They specifically can not be used to support medical residents. Perhaps most importantly, little or no services are performed by the recipients. Thus, unlike the residents' salary stipends, whose receipt is conditioned on the performance of patient care services, the NRSA recipients perform little or nor services, but only learn how to perform research. The defendant also cites (def. br. pp. 6-7) to three revenue rulings in support of its position. The facts in those three revenue rulings reveal either that the recipient performed little or no services in return for the grant or the issues discussed are not in any way comparable to the issues in this case.

The defendant also relies (def. br. p. 7) on a private letter ruling it received regarding its research training programs, that are modeled after the NRSA program, to support its position that the salary stipends are not wages. While it is not entirely clear from the defendant's brief, this research program is not, in any way, related to its residency programs as specifically stated in the ruling letter. As with the other NRSA rulings discussed above, this ruling is of no help to the defendant because little or no services are performed as a condition to receiving the grant. The defendant also suggests (def. br. pp. 7-8) that the salary stipends are for educational training and that the performance of patient care services is merely incidental to such educational training. Thus, the defendant contends, the salary stipends are received as training scholarships and not as a *quid pro quo* for patient care services. This contention is completely contradicted by the defendant's own response to the plaintiff's req. to adm. no. 13 (Ex. 6) where the defendant admitted that patient care is not incidental to the education of the residents. This admission is consistent with the affidavits submitted by the defendant's doctors who stated that patient care is an integral and dominant, not incidental, part of the residents' education.

10

Lastly, the defendant contends (def. br. p. 8, fn. 5) that even if some of the resident's salary stipend is received as wages, there is a factual question as to what part of the stipend is wages and what part is a noncompensatory scholarship (i.e., a training grant).  See Prop. Treas. Reg. §1.117-6(d)(3). This contention is without merit.  Since all residents have agreed, by way of a contractual obligation, to perform patient care services as a condition to receiving their entire salary stipend, no part of the stipend is for other than the performance of services.  Put another way, IRC §117(c) states that if a condition to receiving the salary stipend is the performance of services, the stipend is not received as a scholarship.  Since a condition to receiving the salary stipend does exist, namely the resident must perform patient care services, the entirety of the residents' salary stipends are not received as scholarships. Thus Prop. Treas. Reg. §1.117-6(d)(3) is simply inapplicable to the undisputed material facts in this case.

In summary, contrary to defendant's assertion, there are no factual issues that must be determined in considering whether the salary stipends are wages.  IRC §117 does not apply, as a matter of law, to the salary stipends paid the residents because, under IRC §117(c), its legislative history discussed in our opening brief and the regulations thereunder, as well as long-standing Supreme Court precedent, there is a condition each resident must meet before receiving such salary stipends: Each resident had to perform patient care services under the terms of his or her contract. Thus the salary stipends are, as a matter of law, wages and not noncompensatory scholarships.  This conclusion is consistent with the Supreme Court's admonition that the term "wages" is to be construed broadly, see pl. br. p. 12, as well as its admonition that to be a scholarship the payment must be the result of disinterested generosity.

11

II

THE RESIDENTS DO NOT QUALIFY FOR THE STUDENT EXCEPTION
TO COVERAGE UNDER THE SOCIAL SECURITY SYSTEM

In our opening brief we contended (pl. br. p.23, fn. 16) that in order for the student exception to apply, the putative student could only earn nominal wages and work part time, relying on the Johnson City case. That case is dispositive of the student exception issue here. Incredibly, apparently conceding its continuing validity, the defendant did not so much as mention the Johnson City case once in its opposition brief although it did contend (def. br. pp. 8, 19, 24), relying on Treas. Reg. §31.3121(b)(10)-2(b, c) (pl. ex. 9B, p. 32), that the student exception does not have a nominal amount requirement as a precondition to qualifying for such exemption. That contention has been fully answered (pl. br. p. 23, fn. 16) and will not be repeated.[15] To be clear, however, the defendant's claim (def. br. p. 24), that the Mt. Sinai court's analysis regarding the nominal amount requirement is flawed because it ignored the 1950 repeal of the $45 provision in the student exemption is, itself, flawed. The $45 provision was merely a safe harbor provision within the range of what would be considered a nominal quarterly wage. Thus, one of the preconditions to qualifying for the student exception, the nominal amount test, would be met without question if the wages paid during the quarter were $45 or less. If the wages paid during a quarter exceeded $45, the student would have to establish, in addition to all other conditions, that he or she met the nominal amount test, in order to qualify for the student exception. After the safe harbor was removed by the 1950 amendments, every student attempting to qualify for the student exception would have to establish, if challenged, that his or her quarterly wages were nominal. After the 1950 amendments, the $45 per quarter safe-harbor

---

[15]The Johnson City court found that wages paid during the mid-1980s for seven months in the amount of $4,852 was, as a matter of law, not nominal. The amount of the wages paid to the residents here, of which there is no dispute, are not nominal under Johnson City, whether measured in absolute or relative terms.

12

was just no longer one of the ways for a student to qualify for the student exemption. See pl. exs. 9D, p. 63 and 9E, p.77.

The defendant's brief is a myopic examination of one IRC section, §3121(b)(10), where an examination of the entire statutory and legislative history of related provisions, some of which were enacted at the same time, is required. By focusing solely on §3121(b)(10), the defendant has not discussed one piece of the legislative history of the relevant statutes (with one exception noted below where it only discussed a part of the legislative history which left a false impression of its real meaning) nor the significance of the chronology of the relevant statutes themselves. In fact, the defendant treats the legislative history as if it did not exist, ignoring completely, for example, the statement in the 1939 legislative history that "interns (as distinguished from a resident doctor)" are exempt from coverage.[16] Rather, what we provided the court in our opening brief, and what the court in Mt. Sinai did, is the appropriate analysis: A detailed consideration of the legislative and statutory history of all the relevant statutes is necessary to properly interpret the statute. That analysis reveals that Congress intended the student and intern exceptions, which were enacted together in 1939, to be mutually exclusive. It also reveals that coverage did nothing but expand thereafter, especially in 1965 when Congress decreed that every doctor would be covered by social security, with several small exceptions not relevant here. Further evidence of this intent to provide broad coverage is found in the fact that for over 60 years medical residents were always treated by their employers as covered by the Social Security system and that after Congress repealed the intern exemption in 1965, in response to the St. Lukes case, interns were likewise treated by their employers as covered by social security

---

[16]One reason to focus on more than just the legislative history of §3121(b)(10) is that Congress chose to treat the resident doctor issue in the legislative history of the intern exception. Thus, contrary to defendant's assertion (def. br. p. 17-18) that in analyzing the legislative history of the student exception, referring to the legislative history of other sections such as the intern exception is, at best, a distraction, simply reflects the defendant's inability to comprehend the legislative and statutory history of the student exception.

13

protection for over 33 years.  This uniform treatment of interns and residents as being covered

changed with the aberrant <u>Apfel</u> decision in 1998, after which thousands of claims for refund were

filed by hospitals seeking a return of amounts paid into the social security system on the theory that

medical residents and interns were not subject to social security protection by virtue of the student

exception.

We set forth our reasons in detail (pl. br. pp. 7, fn. 7) as to why the legislative history of the

statute in issue, the student exception, as well as related statutes such as the intern exception passed

at the same time, must be considered in determining whether Congress intended medical residents

and interns not to be covered.  The defendant argues (pl. mem. pp. 8-11) that the student exception

statute is unambiguous and therefore no legislative history of any statute should be consulted to

determine whether Congress intended to include medical residents and interns within the meaning of

the student exception.  The defendant offers little analysis as to why it believes the statute is

unambiguous.  It only repeats the mantra of the cases it cites regarding statutory construction, that if

the statute in question is unambiguous its legislative history is not to be considered.  In fact, if the

statute is unambiguous on its face, the only conclusion that can be drawn from §3121 (b)(10) and the

broader context of the statute as a whole, is that Congress did not intend that medical residents and

interns would be included in the student exception, especially given the Supreme Court's admonition

that social security coverage is to be broadly construed and as universal as possible.

