# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                        Case No.  05-11576-DPW

PARTNERS HEALTHCARE            **ORAL ARGUMENT**
SYSTEM, INC.,                   **REQUESTED**

        Defendant.

_____/

## DEFENDANT PARTNERS HEALTHCARE SYSTEM, INC.'S SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BENJAMIN A. GOLDBERGER (No. 654357)
JOSEPH H. SELBY (No. 643275, *admitted pro hac vice*)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Telephone: (617) 535-4000
Facsimile:  (617) 535-3800
E-Mail: bgoldberger@mwe.com
      jselby@mwe.com

CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*
MARK H. CHURCHILL (No. 652578, *admitted pro hac vice*)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005
Telephone: (202) 756-8000
Facsimile:  (202) 756-8087
E-Mail: ckliefoth@mwe.com
      mchurchill@mwe.com

*Attorneys for Partners Healthcare System, Inc.*

# <u>TABLE OF CONTENTS</u>

**Page**

I.     SUMMARY OF SUR-REPLY ......................................................................... 1

II.    GENUINE TRIABLE ISSUES EXIST IN LIGHT OF PARTNERS' SHOWING
       THAT PARTNERS' STIPENDS ARE NONCOMPENSATORY
       SCHOLARSHIPS OR FELLOWSHIPS FOR FICA PURPOSES.................................. 2

       A.     Partners' Stipends Are in the Nature of a Scholarship or Fellowship ................... 3

       B.     Partners' Stipends Are Not Remuneration for Services and Do Not
              Constitute a *Quid Pro Quo* in Exchange for the Residents' Provision of
              Patient Care ..................................................................................... 5

              1.     Partners Has Presented Sufficient Evidence for the Court to Find
                     That the Resident Stipends Are Not Remuneration for
                     Employment/Services Rendered. ............................................. 6

                     a.     Partners' Amended Response to Plaintiff's  Interrogatory
                            No. 1 ........................................................................ 6

                     b.     Statements of Fact from Partners' SUMF and Partners'
                            Response to Plaintiff's SUMF ....................................... 7

              2.     Plaintiff Overstates the Significance of Statements in Partners'
                     Graduate Trainee Contract and the Response to Request for
                     Admission No. 11 Based on that Contract. ............................... 12

              3.     Plaintiff Misreads the Meaning and Significance of Partners'
                     Admission that Patient Care Is Not Incidental to the Education of
                     the Residents in Issue. ......................................................... 14

III.   CONCLUSION ........................................................................................ 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 2, 14

*Bergersen v. Commissioner*, 109 F.3d 56 (1st Cir. 1997) .............................................. 8

*Bingler v. Johnson*, 394 U.S. 741 (1969) ...................................................................... 4, 5

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945) ............................................ 8

*Gregory v. Helvering*, 293 U.S. 465 (1935) .................................................................. 8

*Johnson City Med. Ctr. v. United States*, 999 F.2d 973 (6th Cir. 1993) ........................ 15

*O'Connor v. Steeves*, 994 F.2d 905 (1st Cir. 1993) ...................................................... 2, 14

*United States v. Mayo Found. for Med. Educ. & Res.*, 282 F. Supp. 2d 997 (D. Minn. 2003) ...................................................................................................................... 16, 17

*United States v. One Parcel of Real Prop.*, 960 F.2d 200 (1st Cir. 1992) ..................... 2

*United States v. Phellis*, 257 U.S. 156 (1921) ............................................................. 8

## Statutes

IRC § 117 ..................................................................................................................... 1, 2, 4, 5

IRC § 117(c) ................................................................................................................. 14

IRC § 3121(a) ............................................................................................................... passim

IRC § 3121(b)(10) ........................................................................................................ 1, 15, 16

IRC § 3121(b)(13) ........................................................................................................ 15

## Regulations

Treas. Reg. § 1.117-3(a) ................................................................................................ 4

Treas. Reg. § 1.117-3(c) ................................................................................................ 4

Treas. Reg. § 1.117-4(c) ................................................................................................ 5

Treas. Reg. § 1.117-4(c)(2) .................................................................................................... 3

Treas. Reg. § 1.117-6(d)(3) .................................................................................................... 14

Treas. Reg. § 31.3121(b)(10)-2(b) ......................................................................................... 15

Treas. Reg. § 31.3121(b)(10)-2(d)(3) ..................................................................................... 16

## Other Authorities

1960-2 C.B. 38 ....................................................................................................................... 2

1971-2 C.B. 95 ....................................................................................................................... 2

1987-1 C.B. 475 ..................................................................................................................... 2

Fed. R. Civ. P. 56(c) .............................................................................................................. 2

IRS Notice 87-31 ............................................................................................................. 2, 14

Local Rule 56.1 ...................................................................................................................... 1

Rev. Rul. 60-378 .................................................................................................................... 2

Rev. Rul. 71-378 .................................................................................................................... 2

