# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Mark H. Churchill
Attorney at Law
mchurchill@mwe.com
202.756.8058

July 28, 2006

## VIA ECF & FEDERAL EXPRESS DELIVERY

The Honorable Douglas P. Woodlock
United States District Court Judge
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA   02210

      Re:    *United States v. Partners Healthcare System, Inc.*, No. 05-11576-DPW
            (U.S.D.C. D. Mass)

Dear Judge Woodlock:

I write further to Chris Kliefoth's letter to the Court of July 14, 2006, which enclosed the short-form version of Judge Beckwith's order denying the government's summary judgment motion in *United States v. University Hospital, Inc.* (S.D. Ohio, No. 1:05-cv-445). Enclosed please find the full order as issued by the Court on July 26, 2006.

Sincerely,

Mark H. Churchill

cc:     Stephen T. Lyons, Esq. (Trial Counsel, U.S. Department of Justice)

Enclosure

WDC99 1264144-1.057158.0039

U.S. practice conducted through McDermott Will & Emery LLP.

600 Thirteenth Street, N.W.  Washington, D.C.  20005-3096  Telephone: 202.756.8000  Facsimile: 202.756.8087  www.mwe.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

United States of America,      )
                               )
            Plaintiff,         )   Case No. 1:05-CV-445
                               )
      vs.                      )
                               )
University Hospital, Inc.,     )
                               )
            Defendant.         )

O R D E R

This matter is before the Court on the motion for summary judgment filed by Plaintiff United States of America (Doc. No. 17).  For the reasons stated below, Plaintiff's motion is not well-taken and is **DENIED**.

A. Background

On June 29, 2005, Plaintiff United States of America filed an action against Defendant University Hospital, Inc. ("UHI") pursuant to 26 U.S.C. § 7405(b) to recover erroneously refunded Federal Insurance Contributions Act ("FICA") taxes on stipends paid by UHI to medical residents for the 1999 and 2000 tax years.  UHI originally secured the refunds on the grounds that the stipends were not includable as gross income because they were scholarships within the meaning of 26 U.S.C. § 117(c).  Alternatively, UHI claimed that to the extent the stipends were wages under FICA, they were excludable pursuant to the student exception of 26 U.S.C. § 3121(b)(10) because the stipends were

1

paid for service performed in the employ of a school, college, or university by students enrolled and regularly attending classes at such school, college, or university.  UHI filed an answer and counterclaim on August 9, 2005.  Doc No. 7. UHI's counterclaim seeks a refund of FICA taxes for the 1997, 1999, 2000, 2001, 2002 and 2003 tax years and a refund of FICA taxes paid through February 24, 2004.  The question presented by the instant motion for summary judgment is whether, as a matter of law, such stipends are not scholarships within the meaning of § 117(c) and whether, as a matter of law, such stipends are inelibgle to qualify for the student exception under § 3121(b)(10).  It is the position of the United States that the legislative history of these two statutes demonstrates that Congress intended that medical residents be covered by FICA and that their stipends can never be considered scholarships, nor can they ever be eligible for exclusion under the student exception.  In opposition, UHI argues that whether the stipends are scholarships or eligible for the student exception depends on the facts and circumstances of each case.  As stated in an earlier order (Doc. No. 29), the Court finds that UHI's position is correct.

Because Plaintiff's motion is based on the legislative history of the relevant statutes, the Court finds that an extended recitation of the facts of this case is not necessary. However, Plaintiff's statement of the case appears to be a

2

neutral recount of the background of the case, so the Court

quotes it at length here:

