UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No.  05-11576-DPW

PARTNERS HEALTHCARE
SYSTEM, INC.,

        Defendant.
_____/

## DEFENDANT PARTNERS HEALTHCARE SYSTEM, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY

Defendant Partners Healthcare System, Inc. notifies this Court of the recent opinion and order of the United States District Court for the District of Minnesota in *Regents of the University of Minnesota v. United States of America*, Civ. No. 06-5084 (RHK/JSM), decided April 1, 2008, that bears on the issue of this case.  A copy of the opinion is attached to this notice.

Dated: April 10, 2008                Respectfully submitted,

                                              /s/  Mark H. Churchill_____
                                              CHRISTOPHER KLIEFOTH *(pro hac vice)*
                                              MARK H. CHURCHILL (No. 652578, *pro hac vice)*
                                              ERIC S. JOHNSON (*pro hac vice*)
                                              SARAH E. HANCUR (*pro hac vice*)
                                              McDermott Will & Emery LLP
                                              600 13th Street, N.W.
                                              Washington, DC  20005
                                              Telephone: (202) 756-8000/Facsimile:  (202) 756-8087
                                              E-Mail: ckliefoth@mwe.com
                                                          mchurchill@mwe.com
                                                           ejohnson@mwe.com

                                              *Attorneys for Partners Healthcare System, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system on April 10, 2008, will be served electronically on the registered participants as identified on the Notice of Electronic Filing.

/s/__Mark H. Churchill _____
Mark H. Churchill

WDC99 1554105-1.057158.0039

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Regents of the University
of Minnesota,

                      Plaintiff,

                                              Civ. No. 06-5084 (RHK/JSM)
                                              **MEMORANDUM OPINION**
                                              **AND ORDER**

v.

United States of America,

                      Defendant.

---

Thomas W. Tinkham, Kristina W. Carlson, John W. Windhorst, Jr., Christopher R. Duggan, Emily L. Fitzgerald, Theresa M. Bevilacqua, William R. Goetz, Dorsey & Whitney LLP, Minneapolis, Minnesota, William P. Donohue, University of Minnesota, Minneapolis, Minnesota, for Plaintiff.

Michael R. Pahl, Trial Attorney, Tax Division, United States Department of Justice, Washington, D.C., for Defendant.

---

## INTRODUCTION

Plaintiff Regents of the University of Minnesota (the "University") commenced this action against Defendant United States of America seeking a refund of the FICA taxes withheld and paid on medical residents' stipends during the second quarter of 2005.[1]  The amount of the University's claim is $1,094,803.92, plus interest.  The University has moved for summary judgment.  For the reasons stated below, the Court will grant that Motion.

---

[1] FICA taxes refer to taxes collected pursuant to the Federal Insurance Contributions Act ("FICA").

## BACKGROUND

The University operates graduate medical education programs for medical residents and fellows ("residents"). (Compl. ¶ 5.) A medical resident is an individual who has earned a medical degree and is participating in a residency program for additional medical training in a specialty field, such as internal medicine or surgery. The University entered into affiliation agreements with certain hospitals in Minnesota for the purpose of providing educational experiences to the residents.[2] (See, e.g., Pahl Decl. Tab 2 Ex. 114 at UM 02692.) Pursuant to the affiliation agreements, the University had responsibility for the general educational experience of the residents, including (1) determining educational goals, (2) establishing prerequisite criteria for placement, (3) determining completion of assignments, (4) evaluating the residents' performance, and (5) selecting and appointing staff members at the affiliated hospital to the faculty of the University for the purpose of training the residents. (Id. at UM 02692-02693.) Staff physicians appointed to the University faculty had the "responsibility for teaching, supervising, and evaluating the performance of residents." (Id. at UM 02695.) In addition, the University paid a stipend to the residents for the purpose of providing a minimum level of financial support during their enrollment. (Compl. ¶ 5.)

FICA imposes taxes upon employers and employees for the support of the social security system. See 26 U.S.C. § 3101 et seq. FICA taxes must be paid on "wages." Id.

---

[2] The University sold its own hospital to Fairview in 1997. (See Doc. No. 28 at ¶¶ 6-10, Ex. 5.)