The defendant suggests (def. br. p.10) that the 1965 repeal of the intern exception is

irrelevant to the question of whether the student exception applies to "today's residents" who, it is

alleged, are in factually different programs than they were in 1965.  This argument ignores two basic

tenants of statutory construction.  First, the broader context of the statute as a whole must be

considered.  <u>Robinson v. Shell Oil Co.</u> 519 U.S. 337,341 (1997). This, of course, would include not

14

only the 1939 enactment of the student and intern exceptions that were passed at the same time, but the intern exception's later repeal along with the repeal of the exception for self-employed doctors and medical residents and interns at federal hospitals.[17]  Second, there is the well-established rule that a statute must be construed based on the facts and circumstances in existence at the time it is enacted, not some later date.  St. Lukes at p. 160 and cases cited therein.[18]  As the St. Luke's court observed, if changes have taken place that affect the statute as written, any statutory change must come from Congress not the courts. Thus, it is the facts in existence in 1939 and 1965, not 2006, that are important in interpreting the statute.  See also Johnson City at p. 977 (the court found that the student nurse exception must be viewed as it was written in 1939 even though changes in nursing education programs over the years would render the exception inapplicable to the nursing programs in place during the 1980s).  For this reason, as well as others discussed above, the statements in the affidavits submitted by the defendant regarding its current residency programs, and how they have changed, are irrelevant to a determination of the meaning of the statute.[19]

The defendant argues (def. br. p. 11) that, since both the treasury regulation in effect during

---

[17]The defendant suggests (def. brf. p.10) that we place inordinate reliance on the 1965 repeal of the intern exception to support our contention that the student exception does not apply to medical residents and interns.  Even a cursory reading of our brief, however, reveals that we rely on much more that the intern exception repeal.  We also rely on the legislative history of all of the relevant statutes, such as the student and intern exception, the St. Lukes decision, and the repeal, in 1965, of the statutes exempting from coverage self-employed doctors and federal residents and interns.

[18]The court in St. Lukes pointed out that by 1960, it was no longer necessary to go through an internship to obtain an MD degree.  For this reason, Congress thought it inappropriate to continue the intern exception.  Ibid. That is consistent with the legislative history of the 1965 amendments that medical doctors be covered whether or not in training, whether or not self-employed, and whether or not employed by the federal government.

[19]While the content of the residency programs may have changed over the years, the core of those programs remains the same today as it was 40 years ago: a resident is trained primarily by performing patient care services, although a resident may spend more time now than 40 years ago in didactic training (perhaps up to 20% of a resident's time is spent in such training according to some of the defendant's affidavits).  This change in content is due in part to advances in medical technology.  See, e.g., St. Lukes and Rockswold for a description of older residency programs. The changes do not support an argument that today resident doctors are not covered by the social security system.

15

the years in issue, Treas. Reg. §31.3121(b)(10)-2(c), as well as the one that is effective on or after

April 1, 2005, and thus not applicable to this case, Treas, Reg. §31.3121(b)(10)-2, use a facts and

circumstances, rather than a per se, approach in determining whether the student exception applies,

the court would have to invalidate both regulations in order to find a per se rule applies.  This

contention is without merit.  As to the regulation applicable during the period in suit, it applies a

facts and circumstances approach only with respect to those individuals who could otherwise qualify

for the student exception.  Since, as shown above and in our opening brief, Congress has determined

that medical residents and interns are not eligible to claim the student exception, the regulation

simply has no application to them.  As to the regulation that was not applicable during the years in

suit, a close examination of it reveals that it takes what is, in effect, a per se approach in determining

whether, inter alia, medical residents and interns, are eligible for the student exception.  It provides

that if anyone works 40 hours per week or more, he or she is ineligible for the student exception.

Since no medical resident or intern today works less than 40 hours per week (see the many affidavits

submitted by defendant describing all of the weekly work a resident has to perform to comply with

ACGME curriculum standards), the regulation creates a per se rule that residents and interns do not

qualify for the student exception.  For the same reason, the plaintiff also misunderstands the import

of Example 4 in Reg. §31.3121(b)(10)-2 where it was determined that a medical resident was not

eligible for the student exception solely because he worked 40 or more hours per week.[20]

Defendant declares (def. br. p. 11, fn. 7) that the "Treasury Department has consistently and

unambiguously provided that residents may assert the Student Exception." See also def. br. p. 24, fn.

13 (the longstanding position of the government is that a medical resident is eligible to claim an

---

[20]While the defendant only made a generalized reference to an example in the inapplicable regulations, it must be referring to Example 4.

16

exception from FICA taxation pursuant to the Student Exception).  The defendant does no better at interpreting the government's longstanding position than it does Congress's words.

Defendant is unable to point to a single instance where the Treasury has determined that a medical resident is excepted from coverage because he or she is a student.  In fact, Treasury has stated exactly the converse: "IRS and Treasury believe that Congress has shown the specific intent to provide coverage to individuals who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees, *particularly medical residents and interns*."  *See* Proposed amendments to Treas. Reg. 31.3121(b)(2)-1 and Treas. Reg. § 31.3121(b)(10)-2, Pl. Ex. 11 at 8608 (February 25, 2004).  With respect to the 1939 amendments to the Social Security Act, prior to the 1965 amendment, the Treasury has stated that it has long believed that "*the services of medical interns were excepted from FICA, but the services of resident doctors were not*."  (*Id*.)  Treasury noted that "the Sixth Circuit [in St. Luke's] confirmed that section 3121(b)(13) of the Code applied to medical interns, but that medical residents were not specifically excepted from social security coverage."  *Id*.  Treasury also noted that the 1965 Congressional response to St. Luke's was not to expand the intern exception to include medical residents, but to provide instead that "medical interns be covered by FICA just as medical residents already were."  *Id*. This position is further confirmed by the many years of employers, such as the defendant, treating medical residents and interns as covered by the social security system.  This position is also consistent with the court's conclusion in Mt. Sinai in footnote 6 (p. 1228)–[contrary to the defendant's contention (def. br. p.24)]–, that Treasury's longstanding interpretation of the student exception has been that it does not apply to medical residents and interns.

The defendant has cited to two Chief Counsel Advice (CCA) memos (def. br. p. 11, fn. 7) in support of its position that the student exemption test in IRC §3121(b)(10) must be determined by

17

examining all of the facts and circumstances so that the mere fact that a doctor is in training as an intern or resident is not fatal.  These memos provide suggested guidance to IRS field agents as to how best to audit several test claims out of the many claims filed by hospitals claiming that their residents are not covered because of the student exemption.[21]  The CCA memos do not, as the defendant suggests throughout its brief, represent the position of the IRS and/or the Treasury Department.  Rather, the CCAs represent the opinion of one IRS employee that Congress has specifically stated may not be cited as precedent.  IRC §6110(k)(3).  The defendant knows this, yet it nevertheless cites to and relies on the CCAs.  Having said that, as shown below, when they are considered in their entirety, it is seen that they do not contradict the United States' position that Congress intended to cover all doctors under the social security system.

The CCAs were written after the Apfel decision, a case which appeared possibly to change almost 60 years of residents, and 33 years of interns, being unquestionably included in the Social Security system.  Although never mentioned by the defendant, both CCAs showed that the IRS thought that the legislative history supporting social security coverage for all doctors was quite compelling.  It was stated in both that it was the intent of Congress, based on the amendments to the Social Security Act in 1939, 1950 and 1965, together with their legislative histories, that the student exception not apply to residents and interns and instead "all medical doctors are covered under the social security system, whether or not they are still in training, whether or not they are self-employed, or whether or not they work for the federal government."  Def. ex. B at p. 29.  See also def. ex. C, pp.

---

[21]Because of the long history of coverage of medical residents and interns, the IRS was not as current in its knowledge of the residency programs in existence at the time the CCAs were written as it was after the audit.  The IRS wanted to learn enough about the facts and circumstances of the residency programs to determine whether the programs had changed sufficiently since the 1960s to warrant making distinctions among residency programs.  After completing its work, the IRS is now convinced that nothing has changed and Congress' intention not to exempt residency and intern programs from coverage on account of the student exception is as clear under today's programs as it was under the programs in effect in 1939 and 1965.  See, e.g., 69 Fed. Reg. 8604, 8608 (attached as Ex.11).

18

31-32.  Defendant's exhibit C also noted (p. 32) that a broad interpretation of the student exception would frustrate the intent of Congress to include all young doctors in the Social Security system.  In short, it is seen that the CCAs, when viewed in their entirety, first suggest that the auditing agents take the position that the student exception does not, as a matter of law, as the court in <u>Mount Sinai</u> later held, apply to medical residents and interns, but that as a backup position, they also develop the facts and circumstances of the cases of the residents and interns to establish that the student exception would not apply under a facts and circumstance test either. This makes perfect sense since, if the legal argument based on the statutory and legislative history of the Social Security acts ultimately did not prevail, and it had never been tested at that time in a tax case, all of the facts and circumstances would be available to determine whether the residents and interns fit within the student exception under the facts and circumstances test.[22] Plaintiff is thus mistaken in its belief that the CCAs provide any indication that the Government agrees that medical residents may so qualify.