# I.    **Summary of Sur-Reply.**

Plaintiff fails in its Reply to prove the absence of genuine issues of material fact raised in Partners' Opposition papers and, therefore, cannot succeed on its Motion for summary judgment. Partners' Opposition presented a rationale of recovery not contemplated by Plaintiff's Motion.[1] Yet, faced with a legal argument it had not briefed and genuine issues of material fact it had not addressed, Plaintiff's Reply only makes piecemeal reference to select portions of Partners' counterstatement of material facts and then presumptively concludes that summary judgment is proper.[2]

But contrary to Plaintiff's conclusions in its Reply, Partners has definitively established genuine triable issues concerning the fact-intensive inquiry under IRC § 3121(a) and to the extent applicable here,[3] under what Plaintiff dubs a "two-pronged test" of IRC § 117 and its accompanying regulations.[4]  Partners has submitted sufficient evidence to at least create a genuine dispute as to whether its stipend payments are in the nature of a scholarship or fellowship.  Likewise, the evidence submitted on brief shows a genuine dispute concerning

---

[1] Plaintiff's counsel received by email one day before filing its Motion Partners' Amended Interrogatory Response No. 1, which detailed Partners' IRC § 3121(a) argument.  That Amended Response No. 1 (attached as Exhibit 1 to the Declaration of Mark H. Churchill ("Churchill Decl."), submitted concurrently herewith) also unequivocally states that Partners had "not come to a conclusion as to whether it also contends that its residents were not subject to the FICA tax under Section 3121(a)(20)."  Plaintiff makes no effort to explain why in making its Motion, Plaintiff disregarded Partners' Amended Response No. 1 and the contention stated therein that resident stipends are noncompensatory scholarships/fellowships and thus are not FICA wages under IRC § 3121(a).

[2] Partners' counterstatement of material facts refers to the showing required under Local Rule 56.1 and in this instance, specifically, refers to Partners' separately filed Response to Plaintiff's Statement of Undisputed Material Facts (which portion is referred to herein as "Response to Plaintiff's SUMF") and Partners' Statement of Additional Undisputed Material Facts (which portion is referred to herein as "Partners' SUMF"), as included with Partners' Opposition on February 24, 2006.

[3] The potential relevance to the remuneration for services inquiry of the *quid pro quo* test under IRC § 117 and its regulation is discussed *infra* at note 7.

[4] As stated *supra*, note 1, for the present sur-reply, Partners relies on the arguments in its Opposition regarding the genuine triable issues created concerning the applicability of the Student Exclusion from "employment" for FICA purposes under IRC § 3121(b)(10).  *See* Opposition at 8-25.

whether Partners' resident stipends were "remuneration for services" (also sometimes referred to herein as "remuneration for employment").  Not only must this Court <u>believe</u> Partners' evidence in defending Plaintiff's Motion, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), but also all reasonable inferences and ambiguities must be drawn in the nonmoving party's favor. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  Certainly, Partners has presented sufficient evidence of material facts such that the factfinder could resolve the treatment under IRC § 3121(a) in Partners' favor.  *See United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992).

Accordingly, this Court should find that Plaintiff's decision to largely ignore Partners' counterstatement of material facts proves fatal to its relief requested.  Genuine issues of triable fact remain, and Plaintiff is not entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

## II.    Genuine Triable Issues Exist In Light of Partners' Showing That Partners' Stipends Are Noncompensatory Scholarships or Fellowships for FICA Purposes.

Plaintiff makes no effort in its Reply to address a critical point raised in Partners' Opposition—that the fact a scholarship is not a "qualified scholarship" for income tax purposes under IRC § 117 has no bearing on whether the scholarship or fellowship is wages for FICA tax purposes.  *See* Opposition at 5.  It is irrelevant whether Partners' stipends are taxable for income tax purposes.  Consequently, this Court's deliberations should be guided by focusing attention on the fact that the IRS has itself recognized that a scholarship can be taxable for income tax purposes but exempt from FICA taxes.  *See id.* (citing Rev. Rul. 60-378, 1960-2 C.B. 38; Rev. Rul. 71-378, 1971-2 C.B. 95; IRS Notice 87-31, 1987-1 C.B. 475).

In view of the foregoing, Partners' stipends are properly defined "as a scholarship or fellowship grant" because "the primary purpose of the studies or research is to further the

education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for [past, present, or future employment services]." Treas. Reg. § 1.117-4(c)(2). Plaintiff refers to this framework as a two-pronged test, *see* Reply at 5, and to the extent this Court applies such test to a determination under IRC § 3121(a), Partners establishes genuine issues of material fact as to both prongs.

### A.     Partners' Stipends Are in the Nature of a Scholarship or Fellowship.

Partners has presented material facts showing the primary purpose of the residency program is training and education of residents in their fulfillment of their medical education requirements. From these facts, which are largely unrebutted by Plaintiff, this Court as factfinder could conclude that the stipend payments are in the nature of a scholarship or fellowship. Therefore, summary judgment is improper as to the first Revised Issue presented in Plaintiff's Reply.