> The defendant is an Ohio public benefit corporation
> managed by the Health Alliance of Greater Cincinnati
> ("Health Alliance"), which has six hospital facilities
> covering the entire Greater Cincinnati area. The
> defendant's Form 1023 provides a detailed history of
> how the defendant was formed, and provides that the
> mission of the defendant is "to strive to provide care
> of the highest quality to all persons seeking treatment
> in our facilities. This includes a blend of human
> concern and clinical expertise, while promoting
> excellence in education, research and technological
> progress." In its 2000 income tax return, excerpts of
> which are attached as Pl. Ex. 3, the defendant stated
> that its primary exempt purpose was "to make low-cost,
> quality health care readily available and accessible in
> the greater Cincinnati community."  The defendant
> claims that its predecessor was the first hospital in
> the United States founded primarily for teaching
> purposes.
>
> During the period in issue, all four quarters for each
> of the years 1997 and 1999-2003,and January 1, 2004-
> February 24, 2004, the defendant, as part of the Health
> Alliance, sponsored many medical residency programs for
> medical school graduates in approximately 42 residency
> and fellowship programs offering both medical
> specialties and subspecialties. Those residency
> programs included dentistry, dermatology, emergency
> medicine, neurology and internal medicine. Some of
> these programs had subspecialties. Residency programs
> normally last at least three years, but may last for up
> to seven years if the resident decides to pursue a
> subspecialty after completion of one of the specialty
> residencies.
>
> After accepting an appointment at the defendant, a
> resident signs a contract that is executed by the
> Health Alliance of Greater Cincinnati on behalf of the
> defendant.  This contract sets forth the duties and
> responsibilities of each party to the agreement.  This
> contract is for residents in an accredited residency
> program with some attachments that are referred to in
> the contract.  Under the terms of the contract, the
> hospital reserves the right to terminate the resident

3

at any time for grounds specified in the Graduate
Medical Education Agreement (GMEA).  Also the contract
between the resident or intern and the hospital
provides that the hospital agrees to pay such resident
compensation, called a "stipend", depending on the
resident's postgraduate year (PGY). For example, for
the employment year 2003-2004 (the resident's
employment year runs from July 1 to June 30), a PGY-1
(first year resident or intern) was paid $39,243 and a
PGY-7 (a seventh year resident) was paid $48,240.  As
part of a resident's compensation package, the
defendant provides the resident access to a number of
employee benefits. For example, the defendant hospital
provides free of charge to each resident a professional
liability (medical malpractice) insurance policy.
Other benefits include access to pre-tax medical and
dependent care spending accounts, long-term disability
insurance, vacation and sick leave, health and dental
insurance, life insurance, free parking and free access
to an employee assistance program. Additionally, the
GMEA states that residents are required to participate
in Social Security, and that residents may voluntarily
contribute pretax dollars to an IRC §401(k) retirement
plan.

After having reported the wages paid to its residents
on its Form 941, Employer's Quarterly Federal Tax
Return for 1999 and 2000, defendant filed claims for
refund for all four quarters in 1999 and 2000, alleging
that those wages should not have been included on its
Employment Tax Returns. Those two claims were made on
employment tax returns that were filed for the first
and third quarters of 2003, the former claim based on
the social security taxes withheld from the wages paid
to the residents in 1999 and the latter relating to the
social security taxes withheld from the wages paid to
the residents in 2000. Those two claims were eventually
allowed and the refunds credited. The claim filed with
the return for the first quarter of 2003 was allowed on
September 1, 2003, by crediting the defendant's
outstanding employment tax liabilities for the second
quarter of 2003. The claim filed with the return for
the third quarter of 2003 was allowed on October 31,
2003 and January 5, 2004 by crediting the defendant's
outstanding employment tax liabilities for the first
quarter of 2002. This suit for erroneous refund for
those amounts was then filed on June 29, 2005, which is
within the two-year period allowed by IRC §6532(b) for

4

filing such actions. Defendant subsequently filed a counterclaim on August 9, 2005, seeking to recover $11,056,502.67. This amount represents FICA taxes on the residents' wages the defendant paid during the four quarters of 1997, 2001, 2002, 2003, and for the period January 1, 2004 through February 24, 2004.

Doc. No. 17-2, at 1-4 (internal footnotes and record citations omitted).

## B. The Statutes at Issue

The Federal Insurance Contributions Act imposes a tax on both individuals, 26 U.S.C. § 3101, and employers, 26 U.S.C. § 3111, for the purpose of funding the Social Security Trust Fund. McDonald v. Southern Farm Bureau Life Ins. Co., 291 F.3d 718, 721 (11th Cir. 2002). Section 3101 states:

> In addition to other taxes, there is hereby imposed on the income of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))[.]