FICA defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." 26 U.S.C. § 3121(a). Employers collect FICA taxes by withholding the required amounts from their employees' wages. See 26 U.S.C. § 3102(a). Employers also pay FICA contributions equal to the amounts withheld from their employees' wages. See 26 U.S.C. § 3111(a). "Thus, FICA taxes are 'paid in part by employees through withholding, and in part by employers through an excise tax.'" Ahmed v. United States, 147 F.3d 791, 794 (8th Cir. 1998) (quoting United States v. Lee, 455 U.S. 252, 254 n.1 (1982)).

FICA, however, excludes several categories of "service" from "employment," including "service performed in the employ of . . . a school, college, or university . . . if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university." 26 U.S.C. § 3121(b)(10) ("Student Exclusion").

In 1998, the Eighth Circuit Court of Appeals held that stipends paid by the University to medical residents in 1985-1986 qualified for the Student Exclusion from FICA taxation. See Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998). In 2003, this Court similarly held that stipends paid by the Mayo Foundation to its medical residents in 1994-1996 qualified for the Student Exclusion.[3] See United States v. Mayo Found. for Med. Educ. & Research, 282 F. Supp. 2d 997 (D. Minn. 2003) ("Mayo I"), appeal

---

[3] In 2006, this Court entered judgment dismissing a tax refund case related to stipends paid to residents at Mayo for the period of 1997-2003, pursuant to the parties' stipulation that the residents' stipends were similarly excluded from FICA tax coverage during those years. See Mayo Found. for Med. Educ. & Research v. United States (D. Minn. Civ. No. 05-467, judgment entered May 5, 2006).

dismissed by stipulation (8th Cir. File No. 03-3662, Jan. 7, 2004). In response to Apfel and Mayo I, the IRS amended its regulations in 2004 (effective April 1, 2005) so that medical residents no longer qualified for the exclusion.

The amended regulations provide in pertinent part that student status is determined by "the relationship of the employee with the organization employing the employee." ("General Rule")[4] 26 C.F.R. § 31.3121(b)(10)-2(d). In particular, an employee is deemed a student if the services provided are "incident to and for the purpose of pursuing a course of study." 26 C.F.R. § 31.3121(b)(10)-2(d)(3)(i). In addition, "[t]he educational aspect of the relationship between the employer and the employee, as compared to the service aspect of the relationship, must be predominant in order for the employee's services to be incident to and for the purpose of pursuing a course of study." Id. The "educational" and "service" aspects of the relationship are based "on all the relevant facts and circumstances." Id.

However, the amended regulations also provide that "an employee whose normal work schedule is 40 hours or more per week is considered a full-time employee," and therefore services performed by that individual are "not incident to and for the purpose of pursuing a course of study." 26 C.F.R. § 31.3121(b)(10)-2(d)(3)(iii) ("Full-time Employee Exception"). In addition, an employee's "normal work schedule" is "not

---

[4] The amended regulations also added a "primary function test" to the definition of a "school, college, or university." 26 C.F.R. § 31.3121(b)(10)-2(c). By comparison, the pre-amended regulations provided that "[t]he term 'school, college, or university' within the meaning of this exception is to be taken in its commonly or generally accepted sense." 26 C.F.R. § 31.3121(b)(10)-2(d) (Pre-4/1/05). There is no dispute that the University meets either definition.

affected by the fact that the services performed by the employee may have an educational, instructional, or training aspect." Id. Consequently, a medical resident who works 40 or more hours per week no longer qualifies for the Student Exclusion.

In contrast, the pre-amended regulations provided that student status should be determined "on the basis of the relationship of such employee with the organization for which the services are performed" and that "[a]n employee who perform[ed] services in the employ of a school, college, or university, as an incident to and for the purpose of pursuing a course of study" was a student. 26 C.F.R. § 31.3121(b)(10)-2(c) (Pre-4/1/05). The pre-amended regulations did not have a Full-time Employee Exception.