    The defendant contends (def. br. pp. 20-21), based on a selective sentence out of the legislative history of the 1965 repeal of the intern exception, that Congress intended to allow residents and interns to qualify for the student exception.[23]   Once again, the plaintiff only tells part of the story and this selective quote hardly provides credibility to its argument.  We have previously responded to this contention (pl. br. p. 18, fn. 13) and it will not be repeated.  Thus, this argument once again highlights the fact that the defendant has it backwards when it contends that exemptions

--------

[22]The writer of the CCAs reached her conclusion that the legislative history showed that medical residents and interns were not covered by the student exception even though she was apparently unaware of some of the most compelling legislative history associated with the 1965 amendments, since she failed to cite to it.  This is the legislative history, quoted at page 16 of our brief, that reflected Congress' intent that young doctors be covered like other employees working for the same employer.  See Pl. Ex. 9E, p. 86.

[23]The defendant's suggestion (def. br. p. 20-21), that this piece of legislative history would allow it to contend that both interns and residents could qualify for the student exception because there was little or no difference between interns and residents in 1965, is meritless.  The repeal applied only to interns and the legislative history language is limited solely to interns.  Residents had, since 1939, always been treated as covered.

19

to coverage are to be read broadly, or in this case implied, rather than read narrowly as required by every Supreme Court case that has spoken on this point. The argument also goes against every rule of statutory construction and admonition of Congress that coverage is to be as universal as possible.

We have found nothing in the legislative history, and the defendant has pointed to nothing, that indicates that Congress believed interns (or residents, who were even further along in their medical careers than interns) were eligible for the student exception. If Congress believed that interns' services would be excluded under the student exception, it likely would have said so as it did in the case of services performed for an exempt organization. This conclusion is consistent with what Congress has done since it first began amending the Social Security Act in 1939: Coverage was increased at every turn, particularly with respect to doctors in the 1965 amendments, where Congress stated very clearly that it intended to cover, with the minor exceptions previously noted, every doctor, both private and federal, whether an intern, resident or self-employed, from his first year after medical school forward. The accuracy of this history of how Congress treated interns and residents and self-employed doctors under the Social Security system is unquestioned. Perhaps Treasury put it best in its explanation of the proposed new regulations where it was stated that "these provisions, taken together, indicate Congress's intent to create a scheme under which all medical doctors are covered under the social security system, whether or not they are still in training, whether or not they are self-employed, or whether or not they work for the federal government." Pl. Ex. 11 at p. 8608.

## CONCLUSION

The United States' motion for summary judgment should be granted because the medical residents' payments are not received as scholarships within the meaning of IRC §117 nor are the residents eligible for the student exception found in IRC §3121(b)(10) as demonstrated by that and related section's legislative and statutory histories as well as the fact that it is only available to those

20

students who earn nominal wages.

MICHAEL J. SULLIVAN
United States Attorney

BARBARA HEALY SMITH
Assistant United States Attorney

   /s/ stephen t. lyons
STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6546
e-mail: stephen.t.lyons@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' REPLY

BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT has this 17th  day of

March, 2006, been electronically filed with the Clerk of the District Court using its CM/ECF system.


    <u>/s/ stephen t. lyons</u>
STEPHEN T. LYONS
Senior Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C.  20044
Telephone:  (202) 307-6546

EXHIBIT 11

69 FR 8604-01, 2004-1 C.B. 571, 2004-10 I.R.B. 571, 2004 WL 343478 (F.R.)

PROPOSED RULES

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 31

[REG-156421-03]

RIN 1545-BC81

Student FICA Exception

Wednesday, February 25, 2004

*8604 AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking and notice of public hearing.

SUMMARY: This document contains proposed regulations that provide guidance regarding the meaning of "school, college, or university" and "student" for purposes of the student FICA exception under sections 3121(b)(10) and 3306(c)(10)(B) of the Internal Revenue Code (Code). In addition, this document contains proposed regulations that provide guidance on the meaning of "school, college, or university" for purposes of the FICA exception under section 3121(b)(2) for domestic service performed in a local college club, or local chapter of a college fraternity or sorority by a student. This document also provides a notice of public hearing on these proposed regulations.

DATES: Written and electronic comments must be received by May 25, 2004. Outlines of topics to be discussed at the public hearing scheduled for June 16, 2004 must be received by May 25, 2004.

ADDRESSES: Send submissions to: CC:PA:LPD:PR (REG-156421-03), room 5703, Internal Revenue Service, POB 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG-156421-03), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC. Alternatively, taxpayers may submit comments electronically, via the IRS Internet site at: www.irs.gov/regs.

FOR FURTHER INFORMATION CONTACT: Concerning the proposed regulations, John Richards of the Office of Associate Chief Counsel (Tax Exempt and Government Entities), (202) 622-6040; concerning submissions of comments, the hearing and/or to be placed on the building access list to attend the hearing, Treena Garret, (202) 622-7180 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

Background

This document contains proposed amendments to 26 CFR part 31 under sections 3121(b)(10) and 3306(c)(10)(B) of the Internal Revenue Code. These sections except from "employment" for Federal Insurance Contributions Act (FICA) tax purposes and Federal Unemployment Tax Act (FUTA) purposes, respectively, service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university. In addition, this document contains proposed amendments to 26 CFR part 31 under section 3121(b)(2). This section excepts from employment for FICA purposes domestic service performed in a local college club, or local chapter of a college fraternity or sorority, by a student who is enrolled and is regularly attending cases at a school, college, or university.

Explanation of Provisions

A. Current Law

Section 3121(b)(10) of the Code (the student FICA exception) excepts from the definition of employment for FICA purposes services performed in the employ of a school, college, or university (SCU) (whether or not that organization is exempt from income tax), or an affiliated organization that satisfies section 509(a)(3) of the Code in relation to the SCU ("related section 509(a)(3) organization"), if the service is performed by a student who is enrolled and regularly attending classes at that SCU. Section 3306(c)(10)(B) contains a similar student exception. Thus, the student FICA exception applies to services only if both the "SCU status" and "student status" requirements are met. This regulation deals with both the SCU status and student status requirements.

To satisfy the SCU status requirement, the employer for whom the employee performs services (the common law employer) must be either a SCU or a related section 509(a)(3) organization. If a student is not employed by a SCU or a related section 509(a)(3) organization, then the student FICA exception is not available. See e.g., *8605 Rev. Rul. 69-519 (1969-2 C.B. 185) (holding that students attending an apprenticeship school established pursuant to an agreement between a union and a contractors' association were employees of the participating contractors to whom the students were assigned.) Section 31.3121(b)(10)-2(d) of the Employment Tax Regulations provides that the term "SCU" for purposes of the student FICA exception is to be construed in its "commonly or generally accepted sense."

To satisfy the student status requirement, the employee must meet three requirements. First, under section 3121(b)(10), the employee must be a student enrolled and regularly attending classes at the SCU employing the student. Second, the employee must be pursuing a course of study at the SCU employing the student. Third, the employee must be "[a]n employee who performs services in the employ of a [SCU] as an incident to and for the purpose of pursuing a course of study at such [SCU]. * * *" Reg. § 31.3121(b)(10)-2(c). The IRS's position has been that whether services are incident to and for the purpose of pursuing a course of study depends on two factors: the employee's course workload and the nature of the employee's employment relationship with the employer. See e.g., Rev. Proc. 98-16 (1998-1 C.B. 403); Rev. Rul. 78-17 (1978-1 C.B. 306).

B. Need for Regulations

Treasury and IRS have determined that it is necessary to provide additional clarification of the terms "SCU" and "student who is enrolled and regularly attending classes" as they are used in section 3121(b)(10). In recent years the question has arisen whether the performance of certain services that are in the nature of on the job training are excepted from employment under the student FICA exception. This issue was presented with respect to medical residents and interns in State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998), which concluded that services performed by medical residents and interns are not employment for social security purposes. The question also applies to services performed by employees in other fields, particularly regulated fields, where on the job training is often required to gain licensure. Guidance is needed to address situations where the performance of services and pursuit of that course of study are not separate and distinct activities, but instead are to some extent intermingled.