At first, Plaintiff professes to attack whether the stipends are "scholarships" at all. *See* Reply at 6-7. Plaintiff takes no position on whether the stipends could be in the nature of fellowships instead. In the next breath, however, Plaintiff concedes that among the 139 paragraphs in Partners' SUMF opposing Plaintiff's Motion, exist facts that Partners "claims are additional undisputed material facts, to support its position the salary stipends paid to the residents are received as scholarships." *Id.* at 7. Merely referencing a few paragraphs in Partners' Response to Plaintiff's SUMF and summarily dismissing the entirety of Partners' additional material facts in its own SUMF cannot qualify as refuting its contents. Plaintiff had the opportunity to counter Partners' additional material facts that the stipends are in the nature of "scholarships" or "fellowships" but chose not to do so.[5]

---

[5] Partners notes that Plaintiff acknowledges its conscious decision to leave Partners' SUMF as uncontested and

(continued…)

Notwithstanding that failure by Plaintiff, Treas. Reg. § 1.117-3(a) defines a scholarship as "an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies." Similarly, Treas. Reg. § 1.117-3(c), defines a fellowship grant as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Significant evidence has been submitted that Partners' residents qualify as students and/or fellows, and that the stipends are paid for those individuals' benefit and in aid of their studies. *See, e.g.,* Resp. to Pl.'s SUMF ¶¶ 4, 5; Partners' SUMF ¶¶ 2, 4-18, 21-41, 53-65, 78-139; Pl.'s Ex. 7 at 1-2 (listing responsibilities of trainee in section titled "Graduate Trainee Responsibilities"). Accordingly, Partners believes it has made a sufficient evidentiary showing to at least create a genuine triable issue concerning whether Partners' resident stipends are in the nature of a scholarship or fellowship.

Plaintiff's citation to *Bingler v. Johnson*, 394 U.S. 741, 751 (1969), *see* Reply at 6, does not substitute for its obligation to refute additional material facts raised in Partners' SUMF. Moreover, the significance of *Bingler v. Johnson* is limited to its finding that the "ordinary understanding of 'scholarships' and 'fellowships'" refers to "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." 394 U.S. at 751. Partners does not take issue with the Supreme Court ruling or its interpretation of IRC § 117 prior to its being amended in 1986. Rather, Partners refers Plaintiff and this Court to the statements of fact in its Response to Plaintiff's SUMF and Partners' SUMF that match the relatively disinterested, "no-strings," and lack of a substantial *quid pro quo* descriptions. These facts are more fully addressed in Section B immediately below because the question of whether

---

further notes that Plaintiff's reservation of a right to contest Partners' uncontested SUMF after a denial of summary judgment is to no effect. *See* Reply at 4.

there is a "substantial *quid pro quo*" could be dispositive of the remuneration for services inquiry under IRC § 3121(a) and also forms the second prong in Plaintiff's test for determining if the stipends were "received as scholarships or fellowships."

Otherwise, *Bingler* is distinguishable on its facts, most particularly because the Court found a distinct *quid pro quo* circumstance that justified the decision to rule the payments were compensation for services under Treas. Reg. § 1.117-4(c), rather than "scholarships" or "fellowships" excludible from gross income under IRC § 117.  *See Bingler*, 394 U.S. at 755-58. As the Court held, "most importantly, Westinghouse unquestionably extracted a *quid pro quo*. The respondents not only were required to hold positions with Westinghouse throughout the 'work-study' phase of the program, <u>but also were obligated to return to Westinghouse's employ for a substantial period of time after completion of their leave</u>."  *Id.* at 757 (emphasis added). The residency program does not involve this distinguishing feature of an across-the-board expectation or requirement of employment with Partners after the end of the residency program.

### B.    Partners' Stipends Are Not Remuneration for Services and Do Not Constitute a *Quid Pro Quo* in Exchange for the Residents' Provision of Patient Care.

Partners also has presented material facts showing that the stipends were neither given as remuneration for the performance of patient care, as would be significant under IRC § 3121(a), nor offered as a *quid pro quo*.[6]

---

[6] Plaintiff purports to address the question of whether the stipends were remuneration through the *quid pro quo* analysis of IRC § 117 jurisprudence and regulations.  Of course, disproving that the resident stipends were remuneration for patient care services also disproves that there was a substantial *quid pro quo*.  If instead some portion of the resident stipends were intended as remuneration for services, then only a portion of the stipends could be deemed to be a *quid pro quo* for patient care services.  Thus, one inquiry is instructive of the next.