26 U.S.C. § 3101(a). FICA requires employers to collect this tax from employees, 26 U.S.C. § 3102, and imposes an excise tax on wages paid by employers:

> In addition to other taxes, there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentages of the wages (as defined in section 3121(a)) paid by him with respect to employment (as defined in section 3121(b))[.]

26 U.S.C. § 3111(a).[1] This case concerns the payment of FICA

---

[1]    Subsection (a) of both Sections 3101 and 3111 imposes a 6.2% tax for old-age, survivors, and disability insurance; subsection (b) of both of these sections imposes a 1.45% tax for

excise taxes by UHI and their subsequent refund by the Internal Revenue Service.

As can be seen from the statutes, FICA imposes a tax on "wages" paid or received with respect to "employment." "Wages" means "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash[.]" 26 U.S.C. § 3121(a).[2] "Employment" means, <u>inter alia</u>, "any service, of whatever nature, performed . . . by an employee for the person employing him, irrespective of the citizenship or residence of either . . . within the United States[.]" <u>Id.</u> § 3121(b). Subsection (b) goes on to list a number of forms of service which are not "employment" within the meaning of the statute, one of which is:

> service performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university[.]

26 U.S.C. § 3121(b)(10)(A).

Section 117 of the Internal Revenue Code deals with the circumstances under which scholarships are includable in gross income:

> (a) General rule.--Gross income does not include any amount received as a qualified scholarship by an

_____

hospital insurance.

[2]     The remainder of subsection (a) describes the exceptions to the term "wages," none of which is relevant here.

6

individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii).

(b) Qualified scholarship.--For purposes of this section-

(1) In general.--The term "qualified scholarship" means any amount received by an individual as a scholarship or fellowship grant to the extent the individual establishes that, in accordance with the conditions of the grant, such amount was used for qualified tuition and related expenses.

(2) Qualified tuition and related expenses.--For purposes of paragraph (1), the term "qualified tuition and related expenses" means--

(A) tuition and fees required for the enrollment or attendance of a student at an educational organization described in section 170(b)(1)(A)(ii), and

(B) fees, books, supplies, and equipment required for courses of instruction at such an educational organization.

(c) Limitation.--

(1) In general.--Except as provided in paragraph (2), subsections (a) and (d) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship or qualified tuition reduction.

(2) Exceptions.--Paragraph (1) shall not apply to any amount received by an individual under--

(A) the National Health Service Corps Scholarship Program under section 338A(g)(1)(A) of the Public Health Service Act, or (B) the Armed Forces Health Professions Scholarship and Financial Assistance program under subchapter I of chapter 105 of title 10, United States Code.

26 U.S.C. § 117.

7

C. Discussion

1. The Section 117 Scholarship Exclusion

Pursuant to 26 U.S.C. § 117, although qualified scholarships are not included in the taxpayer's gross income, amounts received by the individual for services rendered in exchange for receiving the scholarship are included in gross income. In Bingler v. Johnson, 394 U.S.741 (1969), the Supreme Court interpreted the term "scholarship" in § 117 to mean "relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." Id. at 751. The facts in Bingler are similar to this case in that the taxpayers, like the medical residents of UHI, received stipends from their employer while on educational leave to pursue doctorate degrees. See id. at 742-43. In so ruling, however, the Court rejected the IRS's contention that in enacting § 117, Congress intended to eliminate the necessity of engaging in a case-by-case assessment of whether such grants or stipends qualify as scholarships. Id. at 753-54.

The Bingler Court eventually ruled against the taxpayers, but not before assessing the facts and circumstances surrounding the granting and receipt of the stipend. See id. at 756. Our own Circuit Court of Appeals has consistently considered § 117 exclusions on a case-by-case basis. Cooney v. United States, 630 F.2d 438, 442 (6th Cir. 1980); Logan v. United

8

States, 518 F.2d 143, 145 (6th Cir. 1975); Stewart v. United
States, 363 F.2d 355, 356-57 (6th Cir. 1966). Other courts have
followed the Supreme Court's lead and have specifically declined
to adopt a per se rule that such stipends do not quality for the
scholarship exclusion. See, e.g., Field v. Commissioner of
Internal Rev., 680 F.2d 510, 514 n.5 (7th Cir. 1980)(Justice
Stewart, retired, sitting by designation); Parr v. United States,
469 F.2d 1156, 1159 (5th Cir. 1972). Most other courts, it
seems, also regard application of § 117 to stipend payments as a
question of fact. See Sebberson v. Commissioner of Internal
Rev., 781 F.2d 1034, 1035 (4th Cir. 1986); Mizell v. United
States, 663 F.2d 772, 775 (8th Cir. 1981)(collecting cases).