The University withheld and paid FICA taxes on the stipends it paid to medical residents enrolled in its residency programs during the second quarter of 2005. Thereafter, the University timely filed a refund claim with the IRS for $1,094,803.92, asserting that the Full-time Employee exception of the amended regulations was invalid. The IRS did not act upon the claim, and in December 2006, the University filed this action.[5] See 26 U.S.C. § 6532. In August 2007, this Court held that the amended regulations were invalid. See Mayo Found. for Med. Educ. & Research v. United States, 503 F. Supp. 2d 1164, 1171-77 (D. Minn. 2007) ("Mayo II").[6]

---

[5] Count One of the University's Complaint seeks a refund of the FICA taxes withheld and paid on the residents' stipends during the second quarter of 2005 on the basis that the Full-time Employee Exception is invalid. Counts Two, Three, and Four seek the same relief under alternative theories. (See Compl. ¶¶ 19-37.)

[6] The Government has appealed Mayo II to the Eighth Circuit.

5

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

The University asserts that the Full-time Employee Exception of the amended regulations is invalid because it is inconsistent with the plain meaning of the Student Exclusion or, alternatively, conflicts with regulations promulgated by the Social Security Administration. (Pl.'s Mem. at 10-15.) It also contends that the Government is barred by collateral estoppel from re-litigating whether medical residents qualify for the Student Exclusion or, alternatively, that residents qualify for the exclusion based on the merits.

(Pl.'s Reply Mem. at 15-29.) In response, the Government asserts that collateral estoppel does not apply because the controlling facts and applicable legal rules have changed. (Def.'s Second Opp'n Mem. at 31-43.) It further argues that there is a genuine issue of material fact as to whether residents qualify for the Student Exclusion. (Id. at 5-29; 44-54.) Finally, the Government briefly argues that the amended regulations are valid, but recognizes that this Court held otherwise in Mayo II.[7] (Id. at 54-56.)

Because the Court previously held in Mayo II that the Full-time Employee Exception of the amended regulations is invalid, it is not necessary to address the collateral-estoppel issue or whether the amended regulations conflict with the regulations from the Social Security Administration. Therefore, the Court will determine (1) whether the residents were "employed" by the University and (2) whether they were "students" who "regularly attend[ed] classes" at the University so as to qualify for the Student Exclusion.

---

[7] The Government asserts that this Court's review of the amended regulations is governed by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and not National Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472 (1979). In support of this argument, the Government relies upon Swallows Holding, Ltd. v. Commissioner, 515 F.3d 162, 167 (3rd Cir. 2008), which held "that the Tax Court erred in applying National Muffler to the extent that the National Muffler factors are inconsistent with [the] Chevron analysis." In Mayo II, this Court stated that "[t]here is no indication that the standard in National Muffler was changed by Chevron. Regardless, the Court reaches the same conclusion under either standard." 503 F. Supp. 2d at 1171. Indeed, the Government fails to get past the first prong of the Chevron analysis because this Court held in Mayo I that the statutory language of the Student Exclusion was clear and unambiguous. Id. at 1171-73, 1175-76 (citing Mayo I, 282 F. Supp. 2d at 1007, 1013-18). Under Chevron, if the statutory language is clear, the Court's inquiry ends and the plain meaning of the statute governs the action. 467 U.S. at 842-43.

I.      **Application of the Student Exclusion to the University Residents**[8]

   A.      **"In the Employ of a School, College, or University"**

The first issue is whether the residents' services are performed in the "employ" of the University. For FICA purposes, the employment relationship is determined under the "common-law" employer-employee relationship as follows:

> Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee . . . . Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services . . . .

26 C.F.R. § 31.3121(d)-1(c). The Government contends that the hospitals possessed the right to control the residents and direct the manner and means by which they provided patient care.[9] (Def.'s Second Opp'n Mem. at 5-13; 44-52.). The evidence, however, contradicts the Government's contention. (See, e.g., Carlson Aff. Ex. 2 at 40; Ex. 3 at 102-103; Ex. 7 at 85, 87, 106; Ex. 12 at 73, 90.)

---

[8] Because the Court has previously held that the amended regulations are invalid, the Court will apply the pre-amended regulations to determine whether the residents qualify for the Student Exclusion.