Section 3121(a) defines "wages" as "all remuneration for employment. * * *" Under section 3121(b), "employment" means "any service * * * performed * * * by an employee for the person employing him." The Social Security Act provides nearly identical definitions of "wages" and "employment." 42 U.S.C. sections 409(a)(1)(I); 410(a). "The very words 'any service * * * performed * * * for his employer,' with the purpose of the Social Security Act in mind, import a breadth of coverage." Social Security Board v. Nierotko, 327 U.S. 358, 365 (1946). The courts have generally found that the terms "wages" and "employment" as used in both the social security benefits and FICA tax provisions are to be interpreted broadly. State of New Mexico v. Weinberger, 517 F.2d 989, 993 (10th Cir. 1995); Mayberry v. United States, 151 F.3d 855, 860 (8th Cir. 1998); Moorhead v. United States, 774 F.2d 936, 941 (9th Cir. 1985); Abrahamsen v. United States, 228 F.3d 1360, 1364 (Fed. Cir. 2000). The broad interpretation of these terms results from the underlying purpose of the Social Security Act, namely, "to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor." Nierotko, 327 U.S. at 364. See also St. Luke's Hospital v. United States, 333 F.2d 157, 164 (6th Cir. 1964) ("[I]n dealing with the

beneficent purposes of the Social Security Act, this court generally favors that interpretation of statutory provisions which calls for coverage rather than exclusion.").

Wage and employment questions affect both social security benefits entitlement and FICA taxes which fund the social security trust fund. Except in unusual circumstances, the Social Security Act, and the Internal Revenue FICA provisions, are to be read in pari materia. United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 213 (2001). Thus, whether certain service is employment affects not just FICA taxation, but also social security benefits eligibility and level of benefits. Moreover, the integrity of the social security system requires symmetry between service that is considered employment for social security benefits purposes and employment for FICA taxation purposes. Resolution of this issue has significant social security benefits and FICA tax implications. The case of medical residents illustrates the possible effect on individuals and the social security system as a whole of excepting service in the nature of on the job training from employment for social security benefits and FICA tax purposes. The Social Security Administration (SSA) reported to the General Accounting Office (GAO) that "[b]ecause many residents are married and have children and work as residents for up to 8 years, an exemption from Social Security coverage could have a very significant effect on their potential disability benefits or their family's survivor benefits." Moreover, SSA reported that if medical residents were determined to be students for purposes of the student FICA exception, 270,000 medical residents would lose some coverage over the next ten years (2001 through 2010). [FN1]

FN1 GAO Report B-284947, Health, Education, and Human Services Division, Social Security: Coverage For Medical Residents (August 31, 2000).

This regulation addresses two issues: (1) Whether an organization carrying on educational activities in connection with the performance of services is a SCU within the meaning of section 3121(b)(10), and (2) whether certain employees performing services in the nature of on the job training have the status of a student who is enrolled and regularly attending classes for purposes of section 3121(b)(10).

C. Whether an Organization Carrying on Educational Activities Is a SCU

Organizations providing on the job training typically carry on both noneducational and educational activities. The issue is whether organizations carrying on both noneducational and educational activities are SCUs within the meaning of section 3121(b)(10). For example, organizations such as hospitals typically carry on both educational and noneducational activities. In United States v. Mayo Foundation, 282 F. Supp. 2d 997 (D. Minn. 2003), the United States argued, consistent with the position it has maintained administratively, that the primary purpose of an organization determines whether the organization is a SCU for purposes of the student FICA exception. The court rejected this argument, finding it inconsistent with the common sense standard. The court stated, "If the [IRS] had intended the term 'SCU' in § 3121(b)(10) to have the same scope and meaning as 'educational institution' (found in § 170(b)(1)(A)(ii) * * * ), it could have clearly and explicitly given the phrase such scope and meaning by cross-referencing those Code provisions and their implementing regulations." Although Treasury and IRS disagree with the interpretation of the district court, the Secretary understands and is responding to the court's view by more clearly incorporating the primary purpose standard in regulations. *8606

This regulation provides that the character of an organization as a SCU or not as a SCU is determined by its primary function. The primary function standard is consistent with the language of section 3121(b)(10) and the existing regulations thereunder, and is consistent with the intended scope of the student FICA exception as reflected in the legislative history accompanying the Social Security Amendments of 1939 and 1950.

Section 170(b)(1)(A) of the Code defines various classes of organizations for charitable deduction purposes. All of the organizations have some combination of charitable, educational, religious and/or cultural purposes. The definitions distinguish them into categories based on various criteria. One such class defined in section 170(b)(1)(A)(ii) is for any "educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on."

Section 1.170A-9(b)(1) of the Income Tax Regulations provides:

An educational organization is described in section 170(b)(1)(A)(ii) if its primary function is the presentation of formal instruction and it normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its

educational activities are regularly carried on. The term includes institutions such as primary, secondary, preparatory, or high schools, and colleges and universities. It includes Federal, State, and other public-supported schools which otherwise come within the definition. It does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities. A recognized university which incidentally operates a museum or sponsors concerts is an educational organization within the meaning of section 170(b)(1)(A)(ii). However, the operation of a school by a museum does not necessarily qualify the museum as an educational organization within the meaning of this subparagraph.

Thus, in order to qualify as an educational organization under section 170(b)(1)(A)(ii), it is not enough that the organization carries on educational activities; instead, the organization's primary function must be to carry on educational activities.

The section 170(b)(1)(A)(ii) standard applies to the organization as a whole, an approach that is consistent with § 31.3121(b)(10)-2(b) of the regulations, which provides that one of "[t]he statutory tests [is] the character of the organization in the employ of which the services are performed as a [SCU] * * *. " Thus, the character of the organization determines whether it is a SCU, not merely whether the organization carries on some educational activities. Further, section 3121(b) provides that "the term 'employment' means any service * * * performed * * * by an employee for the person employing him," and § 31.3121(d)-2 of the regulations provides that "every person is an employer if he employs one or more employees." Under section 7701(a)(1), the term "person" means any individual, trust, estate, association, or corporation. Thus, the character of the person employing the employee--the legal entity recognized for federal tax purposes--determines whether the SCU status requirement is met, not merely the character of a division or function of the employer.

In addition, the primary function standard reaches a result consistent with the "commonly or generally accepted sense" standard of the existing regulation (§ 31.3121(b)(10)-2(d)). In common parlance, the term "hospital" is used to describe an organization with the primary function of caring for patients. The term "museum" is used to describe an organization with the primary function of maintaining a collection and displaying it to the public in a way that will educate them about the collection and related concepts. A hospital or a museum may conduct educational activities, even classes or possibly even certificate or degree programs, but the activities which define them in the public mind are patient care and maintenance and display of a collection. An organization bears the label "school" when its primary function is the conduct of classes for an identified set of students leading to the awarding of a credential demonstrating mastery of some subject matter.

Finally, defining the term "SCU" to include institutions whose primary function is other than to carry on educational activities could lead to expansion of the student FICA exception beyond what Congress intended. When Congress enacted the student FICA exception in 1939, and amended it in 1950, it contemplated that the exception would be limited in scope. The House Report to the Social Security Amendments of 1939 states the following in describing the purpose of the student FICA and other exceptions:

In order to eliminate the nuisance of inconsequential tax payments the bill excludes certain services performed for fraternal benefit societies and other nonprofit institutions exempt from income tax, and certain other groups. While the earnings of a substantial number of persons are excluded by this recommendation, the total amount of earnings involved is undoubtedly very small * * *. The intent of this amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of tax is inconsequential and a nuisance. The benefit rights built up are also inconsequential. Many of those affected, such as students and the secretaries of lodges, will have other employment which will enable them to develop insurance benefits. This amendment, therefore, should simplify the administration for the worker, the employer, and the Government.

H.R. Rep. No. 728, 76th Cong. 1st Sess. (1939), 1939-2 C.B. 538, 543. The Senate Report uses similar language. S. Rep. No. 734, 76th Cong. 1st Sess. 19 (1939), 1939-2 C.B. 565, 570.

The House Report to the Social Security Amendments of 1950 continued to describe the exception as a matter of administrative convenience not meaningfully affecting social security benefits:

The bill would continue to exclude service performed for nominal amounts in the employ of tax-exempt nonprofit organizations, [FN2] service performed by student nurses and internes [sic], [FN3] and service performed by students in the employ of colleges and universities. These exclusions simplify administration without depriving any significant number of people of needed protection.

FN2 The general exception from employment for services performed for non-profit organizations was repealed in 1983 by Public Law 98-21, section 102(b).