    1.       **Partners Has Presented Sufficient Evidence for the Court to Find That the Resident Stipends Are Not Remuneration for Employment/Services Rendered.**

Plaintiff wrongly argues that Partners overlooks the *quid pro quo* inquiry but for paragraph one of Partners' SUMF. *See* Reply at 7. Partners' SUMF ¶ 1 is merely one of a number of factual statements, all supported by testamentary and/or documentary evidence, that prove the stipends were not remuneration for services and thus refute the existence of a substantial *quid pro quo* between the payment of resident stipends by Partners and the provision of patient care by its stipend recipients.

    a.       **Partners' Amended Response to Plaintiff's Interrogatory No. 1.**

The arguments Plaintiff claims are lacking from Partners' Opposition and SUMF are concisely presented in the very interrogatory response Plaintiff omits from its summary judgment papers and exhibits (discussed *supra* at note 2). Addressing why its stipends are not remuneration for employment, Partners states as follows:

> Partners contends that the amounts paid to the residents . . . were not wages under Section 3121(a). Such payments were not made for services rendered to Partners and were not otherwise remuneration for employment. Instead, <u>the payments were made to residents in their role as trainees in Partners' Graduate Medical Education ("GME") program to help pay for their living expenses while trainees in the program</u>. As with scholarships under Section 117(c), these stipends do not represent an amount received for any services rendered.

Churchill Decl., Ex. 1 (Partners' Am. Interrog. Resp. No. 1) at 3 (emphasis added). Partners continues and further debunks the existence of a *quid pro quo*:

> Partners' payments to the residents were not paid as a *quid pro quo*. The GME training provided increased competency, ability, and experience to residents in various specialized areas of medicine and <u>the stipends were paid to allow the residents to devote their full time and attention to their graduate education training</u>.

Further, <u>Medicare, not Partners, was the primary payer of the funding for the residency program and such funding was based upon the number of residents enrolled in Partners' training program, rather than upon any services provided</u>. The training residents received through Partners' residency program was pursuant to strict GME guidelines and accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). . . . <u>[P]atients were seen by residents and attending staff physicians, but Partners only charged for services performed by the attending staff physicians. Residents were continually supervised by attending staff physicians . . . resulting in duplication, not substitution, of patient care services, so that any benefit received by Partners was incidental to the primary purpose of providing an education to the residents. The stipends to residents were not conditioned upon performance or the number of patients seen. Medicare had no expectation of a return benefit for funding Partners' residency program, and there was no expectation, nor requirement, that the residents would remain at Partners following the completion of their residency programs</u>.

*Id.* at 3-4 (emphasis added).

> **b.    Statements of Fact from Partners' SUMF and Partners' Response to Plaintiff's SUMF.**

Turning to the evidence submitted on brief, the following statements and evidence prove that the stipends were, in fact, made to residents in their role as trainees and intended to allow the residents to devote their full time and attention to their graduate education training, rather than as a *quid pro quo* for participation in "patient care services."

<u>**Response to Pl.'s SUMF ¶¶ 4 and 5; Partners' SUMF ¶¶ 1, 37-41**</u>:  In its Response to Plaintiff's SUMF ¶¶ 4 and 5, Partners cites the Weinstein Decl. ¶¶ 21 and the Thibault Decl. ¶ 11, which show that the residents are not intended to be treated and are not actually treated as salaried employees.[7]  Rather, the stipend's purpose and effect is "to defray living costs while the

---

[7] Plaintiff alleges in its SUMF ¶¶ 4 and 5 that Partners labeled the stipend a "salary," that the "[h]ospital reserves the right to terminate resident at any time for cause," and that "[e]ach resident received a Form W-2, Wage Statement showing his or her stipend as wages." Motion at 2 & n. 4. Plaintiff concludes the ultimate question under IRC § 3121(a) as a result. *See id.* (alleging "[t]here is no dispute that the residents are employees of an organization who receive a salary from that organization based on their PGY"). However, as Partners' counterstatement of facts

(continued…)

residents work towards their goal of completing their medical education and obtaining Board certification."  Thibault ¶ 11.  *See also* Weinstein ¶¶ 21-22 (the stipend is "necessary" and calculated at an amount "adequate to ensure that [residents] are able to fulfill the responsibilities of their education programs").  Those who have the real *quid pro quo* – the practicing physicians – are compensated as employees for that work.

Also wrong is Plaintiff's allegation at page seven of the Reply that the Weinstein and Thibault declarations are Partners' only basis for disputing that the stipends are a "*quid pro quo* for providing patient care services."  For example, the entirety of the "Graduate Trainee Responsibilities," of which Plaintiff only cites "patient care," Pl. Ex. 7 at 1-2, provides evidence of the dominant and overriding purpose behind the payment of the stipend – the training and education of residents in their fulfillment of their medical education requirements.  That list of trainee responsibilities covers more than a page of the contract text, and concludes with the following: "These are <u>conditions</u> for issuance of a certificate of completion of the <u>training program</u>."  *Id.* at 2 (emphasis added).[8]  Plaintiff would have this Court find that the residents are obtaining a certificate in the "patient care program."  Of course, that is not the case.  To the extent Partners requires residents to participate in supervised patient care experiences as a condition of the contract, it is in exchange for receiving training and education, not a stipend.  *See* Resp. to Pl.'s SUMF ¶ 11.