     As this discussion of Bingler and other decisions
indicates, the United States starts out with a considerable body
of case law in opposition to its contention that the stipends
paid by UHI to its medical residents do not qualify as
scholarships under § 117 as a matter of law. Plaintiff's
position is also contrary to a long history of the IRS's
application of § 117 to stipends on a case-by-case basis.[3]
Plaintiff's primary argument in favor of per se treatment of the
stipends is that medical residents are required to provide

---

[3]     See I.R.S. Priv. Ltr. Rul. 200226005 (June 28, 2002);
I.R.S. Priv. Ltr. Rul. 200042027 (July 25, 2000); I.R.S. Priv.
Ltr. Rul. 8239111 (June 30, 1982); Rev-Rul. 76-252, 1976-2 C.B.
36; Rev. Rul. 71-346, 1971-2 C.B. 99.

medical services to patients as a condition of their residency
with UHI.  Ergo, Plaintiff contends, the stipends are not
scholarships because UHI extracts a quid pro quo from the
residents.  This is not a bad argument except that in <u>Bingler</u> the
Court modified quid pro quo with "substantial," which indicates
that an insubstantial quid pro quo does not disqualify a stipend
under § 117.  In other words, <u>Bingler</u> suggests that the magnitude
of the quid pro quo is a question of fact.

 Plaintiff's argument also ignores that in <u>Bingler</u>, in
ultimately ruling against the taxpayers, the Court considered
more than the fact that the employer extracted a quid pro quo for
the stipend.[4]  Evidence also indicating to the Court that the
stipends were compensation included the fact that the stipends
were close in amount to the taxpayers' prior salaries, the
taxpayers continued to receive employee benefits from the
employer, the topics of study related to their prior work, and
the taxpayers were required to submit periodic work reports to
the employer.  <u>Bingler</u>, 394 U.S. at 756-57.  Thus, while the
existence of a quid pro quo is clearly an important factor, it
does not appear to be the start and finish of the question, as
Plaintiff's papers suggest.

 Moreover, and not to be overlooked, the plain language

---

[4] The taxpayers were required to return to work for the
employer upon conclusion of their studies as a condition of
receiving the stipend.

of § 117(b)(1) states that an amount is a "qualified scholarship means any amount received by an individual as a scholarship . . . <u>to the extent that the individual establishes that</u> . . . such amount was used for qualified tuition and related expenses." 26 U.S.C. § 117(b)(1)(emphasis added).  In other words, by its own terms, this subsection affords the individual an opportunity to prove that the amount received qualifies as a scholarship.  Thus, rather than imply per se exclusions of categories of scholarships, the language of § 117 necessitates a case-by-case assessment of the claimed exclusion.  The Court recognizes from the legislative history supplied by the United States that in 1986 Congress amended § 117 because of the number of resident physicians and graduate teaching fellows who sought to exclude income under this section "notwithstanding substantial case authority to the contrary."  Doc. No. 17, Ex. 9F, JOINT COMMITTEE ON TAXATION, 99TH CONG., GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986, at 41.  However, nothing in this legislative history states or shows that Congress intended to make the stipends at issue ineligible per se under § 117.  Rather, according to the Committee Report, the amendment "should <u>lessen</u> these problems of complexity, uncertainty of tax treatment, and controversy."  <u>See id.</u>  Had Congress wished to establish a per se rule in response to the problem that the amendment specifically addressed, it would have been simple enough to add a sentence in § 117(b)(1) which states:

11

"The term 'qualified scholarship' does not include stipends paid by teaching hospitals to medical residents."  In sum, the Court does not believe that the legislative history demonstrates an intent to establish any per se rules under § 117.