[9] The Government relies upon several cases to show that the residents were controlled by the staff physicians at the hospitals and therefore were employed by the hospitals. (See Def.'s Second Opp'n Mem. at 44-46.) Those cases, however, are inapposite. Indeed, Cody v. Ribicoff, 289 F.2d 394 (8th Cir. 1961), involved neither a resident nor a hospital. Moreover, St. Luke's Hospital Ass'n v. United States, 212 F. Supp. 387 (N.D. Ohio 1962), rev'd on other grounds, 333 F.2d 157 (6th Cir. 1964); Boston Medical Center Corp., 330 NLRB 152, 1999 WL 1076118 (1999), and Rockswold v. United States, 471 F. Supp. 1385 (D. Minn. 1979), actually support the University's position because the faculty physicians supervised and controlled the residents. Finally, the Government refers to a medical malpractice case, in which the court found that "as employer of the resident, Ramsey Hospital clearly exercised legal control over Dr. Lisita and was liable for her negligence." Dang v. St. Paul Ramsey Med. Ctr., 490 N.W.2d 653, 657 (Minn. Ct. App. 1992). However, the University was not a party in that case and therefore did not participate in the parties' stipulation that the resident was an employee of Ramsey Hospital. Id. at 656.

8

The University faculty and program directors interviewed candidates and selected residents for its residency programs. (See, e.g., id. Ex. 9 at 58-59; Ex. 12 at 64-65, 93; Ex. 17 at 52; Ex. 18 at 44-45; Ex. 25 at ¶ 4; Ex. 19 at ¶ 3; Ex. 20 at ¶ 3; Ex. 26 at ¶ 4.) In addition, the University had affiliation agreements with certain hospitals in Minnesota at which residents could perform their residencies. (See, e.g., Pahl Decl. Tab 2 at Ex. 114). These hospitals had supervising physicians who were appointed to the University faculty and were responsible for "teaching, supervising and evaluating the performance of [the] residents." (Id. at UM 02695).

Notably, residents signed residency agreements with the University for each year of the residency program. (Carlson Aff. Ex. 4 at 97, Govt. Exs. 67-69; Ex. 25 at ¶ 4, Ex. C at UM 03286.) The residency agreement provided that the resident would "accept the duties, responsibilities, and rotations *assigned by the program director* or designee[;] . . . participate fully in the educational and scholarly activities of the residency program[;] . . . [and] provide safe, effective, and compassionate care of patients *under faculty supervision*."[10] (Id. Ex. 4, Govt. Ex. 67 at UM 06723-24 (emphases added).) The University also paid the residents' stipends and benefits, which included malpractice insurance.[11] (Id. at UM 06724.) In addition, the University, not the hospitals, had the

---

[10] An affiliated hospital's policies did not dictate how the University's residents should be taught while they were at the hospital. (Pahl Decl. Tab 1 at 76.)

[11] The Government contends that the trial proceeding in a malpractice case against a former resident "demonstrates that residents were not University employees." (See Def.'s Second Opp'n Mem. at 12.) The Court disagrees. Although the University's counsel in that malpractice action stated in a letter that residents were "students" and not University "employees," he did not contend that residents were hospital employees. (Pahl Decl. Tab 20 at Ex. 176.) Rather, he

power to suspend or terminate a resident from a residency program.[12] (Id. at UM 06725-26.) In essence, the residency agreement was an employment agreement between the University and the residents. Thus, the University contractually retained the right to control the residents.

The Government, however, contends that the hospitals benefited economically from the residents' services, whereas, the University did not receive any benefit or services from the residents.[13] (Def.'s Second Opp'n Mem. at 10.) This argument ignores the crucial fact that the University is a nonprofit organization; its purpose and function is medical education. The University benefits when the residents complete the residency program because it has fulfilled its educational mission of preparing residents to practice in a medical specialty. The Government also argues that the residents' stipends were compensation for services. (Id. at 11.) But, the question of whether the residents' services are performed in the "employ" of the University "depends not on the nature of

---

acknowledged that the University provides insurance coverage for the residents and was "responsible" for them. (Id.) Notably, no hospital was named as a defendant in that malpractice action, and the University's counsel represented both the University and the resident. (Id. at Ex. 175.)