FN3 The Social Security Amendments of 1965 repealed the student intern exception under §
3121(b)(13). See discussion infra.
H.R. Rep. No. 1300, 81st Cong. 1st Sess. 12 (1949). The Senate Report contains similar language. S.
Rep. No. 1669, 81st Cong. 2d Sess. 15 (1950). Defining "SCU" to include organizations whose
primary purpose is not to carry on educational activities would create a broad exception contrary to
what Congress intended. Accordingly, the term "SCU" should not be interpreted so broadly as to
include organizations whose primary function is other than to carry on educational activities.

D. Whether Certain Employees Are Students

This regulation clarifies who is a student enrolled and regularly attending classes for purposes of
section 3121(b)(10). The existing regulations at § 31.3121(b)(10)-2(c) provide that an employee will
have the status of student only if the services are performed "as an incident to and for the purpose of
pursuing a course of study" at the SCU. **8607** Thus, to qualify for the exception, the individual's
predominant relationship with the SCU must be as a student, and only secondarily or incidentally as
an employee.
Where an individual's employment and educational activities are separate and distinct, the extent and
nature of the respective activities determine whether the employment or student aspect of the
relationship with the SCU is predominant. See _Rev. Proc. 98-16_. In the vast majority of cases the
service and the course of study are separate and distinct activities; for example, the biology major's
service in the cafeteria is unrelated to his course of study. By contrast, some employees' services are
arguably part of a course of study; for example, the services of a medical resident are necessary to
receive a certificate in a medical specialty. The _standards in Rev. Proc. 98-16_--whether the employee
has at least a half-time course workload, and whether the employee is eligible to receive certain
employee benefits--are inadequate to determine student status in such circumstances. Where the
services performed by the individual for the SCU are also earning the individual credit toward an
educational credential, the determination of whether the employment relationship is the predominant
relationship with the SCU must be based on other factors. This regulation is intended to provide
standards to determine student status in such cases.
This regulation is intended to further Congress's intent regarding those eligible for the student FICA
exception as reflected by the legislative history to the Social Security Amendments of 1939.
Consistent with Congress's intent, the student FICA exception covers individuals earning small
amounts who are expected to accumulate social security benefits through future employment that will
follow the completion of their education. Thus, in the typical case, a student will earn a modest
amount while devoting his primary time and attention to classes and study.
This regulation provides clarification in three respects. First, it describes what the individual must be
doing to be considered enrolled and regularly attending classes. In order to be a class, the activity
must be more than an activity that gives the individual an opportunity to acquire new skills and
knowledge. It must involve instructional activities, and be led by a knowledgeable faculty member
following an established curriculum for identified students. Classes can include much more than
traditional classroom-based instruction, but the faculty leadership, the set curriculum, and the
prescribed time frame are essential.
Second, this regulation provides standards for determining whether an employee is pursuing a course
of study. The regulation provides that one or more courses conducted by a SCU the completion of
which fulfills the requirements to receive an educational credential granted by the SCU is a course of
study.
Third, this regulation provides standards for determining whether an employee's services are incident
to and for the purpose of pursuing a course of study. The regulation provides in general that whether
the employee's services are incident to and for the purpose of pursuing a course of study depends on
all the facts and circumstances. This determination is made by comparing the educational aspect of
the relationship between the employer and the employee with the service aspect of the relationship.
The regulation provides that the employee's course workload is used to measure the scope of the
educational aspect of the relationship. A relevant factor is the employee's course workload relative to
a full-time course workload. The regulation further provides that where an employee has the status of
a career employee, the services performed by the employee are not incident to and for the purpose
of pursuing a course of study.
This regulation specifies various aspects of an individual's employment relationship with the SCU
which cause conclusively the individual to have the status of a "career employee."

This regulation provides that the criteria used to identify an employee as having the status of a career employee are (1) the employee's hours worked, (2) whether the employee is a "professional employee," (3) the employee's terms of employment, and (4) whether the employee is required to be licensed in the field in which the employee is performing services. The hours worked criteria reflects Congressional intent to limit the student FICA exception to services performed by those individuals who are predominantly students. Employees who are working enough hours to be considered full-time employees (40 hours or more per week) have filled the conventional measure of available time with work, and not study. Even if they are capable of balancing a full-time job with a heavy course load, they are earning wages at a level that exceeds Congress's intended scope for the student FICA exception. The IRS's long-standing position is that hours worked is a relevant factor in determining whether an employee has student status. Rev. Rul. 78-17 (1978-1 C.B. 306) (holding that whether an employee has student status is determined by hours worked relative to credits taken); Rev. Rul. 66-285 (1966-2 C.B. 455) (holding that services of an employee employed full-time are not incident to and for the purpose of pursuing a course of study). Rev. Rul. 85-74 (1985-1 C.B. 331), dealing with the student nurse exception, uses an hours worked standard. The student nurse exception and the student FICA exception share the same legislative history. The IRS's use of an hours worked standard was found to be a reasonable interpretation of the legislative history in Johnson City Medical Center v. United States, 999 F.2d 973 (6th Cir. 1993).

The regulation provides that a "professional employee" has the status of a career employee, and thus his services are not incident to a course of study. The standards defining a professional employee for purposes of this regulation closely follow existing Department of Labor standards defining certain professional employees. See 29 U.S.C. 213(a); and 29 CFR 541.3(a)(1), (b), (c), (d). Section 213(a) and the regulations thereunder provide that certain employees are exempt from the minimum wage and overtime laws. This regulation provides that a professional employee for purposes of the student FICA exception is an employee whose primary duty consists of the performance of services requiring knowledge of an advanced type in a field of science or learning, whose work requires the consistent exercise of discretion and judgment in its performance, and whose work is predominantly intellectual and varied in character. The services of employees exhibiting these characteristics are not incident to a course of study.

This regulation provides that an employee's terms of employment may also cause an employee to have the status of a career employee. A list of terms is provided, any one of which causes the employee to have the status of a career employee. On the list are terms of employment that provide for eligibility to receive certain employee benefits typically associated with career employment, such as eligibility to participate in certain types of retirement plans or tuition reduction arrangements. The notion of a career employee standard based on eligibility to receive certain fringe benefits was recommended by the higher education community for purposes of guidance that was issued in Rev. Proc. 98-16, and Treasury and IRS believe it is an appropriate standard to use for purposes **8608* of identifying employees whose services are not incident to and for the purpose of pursuing a course of study. Rev. Proc. 98-16 provides that career employee status precludes application of the safe harbor standard, but leaves the possibility that the employee could have the status of a student based on all the facts and circumstances. In contrast, this regulation provides that an employee considered as having the status of a career employee based on eligibility to receive certain employee benefits does not have the status of a student for purposes of the student FICA exception.

Finally, this regulation provides that an employee who must be licensed by a government entity in order to perform a certain function has the status of a career employee. An employee who is required to be licensed to perform the services must have received sufficient prior instruction and demonstrated sufficient mastery of the activity to receive the license. Furthermore, licensed workers typically earn more than a modest amount for their work to reflect their expertise. As discussed, the legislative history indicates that the student FICA exception is intended to cover individuals earning a small amount of wages prior to entry into meaningful post-education employment. The exception is not intended to cover an individual who has developed enough expertise to be working in a field where he or she is already licensed and has the capacity to earn substantial wages.

The IRS requests comments on the criteria used to identify an employee as having the status of a career employee. In particular, the IRS requests comments on the licensure criterion and whether this criterion should be further refined or clarified.

IRS and Treasury believe that Congress has shown the specific intent to provide social security coverage to individuals who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees, particularly medical residents and interns. The Social Security Amendments of 1939 added section 1426(b)(13) to the Code (later

redesignated section 3121(b)(13)), which provided an exception from social security coverage for "service performed as an intern in the employ of a hospital by an individual who has completed a 4 year course in a medical school chartered or approved pursuant to State law." The House Report accompanying the legislation provides:

Paragraph 13 excepts service performed as a student nurse in the employ of a hospital or a nurse's training school by an individual who is enrolled and is regularly attending classes * * *; and service performed as an interne [sic] (as distinguished from a resident doctor) in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law.

H.R. Rep. No. 728, 76th Cong. 1st Sess. 49 (1939), 1939-2 C.B. 538, 550-51 (emphasis added); see also S. Rep. No. 734, 76th Cong. 1st Sess. 58, 1939-2 C.B. 565, 578. Thus, the services of medical interns were excepted from FICA, but the services of resident doctors were not.