Plaintiff's argument on the narrow issue that "the size of the [stipend], … has nothing to

---

makes clear, terms and labels Partners may employ are not determinative of tax treatment.  Plaintiff would have this Court elevate form over substance, which violates the well-settled rule of tax law that the substance of transactions, not the form, must prevail.  *See United States v. Phellis*, 257 U.S. 156, 168-69 (1921); *Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935); *Bergersen v. Commissioner*, 109 F.3d 56, 60 (1st Cir. 1997) (citing *Commissioner v. Court Holding Co.*, 324 U.S. 331, 333 (1945)).

[8] Among the responsibilities, residents also contract to "participate fully in the education and scholarly activities of the training program as specified by the training program director."  Pl. Ex. 7 at 1.

do with whether the performance of the residents' services were a condition of receiving [it]," Reply at 8, also presumes too much.  First, Plaintiff wrongly assumes that the size of the stipend vis-à-vis practicing physician salaries has no impact on Partners' intent and/or purpose behind providing the stipend payment.  Partners' affiants Weinstein and Thibault say it does and, in fact, that it is indicative of the overriding emphasis on training and education (only part of which occurs through patient contact – the chief concern of practicing physicians).  *See* Weinstein Decl. ¶¶ 22-23; Thibault Decl. ¶ 11.[9]  Second, as discussed *infra*, Plaintiff also has wrongly argued that anything that is "a condition" of the resident stipend under the Graduate Trainee contract (Pl. Ex. 7) satisfies the substantial *quid pro quo* inquiry.

**Response to Pl.'s SUMF ¶ 7**:  Also concerning whether the resident stipend is compensation or remuneration for services, Partners' Response to Plaintiff's SUMF ¶ 7 refutes Plaintiff's contention that either MGH or BWH provides a "compensation package" or "employee benefits" to Partners' residents.  Resp. to Pl.'s SUMF ¶ 7 at 4.  Partners adds that it does not provide a "compensation package," as Plaintiff alleges; rather, "Partners provides a stipend and certain trainee benefits to its residents."  *Id.*  In support, Partners cites to the "House Officer Manual," which is publicly available via the internet.  *See* http://www.partners.org/ research/gme/houseofficermanuals/directory.html.

Plaintiff takes issue with Partners' Response to SUMF ¶ 7, and cites back to Partners the stated terms of the Graduate Trainee contract.  *See* Pl. Ex. 7.  Plaintiff is correct that the Graduate Trainee contract provides for "compensation and benefits."  *Id.* at 2.  However, as Plaintiff also states, *see* Reply at 3, the labels used are simply not relevant.  In substance, the resident stipends

---

[9] Plaintiff also relies on a flawed analogy to "young prosecutors" receiving smaller wages than "other lawyers."  *See* Reply at 8, n.14.  The example of a government attorney's compensation in comparison to his or her private sector brethren working for private clients is in no way analogous to the facts at bar.

do not constitute employee wages (discussed above); and in substance, the benefits Partners

provides do not render the residents employees for FICA purposes.  Looking to the substantive

evidence, the nature of the benefits proves that residents are not standard "employees" but

instead uniquely treated by Partners – as would be expected of stipend recipients whose

preeminent purpose is to train in the area of graduate medical education.

Residents receive a specific benefits enrollment guide, which is distinct from that

received by corporate staff (*i.e.,* the non-medical staff) and from that received by the hospitals'

professional staff (*i.e.,* the medical staff).  *See* Churchill Decl., Exs. 2-6.

Further illustrative are the differences in retirement benefits offered residents versus

corporate and professional staff.  For example, although Partners offers residents the opportunity

to contribute on a pre-tax basis to tax sheltered annuities ("TSA"), it gives the same opportunity

to corporate staff and further commits to match staff contributions after one year of service.

*Compare* Pl. Ex. 7 (Partner Residents Benefits) at 6-7 *with* http://www.partners.org/careers/

careers_benefit.html.  Moreover, residents are specifically excluded from participating in the

qualified pension plans covering fully trained physicians at MGH and BWH.  *See* Churchill

Decl., Ex. 5 at 25; *id.*, Ex. 6 at 21.  Thus, only if a resident completes his or her residency and

then becomes a member of the professional staff can he or she obtain pension coverage (as

offered through a new benefits enrollment package for "Professional Staff").

The Graduate Trainee Leave Policy is similarly unique compared to benefits offered to

corporate staff and practicing physicians.  Unlike staff employees, who "earn paid time off (used

for holidays, sick leave, vacation or personal days) based on years of service" and start with "24

days annually," *see* http://www.partners.org/careers/careers_benefit.html, Partners' residents

cannot earn paid leave.  Rather, under the Graduate Trainee Leave Policy, the applicable chief

resident determines what "vacation time" a resident may be entitled to (only the minimum of ten days is specified), and "sick time" starts at twelve days for residents, is capped at sixty days total, and "may not be 'cashed in.'" Pl. Ex. 7 (Graduate Trainee Leave Policy) at 9-10.[10]  In addition, Graduate Trainees are subject to unique "Family and Medical Leave" provisions, *see id.* at 1-2, whereas they are excluded from similar provisions applicable to medical staff.  *See, e.g.*, Churchill Decl., Ex. 7 (BWH Medical Staff Family and Medical Leave Policy) at 1.