That is not to say, however, that a per se rule is a bad idea.  As the Fifth Circuit pointed out thirty-five years ago, these cases almost invariably end the same way - the taxpayer loses.  <u>See</u> <u>Parr</u>, 469 F.2d at 1159 ("We do not attempt to dictate a per se rule holding that all advanced medical personnel are employees and that all payments to them are subject to taxation. However, we sympathize with the District Court's lamentation that these facts, or facts nearly identical, have been litigated so often that one may wonder whether this is wise or what good it can do.").  Nevertheless, the Court finds no basis for excluding stipends paid to medical residents from consideration under § 117 as a matter of law.

b. <u>The Section 3121(b)(10) Student Exception</u>

Even if the stipends at issue in this case are income or compensation for purposes of § 117, they may not be "wages" from "employment" subject to FICA taxes if § 3121(b)(10) applies. In comparison to § 117, Congress has amended § 3121 a number of times and there is a substantial amount of legislative history, dating back to 1939.  Nevertheless, as UHI accurately argues, in interpreting a statute, the court must begin with its plain

12

language and may only resort to a review of the legislative
history to ascertain Congressional intent if the statute is
ambiguous.  <u>Olden v. LaFarge, Inc.</u>, 383 F.3d 495, 502 (6th Cir.
2004).  Likewise, if the plain language of the statute is clear,
the court should not review predecessor statutes in search of
Congressional intent.  <u>Lamie v. United States Trustee</u>, 540 U.S.
526, 534 (2004).  Finally, the court should not review the
legislative history of a statute to create an ambiguity where
none otherwise exists.  <u>Ratzlaf v. United States</u>, 510 U.S. 135,
147-48 (1994)("[W]e do not resort to legislative history to cloud
a statutory text that is clear.").

     In this case, contrary to the position of the United
States, § 3121(b)(10) is unambiguous in that it does not
categorically make stipends paid to medical residents ineligible
for the exception.  As UHI correctly argues, under the plain
terms of this subsection, which the Court cites again in the
margin,[5] the taxpayer or employer must establish two elements for

---

    [5]   Section 3121(b)(10) states that employment does not
include:

> service performed in the employ of . . .  a school,
> college, or university . . . if such service is
> performed by a student who is enrolled and regularly
> attending classes at such school, college, or
> university[.]

26 U.S.C. § 3121(b)(10)(A).

this exclusion to apply: 1) the service was performed in the
employ of a school, college, or university; and 2) the service
was performed by a student who is enrolled and regularly
attending classes at such school, college or university.  The
text of the subsection contains no exceptions to the application
of the exception.  In other words, while § 3121(b)(10)
establishes requirements for the exception to apply, it does not
create any specific exclusions which prohibit its application.

 Indeed, Congress knows how to create exclusions from
the application of a provision when it so desires.  Section
3121(b)(6) is an example.  This subsection excepts from the
definition of "employment" service performed "in the employ of
the United States . . . if such service is performed by any
individual as an employee included under section 5351(2) of title
5 United States code (relating to certain interns, student
nurses, and other student employees of hospitals of the Federal
government), other than as a medical or dental intern or a
medical or dental resident in training[.]"  26 U.S.C. §
3121(b)(6)(B)(emphasis added).  Thus, in contrast to subsection
(b)(10), subsection (b)(6) creates a specific exception to its
provisions - it does not apply to service performed by medical or
dental interns and residents.  It is also interesting to note
that subsection (b)(6) demonstrates that Congress was aware of
medical residents as an employment category and could have easily

14

written the same exception into subsection (b)(10) if it
specifically wanted to make medical residents ineligible as a
matter of law for this exclusion.

At this point, an observant reader would likely be
justified in believing that the Court has just improperly
rendered an interpretation of § 3121(b)(10) which is inconsistent
with § 3121(b)(6).  See Chrysler Corp. v. Commissioner of
Internal Rev., 436 F.3d 644, 654-55 (6th Cir. 2006)("[W]e must
construe a statute as a whole and, in so doing, we must strive to
interpret provisions so that other provisions in the statute are
not rendered inconsistent, superfluous, or meaningless.")
(internal quotation marks omitted).  After all, why would
Congress mandate in subsection (b)(6) that medical residents
employed by hospitals of the federal government be covered by
FICA and yet leave open a loophole in FICA in subsection (b)(10)
for medical residents in non-federal service?  Frankly, we may
not ever know the answer to that question - the legislative
history on this point provides no answers - but it does not
appear that the difference in treatment was an accident.  In
subsection (b)(7) of § 3121, Congress, in its double-negative way
of drafting statutes, excluded from the definition of employment
service performed by medical residents employed by hospitals of