[12] The Court notes that in cases where a resident's conduct threatened the safety or welfare of a patient, an affiliated hospital had the limited power to "suspend" the resident's participation at the hospital. (Carlson Aff. Ex. 1, Govt. Ex. 114 at UM 2696; Ex. 8, Govt. Ex. 113 at UM12591-92.) Nonetheless, the University had the final say as to whether a resident would be disciplined or dismissed from the program. (Id. Ex. 4, Govt. Ex. 67 at UM 06725-26.)

[13] The Government also argues that the hospitals really paid the residents' stipends and benefits because the hospitals reimbursed the University. (Def.'s Second Opp'n Mem. at 10-11.) The hospitals, however, did not completely reimburse the University. (See Carlson Aff. Ex. 13 at 55; Ex. 24 at ¶¶ 3-4.) Moreover, the ultimate responsibility of paying the residents' stipends and benefits remained with the University.

10

stipends but on the nature of the residents' relationship with the University." Apfel, 151 F.3d at 748 n.9.

Program directors, not the hospitals, were responsible for determining the residents' rotation schedules. (Carlson Aff. Ex. 4 at 103; Ex. 5 at 42; Ex. 6 at 109-11; Ex. 7 at 85-87; Ex. 9 at 18; Ex. 12 at 90; Ex. 17 at 54, 68.) Moreover, there is no evidence that the hospitals ever "hired" or "fired" residents; rather, residents enrolled in the University's residency program and were assigned to "rotations" – which took them to the affiliated hospitals – pursuant to a written curriculum that the program director of the given residency program established. (Id. Ex. 17 at 67; Ex. 19 at ¶ 3; Ex. 20 at ¶ 3; Ex. 26 at ¶ 4.) The Government, however, argues that the hospitals directed the residents through attending physicians. (Def.'s Second Opp'n Mem. at 7-8, 9-10.) But, the attending physicians who taught and supervised the residents had an academic appointment at the University.[14] (Carlson Aff. Ex. 1, Govt. Ex. 106 at FV 001743; Ex. 2 at 40; Ex. 3 at 102-03; Ex. 6 at 120-30; Ex. 7 at 85, 87, 106; Ex. 8 at 79; Ex. 9 at 7, 15; Ex. 12 at 66, 73, 90; Ex. 14 at 44; Ex. 17 at 66.) In other words, the physicians involved in the University residency program held faculty appointments and acted as agents of the University in the administration of the program. Thus, residents learned how to care for patients under the supervision and control of the University-faculty physicians. (Id. Ex. 7

---

[14] The Government cites to a Texas malpractice case, in which the court held that a resident was not an employee of the sponsoring institution because he was a "borrowed employee" of a participating institution at which his services were performed. St. Joseph's Hosp. v. Wolff, 94 S.W.3d 513, 542-44 (Tex. 2002). The Court is not persuaded by that decision and agrees with the dissenting opinion which concluded that the resident was employed by the sponsoring institution because it had contractually retained control over him. Id. at 545-50.

11

at 112-13; Ex. 9 at 14-15, 75-76; Ex. 14 at 75-76.)  Based on the foregoing, the Court finds that the residents' services were performed in the "employ" of the University.

### B. Student Status

The final issue is whether the residents are students.  The statutory test is whether the individual was "enrolled and regularly attending classes" at the University.  See 26 U.S.C. § 3121(b)(10).  In particular, "[a]n employee who performs services in the employ of a school, college, or university, as an incident to and for the purpose of pursuing a course of study" is deemed to be a student.  26 C.F.R. § 31.3121(b)(10)-2(c) (Pre-4/1/05); see also Apfel, 151 F.3d at 748 (stating that an analysis of student status requires "a case-by-case examination" to determine whether the resident's relationship with the organization was "*primarily for educational purposes or primarily to earn a living*") (emphasis added).