Twenty-five years later, in St. Luke's Hospital v. United States, 333 F.2d 157 (6th Cir. 1964), the Sixth Circuit confirmed that section 3121(b)(13) of the Code applied to medical interns, but that medical residents were not specifically excepted from social security coverage. St. Luke's claimed a refund of FICA taxes for the years 1953 through 1958 based on the student intern exception under section 3121(b)(13). The refund claims were computed based upon the remuneration paid to medical school graduates in their second or subsequent year of clinical training. The court held that the services of medical residents were not excluded under the medical intern exception.

In 1965, one year after the St. Luke's decision, Congress amended the Code to repeal the special exemption for medical interns. The legislative history underlying the Social Security Amendments of 1965 (Public Law 89-97) suggests that Congress intended that medical interns be covered by FICA just as medical residents already were. The House Report states:

Coverage would also be extended to services performed by medical and dental interns. The coverage of services as an intern would give young doctors an earlier start in building up social security protection and would help many of them to become insured under the program at the time when they need the family survivor and disability protection it provides. This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families. Interns would be covered on the same basis as other employees working for the same employers, beginning on January 1, 1966.

H.R. Rep. No. 213, 89th Cong. 1st Sess. 95 (1965).

The Senate Report states:

Section 3121(b)(13) of the Internal Revenue Code of 1954 excludes from the term "employment," and thus from coverage under the [FICA], services performed as an intern in the employ of a hospital by an individual who has completed a 4-year course in a medical school . . . . Section 311(b)(5) of the bill amends section 3121(b)(13) so as to remove this exclusion. The effect of this amendment is to extend coverage under the [FICA] to such interns unless their services are excluded under provisions other than section 3121(b)(13). Thus, the services of an intern are covered if he is employed by a hospital which is not exempt from income tax as an organization described in section 501(c)(3) of the Code.

S. Rep. No. 404, 89th Cong. 1st Sess. 237-38 (1965). The last sentence makes indirect reference to the exclusion from FICA for services performed for exempt organizations under section 3121(b)(8)(B) of the 1954 Code. That exclusion was repealed by the Social Security Amendments of 1983 ( Public Law 98-21). Nothing in the legislative history indicates that Congress believed interns (or residents, who were even further along in their medical careers than interns) were eligible for the student FICA exception.

In addition to revoking the medical intern exception, section 311 of the Social Security Amendments of 1965, entitled, "Coverage for Doctors of Medicine," changed the law in two other ways affecting medical doctors. First, section 1402(c)(5) of the 1954 Code was amended to eliminate the exception for physician services from the definition of "trade or business," thus subjecting these services to self-employment tax. Second, section 3121(b)(6)(C)(iv) of the 1954 Code, which provided an exception from the definition of employment for "service performed by any individual as an employee included under § 5351(2) of title 5, [U.S.C.], (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government)," was amended by adding, "other than as a medical or dental intern or a medical or dental res dent in training." These provisions, taken together, indicate Congress's intent to create a scheme under which all medical doctors are covered under the soc a security system, whether or not they are stil in training, whether or not they are self-employed, or whether or not

they work for the federal government.

E. Effect on Rev. Proc. 98-16

Several years ago, representatives of higher education asked the IRS and Treasury for guidance on the application of the student FICA exception. Colleges and universities were particularly interested in guidance relating to students who had on-campus jobs that were completely separate and  *8609 distinct from their course work. In response, the  IRS issued Rev. Proc. 98-16, which sets forth standards for determining whether services performed by students in the employ of certain institutions of higher education qualify for the exception from FICA tax provided under section 3121(b)(10). The revenue procedure provided answers to many longstanding questions.
The revenue procedure addresses different circumstances than those prompting the need for the clarifications provided in this proposed regulation. It provides a safe harbor that applies where the student's course work and the student's employment are separate activities, and are not intermingled. In clarifying the regulations interpreting section 3121(b)(10), the IRS and Treasury fully intend to retain the safe harbor in the revenue procedure. However, several discrete aspects of the safe harbor need to be updated to align with the proposed regulations. Thus, in conjunction with this notice of proposed rulemaking, the IRS is suspending  Rev. Proc. 98-16 and proposing to replace it with a new revenue procedure that is revised in limited ways to align with the proposed regulations. See Notice 2004-12, to be published in I.R.B. 2004-10 (March 8, 2004). Taxpayers may rely on the proposed revenue procedure until final regulations and a final revenue procedure are issued. Also, the public is invited to comment on the proposed revenue procedure.

F. Related Proposed Amendments

Section 3306(c)(10)(B) of the Code excepts from "employment" for FUTA tax purposes services performed by a student who is enrolled and regularly attending classes at a SCU. This regulation provides that the standards that apply in determining whether an employer is a SCU and whether an employee is a student for purposes of section 3121(b)(10) also apply for purposes of section 3306(c)(10)(B). In addition, this regulation provides that the standards that apply for purposes of determining whether an employer is a SCU for purposes of section 3121(b)(10) also apply for purposes of section 3121(b)(2) (excluding from employment for FICA purposes domestic services performed for local college clubs, fraternities, and sororities by students who are enrolled and regularly attending classes).

G. Proposed Effective Date

It is proposed that these regulations apply to services performed on or after February 25, 2004.

Special Analyses

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations. In addition, because no collection of information is imposed on small entities, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply, and, therefore, a Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on the impact on small business.

Comments and Public Hearing

Before these proposed regulations are adopted as final regulations, consideration will be given to any written or electronic comments that are submitted timely to the IRS. The IRS and Treasury Department request comments on all aspects of the proposed regulations and how they can be made easier to understand. All comments will be available for public inspection and copying.
A public hearing is scheduled for June 16, 2004, beginning at 10 a.m. in room 2615 of the Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. All visitors must present photo

identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 30 minutes before the hearing starts. For information about having your name placed on the building access list to attend the hearing, see the FOR FURTHER INFORMATION CONTACT section of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments at the hearing must submit electronic or written comments by May 25, 2004 and submit an outline of the topics to be discussed and the time to be devoted to each topic (signed original and eight (8) copies). A period of 10 minutes will be allotted to each person for making comments. An agenda showing the scheduling of the speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

Drafting Information

The principal author of these proposed regulations is John Richards of the Office of Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities). However, other personnel from the IRS and Treasury Department participated in their development.

List of Subjects in 26 CFR Part 31

Employment taxes, Income taxes, Penalties, Reporting and recordkeeping requirements.

Proposed Amendment to the Regulations

Accordingly, 26 CFR part 31 is proposed to be amended as follows:

PART 31--EMPLOYMENT TAXES

Paragraph 1. The authority citation for part 31 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

Par. 2. In § 31.3121(b)(2)-1, paragraph (d) is revised to read as follows:

§ 31.3121(b)(2)-1 Domestic service performed by students for certain college organizations.

* * * * *
(d) A school, college, or university is described in section 3121(b)(2) if its primary function is the presentation of formal instruction, it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.
* * * * *
Par. 3. Section 31.3121(b)(10)-2 is amended by: adding a heading for paragraphs (a) and (b), revising paragraphs (c) and (d), redesignating paragraph (e) as paragraph (g), and adding paragraphs (e) and (f).
The revisions and additions read as follows:

§ 31.3121(b)(10)-2 Services performed by certain students in the employ of a school, college, or university, or of a nonprofit organization auxiliary to a school, college, or university.

(a) General rule. (1) * * *
(b) Statutory tests. * * *
(c) School, College, or University. A school, college, or university is described in section 3121(b)(10) if its primary function is the presentation of formal instruction, it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in *8610 attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.
(d) Student Status--general rule. Whether an employee has the status of a student performing the services shall be determined based on the relationship of the employee with the organization for which the services are performed. In order to have the status of a student, the employee must

perform services in the employ of a school, college, or university described in paragraph (c) of this section at which the employee is enrolled and regularly attending classes in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study within the meaning of paragraph (d)(3) of this section at such school, college, or university. An employee who performs services in the employ of an affiliated organization described in paragraph (a)(2) of this section must be enrolled and regularly attending classes at the affiliated school, college, or university within the meaning of paragraph (c) of this section in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study within the meaning of paragraph (d)(3) of this section at such school, college, or university.