For all of these reasons, this Court should find that Partners has at least created a triable issue as to whether its residents receive, in substance, a "compensation package."

**Partners' SUMF ¶¶ 42-52**:  Plaintiff openly admits it does not contest the facts stated in SUMF ¶¶ 42-65, and argues that "[t]he details of the residency program and their relation to Medicare are, however, not relevant to this part of the case as it involves only questions of law which require very little background information."  Reply at 4; *see also id.* at 3 (arguing that "who compensates the residents . . . [is] not relevant").  However, the fact that the federal government funds graduate medical education through Medicare creates a disputed issue of material fact as to whether Medicare is the grantor or partial grantor of the resident stipends, rather than Partners alone.  That currently uncontested fact vitiates a *quid pro quo* analysis involving Partners.  *See* Partners' SUMF ¶¶ 42-52 (stating facts and citing evidentiary support that the federal government funds graduate medical education through Medicare, and such funding is not based on any patient care provided by the residents).  *See also* Opposition at 11, n.6 (stating that Medicare, not Partners, was primary payer of the funding for the residency program); Churchill Decl., Ex. 1 (Partners' Am. Interrog. Response No. 1) at 3-4 (same).[11]

---

[10] Professional Staff are not similarly constrained, and in large respect, the vacation and sick leave policies of the respective MGH and BWH departments are unwritten and/or informally maintained.

[11] Partners' Amended Interrogatory Response No. 1 also notes that Medicare funding "was based upon the number

(continued…)

**2.    Plaintiff Overstates the Significance of Statements in Partners' Graduate Trainee Contract and the Response to Request for Admission No. 11 Based on that Contract.**

In disregard of the material facts noted above, Plaintiff argues that an analysis of facts relevant to the *quid pro quo* analysis need not be undertaken at all for Partners' IRC § 3121(a) argument because Partners' graduate trainee contract provides that a condition for receiving the stipend is provision of patient care.  *See* Reply at 2, n.6, 4, 6, 8, 10.  Using that same language and tying it specifically to the same contract provision, Plaintiff posed its Request for Admission ("RFA") No. 11, *see* Pl. Ex. 6 at 5, which Partners admitted.  Seen in the proper context, Partners' Response to RFA No. 11 amounts to an admission that the contract says what it says and is not nearly so remarkable as Plaintiff urges.  *See* Reply at 2, n.6, 3, 6, 8.

Moreover, as already discussed (*see* II.B.1.b.), Plaintiff selectively cites but one condition from the "Graduate Trainee" contract and the relevant portion, which is titled "Graduate Trainee Responsibilities."  For that matter, Plaintiff does not even recite the entire "patient care" provision.[12]  That responsibility states that the graduate trainee must, among other responsibilities:

- provide patient care, under appropriate supervision, as assigned by the training program director or his/her designee, consistent with the educational goals of the program and the highest standards of patient care ("patient care" includes responsibility for associated documentation in the medical record, which should be completed in a timely fashion, and attendance at patient care rounds as assigned)

- make appropriate use of the available supervisory and support systems, seeking advice and input from the attending staff

---

of residents enrolled in Partners' training program, rather than upon any services provided."  Churchill Decl., Ex. 1 (Am. Interrog. Resp. No. 1), at 3.  *See also* Partners' SUMF ¶ 49.

[12] Plaintiff creates the term "patient care services."  That term does not appear in the Graduate Trainee Benefits and Responsibilities document.  *See* Pl. Ex. 7 at 1-2 (referring simply to "patient care").

physician/s when and as appropriate, and in accordance with the Hospital Guidelines for Supervision of Residents and Clinical Fellows

- participate fully in the education and scholarly activities of the training program as specified by the training program director, including attendance at didactic conferences and other responsibilities which may include a research project, completion of examinations, maintenance of procedure logs or other items

- develop a personal program of learning to foster continued professional growth, with guidance from the teaching staff

- assume responsibility, as called upon, in teaching more junior trainees and medical students, within the scope of the training program

   . . .

- participate in institutional programs, councils or committees and other medical staff activities, as appropriate

Pl. Ex. 7 at 1.

In sum, the Court should weigh the existence of a contractual obligation along with the significant evidence disproving the actual existence of a substantial *quid pro quo*, including, for example: that Partners is not allowed to bill Medicare for any time that residents spend with patients (*see* Partners' SUMF ¶¶ 58-59, 64); that residents are not allowed to participate in unsupervised patient care experiences (*see id.* ¶¶ 66, 70, 81, 85-86); that residents participate in numerous educational activities that do not involve any patient interaction (*see id.* ¶¶ 81, 96 117-24); and that the Federal government's funding of Partners' residency programs is for the sole purpose of defraying the costs of educating and training medical residents. *See id.* ¶¶ 1, 37-41.