15

the District of Columbia.[6]  In other words, in one subsection

---

        [6]    FICA, § 3121(b)(7), in relevant part, excepts from the
definition of employment:

            service performed in the employ of a State, or any
            political subdivision thereof, or any instrumentality
            of any one or more of the foregoing which is wholly
            owned thereby, except that this paragraph shall not
            apply in the case of--
            . . .

            service performed in the employ of the District of
            Columbia or any instrumentality which is wholly owned
            thereby, if such service is not covered by a retirement
            system established by a law of the United States (other
            than the Federal Employees Retirement System provided
            in chapter 84 of title 5, United States Code [5
            U.S.C.A. § 8401 et seq.]); except that the provisions
            of this subparagraph shall not be applicable to service
            performed--
            . . .

            by any individual as an employee included under section
            5351(2) of title 5, United States Code (relating to
            certain interns, student nurses, and other student
            employees of hospitals of the District of Columbia
            Government), other than as a medical or dental intern
            or as a medical or dental resident in training[.]

26 U.S.C. § 3121(b)(7)(C)(ii).  Broken into more manageable
pieces, this subsection means: 1) "employment" in § 3121(b) does
not mean service performed in the employ of State, unless; 2) the
State is the District of Columbia, in which case the service
would be "employment," unless; 3) the employee of the District of
Columbia is already covered by a retirement system authorized by
federal law, in which case the service is not "employment,"
unless; 4) the service was performed by an intern, student nurse,
or other student employee employed by a hospital of the District
of Columbia, in which case the service is "employment," except
that; 5) service by an medical or dental intern or resident of a
hospital of the District of Columbia is not "employment."

As convoluted as the explanation of this subsection appears to
be, and it is, the legislative history in this case confirms that
it is correct:

Congress explicitly included one set of medical residents in FICA
coverage and in the next explicitly excluded another set of
medical residents from coverage in FICA.  Therefore, the Court's
conclusion that subsection (b)(10) does not exclude medical
residents from its exception as a matter of law does not render
that provision inconsistent with the rest of § 3121(b).  Rather,
it recognizes and is consistent with an apparent desire by
Congress to treat some types of service different from other
types of service for purposes of FICA coverage.  See, e.g.,
Matthews v. Commissioner of Internal Rev., 907 F.2d 1173, 1177
(D.C. Cir. 1990)(noting that under 1982 version of § 3121 gave

---

> Sections 317(a) and 317(b) of the bill amend the Social
> Security Act (sec. 210(a)(7)) and the Internal Revenue
> Code of 1954 (sec. 3121(b)(7)) to include in the
> definition of employment services performed by certain
> temporary employees of the District of Columbia. Under
> the amendments, service performed in the employ of the
> District of Columbia, or any wholly owned
> instrumentality thereof, is included as employment if
> such service is not covered by a retirement system
> established by a law of the United States, except that
> the extension of coverage is not to apply to service
> performed:
>
> . . .
>
> in a hospital of the District of Columbia by a student
> dental intern [sic] or as a medical or dental
> resident-in-training) included under section 2 of the
> act of August 4, 1947 (5 U.S.C. 1052)[.]

SEN. REP. NO. 89-404 (1965), reprinted in 1965 U.S.C.C.A.N. 1943,
at 2183 (emphasis added).

17

varying treatment to a wide range of persons in the employ of the United States, viz., service by the President is not "employment" but service by an employee of the Federal Reserve Bank is "employment").