#### 1. "Enrolled" in a residency program

The record shows that the residents were enrolled at the University.  (Carlson Aff. Ex. 3, Govt. Ex. 32 at UM 03011 ("All residents and fellows are formally enrolled as students" at the University, "are automatically registered each semester for their Medical School training course . . . [and] [f]ormal registration at the University of Minnesota Medical School is a requirement of our training programs"); Ex. 4 at 13; Ex. 11 at 7-9; 22; Ex. 12 at 36; Ex. 18 at 17 (departments within medical schools enroll residents). )  The Government, however, argues that the residents applied to a residency program through the National Resident Matching Program ("NRMP") and therefore the

enrollment at the University was meaningless. (Def.'s Second Opp'n Mem. at 13.) But, "the NRMP is not an application service or job placement service. Applicants must apply directly to residency programs in addition to registering for the Match." See http://www.nrmp.org/res_match/index.html (last visited March 28, 2008). Consequently, applicants have to apply to the residency programs of their choice using the method accepted by the program. Most programs at the University participate in the Electronic Residency Application Service ("ERAS"), a service that transmits residency applications, letters of recommendation, medical-student-performance evaluations, transcripts, and other supporting credentials to the residency programs through the Internet. (See Pahl Decl. Tab 9 at 97-98; see also http://www.aamc.org/audienceeras.htm (last visited March 28, 2008).) The University reviews the applications; applicants are then interviewed by the program directors and faculty physicians. (See, e.g., Carlson Aff. Ex. 9 at 58-59; Ex. 12 at 64-65, 93; Ex. 17 at 52; Ex. 18 at 44-45; Ex. 25 at ¶ 4; Ex. 19 at ¶ 3; Ex. 20 at ¶ 3; Ex. 26 at ¶ 4.) Indeed, the program directors have the ultimate authority in determining which applicants it intends to admit and in what order of preference. (Id. Ex. 20 at ¶ 3.) The University's decision and the applicant's preference are then "matched." (Pl.'s Reply Mem. at 12-13, n.20.) Finally, residents paid tuition of $1,200 for the relevant time period, which was deducted from the residents' paychecks during their academic year.[15] (Carlson Aff. Ex. 13 at 16, 29, 36; Ex. 18, Govt. Ex. 64 at UM 03099.) Thus, the residents were clearly enrolled at the University.

---

[15] The Government argues that the residents were not enrolled at the University because the

### 2. "Regularly Attending Classes"

The crux of the Government's argument is that the residents were not students who regularly attended classes, but were physicians who worked in hospitals. (Def.'s Second Opp'n Mem. at 13-29.) The record, however, establishes that the clinical setting is the classroom for residents. Indeed, "[t]he transition between medical school and residency is a transition from more book learning to more hands-on learning" and even though residents have received medical degrees and have knowledge about illnesses and treatments, they have not fully learned how to safely perform medical procedures on patients until after they have completed their residency program. (See Carlson Aff. Ex. 10 at 83; Ex. 18 at 48.) Simply put, the educational aspect of the University's residency program necessarily includes learning how to safely care for patients. Thus, the principal classroom for residents must be the clinical setting because they learn by caring for patients in a medical specialty under the supervision of a University-faculty member.

Each year, residents had 13 four-week blocks called "rotations," a term often used interchangeably with "course."[16] (Id. Ex. 3 at 29-30; Ex. 4 at 16; Ex. 6 at 21.) Residency courses are listed in the University's electronic catalog, which describes the learning

---

hospitals paid the residents' purported tuition by reimbursing the University for the residents' stipends. (Def.'s Second Opp'n Mem. at 19-23.) That the hospital reimbursed the University for the residents' stipends does not mean that the residents were not enrolled in a residency program at the University. See Mayo I, 282 F. Supp. 2d at 1002, 1015-16 (finding that residents were enrolled despite the fact that they did not pay tuition to participate in a residency or fellowship program.) Regardless, the other factors support a finding that the residents were enrolled at the University.