(1) Enrolled and regularly attending classes. An employee must be enrolled and regularly attending classes at a school, college, or university within the meaning of paragraph (c) of this section at which the employee is employed to have the status of a student within the meaning of section 3121(b)(10). An employee is enrolled within the meaning of section 3121(b)(10) if the employee is registered for a course or courses creditable toward an educational credential described in paragraph (d)(2) of this section. In addition, the employee must be regularly attending classes to have the status of a student. For purposes of this paragraph (d)(1), a class is an instructional activity led by a knowledgeable faculty member for identified students following an established curriculum. Traditional classroom activities are not the sole means of satisfying this requirement. For example, research activities under the supervision of a faculty advisor necessary to complete the requirements for a Ph.D. degree may constitute classes within the meaning of section 3121(b)(10). The frequency of events such as these determines whether the employee may be considered to be regularly attending classes.

(2) Course of study. An employee must be pursuing a course of study in order to have the status of a student. A course of study is one or more courses the completion of which fulfills the requirements necessary to receive an educational credential granted by a school, college, or university within the meaning of paragraph (c) of this section. For purposes of this paragraph, an educational credential is a degree, certificate, or other recognized educational credential granted by an organization described in paragraph (c) of this section. In addition, a course of study is one or more courses at a school, college or university within the meaning of paragraph (c) of this section the completion of which fulfills the requirements necessary for the employee to sit for an examination required to receive certification by a recognized organization in a field.

(3) Incident to and for the purpose of pursuing a course of study. An employee's services must be incident to and for the purpose of pursuing a course of study in order for the employee to have the status of a student. Whether an employee's services are incident to and for the purpose of pursuing a course of study shall be determined on the basis of the relationship of such employee with the organization for which such services are performed. The educational aspect of the relationship, as compared to the service aspect of the relationship, must be predominant in order for the employee's services to be incident to and for the purpose of pursuing a course of study. The educational aspect of the relationship between the employer and the employee is established by the employee's course workload. The service aspect of relationship is established by the facts and circumstances related to the employee's employment. In the case of an employee with the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section, the service aspect of the relationship with the employer is predominant. Standards applicable in determining whether an employee's services are considered to be incident to and for the purpose of pursuing a course of study are provided in paragraphs (d)(3)(i) and (ii) of this section.

(i) Course workload. The educational aspect of an employee's relationship with the employer is evaluated based on the employee's course workload. Whether an employee's course workload is sufficient in order for the employee's employment to be incident to and for the purpose of pursuing a course of study generally depends on the particular facts and circumstances. A relevant factor in evaluating an employee's course workload is the employee's course workload relative to a full-time course workload at the school, college or university within the meaning of paragraph (c) of this section at which the employee is enrolled and regularly attending classes.

(ii) Career employee status. Services of an employee with the status of a career employee are not incident to and for the purpose of pursuing a course of study. An employee has the status of a career employee if the employee is described in paragraph (d)(3)(ii)(A), (B), (C) or (D) of this section.

(A) Hours worked. An employee has the status of a career employee if the employee regularly performs services 40 hours or more per week.

(B) Professional employee. An employee has the status of a career employee if the employee is a professional employee. A professional employee is an employee--

(1) Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education, from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

(2) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(3) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) Terms of employment. An employee with the status of a career employee includes any employee who is--

(1) Eligible to receive vacation, sick leave, or paid holiday benefits;

(2) Eligible to participate in any retirement plan described in section 401(a) that is established or maintained by the employer, or would be eligible to participate if age and service requirements were met;

(3) Eligible to participate in an arrangement described in section 403(b), or would be eligible to participate if age and service requirements were met;

(4) Eligible to participate in a plan described in section 457(a), or **8611** would be eligible to participate if age and service requirements were met;

(5) Eligible for reduced tuition (other than qualified tuition reduction under section 117(d)(5) provided to a teaching or research assistant who is a graduate student) because of the individual's employment relationship with the institution;

(6) Eligible to receive employee benefits described under sections 79 (life insurance), 127 (qualified educational assistance), 129 (dependent care assistance programs), or 137 (adoption assistance); or

7) Classified by the employer as a career employee.

(D) Licensure status. An employee is a career employee if the employee is required to be licensed under state or local law to work in the field in which the employee performs services.

(e) Examples. The following examples illustrate the principles of paragraphs (c) and (d) of this section:

Example 1. (i) Employee C is employed by State University T to provide services as a clerk in T's administrative offices, and is enrolled and regularly attending classes at T in pursuit of a B.S. degree in biology. C has a course workload which constitutes a full-time course workload at T. C performs services on average 20 hours per week, but from time to time works 40 hours or more during a week. C receives only hourly wages and no other pay or benefits. C is not required under state or local law to be licensed to perform the services for T.

(ii) In this example, C is employed by T, a school, college, or university within the meaning of paragraph (c) of this section. C is enrolled and regularly attending classes at T in pursuit of a course of study. C's hours worked do not cause C to have the status of a career employee, even though C may occasionally work 40 hours or more during a week. C's part-time employment relative to C's full-time course workload indicates that C's services are incident to and for the purpose of pursuing a course of study. C is not a professional employee, and C's terms of employment and licensure status do not cause C to have the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, C has the status of a student. Accordingly, C's services are excepted from employment under section 3121(b)(10).

Example 2. (i) Employee D is employed in the accounting department of University U, and is enrolled and regularly attending classes at U in pursuit of an M.B.A. degree. D has a course workload which constitutes a half-time course workload at U. D's work does not require the consistent exercise of discretion and judgment, and is not predominantly intellectual and varied in character. D regularly performs services full-time (40 hours per week), and is eligible to participate in a retirement plan described in section 401(a) maintained by U.

(ii) In this example, D is employed by U, a school, college, or university within the meaning of paragraph (c) of this section. In addition, D is enrolled and regularly attending classes at U in pursuit of a course of study. However, D has the status of a career employee because D regularly works 40 hours per week, and is eligible to participate in U's section 401(a) retirement plan. Because D has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section, D's services are not incident to and for the purpose of pursuing a course of study. Accordingly, D's services are not excepted from employment under section 3121(b)(10).

Example 3. (i) Employee E is employed by University V to provide patient care services at a teaching hospital that is an unincorporated division of V. These services are performed as part of a medical residency program in a medical specialty sponsored by V. The residency program in which E participates is accredited by the Accreditation Council for Graduate Medical Education. Upon completion of the program, E will receive a certificate of completion, and be eligible to sit for an examination required to be certified by a recognized organization in the medical specialty. E regularly performs services more than 40 hours per week. E's patient care services require knowledge of an advanced type in the field of medicine, and are predominantly intellectual and varied in character. Further, although E is subject to supervision, E's services require the consistent exercise of discretion and judgment regarding the treatment of patients. In addition, E receives vacation, sick leave, and paid holiday benefits; and salary deferral benefits under an arrangement described in section 403(b). E is a first-year resident, and thus is not eligible to be licensed to practice medicine under the laws of the state in which E performs services.

(ii) In this example, E is employed by V, a school, college, or university within the meaning of paragraph (c) of this section. However, because of E's hours worked, professional employee status, and employee benefits, E has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, E's services are not incident to and for the purpose of pursuing a course of study. Accordingly, E's services are not excepted from employment under section 3121(b)(10).

Example 4. (i) Employee F is employed in the facilities management department of University W. F has a B.S. degree in engineering, and is completing the work experience required to sit for an examination to become a professional engineer eligible for licensure under state or local law. F is not attending classes at W in pursuit of a course of study leading to an educational credential. F regularly performs services 40 hours or more per week. F receives certain employee benefits including vacation, sick leave, and paid holiday benefits. F also receives retirement benefits under an arrangement described in section 457.

(ii) In this example, F is employed by W, a school, college, or university within the meaning of paragraph (c) of this section. However, F is not enrolled and regularly attending classes at W in pursuit of a course of study. F's work experience is not a course of study for purposes of paragraph (d)(2) of this section. In addition, because of F's hours worked and employment benefits, F has the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, F's services are not incident to and for the purpose of pursuing a course of study. Accordingly, F's services are not excepted from employment under section 3121(b)(10).

Example 5. (i) Employee G is employed by Employer X as an apprentice in a skilled trade. X is a subcontractor providing services in the field in which G wishes to specialize. G is pursuing a certificate in the skilled trade from Community College C. G is performing services for X pursuant to an internship program sponsored by C under which its students gain experience, and receive credit toward a certificate in the trade.

(ii) In this example, G is employed by X. X is not a school, college or university within the meaning of paragraph (c) of this section. Thus, the exception from employment under section 3121(b)(10) is not available with respect to G's services for X.