Partners should not be found to concede that there is a *quid pro quo* simply because a term in their contract partially conditions receipt of the resident stipend on the provision of "patient care." Pl. Ex. 7 at 1. The contract is but one piece of evidence. Its mere existence does

not prove that there is a *quid pro quo* in principal, much less a substantial one in practice. Moreover, in the presence of disputed facts, it is non-movant Partners' evidence, and not Plaintiff's, that the Court is to believe, *see Anderson.*, 477 U.S. at 255, and all reasonable inferences and ambiguities must be drawn in the Partners' favor. *See O'Connor*, 994 F.2d at 907.

Plaintiff also incorrectly argues at page ten of its Reply that the text of IRC § 117(c) prevents this Court from making a factual allocation should it find that stipends only <u>partially</u> compensate the residents as remuneration for services. *See* Opposition at 8, n.5 (citing Prop. Treas. Reg. § 1.117-6(d)(3); IRS Notice 87-31). Plaintiff's attempt to construe a limitation on the face of the statutory provisions fails. Though the limiting language in IRC § 117(c) does speak in terms of services needing merely to be "<u>a</u> condition" to payment, that language also only applies to "<u>that portion</u> of any amount received which represents payment for [those services required]." (emphasis added).

> **3.    Plaintiff Misreads the Meaning and Significance of Partners' Admission that Patient Care Is Not Incidental to the Education of the Residents in Issue.**

Plaintiff misreads the case law and turns the relevant analysis on its head in concluding that Partners' Response to RFA No. 13 and the related testimony from Partners' affiants "completely contradict[]" Partners' argument that its resident stipends were not paid as a *quid pro quo* for the performance of patient care. Reply at 9. In fact, Partners' positions are entirely consistent, and the admission that participation in supervised patient care experiences is "not incidental to the education of the residents in issue," Pl. Ex. 6 at 5, is neither dispositive of the *quid pro quo* analysis nor in the least bit unexpected.

The text of Partners' Amended Interrogatory Response No. 1 again proves useful. Therein, Partners states, in pertinent part, as follows:

> During the ACGME residency training program at Partners, patients were seen by residents and attending staff physicians, but Partners only charged for services performed by the attending staff physicians.  Residents were continually supervised by attending staff physicians . . . resulting in duplication, not substitution, of patient care services, <u>so that any benefit received by Partners was incidental to the primary purpose of providing an education to the residents</u>.

Churchill Decl., Ex. 1 (Partners' Am. Interrog. Resp. No. 1) at 4 (emphasis added).  Partners made this same argument in its Opposition when it concluded that "<u>no</u> portion of the stipend is intended as a *quid pro quo* for any incidental patient care services performed by residents."  Opposition at 7-8  (emphasis in original).  Plaintiff confuses the separate issue of whether participation in supervised patient care is incidental to the <u>residents' education</u>, as discussed in Admission No. 13, with whether such participation is incidental to <u>Partners' residency program</u>.

Interestingly, both analyses are relevant to the Student Exception under IRC § 3121(b)(10) – the second issue presented by Plaintiff's Motion[13] – rather than the wages analysis

---

[13] Partners notes only briefly here Plaintiff's misplaced emphasis and reliance on *Johnson City Med. Ctr. v. United States*, 999 F.2d 973 (6th Cir. 1993).  *See* Reply at 11.  The *Johnson City* case – which merited a footnote reference in Plaintiff's Motion, *see* Motion at 23, n.16 – discussed the separate student nurse employment tax exception under IRC § 3121(b)(13) and the IRS's creation of a nominal earnings limit.  *See Johnson City*, 999 F.2d at 974-75.  Partners did not address that case in its Opposition because the contrasts in legal issues and the interpretative guidance issued by the IRS needed little explanation.  In *Johnson City*, the IRS imposed a nominal earnings requirement on the student nurse exception via a revenue ruling, *see id.* at 975, whereas for the Student Exception, the IRS and the Treasury Department specifically established a contrary position in regulations that state that "the amount of remuneration for services performed by the employee, . . . [is] not material."  Treas. Reg. § 31.3121(b)(10)-2(b).  Another critical difference between the relevance of this very clear regulatory language and the position in the student nurse revenue ruling is, as the *Johnson City* court acknowledged, a Treasury regulation is entitled to much greater deference than a mere revenue ruling.  999 F.2d at 976.