This discussion brings us full-circle to the Court's original point - Congress knows how to draft an exception to an exception and the plain language of § 3121(b)(10), unlike subsections (b)(6) and (b)(7), does not exclude the service of medical residents from its provisions. Therefore, by its plain terms, § 3121(b)(10) remains open for medical residents and hospitals to attempt to establish, on a case-by-case basis, that the service rendered by medical residents is not "employment" within the meaning of FICA. Since the plain language of the statute is clear, the Court will not resort to a review of the legislative history of the student exception in search of Congressional intent to remove medical residents from the exception.[7]

Before concluding, the Court will address why it believes that three cases which the United States contends supports its position that medical residents do not qualify for the student exception as a matter of law are inapplicable. The

---

[7] The Court did review the legislative history of subsections (b)(6) and (b)(7), but not because they were ambiguous. Rather, the Court consulted the legislative history to ensure that the difference in treatment accorded to medical residents by the two subsections was not accidental.

18

first case, and the one which requires the most discussion, is
<u>St. Luke's Hosp. Ass'n of Cleveland v. United States</u>, 333 F.2d
157 (6th Cir. 1964).  In <u>St. Luke's</u>, the hospital claimed that
the stipends it paid to medical residents were excludable
pursuant to § 3121(b)(13).  At the time, § 3121(b)(13) excluded
from the definition of "employment" the service of student nurses
and the service of interns performed in the employ of a hospital.
<u>Id.</u> at 158.  The hospital claimed that medical residents were
interns for purposes of FICA.  The Court, however, found that at
the time Congress drafted the student nurse/intern exception, it
was aware that interns were different from medical residents.
<u>See</u> <u>id.</u> at 163-64.  Because Congress was aware of this
difference, it could not have meant to include medical residents
in the definition of "intern."  <u>Id.</u>  Therefore, the service of
medical residents could not be excluded pursuant to §
3121(b)(13).  <u>St. Luke's</u> is inapposite, however, because it
addressed the student nurse/intern exception, not the student
exception, and rests on the distinction between interns and
residents.

        The United States argues that in response to <u>St.
Luke's</u>, in 1965, Congress amended the Social Security Act to
eliminate the intern exception and to expand FICA coverage to
self-employed physicians.  Therefore, the United States contends
Congress must have also wanted to expand coverage for medical

residents.  Again, this is not a bad argument except that the
legislative history to the 1965 amendments indicates that in
repealing the intern exception, Congress did not intend to
foreclose interns from claiming exceptions from coverage under
other subsections of § 3121.  H.R. REP. No. 213, at 747 ("The
effect of this amendment [eliminating the intern exclusion of §
3121(b)(13)] is to extend coverage under the Federal Insurance
Contributions Act to such interns <u>unless their services are
excluded under provisions other than § 3121(b)(13)</u>.")(emphasis
added).  In light of this statement, and the Court's previous
discussion concerning Congress's ability to draft exceptions to
exceptions, the Court does not view the 1965 amendments as
foreclosing residents and hospitals from attempting to claim
exclusion from FICA pursuant to § 3121(b)(10).

     <u>Johnson City Med. Center v. United States</u>, 999 F.2d 973
(6th Cir. 1993), is inapplicable here because it also dealt with
the student nurse exception in § 3121(b)(13) and not the §
3121(b)(10) exception.  <u>United States v. Mount Sinai Med. Cent.</u>,
353 F. Supp.2d 1217 (S.D.Fla. 2005), supports the government's
position that stipends paid to medical residents cannot qualify
for exclusion under § 3121(b)(10) as a matter of law.  This
decision,  however, is not binding on the Court.  Moreover, the
Court in <u>Mount Sinai</u> reached its conclusion by reviewing the
legislative history to arrive at its interpretation of § 3121.

This Court, however, does not believe it is appropriate to resort to the legislative history of the statute for the reasons stated.

<u>Conclusion</u>

In conclusion, for the reasons stated, the Court finds that whether the stipends at issue in this case qualify for the scholarship exclusion from income under 26 U.S.C. § 117, or whether they qualify for exclusion under 26 U.S.C. § 3212(b)(10) depends on the facts and circumstances under which they were paid and received. The plain text of the statutes does not support Plaintiff's position that the stipends do not qualify for exclusion under either of these statutes as a matter of law. Accordingly, Plaintiff's motion for summary judgment is not well-taken and is **DENIED**.

**IT IS SO ORDERED**

Date July 26, 2006          s/Sandra S. Beckwith
                            Sandra S. Beckwith, Chief Judge
                            United States District Court