[16] Program coordinators at the University registered residents for courses and the residents received credits. (Carlson Aff. Ex. 5 at 18, 26, 28; Ex. 11 at 8, 12, 14, 17-19; 22; Ex. 17 at 65.)

objectives of the program, the required conferences and reading, and the subject matter to be covered in a residency program through a schedule of rotations. (Id. Ex. 11 at 18-19; see, e.g., http://www.medres.umn.edu/medres/program/rotations/gastroenterology.html (last visited March 28, 2008).) Rotations covered a variety of medicine-related topics and each had a written curriculum. (See, e.g., Carlson Aff. Ex. 4 at Govt. Ex. 23; Ex. 6 at UM 06013-6112.) Furthermore, residents regularly attended conferences and lectures throughout the week. (Id. Ex. 1 at 13; Ex. 2 at 15, 34, 59; Ex. 3 at 71-72; 83; Ex. 4 at 46-55, 63-64, Govt. Ex. 35 at UM 022967 (conferences include Morning Report with Faculty, Morbidity and Mortality, Weekly Grand Rounds, Core Conferences, Journal Club, and Seminars).) Residents also took exams, including an "in-training" exam to identify areas of weakness, and other tests while on certain rotations. (Id. Ex. 2 at 52; Ex. 3 at 37-38; Ex. 4 at 18-19; Ex. 6 at 72-74; Ex. 10 at 69-70; Ex. 18 at 18-19.) A resident's performance in each subject-matter rotation was evaluated, graded, and recorded on the resident's transcript.[17] (Id. Ex. 11 at 6-7, Govt. Ex. 139 at UM 2940-42; Ex. 4, Govt. Ex. 67 at UM 06725.) Based on the foregoing, the Court finds that the University residents were "regularly attending classes."

---

[17] The University may require a resident to repeat some or all of a rotation if the student failed to perform adequately during a rotation. (Carlson Aff. Ex. 6 at 76-77; Ex. 15 at 8-11; Ex. 17 at 66.) In general, the University considers residency a pass-fail endeavor. (Id. Ex. 12 at 19; Ex. 11 at 19-21.) Upon completion of the residency program, residents received diplomas or certificates of completion from the University at a graduation ceremony. (Id. Ex. 3 at 45-46; Ex. 10 at 80-81; Ex. 11 at 8-9.)

15

### 3. "Incident to and for the Purpose of Pursuing a Course of Study"

The Government argues that the residents' services were not "incident to and for the purpose of pursuing a course of study" because the hospitals paid the residents to work long hours taking care of patients. (Def.'s Second Opp'n Mem. at 27-28.) It further contends that the "residents provided patient-care services when education was minimal or nonexistent." (Id. at 28.) The Court disagrees. The primary purpose of the University's residency program is educational. (See, e.g., Carlson Aff. Ex. 19 at 94 ("residency program is there to meet the educational needs of the resident, not the service needs of the hospitals"); Ex. 7 at 99, 116; Ex. 8 at 57-58, Govt. Ex. 155 at 1, 10-11.) Residents spent the majority of their time learning how to care for patients under the watchful eye of a faculty physician. (Id. Ex. 3 at 30, 83; Ex. 12 at 36-37.) Indeed, the clinical setting was the principal classroom for residents because this was where they learned how to provide patient care. As discussed above, residents applied to and enrolled in residency programs at the University. The residents' primary purpose for enrolling in a residency program at the University was educational – to gain the knowledge and skill necessary to practice in a specialty area of medicine. (See, e.g., id. Ex. 3 at 30-31.) The goal of providing educational experiences to the residents in a clinical setting is precisely the purpose behind the affiliation agreements. (See, e.g., Pahl Decl. Tab 2, Govt. Ex. 114.) Further, the record establishes that the hospitals understood that the residents were there to learn because the faculty physicians "could [have] easily provide[d] [patient-care] services in a more efficient and quicker fashion if they didn't

have residents." (Carlson Aff. Ex. 9 at 28.) Accordingly, the Court finds that the patient-care services provided by residents in the University's residency programs were incidental to and for the purpose of pursuing a course of study in postgraduate medical education.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. No. 25) is **GRANTED IN PART** as follows:

1. Plaintiff's Motion is **GRANTED** as to Count One of its Complaint; Plaintiff is entitled to a refund of FICA taxes withheld and paid in the amount of $1,094,803.92, plus interest; and

2. Counts Two, Three, and Four of Plaintiff's Complaint are **DISMISSED WITHOUT PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  April 1, 2008

                                                                        s/Richard H. Kyle
                                                                        RICHARD H. KYLE
                                                                        United States District Judge