Example 6. (i) Employee H is employed by a cosmetology school Y at which H is enrolled and regularly attending classes in pursuit of a certificate of completion. Y's primary function is to carry on educational activities to prepare its students to work in the field of cosmetology. Prior to issuing a certificate, Y requires that its students gain experience in cosmetology services by performing services for the general public on Y's premises. H performs services less than 40 hours per week. H's work does not require knowledge of an advanced type in a field of science or learning, nor is it predominantly intellectual and varied in character. H receives remuneration in the form of hourly compensation from Y for providing cosmetology services to clients of Y, and does not receive any other compensation or benefits. H is not required to be a licensed cosmetologist in the state in which H performs services while participating in the training program.

(ii) In this example, H is employed by Y, a school, college or university within the meaning of paragraph (c) of this section, and is enrolled and regularly attending classes at Y in pursuit of a course of study. In addition, because H works less than 40 hours per week, H is not a professional employee, and H's terms of employment, and licensure status do not indicate that H has the status of a career employee, H is not a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, H's services are incident to and for the purpose of pursuing a course of study. Accordingly, H's services are excepted from employment under section 3121(b)(10).

Example 7. (i) Employee J is a teaching assistant at University Z. J is enrolled and regularly attending

classes in pursuit of a graduate degree at Z. J has a course workload which constitutes a full-time course workload at Z. J performs services less than 40 hours per week. J's duties include grading quizzes, providing class and laboratory instruction pursuant to a lesson plan developed by the professor, and preparing laboratory equipment for demonstrations. J *8612 receives no employee benefits. J receives a cash stipend and a qualified tuition reduction within the meaning of section 117(d)(5) for the credits earned for being a teaching assistant. J is not required under state or local law to be licensed to perform the activities of a teaching assistant.

(ii) In this example, J is employed as a teaching assistant by Z, a school, college, or university within the meaning of paragraph (c), and is enrolled and regularly attending classes at Z in pursuit of a course of study. J's full-time course workload relative to J's employment workload indicates that J's services are incident to and for the purpose of pursuing a course of study. J is not a professional employee because J's work does not require the consistent exercise of discretion and judgment in its performance. In addition, J's terms of employment and licensure status do not cause J to have the status of a career employee within the meaning of paragraph (d)(3)(ii) of this section. Thus, J has the status of a student. Accordingly, J services are excepted from employment under section 3121(b)(10).

(f) Effective date. Paragraphs (c), (d) and (e) of this section apply to services performed on or after February 25, 2004.
* * * * *

Par. 4. In § 31.3306(c)(10)-2:
1. Paragraph (c) is revised.
2. Paragraphs (d) and (e) are added.
The revision and addition read as follows:

§ 31.3306(c)(10)-2 Services of student in employ of a school, college, or university.

* * * * *

(c) General rule. (1) For purposes of this section, the tests are the character of the organization in the employ of which the services are performed and the status of the employee as a student enrolled and regularly attending classes at the school, college, or university described in paragraph (c)(2) of this section, in the employ of which he performs the services. The type of services performed by the employee, the place where the services are performed, and the amount of remuneration for services performed by the employee are not material.

(2) School, college, or university. A school, college, or university is described in section 3306(c)(10)(B) if its primary function is the presentation of formal instruction, and it normally maintains a regular faculty and curriculum, and it normally has a regularly enrolled body of students in attendance at the place where its educational activities are regularly carried on. See section 170(b)(1)(A)(ii) and the regulations thereunder.

(d) Student Status--general rule. Whether an employee has the status of a student within the meaning of section 3306(c)(10)(B) performing the services shall be determined based on the relationship of the employee with the organization for which the services are performed. In order to have the status of a student, the employee must perform services in the employ of a school, college, or university described in paragraph (c)(2) of this section at which the employee is enrolled and regularly attending classes in pursuit of a course of study within the meaning of paragraphs (d)(1) and (2) of this section. In addition, the employee's services must be incident to and for the purpose of pursuing a course of study at such school, college, or university within the meaning of paragraph (d)(3) of this section.

(1) Enrolled and regularly attending classes. An employee must be enrolled and regularly attending classes at a school, college, or university within the meaning of paragraph (c)(2) of this section at which the employee is employed to have the status of a student within the meaning of section 3306(c)(10)(B). An employee is enrolled within the meaning of section 3306(c)(10)(B) if the employee is registered for a course or courses creditable toward an educational credential described in paragraph (d)(2) of this section. In addition, the employee must be regularly attending classes to have the status of a student. For purposes of this paragraph (d)(1), a class is a didactic activity in which a faculty member plays a leadership role in furthering the objectives of an established curriculum. Traditional classroom activities are not the sole means of satisfying this requirement. The frequency of events such as these determines whether the employee may be considered to be regularly attending classes.

(2) Course of study. An employee must be pursuing a course of study in order to have the status of a

student within the meaning of section 3306(c)(10)(B). A course of study is one or more courses the completion of which fulfills the requirements necessary to receive an educational credential granted by a school, college, or university within the meaning of paragraph (c)(2) of this section. For purposes of this paragraph, an educational credential is a degree, certificate, or other recognized educational credential granted by an organization described in paragraph (c)(2) of this section. In addition, a course of study is one or more courses at a school, college or university within the meaning of paragraph (c)(2) of this section the completion of which fulfills the requirements necessary for the employee to sit for an examination required to receive certification by a recognized organization in a field.

(3) Incident to and for the purpose of pursuing a course of study. An employee's services must be incident to and for the purpose of pursuing a course of study in order for the employee to have the status of a student within the meaning of section 3306(c)(10)(B). Whether an employee's services are incident to and for the purpose of pursuing a course of study shall be determined on the basis of the relationship of such employee with the organization for which such services are performed. The educational aspect of the relationship, as compared to the service aspect of the relationship, must be predominant in order for the employee's services to be incident to and for the purpose of pursuing a course of study. The educational aspect of the relationship between the employer and the employee is established by the employee's course workload. The service aspect of relationship is established by the facts and circumstances related to the employee's employment. In the case of an employee with the status of a career employee, the service aspect of the relationship with the employer is predominant. Standards applicable in determining whether an employee's services are considered to be incident to and for the purpose of pursuing a course of study are provided in paragraphs (d)(3)(i) and (ii) of this section.

(i) Course workload. The educational aspect of an employee's relationship with the employer is evaluated based on the employee's course workload. Whether an employee's course workload is sufficient for the employee's employment to be incident to and for the purpose of pursuing a course of study generally depends on the particular facts and circumstances. A relevant factor in evaluating the employee's course workload is the employee's course workload relative to a full-time course workload at the school, college or university within the meaning of paragraph (c)(2) of this section at which the employee is enrolled and regularly attending classes.

(ii) Career employee status. Services of an employee with the status of a career employee are not incident to and for the purpose of pursuing a course of study. An employee has the status of a career employee if the employee is described in paragraph (d)(3)(ii)(A), (B), (C), or (D) of this section.

(A) Hours worked. An employee has the status of a career employee if the employee regularly performs services 40 hours or more per week.  **\*8613**

(B) Professional employee. An employee has the status of a career employee if the employee is a professional employee. A professional employee is an employee--

(1) Whose primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education, from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes.

(2) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(3) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(C) Terms of employment. An employee with the status of a career employee includes any employee who is--

(1) Eligible to receive vacation, sick leave, or paid holiday benefits;

(2) Eligible to participate in any retirement plan described in section 401(a) that is established or maintained by the employer, or would be eligible to participate if age and service requirements were met;

(3) Eligible to participate in an arrangement described in section 403(b), or would be eligible to participate if age and service requirements were met;

(4) Eligible to participate in a plan described under section 457(a), or would be eligible to participate if age and service requirements were met;

(5) Eligible for reduced tuition (other than qualified tuition reduction under section 117(d)(5) provided to a teaching or research assistant who is a graduate student) because of the individual's employment relationship with the institution;

(6) Eligible to receive employee benefits described under sections 79 (life insurance), 127 (qualified educational assistance), 129 (dependent care assistance programs), or 137 (adoption assistance); or

(7) Classified by the employer as a career employee.

(D) Licensure status. An employee is a career employee if the employee is required to be licensed under state or local law to work in the field in which the employee performs services.

(e) Effective date. Paragraphs (c) and (d) of this section apply to services performed on or after February 25, 2004.

Mark E. Matthews,

Deputy Commissioner for Service and Enforcement.

[FR Doc. 04-3994 Filed 2-24-04; 8:45 am]

BILLING CODE 4830-01-P

69 FR 8604-01, 2004-1 C.B. 571, 2004-10 I.R.B. 571, 2004 WL 343478 (F.R.)

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.