Moreover, the Plaintiff's erroneous application of *Johnson City* does not end there as it cites the case for the proposition that the facts in existence when the statute was enacted govern its contemporaneous interpretation.  Actually, just the opposite is true.  As the government contended in that case, and the Sixth Circuit agreed, the difference in interpretation and application of the statute over the passage of time did not result from a change in the statute, but instead resulted from changes in the nursing programs themselves; so that the facts of the typical student nurse's services no longer qualified for the employment exception.  *See id.* at 976-77.  In this case, Partners is asserting that the facts and circumstances of medical residencies have changed so significantly from both 1939 and 1965 that the medical residents now can qualify for the Student Exception even, assuming *arguendo*, the original intent was to exclude such individuals.  If facts can change to preclude the application of an employment exception, the same principle of statutory construction dictates that the converse is equally true and the facts can change to result in <u>the application</u> of the employment exception.

under IRC § 3121(a).  First, Partners' admission that the provision of patient care is "<u>not</u> <u>incidental</u> to the <u>education of the residents</u> in issue" supports a finding that Partners' residency program constituted a "school" for purposes of the Student Exception test under IRC § 3121(b)(10).  *See United States v. Mayo Found. for Med. Educ. & Res.*, 282 F. Supp. 2d 997, 1014-15 (D. Minn. 2003) (holding that the Student Exception from "employment" for FICA purposes applied, in part, because the Mayo Foundation constituted a "school" for purposes of the statute).[14]  Partners readily admits that the residents' education takes place, in part, through supervised performance of patient care experiences.  *See* Partners' SUMF ¶¶ 28-29, 35, 56, 70, 81-139; *see also* Reply at 2; Pl. Ex. 6 (Resp. to Request for Admission No. 13) at 5.

Second, evidence that the residents' patient care experiences are incidental to and for the purpose of pursuing the graduate course of study offered by Partners supports a finding that Partners' residents qualify as "students" for the Student Exception under Treas. Reg. § 31.3121(b)(10)-2(d)(3) ("An employee's services must be incident to and for the purpose of pursuing a course of study in order for the employee to have the status of a student.").   Thus, in *Mayo*, the court found that payments in exchange for patient care services were nonetheless exempt from FICA under the Student Exception because – as would be the case here – such

---

[14] Certainly, there's nothing incongruous about Partners' admission that patient care is, to use Plaintiff's characterization of Partners' witness affidavits, an "integral and dominant" part of the residents' education.  Reply at 9.  As the *Mayo* court found:

> The quality of a graduate medical education program depends directly on the breadth and quality of patient care pursued at the clinical institutions. (Trial Tr. at 184.) Put another way, a substantial and diverse patient base, together with the pursuit of high quality care by staff physicians and other members of the patient care team, is necessary for providing appropriate training to residents. "Actual care in the service of patients is inherent in the educational process. It really cannot be separated from that. Playing just an observational role in this is not the same as actually being involved directly in patient care." (Trial Tr. at 184.) Because the objective of residency programs is ultimately to make physicians capable of caring for patients twenty-four hours a day and seven days a week, it is impossible to separate "education" from "patient care." Thus, the principal classroom for residents must be the clinical setting because patient care in a medical specialty is what residents are receiving training for.

*Mayo*, 282 F. Supp. 2d at 1014-15.

services were <u>incidental to</u> and <u>for the purpose of</u> pursuing a course of study in postgraduate medical education. *Mayo*, 282 F. Supp. 2d at 1018 (finding the Student Exception applied based on "Unrebutted evidence . . . that large portions of the patient-care services performed by residents – such as physical examinations and the review of test results – were repeated by the supervising staff physicians who were ultimately responsible for the patients' care. The learning process on clinical rotations consisted largely of residents making suggestions to the staff physicians and the staff physicians correcting the residents.") (internal citations omitted). In this case, Partners' Amended Interrogatory Response No. 1 (discussed above) and the other unrebutted evidence submitted on brief prove that even assuming *arguendo* that Partners' resident stipends were remuneration for services, the provision of any "patient care services" was, in fact, incidental to and for the purpose of pursuing a course of study in postgraduate medical education. *See* Partners' SUMF ¶¶ 2, 28-36, 53-139.

**III.    Conclusion.**

For the foregoing reasons, this Court should find that Partners has established the existence of genuine issues for trial regarding whether Partners' resident stipends are remuneration for employment under IRC § 3121(a).  Accordingly, Partners respectfully requests that the Court deny Plaintiff's Motion.

Dated:  April 12, 2006

|  |  |
|---|---|
|  | _____/s/ Christopher Kliefoth_____<br>BENJAMIN A. GOLDBERGER (No. 654357)<br>JOSEPH H. SELBY (No. 643275, *admitted pro hac vice*)<br>McDermott Will & Emery LLP<br>28 State Street<br>Boston, MA 02109<br>Telephone: (617) 535-4000/Facsimile:  (617) 535-3800<br>E-Mail: bgoldberger@mwe.com<br>        jselby@mwe.com<br><br>CHRISTOPHER KLIEFOTH *(admitted pro hac vice)*<br>MARK H. CHURCHILL (No. 652578, *admitted pro hac vice)*<br>McDermott Will & Emery LLP<br>600 13th Street, N.W.<br>Washington, DC  20005<br>Telephone: (202) 756-8000/Facsimile:  (202) 756-8087<br>E-Mail: ckliefoth@mwe.com<br>        mchurchill@mwe.com<br><br>*Attorneys for Partners Healthcare System, Inc.* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing, and

paper copies will be sent to those indicated as non-registered participants on April 12, 2006.


/s/  Mark H. Churchill
Mark H. Churchill